## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WEAVER'S COVE ENERGY, LLC,<br>Weaver's Cove Energy, LLC<br>Weaver's Cove Energy<br>1 New Street<br>Fall River, MA 02720 | ) ) ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| vs. | ) ) ) |
| THE UNITED STATES OF AMERICA,<br>DEPARTMENT OF THE INTERIOR, acting<br>by and through DIRK A. KEMPTHORNE,<br>Secretary of the Interior,<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington DC 20240 | ) ) ) ) ) ) ) ) ) |
| THE UNITED STATES OF AMERICA, FISH<br>AND WILDLIFE SERVICE, acting by and<br>through H. DALE HALL, Director of the Fish<br>and Wildlife Service, and<br>(same address as above) | ) ) ) ) ) ) |
| THE UNITED STATES OF AMERICA,<br>NATIONAL PARK SERVICE, acting by and<br>through MARY A. BOMAR, Director of the<br>National Park Service,<br>(same address as above) | ) ) ) ) ) ) ) |
| *Defendants.* | ) ) |

Case No. _____

## COMPLAINT FOR JUDGMENT AND RELIEF PURSUANT TO
## THE DECLARATORY JUDGMENT ACT AND
## THE ADMINISTRATIVE PROCEDURE ACT

Comes now Plaintiff, Weaver's Cove Energy, LLC ("Weaver's Cove"), by and through its

attorneys, Baker Botts L.L.P., and by this Complaint alleges the following:

1.    In order to ease the growing shortage of gas supply to New England, in 2003 Weaver's Cove requested authorization from the Federal Energy Regulatory Commission ("FERC"), under Section 3 of the Natural Gas Act, 15 U.S.C. § 717b ("NGA"), to construct and operate a liquefied natural gas ("LNG") marine receiving terminal and storage facility near the mouth of the Taunton River in Fall River, Massachusetts.

2.    In addition to seeking authorization from the FERC under the NGA, Weaver's Cove also sought authority from the United States Army Corps of Engineers ("USACE") under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344, to dredge portions of the federal navigation channel in Massachusetts and Rhode Island. That application is being held up due to the regulatory delays that are the subject of this complaint.

3.    In 2005, the FERC, which is the federal agency vested with exclusive siting authority for LNG import terminals under the NGA, determined that Weaver's Cove's terminal site on the lower Taunton River is in the public interest, and approved the project subject to certain conditions.

4.    This lawsuit challenges two determinations made by the U.S. Department of the Interior ("DOI")—through two of its agencies, the National Park Service ("NPS") and the Fish and Wildlife Service ("FWS")—pursuant to the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.* ("WSRA"), that adversely affect Weaver's Cove's ability to commence its project, which has been conditionally approved by the FERC.

5.    The first determination was a July 5, 2005, letter to the FERC stating, without legal or factual basis, that dredging operations in the Taunton River required to implement the Weaver's Cove project could not be approved ("July 5 Determination") as being in compliance with the Wild and Scenic River Act. In response, the FERC ordered Weaver's Cove, as one of

the conditions its FERC approval, to secure DOI approval for dredging prior to construction. *See* ¶¶ 39-40, *infra*.

6.    The second determination was a February 7, 2006 letter to the USACE stating that dredging should not be approved by the USACE without imposing unreasonably restrictive and scientifically unsupported time-of-year limitations on when dredging operations could be conducted ("February 7 Determination"). In response, the USACE advised Weaver's Cove that unless the position in the February 7 Determination was changed, USACE could not issue a permit, or if it did, it had no choice but to adopt the dredging restrictions described in that letter.

7.    The DOI based those determinations on its view that no agency can issue permits, licenses, or otherwise support the dredging project because it would have a substantial adverse effect on the Taunton River's potential designation as a "Wild and Scenic River" under the WSRA. Those determinations, however, contravene the express text of the WSRA, exceed the DOI's statutory authority, are unfounded in science or fact, and are otherwise arbitrary and capricious.

8.    The DOI's determinations impose actual, immediate injury on Weaver's Cove. The DOI's determinations in this case have, and were intended to have, the effect of preventing Weaver's Cover from: (a) fulfilling the conditions of FERC's approvals; and (b) obtaining a permit from the USACE to perform necessary dredging of a federal navigational channel to permit LNG vessels to deliver LNG to the FERC-approved terminal. The relief requested in this Complaint is indispensable if Weaver's Cove is ever to be able to satisfy the conditions of the FERC orders approving the project and to obtain necessary permits and licenses, including the USACE permit.

## PARTIES

9.    Plaintiff Weaver's Cove is a limited liability company organized and incorporated under the laws of the State of Delaware, with its principal place of business located in Fall River, Massachusetts.  Weaver's Cove proposes to develop an LNG marine receiving and storage terminal in Fall River, Massachusetts.

10.    Defendant DOI is a Department of the United States government located in Washington, D.C.  Defendant Dirk Kempthorne is the Secretary of the Interior.

11.    Defendant FWS is a service within the DOI, headquartered in Washington, D.C. H. Dale Hall is the Director of the FWS.

12.    Defendant NPS is a service within the DOI, headquartered in Washington, D.C. Mary A. Bomar is the Director of the NPS.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706, because this case arises under federal law and calls for review of the final agency action of a federal agency.

14.    This Court is empowered to provide declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"), and Rule 57 of the Federal Rules of Civil Procedure.

15.    This Court is further empowered to provide relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

16.    Venue is proper under 28 U.S.C. § 1391(b)(2), because the Defendant agencies are located in this district; a substantial part of the management of Defendant agencies is located in this district; and the actions, inactions or omissions giving rise to the claim occurred in this

district.  Venue also properly lies in this forum pursuant to 5 U.S.C. § 703, because it is a proper

legal action filed in a court of competent jurisdiction.

## FACTUAL AND STATUTORY BACKGROUND

### The Wild and Scenic Rivers Act

#### *The WSRA Framework*

17.    The WSRA was enacted to "protect[] for the benefit and enjoyment of present and

future generations" certain selected rivers and environments that may "possess outstandingly

remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar

values". 16 U.S.C. § 1271.

18.    A river may fall within the WSRA's coverage in one of two ways:  *First*,

Congress may designate a river, or a portion of a river, *for inclusion* in the list of wild and scenic

rivers system rivers.  *Id.* § 1274.  *Second*, Congress may designate a river, or portion of a river,

*to be studied* by the Secretary of the Interior (or in some instances not relevant here, by the

Secretary of Agriculture) for *possible future inclusion* in the statutory list of wild and scenic

rivers system rivers (hereinafter a "study river").  *See id.* §§ 1275, 1278; *see also id.* § 1276(a)

(listing study rivers).

19.    This controversy involves not a project within a study river but, rather a project

on a river segment located *downstream* of a study river.  *See* ¶¶ 26-29, *infra*.

20.    The WSRA provides that when Congress designates a river (or a portion thereof)

as a study river, the Secretary of the Interior (or in some instances the Secretary of Agriculture)

"shall study and submit to the President reports on the suitability or nonsuitability for addition to

the national wild and scenic rivers system of rivers . . . ."  16 U.S.C. § 1275(a).  Upon receipt of

the Secretary's report, "[t]he President shall report to the Congress his recommendations and

proposals with respect to the designation of each such river . . . ."  *Ibid.*

21.    Upon receipt of the report of the President's recommendation, Congress can then decide whether to designate the river, or a portion thereof, as a wild and scenic river. *See id.* § 1278(b)(iii).

22.    The WSRA also establishes procedural and substantive limits on government action that may impact such study rivers. Among other things, for specified periods (including the three years following a river's designation as a study river), the WSRA precludes any agency from assisting — by license, loan, or otherwise — the development or construction of any "water resources project" that has been found to have a "direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval." 16 U.S.C. § 1278(b).

### *Congress Designates The Upper Taunton River for Study*

23.    In 2000, Congress designated an upstream portion of the Taunton River for study for possible inclusion in the system of wild and scenic rivers. *See* Taunton River Wild and Scenic River Study Act of 2000, Pub. L. 106-318 § 3, 114 Stat. 1278 (Oct. 19, 2000) ("Taunton River Study Act").

24.    Congress limited the portion of the river designated for study to "[t]he segment downstream from the headwaters, from the confluence of the Town River and the Matfield River in Bridgewater to the confluence with the Forge River in Raynham, Massachusetts." *Id.* § 3(2), *amending* 16 U.S.C. § 1276(a). For the purposes of this Complaint, this portion of the Taunton River designated for study is referred to as "the Upper Taunton River."

25.    Pursuant to the WSRA, this designation of the Upper Taunton River as a study river gave rise to certain protections that would apply to the Upper Taunton River for a period of three complete fiscal years, through fiscal year 2004. *See* ¶ 22, *supra*, ¶¶ 78-33, *infra*.

26.     Congress did not designate the remaining, downstream portion of the Taunton River ("the Lower Taunton River") for study as a potential wild and scenic river system river. *See ibid.*

27.     Weaver's Cove's FERC-approved LNG Terminal, and the proposed USACE-supervised dredging, will be confined to the *Lower* Taunton River, approximately *sixteen miles downstream* of the lowest reaches of the Upper Taunton River, the study river.

28.     Whereas the portion of the river designated for study (and not affected by the Weaver's Cove project) arguably may have some of the qualities of a wild and scenic river, the Lower Taunton River in stark contrast has longstanding been a highly industrialized and developed area, with an active port with a long history of and still dedicated to industrial use, exhibiting nothing characteristic of a wild or scenic river.

29.     The Secretary of the Interior has not submitted to the President a report on the Upper Taunton River under Section 1275(a), as described *supra* ¶ 20.  Likewise, the President has not submitted to the Congress any report of his recommendations and proposals regarding the Upper Taunton River under Section 1275(a), as described *supra* ¶ 20.[1]

**The Weaver's Cove Project**

*The Project's Parameters*

30.     In response to the well-recognized, intensifying shortage of supplies of natural gas in New England, and to meet the future needs of natural gas consumers and electric power

---

[1] Weaver's Cove notes that on July 25, 2007 the NPS first published its "Draft Report and Environmental Assessment" that was supposed to be completed by 2003.  That draft offers no indication of whether a final report will eventually be prepared, or whether it will ultimately be approved by the Secretary and transmitted to the President pursuant to Section 1275(a).  Nor does the draft provide any indication of whether the President would adopt such a final report and transmit it to the Congress pursuant to Section 1275(a).

generators in that region, Weaver's Cove proposes to construct and operate an LNG marine import, storage vaporization terminal facility in Fall River, Massachusetts.

31.    LNG is natural gas that has been chilled to -260° F to form a liquid that has one six-hundredth the volume of natural gas in its gaseous state. Converting natural gas to liquid facilitates the efficient transportation of gas from distant gas producing areas to consumers in the United States, via oceangoing tankers. When LNG is returned to its gaseous state through a warming process known as "vaporization," it is essentially indistinguishable from natural gas currently used to heat homes and generate electricity in this country.

32.    Weaver's Cove proposes to receive LNG from specially-designed ships at the terminal, store it in a specially-designed storage tank, convert the LNG back to natural gas through vaporization, and then transport this gas to customers through the existing natural gas pipeline grid.

33.    As currently proposed to and approved by the FERC, *see* ¶¶ 37-38, *infra*, LNG vessels would travel between international waters and the LNG terminal at Fall River by transiting the federal navigational channel in Narragansett Bay, Mount Hope Bay, crossing the border between Rhode Island and Massachusetts, and then up the Lower Taunton River for about two miles to the terminal site.

34.    The site was formerly used for about a decade as an oil refinery beginning in 1920, and then for an additional six decades as a marine receiving terminal for liquid petroleum products delivered by ships and barges for storage in multiple, large fuel tanks located on the site.

35.    Weaver's Cove proposes to perform, at its own expense, "maintenance" dredging in the existing federal navigation channel in Rhode Island and for a short distance— approximately two miles—on the lower Taunton River to return the channel to its authorized

depth of 35 feet. "Improvement" dredging will then be conducted to increase the channel depth to 37 feet. Weaver's Cove also proposes to perform, at its own expense, "maintenance " dredging to restore the existing federal "turning basin" (*i.e.*, where the ships are turned around) to 35 feet in depth, and to conduct "improvement" dredging to expand the size of the turning basin from approximately 33 acres to approximately 52 acres and deepen it to 41 feet. This vessel turning basin is immediately adjacent to the proposed LNG terminal site along the shores of the Taunton River. Such dredging will facilitate LNG vessel transit to and from the proposed LNG terminal at Fall River and will remain available for use by other shipping interests.

36.    No aspect of the Weaver's Cove project would occur in the area of the study river and, in fact, all activities associated with the project will occur at least *sixteen miles* downstream from the Upper Taunton River study area.

***The FERC's Approval Of The Weaver's Cove LNG Project***

37.    The FERC found Weaver's Cove's proposed project to be in the public interest, and authorized its construction and operation under Section 3 of the Natural Gas Act, 15 U.S.C. § 717b. *See* Order Granting Authority Under Section 3 Of The Natural Gas Act And Issuing Certificate, *Weaver's Cove Energy, LLC et al.*, 112 F.E.R.C. ¶ 61,070 (2005) ("*Initial Order*"); Order On Rehearing, *Weaver's Cove Energy, LLC et al.*, 114 F.E.R.C. ¶ 61,058 (2006) ("*Order on Rehearing*").[2]

---

[2] Various parties have petitioned for review of the FERC orders in the First Circuit. *City of Fall River v. FERC*, No. 06-1203 (1st Cir. filed Jan. 26, 2006); *Conservation Law Found., v. FERC*, No. 06-1204 (1st Cir. filed Jan. 26, 2006); *Miozza v. FERC*, No. 06-1220 (1st Cir. filed Jan. 30, 2006). While petitioners have identified various grounds on which they challenge the FERC decisions, the issues involved in this Complaint cannot be resolved in the appeals before the First Circuit. This Complaint challenges not the validity of the FERC's decisions (including the conditions attached to the FERC's certification of the project), but those actions of other governmental bodies that unlawfully impair Weaver's Cove's ability to satisfy those conditions or to secure a permit from the USACE.

38.    The FERC's approval was granted subject to certain customary conditions, including the receipt of certain permits and approvals from other federal agencies. Those conditions included the following:

> Prior to construction, Weaver's Cove shall file with the Secretary [of FERC] documentation of concurrence from the U.S. Department of the Interior that the project would not have a substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River (WSR) and that the project would be consistent with the Wild and Scenic Rivers Act if the Taunton River were designated a Wild and Scenic River.

See Initial Order, 112 F.E.R.C. ¶ 61,070 at Appx. B ¶ 25.

**The U.S. Army Corps of Engineers**

39.    Because the project proposes to dredge portions of the federal navigational channel in the Lower Taunton River to permit the transit of LNG vessels to the proposed terminal, Weaver's Cove submitted on March 18, 2004 its applications for USACE permits under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344.[3]

40.    The USACE application process has included extended periods for notice and comment by interested parties, including other federal agencies. See Revised Public Notice and Announcement of Public Hearing, USACE (Nov. 1, 2005) (available at http://www.nae.usace.army.mil/reg/weaver2pn.pdf); Revised Public Notice to Extend Comment Period, USACE (Dec. 27, 2005) (extending the comment period to Feb. 8, 2006) (available at http://www.nae.usace.army.mil/reg/WeaversCoveEnergyLLC.pdf). See also Weaver's Cove

---

[3]  On March 17, 2005, Weaver's Cove amended its application to include Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972, in light of a subsequent decision to undertake offshore ocean disposal of dredged materials at a site approved by the U.S. Environmental Protection Agency, in lieu of depositing those materials upland at the LNG terminal site.

*LNG    Facility    Permit    Application    Public    Comments,*    USACE,    at
http://www.nae.usace.army.mil/projects/ma/weaverscove/weavercomments.htm    (publishing
comments received).

## The Challenged Determinations

41.    The WSRA, for specified periods following the designation of a river as a "study
river," requires the Secretary of Interior to determine whether a proposed water resources project
"would have a direct and adverse effect on the values for which [a study] river may be
designated" a "Wild and Scenic River." 16 U.S.C. § 1278(b). "No department or agency of the
United States," including USACE, may "assist by loan, grant, license, or otherwise in the
construction of any water resources project" if the DOI determines that the project would have
such a direct and adverse effect. *Id.*

42.    Defendants have made two determinations pursuant to Section 1278(b) with
respect to the Weaver's Cove project, each of which has had an immediate and ongoing adverse
effect on Weaver's Cove's ability to obtain the necessary USACE dredging permit, and thereby
satisfy a condition to its FERC authorization.

### *Determinations at FERC*

43.    On September 17, 2004, in response to FERC's Draft Environmental Impact
Statement ("DEIS") for the Weaver's Cove project, the Secretary of the Interior advised the
FERC of its preliminary determination that the Weaver's Cove project would allegedly have a
substantial adverse impact to fishery resources in the Taunton River. (The September 17, 2004
letter is attached as Exhibit A.) The DOI asserted that "many anadromous fish species[4] . . . use
all or some of the Taunton River for passage, spawning, nursery and forage," and that "the

---

4 "Anadromous" fish are fish that "ascend[] rivers from the sea at certain seasons for breeding."
WEBSTER'S THIRD INT'L DICTIONARY 76 (1971).

dredging for this project will have an unacceptable impact to fishery resources in the Taunton River [which] can be mitigated partially by instituting time-of-year restrictions."

44.    The September 17, 2004 letter contained no scientific or other evidence supporting those conclusory assertions, and it failed to distinguish alleged impacts on the Upper Taunton River from alleged impacts on the Lower Taunton River.

45.    On July 5, 2005, the Office of the Secretary of the Interior sent its July 5 Determination to the FERC in response to the FERC Staff's Final Environmental Impact Statement ("FEIS"), which had been prepared in cooperation with other federal agencies, including the USACE. *See* Exhibit B.

46.    The July 5 Determination concluded, similarly to the DOI's September 17, 2004 conclusion, that the Weaver's Cove project is "[in]compatible with the Taunton River's potential designation as a Wild and Scenic River."

47.    The July 5 Determination incorrectly identified the *entire* Taunton River as the study river, when in fact only the Upper Taunton River has been so designated by Congress.

48.    The July 5 Determination also stated that "in the absence of satisfactory fishery resource protection, we will not be able to provide the statutorily required affirmative statement of no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System." It continued, "[w]e must therefore disagree with FERC's tentative conclusion that the proposed project is compatible with the Taunton River's potential designation as a Wild and Scenic River. Based upon our understanding of the project as currently proposed in the FEIS, the NPS would not be able to find such compatibility." July 5 Determination at 4.

49.    The July 5 Determination contained no scientific or other evidence to support the conclusory assertion that the Weaver's Cove project would adversely affect the Upper Taunton River, the designated study river.

50.    The July 5 Determination contained no legal justification or support for asserting jurisdiction, under the WSRA, over the Lower Taunton River, where the Weaver's Cove project is located.  The Lower Taunton River has not been designated by Congress as a study river.

51.    The July 5 Determination was also premised on the (incorrect) conclusion that the Weaver's Cove project is a "water resources project" for the purposes of the WSRA.  *See* 16 U.S.C. § 1278(b) (limiting its restrictions to "water resource projects").

52.    In response to DOI's determinations, in its order approving the Weaver's Cove project, FERC conditioned construction approval on DOI approval under the WSRA, as quoted *supra* ¶ 38.  See *Initial Order*, 112 F.E.R.C. ¶ 61,070 at Appx. B ¶ 25.

53.    The FERC, by contrast, concluded that the Weaver's Cove project would *not* have a substantial adverse effect on the Taunton River's potential designation as a wild and scenic river:

> The [Final Environmental Impact Statement prepared by FERC staff and adopted by the FERC] addressed the Wild and Scenic River Program and the impact of the LNG terminal and the western lateral pipeline that would run beneath the Taunton River, and concluded that *construction and operation of the proposed project would not have an adverse effect* on the Taunton's River's potential designation as a wild and scenic river.

*Order on Rehearing*, 114 F.E.R.C. at ¶ 117.

### Determinations at USACE

54.    On September 22, 2004, the FWS sent (on behalf of the DOI) a four-page letter to the USACE advising the USACE of its preliminary determinations under the WSRA.  Similar to the assertions made by the DOI in its September 17, 2004, letter to the FERC, the FWS asserted

that "the dredging for [the Weaver's Cove] project will have an unacceptable impact to fishery resources in the Taunton River. These impacts can be mitigated partially by instituting time-of-year restrictions on the dredging" ("September 22 letter") (attached as Exhibit C). In the September 22 letter, the FWS "recommend[ed] that a permit for this project not be issued at this time."

55.    The September 22 letter contained no scientific or other evidence supporting the conclusory assertion that dredging in the Lower Taunton River would impact the upstream migration of anadromous fish, and otherwise is without any stated basis for its conclusions.

56.    On February 7, 2006, the FWS and the NPS (on behalf of the DOI) advised the USACE of its final determination. *See* Exhibit D.

57.    The February 7 Determination asserted authority under the WSRA, declaring that the "statutorily required resource protections of the Wild Scenic Study legislation . . . apply to the protection of anadromous fish resources" in the Taunton River, and that "to comply with the required protection standard, no diminishment of this resource value may be allowed." *Id.* at 2.

58.    The February 7 Determination stated that, "[a]s currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River. Without time-of-year restrictions for both upstream and downstream migrations, we continue to recommend that this application be denied." *Id.* at 4.

59.    The February 7 Determination "recommend[ed] a time-of-year restriction of March 1 – July 31 for the protection of the incoming anadromous fish migration." *Id.* at 2. It further "recommend[ed] a time-of-year restriction of July 1 through October 31" to "adequately protect the downstream migration" of anadromous fish. *Id.*

60.    When added to other time-of-year restrictions on dredging imposed by the FERC, the sum of all asserted dredging restrictions would only allow dredging during the period

between November 1 and January 15, effectively rendering the dredging for the Weaver's Cove project a practical impossibility because it would take nearly a decade to complete, and at extraordinary additional expense.

61.    The February 7 Determination's assertion that the Weaver's Cove project would adversely affect the anadromous fish resources in the Upper Taunton River is not supported by any scientific or other evidence in the record.

62.    The February 7 Determination to seek to limit dredging to but ten weeks a year is arbitrary and not supported by any scientific or other evidence in the record.

### *Weaver's Cove Suffers Immediate And Irreparable Injury*

63.    Defendants' unsupported determination set forth in the February 7 Determination—*i.e.*, that the Weaver's Cove dredging is a water resources project that will have a direct and adverse effect on the values of a study river, *see* ¶ 57, *supra*—is being used unlawfully as a basis to obstruct Weaver's Cove from obtaining, from any "department or agency of the United States," any "assist[ance] by loan, grant, license, or otherwise in the construction of [the] project." 16 U.S.C. § 1278(b).

64.    Specifically, Defendants' unsupported and unlawful determinations prevent Weaver's Cove from satisfying Condition No. 25 of the FERC's *Initial Order* as set forth in Paragraph 38, *supra*.

65.    Furthermore, Defendants' unsupported and unlawful determinations prevent the USACE from issuing dredging permits unless the USACE includes in those permits the highly restrictive and practically unworkable DOI-proposed dredging restrictions.

66.    In sum, Defendants' determinations have prevented and continue to prevent Weaver's Cove from obtaining the necessary permits and otherwise fulfilling the conditions and

statutory prerequisites to the FERC's approval of the Weaver's Cove project, notwithstanding the FERC's determination that the project is in the public interest.

## COUNT I
### (Declaratory Judgment Act)

*The Weaver's Cove Project Is Not A "Water Resources Project"*

67.    Plaintiff realleges and reincorporates by reference the allegations in Paragraphs 1 through 66, above.

68.    Defendants' assertion of authority under the WSRA in this case is in excess of jurisdiction and contrary to applicable law.

69.    The WSRA prohibitions at issue in this matter, and the Secretary of Interior's authority to issue determinations that preclude other federal agencies and departments from "assist[ing]" projects "by loan, grant, license or otherwise," apply only to "water resources projects." 16 U.S.C. § 1278(b).

70.    A "water resources project" is defined as "any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act (41 Stat. 1063) as amended, or other construction of developments which would affect the free-flowing characteristics of a Wild and Scenic River or Study River." 36 C.F.R. § 297.3. "Free-flowing" is defined as "existing or flowing in natural condition without impoundment, diversion, straightening, riprapping, or other modification of the waterway." *Ibid.*

71.    The Weaver's Cove project, and the proposed dredging of the federal channel, is not a "dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act" within the meaning of the WSRA or implementing regulations.

72.    The Weaver's Cove project, and the proposed dredging, do not constitute "construction or developments which would affect the free-flowing characteristics of a Wild and Scenic River or Study River" within the meaning of the WSRA or implementing regulations. In

fact, the Weaver's Cove dredging project is sixteen miles *downstream* from the study area and therefore could not possibly "result in any change in the free-flowing characteristics of" the study river, *i.e.*, the Upper Taunton River. Likewise, the dredging project does not "impound[], diver[t], riprap[], or otherwise modify" the Upper Taunton River. *Ibid.*

73.    Because the Weaver's Cove project would not "result in a change of the free-flowing characteristics" of the Upper Taunton River, it lawfully cannot be deemed to be a "water resources project" under the WSRA, and therefore is not subject to the prohibitions of 16 U.S.C. § 1278(b). 36 C.F.R. § 297.3.

74.    In the July 5 and February 7 Determinations in which Defendants assert controlling authority under the WSRA, Defendants did not provide any record evidence demonstrating that the Weaver's Cove project would affect the free-flowing characteristics of the Upper Taunton River.

75.    Weaver's Cove therefore prays this Court to declare that the DOI's assertions in the July 5 and February 7 Determinations that Weaver's Cove's dredging project is a "water resources project" under the WSRA is contrary to the WSRA, and that the DOI therefore lacks the authority under the WSRA to dictate the terms or conditions of dredging to the USACE.

76.    Declaratory relief is proper in this case because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

## COUNT II
### (Declaratory Judgment Act)

*Defendants' Actions Are Contrary To Law,*
*Because The Time-Limited Protections Of The WSRA Lapsed Years Ago*

77.    Plaintiff realleges and reincorporates by reference the allegations in paragraphs 1 through 76 above.

78.    The WSRA prohibitions against licensing projects that would impact a study river, 16 U.S.C. § 1278(b), apply only during three discrete time periods that have either expired or were never established in the first place.

79.    First, the prohibitions apply "for a three complete fiscal year period following [designation of the] river for potential addition to the national wild and scenic rivers system"— that is, three years from the river segment's designation as a study river. *Id.* § 1278(b)(i).

80.    As discussed above (¶ 23,), Congress designated the Upper Taunton River for study in the Taunton River Study Act on October 19, 2000. The three-fiscal year period for study designation and associated prohibitions thus commenced partway through fiscal year 2001 (*i.e.*, between October 1, 2001, and October 1, 2002), and it therefore ended at the end of fiscal year 2004 (*i.e.* on September 30, 2004). *See* 31 U.S.C. § 1002 (defining "fiscal year"). Accordingly, the time limit specified in Section 1278(b)(i) has expired as to the Upper Taunton River.

81.    Second, the WSRA prohibitions can also apply "during such interim period from *the date a report is due* and the time a report is actually submitted to the Congress". 16 U.S.C. § 1278(b)(ii) (emphasis added). Because Congress did *not* elect to set a due date for the President's report to Congress in enacting the Taunton River Study Act, the prohibitions and requirements in Section 1278(b)(ii) of the WSRA never applied to the Upper Taunton River.

18

82.    Third, the WSRA prohibition can also apply "during such additional period thereafter as, in the case of any river the report for which is submitted to the President and the Congress, is necessary for congressional consideration thereof . . . , which additional period, however, shall not exceed three years in the first case and one year in the second." *Id.* § 1278(b)(iii).

83.    There is no report from the President currently under consideration in the Congress, and there was never any recommendation from the President to the Secretary of the Interior for inclusion of the Upper Taunton River in the national wild and scenic rivers system. Accordingly, Section 1278(b)(iii) does not apply to the Upper Taunton River.

84.    In sum, all of the time periods during which the requirements and prohibitions set forth in Section 1278(b) apply have either expired or are otherwise inapplicable to the Upper Taunton River. It follows *a fortiori* that Defendants cannot lawfully impose such prohibitions and requirements on Weaver's Cove's activities on the *Lower* Taunton River, which Congress *never* designated for study.

85.    Weaver's Cove therefore prays this Court to declare that the DOI's July 5 and February 7 Determinations (along with its associated request that the FERC withhold unconditioned approval or that the USACE impose extremely restrictive and practically unworkable dredging restrictions based on the premise that Section 1278(b) permits them to require such a result) are unlawful, in excess of agency jurisdiction, and without legal support.

86.    Relief under the Declaratory Judgment Act is warranted in this case because there is no more action to be taken by Defendants and there are no administrative remedies to be pursued.

87.    Relief under the Declaratory Judgment Act is warranted in this case, because such relief would promote the Act's "laudable policy of providing speedy adjudication of legal

19

disputes to remove uncertainty and insecurity from legal relationships." *Wilderness Soc'y v Morton*, 479 F.2d 842, 887 (D.C. Cir. 1973).

88.    Declaratory relief is proper in this case because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

## COUNT III
### (Administrative Procedure Act)

### *Defendants' Actions Were Arbitrary And Capricious*

89.    Plaintiff realleges and incorporates by reference the allegations in the Paragraphs 1 through 88, above.

90.    With respect to river segments such as the Lower Taunton, which are located "below or above a potential wild, scenic or recreational river area," the WSRA does not permit the DOI to place conditions on or prohibit any developments that "will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area on the date of designation of a river for study." 16 U.S.C. § 1278(b).

91.    Neither the September 17 letter nor the July 5 letter specifically concluded that the Weaver's Cove project will "invade the area" or "diminish the scenic, recreational, and fish and wildlife values" present in the Upper Taunton on October 19, 2000.

92.    Even if, contrary to the plain words of the Taunton River Study Act, the Lower Taunton were itself a protected study river, the Weaver's Cove project would not be unlawful under the WSRA unless Defendants would have concluded that the project "would have a direct and adverse effect on the values for which such river might be designated." 16 U.S.C. § 1278(b).

93.    Neither the September 17 letter nor the July 5 letter specifically concluded that the Weaver's Cove project will "have a *direct* and adverse effect on the values for which the river might be designated."

94.    Because Defendants' decisions failed to "consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made," and have "relied on improper factors," their actions are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228, 2007 WL 1574609 at *6 (D.C. Cir. June 1, 2007) (brackets omitted). Those decisions should, therefore, be vacated.

## COUNT IV
### (Administrative Procedure Act)

*Defendants' Actions Are Unsupported By Substantial Evidence*

95.    Plaintiff realleges and incorporates by reference the allegations in the Paragraphs 1 through 94, above.

96.    The APA requires that actions or findings of federal agencies be supported by substantial evidence in the record. 5 U.S.C. § 706(2)(E).

97.    Even if the DOI made the requisite findings (as discussed in Count III, *supra*) in support of the July 5 and February 7 Determinations that the Weaver's Cove project would "invade the area or diminish the scenic or recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area on [October 19, 2000]," or "would have a direct and adverse effect on the values for which such river might be designated [for inclusion as a wild and scenic river]," such findings still are unlawful under the APA as they lacked substantial evidence to support them.

98.    Defendants have proffered no record evidence supporting their conclusions that the Weaver's Cove project would "invade the area or diminish the scenic or recreational, and fish

and wildlife values present in the potential wild, scenic or recreational river area on [October 19, 2000]," or "would have a direct and adverse effect on the values for which such river might be designated [for inclusion as a wild and scenic river]."

99.     Therefore, Defendants' actions also would be—if not already arbitrary and capricious for the reasons discussed above—unsupported by substantial evidence in the record, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that this Court:

(A)     Declare that Defendants do not have jurisdiction under the WSRA to impose on the USACE any conditions or other edicts as to the terms and conditions of the dredging permits requested by Weaver's Cove;

(B)     Declare that even if Defendants once had jurisdiction over the Lower Taunton River under the WSRA, Defendants' attempts in the July 5 and February 7 Determinations to require the USACE to impose in the dredging permit extremely restrictive and practically unworkable time-of-year restrictions on dredging violate the APA as they are arbitrary, capricious, an abuse of discretion, not in accordance with law, and not supported by substantial evidence in the record;

(C)     Enjoin Defendants from further asserting jurisdiction under the WSRA or otherwise mandating that the USACE abide by the DOI positions as to dredging restrictions or other issues related to the dredging permit;

(D)     Enjoin Defendants from contesting Weaver's Cove's compliance with Condition No. 25 of the *Initial Order*;

(E)    Order that Weaver's Cove be awarded costs and attorneys' fees pursuant to any applicable statute or authority; and

(F)    Provide any other relief that this Court deems to be just and appropriate.

Respectfully submitted,

Jeffrey M. Bauer (D.C. Bar No. 494284)
Adam J. White (D.C. Bar No. 502007)
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC  20004-2400
Phone:  (202) 639-7700
Fax:  (202) 639-7890

*Attorneys for Weaver's Cove Energy, LLC*

Dated:  August 24, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC,<br>Weaver's Cove Energy<br>1 New Street<br>Fall River, MA 02720<br><br>    *Plaintiff,*<br><br>  vs.<br><br>THE UNITED STATES OF AMERICA,<br>DEPARTMENT OF THE INTERIOR, acting<br>by and through DIRK A. KEMPTHORNE,<br>Secretary of the Interior,<br>1849 C Street, N.W.<br>Washington DC 20240<br><br>THE UNITED STATES OF AMERICA, FISH<br>AND WILDLIFE SERVICE, acting by and<br>through H. DALE HALL, Director of the Fish<br>and Wildlife Service, and<br>(same address as above)<br><br>THE UNITED STATES OF AMERICA,<br>NATIONAL PARK SERVICE, acting by and<br>through MARY A. BOMAR, Director of the<br>National Park Service,<br>(same address as above)<br><br>    *Defendants.* | Case No. _____ |

**EXHIBITS**

# EXHIBIT A



# ORIGINAL

## United States Department of the Interior

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
408 Atlantic Avenue – Room 142
Boston, Massachusetts 02210-3334

September 17, 2004

ER 04/571

Magalie R. Salas, Secretary
Federal Energy Regulatory Commission
888 First St. N.E., Room 1A
Washington, DC 20426

REF:   Docket Number CP04-36-000
         Draft Environmental Impact Statement
         Weaver's Cove LNG Project, Bristol County, Massachusetts

Dear Ms. Salas:

The Department of the Interior has reviewed, and is providing the following comments on the Draft Environmental Impact Statement (DEIS) for the liquefied natural gas (LNG) import terminal and natural gas pipeline facilities in Bristol County, Massachusetts proposed by Weaver's Cove Energy.

The proposal is for the development of a LNG terminal on the site of a former Shell Oil Facility along the Taunton River in Fall River, Massachusetts. While the site development will include over one acre of permanent wetland and waterway fill, the dredging of 2.6 million cubic yards of material from the navigation channel and turning basin will have significant impacts to fishery and shellfishery resources.

### Fishery Resources

The Taunton River provides valuable habitat for a diverse assemblage of finfish and invertebrates. In recognition of the extremely productive quahog, soft-shelled clam and American oyster resources found within and adjacent to the proposed project footprint, the Commonwealth of Massachusetts has designated these portions of the Taunton River as Significant Shellfish Habitat, affording special protection to these areas. Many anadromous fish species, including the blueback herring, alewife, American shad, hickory shad, gizzard shad, rainbow smelt, white perch, striped bass, and American eel use all or some of the Taunton River for passage spawning, nursery and forage. Many of these species provide forage for other predatory fish and birds. Some are also harvested by recreational and commercial fishermen. Finally, various life stages of other finfish such as winter flounder, Atlantic menhaden, tautog and bluefish also transit and inhabit the river during the year. We are particularly concerned with

Magalie R. Salas, Secretary                                                    2

the winter flounder. This area serves as an important winter flounder spawning and juvenile development habitat. There has been a decline in winter flounder resources within the Mount Hope Bay area. Efforts are being made to reduce impacts, led by a $150-$250 million effort by the Brayton Point power plant.

As proposed, the dredging of 2.6 million cubic yards of material will have an unacceptable impact to shellfish and finfish resources. Continuous dredging is proposed for 36 months. This will result in the direct loss of shellfish and winter flounder habitat and temporary loss during the three years of dredging to many finfish and shellfish resources due to sediment suspension and deposition. There must be time-of-year restrictions at a minimum imposed on the dredging schedule to protect the fishery resources.

## Taunton River Wild and Scenic Study

Public Law 106-318, the Taunton River Study Act of 2000, authorized a study of the Upper Taunton River from its headwaters at the confluence of the Town and Matfield Rivers to its confluence with the Forge River in Raynham. In September, 2002, responding to petitions from the five lower Taunton River communities from Taunton to Fall River, U.S. Representatives Barney Frank, James McGovern and Stephen Lynch formally requested that the study area be extended to include all of the Taunton River to its confluence with Mt. Hope Bay. In the spring of 2003, the study area was expanded as requested.

### Interim Protections of Study Rivers

The Wild and Scenic Rivers Act provides statutory protection to rivers under congressionally authorized study for potential designation as components of the National Wild and Scenic Rivers System.

The pertinent language from Section 7(b) of the Wild and Scenic Rivers Act is:

> "....and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval."

(and)

> "Nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area..."

Magalie R. Salas, Secretary

3

## Potential For Designation

Based upon preliminary findings of the study, the Taunton River appears to support natural and cultural resource values that would qualify it for national designation. The 40-mile mainstem of the Taunton River is one of the few significant rivers in the region that are free of dams and do not have a history of damming, obstruction, channelization or other significant alteration. This natural, free-flowing condition supports significant fish, wildlife, cultural, and recreational values ranging from shipbuilding/maritime history to one of the most significant anadromous fish resources of the state and region.

Specifically, the fisheries resources of the Taunton River are considered to be one of the most significant contributors to the river's potential eligibility as a National Wild and Scenic River.

The National Park Service expects to complete its study of the Taunton River in 2005.

## Conclusion

As currently proposed, the dredging for this project will have an unacceptable impact to fishery resources in the Taunton River. These impacts can be mitigated partially by instituting time-of-year restrictions on the dredging. However, substantial impacts would remain and continue for the life of the project. This alternative would eliminate the adverse impacts to the shellfish and finfish resources and any conflicts with the Wild and Scenic study and potential designation. The DEIS does not adequately discuss the alternative of offshore deepwater ports. The Department recommends that a Supplemental DEIS is prepared by the FERC so as to expand on the offshore alternative.

Thank you for the opportunity to comment on this DEIS. Please contact me at (617) 223-8565 if you have any questions.

Sincerely,

Andrew L. Raddant
Regional Environmental Officer

# EXHIBIT B



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



JUL 0 5 2005

ER 04/0571

Honorable Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**RE: COMMENTS ON THE FINAL ENVIRONMENTAL IMPACT STATEMENT FOR THE DRAFT CONFORMITY DETERMINATION FOR THE PROPOSED WEAVER'S COVE LNG PROJECT, BRISTOL COUNTY, MASSACHUSETTS, (Docket Nos. CP04-36-000, and CP04-41-000)**

Dear Ms. Salas:

The U.S. Department of the Interior (DOI) has reviewed the subject final environmental impact statement (FEIS) for the development of a liquefied natural gas (LNG) terminal and natural gas pipeline facilities proposed by Weaver's Cove Energy.

DOI previously submitted comments provided by our U.S. Fish and Wildlife Service (FWS), and our National Park Service (NPS). Our comments on the FEIS are as follows:

General Comments

DOI's comments on the Weaver's Cove draft environmental impact statement (DEIS) dated September 17, 2004, included reference to the statutory protections afforded to rivers under the congressionally authorized study for potential designation as components of the National Wild and Scenic Rivers System, (Wild and Scenic Rivers Act, Section 7(b)):

> "...and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval"

This statutory provision applies during the period of the study and up to three years following submittal of a final report to Congress.

The Federal Energy Regulatory Commission's (FERC) FEIS concludes its treatment of the Wild and Scenic River issue (page 4-168) as follows:

1

Honorable Magalie R. Salas

"For reasons stated above, we do not believe that construction or operation of the proposed project would have a substantial adverse effect on the Taunton River's potential designation as a Wild and Scenic River. However, final determination on whether the Weaver's Cove LNG Project would have a substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River would be made by the U.S. Department of the Interior. In addition, the COE would provide a draft of its permits pursuant to Section 10 of the Rivers and Harbors Act and Section 404 of the CWA to the NPS for review. If the NPS objects to the permit under the provision of the WSR Act, the COE would not issue the permits. Therefore we recommend that:

- Prior to construction, Weaver's Cove Energy must file with the Secretary, documentation of concurrence from the U.S. Department of the Interior that the project would not have a substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River, and that the project would be consistent with the WSR Act if the Taunton River were designated a Wild and Scenic River."

## Current Status of Wild and Scenic River Consideration

In the nine months since FERC issued the DEIS for comment, the Wild and Scenic River Study of the Taunton River has progressed, and is now in the final stage.

As of June 6, 2005, the legislative bodies of nine out of 10 communities abutting the main-stem of the Taunton River voted to endorse the Taunton River Stewardship Plan and seek Federal designation as a Wild and Scenic River. The City of Fall River has specifically requested that the designation extend all the way to Mt. Hope Bay at the 195 Bridge (Braga Bridge). This showing of strong local support is the final step required to judge suitability for Federal designation.

The Taunton Wild and Scenic River Study Advisory Committee (representing local, State, and non-governmental river stakeholders) recommended Congressional designation of the entire main stem of the Taunton River from the confluence of the Town and Matfield Rivers to Mt. Hope Bay as a National Wild and Scenic River. The NPS's draft report will be issued later this summer.

## Protection of Outstanding Fishery Values

As a part of DOI's comments on the DEIS dated September 17, 2004, the protection of the outstanding fishery value of the Taunton River was highlighted as a critical issue related to the potential Wild and Scenic River designation. The importance of these resource values has been expanded upon by State and Federal agencies, including National Marine Fisheries Service and Massachusetts Division of Marine Fisheries.

2

Honorable Magalie R. Salas

It does not appear that the conditions proposed as a part of the FEIS adequately address protection of the fishery resource. Of particular concern to the NPS, the failure to require recommended dredging time of year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as Wild and Scenic. The National Marine Fisheries Service (NOAA Fisheries) specifically commented in this regard:

> "In order to take a risk averse approach for the conservation of anadromous fishery resources within the Taunton River, NOAA Fisheries recommends that no work should be conducted between March 1-July 31 of any year to avoid adverse impacts on upstream spawning migrations of Alewife, Blueback Herring, Rainbow Smelt, and American Shad. Downstream migrations of anadromous fishery resources in the Taunton River generally occur and need protection between June 15 and October 31 of any year.  Alternatives should be developed and analyzed that avoid adverse impacts on downstream migrations of these aquatic resources of national importance."

Our NPS will continue to consult and coordinate with the appropriate fishery resource experts and permitting agencies on the conditions that would be necessary to safeguard the outstanding fishery resource of the Taunton River, including its anadromous fish stocks.

In the absence of satisfactory fishery resource protection, we will not be able to provide the statutorily required affirmative statement of no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System.

Site Impacts to the Lower Taunton River

All of the communities abutting the lower Taunton River have voted to endorse the Taunton River Stewardship Plan and seek federal legislation to designate the Taunton River to Mt. Hope Bay as a component of the Wild and Scenic Rivers System.

The relevant State and Federal fishery agencies, in their comments on the DEIS, have indicated that there may be unavoidable adverse site impacts related particularly to the enlargement of the turning basin and development of the Weaver's Cove site.  These include the permanent loss of 11 acres of winter flounder habitat and 1.15 acres saltmarsh and intertidal/subtidal habitat.  The FEIS appears to agree that these impacts to this portion of the Lower Taunton River are unavoidable.

In addition, the proposed development of the Weavers Cove site for LNG purposes appears to be contrary to the goals and intentions of the City of Fall River as it relates to the desire to seek Federal Wild and Scenic River designation and endorse the Taunton River Stewardship Plan. Development of this site would foreclose opportunities for the City to connect a significant portion of their waterfront to the Taunton River through redevelopment, emphasizing public access and recreation as an important aspect of economic revitalization and quality of life improvement.

3

Honorable Magalie R. Salas

For these reasons, we do not feel that the proposed development can be made compatible with Wild and Scenic River designation of the lower Taunton River in vicinity of the project area.

We must therefore disagree with FERC's tentative conclusion that the proposed project is compatible with the Taunton River's potential designation as a Wild and Scenic River. Based upon our understanding of the project as currently proposed in the FEIS, the NPS would not be able to find such compatibility.

Until Congress has made a final determination on whether to designate some, all, or none of the Taunton River as a component of the National Wild and Scenic River System, we may not be able to render a finding of no adverse impact related to the potential Wild and Scenic River designation.

If FERC or Weaver's Cove have any questions or you need further assistance or information please contact Mr. Jamie Fosburgh, NPS, Program Manager, 617-223-5191.

The Department of the Interior appreciates the opportunity to review and provide comments on the final EIS for the Weaver's Cove LNG Project.

Sincerely,

Willie R. Taylor, Director
Office of Environmental Policy
and Compliance

cc: Service List

Honorable Magalie R. Salas

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding (Docket Nos. CP04-36-000, CP04-41-000).

_Kenneth F. Horan (Acting)_

Vijai N. Rai, Team Leader
Office of Environmental Policy and Compliance
202-208-6661

JUL _ 5 2005
Dated

# EXHIBIT C



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE

New England Field Office
70 Commercial Street, Suite 300
Concord, New Hampshire 03301-5087



REF:   Public Notice  NAE-2004-2355

September 22, 2004

Ms. Christine Godfrey, Chief
Regulatory Division
U. S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742-2751

RECEIVED
SEP 2 4 2004
REGULATORY DIVISION

Dear Ms. Godfrey:

We have reviewed the Public Notice on the liquefied natural gas (LNG) import terminal and natural gas pipeline facilities in Bristol County, Massachusetts proposed by Weaver's Cove Energy. These are the comments of the Department of the Interior. The following comments are provided in accordance with the Fish and Wildlife Coordination Act 948 stat. 401, as amended; 16 U.S.C. 661 et seq.).

The proposal is for the development of a LNG terminal on the site of a former Shell Oil Facility along the Taunton River in Fall River, Massachusetts. Site development will include over one acre of permanent wetland and waterway fill. Moreover, the dredging of 2.6 million cubic yards of material from the navigation channel and turning basin will have significant impacts to fishery and shellfishery resources.

### Fishery Resources

The Taunton River provides valuable habitat for a diverse assemblage of finfish and invertebrates. In recognition of the extremely productive quahog, soft-shelled clam and American oyster resources found within and adjacent to the proposed project footprint, the state of Massachusetts has designated these portions of the Taunton River as Significant Shellfish Habitat, affording special protection to these areas. Many anadromous fish species, including the blueback herring, alewife, American shad, hickory shad, gizzard shad, rainbow smelt, white perch, striped bass, and American eel use all or some of the Taunton River for passage, spawning, nursery and forage. Many of these species provide forage for other predatory fish and birds. Some are also harvested by recreational and commercial fishermen. Finally, various life stages of other finfish such as winter flounder, Atlantic menhaden, tautog and bluefish also transit and inhabit the river during the year. We are particularly concerned with the winter flounder. This area serves as an important winter flounder spawning and juvenile development habitat. There has been a decline in winter flounder resources within the Mount Hope Bay area.

2

Efforts are being made to reduce impacts, including a $150-$250 million effort by the Brayton Point power plant, to reduce their impacts.

As proposed, the dredging of 2.6 million cubic yards of material will have an unacceptable impact to shellfish and finfish resources. Continuous dredging is proposed for 36 months. This will result in the direct loss of shellfish and winter flounder habitat and temporary loss during the three years of dredging to many finfish and shellfish resources due to sediment suspension and deposition. There must be time-of-year restrictions at a minimum imposed on the dredging schedule to protect the fishery resources.

### Taunton River Wild and Scenic Study

Public Law 106-318, the Taunton River Study Act of 2000, authorized a study of the Upper Taunton River from its headwaters at the confluence of the Town and Matfield Rivers to its confluence with the Forge River in Raynham. In September, 2002, responding to petitions from the five lower Taunton River communities from Taunton to Fall River, U.S. Representatives Barney Frank, James McGovern and Stephen Lynch formally requested that the study area be extended to include all of the Taunton River to its confluence with Mt. Hope Bay. In the spring of 2003, the study area was expanded as requested.

### Interim Protections of Study Rivers

The Wild and Scenic Rivers Act provides statutory protection to rivers under congressionally authorized study for potential designation as components of the National Wild and Scenic Rivers System.

The pertinent language from Section 7(b) of the Wild and Scenic Rivers Act is:

"....and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval."

(and)

"Nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area..."

### Potential For Designation

Based upon preliminary findings of the study, the Taunton River appears to support natural and cultural resource values that would qualify it for national designation.

3

The 40-mile mainstem of the Taunton River is one of the few significant rivers in the region that are dam free and do not have a history of damming, obstruction, channelization or other significant alteration. This natural, free-flowing condition supports significant fish, wildlife, cultural, and recreational values ranging from shipbuilding/maritime history to one of the most significant anadromous fish resources of the state and region.

Specifically, the fisheries resources of the Taunton River are considered to be one of the most significant contributors to the river's potential eligibility as a National Wild and Scenic River.

The National Park Service expects to complete its study of the Taunton River in 2005.

**Conclusion**

As currently proposed, the dredging for this project will have an unacceptable impact to fishery resources in the Taunton River. These impacts can be mitigated partially by instituting time-of-year restrictions on the dredging. However, substantial impacts would remain and continue for the life of the project. The applicant does not adequately discuss the alternative of offshore deepwater ports. This alternative would eliminate the adverse impacts to the shellfish and finfish resources and any conflicts with the wild and scenic study and potential designation. Therefore, we recommend that a permit for this project not be issued at this time. The offshore deepwater port alternative should be further pursued.

Sincerely,

William J. Neidermyer
Assistant Supervisor, Federal Projects
New England Field Office

4

cc:    Jamie Fosburgh, NPS, 15 State St., Boston, MA 02109
       Eric Poulin, City of Fall River, Mayor's Office,
         One Government Center, Fall River, MA 02722
       Lisa Lowney, Cong. Frank's Office,
         222 Milliken Place, Fall River, MA 02721
       Patrick Norton, Fall River Dist. Rep.,
         218 South Main St., Rm 204, Fall River, MA 02721
       Reading file

ES:    WNeidermyer:9-22-04:603-223-2541

# EXHIBIT D

FEB-07-2006 TUE 01:40 PM U.S.Fish & Wildlife          FAX NO. 6032230104          P. 01




# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
New England Field Office
70 Commercial Street, Suite 300
Concord, New Hampshire 03301-5087

REF: Public Notice NAE-2004-2355                              February 7, 2006

Ms. Christine Godfrey, Chief
Regulatory Division
U. S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742-2751

Dear Ms. Godfrey:

We have reviewed the Public Notice on the liquefied natural gas (LNG) import terminal and natural gas pipeline facilities in Bristol County, Massachusetts proposed by Weaver's Cove Energy. These are the comments of the Department of the Interior. The following comments are provided in accordance with the Fish and Wildlife Coordination Act (948 stat. 401, as amended; 16 U.S.C. 661 et seq.) and the Wild and Scenic Rivers Act (16 U.S.C. 1271-1287, as amended).

The proposal is for the development of a LNG terminal on the site of a former Shell Oil Facility along the Taunton River in Fall River, Massachusetts. Site development will include over one acre of permanent wetland and waterway fill. Moreover, the dredging of 2.6 million cubic yards of material from the navigation channel and turning basin will have significant impacts to fishery and shellfishery resources.

We previously addressed our concerns for anadromous fish, and the Wild and Scenic Rivers issue, in our letter of September 22, 2004 to the Corps of Engineers, and the Department's July 5, 2005 comment letter to FERC.

Protection of Fishery Resources

As we have stated previously, the Taunton River provides important habitat for anadromous fish, including the blueback herring, alewife, American shad and rainbow smelt. These species use all or some of the Taunton River for passage, spawning, nursery and foraging. To protect these resources, we have previously recommended time-of-year restrictions for both upstream and downstream migrations. Subsequent to our recommendations, the applicant has decided to use ocean disposal of dredge material and to institute time-of-year restrictions for the spring

-2-

upstream migrations. However, the applicant has refused to incorporate restrictions to protect downstream migrations.

We recommend a time-of-year restriction of March 1 – July 31 for the protection of the incoming anadromous fish migration.  To adequately protect the downstream migration, we continue to recommend a time-of-year restriction of July 1 through October 31. If this is unacceptable, we recommend that no dredging take place upstream of the I-195 bridge from July 1 to October 31.

Taunton Wild and Scenic River Study

Public Law 106-318, the Taunton River Study Act of 2000, authorized a study of the Upper Taunton River from its headwaters at the confluence of the Town and Matfield Rivers to its confluence with the Forge River in Raynham.

Interim Protections of Study Rivers

Resource values contributing to the potential designation of such congressionally-authorized study segments are afforded statutory protection under the Wild and Scenic Rivers Act.

The pertinent language from Section 7(b) of the Wild and Scenic Rivers Act is:

"...and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval..."

(and)

"Nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area..."

Protection of the Wild and Scenic River Values of the Taunton River

The significance of the anadromous fish resources of the Taunton River is well documented, and is one of the values for which the upper Taunton River would be designated by Congress as a component of the National Wild and Scenic Rivers System.  The statutorily required resource protections of the Wild and Scenic Study legislation, as cited above, therefore apply to the protection of anadromous fish resources.  In order to comply with the required protection standard, no diminishment of this resource value may be allowed.  It is the Department's determination that the time-of-year restrictions stipulated in this letter will ensure that this standard is met.

- 3 -

### Considerations Related to the Lower Taunton River

In September, 2002, responding to petitions from the five lower Taunton River communities from Taunton to Fall River, U.S. Representatives Barney Frank, James McGovern and Stephen Lynch formally requested that the study area be extended to include all of the Taunton River to its confluence with Mt. Hope Bay. In the spring of 2003, the National Park Service agreed to expand the study area as requested. The expanded area is not subject to the statutory protection of the study legislation.

### Current Status of Wild and Scenic River Study

Between November 2004 and July 2005, all ten communities abutting the mainstem of the Taunton River voted through Town Meeting or City Council (Cities of Fall River and Taunton) to endorse the Taunton River Stewardship Plan and to seek federal Wild and Scenic River designation. Such community votes are the final step required by the National Park Service's Study process. Since that time, the Commonwealth of Massachusetts, through a letter from the Secretary of the Executive Office of Environmental Affairs, has written to express support for Wild and Scenic River designation of the entire Taunton River, as have many non-governmental and citizen groups. Legislation has also been filed in both the U.S. House of Representatives and the U.S. Senate to designate the entire mainstem of the Taunton River. A Draft Report to Congress is under preparation that will document study findings and the expressed public support for designation.

### Lower Taunton Site Impacts

Consistent with the Department's July 5, 2005 comment letter to FERC on the Final EIS for this project, we continue to believe that there are likely to be unavoidable site impacts associated with this project that render its construction and operation incompatible with Wild and Scenic River designation of the lower-most portion of the mainstem of the Taunton River (below Steep Brook in north Fall River). While this incompatibility is not subject to the same statutory protection requirement afforded the Upper Taunton Study area, there has been a substantial demonstration of the public interest in seeing the entire mainstem protected as a National Wild and Scenic River. This demonstration has been noted elsewhere in this letter. The Department believes that this expression of public interest needs to be fully considered by the Corps of Engineers in its own weighing of the public interest.

- 4 -

Conclusion

As currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River. Without time-of-year restrictions for both upstream and downstream migrations, we continue to recommend that this application be denied. If you have any questions please call me at 603-223-2541, or Jamie Fosburgh, of the National Park Service, at 617-223-5191.

Sincerely yours,

William J. Neidermyer
Assistant Supervisor, Federal Activities
New England Field Office

FEB-07-2006 TUE 01:42 PM U.S. Fish & Wildlife          FAX NO. 8032230104          P. 05

-5-

cc:     Reading File
        NMFS
        EPA
        MA Marine Fisheries
        J. Fosburgh, NPS
ES:     WNeidermyer:2-7-06:603-223-2541

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WEAVER'S COVE ENERGY, LLC, | THE UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, et al. |

| | |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Fall River, MA<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)   Washington, D.C.<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Jeffrey M. Bauer<br>Adam J. White<br>Baker Botts, LLP<br>The Warner, 1299 Pennsylvania Avenue, NW 20004<br>(202) 639-7721 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
  Plaintiff

◉ 2 U.S. Government
  Defendant

○ 3 Federal Question
  (U.S. Government Not a Party)

○ 4 Diversity
  (Indicate Citizenship of
  Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ◉ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☒ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)*  OR  ○ F. *Pro Se General Civil* | | |
|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/* *2255* | ○ **H.** *Employment* *Discrimination* | ○ **I.** *FOIA/PRIVACY* *ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA* *(non-employment)* | ○ **L.** *Other Civil Rights* *(non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original
Proceeding
○ 2 Removed
from State
Court
○ 3 Remanded from
Appellate Court
○ 4 Reinstated
or Reopened
○ 5 Transferred from
another district
(specify)
○ 6 Multi district
Litigation
○ 7 Appeal to
District Judge
from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Declaratory Judgement Act and Administrative Procedure Act

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ **JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐    NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE **August 27, 2007**    SIGNATURE OF ATTORNEY OF RECORD    _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.