IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case: 1:07-cv-01525 (RBW) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF THE INTERIOR; | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE; | ) | |
| UNITED STATES NATIONAL PARK | ) | |
| SERVICE, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' SHOWING OF CAUSE WHY ADMINISTRATIVE RECORD
SHOULD BE SUBMITTED ON 15 FEBRUARY 2008, NOT 2 FEBRUARY**

In its 14 January 2008 Minute Order ("Order"), the Court agreed, on grounds

of "judicial economy," to require federal defendants ("Interior") to file a dispositive motion

"on or before January 31, 2008." Pursuant to this Court's direction, Interior will file its

jurisdictional motion to dismiss for lack of both standing and ripeness under the Constitution

on January 31.

Before the Court issued the Order, the parties submitted their Joint Meet and

Confer Report on 10 January 2008. In that report, plaintiff requested a scheduling plan

1

requiring Interior to submit a record by "February 2, 2008;" in contrast, Interior requested a schedule requiring submission of the administrative record by "February 15." Joint Meet and Confer Report at 3-4 (filed 10 January 2008). In response, the Court directed Interior to show in writing why it should not be required to submit the administrative record "on or before February 2, 2008." Order (filed 14 January 2008).

Interior believes there are at least three reasons why requiring federal defendants to submit the record by 15 February, as opposed to 2 February, would be efficient, convenient for the Court, and convenient for plaintiff. First, the parties disagree about the legal issue of whether the two Interior comment letters challenged in plaintiff's complaint are or are not final agency actions under the Administrative Procedure Act ("APA"). Because Interior does not believe that plaintiff challenges final agency actions or final agency decisions under the APA, the record has been difficult to define as a legal matter and, as a result, has taken longer to compile than a typical APA record of equivalent size.

Under plaintiff's theory of the case, the two challenged Interior letters are each final agency actions under the APA. Therefore, the record under plaintiff's theory would end as of 7 February 2006, the date of the last Interior letter. See Joint Statement of Case and Causes of Action at 1 (filed 14 January 2008)("Joint Statement of Case"). In contrast, Interior believes these two letters do not embody final agency decisions but, instead, reflect ongoing federal analysis that may or may not change, depending on the future decisions of independent agencies "that have not yet been and may never be made." Id. at 2.

Two of these independent agencies are the United States Coast Guard and the

U.S. Army Corps of Engineers. Id. at 2. On 7 December 2007, the Coast Guard decided to block the same liquified natural gas marine terminal and dredging project ("LNG dredging project") for which plaintiff requests relief here because its LNG dredging project would not protect "navigation safety." Attachment 1. Unless the Coast Guard reverses its decision, the U.S. Army Corps of Engineers ("COE") will not proceed with issuing the permits required for the LNG dredging project.

Further, after Interior analyzed the then-existing LNG dredging project in the comment letters that plaintiff challenges here, plaintiff changed that project to include a larger number of smaller LNG commercial vessels on the Taunton River. See id. Thus, if the Coast Guard decides to reverse its 7 December 2007 decision, pursuant to plaintiff's ongoing appeal, Interior would have to supersede the comment letters challenged by plaintiff by submitting additional comments to the COE because the LNG dredging project on which Interior premised the challenged letters has materially changed. Therefore, under Interior's theory of the case, the record extends at least to documents generated as of 7 December 2007, the date of the Coast Guard's decision, because that decision both blocked and may precipitate future changes to the same LNG dredging project on which Interior premised the two comment letters challenged here.

Second, in light of Interior's decision to include the federal documents corresponding to the Coast Guard's 7 December decision in the administrative record, Interior's proposal to submit the record in computer disc format, hyperlinked to Interior's index, by 15 February 2008 was both efficient and cost-effective. Immediately after the

Coast Guard blocked plaintiff's LNG dredging proposal on 7 December 2007, the Interior employees responsible for compiling and then indexing the record decided to complete this task by choosing one of two administrative options: (1) one limited to physical paper, in which an in-house team would physically Bates-stamp, index, and present a paper record to plaintiff after the holidays, by either the end of January or early February 2008 or (2) a second option that would also allow plaintiff to search the record by computer, in which the record physically compiled and indexed by Interior employees would also be: Bates-stamped, converted to electronic format, made searchable by a hyperlink with Interior's index, and then presented in computer disc form to plaintiff on or before 15 February, 2008, pursuant to an agreement with a private contractor.

Interior chose the second option not to delay this case, but to provide this Court and plaintiff with a more efficient mechanism for searching a voluminous record. Under Interior's agreement with its private contractor, the hyperlink format described above would allow both the Court and the parties to move immediately from Interior's index to the document desired.

Third, in the context of a cordial and cooperative relationship to date between the undersigned federal counsel and plaintiff's attorneys, plaintiff's counsel did not inform Interior that plaintiff desired the record either by or before 2 February (as opposed to 15 February) until the period between 8 January 2008 and 10 January 2008, the time the parties finalized their Joint Meet and Confer Report. In response, federal counsel explained that extending plaintiff's preferred 2 February date to 15 February would be advantageous to all

4

concerned because it would generate, free of charge to plaintiff, a computer disc searchable by hyperlink with Interior's index .

Since this case began, the parties have known that the independent agency actions of different federal and state agencies not challenged in the complaint, including the Coast Guard and the COE, have blocked the LNG dredging project desired by plaintiff. See e.g., Attachment 1.  On these grounds, Interior both believed and still believes that the difference between the 2 February date desired by plaintiff and the 15 February date preferred by Interior would be of no practical consequence to plaintiff.

However, if arguendo either plaintiff or this Court chooses a 2 February date, then Interior could make the record available for plaintiff's inspection in paper format, pursuant to Rule 34, Fed. R. Civ. P.  However, this record would not be Bates-stamped because, under Interior's contractual agreement to provide plaintiff with a searchable computer disc, summarized above, Interior's private contractor is now completing all Bates-stamping and related cross-indexing.

In sum, Interior respectfully requests that it be allowed to submit the computer disc described above by or before 15 February for three reasons (1) Interior's theory of the case required it to include documents generated as of 7 December 2007, corresponding to the Coast Guard's decision that day to block the LNG dredging project desired by plaintiff; (2) the difference between 2 February and 15 February is of no practical significance to plaintiff because, as of 7 December 2007, its LNG dredging project has been blocked by two federal agencies not challenged in the complaint, the Coast Guard and the COE; and (3) the 15

February 2008 date preferred by Interior would also be more efficient for this Court and

plaintiff because it would yield a computer disc with search and cross-indexing capabilities

superior to a paper record by itself.


Respectfully submitted,


_____
GREGORY D. PAGE, DC Bar 398121
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0446
Attorneys for the Federal Defendants

# CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served on 18 January

2008 by electronic filing to :

> Jeffrey M. Bauer
> Adam J. White
> Baker Botts L.L.P.
> 1299 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2400


_____
Gregory D. Page

# ATTACHMENT 1

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commanding Officer
U.S. Coast Guard
Sector Southeastern New England

1 Little Harbor Road
Woods Hole, MA 02543
Phone: 508-457-3219
Fax: 508-457-3236
Email: Edward.G.LeBlanc@uscg.mil

16000
December 7, 2007

BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Bruce F. Kiely
Baker Botts L.L.P.
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

Mr. Gordon Shearer
President and Chief Executive Officer
Weaver's Cove Energy, LLC
1185 Avenue of the Americas
New York, NY 10036

Dear Mr. Kiely and Mr. Shearer:

I have reviewed your letter of November 20, 2007, requesting reconsideration of my Letter of
Recommendation (LOR) of October 24, 2007. As requested, I reconsidered my determinations,
analysis, and ultimate recommendation that the waterway from near Sandy Point, Prudence
Island, Rhode Island to the proposed facility in Fall River, Massachusetts, is unsuitable from a
navigation safety perspective for the type, size, and frequency of LNG marine traffic associated
with your proposal of May 12, 2004, as amended by your change of information letter dated
February 2, 2006. After a thorough review of your request, including its exhibits and other
documents referenced therein, I find no substantive issue, nor new information, that would
suggest my recommendation of unsuitability was incorrect or made without due consideration of
the record. Consequently, I stand by my October 24, 2007 recommendation.

Several recurring themes and inaccurate factual assertions raised in your request for
reconsideration merit specific response:

1. **The LOR Process:** Your letter suggests that Weaver's Cove has not been afforded due
   process, and specifically that I "in spirit and substance...did not adhere to the process set
   forth in NVIC 05-05."[1] As a preliminary matter, I note that the *guidance* provided by NVIC
   05-05, by its own language, was not applicable to your application to the extent that NVIC
   05-05 was published on June 14, 2005, more than a year *after* Weaver's Cove submitted its
   original Letter of Intent, and more than a month after FERC issued its Final Environmental
   Impact Statement (FEIS). FERC's approval order was issued just one month later. In any
   event, I have reviewed the steps that I and my predecessors undertook in gathering and

---

[1] Weaver's Cove Request for Reconsideration ("Reconsideration Request") dated November 20, 2007, page 10

16000
December 7, 2007

analyzing the information I am required to assess in making my waterway suitability recommendation under 33 CFR § 127.009, and I am convinced that the process used to evaluate the information in the record and arrive at a decision was full, fair, transparent and in accordance with law, regulation, and policy.

2. **The Administrative Record**:

    a.  Your request for reconsideration contends that I "ignored or missed four (4) key evidentiary documents before [me] at the time of decision..."[2] I will address each assertion in order.

        i.  <u>The October 9, 2007, letter from Weaver's Cove to the COTP regarding issues raised at a meeting of September 4, 2007.</u> Admittedly, this letter is not listed as part of the Administrative Record in Enclosure (1) to my Letter of Recommendation. This submission was received just as my analysis was finalized. I have, however, since reviewed the letter, along with the accompanying documentation, in its entirety. I find nothing therein that prompts me to alter my ultimate recommendation of unsuitability.

        ii.  <u>The COTP letter of May 23, 2007.</u> As I was the author of this letter, I implicitly considered its contents in developing my Letter of Recommendation. As the letter itself does not contain any substantive matter on which my Letter of Recommendation was based, it was not specifically listed in Enclosure (1) to the LOR. My letter (of May 23, 2007) speaks to, among other things, a NEPA review. The Record of Decision, issued concurrently with my Letter of Recommendation on October 24, 2007 (available on FERC's public docket), states:

            As I view the safety of navigation as paramount, my recommendation that the waterway is unsuitable generated no additional environmental documentation requirements. I, therefore, (pursuant to 40 CFR § 1506.3) adopt those portions of the FERC EIS that address the environmental impacts associated with the proposed use of the waterway and those portions addressing any environmental impacts of the no action alternative. This letter represents the Coast Guard's record of decision on the adopted portions of the FERC EIS.

        Accordingly, the record indicates I considered and addressed the procedural substance of my May 23, 2007 letter.

---

[2] Reconsideration Request at 7.

16000
December 7, 2007

iii. The third and fourth sets of documents your letter suggests were not considered by me are the "input, letter, or other submission" provided by the Coast Guard to FERC preceding issuance of FERC's DEIS and FEIS, respectively. Unlike in other post-NVIC 05-05 FERC-led LNG terminal siting projects mentioned in your letter, the Coast Guard neither produced nor submitted a waterway suitability report, as such, to FERC. The Coast Guard did, however, provide the functional equivalent through the course of the Port and Waterways Safety Assessment (PAWSA) workshop, held on September 7 and 8, 2004; and through several other workshops focused exclusively on maritime security. The results of these workshops were communicated to FERC during the course of the Coast Guard's dialogue with that agency during its environmental review process.[3] This input was adopted by FERC and is reflected in DEIS and FEIS documents themselves.

As my Letter of Recommendation indicated, because my ultimate recommendation was based on my analysis of *navigation safety* issues, other relevant factors, such as maritime security, were not further analyzed. With respect to the PAWSA workshop, its results were indeed considered by me.[4] Reliance on its findings, however, was tempered by, among other things, the fact that the 2004 PAWSA assumed (1) that the old Brightman Street Bridge would be removed before LNG tanker transits would take place, and (2) that LNG tanker deliveries to Fall River would occur at a rate of about one per week.

b. Your request for reconsideration also contends that I "relied on at least seven (7) documents of which [I] had not provided Weaver's Cove prior notice of [my] intent to rely on them and the opportunity to rebut or refute."[5] Again, I will address each assertion in order.

---

[3] With respect to these documents, you claim that Coast Guard has "refused" to respond to requests under the Freedom of Information Act (FOIA) for their production. In fact, the Coast Guard has not refused to provide documents. Rather, we are working diligently to respond to the FOIA requests submitted on behalf of Weavers Cove. As the FOIA requests at issue are very broad in nature, however, it is taking considerable resources to locate, examine, and copy the material that is responsive to your request. We will continue to process your requests in accordance with applicable law and procedures.

[4] In a related argument, your reconsideration request claims that "the previous COTP" made findings favorable to Weaver's Cove that have now been arbitrarily overturned. This misrepresents the record. The previous COTP neither made findings, nor issued a Letter of Recommendation. At the time – a time before federal law effectively barred removal of the old Brightman Street Bridge – the previous COTP cooperated with FERC in developing a DEIS and FEIS, under the hypothesis of what could be possible if it were (later) determined (through the LOR process) that the waterway was suitable for LNG transits, which is one of about 75 conditions attached to FERC's approval.

[5] Reconsideration Request at 5.

16000
December 7, 2007

    i.  The Rothblum paper, "Human Error and Marine Safety," a product of the Coast Guard Research and Development Center, was relied on for the general proposition that human error can contribute to marine accidents. Weaver's Cove does not dispute that proposition. [6]

    ii.  The First District memo regarding the old Brightman Street Bridge, listed in Enclosure (1) to my Letter of Recommendation, was incorrectly transcribed from "4/3/06" as March 4, 2006. It should read "April 3, 2006."[7] This April 3, 2006, memo was provided to you via a previous FOIA request.

    iii.  The Corps of Engineers correspondence you reference (including both the dredging information and Docket CP04-46) is included in FERC's docket for the Weaver's Cove proposal. Thus, Weaver's Cove has had ample opportunity to review and comment on its contents.

    iv.  The recently completed Coast Guard Waterways Analysis and Management System (WAMS) review was relied on primarily for the proposition that the aids-to-navigation system in the waterway at issue is adequate for current users. Nowhere has Weaver's Cover refuted that assertion. Moreover, the general public, including Weaver's Cove in particular, was invited to provide input during the WAMS review. No input was received from Weaver's Cove.

    v.  The vessel critical profiles for vessels delivering coal to NRG power were obtained from a Coast Guard database (Marine Information for Safety and Law Enforcement, or MISLE) to assess Weaver's Cove's claim, in its letter of July 18, 2007, that its proposed LNG vessels were essentially similar to coal ships already transiting the area. Should Weaver's Cove wish to refute the accuracy of the vessel characteristic information maintained by the Coast Guard, it is free to do so.

  c.  Additionally, your request for reconsideration suggests that various politicians made "numerous undocumented assertions and held several undisclosed meetings" with me and members of my staff, and that I did not give Weaver's Cove "notice of those comments or meetings," or "afford Weaver's Cove an opportunity to rebut comments

---

[6] Your request for reconsideration asserts that in the absence of information on LNG tanker accident statistics, "any statements about human error have no relevance or validity in [my] analysis." I disagree. Your letter misconstrues, and misrepresents, my intent in mentioning the myriad places where any human error could affect the safe navigation of a tanker and tug combination undertaking the unique evolution that would be required to negotiate the old and new Brightman Street bridges. I did not intend to employ a quantitative, statistical risk analysis of this evolution. Again, as you concede, it is undisputable that human error can contribute to marine accidents. The point is that the navigation evolution you propose leaves little to no room for such error – something the simulation modeling data and reports affirmed. Thus, I highlighted a number of places where that error could manifest to help illustrate why, in my professional opinion, navigating the proposed transit route with the type, size, and frequency of ships you propose cannot be done safely on a *repeatable* basis.

[7] In reviewing Enclosure (1) to the LOR, an additional typographical error was found. In item #40 (Response to Weaver's Cove regarding navigation issues), the date should read "April 3, 2006" vice "April 3, 2007."

16000
December 7, 2007

made in those meetings."[8]  The Coast Guard routinely provides informational briefings to federal, state, and local officials on various Coast Guard operations and responsibilities.

I personally provided three briefings on the Weaver's Cove proposal to various elected officials, at their specific request.  Importantly, in all such instances, I limited my interaction to providing factual background and details from the public record, information regarding my duties and responsibilities with respect to assessing the suitability of the waterway for LNG marine traffic, and updates on the procedural posture and anticipated timeline for issuing my Letter of Recommendation.  Those officials wishing to comment on the project were asked to do so in writing to ensure that all comments could be reflected in the public docket.  If any elected official provided me with unsolicited opinions outside the docket or public meeting process, I did not consider those comments in arriving at my ultimate recommendation, I only considered those written comments contained in the record, including notes from public meetings where verbal comments were received.

3.  **Professional Judgment**:  In your request for reconsideration, you indicated surprise that I "chose to override the recommendation of the marine pilots" and claim you are "unaware of anywhere else in the LNG industry where a COTP has substituted his judgment for the judgment of professional pilots"[9].  The judgment of marine pilots is indeed valued and was carefully considered in my analysis.  Of course, marine pilots are but one of several groups of professional mariners the Coast Guard works with.  Ultimately, I am the only financially disinterested party with the statutory authority and responsibility in the LOR process for ensuring the safety of the federal waterway.  Weaver's Cove suggestions notwithstanding, I will not abdicate that responsibility to marine pilots, to Weaver's Cove, or any other person or entity—that duty is mine alone.  I carefully considered the entire record before exercising my professional judgment and discretion to arrive at my ultimate recommendation.

For the reasons cited above, I affirm my determinations, analysis, and ultimate recommendation that the waterway from near Sandy Point, Prudence Island, Rhode Island to the proposed facility in Fall River, Massachusetts, is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG marine traffic associated with your proposal.

If you feel aggrieved by this action, you may appeal to the Commander, First Coast Guard District, pursuant to 33 C.F.R. §127.015(a).  Your appeal must be submitted, in writing, to the Commander, First Coast Guard District, within 30 days of receipt of this letter.  Your appeal should be addressed to:

> Commander (dp)
> First Coast Guard District
> 408 Atlantic Ave
> Boston, MA 02110-3350

---

[8] Reconsideration Request at 3.

[9] Reconsideration Request at 45.

16000
December 7, 2007

If the delay in presenting a written appeal would have an adverse impact on your operations, you may request to make an oral presentation, but your written request must be submitted within five days of your oral presentation.

If you have questions, my point of contact remains Mr. Ed LeBlanc of the Sector Southeastern New England Waterways Management Branch. He may be reached at the address, phone number, and e-mail address listed above.

Sincerely,

ROY A. NASH
Captain, U.S. Coast Guard
Captain of the Port
Southeastern New England

Copy: Commander, First Coast Guard District (d, dp, dl)
Commander, Atlantic Area (Am)
Commandant (CG-3PSO)
Federal Energy Regulatory Commission
U.S. Army Corps of Engineers, New England District
Mass and RI Congressional delegations
Mayor, City of Fall River
Applicable state and local agencies