IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEAVER'S COVE ENERGY, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Case: 1:07-cv-01525 (RBW) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| DEPARTMENT OF THE INTERIOR; | ) |
| UNITED STATES FISH AND WILDLIFE | ) |
| SERVICE; | ) |
| UNITED STATES NATIONAL PARK | ) |
| SERVICE, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A
CLAIM AND LACK OF JURISDICTION AND A
<u>SUPPORTING MEMORANDUM OF LAW</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case: 1:07-cv-01525 (RBW) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF THE INTERIOR; | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE; | ) | |
| UNITED STATES NATIONAL PARK | ) | |
| SERVICE, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF JURISDICTION

For two reasons, plaintiff has not raised a justiciable Wild and Scenic Rivers Act ("WSRA") or Administrative Procedure Act ("APA") claim. First, plaintiff has not pleaded a prima facie WSRA case because, even if true, its allegations do not establish that Interior violated a legal requirement of the WSRA. Second, plaintiff challenges two agency letters here, written in 2005 and 2006, that are not final agency actions under the APA.

For two additional reasons, this Court lacks subject matter jurisdiction. First, plaintiff lacks constitutional and prudential standing because, unable to plead a WSRA violation, it

1

cannot establish harm from a legal wrong.  Finally, plaintiff's attempt to challenge the two

agency letters now is not ripe under the Constitution.  Therefore, under Rules 12(b)(1) and

(6), Fed. R. Civ. P., this Court must dismiss plaintiff's complaint.

     This motion is supported by the Declaration of Robert McIntosh ("Exhibit A") and 14

attachments to it, authenticated by Mr. McIntosh and incorporated into his declaration.

                  Respectfully submitted,


                  _____

                  GREGORY D. PAGE, DC Bar 398121
                  U.S. Department of Justice
                  P.O. Box 663
                  Washington, D.C. 20044-0663
                  Telephone: (202) 305-0446
                  Attorneys for the Federal Defendants

# **TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  STATUS OF THE TAUNTON RIVER UNDER WSRA . . . . . . . . . . . . . . . . . 5

    B.  2005 AND 2006 LETTERS CHALLENGED BY PLAINTIFF . . . . . . . . . . . 6

    C.  PLAINTIFF'S INITIAL AND EXISTING LNG DREDGING PROJECTS . . 9

    D.  COAST GUARD ADMINISTRATIVE PROCEEDINGS  . . . . . . . . . . . . . 11

    E.  COE PERMITTING PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F.  STATE CLEAN WATER ACT PERMITTING PROCEEDINGS  . . . . . . . . 12

    G.  FERC'S CONDITIONAL CERTIFICATE  . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.      PLAINTIFF HAS NOT STATED A JUSTICIABLE CLAIM
            FOR RELIEF UNDER EITHER THE WSRA OR THE APA . . . . . . . . . . . . . . . . . . . . . 14

            1.  Plaintiff Has Not Raised a Cognizable Claim Under the WSRA. 15

            2.  Plaintiff Has Not Raised a Cognizable Claim Under the APA . . . . . . 17

    B.      EVEN IF PLAINTIFF HAD DESCRIBED A COGNIZABLE
            WSRA OR APA CLAIM, IT LACKS STANDING TO RAISE IT . . . . . 22

    C.      THIS COURT ALSO LACKS JURISDICTION BECAUSE
            PLAINTIFF'S CLAIMS ARE NOT RIPE UNDER THE
            CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            1.  Plaintiff's Cause of Action is Not Fit for Judicial Decision . . . . 26

            2.  Deferring Judicial Review Now Would Not Harm Plaintiff . . . 27

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

**FEDERAL CASES**

Abbott Laboratories v. Gardner,
  387 U.S. 136 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

AT&T v. EEOC,
  270 F.3d 973 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bennett v. Spear,
520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17, 20

Califano v. Sanders,
  430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Center for Auto Safety v. National Highway Traffic Safety Administration,
  452 F.3d 798 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Clarke v. Sec. Indus. Ass'n,
  479 U.S. 388 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

Clean Air Implementation Project v. EPA,
  150 F.3d. 1200 (D.C. Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

Cronin v. Federal Aviation Admin.,
  73 F.3d 1126 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Florida Power & Light Co. v. EPA,
  145 F.3d 1414, 1421 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Independent Petro. Assoc. of Am. v. Babbitt,
  235 F.3d 588 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Kerr-McGee Chemical Corporation v. United States Department of the Interior,
  709 F.2d 597 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-28

Kokkonen v. Guardian Life Ins. Co. of America,
  511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iii

American Paper Institute v. EPA,
  882 F.2d 287 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

National Association of Home Builders v. Norton,
  298 F.Supp.2d 68 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

National Treasury Employees Union v. United States.,
  101 F.3d 1423 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers,
  417 F.3d 1272 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 27

Norton v. Southern Utah Wilderness,
  542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Ohio Forestry Association, Inc. v. Sierra Club,
  523 U.S. 726 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25-28

Pennsylvania Municipal Authorities Association  v. Horinko,
  292 F.Supp.2d 95, 105 (D.D.C.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . )20, 21

Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission,
  324 F.3d 726 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18-21

Royster-Clark Agribusiness, Inc. v. Johnson,
  391 F.Supp.2d 21(D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

State Farm Mut. Auto Ins. Co. v. Dole,
  802 F.2d 474 (D.C. Cir. 1986), cert. denied, 480 U.S. 951 (1987) . . . . . . . . . . . . . . . . . 24

Steel Co. v. Citizens for a Better Environment,
  523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454
  U.S. 464, 474–75 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Whitman v. American Trucking Association,
  531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Wyoming Outdoor Council v. U.S. Forest Service,
  165 F.3d 43 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## FEDERAL STATUTES

109 Pub. L. 59 §§ 1702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

13 U.S.C. 717b(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 717b(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

16 U.S.C. § 1278(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 17

16 U.S.C. § 1286(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 791a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16 U.S.C. §§ 1278(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

16 U.S.C. §§ 1278(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1225(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

33 U.S.C. § 1341(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

33 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

33 U.S.C. §§ 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. 7474(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 22, 23

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

5 U.S.C. §§ 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16 U.S.C. § § 1275(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-10

41 Stat. 1063 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16 U.S.C. § 1276(a)(137) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1273(a)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**STATE STATUTES**

Massachusetts' and Rhode Island's Section 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WEAVER'S COVE ENERGY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case: 1:07-cv-01525 (RBW) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| DEPARTMENT OF THE INTERIOR; | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE; | ) | |
| UNITED STATES NATIONAL PARK | ) | |
| SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF JURISDICTION**

## I. INTRODUCTION

Since at least 2003, plaintiff has failed to obtain federal and state approval for the

commercial project on which all of its legal claims rest: a marine terminal and related

dredging project for liquified natural gas near the mouth of the Taunton River ("LNG

dredging project"), abutting the City of Fall River, Massachusetts.  Declaration of Robert

McIntosh ("Exh. A") at ¶ 3 and Attachment 1 at 1.  For the foreseeable future, plaintiff's

LNG dredging project cannot begin because it has not received or satisfied the contingent

regulatory approvals or environmental permits of numerous federal or state agencies not

challenged in this case, including those of the (1) United States Coast Guard ("Coast Guard")

- 1 -

under 33 U.S.C. § 1225; (2) the U.S. Army Corps of Engineers ("COE") under Section 404 of the Clean Water Act, 33 U.S.C. § 1344; (3) the States of Massachusetts and Rhode Island under Section 401 of the Clean Water Act, 33 U.S.C. § 1341(a); and (4) the Federal Energy Regulatory Commission ("FERC") under 15 U.S.C. § 717b(e). Exh. A at ¶¶ 5-10, 14-17.

Rather than challenge these federal or State agencies here, plaintiff challenges two letters that federal defendants ("Interior") sent in 2005 and 2006 ("2005 letter" and "2006 letter") to FERC and COE respectively. In the 2005 letter, Interior commented on FERC's environmental impact statement ("EIS") for the LNG dredging project, an EIS that plaintiff also does not challenge here. In the 2006 letter, Interior submitted its comments on the COE's proposed Section 404 dredging permit that, as mentioned above, plaintiff does not challenge here. In both the 2005 and 2006 letters, Interior stated that "we do not feel that the [LNG dredging project] can be made compatible with [the] Wild and Scenic River designation of the lower Taunton River in the vicinity of the project area." Exh. A at ¶¶ 9, 11; id., Attachments 1 at 4 and Attachment 4 at 4.

The crux of plaintiff's claims is that these 2005 and 2006 letters harmed its economic and commercial interests by (1) violating the Wild and Scenic Rivers Act ("WSRA"), a statute that Congress enacted to protect the natural environment and (2) compelling FERC to impose a discrete condition in FERC's conditional certificate for the LNG dredging project that, in plaintiff's view, it cannot meet because it required plaintiff to obtain Interior's concurrence that this dredging project would be "consistent with the [WSRA]." Complaint at ¶ 38 and p. 22 (prayer for relief section)(identifying COE and FERC conditions to which

plaintiff objects).

However, for two independent reasons, plaintiff has not raised a justiciable WSRA claim against Interior.  First, under the facts alleged by plaintiff, the WSRA does not confer a legal duty or requirement on Interior.  Instead, the WSRA language at issue is specifically limited to a prohibition of either FERC, in its licensing capacity, or any other agency from "assist[ing] in the construction of any **water resources project** that **would have** a direct and adverse effect  on the values for which [any river designated under the WSRA] was established."  16 U.S.C. § 1278(a) and (b)(emphasis supplied).

Plaintiff expressly premises its WSRA claim on allegations that Interior erred under this statutory language because the LNG dredging project was not and is not a "water resources project" that would directly or adversely affect a river designated under it. Complaint at  ¶¶ 67-76.  However, by the plain terms of the WSRA language quoted above, the WSRA does not bind Interior where there is no "water resources project" affecting a WSRA river.  16 U.S.C. § 1278(a) and (b).  Therefore, plaintiff has not alleged a prima facie WSRA case because, if arguendo its WSRA allegations were true, the WSRA would not **require** Interior or any other agency to oppose a proposed commercial project, support one, or remain neutral, as plaintiff urges.  Id.

Second, plaintiff may not challenge Interior's activities under the WSRA unless it also complies with the Administrative Procedure Act ("APA"), governing plaintiff's right to seek judicial review of informal agency action.  See Complaint at ¶¶ 13-16.  Challenged federal conduct is not justiciable under the APA unless it is "final agency action."  5 U.S.C. § 704.

Under traditional case law, the challenged 2005 and 2006 letters are not final agency actions because, by their express terms, they (1) are premised on a particular LNG dredging project that plaintiff substantially changed after Interior wrote the letters and (2) are also tentative, problematic, and precatory because, by themselves, they do not: impose a binding legal obligation on plaintiff, deny it a right or entitlement, or require plaintiff to either act or not act. See e.g., Bennett v. Spear, 520 U.S. 154, 177-178 (1997).

Even if arguendo plaintiff has described cognizable WSRA and APA claims, plaintiff lacks constitutional or prudential standing to assert them. Because plaintiff's asserted economic and commercial interests in pursuing the LNG dredging are distinctly unrelated to the WSRA's environmental and preservationist purposes, plaintiff lacks standing to sue under the WSRA. See Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987); Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1287 (D.C. Cir. 2005).

Finally, even if plaintiff could invoke an environmental statute to protect its economic interest in LNG dredging, this Court lacks jurisdiction because plaintiff's WSRA and APA claims are not ripe under the Constitution. As mentioned above, regardless of plaintiff's WSRA claims, it cannot commence the LNG dredging project now because independent federal and state agencies not challenged here have not allowed it. Therefore, plaintiff's claims are not ripe for judicial resolution because plaintiff cannot demonstrate that deferring judicial review of the challenged 2005 and 2006 letters would cause concrete harm or hardship. As applied here, the constitutional defense of ripeness would also protect both this Court and Interior from becoming embroiled in a highly abstract and rapidly changing

- 4 -

permitting dispute that numerous federal and state agencies could either change or clarify before plaintiff would suffer the harm alleged.  See Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 732-733 (1998).

## II.  REGULATORY BACKGROUND

### A.  STATUS OF THE TAUNTON RIVER UNDER WSRA

The Wild and Scenic Rivers Act  of 1968 ("WSRA") declares a national policy to (1) protect and preserve certain rivers "which, with their immediate environments, possesses outstandingly remarkable scenic, recreational, geologic, fish and wildlife . . . or other similar values" in a free-flowing condition and (2) also protect the immediate environments of such rivers for the benefit and enjoyment of present and future generations. 16 U.S.C. § 1271.  A river is eligible for inclusion in the National Wild and Scenic River ("NWSR") System if it is free-flowing (as defined at 16 U.S.C. § 1286(b)) and possesses one or more of the outstandingly remarkable values ("ORVs") to which 16 U.S.C. § 1271 refers, i.e., scenic, recreational or fish and wildlife values.

A river may be designated as part of the NWSR System by one of two methods. First, Congress can authorize an eligible river for inclusion in the System. 16 U.S.C. § 1273(a)(I). The second method is by application of a state governor to the Secretary of the Interior. Rivers included in the System by application and designation of the Secretary must not only possess ORVs, but must also be designated as wild, scenic, or recreational by the state legislature.  16 U.S.C.  § 1273(a)(ii).

In the Taunton River Study Act of 2000, Congress authorized Interior to study of the

Taunton River to determine if it should be included in the NWSR System. 16 U.S.C. § 1276(a)(137).  The study area, known as the upper Taunton River, extends "downstream from the headwaters, from the confluence of the Town River and the Matfield River in Bridgewater to the confluence with the Forge River in Raynham, Massachusetts." Id.

Although Congress authorized the study for the upper Taunton River only, Representatives Barney Frank, Jim McGovern, and Stephen Lynch requested in September 2002 that this Interior study should also include the lower Taunton River from the Raynham line to the Mount Hope Bay at Fall River and Somerset.  Accepting this request, Interior administratively extended the study area to include the entire river. Section 5 of the WSRA gives the Secretary of the Interior broad discretion to both consider other potential additions to the NWSR System and submit Interior' recommendations to Congress and the President. 16 U.S.C. § § 1275(a), 1276(d); Exh. A at ¶ 20.

## B.  2005 AND 2006 LETTERS CHALLENGED BY PLAINTIFF

In the 2005 letter's title, Interior described its purpose as "COMMENTS ON THE FINAL ENVIRONMENTAL IMPACT STATEMENT" for the LNG dredging project. FERC prepared this environmental impact statement ("EIS") to analyze its proposed certificate for the LNG dredging project.  Thus, Interior also stated that it was submitting comments to the "Federal Energy Regulatory Commission." Exh. A, Attachment 1 at 1.  As mentioned above, plaintiff does not challenge this EIS here.  See Complaint for Judgment and Relief (filed 27 August 2007).

Interior stated in the 2005 letter's title that it was analyzing FERC's "conformity

determination," in which FERC determined in the EIS that a conditional FERC certificate for the LNG dredging project would be compatible with WSRA. Interior also analyzed FERC's statements in the EIS (1) that, in FERC's opinion, Interior would make a "final determination on whether the [LNG dredging project] would have a substantial adverse effect on the Taunton River's potential designation as a Wild and Scenic River [under WSRA]" and (2) that, therefore, FERC's proposed certificate to plaintiff would include a condition requiring it to file "documentation of concurrence from [Interior] that the project would not have a substantial adverse [effect] on the Taunton River's potential designation as a Wild and Scenic River." Exh. A, Attachment 1 at 1-3.

Interior stated that it disagreed with FERC's WSRA conformity determination for two primary reasons. First, Interior stated to FERC that it "does not appear" that the LNG dredging project would protect the "outstanding fishery value of the Taunton River." Id. Interior also summarized the National Park Service's

> particular concern [that] failure to require recommended dredging time of year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as Wild and Scenic...
> [The Park Service] will continue to consult and coordinate with the appropriate fishery experts and permitting agencies on the conditions that would be necessary to safeguard the outstanding fishery resource of the Taunton River, including its anadromous fish stocks.
> In the absence of satisfactory fishery resource protection, we will not be able to provide the statutorily required affirmative statement of no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System.

Exh. A, Attachment 1 at 3.

- 7 -

Second, Interior agreed with

[t]he relevant State and Federal fishery agencies...that there may be unavoidable adverse site impacts related particularly to the enlargement of the [area in which LNG river vessels would turn] and development of the Weaver's Cove site.  These include permanent loss of 11 acres of winter flounder habitat and 1.15 acres [of] saltmarsh and intertidal/subtidal habitat

Id.  Interior also stated that the LNG dredging project "appears to be contrary to the goals and intentions of the City of Fall River" to both "seek Federal Wild and Scenic River designation" and "connect a significant part of their waterfront to the Taunton River through redevelopment, emphasizing public access and recreation as an important aspect of economic revitalization and quality of life improvement."  Id.

On these primary grounds, Interior "disagree[d] with FERC's tentative conclusion that the proposed project is compatible with the Taunton River's potential designation as a Wild and Scenic River."  Id. at 4.  In submitting these "comments on the [FERC EIS]," Interior did not order or direct either FERC or plaintiff to do or not do anything in the 2005 letter.  See id. at 1.  Further, Interior expressly limited its analysis to the LNG dredging project "as currently proposed" in the EIS as of 5 July 2005, the date of the 2005 letter.  Id. at 4.

In the 2006 letter, Interior states that it is submitting the "following comments" to the "U.S. Army Corps of Engineers ["COE"]."   See Exh. A at ¶ 6 and Attachment 4 at 1.  Interior submitted these comments to COE in response to COE's pending decision to either issue or not issue Section 403 and Section 404 dredging permits under the CWA for the LNG dredging project.  See Exh. A at ¶ 6 and Attachment 4 at 1.  Plaintiff does not challenge these dredging permits here.  See Complaint.

In addition, Interior recommended in its 2006 letter that the COE adopt two conditions in the proposed CWA permits to protect "anadromous fish" by protecting their "upstream and downstream migrations." Exh. A, Attachment 4 at 1. To protect these fish and their migrations, Interior recommended a "time of year" restriction on dredging "of March 1–July 31" for upstream migration, and "July 1 through October 31" for downstream migration. Interior also stated that, if these dredging restrictions were not included in the COE permits, Interior would "continue to recommend that [plaintiff's] application be denied." Id. at 2, 4.

In submitting this recommendation to COE, Interior did not direct or require either COE or plaintiffs to do or refrain from doing anything. Again, Interior expressly limited its recommendation to the LNG dredging project "currently proposed" as of 7 February 2006, the date of the 2006 letter. Id. at 4.

## C. **PLAINTIFF'S INITIAL AND EXISTING LNG DREDGING PROJECTS**

Both the LNG dredging project's marine terminal and its "navigation channel and [vessel] turning basin" for the LNG tankers and vessel traffic proposed in this project would require dredging between 2.5 and 2.6 million cubic yards of sediment from the Taunton River. Exh. A at ¶ 3 and Attachment 4 at 1.

As of the dates of the 2005 and 2006 letters, the LNG dredging project proposed by plaintiff required the use of large, "150-foot wide LNG tankers." Exh. A, Attachment 3 at 15-16 (23 January 2006 FERC supplemental hearing). Plaintiff's proposed tankers would have to safely traverse a marine corridor under the Brightman Street Bridge, "a nearly 100-year old" drawbridge. Id. In the 2005 Safe, Accountable, Flexible, Efficient

Transportation Equity Act: A Legacy for Users ("Transportation Act"), Congress prohibited

the demolition of this bridge with federal funds.  109 Pub. L. 59 §§ 1702, 1948 (Aug. 10,

2005).  In response, FERC determined that, as proposed, the LNG dredging project could not

begin because plaintiff's proposed 150-foot wide tankers could not use the navigation

channel.

> The existing Brightman Street Bridge was, until passage of [the
> Transportation Act] scheduled for demolition upon completion of a new
> Brightman Street Bridge [to] replace the old bridge.  The existing bridge has
> a horizontal clearance of only 98 feet, which will not accommodate the
> 150-foot wide LNG tankers Weaver's Cove plans to employ to transport LNG
> to the new terminal. [The City of] Fall River is correct that if the existing
> Brightman Street Bridge is not removed, as had been planned, the large LNG
> vessels described in the [FERC] application will not be able to access the
> proposed upstream LNG terminal.  The [previous FERC] Order includes a
> condition requiring Weaver's Cove to review its waterway suitability
> assessment on an annual basis in consultation with the Coast Guard.  This
> annual update to [FERC] will need to address the continuing status of the
> Brightman Street Bridge, and thus, the viability of the Weaver's Cove project.

Exh. A, Attachment 3 at 15-16 (23 January 2006 FERC supplemental hearing).

Thereafter, in early February 2006, plaintiff changed the LNG dredging project

analyzed in Interior's 2005 and 2006 letters by (1) proposing to use smaller tankers or vessels

with a width of less than "98-feet" that would also require "more frequent trips to the

proposed Taunton River LNG terminal" and (2) adopting some of the time of year dredging

restrictions recommended in Interior's 2006 letter.  Exh. A at ¶ 12 and Attachment 3 at 15-16

(23 January 2006 FERC supplemental hearing).

Interior learned that plaintiff changed its LNG dredging proposal after Interior sent

its 2005 and 2006 letters to FERC and the COE respectively. Exh. A at ¶ 18.  Thus, Interior

determined that the analysis in those letters did not and could not reflect "a final decision under the WSRA about the Taunton River dredging project's potential impacts to the Taunton River's fish and wildlife values." Id. Instead, in response to intervening navigation safety and environmental decisions of the Coast Guard, COE, Massachusetts, and Rhode Island, summarized below, Interior "suspended its review of the Taunton River dredging project," pending the outcome of those decisions. Id.

### D.  COAST GUARD ADMINISTRATIVE PROCEEDINGS

Pursuant to its statutory mandate to protect "the navigable waters...from harm resulting from vessel or structure damage," the Coast Guard reviewed the new waterway suitability assessment that plaintiff submitted under its new proposal to both decrease the size and increase the marine density of its proposed LNG tanker traffic. See 33 U.S.C. § 1225(a)(2); see also Exh. A at ¶¶ 14, 17 and Attachments 7, 8, and 12 at 5. In separate determinations dated 9 May 2007, 24 October 2007, and 7 December 2007, the Coast Guard decided that both the design and the traffic density proposed for plaintiff's new LNG tankers would create an unacceptably high risk of damaging "the Brightman Street bridges" and closing "the waterway...to marine traffic for a prolonged period of time."  Exh. A, Attachment 8 at 26.  Therefore, the Coast Guard concluded that the LNG dredging project "is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG traffic associated with" it. Id. at ¶¶ 14, 17 and Attachment 12 at 5.

### E.  COE PERMITTING PROCEEDINGS

Pursuant to Sections 403 and 404 of the Clean Water Act ("CWA"), the LNG

dredging project cannot proceed without dredging permits from the COE. See 33 U.S.C. §§ 403 and 1344(a); Exh. A at ¶ 6. In June 2007, the COE decided to conduct "additional agency and public comment" before deciding to grant or not grant the Section 403 and 404 dredging permits. The COE also notified Interior that it "would not issue the required dredging permits to Weaver's Cove unless and until the project had cleared both the Coast Guard and state water qualification hurdles." Exh. A at ¶ 16 and Attachment 11.

### F. STATE CLEAN WATER ACT PERMITTING PROCEEDINGS

Pursuant to Section 401 of the CWA, the LNG dredging project cannot proceed unless the States of Massachusetts and Rhode Island certify that discharges from this dredging project would comply with their state water quality standards. See 33 U.S.C. § 1341(a); Exh. A at ¶ 7. On 4 June 2007 and 14 December 2007, Massachusetts (1) suspended its processing of plaintiff's proposed Section 401 authorization, pending the Coast Guard's resolution of the navigation safety issues summarized above and (2) decided that plaintiff's Section 401 permit application was defective. Exh. A at ¶ 15 and Attachments 9 and 10. Similarly, on 10 August 2007, Rhode Island denied plaintiff's proposed Section 401 permit because the permit application was incomplete and also because plaintiff had changed the "scope of the" LNG dredging project after submitting this application. Exh. A at ¶ 15. Plaintiff is now challenging Massachusetts' and Rhode Island's Section 401 determinations in the District of Columbia Circuit. Id.

### G. FERC'S CONDITIONAL CERTIFICATE

Under Section 3 of the Natural Gas Act ("NGA"), the LNG dredging project cannot

begin until plaintiff both receives and complies with the conditions of a FERC certificate governing this project's location, construction, and operation. See 13 U.S.C. 717b(e). On 15 July 2005, plaintiff obtained a contingent FERC certificate that, among other things, required plaintiff to meet 77 conditions before commencing its LNG dredging project. Exh. A at ¶ 5 and Attachment 2 at 44-59 (describing the 77 conditions). Thereafter, FERC noted that the the LNG dredging project's commencement:

> is subject to many significant variables whose outcomes cannot be predetermined. Accordingly, consistent with longstanding practice, and as authorized [by statute, FERC] typically issues certificates under its NGA jurisdiction subject to conditions that must be satisfied by an applicant or others before the grant of a certificate can be effectuated by constructing and operating the project...As is the case in virtually every certificate issued by [FERC] that authorizes construction of facilities, the approval in [the certificate] is subject to Weaver's Cove's compliance with the environmental conditions set forth in the order. In this proceeding, there are 77 such conditions.

Exh. A, Attachment 3 at 38-39 (23 January 2006 FERC supplemental order).

Because the Coast Guard, COE, Massachusetts, and Rhode Island have not granted the regulatory approvals necessary for the LNG dredging project to proceed under their separate jurisdiction, described above, FERC also cannot authorize this project under its jurisdiction. To date, plaintiff has not met several conditions of its contingent FERC certificate, including (1) condition 75, which requires plaintiff to submit a "water suitability assessment" for the Coast Guard's "review and validation," (2) conditions 16 and 19, which require plaintiff to consult with the COE about "dredging and managing [consequent] sediment" and also to file any related COE plans or requirements with FERC for its "review

and approval...**prior to dredging**," and (3) conditions 23 and 24, which require plaintiff to file "documentation of concurrence" by the States of Massachusetts and Rhode Island. Exh. A, Attachment 2 at 49-50, 59 and Attachment 3 at 4 (17 April 2006 FERC supplement order)(emphasis in original).

## III. ARGUMENT

### A.  PLAINTIFF HAS NOT STATED A JUSTICIABLE CLAIM FOR RELIEF UNDER EITHER THE WSRA OR THE APA

Plaintiff alleges that Interior violated two statutes: the WSRA and the Administrative Procedure Act ("APA"). <u>See</u> Complaint at ¶¶ 67-88 (WSRA claims) and ¶¶ 89-99 (APA claims). Plaintiff has not alleged a prima facie case under either statute. Therefore, under Rules 12(b)(1) and (6), Fed. R. Civ. P., this Court must dismiss plaintiff's complaint because plaintiff has not stated a cognizable claim.

#### 1.  **<u>Plaintiff Has Not Raised a Cognizable Claim Under the WSRA</u>**.

Plaintiff rests its claims on a mistaken belief that the APA, by itself, can establish both subject matter jurisdiction and a statutory basis for plaintiff's allegation that the 2005 and 2006 letters were illegal because they were also "arbitrary and capricious" under the APA. <u>See</u> Complaint at ¶¶ 13, 15, 94, and 99. However, the APA only provides a limited waiver of defendants' sovereign immunity from lawsuits challenging administrative actions where plaintiffs establish, among other things, that they were harmed by a "legal wrong...within the meaning of a relevant statute" different from the APA. 5 U.S.C. § 702. Therefore, it is well-settled that, by itself, the APA cannot establish either subject matter jurisdiction or a

- 14 -

statutory basis for relief.  See  e.g., Califano v. Sanders, 430 U.S. 99, 107 (1977)("APA does not afford an implied grant of subject matter jurisdiction"); Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission, 324 F.3d 726, 731-735 (D.C. Cir. 2003).

To make a prima facie WSRA case, plaintiff would have to establish, among other things, that Interior either committed a "legal wrong" under the WSRA or did not take an action "legally required" by the WSRA.  5 U.S.C. §§ 702, 706(1); Norton v. Southern Utah Wilderness, 542 U.S. 55, 63-64 (2004).  Here, on the face of plaintiff's WSRA allegations, the WSRA 's relevant provisions did not require Interior to either do or refrain from doing anything.  Therefore, plaintiff has not alleged a justiciable claim.

Plaintiff rests its WSRA claim on 16 U.S.C. §§ 1278(a) and (b).  See Complaint at ¶¶ 67-94.  The first sentences of Section 7(a) and Section 7(b) are nearly identical:

> The Federal Energy Regulatory Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act (41 Stat. 1063), as amended (16 U.S.C. § 791a et seq.), on or directly affecting any river which is designated in section 1274 of this title as a component of the national wild and scenic rivers system or which is hereafter designated for inclusion in that system, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any **water resources project that would have a direct and adverse effect on the values for which such river was established**, as determined by the Secretary charged with its administration.

16 U.S.C. § 1278(a) (emphasis added).[1]

_____

[1]Section 7(b) differs only in that it applies to any river listed in Section 1276(a) (Study Rivers) and places time limitations on the protection provided for rivers being studied for potential addition to the NWSR System.  See 16 U.S.C. §§ 1278(b).

To make a prima facie case under this language, plaintiff would have to allege that the relevant commercial project was (1) a "water resources project" and (2) that this project would directly or adversely affect the environmental "values" of a WSRA river.  Id. However, plaintiff has pleaded precisely the opposite circumstances.  The gist of its WSRA theory is that its LNG dredging project would **not** "have a direct and adverse effect on the values for which" the Taunton River was designated under the WSRA because (1) the LNG dredging project is not a "water resources project" within the meaning of the WSRA language above and, therefore, is consistent with the WSRA and (2) Interior did not muster sufficient evidence that the this dredging project would "have a direct and adverse effect" on the Taunton River.  See id.; Complaint at ¶¶ 93-94, 98.

However, if arguendo these allegations were true, the WSRA would not require Interior to write letters or otherwise act, either for or against that project.  16 U.S.C. §§ 1278(a) and (b). Therefore, plaintiff has not pleaded a justiciable claim because its WSRA allegations do not establish a "legal wrong...within the meaning of" either the WSRA or any other statute.  5 U.S.C. § 702.

## 2.  **Plaintiff Has Not Raised a Cognizable Claim Under the APA.**

Even if plaintiff arguendo has identified a mandatory WSRA duty or requirement that Interior could have violated under the facts alleged, it has not stated a cognizable claim under the APA.  Plaintiff does not dispute that the WSRA, by itself, does not render agency actions challenged under it "reviewable [in federal court] by statute."  5 U.S.C. § 704.  Where, as here, "no other statute provides a private right of action, the 'agency action' complained of

- 16 -

[under the APA] must be '**final** agency action.'" <u>Norton</u>, 542 U.S. at 61-62 (emphasis in original), <u>quoting</u> 5 U.S.C. § 704.

To challenge "final" and therefore justiciable agency action under the APA, plaintiff must show that 2005 and 2006 letters transmitted completed or inevitable agency actions or decisions with two primary characteristics. First, these letters must mark the completion and "consummation of the agency's decisionmaking process–it must not be of a tentative or interlocutory nature." <u>Bennett v. Spear</u>, 520 U.S. 154, 177-178 (1997)(internal quotations and citations omitted) ("<u>Bennett</u>").

Under this <u>Bennett</u>'s "completion" standard, a challenged federal activity is not final where plaintiff retained both the opportunity and discretion, without seeking judicial or other adjudicative review, to ask the relevant agency to reconsider its analysis. Thus, even where a challenged letter notified plaintiff of a "preliminary determination" that it had violated federal law, requested plaintiff to take "corrective action," and also notified plaintiff of imminent "on-the-record adjudication" if it did not take corrective action, the D.C. Circuit deemed the letter not final under the APA because:

> [s]o long as [plaintiff] retains the opportunity to convince the agency [that it was wrong], it makes no sense for a court to intervene. It conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review was undertaken.

<u>Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission</u>, 324 F.3d 726, 733 (D.C. Cir. 2003).

Plaintiff consequently cannot meet the Supreme Court's completion standard because,

on their face, the 2005 and 2006 letters inform COE and FERC that Interior could change its mind after additional analysis. In the 2005 letter, Interior states that the decision therein to not yet "provide the statutorily required affirmative statement of no adverse impact" to the Taunton River is premised on the existing "absence of satisfactory fishery resource protection" and, therefore, could change if either FERC or plaintiff adopted "satisfactory fishery resource protection." Exh. A, Attachment 1 at 3.

Further, Interior specifically states in the 2005 letter that it would not finalize its analysis of the WSRA issues until after it (1) completes ongoing discussions with federal and state natural resource agencies and (2) also considers future action by Congress.

> [Interior] will continue to consult and coordinate with the appropriate fishery resource experts and permitting agencies on the conditions that would be necessary to safeguard the outstanding fishery resource of the Taunton River, including its anadromous fish stocks...
> Until Congress has made a final determination on whether to designate some, all, or none of the Taunton River as a component of the National Wild and Scenic River System, we may not be able to render a finding of no adverse impact related to the potential Wild and Scenic River designation.

Id. at 3-4. Similarly, as mentioned above, Interior later recommended time of year dredging restrictions in its 2006 letter to the COE for both potential upstream and potential downstream fish migration.[2] Thus, Interior specifically stated to the COE that its 2006 analysis also could change if either COE or plaintiff adopted "time-of-year restrictions for both upstream and downstream migrations." Exh. A, Attachment 4 at 4.

Finally, on their face, the 2005 and 2006 letters are each contingent on the LNG

---

[2] See supra at 9.

dredging project "currently proposed" as of 5 July 2005 and 7 February 2006 respectively, the dates of those letters. Id., Attachments 1  at 4 and Attachment 4 at 4.  As shown above, supra at 9-11, plaintiff materially changed the LNG dredging project after Interior wrote the challenged letters.  Therefore, FERC, plaintiff, and COE each retained discretion to request Interior to reconsider the 2005 and 2006 letters because, by their terms, the analysis therein was not only tentative but also outdated and void before plaintiff commenced this lawsuit. See also Exh. A at ¶¶ 12, 18 (Interior decides in early 2006 to begin new analysis superseding previous 2006 letter but later suspends its new analysis, pending resolution of separate navigation safety and other issues by the Coast Guard, Massachusetts, and Rhode Island).

On these grounds, plaintiff cannot meet Bennett's and the D.C. Circuit's completion standard because the 2005 and 2006 letters stated on their face that FERC, plaintiff, or the COE still retained viable opportunities to change the environmental analysis therein.  Thus, the 2005 and 2006 letters do not constitute final agency action under the APA because they were not definitive but highly contingent and, therefore, could not affect plaintiff's day to day business by themselves.  Independent Petro. Assoc. of Am. v. Babbitt, 235 F.3d 588, 594 (D.C. Cir. 2001); see also Whitman v. American Trucking Association, 531 U.S. 457, 478 (2001)(agency action not final unless agency "has rendered its last word on the matter"); Bennett, 520 U.S. 154, 177-178; Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission, 324 F.3d 726, 731, 733; Pennsylvania Municipal Authorities Association v. Horinko, 292 F.Supp.2d 95, 105 (D.D.C.2003)( challenged federal activities are not final agency actions because they do "not preclude [plaintiffs] from bringing future

actions when and if they suffer more concrete harms").

Plaintiff also cannot meet the second part of <u>Bennett</u>'s definition of final agency action: challenged federal activities are not final unless, by themselves, they are completed agency actions for which particular "rights or obligations have been determined, or from which legal consequences will flow." <u>Bennett</u>, 520 U.S. at 177-178 (quotations omitted). Under Bennett's "independent legal consequences" standard, challenged agency letters are not final agency actions where they do not, by themselves, "inflict cognizable legal injury nor bind the agency to a particular course of action." <u>Royster-Clark Agribusiness, Inc. v. Johnson,</u> 391 F.Supp.2d 21, 28-29 (D.D.C. 2005); <u>see also</u> <u>Reliable Automatic Sprinkler Co.</u>, 324 F.3d at 731, 733-734 (challenged activity must impose a "legally binding determination" by itself).; <u>AT&T v. EEOC</u>, 270 F.3d 973. 975-976 (D.C. Cir. 2001).

Here, the challenged letters do not state that they are imposing a binding legal obligation on FERC, COE, or plaintiff. Instead, these letters were specifically written to the two agencies, FERC and the COE, that had primary regulatory authority to bind plaintiff or harm its stated interests by either approving or denying the LNG dredging project. Notably, plaintiff has not adduced a statute or case law that requires either FERC or the COE to agree with the 2005 and 2006 letters. Therefore, these letters are not final agency actions because they do not state – and because federal law does not require – that FERC, plaintiff, or COE must change their behavior because of them. <u>Id.</u>; <u>see also</u> <u>National Association of Home Builders v. Norton</u>, 298 F.Supp.2d 68, 78-79 (D.D.C. 2004).

Therefore, lacking recognized authority to impose a legal requirement on plaintiff by

themselves, the 2005 and 2006 letters are not final agency actions because "telegraphing your punches is not the same thing as delivering them."  <u>Pennsylvania Municipal Authorities Association v. Horinko</u>, 292 F.Supp.2d 95, 105 <u>Id</u>. at 103, quoting  <u>American Paper Institute v. EPA</u>, 882 F.2d 287, 289 (7th Cir. 1989).  Plaintiff consequently has not raised a justiciable claim because this Court lacks "authority to review claims under the APA where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party."[3/] <u>Center for Auto Safety v. National Highway Traffic Safety Administration</u>, 452 F.3d 798, 807-808 (D.C. Cir. 2006)(quotations omitted).

### B.  EVEN IF PLAINTIFF HAD DESCRIBED A COGNIZABLE WSRA OR APA CLAIM, IT LACKS STANDING TO RAISE IT

To establish standing and therefore subject matter jurisdiction under Article III of the Constitution,[4/] plaintiff may not rest on mere allegations, but must set forth specific facts . <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992). Plaintiff has the burden of establishing standing.  <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 103-104 (1998).  Among other things, plaintiff must demonstrate that: (1) it has suffered an "injury-in-fact" to a legally protected interest that is both "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical;" (2) there is a "causal

---

[3/]In addition to expressing Interior comments pursuant to the WSRA, these same letters contain comments provided pursuant to the Fish and Wildlife Coordination Act, 16 U.S.C. § 661. For all the same reasons expressed above, comments made pursuant to the Fish and Wildlife Coordination Act cannot be considered final agency action for the purposes of an APA challenge.

[4/] Article III, Section 2 of the Constitution extends "the judicial Power" to all "Cases [and] Controversies."

connection between their injury and the conduct complained of;" and (3) it is "likely" – not merely "speculative" – that their injury will be "redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-561.

Plaintiff cannot come close to meeting any of these traditional standards.  As shown above, <u>supra</u> at 14-17, plaintiff has not pleaded a prima facie WSRA or APA case because their WSRA allegations on their face do not establish a "legal wrong" under either the WSRA or any other statute.  5 U.S.C. § 702.  Further, plaintiff has failed to identify a provision of the WSRA or any other law that requires the federal agencies with primary regulatory responsibility to either stop or authorize the LNG dredging project (the Coast Guard, FERC, and COE) to agree with the 2005 and 2006 letters.  Thus, unable to plead a prima facie WSRA case, plaintiff also cannot show injury to an interest protected by an applicable requirement of the WSRA and, for the same reason, this Court cannot rectify the commercial injuries that plaintiff postulates.  <u>See</u> <u>id</u>.

Therefore, plaintiff lacks standing under Article III of the Constitution.  <u>Id</u>.  Where, as here,  plaintiff's alleged injury hinges on the highly problematic choices of independent government agencies and the communities they regulate, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury."  <u>Id</u>. at 562.

In addition to Article III's constitutional requirements, courts have developed a set of prudential considerations to limit standing in federal court and thereby prevent plaintiffs "from adjudicating 'abstract questions of wide public significance' which amount to

'generalized grievances' pervasively shared and most appropriately addressed in the representative branches."   Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 474–75 (1982) (quoting Warth v. Seldin, 422 U.S. 490, 499–500 (1975)).  To that end, "the plaintiff's complaint must fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"   Valley Forge, 454 U.S. at 475 (quoting Ass'n of Data Processing Service Orgs. v. Camp, 397 U.S. 150, 153 (1970)).

    As shown above, supra at 5-6, Congress enacted the WSRA not to augment dredging projects or other commercial enterprises, but to protect rivers possessing "outstandingly remarkable scenic, recreational, geologic, fish and wildlife . . . or other similar values."  16 U.S.C. § 1271. Therefore, plaintiff lacks prudential standing because it asserts commercial interests here "'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"   Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers, 417 F.3d 1272, 1287, quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987).

### C.  THIS COURT ALSO LACKS JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARE NOT RIPE UNDER THE CONSTITUTION

    Ripeness is a constitutional and jurisdictional doctrine derived from Article III's "case or controversy" clause.  See e.g., State Farm Mut. Auto Ins. Co. v. Dole, 802 F.2d 474, 479 (D.C. Cir. 1986), cert. denied, 480 U.S. 951 (1987). Under Supreme Court precedent, the party commencing the cause of action bears the burden of establishing jurisdiction.

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)(once jurisdiction is raised, Court presumes that "cause lies outside [our] limited jurisdiction" and that "burden of establishing the contrary rests upon the party asserting jurisdiction").  Traditionally, the Supreme Court and the District of Columbia Circuit apply ripeness principles to protect federal courts, federal agencies, or the public from litigation that is harmful or wasteful precisely because it is also premature.  As a jurisdictional doctrine, ripeness is often the prudential mechanism by which federal courts abate two types of extra-judicial injuries.

First, ripeness analysis protects the courts from "entangling themselves" in abstract administrative or constitutional disputes for which there is no palpable or inevitable harm and, therefore, for which the expenditure of judicial time and resources would be wasteful and improvident.  Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 732-733 (1998), quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149 (1967); see also National Treasury Employees Union v. United States., 101 F.3d 1423, 1431 (D.C. Cir. 1996).

Second, the ripeness doctrine also protects federal agencies from premature judicial interference in administrative decision-making or decisions that can be refined or changed in the future because their effects have not yet been "felt in a concrete way by the challenging parties."  Id.; see also Clean Air Implementation Project v. EPA, 150 F.3d. 1200, 1205-1206 (D.C. Cir. 1998); Kerr-McGee Chemical Corporation v. United States Department of the Interior, 709 F.2d 597-598, 600-601 (9th Cir. 1983).

To advance these prudential purposes, courts enforce ripeness principles by balancing two jurisprudential factors, of which a "case or controversy"-–or the lack thereof–- is

necessarily comprised.  First, courts must assess the extent to which the  underlying dispute is inevitable and therefore palpable to ascertain "the fitness of the issues for judicial decision."  Second, courts must consider "whether delayed review would cause hardship to the plaintiffs." Ohio Forestry Association, Inc. v. Sierra Club, 523 U.S. 726, 732-733.

**1. Plaintiff's Cause of Action is Not Fit for Judicial Decision.**

Applying the first part of this standard, the operative dispute between plaintiff and Interior is not sufficiently inevitable and concrete to be efficiently adjudicated.  As shown above, supra at 6-11, (1) Interior expressly premised its 2005 and 2006 letters on the LNG dredging project as "currently proposed," (2) plaintiff materially changed that project after Interior wrote the challenged letters; (3) Interior commenced a new analysis of the same WSRA issues in response to plaintiff's new LNG dredging project; and (4) Interior then suspended its new analysis, pending resolution of separate navigation safety issues or water quality issues by the Coast Guard, COE, and the States of Rhode Island and Massachusetts. See also Exh. A at ¶¶ 12-18.

On these eminently practical grounds, plaintiffs' cause is not fit "for judicial decision" because judicial review of plaintiff's dispute with Interior now "may impede" Interior's interest in applying its WSRA expertise to both a new and a highly "particular [factual] setting," occasioned by the intervening decisions of different federal and state agencies to consider new navigation safety and water quality issues. Cronin v. Federal Aviation Admin., 73 F.3d 1126, 1131 (D.C. Cir. 1996)(case not fit for resolution where judicial review would "benefit from letting the question arise in some more concrete form"); see also Ohio Forestry

- 25 -

Association, 523 U.S. at 735; <u>Wyoming Outdoor Council v. U.S. Forest Service</u>, 165 F.3d 43, 48-49 (D.C. Cir. 1999)(case not fit for adjudication where plaintiff's interest in prompt adjudication is outweighed by "agency's interest in crystallizing its policy...and court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting"); <u>Kerr-McGee Chemical Corporation</u>, 709 F.2d 597-598, 600-601 (case not fit for judicial resolution where state's ability to "act independently of and inconsistently with [federal] recommendation" implicates future state and federal decision-making).

### 2.  **Deferring Judicial Review Now Would Not Harm Plaintiff.**

Plaintiff must also show that the effect of the 2005 and 2006 letters "now inflicts significant practical harm upon [their] interests" to merit judicial review now, as opposed to "later." <u>Ohio Forestry Association</u>, 523 U.S. at 733-734.  In contrast, a case is not ripe where a plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."  <u>Id.</u> at 734.

Here, regardless of whether this Court decides to adjudicate plaintiff's WSRA claims now, the LNG dredging project cannot proceed because the Coast Guard, COE, FERC, Massachusetts, and Rhode Island have not authorized it.  Further, at a later time after completion of these administrative processes, assuming plaintiff opposes the final decisions, plaintiff may seek judicial review.  Therefore, plaintiff's claims are not ripe because deferring judicial review of their claims would not "have a direct and immediate impact on [plaintiff] that rises to the level of hardship." <u>Nat'l Ass'n of Home Builders</u> , 417 F.3d at 1284; <u>Clean Air Implementation Project v. EPA</u>, 150 F.3d. 1200, 1205-1206, quoting <u>Florida</u>

Power & Light Co. v. EPA, 145 F.3d 1414, 1421 (D.C. Cir. 1998) ("burden of participating in future [administrative or judicial] proceedings does not 'constitute sufficient hardship for the purposes of ripeness').

The relevant facts of Kerr-McGee, 709 F.2d 597-598, 600-601, are highly analogous to those here. In Kerr-McGee, a corporation alleged that it would be harmed under the Clean Air Act ("CAA") and other statutes by the federal government's prospective imposition of stricter air quality standards. However, although the Department of the Interior had prepared an environmental document recommending the imposition and "redesignation" of stricter environmental standards, California retained final and "ultimate control" over whether these stricter standards would actually be imposed against the plaintiff corporation. Because the state retained authority under CAA to "act independently of and inconsistently with the [federal redesignation recommendation]," the Ninth Circuit held that the corporation's cause of action was "not ripe for decision." Id. at 601-602.

Here, the Coast Guard, COE, Massachusetts, and Rhode Island have exercised more independent authority than California did in Kerr-McGee. Instead of merely retaining independent authority in the future to regulate the LNG dredging project, these entities have recently withdrawn, withheld, or suspended their authority to approve it on grounds not challenged here. In sum, plaintiff cannot show that deferring any judicial review to a "later" time would precipitate "an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached" to deferring judicial review. Ohio Forestry Association, 523 U.S. at 734; Abbott Laboratories, 387 U.S. at 153. Therefore, plaintiff's claim is not ripe under the Constitution.

- 27 -

## IV.  CONCLUSION

For two reasons, plaintiff has not raised a justiciable WSRA or APA claim.  First, plaintiff has not pleaded a prima facie WSRA case because, even if true, its allegations do not establish that Interior violated a legal requirement of the WSRA.  Second, the challenged 2005 and 2006 letters are not final agency actions under the APA.

Further, for two additional reasons, this Court lacks jurisdiction.  First, plaintiff lacks constitutional and prudential standing because, unable to plead a WSRA violation, it cannot establish harm from a legal wrong.  Finally, plaintiff's attempt here to challenge the two Interior letters is not ripe under the Constitution.  Therefore, under Rules 12(b)(1) and (6), Fed. R. Civ. P., this Court must dismiss plaintiff's complaint.

Respectfully submitted,

_____
GREGORY D. PAGE, DC Bar 398121
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0446
Attorneys for the Federal Defendants

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served on 31 January 2008 by electronic filing to :

> Jeffrey M. Bauer
> Adam J. White
> Baker Botts L.L.P.
> 1299 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2400

_____
Gregory D. Page

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————x

WEAVER'S COVE ENERGY, LLC,

          Plaintiff,

              v.

U.S. DEPT. OF THE INTERIOR, ET AL.,

          Defendants.

—————————————————————x

**DECLARATION OF**
**ROBERT MCINTOSH**

CIVIL ACTION
07-cv-05125

I, ROBERT MCINTOSH, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury that the following is true and correct based on my personal knowledge and belief:

      1.     I am employed by the National Park Service (NPS), which is a bureau of the U.S.

Department of the Interior ("Interior"). I currently hold the position of Associate Regional

Director for Planning, Construction and Facility Management for the Northeast Region of the

NPS. I have been employed in this position since the spring of 2006. I have served in various

capacities as an Associate Regional Director in the Northeast Region since 1990. Prior to that, I

served as the General Superintendent for the Gateway National Recreation Area, Regional

Director of the former Heritage Recreation and Conservation Service as well as various planning

and policy management positions in Washington, the Southwest and the Pacific West regions.

Throughout my career and particularly since the enactment of the National Environmental Policy

Act (NEPA), I have managed the preparation and review of environmental impact documents

and Federal permit applications for projects proposed by the NPS, as well as other agencies and

the private sector. These projects have ranged from general management plans for many of the

parks in the Northeast Region, to storm damage reduction projects undertaken by the U. S. Army

Corps of Engineers ("Corps") and maintenance dredging projects for navigation channels. The

NPS reviews projects proposed by other agencies and the private sector for potential impacts to

natural and cultural resources, and recreational opportunities.

      2.      As the Associate Regional Director for Planning, Construction and Facility

Management, I oversee the NPS' regional planning responsibilities for park general management

plans, special resource studies that determine the suitability and feasibility of potential additions

to the National Park System, studies that determine the feasibility of potential additions to the

National Wild and Scenic Rivers System, the National Trail System, and National Heritage

Areas. The Taunton River has been designated as a potential addition to the National Wild and

Scenic River System pursuant to 16 U.S.C. § 1276(a)(137). Under the Wild and Scenic Rivers

Act ("WSRA"), Interior is responsible for administering, managing, and protecting rivers

included in the National Wild and Scenic Rivers System.[1] Interior has delegated its authority to

carry out the purposes of the WRSA to the NPS. Section 7 of the WSRA prohibits federal

agencies from authorizing or licensing certain developments that would affect a Wild and Scenic

River or a river designated by Congress for study as a potential addition to the National Wild and

Scenic Rivers System. 16 U.S.C. § 1278.

---

[1] The Department of Agriculture is responsible for National Wild and Scenic Rivers that
are located within national forests.

3.    I am familiar with Weaver's Cove Energy, LLC's ("Weaver's Cove") proposed liquefied natural gas (LNG) facility near the mouth of the Taunton River in Fall River, Massachusetts. Based on Weaver's Cove's most recent dredging proposal, construction of the proposed LNG facility would require dredging approximately 2.5 million cubic yards of sediment in the lower Taunton River and Mount Hope Bay to improve and expand the existing navigation channel and turning basin. Hereinafter, I refer to the proposed project as the "Taunton River dredging project."

4.    I have reviewed the complaint filed by Weaver's Cove and I am familiar with plaintiff's allegations, particularly as they relate to Interior's statutory authority under the WSRA, 16 U.S.C. § 1272, for which the NPS is responsible.

5.    Before Weaver's Cove can commence construction of the Taunton River dredging project, it must obtain a number of state and federal regulatory approvals. First, the Federal Energy Regulatory Commission ("FERC") must approve the siting, construction and operation of the LNG terminal under Section 3 of the Natural Gas Act, 15 U.S.C. § 717b.

6.    Second, the Corps must issue dredging permits pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, Section 103 of the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1413, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344. These laws prohibit construction, dredging, filling, or disposing of material in United States waters without the approval of the Corps. The Corps ensures compliance with these laws by issuing permits for dredging activities that are in the public interest.

7.    Third, Weaver's Cove must obtain water quality certification under Section 401 of the Clean Water Act, 33 U.S.C. § 1341, from the Commonwealth of Massachusetts and the State

-3-

of Rhode Island, for the dredging project. Section 401 of the Clean Water Act requires an

applicant for a Federal permit to conduct an activity that may result in any discharge into

navigable waters, to obtain certification from the State (in which the discharge will originate)

that the discharge complies with the State's water quality standards.

8.      Fourth, the U.S. Coast Guard is responsible for the Taunton River and the

resources therein from harm resulting from marine traffic related to the Weaver's Cove proposed

LNG project, and for ensuring navigational safety pursuant to 33 U.S.C. § 1225.

9.      On July 5, 2005, Interior's Office of Environmental Policy and Compliance

submitted comments to FERC on behalf of the Fish and Wildlife Service (FWS) and the NPS

regarding the final environmental impact statement prepared with respect to Weaver's Cove's

Section 3 application. Attachment 1. The Office of Environmental Policy and Compliance

designated the FWS as the lead bureau responsible for coordinating and preparing comments on

behalf of Interior and its other bureaus because of the focus on fisheries issues. Interior's analysis

of the Taunton River dredging project was based on the project description proposed at that time.

Attachment 1 at 4.

10.      On July 15, 2005, FERC issued an order granting Weaver's Cove Section 3

application. Order Granting Application, 112 FERC ¶ 61,070 ("Approval Order"). Attachment 2.

This order is subject to several conditions that have not yet been met. These conditions are set

forth in Appendix B, and include the following:

A.      Condition 75 requires annual updates of Weaver's Cove's waterway
suitability assessment for the project from the U.S. Coast Guard pursuant to 33 C.F.R. § 127.009,
which implements the Coast Guard's responsibilities under 33 U.S.C. § 1225. Pursuant to 33
U.S.C. § 1225, the U.S. Coast Guard is required to prevent damage to any bridge or other
structure on or in navigable waters and to protect navigable waters and the resources therein
from harm resulting from vessel or structure damage, destruction, or loss.

-4-

B.    Condition 25 requires Weaver's Cove to file with FERC prior to the start of construction documentation of concurrence from the Department of the Interior that the project would not have a substantial adverse effect on the Taunton River's potential designation as a Wild and Scenic River and that the project would be consistent with the WSRA if the Taunton River were designated as a Wild and Scenic River.

FERC supplemented the Approval Order with orders dated January 23, 2006 and April 17, 2006.

Attachment 3.

11.    On February 7, 2006, the FWS, acting as the lead Interior bureau under the Fish and Wildlife Coordination Act (FWCA), 16 U.S.C. §§ 661 et seq., submitted a comment letter to the Corps regarding the Taunton River dredging project. Attachment 4. This letter, issued by the FWS on behalf of Interior, incorporated NPS' comments regarding the project's impacts to the Taunton River's potential designation as a Wild and Scenic River. Again, Interior's analysis of the Taunton River dredging project was based on the project description proposed at that time. Attachment 4 at 4.

12.    Subsequent to submitting the February 7, 2006 comment letter to the Corps, Interior learned that Weaver's Cove had altered its proposal to utilize smaller tankers, which would require more frequent trips to the proposed Taunton River LNG terminal. Interior needed to evaluate what impacts, if any, the use of smaller ships making more frequent trips, would have on fisheries resources in the project area. Additionally, in an attempt to resolve the differences between Weaver's Cove and Interior, Weaver's Cove proposed to implement additional mitigation measures as part of the Taunton River dredging project. The NPS, with continued technical support provided by the FWS and other governmental experts in fisheries and aquatic impacts, analyzed the new mitigation proposals.

13.    In February 2007, the Corps attempted to convene a meeting among state and federal fisheries agencies to review a revised set of time of year restrictions for the Taunton River dredging project, and other proposals to mitigate the impacts to anadromous fish species in the Taunton River. The National Marine Fisheries Service ("NMFS") sent to the Corps a revised proposal, which was based on a consensus developed by Interior, NMFS and the Massachusetts Division of Marine Fisheries, in an attempt to resolve the outstanding permit issues. Attachment 5. At the request of Weaver's Cove, however, the meeting was cancelled and has not been rescheduled. Attachment 6.

14.    On May 9, 2007, the Coast Guard issued a preliminary assessment that the Taunton River may not be suitable for the type and frequency of LNG marine traffic proposed by Weaver's Cove. Attachment 7. The Coast Guard's preliminary assessment indicated that the Coast Guard intended to perform a supplemental environmental review under NEPA, 42 U.S.C. §§ 4231 et seq., to analyze Weaver's Cove's new proposal to utilize smaller tankers to deliver LNG to the terminal. On October 24, 2007, the Coast Guard issued a determination that the waterway is not suitable from a navigational safety perspective for the type, size and frequency of the LNG marine traffic associated with the Weaver's Cove project. Attachment 8. Because the Coast Guard's final determination was based on the navigational safety, the Coast Guard did not conduct any additional environmental review.

15.    On June 4, 2007, the Massachusetts Department of Environmental Protection ("MassDEP") suspended its review of the Taunton River dredging project and ceased processing the water quality certificate required under Section 401 of the Clean Water Act pending resolution of the issues raised by the Coast Guard. Attachment 9. On December 14, 2007,

-6-

MassDEP concluded that Weaver's Cove's application was deficient and the agency refused to act on a deficient application. Attachment 10. Additionally, on August 10, 2007, the Rhode Island Department of Environmental Management denied Weaver's Cove's application for a dredging permit and state water quality certificate, stating that the application was incomplete and insufficient, and that the scope of the project had changed substantially. Weaver's Cove has challenged the state agencies' decisions in U.S. District Court for the District of Columbia in civil action nos. 07-1235 and 07-1238.

16.    In June 2007, Ted Lento, the Corps Project Manager, informed the NPS that in light of the Coast Guard's preliminary assessment, the Corps had agreed to be a cooperating agency with the Coast Guard in conducting the additional environmental review under NEPA to address the deficiencies identified by the Coast Guard, and that there would be an opportunity for additional agency and public comment before the Corps made its decision regarding the dredging permits required for the Taunton River dredging project. Mr. Lento also informed the NPS that the Corps would not issue the required dredging permits to Weaver's Cove unless and until the project had cleared both the Coast Guard and state water quality certification hurdles. Attachment 11.

17.    At this time it is not possible to reasonably estimate how long it will take the Corps or the state agencies to issue the required dredging permits to Weaver's Cove for the following reasons. First, on December 7, 2007, the Coast Guard affirmed its October 24, 2007 decision in response to Weaver Cove's request for reconsideration. Attachment 12. Weaver's Cove could appeal this decision at the administrative level. If still not satisfied with the result, Weaver's Cove could then seek judicial review. The NPS is not in a position to estimate how

-7-

long the Coast Guard's administrative appeal process could take or what the outcome of such a process might be. Second, the NPS is not a party to Weaver's Cove's litigation challenging the state agencies in civil action nos. 07-1235 and 07-1238.

18.     Interior has not made a final decision under the WSRA about the Taunton River dredging project's potential impacts to the Taunton River's fish and wildlife values. Based on its analysis of the new elements of the Taunton River dredging project, pursuant to its responsibilities under the WSRA, the NPS, on behalf of Interior, had been preparing to submit to the Corps its final analysis of the Taunton River dredging project's impacts, if and when, the additional environmental review required by the Coast Guard was completed. However, after learning that the Coast Guard did not undertake any additional environmental review and that the Corps would not be taking any permitting action until both the Coast Guard and the state water quality certification issues had been resolved, NPS suspended its review of the Taunton River dredging project. Otherwise, Interior would have submitted its final WSRA analysis to both the Corps and FERC to satisfy Condition 25 in the FERC Approval Order.

19.     The City of Fall River, the Conservation Law Foundation and a private citizen filed lawsuits in the First Circuit against FERC challenging its Approval Order and its decision not to reopen its record in civil action nos. 06-1203, 06-2146, 06-1204, 06-2147 and 06-1220. On October 26, 2007, the First Circuit dismissed the lawsuit on ripeness grounds because the conditions placed on FERC's approval of the project had not been met. City of Fall River v. FERC, 507 F.3d 1 (1st Cir. 2007). Attachment 13.

20.     On March 13, 2007, Senators Ted Kennedy and John Kerry (D-MA) introduced S.868, which would amend the WSRA to designate all 40 miles of the Taunton River as a

-8-

component of the National Wild and Scenic River System. The bill would amend Section 3(a) of the WSRA, 16 U.S.C. § 1274(a) to add: "(170) Taunton River, Massachusetts. The segment downstream from the headwaters, from the confluence of the Town River and the Matfield River in Bridgewater to the Mount Hope Bay in the City of Fall River, Massachusetts." Representative Frank had introduced identical legislation (H.R.415) in the House of Representatives on January 11, 2007. Attachment 14. The bills have been referred to the Senate Committee on Energy and Natural Resources and the House Committee on Natural Resources, respectively. The congressional committees held hearings on these bills on September 11, 2007 and October 30, 2007, respectively. As of this date, no further congressional action has been taken.

I certify under the penalty of perjury that the foregoing facts are true and correct to the best of my information, knowledge and belief.

ROBERT MCINTOSH
Associate Regional Director for Planning,
        Construction and Facility Management
U.S. Department of the Interior
National Park Service
Northeast Region

Dated: Boston, Massachusetts
       January 16, 2008

-9-

# ATTACHMENT 1



$NP_{\underline{s}}$

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



JUL 0 5 2005

ER 04/0571

Honorable Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**RE: COMMENTS ON THE FINAL ENVIRONMENTAL IMPACT STATEMENT
FOR THE DRAFT CONFORMITY DETERMINATION FOR THE
PROPOSED WEAVER'S COVE LNG PROJECT, BRISTOL COUNTY,
MASSACHUSETTS, (Docket Nos. CP04-36-000, and CP04-41-000)**

Dear Ms. Salas:

The U.S. Department of the Interior (DOI) has reviewed the subject final environmental impact
statement (FEIS) for the development of a liquefied natural gas (LNG) terminal and natural gas
pipeline facilities proposed by Weaver's Cove Energy.

DOI previously submitted comments provided by our U.S. Fish and Wildlife Service (FWS), and
our National Park Service (NPS). Our comments on the FEIS are as follows:

General Comments

DOI's comments on the Weaver's Cove draft environmental impact statement (DEIS) dated
September 17, 2004, included reference to the statutory protections afforded to rivers under the
congressionally authorized study for potential designation as components of the National Wild
and Scenic Rivers System, (Wild and Scenic Rivers Act, Section 7(b)):

> "....and, no department or agency of the United States shall assist by loan, grant license
> or otherwise in the construction of any water resources project that would have a direct
> and adverse effect on the values for which such river might be designated, as determined
> by the Secretary responsible for its study or approval"

This statutory provision applies during the period of the study and up to three years following
submittal of a final report to Congress.

The Federal Energy Regulatory Commission's (FERC) FEIS concludes its treatment of the Wild
and Scenic River issue (page 4-168) as follows:

7/8

Honorable Magalie R. Salas                                                                  2

"For reasons stated above, we do not believe that construction or operation of the
proposed project would have a substantial adverse effect on the Taunton River's potential
designation as a Wild and Scenic River. However, final determination on whether the
Weaver's Cove LNG Project would have a substantial adverse affect on the Taunton
River's potential designation as a Wild and Scenic River would be made by the U.S.
Department of the Interior. In addition, the COE would provide a draft of its permits
pursuant to Section 10 of the Rivers and Harbors Act and Section 404 of the CWA to the
NPS for review. If the NPS objects to the permit under the provision of the WSR Act,
the COE would not issue the permits. Therefore we recommend that:

- Prior to construction, Weaver's Cove Energy must file with the Secretary,
  documentation of concurrence from the U.S. Department of the Interior that the
  project would not have a substantial adverse affect on the Taunton River's
  potential designation as a Wild and Scenic River; and that the project would be
  consistent with the WSR Act if the Taunton River were designated a Wild and
  Scenic River."

Current Status of Wild and Scenic River Consideration

In the nine months since FERC issued the DEIS for comment, the Wild and Scenic River Study
of the Taunton River has progressed, and is now in the final stage.

As of June 6, 2005, the legislative bodies of nine out of 10 communities abutting the main-stem
of the Taunton River voted to endorse the Taunton River Stewardship Plan and seek Federal
designation as a Wild and Scenic River.   The City of Fall River has specifically requested that
the designation extend all the way to Mt. Hope Bay at the 195 Bridge (Braga Bridge). This
showing of strong local support is the final step required to judge suitability for Federal
designation.

The Taunton Wild and Scenic River Study Advisory Committee (representing local, State, and
non-governmental river stakeholders) recommended Congressional designation of the entire
main stem of the Taunton River from the confluence of the Town and Matfield Rivers to Mt.
Hope Bay as a National Wild and Scenic River. The NPS's draft report will be issued later this
summer.

Protection of Outstanding Fishery Values

As a part of DOI's comments on the DEIS dated September 17, 2004, the protection of the
outstanding fishery value of the Taunton River was highlighted as a critical issue related to the
potential Wild and Scenic River designation. The importance of these resource values has been
expanded upon by State and Federal agencies, including National Marine Fisheries Service and
Massachusetts Division of Marine Fisheries.

Honorable Magalie R. Salas                                                          3

It does not appear that the conditions proposed as a part of the FEIS adequately address protection of the fishery resource. Of particular concern to the NPS, the failure to require recommended dredging time of year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as Wild and Scenic. The National Marine Fisheries Service (NOAA Fisheries) specifically commented in this regard:

> "In order to take a risk averse approach for the conservation of anadromous fishery resources within the Taunton River, NOAA Fisheries recommends that no work should be conducted between March 1-July 31 of any year to avoid adverse impacts on upstream spawning migrations of Alewife, Blueback Herring, Rainbow Smelt, and American Shad. Downstream migrations of anadromous fishery resources in the Taunton River generally occur and need protection between June 15 and October 31 of any year. Alternatives should be developed and analyzed that avoid adverse impacts on downstream migrations of these aquatic resources of national importance."

Our NPS will continue to consult and coordinate with the appropriate fishery resource experts and permitting agencies on the conditions that would be necessary to safeguard the outstanding fishery resource of the Taunton River, including its anadromous fish stocks.

In the absence of satisfactory fishery resource protection, we will not be able to provide the statutorily required affirmative statement of no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System.

Site Impacts to the Lower Taunton River

All of the communities abutting the lower Taunton River have voted to endorse the Taunton River Stewardship Plan and seek federal legislation to designate the Taunton River to Mt. Hope Bay as a component of the Wild and Scenic Rivers System.

The relevant State and Federal fishery agencies, in their comments on the DEIS, have indicated that there may be unavoidable adverse site impacts related particularly to the enlargement of the turning basin and development of the Weaver's Cove site. These include the permanent loss of 11 acres of winter flounder habitat and 1.15 acres saltmarsh and intertidal/subtidal habitat. The FEIS appears to agree that these impacts to this portion of the Lower Taunton River are unavoidable.

In addition, the proposed development of the Weavers Cove site for LNG purposes appears to be contrary to the goals and intentions of the City of Fall River as it relates to the desire to seek Federal Wild and Scenic River designation and endorse the Taunton River Stewardship Plan. Development of this site would foreclose opportunities for the City to connect a significant portion of their waterfront to the Taunton River through redevelopment, emphasizing public access and recreation as an important aspect of economic revitalization and quality of life improvement.

Honorable Magalie R. Salas                                                              4

For these reasons, we do not feel that the proposed development can be made compatible with Wild and Scenic River designation of the lower Taunton River in vicinity of the project area.

We must therefore disagree with FERC's tentative conclusion that the proposed project is compatible with the Taunton River's potential designation as a Wild and Scenic River. Based upon our understanding of the project as currently proposed in the FEIS, the NPS would not be able to find such compatibility.

Until Congress has made a final determination on whether to designate some, all, or none of the Taunton River as a component of the National Wild and Scenic River System, we may not be able to render a finding of no adverse impact related to the potential Wild and Scenic River designation.

If FERC or Weaver's Cove have any questions or you need further assistance or information please contact Mr. Jamie Fosburgh, NPS, Program Manager, 617-223-5191.

The Department of the Interior appreciates the opportunity to review and provide comments on the final EIS for the Weaver's Cove LNG Project.

Sincerely,

Willie R. Taylor, Director
Office of Environmental Policy
    and Compliance

cc: Service List

# ATTACHMENT 2

112 FERC ¶ 61,070
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
Nora Mead Brownell, Joseph T. Kelliher,
and Suedeen G. Kelly.

| | |
|---|---|
| Weaver's Cove Energy, LLC | Docket No.   CP04-36-000 |
| Mill River Pipeline, LLC | Docket Nos. CP04-41-000 |
| | CP04-42-000 |
| | CP04-43-000 |

ORDER GRANTING AUTHORITY UNDER SECTION 3 OF THE NATURAL
GAS ACT AND ISSUING CERTIFICATE

(Issued July 15, 2005)

1.      On December 19, 2003, Weaver's Cove Energy, LLC (Weaver's Cove) filed an
application under section 3 of the Natural Gas Act (NGA) requesting authority to site,
construct, and operate a liquefied natural gas (LNG) terminal in Fall River,
Massachusetts. Also on December 19, 2003, Mill River Pipeline, LLC (Mill River), an
affiliate of Weaver's Cove, filed an application under section 7(c) of the NGA to
construct and operate two new lateral pipelines to transport revaporized natural gas from
the proposed Weaver's Cove LNG facility to two separate interconnects with interstate
pipeline facilities of Algonquin Gas Transmission Company (Algonquin). Mill River
also requests a blanket certificate authorizing open-access transportation under Subpart G
of Part 284 of the Commission's regulations, and a blanket certificate under Subpart F of
Part 157 of the regulations authorizing certain routine construction activities.

2.      On April 14, 2004, the Commission issued an order denying a request by
Weaver's Cove for a preliminary determination on non-environmental issues in this
proceeding.[1] We stated that the Commission would issue a decision on the merits of the
proceeding upon completion of the environmental analysis of the proposed project. We
have now completed our review under the National Environmental Policy Act of 1969
(NEPA).

3.      In performing this review, we have taken a number of extraordinary steps to
assure detailed consideration of safety and security issues regarding both the proposed
LNG import terminal and related LNG vessel operations. Recognizing the public

---

[1] See 107 FERC ¶ 61,022 (2005).

Docket No. CP04-36-000                                                                    2

concern, the U.S. Coast Guard in coordination with the Commission initiated a series of
workshops with local law enforcement agencies and port stakeholders to develop the
procedures and resources required to manage the safety and security of LNG vessels
while moving through Narragansett Bay and unloading LNG at the dock. An initial
vessel transit security plan is summarized in the final environmental impact statement
(FEIS). This process was the most extensive effort ever performed prior to Commission
authorization of an LNG import project, and will serve as a blueprint for evaluating
future proposals.

4.      In response to comments from local agencies about the security and emergency
management cost that could be imposed on state and local agencies, we are adopting the
FEIS' recommendation that Weaver's Cove be required to prepare a comprehensive plan
identifying the mechanisms for funding all project-specific security and emergency
management costs incurred by state and local agencies. We are also requiring Weaver's
Cove to file an initial emergency response plan and identify emergency evacuation routes
prior to construction, to develop emergency response plans with local officials throughout
the construction period, and to report progress at 6-month intervals as recommended in
the FEIS. We are also requiring additional safety measures by requiring Weaver's Cove
to incorporate into the final design of the terminal improved features for cryogenic
valves, instrumentation, equipment isolation, hazard detection and control systems.
Weaver's Cove must also revise the design of the spill impoundment sump and transfer
line trenches for improved control of vapors associated with potential LNG spills,
provide a back-up to the firewater system using either a fire water storage tank or river
water, and include provisions for recovering boil-off gas under all operating conditions.

5.      With these conditions and others discussed herein, we find that the proposed new
LNG terminal will promote the public interest by increasing the availability of natural gas
supplies in the New England market and that the Mill River laterals are required by the
public convenience and necessity to connect the proposed LNG facilities to the interstate
pipeline system.

## Background

6.      The New England region's demand for natural gas is growing, driven largely by
the increasing use of natural gas for electric power generation. The U.S. Energy
Information Administration (EIA) projects that total gas consumption in New England
will increase at an annual average rate of 1.38% between 2004 and 2024, but that
U.S. domestic gas production will grow at a slower rate than demand. A recent report to

Docket No. CP04-36-000                                                              3

the New England Governors by the Power Planning Committee of the New England
Governors' Conference (Governors' Conference Report) found that the region should
have adequate delivery infrastructure to meet winter cold day peak demands through
2010, but that to ensure reliable delivery of natural gas to the region after that time there
must be a substantial amount of demand reduction or infrastructure development.[2]

7.      Weaver's Cove states that, for cost reasons, long-line pipeline expansions to serve
New England appear to be unlikely in the near future.  Because the interstate pipeline
system is currently running at nearly full capacity during the winter, and because there
are no geological gas storage formations in New England, LNG storage plays a
significant role in meeting winter peak day heating demands for natural gas.  Weaver's
Cove states that on an average winter peak day demand can exceed pipeline capacity by
over 1 Bcf.

8.      The Governors' Conference Report explains that LNG meets approximately
20 percent of New England's annual gas demand, and that in the winter this increases to
well over 30 percent.  Currently, LNG is transported by truck from the Distrigas LNG
import storage facility in the Boston, Massachusetts vicinity to local distribution
company LNG storage tanks in 31 communities in 5 states.  These facilities have the
ability, states the Governors' Conference Report, to hold just over 10 days of winter peak
demand volumes.

## Proposals

### Weaver's Cove LNG Terminal

9.      In Docket No. CP04-36-000, Weaver's Cove proposes to construct an LNG
terminal with a peak day sendout capacity of 800 MMcf a day on a site located on the
Taunton River in the City of Fall River, Massachusetts.  The proposed facilities include a
marine berth, an LNG storage tank, regasification facilities, and an LNG truck
distribution facility.  The proposed terminal will receive LNG from ocean-going ships
and store the LNG.  LNG will be transferred into trucks for transportation to peak
shaving storage facilities and industrial customers throughout New England, and
vaporized LNG will be delivered as pipeline quality natural gas at approximately
1,000 psi into the pipeline laterals to be constructed by Mill River for transportation to
the proposed interconnects with the Algonquin system for further transportation.

---

[2] The Power Planning Committee of the New England Governors' Conference,
Inc., *Meeting New England's Future Gas Demands:  Nine Scenarios and Their Impacts*,
March 1, 2005.

Docket No. CP04-36-000                                                                    4

10.    Weaver's Cove avers that its LNG terminal is in the public interest because it will
increase the supply of natural gas in the heart of the rapidly growing New England gas
market which, its studies show, is greatly in need of incremental gas supply. Because the
proposed LNG terminal is in close proximity to this market and to existing pipeline
facilities, it states, gas can flow into major gas markets without the cost and
environmental impacts associated with new pipeline construction. In addition, the
proposed terminal will incorporate four truck filling stations for loading motor carriers
that will deliver LNG to numerous LNG peak shaving storage facilities and industrial
customers located throughout New England. The Weaver's Cove LNG terminal will be
located on the site of a former petroleum terminal in a Designated Port Area already
identified under the Massachusetts Coastal Zone Management Program (CZMA) as being
set aside for water-dependent industrial uses.

11.    Weaver's Cove states that, as a new entrant into United States LNG markets, it has
no existing customers that could be adversely affected by its project. Weaver's Cove
does not propose to offer open access service or maintain a tariff or rate schedule for
service from its proposed facility. Weaver's Cove has executed a binding precedent
agreement with Metis Energy, LLC (Metis), an affiliate of Weaver's Cove, for all the
LNG terminal's capacity. Weaver's Cove's costs will be recovered through the sale of
natural gas, and Weaver's Cove will assume the entire economic risk of constructing and
operating the proposed LNG terminal.

### Mill River Lateral Pipelines

12.    In Docket No. CP04-41-000, Mill River proposes to construct and operate two
24-inch diameter laterals that will connect the outlet of the Weaver's Cove LNG terminal
to the Algonquin pipeline system, which applicant describes as the main pipeline supply
system for Rhode Island and Southeastern Massachusetts. The proposed Western Lateral
will extend 2.52 miles from the Weaver's Cove LNG facility to Algonquin's existing
20-inch diameter G-22 lateral pipeline. As proposed, the Western Lateral will cross
under the Taunton River in a northwesterly direction, briefly coincide with Riverside
Avenue, travel along two existing electric transmission rights-of-way (ROW), and cross
approximately 1,800 feet of forested land to the Algonquin interconnect. The other
Mill River lateral, the Northern Lateral, will extend 3.59 miles from the LNG terminal to
Algonquin's existing 12 and 20-inch diameter G-1 laterals. For most of its length, the
Northern Lateral will occupy an existing pipeline ROW containing an idled 20-inch
naphtha pipeline. The two Mill River laterals will each have a design pressure of
1,440 psi and a normal operating pressure of up to 1,000 psi.

Docket No. CP04-36-000                                                                  5

13.     Mill River states that it has proposed two laterals rather than one in order to
provide for reliable base-load deliveries of 400,000 Dth per day of vaporized LNG into
the Algonquin system, and to accommodate peak day deliveries of up to 800,000 Dth
per day. It further explains that it selected the two proposed Algonquin interconnection
points to optimize the receipt of gas on Algonquin to facilitate increasing effective
capacity through backhauls.

14.     In August 2003, Mill River held a two-week open season for bidding for the
Mill River proposed capacity. As a result of the open season, which included a
requirement that the bidder concurrently subscribe for equivalent sendout capacity from
the proposed Weaver's Cove LNG terminal, Mill River entered into a precedent
agreement with its affiliate Metis for firm capacity totaling 400,000 Dth per day, and
interruptible capacity of 400,000 Dth per day for a term of 30 years at maximum recourse
rates.

## Interventions and Procedural Matters

15.     Notice of the Weaver's Cove and Mill River applications was published in the
*Federal Register* on January 9, 2004 (69 *Fed. Reg.* 1580). Timely, unopposed motions to
intervene in this proceeding were filed by a number of parties and are granted by
operation of Rule 214 of the Commission's regulations.[3]  Untimely unopposed motions
to intervene were filed by the City of Fall River, the KeySpan Delivery Companies
(KeySpan Delivery),[4] Somerset Power LLC,[5] New England Gas Company, FPL Group
Resources LLC, Sempra Energy LNG, Amerada Hess Corporation, ExxonMobil Gas &
Power Marketing Company, Green Futures, the Attorney General of the State of Rhode
Island, National Grid USA, and Project Technical Liaison Associates, Inc., individually,
and Statoil ASA and Statoil Natural Gas LLC, jointly. Because these entities
demonstrated an interest in this proceeding and granting late intervention at this stage of
the proceeding will not delay, disrupt, or otherwise prejudice the rights of any party, for
good cause shown, we will permit their late intervention.

---

[3] 18 C.F.R. § 385.214.

[4] The Brooklyn Union Gas Company, dba KeySpan Energy Delivery New York;
KeySpan Gas East Corporation, dba KeySpan Energy Delivery Long Island; and Boston
Gas Company; Colonial Gas Company, EnergyNorth Natural Gas, Inc.; and Essex Gas
Company, collectively known as KeySpan Energy NE.

[5] Somerset requests intervention only in the Mill River applications, Docket Nos.
CP04-41-000, CP04-42-000, and CP04-43-000.

Docket No. CP04-36-000                                                        6

16.    On July 30, 2004, the Commission issued notice of the availability of a draft
environmental impact statement (DEIS). The DEIS invited comments from the public
and stated that intervention may be sought based on the DEIS. The Attorney General of
the Commonwealth of Massachusetts, the Conservation Law Foundation, Merchants
Mills Limited Partnership, Save the Bay, Narragansett Bay, Inc., and Michael L. Miozza
filed requests to intervene, and they have been added as parties to the proceeding. All the
intervenors are listed in Appendix A to this order.

17.    The Commission also received several hundred comments from interested
individuals and groups, many objecting for safety reasons to locating an LNG terminal in
Fall River. The location of the proposed LNG facility and safety issues relating to
operation of the facility and transportation of LNG by ship to the LNG facility are
addressed in the environmental discussion in this order.

### Requests for Evidentiary Hearing, Comparative Hearing and a Regional Approach to LNG Facilities Siting

18.    On September 16, 2004, the Mayor of Fall River filed a motion requesting the
Commission to hold a full evidentiary hearing in this matter. The Mayor averred that
there is a serious factual dispute regarding the safety of an LNG terminal facility at the
site proposed by Weaver's Cove. The motion states that the Mayor is prepared to submit
evidence at an oral hearing consistent with a number of reports attached to the motion
from a consultant scientist and various Fall River officials that question the safety of the
proposed facility. Weaver's Cove replied to the motion, requesting that it be denied.

19.    The Attorneys General of Massachusetts and Rhode Island, along with the City of
Fall River, Green Futures, and the Conservation Law Foundation request that the
Commission develop a regional strategic plan for assessing the need for and siting of
LNG marine terminals in New England, the availability of alternatives to LNG deliveries
into the area by ship, and public safety and security concerns. The Conservation Law
Foundation suggests that this regional approach should be in the context of a
programmatic type EIS addressing a broad array of what it calls complicated and
controversial issues to provide a larger context for LNG terminal siting decisions in
New England.

20.    On May 12, 2005, the City of Fall River and the Attorney General of
Massachusetts (movants) jointly filed a motion requesting that the Commission
consolidate this proceeding with all other pending LNG facilities applications in the
New England region, that the Commission invite additional proposals for LNG facilities
or other projects that could address the natural gas needs of New England from others
who are considering projects (including deepwater ports not subject to the Commission's
jurisdiction), and that the Commission hold a comparative type evidentiary hearing to
identify and assess which of these projects can best serve those needs in the safest

Docket No. CP04-36-000                                                                7

manner. They state that the Commission adopted this kind of approach in the 1980's when it consolidated existing applications to provide natural gas service by pipeline to the Northeast United States, and established an open season "aggressively" soliciting new applications.[6] Discussion of alternatives as part of the environmental impact process is not sufficient, they say, because there are numerous material issues, especially safety issues, that can be properly addressed only through examination of witnesses as part of a "rigorous trial-type adjudication". Although movants implicitly acknowledge that the *Ashbacker* doctrine[7] requiring a comparative hearing when applications are mutually exclusive may not strictly apply here, they contend that public safety can be determined only by assessing whether there are alternatives available that would offer less risk than others. They argue that the Commission should not narrowly limit itself to considering only alternatives that offer LNG deliveries by truck, and thereby eliminate from consideration feasible services that could meet New England's broader gas needs, such as, for example, offshore LNG facilities or increased pipeline deliveries from Canadian LNG facilities. They state that the Commission should not certify LNG facilities of the type proposed by Weaver's Cove in the heart of an urban area until it examines fully and openly all the serious safety implications of the proposal and compares the risks against all credible alternatives. Rather than causing delay, movants aver that this comprehensive procedure likely would offer the most expeditious vehicle for the earliest possible introduction into New England of new supplies of natural gas. On May 27, 2005, intervenor Merchants Mills filed a pleading stating an intention to join in the motion. On June 16, 2005 the Massachusetts Energy Facilities Siting Board filed a pleading in support of the hearing request, to which Weaver's Cove replied on June 27, 2005.

21.    In the motion The City of Fall River and the Massachusetts Attorney General state that at such a hearing they would offer witnesses that would address the safety implications of operating onshore LNG facilities and navigating LNG tankers along inland waterways, the implausibility of preventing threats to public safety and the impossibility of assuring safe evacuation in the event of an accidental or intentional spill, the implications of required security precautions on regional development, infrastructure, recreational, commercial and residential resources, the availability of alternatives, and other issues "central to the resolution of the public interest determinations that the Commission will be called upon to make." Subsequently, on June 9, 2005, movants submitted written testimony that they say they would offer at the adjudicatory hearing they seek in their motion.

---

[6] *See Northeast U.S. Pipeline Projects,* 40 FERC ¶ 61,087 (1987), (*Notice Inviting Applications to Provide New Gas Service to the Northeast U.S.)* (*Northeast Pipelines*).

[7] *Ashbacker Radio Corporation v. FCC,* 326 U.S. 327 (1945).

Docket No. CP04-36-000                                                                          8

22.    On June 28, 2005, the Attorney General of Rhode Island also filed a request for a full evidentiary hearing. The Attorney General states that there are a number of material issues of fact that remain in dispute regarding the security of LNG vessels traveling through Rhode Island coastal waterways to Fall River. These issues, he argues, which relate to the threat and consequences associated with a deliberate attack on an LNG vessel, must be examined in a trial-type hearing in which witnesses would be subject to cross-examination to test their competency and conclusions. The Attorney General of Rhode Island also supports the request by the City of Fall River and the Attorney General of Massachusetts that the proceeding be a comparative evidentiary hearing.

### Answer by Weaver's Cove

23.    In reply, Weaver's Cove argues that the May 12, 2005 motion is inexcusably late. Weaver's Cove points out that it filed its application in December 2003, approximately 18 months ago, after participating for approximately 6 months in the Commission's NEPA pre-filing process. Further, holding an oral hearing at this point, it argues, would unfairly prejudice Weaver's Cove and its right to timely processing of its application. It states that requests such as those now made by the City and the Attorney General must be filed at the early stages of a proceeding to allow an orderly procedure for the expeditious and administratively efficient processing of an application. The trial-type evidentiary hearing process suggested by movants, avers Weaver's Cove, will guarantee endless delays in the processing of all applications to bring gas supplies to New England.

24.    Consolidation of its project application with other proposed or potential projects, avers Weaver's Cove, will be unduly burdensome on the participants in this proceeding and unnecessary for the Commission to carry out its responsibilities under NEPA. Weaver's Cove also calls the suggestion for an open season for new proposals and a comparative hearing process unwieldy and unworkable. The Northeast Pipelines situation does not apply here, says Weaver's Cove, and there are too many variables in the types and stages of development of projects suggested to allow for an effective hearing that would facilitate bringing new LNG import facilities to New England. Even after a protracted hearing, any project selected by the Commission would then have to undergo further environmental scrutiny, likely local opposition, and rigorous state and federal permitting processes. Weaver's Cove avers that the Commission has already analyzed extensively both onshore and offshore alternatives to its project as part of its environmental review and asserts that the new motion for a comparative hearing is an attempt to compel the Commission's detailed review of impracticable theoretical alternatives, while at the same time brushing aside a significant and reasonable goal of its project, namely LNG truck deliveries to peakshaving facilities.

Docket No. CP04-36-000                                                                9

### Commission Response

25.    We will deny the requests for an evidentiary, trial-type hearing. The Commission
has substantial discretion in deciding whether to hold a trial-type evidentiary hearing or
to give interested parties an opportunity to participate through evidentiary submission in
written form. Trial-type evidentiary hearings are required only where there are material
issues of fact that cannot be resolved on the basis of the written record. [8]  The
Commission invited written comments from all interested persons and has held public
meetings in Massachusetts and Rhode Island for oral presentation of evidence. The
reports attached to the Mayor's earlier motion for evidentiary hearing are part of the
record. There is a plethora of additional materials in the record from government
agencies, scientists, and others addressing the safety issue. These materials and the safety
issue raised by these materials are treated in considerable detail in the Commission's
FEIS. All interested parties have been afforded a full and complete opportunity to
present their views to the Commission through written submissions.[9]  Indeed, we have
considered all materials submitted to the Commission up to the time the FEIS was issued,
far exceeding our normal timelines for submitting comments and far exceeding the
comment deadlines originally established in this proceeding. All aspects of the safety
issue, including those areas with respect to which the City of Fall River and the Attorney
General would introduce witnesses, have been fully presented as part of the written
record, and there is ample evidence to permit us to make a reasoned determination.
Contrary to movants' assertion, we do not believe that cross examination of witnesses at
a hearing would assist us in understanding or resolving the technical issues before the
Commission in this proceeding. We find that there is no material issue of fact regarding
the safety issue that we cannot resolve on the basis of the written environmental record in
this proceeding. Therefore, in addition to denying the request for a trial-type hearing, we
will also reject the written testimony tendered by the City of Fall River and the Attorney
General on June 9, 2005 which they say they would offer at such hearing.

26.    Although we are denying the requests for a full trial-type evidentiary hearing, we
note that in response to a request from Mayor Lambert, the Commission's Chairman
Wood and Commissioner Kelly met with the Mayor, U.S. Senators Edward Kennedy and
John Kerry, U.S. Congressman James McGovern, Massachusetts Representative David
Sullivan, and Ranch Kimball, Director of Economic Affairs for the Commonwealth of
Massachusetts (Representing Massachusetts Governor Mitt Romney) at a meeting open

---

[8] *See, e.g., Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988);
Cerro Wire & Cable Co. v. FERC, 677 F.2d 124 (D.C. Cir. 1982); *Citizens for Allegan
County, Inc. v. FPC*, 414 F.2d. 1125, 1128 (D.C. Cir. 1969).

[9] The Commission, in fact, suspended its usual deadline for filing comments and
has accepted all comments up to the present.

Docket No. CP04-36-000 10

to the public at the Commission's Washington, DC headquarters on January 24, 2005.
Those attending the meeting, including the Mayor, presented their views and discussed
their concerns about the LNG terminal proposal with Chairman Wood and Commissioner
Kelly. [10]

27.    We are also denying the requests to consolidate this proceeding and to hold a
comparative hearing. The Commission is a regulatory agency entrusted with the
responsibility to review applications for specific proposals for individual terminal sites
under section 3 of the NGA and NEPA as they are filed to ensure timely and efficient
development of much needed natural gas infrastructure. We are considering such a
specific proposal here. The Commission's role is to determine whether a proposed site is
environmentally acceptable and safe, and to approve projects that are in the public
interest. Nevertheless, regional issues and needs already play an important role in the
Commission's decision-making process. The Commission's environmental review
process in this application proceeding included analysis of reasonable alternative sites in
New England, offered significant opportunity for public participation and comment, and
involved substantial coordination in many areas with federal and state agencies and
elected officials. After approximately two years of study, our analysis is complete, and
we find that the public interest will be best served by acting now on Weaver's Cove's and
Mill River's applications.

28.    The City and the Attorney General's assertion that this situation is the same as in
the *Northeast Pipelines* proceeding is misplaced. The situation here is considerably
different. In 1987, the Commission had before it a large number (at one time over 100)
applications for pipeline construction projects to serve the northeast United States. In
*Northeast Pipelines,* the Commission explained that in many instances the applicants
themselves had alleged that two or more of the existing proposals were mutually
exclusive so that they were entitled to an *Ashbacker* comparative hearing.[11]    The
Commission issued a notice consolidating the existing applications and inviting new ones
for consideration along with the applications already filed. The notice stated that
applications filed by a certain date would be evaluated as a class to determine which
projects required a comparative hearing under *Ashbacker*; applications filed after that
date would not be considered as competitive with, or mutually exclusive to, applications
filed prior to that date. The Commission explained that its decision to employ this

---

[10] A transcript of that meeting is part of the record in this proceeding.

[11] 40 FERC ¶ 61,087 at 61,237.

Docket No. CP04-36-000                                                         11

procedure arose in large part from its experience in the *Boundary Gas* proceeding [12] where over a protracted period of time many competing applications and amendments to applications were filed on a comparative basis, resulting in considerable delay. In *Boundary Gas*, the Commission explained,

> Under the rubric of *Ashbacker*, many participants at the Commission exercised their administrative prerogatives in a manner which turned the *Boundary* proceeding into an administrative procedural moving target, constantly evoking further applications, amendments to applications, counterproposals, and proposals to counter the counterproposals, to the point that scarcely any matter became ripe for adjudication for an extended period of time. [13]

29.    The Commission consolidated the proceedings to establish deadlines for filing new applications for consideration on a comparative basis so that it could assure that it acted efficiently and expeditiously and avoid the difficulties it encountered in *Boundary Gas*. The Commission did not consolidate the many applications because it was looking for the preferred or optimal project for the Northeast. Nor did the Commission aggressively solicit new applications. The Commission never intended to address all the applications in a single consolidated hearing. In fact, although the Commission initially consolidated the *Northeast Pipeline* applications into a single proceeding, thereafter it grouped certain proposals for comparative hearings and split off others as discrete, noncompetitive projects to be handled separately. The Commission did not hold an evidentiary hearing for any of those applications.

30.    The City of Fall River and the Attorney General nevertheless assert that we should invite proposals for other projects and consider them along with the Weaver's Cove application. While there are other projects on the horizon in the development stage, we do not know at this point which, or if any, of these concepts will advance beyond that stage to an actual application with the Commission, or even which projects would be subject to our jurisdiction. On the other hand, we have before us here a project which the Commission has been analyzing for approximately two years. Especially in view of the substantial construction period necessary for LNG projects, the substantial environmental compliance that must occur, and the other permits that must be obtained before construction can even begin, we find that delaying disposition of this application in order to consider it with other proceedings not yet filed is neither necessary nor a viable approach to helping solve New England's recognized need for new gas supplies and the infrastructure to deliver those supplies.

---

[12] *Boundary Gas, Inc.*, 40 FERC ¶ 61,088 (1987).

[13] 40 FERC at 61,239.

31. Under the *Ashbacker* doctrine a hearing to compare proposals is required only when the proposals are mutually exclusive so that the approval of one proposal would require denial of another. In the past, traditional regulatory approach required careful comparison of competing proposals because only one could be granted. The monopolistic advantages conferred on the winner would effectively bar others from entering that market and, absent close oversight of the winner's rates and services, would leave consumers subject to exploitation.[14] It has been Commission policy for well over a decade, however, to permit the market to decide which projects are best suited to serve the infrastructure needs of an area. The Commission believes that approach best serves the public interest and allows for the most efficient, cost effective, and timely development of energy infrastructure. Approval of a variety of projects benefits the public by allowing it to choose which proposals offer the most attractive and timely service.[15] Thus, we indeed invite additional proposals to provide natural gas to New England, but there is no reason to delay this proceeding for future projects to catch up.

32. The primary consideration before us here is whether the proposed Weaver's Cove facilities can be constructed and operated safely. We can evaluate the safety of this project by examining the project on its own merits because the safety of a project stands on its own, not necessarily in relation to other projects which may or may not satisfy the proposed objectives. NEPA's requirement that the Commission look at alternatives does not call for a comparative hearing, and we do not believe that a comparative hearing is necessary to carry out the Commission's safety responsibilities. A number of alternatives have been analyzed in the FEIS and, for reasons spelled out there and in this order, found not to be superior to the Weaver's Cove proposal. The City of Fall River and the Attorney General state that we should view New England's gas needs broadly and consider alternatives that would not involve transportation of LNG by truck. We have considered such alternatives, including potential offshore projects. The transportation of LNG by truck, however, is an important and appropriate goal of the proposed project that must be considered in evaluating the ability of alternatives to satisfy a purpose of the project proposed by the applicant. Truck deliveries of LNG can be accomplished only from an onshore storage facility. We have carefully studied all aspects of the safety of the Weaver's Cove proposal, and for reasons set forth below and in more detail in the FEIS, we are convinced that, if the project is constructed and operated in accordance with the conditions attached to our approval, the Weaver's Cove project will be safe.

---

[14] *See Islander East Pipeline Company, L.L.C.*, 100 FERC ¶ 61,276 (2002).

[15] *Id.* at 62,109.

Docket No. CP04-36-000                                                          13

### Requests for a Supplemental DEIS

33.    Several parties and commentors [16] contend that the DEIS analysis of the
environmental effects of the proposal is deficient, and they request that the Commission
prepare a supplemental draft environmental impact statement. Collectively, they aver
that the DEIS does not sufficiently address safety and security concerns related to
locating an LNG terminal in a populated area or of transporting the LNG by ship to the
terminal site. They also allege that the DEIS does not adequately address other
environmental aspects of the proposed project such as the impacts from dredging on
water quality, fish habitat, and the disposal of contaminated material on a site already
undergoing environmental remediation, and other impacts related to air quality, wetlands,
waterways, and recreation.

34.    Under NEPA, the purpose of an environmental impact statement is to ensure that
an agency, in reaching its decisions, will have available and will carefully consider,
detailed information concerning significant environmental impacts; it also guarantees that
the relevant information will be made available to the larger audiences that may play a
role in both the decision-making process and the implementation of that decision.[17] The
draft EIS puts interested parties on notice of the types of activities contemplated and their
impacts. By its very name, the DEIS is a draft of the agency's proposed final EIS (FEIS),
and, as such, its purpose is to elicit suggestions for change.[18] The DEIS thus serves as "a
springboard for public comment."[19]

35.    We do not believe that a supplemental DEIS is necessary. In response to our
invitation, the Commission received a large number of comments on the DEIS from state
and federal government agencies, environmental groups, and individuals. We have
addressed each comment in the FEIS. In some cases, based on the comments to the
DEIS, we requested additional material from Weaver's Cove. For example, we required
Weaver's Cove to provide more information relating to such issues as dredging and the
placement of dredged material on the proposed LNG terminal site, the construction and
construction timing of the new Brightman Street bridge, and impacts and mitigation

---

[16] The Governor of Massachusetts and several Massachusetts state agencies, the
Attorney General of Rhode Island, the City of Fall River, the Somerset Conservation
Commission, the U.S. Environment Protection Agency, the U.S. Department of the
Interior, Save the Bay, Green Futures, and Merchant Mills, L.P.

[17] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

[18] *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1507 (D.C. Cir.
1994).

[19] *See Robertson*, 490 U.S. 332 (1989).

Docket No. CP04-36-000                                                          14

measures Weaver's Cove would implement with respect to wetland areas, water resources, fish habitat, vehicular traffic, and air quality. Regarding the Mill River pipelines extending from the tailgate of the LNG terminal, we requested information relating to horizontal directional drill and hydrostatic testing. The new material is addressed in the FEIS, and where appropriate, the FEIS modifies earlier recommendations for environmental conditions set forth in the DEIS. Since issuance of the DEIS, a comprehensive new study of LNG safety has been completed by the U.S. Department of Energy's (DOE) Sandia National Laboratories, *Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water* (Sandia Report). We also have received comments from the United States Coast Guard regarding ship transit and port security matters. The FEIS includes relevant material from those sources.

36.    We are confident that the FEIS, as supplemented from the DEIS, contains ample information needed for the Commission to consider and address fully the environmental impacts associated with the Weaver's Cove LNG terminal project and the associated pipelines. The new material included in the FEIS does not result in any significant modification of the project that requires additional notification to the public and revision of the DEIS for further public comment. Rather, the new material adds to the Commission's knowledge of impacts from certain aspects of the project and enables the Commission to refine its conditions mitigating those impacts on the environment. The environmental impacts from the project are discussed below.

### Requests to Delay Commission Action Pending Action on Petition Filed with the United States Department of Transportation

37.    In September 2004, the City of Fall River and the Attorneys General of Massachusetts and Rhode Island filed rulemaking petitions with the United States Department of Transportation (DOT) requesting that it modify its location standards for LNG facilities by requiring such facilities to be placed in remote areas away from population centers. They request the Commission to delay action on Weaver's Cove's application until DOT acts on their requests.

38.    As part of the Pipeline Safety Act of 1979 (Pub. L. No. 96-129), Congress directed DOT to develop minimum safety standards for determining the location, design, and installation for new LNG facilities. Remote sites for such facilities were one of the factors DOT was to consider in adopting its standards.[20]  DOT adopted comprehensive LNG safety standards in 1980.[21]  Rather than requiring remote locations for all LNG

---

[20] 49 U.S.C. § 60103(a).

[21] *See* 49 C.F.R. §§ 193.2051 *et al.*

Docket No. CP04-36-000                                                                    15

facilities, [22] DOT instead adopted standards that it determined would better provide safe separation distances to protect the public in the vicinity of LNG facilities in the event of a spill. DOT's regulations establish thermal and flammable vapor dispersion exclusion zones, based on standards of the National Fire Protection Association, to protect persons and property from harm caused by heat radiation from fire and by dispersion and delayed ignition of gas vapor. DOT has not addressed the September 2004 rulemaking petitions, and we have no indication at this point that it is considering modification of its rules. Accordingly, we will process the proposal before us under the DOT regulations in place.

## Massachusetts Environmental Review

39.    On August 28, 2003, the Secretary of Environmental Affairs for the Commonwealth of Massachusetts (state agency) agreed to coordinate its environmental review of the proposed project under the Massachusetts Environmental Protection Act (MEPA) with the Commission's review of the project under NEPA to facilitate federal and state review of the project. Under the agreement, this Commission's DEIS and FEIS would serve as the pertinent environmental review documents under both statutes. The state agency, however, expressly reserved the right to evaluate the adequacy of the information in the DEIS and FEIS and to require Weaver's Cove to provide additional information considered necessary for resolution of issues under MEPA.

40.    The state agency determined that in several areas the DEIS did not fully address how the project meets Massachusetts regulatory requirements, and it directed Weaver's Cove to provide additional information. Weaver's Cove submitted the information requested by the state in November 2004. Subsequently, on December 17, 2004, the state required Weaver's Cove to provide more information. Weaver's Cove indicated that it would comply with the state's directive. [23] The state has requested this Commission to delay the proceeding until the state completes its evaluation of the environmental issues under MEPA.

---

[22] In addressing the remote siting issue in its rulemaking proceeding, DOT recognized the difficulty in predicting whether a remote location would remain remote during the operating life of an LNG facility. *See LNG Facilities; Federal Safety Standard, Notice of Proposed Rulemaking*, 44 *Fed. Reg.* 8142 (1979).

[23] *See*, letter dated February 22, 2005, from Weaver's Cove to Secretary Ellen Roy Herzfelder, Massachusetts Executive Office of Environmental Affairs.

Docket No. CP04-36-000                                                          16

41.     Although the state environmental review remains ongoing, we have completed a
comprehensive and detailed environmental review under NEPA pursuant to the guiding
regulations of the Council on Environmental Quality[24]. From our own investigations and
consultation with and input from the public and a number of state and federal government
agencies, we have ample information to assess the impacts of the proposed project on the
environment and to adopt measures to mitigate those impacts appropriately under federal
law.

### Protest and Request for Full Evidentiary Hearing by Shell Oil Products US

42.     Shell Oil Products US (Shell) filed a protest and request for hearing with its
intervention. Shell or Shell affiliates formerly operated an oil refinery and fuel terminal
facility on the site proposed for the Weaver's Cove LNG terminal. Shell sold the
property to its current owner Jay Cashman, Inc. (Cashman) in 2000, but holds a
continuing obligation to perform groundwater remediation under the Massachusetts
Contingency Plan (MCP).[25] Shell also holds an option to purchase the property from
Cashman.

43.     The deed conveying the subject property from Shell to Cashman created
easements allowing Shell to perform its remediation, and established provisions
restricting future use of the site and governing the rights of Shell, Cashman, and
successors to Cashman's interests. The deed also gives Shell the right to impose
additional restrictions on the use of the site in the future, including activity and use
limitations (AULs) that Shell's Licensed Site Professional (LSP) determines are
reasonably necessary to meet requirements of the MCP.

---

[24] 40 C.F.R. §§ 1500 et seq.

[25] The MCP is a comprehensive regulatory program established by the
Massachusetts Department of Environmental Protection to implement the Massachusetts
Oil and Hazardous Material Release Prevention Act (Massachusetts General Laws,
ch. 21E). One of the purposes of the MCP is the implementation of appropriate remedial
actions to abate, prevent, remedy, or otherwise respond to a release or threat of release of
oil and/or hazardous material (310 Code of Massachusetts Regulations (CMR)
40.0002(1)(a)(5)). Under the MCP, those responsible for cleaning up contamination hire
a licensed site professional (LSP) to oversee most cleanups to ensure compliance with the
MCP. The Massachusetts Contingency Plan is intended to complement the National
Contingency Plan promulgated by the United States Environmental Protection Agency
under the Comprehensive Environmental Response, Compensation, and Liability Act of
1980, as amended (310 CMR 40.002(4)).

Docket No. CP04-36-000                                                                    17

44.     Shell objects to the Weaver's Cove proposal to deposit material dredged from the
Taunton River and New Hope Bay on the land proposed for the LNG terminal because it
could possibly cause further contamination of soil on the site, adversely affect Shell's
environmental remediation, and/or add significantly to the cost of that remediation. Shell
suggests that it may be necessary to impose an AUL on the property to prevent further
environmental damage to the site and to its remediation program by Weaver's Cove.
Weaver's Cove states that its tests demonstrate that use of the dredged sediment on the
site will not degrade the site as Shell contends. Weaver's Cove acknowledges that
construction may increase Shell's remediation costs, but states that it will reimburse Shell
for any incremental costs. Weaver's Cove also acknowledges that its construction
activities must be consistent with the requirements of the MCP.

45.     Shell states that the Commission should hold a full evidentiary hearing to address
the issues concerning the effect of the Weaver's Cove proposal on the property in
question and Shell's ongoing remediation. Such a hearing, it avers, would enable the
parties, under the auspices of the Commission, to explore fully the potential ramifications
of Weaver's Cove's dredging proposal on Shell's rights and obligations with respect to
the site.

46.     We have addressed the placing of dredged material on the proposed terminal site
as part of our environmental review process under NEPA. To protect against any further
deterioration of the site, Environmental Condition 18, for example, directs Weaver's
Cove to verify that placement of the dredged material on the site will be consistent with
the MCP. Shell, Weaver's Cove, and other parties have introduced ample material into
the record for the Commission to resolve dredging issues without holding a trial-type
hearing, and we will deny Shell's request for such a hearing. As explained above, trial-
type evidentiary hearings are required only where there are material issues of fact in
dispute that cannot be resolved on the basis of the written record.

47.     The Commission recognizes that Shell and Weaver's Cove have different views
on the proper interpretation of the deed provisions governing future activities on the site
of the proposed terminal, and whether the deed permits the placing of dredged material
on the site without the approval of Shell and its LSP. However, this Commission cannot
resolve these questions, either with a trial-type hearing or on the basis of the record for
this paper hearing. Interpretation of property deed restrictions is outside this
Commission's expertise and jurisdiction. The meaning and application of provisions in
this deed are a matter of Massachusetts property and contract law within the province of a
Massachusetts state court. Shell has stated that it does not believe that its remedial
obligations pose an insurmountable obstacle to the LNG project and it has described
conditions that it would find acceptable for use of the site for the LNG terminal. Shell
and Weaver's Cove have been engaged in negotiations aimed at reaching agreement over
Weaver's Cove's dredging plan. We urge that the parties continue these efforts so that

Docket No. CP04-36-000                                                                18

the project can move forward.[26] We will condition any construction on the proposed site, however, upon resolution of this issue, either by an agreement of the parties, or by a decision of a court of appropriate jurisdiction.

## Discussion

### The Weaver's Cove LNG Terminal Facilities

48.    Because the proposed LNG terminal facilities will be used to import natural gas from a foreign country, the construction and operation of the facilities and the location of the facilities require approval by the Commission under section 3 of the NGA. The Commission's authority over facilities constructed and operated under section 3 includes the authority to apply terms and conditions as necessary and appropriate to ensure that the proposed construction and siting is in the public interest.[27] Section 3 provides that the Commission "shall issue such order on application ... unless it finds that the proposal "will not be consistent with the public interest."[28]

---

[26] When the Commission issues a certificate under section 7 of the NGA to construct pipeline facilities, the certificate provides the right for the pipeline company to acquire property for an easement for the pipeline, either through negotiation with the landowner, or through eminent domain procedures should negotiation not result in an agreement. Authorizations of projects under NGA section 3 do not convey such rights to acquire eminent domain.

[27] *Distrigas Corporation v. F.P.C.*, 495 F.2d 1057, 1063-64, *cert. denied*, 419 U.S. 834 (1974); *Dynegy LNG Production Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

[28] The regulatory functions of section 3 of the NGA were transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the Department of Energy Organization Act (Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq*). The Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of import and export facilities and the site at which such facilities shall be located. DOE Delegation Order No. 00-004.00, 67 *Fed. Reg.* 8,946 (2002).

Docket No. CP04-36-000                                                              19

49.    The Commission has determined that it is appropriate to exercise a less intrusive degree of regulation for LNG import terminals, and does not require the applicant to offer open-access service or to maintain a tariff or rate schedules for its terminal service.[29] However, the Commission reserves the authority under section 3 to take any necessary and appropriate action if it receives complaints of undue discrimination or anticompetitive behavior.

50.    The Commission recognizes the important role that LNG will play in meeting future demand for natural gas in the United States and has noted that the public interest is served through encouraging gas-on-gas competition by introducing new imported supplies.[30]  The record in this case shows that the Weaver's Cove LNG terminal will provide such additional supplies of natural gas to consumers.

51.    The LNG terminal facilities proposed here will enable the introduction of new gas volumes from new sources of supply into the New England area where substantial market growth is expected.  The March 2005 Governors Conference Report found that an on-shore LNG facility the size and scope of the proposed Weavers Cove facility would contribute significantly to reserve margins and service reliability because it can provide additional storage in an area that is critically dependent on storage to meet peak day gas demands.  Moreover, because the facility will be located near existing major interstate pipeline facilities, only minimal new pipeline construction will be required to connect the LNG terminal with the interstate pipeline system.  The location of the terminal will ensure ready access to local and regional markets and to substantial gas-fired generating capacity along the Algonquin system.  Another significant aspect of the proposal is that the terminal's location will facilitate deliveries of LNG by motor carrier to LNG peak shaving storage facilities and other customers across New England.  Weaver's Cove is also a new entrant to the LNG business in the United States with no existing customers that might be adversely affected by the costs or risks of recovery of the costs associated with the proposed terminal facility.  The economic risks will be borne by Weaver's Cove. Thus, we find that approval of the Weaver's Cove LNG terminal facilities will be consistent with the public interest.

---

[29] *See Hackberry LNG Terminal, L.L.C.*, 101 FERC ¶ 61,294 (2002), *order issuing certificates and granting reh'g*, 104 FERC ¶ 61,269 (2003).

[30] *Hackberry LNG*, 101 FERC ¶ 61,294 at P 26 (2002).

Docket No. CP04-36-000                                                          20

### The Mill River Pipeline Facilities

52.     Because the proposed pipeline facilities will be used to transport natural gas in interstate commerce subject to the jurisdiction of the Commission, their construction and operation are subject to the requirements of section 7(c) of the NGA

### A.     The Certificate Policy Statement

53.     On September 15, 1999, the Commission issued a Policy Statement[31] providing guidance as to how proposals for certificating new construction will be evaluated. Specifically, the Policy Statement explains that the Commission, in deciding whether to authorize the construction of new pipeline facilities, balances the public benefits against the potential adverse consequences. Our goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment and the unneeded exercise of eminent domain in evaluating new pipeline construction.

54.     Under this policy the threshold requirement for existing pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from the existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of a new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission then proceed to complete the environmental analysis where other interests are considered.

55.     The two Mill River pipeline laterals will permit connection of the Weaver's Cove LNG facilities to Algonquin's pipeline system and thus bring about the benefits of the LNG terminal facilities described above. Mill River does not own any other pipeline facilities, and is not engaged in the transportation of natural gas. The laterals will serve new market demand and provide public benefits without subsidies and without adverse impact on existing pipelines or customers. The total length of the two laterals will be

---

[31] *Certification of New Interstate Natural Gas Pipeline Facilities (Policy Statement)*, 88 FERC ¶ 61,227 (1999); *Order Clarifying Statement of Policy*, 90 FERC ¶ 61,128 (2000); *Order Further Clarifying Statement of Policy*, 92 FERC ¶ 61,094 (2000).

Docket No. CP04-36-000                                                                 21

slightly longer than six miles, and to minimize impact on landowners and the surrounding communities, the lines will run primarily along existing utility rights-of-way. We find that the benefits from Mill River's proposal will outweigh any potential adverse effects, and that the proposed pipeline laterals are required by the public convenience and necessity.

### B.    Rates

#### a.    Cost and Financing

56.    Mill River estimates that the total capital cost of constructing its proposed laterals and appurtenant facilities will be approximately $37 million. Mill River proposes to utilize an imputed initial capital structure of forty percent (40%) equity and sixty percent (60%) debt. Mill River estimates its debt cost to be eight percent (8%) and, in consideration of all of its risk factors, proposes an initial return on equity in its recourse rates of fourteen percent (14%). Mill River's weighted average cost of capital under its proposed capital structure is 10.40 percent. Mill River proposes to finance the project permanently using generally available funds. We find the proposed capital structure and its proposed financing for the project reasonable for a new pipeline entity like Mill River. Mill River's proposed 14% return on equity is consistent with other recent projects approved by the Commission.[32]

#### b.    Service and Rates

57.    Mill River proposes to offer both firm and interruptible services on an open access, nondiscriminatory basis pursuant to Part 284 of the Commission's regulations, with services available at both recourse and negotiated rates.

58.    Mill River proposes to offer firm transportation service under Rate Schedule FT, and seeks the authority to negotiate with shippers, on a nondiscriminatory basis, rates for firm service that deviate from its maximum recourse Rate Schedule FT rates. Mill River's Rate Schedule FT recourse rate is a traditional cost-of-service based rate, designed under the straight fixed variable (SFV) method, based on 100 percent of Mill River's base load operation design capacity (400,000 Dth per day). Mill River's maximum reservation recourse rate for Rate Schedule FT service is $1.347 per Dth per month, and its maximum rate for Rate Schedule IT service is $0.044 per Dth (designed as a 100 percent load factor of the Rate Schedule FT rate).

---

[32] *See Cheniere Sabine Pass Pipeline Company*, 109 FERC ¶ 61,324 (2004); *Tractebel Calypso Pipeline*, LLC, 103 FERC ¶ 61,106 (2003); *Millennium Pipeline Company, L.P.*, 100 FERC ¶ 61,277 (2002); and *Islander East Pipeline Company, L.L.C.*, 97 FERC ¶ 61,363 (2001).

Docket No. CP04-36-000                                                          22

59.     Mill River's proposed General Terms and Conditions (GT&C) provide for the
negotiation, on a nondiscriminatory basis, of rates that differ from Mill River's generally
applicable recourse rates. Mill River agrees to comply with the Commission's
regulations and policies pertaining to negotiated rates.

60.     During its open season, Mill River offered to all interested shippers the option to
elect recourse rates based on the traditional cost-of-service and SFV rate design or, on a
nondiscriminatory basis, to elect negotiated rates. In the precedent agreement, the
subscribing shipper has selected a maximum recourse rate agreement.

61.     Mill River's proposed rates are consistent with traditional SFV design. However,
Mill River used 400,000 Dth per day billing determinants to calculate its proposed FT
reservation rate of $1.347 per Dth and proposes a $0.044 per Dth usage rate for the Rate
Schedule ITS interruptible transportation calculated as a 100 percent load factor
derivative of the Rate Schedule FT rates. The Commission's engineering analysis finds
that Mill River's two proposed 24-inch laterals will be capable of transporting
836,000 Dth per day of regasified LNG from the Weaver's Cove LNG terminal into
Algonquin's G-System. Commission precedent generally dictates the use of actual
design capacity for rate design purposes, and a pipeline is placed at risk for the costs of
unsubscribed capacity based on the actual capacity.[33] Accordingly, Mill River must
calculate both its FT and IT rates using billing determinants equal to the design capacity
of 836,000 Dth per day. Using this figure, Mill River's FT reservation rate should be
$0.644 per Dth, and its IT rate should be $0.021. We direct Mill River to revise its
FT reservation rate and its IT rate accordingly.

62.     Mill River does not propose to allocate any costs to its interruptible services, nor
does Rate Schedule IT contain a mechanism for the crediting of IT revenues. The
Commission's policy regarding new interruptible services requires either a 100 percent
credit of the interruptible revenues, net of variable costs, to firm and interruptible
customers or an allocation of costs and volumes to these services.[34] Accordingly, we will
require Mill River either to allocate an appropriate level of the estimated cost of service
to interruptible services and recalculate its rates, or alternatively, to provide a mechanism
to credit 100 percent of IT revenues to its firm and interruptible shippers.

---

[33] *See Crossroads Pipeline Company*, 71 FERC ¶ 61,076 at 61,264 (1995).

[34] *See, e.g., Tractebel Calypso Pipeline, LLC,* 106 FERC ¶ 61,273 (2004).

Docket No. CP04-36-000                                                                    23

63.     We also find that Mill River's proposal to offer negotiated rates conforms to the guidelines for negotiated rates as articulated in the Commission's Alternative Rate Policy Statement.[35] Under that policy, revenue shortfall due to the lower negotiated rates cannot be recovered from existing shippers.[36] Commission policy, therefore, is to permit negotiated rates at lower than recourse rates in all cases, even to affiliates, and not only when lower rates are needed to compete for business. Accordingly, we will approve Mill River's proposal, subject to Mill River's maintaining separate and identifiable accounts for volumes transported, billing determinants, rate components, surcharges and revenues associated with its negotiated rates and keeping such information in sufficient detail so that it can be identified in future rate cases. Mill River's negotiated rate authority is also subject to the Commission's policies protecting the recourse rate-paying shippers against inappropriate cost shifting with negotiated rates and discount adjustments, and regarding deviations in a negotiated rates agreement from the form of service agreements in Mill River's tariff.[37]

64.     Consistent with Commission precedent, the Commission will require Mill River to file a cost and revenue study at the end of its first three years of actual operation to justify its existing cost-based firm and interruptible recourse rates.[38] In its filing, the projected units of service should be no lower than those upon which Mill River's approved initial rates are based. The filing must include a cost and revenue study in the form specified in section 154.313 of the regulations to update cost of service data. After reviewing the data, we will determine whether to exercise our authority under NGA section 5 to establish just and reasonable rates. In the alternative, in lieu of this filing, Mill River may make an NGA section 4 filing to propose alternative rates to be effective no later than 3 years after the in-service date for its proposed facilities.

---

[35] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076 (1996), *reh'g and clarification denied*, 75 FERC ¶ 61,024 (1996), *reh'g denied*, 75 FERC ¶ 61,066 (1996); *petition for review denied*, Burlington Resources Oil & Gas Co. v. FERC, Case No. 96-1160, et al., U.S. App. Lexis 20697 (D.C. Cir. July 20, 1998).

[36] *NorAm Gas Transmission Co.*, 77 FERC ¶ 61,011 (1996), *order on reh'g*, 81 FERC ¶ 61,204 (1997).

[37] *See Energy West Development, Inc.*, 103 FERC ¶ 61,015 (2003).

[38] *See, e.g., Trunkline LNG Co.*, 82 FERC ¶ 61,198, at p. 61,780 (1998), *aff'd sub nom, Trunkline LNG Co. v. FERC*, 194 F.3d 68 (*D.C. Cir. 1999*); *Horizon Pipeline Co., L.L.C.*, 92 FERC ¶ 61,205, at p. 61,687 (2000); *Vector Pipeline Company*, 85 FERC ¶ 61,083 (1998).

Docket No. CP04-36-000                                                                 24

### c.   Pro Forma Tariff Issues

65.    Mill River proposes to provide open access transportation pursuant to its *pro forma* tariff.[39]  Mill River asserts that its proposed GT&C meet or exceed the applicable requirements of Order No. 636, as well as the standards recommended by the North American Energy Standards Board and adopted by the Commission; however, its application contains no mention of its compliance with Order No. 637.  Accordingly, we direct Mill River to file a detailed narrative explaining how the tariff conforms to the applicable provisions of Order No. 637, a chart identifying how it complies with the NAESB Standards and Definitions (including standards governing nominations, flowing gas, invoicing, electronic delivery mechanisms and capacity release), and the location of the NAESB Standards as incorporated verbatim or by reference in Mill River's tariff.  On May 9, 2005, the Commission issued Order No. 654 amending its regulations, which among other things, adopted Version 1.7 of the NAESB standards.[40]  Therefore, when it files actual tariff sheets in this proceeding, Mill River must revise its tariff to be compliant with Order No. 654, as modified by any future NAESB requirements then in effect.

66.    Also, in Part 358 of the Regulations, the Commission adopted new standards of conduct to ensure that transmission providers cannot extend their market power over transmission by giving energy affiliates unduly preferential treatment.[41]  Mill River must revise its *pro forma* tariff to comply with the standards of conduct requirements in Order No. 2004.

---

[39] The tariff sheets in Mill River's *pro forma tariff* do not contain the borders required by section 154.101 of the Commission's regulations.  When Mill River files its actual tariff, it must comply with the Commission's regulations with regard to the form of tariff sheets.

[40] *Standards For Business Practices of Interstate Natural Gas Pipelines*, Order No. 654, 111 FERC ¶ 61,203 (2005) (amending the regulations to incorporate by reference the most recent version of the standards:  Version 1.7 of the consensus standards promulgated December 31, 2003 by the Western Gas Quadrant (WGQ) of the NAESB; the standards ratified by NAESB on June 25, 2004 to implement Order 2004; the standards ratified by NAESB on May 3, 2005 to implement the Order 2004-A; and the standards implementing gas quality requirements ratified by NAESB on October 20, 2004).

[41]*Standards of Conduct for Transmission Providers*, Order No. 2004, 68 *Fed. Reg.* 69,134 (December 11, 2003), III FERC Stats. & Regs. ¶ 31,155 (2003), *order on reh'g*, Order No. 2004-A, 69 *Fed. Reg.* 23,562 (April 29, 2004), III Stats. & Regs. ¶ 31,161 (2004).

Docket No. CP04-36-000                                                                25

67.     Section 21.4 of the GT&C contains Mill River's creditworthiness standards. The Commission finds the tariff language in Section 21.4(b) is vague with respect to how Mill River will evaluate a shipper's creditworthiness if said shipper is not rated by Dun & Bradstreet. The proposed language in that section allows Mill River too much discretion in determining creditworthiness and does not meet the Commission's requirement that criteria for determining creditworthiness must be clear and objective and not unduly discriminatory. Therefore, consistent with our ruling in *Tennessee Gas Pipeline Company*,[42] we will require Mill River to revise Section 21.4(b) to include the objective financial analyses and criteria it will use to determine a shipper's creditworthiness. If Mill River intends to find a shipper creditworthy that does not have a credit rating, it must state in its tariff what it will rely upon to determine that a shipper's financial position is acceptable.[43] In *Natural Gas Pipeline Company of America*,[44] we stated that it is important that the creditworthiness evaluation process be open and objective.

## C.     Accounting

### a.     Book Depreciation Rate

68.     For financial accounting purposes, Mill River proposes a straight-line depreciation rate of 3.33 percent per annum based upon a 30-year life. Mill River's use of straight-line depreciation is consistent with the Commission's Uniform System of Accounts because it is a systematic and rational depreciation method. Therefore, the Commission approves the use of a 3.33 percent depreciation rate for Mill River.

### b.     Allowance for Funds Used During Construction

69.     An allowance for funds used during construction (AFUDC) is a component part of the cost of constructing Mill River's facilities. Gas Plant Instruction 3(17)[45] prescribes a formula for determining the maximum amount of AFUDC that may be capitalized as a component of construction cost. That formula, however, is not applicable here, as it uses prior year book balances and cost rates of borrowed and other capital that either do not exist or could produce inappropriate results for initial construction projects of newly created entities such as Mill River.

---

[42] 102 FERC ¶ 61,075 at P 41 (2003).

[43] In recent orders, the Commission has approved a range of criteria for determining creditworthiness which it considers clear and objective, while allowing a service provider to exercise discretion in its determination. *See, e.g., Gulf South Pipeline Co., LP*, 107 FERC ¶ 61,273 at P 20 (2004).

[44] 102 FERC ¶ 61,355 at P 69 (2003).
[45] 18 C.F.R. Part 201.

Docket No. CP04-36-000                                                    26

70.    In the application, Mill River states that it will finance construction using generally available funds, and estimates the capitalized AFUDC to be $1,014,000. In additional information provided, Mill River indicates that no equity AFUDC was included in its calculation. Mill River states that the entire AFUDC amount included in the filing related only to debt cost at 4.8 percent during the construction period. Mill River states that it expects that once an equity rate of return is established for the proposed pipeline, this approved rate would be used in the calculation of actual equity funds used during construction. As a result, we cannot determine from the information provided whether Mill River's AFUDC methodology will result in an appropriate determination of the cost of funds used during construction for this project.

71.    In similar cases, the Commission has required the applicant to limit its AFUDC rate to a rate no higher than it could earn on operating assets. The Commission limited the maximum amount of AFUDC that the pipeline could capitalize by limiting the AFUDC rate to a rate no higher than the overall rate of return underlying its recourse rates.[46] Additionally, the Commission required that the equity portion percentage of the AFUDC rate capitalized not exceed the equity percentage of its capitalization structure.

72.    We will therefore require Mill River to revise its AFUDC methodology to ensure that its maximum AFUDC rate for the entire construction period is no higher than the overall rate of return underlying its recourse rates. Further, Mill River must use its actual cost of debt (short-term and long-term) in the determination of its AFUDC rate, if it results in an AFUDC rate lower than the overall rate of return underlying its recourse rates.

D.    **Engineering**

73.    We have reviewed and analyzed the flow diagrams and flow information submitted with Mill River's application filed on December 19, 2003. Our analysis confirms that Mill River has properly designed its two laterals (North Lateral and West Lateral) to transport up to 836,000 Dth per day of regasified LNG supplies from the Weaver's Cove LNG Terminal to the proposed interconnects with Algonquin's G-System. The analysis shows that, individually, each lateral is capable of providing the firm transportation requirements for Metis, the subscribing shipper, of 400,000 Dth per day. We agree with Mill River, moreover, that constructing two 24-inch diameter laterals will provide increased operational reliability and flexibility for the regasified LNG supplies to enter Algonquin's G-System.

---

[46] *See Gulfstream Natural Gas System, L.L.C.*, 91 FERC ¶ 61,119 (2000) and *Buccaneer Gas Pipeline Company L.L.C.*, 91 FERC ¶ 61,117 (2000).

Docket No. CP04-36-000                                                        27

74.     Next, we also examined the ability of Algonquin's G-System to receive the regasified LNG from the proposed interconnects. That analysis showed that the existing 750 psig MAOP (maximum operating pressure) of Algonquin's 16-inch G-20 Lateral and the 20-inch G-22 Lateral was too low to displace the gas volumes in the G-System under design conditions. For the entire 836,000 Dth per day of regasified LNG to enter Algonquin's G-System at operating pressures experienced under design conditions, Algonquin will need to uprate the MAOP of certain pipe segments of its G-System. Specifically, Algonquin will have to uprate: (1) the MAOP from 750 psig to 980 psig for 3.5 miles of its 16-inch diameter pipeline on the G-20 Lateral; and (2) the MAOP from 750 psig to 970 psig for 8.4 miles of its 20-inch diameter pipeline on the G-22 Lateral. With these modifications, our analysis shows that the entire 836,000 Dth per day could flow into Algonquin's G-System as a new source of supply. These results were confirmed by Algonquin's, Mill River's and Weaver's Cove's response to staff's March 2, 2004 data requests.[47]

75.     Based upon design conditions, Algonquin's load requirements on its G-System are less than the 836,000 Dth per day which would be supplied by the Weaver's Cove LNG terminal through Mill River's two laterals. The excess supplies, therefore, could be delivered to and made available at Algonquin's G-System interconnect with its mainline. Currently, however, Algonquin's system only has about 35,500 Dth per day of unsubscribed mainline capacity[48] upstream of the G-System. Without additional unsubscribed capacity downstream of its G-System, Algonquin would not be able to transport the excess regasified LNG supply on its mainline facilities. Without more specific information regarding potential shippers and location of delivery points, we cannot determine if additional mainline facilities would be required to effectuate delivery

---

[47] On March 12, 2004, Algonquin, Mill River and Weaver's Cove stated that an uprate of the existing 750 psig MAOP on Algonquin's G-20 and G-22 laterals is required in order to accommodate the entire 836,000 Dth per day of regasified LNG service.

[48] As of February 1, 2004, Algonquin's electronic bulletin board reflects only 35,455 Dth per day of unsubscribed mainline capacity under Rate Schedule AFT-1 (X-38) from the Columbia Gas interconnect with Algonquin at Hanover (Meter 240) to US Gen New England at the Manchester Street delivery point on Algonquin's G-System (Meter 087).

Docket No. CP04-36-000                                                                  28

of regasified LNG downstream of the G-System's interconnect with Algonquin's
mainline.[49] Nevertheless, we note, that even without mainline capacity, Algonquin could
transport the regasified LNG through displacement/backhaul or as a alternate supply
source for an existing shipper.

76.     In sum, we conclude that Mill River's proposed North and West Laterals are
properly designed to provide up to 836,000 Dth per day of regasified LNG to
Algonquin's G-System.

## Environmental Review

77.     On May 20, 2005, our staff issued a final Environmental Impact Statement (FEIS)
for the Weaver's Cove LNG project.[50] Approximately 1,600 copies of the FEIS were
mailed to agencies, groups, and individuals on the mailing list. The FEIS addresses the
environmental and safety aspects of the proposed projects, and we adopt its analysis and
its recommendations as our own.

78.     The FEIS analyzed both the Weaver's Cove LNG Terminal and the Mill River
lateral pipelines, and addressed the project's purpose and need, alternatives, geology,
soils and sediments, water resources, wetlands and vegetation, wildlife and aquatic
resources, federally listed species, land use, socioeconomics, cultural resources, air
quality and noise, safety, and cumulative impacts. The National Marine Fisheries Service
(NOAA Fisheries), the U.S. Coast Guard, the U.S. Environmental Protection Agency
(EPA), and the United States Army Corps of Engineers (COE) were cooperating
agencies in the preparation of the FEIS.

79.     The FEIS addressed comments from individuals, organizations, companies, and
local authorities who attended public meetings held by the Commission in Swansea,
Massachusetts on September 8 and in Middletown, Rhode Island on September 9, 2004.
Sixty-seven people provided comments at these two meetings. In addition, the FEIS also
addressed 729 comment letters in response to the DEIS (554 of these letters were mass
mailings such as comment cards or form letters).[51] There has been considerable

---

[49] In their responses to staff's data request on March 4, 2004, Algonquin,
Mill River and Weaver's Cove claim that since specific delivery points have not been
identified by either Mill River or Weaver's Cove, hydraulic studies examining
Algonquin's take-away capacity have not been evaluated.

[50] On May 27, 2005, the U.S. Environmental Protection Agency published a
Notice of Availability of the FEIS in the *Federal Register*.

[51] We issued the draft EIS on July 30, 2004.

Docket No. CP04-36-000                                                    29

opposition to the proposed project by elected and other public officials, municipality representatives, special interest groups, and members of the public. The commentors' primary concern related to public safety regarding both the LNG terminal and the LNG vessel transit along the federal navigation channel through Narragansett Bay, Mount Hope Bay, and the Taunton River. Because of these safety concerns, numerous commentors' expressed their preference that Weaver's Cove develop its LNG project offshore. The FEIS addressed both the safety concerns and offshore alternatives.

80.     The FEIS evaluated the safety of both the proposed Weaver's Cove LNG Project LNG import terminal facility and the related LNG vessel transit through Narragansett Bay to Fall River. The analysis identified the principal properties and hazards associated with LNG, presented a summary of the design and technical review of the cryogenic aspects of the LNG terminal, discussed the types of storage and retention systems, analyzed the thermal radiation and flammable vapor cloud hazards resulting from credible LNG spills, analyzed the safety aspects of LNG transportation by ship, and reviewed issues related to security and terrorism.

81.     With respect to the onshore facility, a cryogenic design and technical review of the proposed terminal design and safety systems was completed and reported in the FEIS. That review noted several areas of concern, and as a result, in Environmental Conditions 33 through 42 we are requiring Weaver's Cove to make certain modifications to its terminal design prior to construction. The FEIS also evaluated the thermal radiation and flammable vapor dispersion exclusion zones of the proposed LNG terminal. The analysis found that no excluded uses are within these areas, although a small section of the thermal exclusion zone would extend off the property. To address the section extending off the property, Environmental Condition 40 requires that Weaver's Cove demonstrate legal control over this area, or secure a waiver from the DOT, before Weaver's Cove is given any authority to begin construction.

82.     In addition, the FEIS included an analysis of DOE's December 2004 Sandia Report evaluating the consequences of an LNG spill on water. The report evaluated an LNG cargo tank breach using modern finite element modeling and explosive shock physics modeling to estimate a range of breach sizes for credible accidental and intentional LNG spill events. Based on the Sandia Report, thermal radiation and flammable vapor hazard distances were calculated in the FEIS for an accident or an attack on an LNG vessel. For the nominal intentional breach scenarios (2.5-meter and 3-meter diameter holes in an LNG cargo tank), the estimated distances ranged from 4,340 to 4,810 feet respectively, for a thermal radiation level of 1,600 British thermal unit per feet squared per hour (Btu/hr-ft$^2$), the threshold level at which the thermal radiation becomes hazardous to unprotected persons located outdoors.

Docket No. CP04-36-000                                                             30

83.    As explained in the FEIS, the evaluation of safety is more than an exercise in
calculating the consequences of worst case scenarios. Rather, it is a determination of the
acceptability of risk which considers: the probability of events; the effect of mitigation;
and the consequences of events. Based on the extensive operational experience of LNG
shipping, the structural design of an LNG vessel, and the operational controls imposed by
the Coast Guard and the local pilots, a cargo containment failure and subsequent LNG
spill from a vessel casualty – collision, grounding, or allision – is highly unlikely. For
similar reasons, an accident involving the onshore LNG import terminal or LNG trucking
from the terminal is unlikely to affect the public. As a result, the FEIS determined that
the risk to the public from accidental causes is negligible.

84.    Unlike accidental causes, historical experience provides little guidance in
estimating the probability of a terrorist attack on an LNG vessel or onshore storage
facility. For a new LNG import terminal proposal having a large volume of energy
transported and stored near populated areas, the perceived threat of a terrorist attack is a
serious concern of the local population and requires that resources be directed to mitigate
possible attack paths. While the risks associated with the transportation of any hazardous
cargo can never be entirely eliminated, we are confident that they can be reduced to
minimal levels and that the public will be well protected from harm.

85.    The Coast Guard recently completed a series of project-specific security
workshops with port stakeholders and federal, state, and local agencies. The workshop
participants identified measures that would be necessary to manage the risks associated
with LNG traffic responsibly. These measures complement the Maritime Transportation
Security Act regulations enacted on July 1, 2004. The Coast Guard has identified
protocols to mitigate specific risks and created an initial Vessel Transit Security Plan,
which will become the basis for appropriate security measures for each Maritime Security
threat level. Prior to an LNG vessel's being granted permission to enter Narragansett
Bay, both the vessel and the facility will need to be in full compliance with the
appropriate requirements of the Maritime Transportation Security Act and International
Ship and Port Security Code, and the security protocols established by the Captain of the
Port in the Vessel Transit Security Plan. In addition, the resources required to implement
the security protocols would have to be in place before the Coast Guard would allow any
LNG vessel access to the port.

86.    On June 23, 2005, the City of Fall River and the Attorney General of
Massachusetts requested that the Commission require Weaver's Cove to prepare the
comprehensive waterway suitability assessment as provided for in the Coast Guard's
*Navigation and Vessel Inspection Circular* No. 05-05, *Guidance on Assessing the
Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic* (NVIC).[52]

_____

[52] NVIC was issued by the Coast Guard on June 14, 2005, and made available to
the public on June 20, 2005.

Docket No. CP04-36-000                                                          31

Weaver's Cove has already submitted a waterway suitability assessment, which was used by the Coast Guard in the development of the Vessel Transit Security Plan for the Weaver's Cove project. In fact, although NVIC was issued after the Weaver's Cove Vessel Transit Security Plan, the procedures used by the Coast Guard in developing the Vessel Transit Security Plan for this proceeding are the basis for NVIC, and the Weaver's Cove Vessel Transit Security Plan complies with NVIC in all material respects. Further, Environmental Condition 75 requires annual updates of Weaver's Cove's waterway suitability assessment for the project.

87.    On May 18, 2005, Patrick Lynch, Rhode Island Attorney General, filed a letter urging the Commission to dismiss the Weaver's Cove application based on a recent report prepared by Richard Clarke, *LNG Facilities in Urban Areas* (Clarke Report). [53] The Clarke Report's key findings are that traditional risk management calculations are insufficient to deal with the security risk posed by terrorist groups because the probability of a terrorist attack cannot be effectively measured. Instead, says the report, security risk management methodology should examine five factors: intent, capabilities, vulnerabilities, consequences, and recovery. The net assessment of the report is that while there is no adequate way to determine the probability of an attack on a proposed urban LNG facility and inland waterway transit, there are adequate grounds to judge that such an attack would be consistent with terrorists' demonstrated intent and capability. The report states further that there is also a basis to judge that likely enhanced security measures would not significantly reduce the risk, and to conclude a high risk of catastrophic damage. The report makes a general finding that siting the LNG facility in a non-urban setting would reduce the incentive for a terrorist attack. We have reviewed the Clarke Report carefully, but find, as discussed below, that it does not warrant a change in our conclusions that the Weaver's Cove project will be well protected.

88.    Section 1 of the Clarke Report, a background and threat analysis, reviews a wide selection of articles published in journals, newspapers, and books stating that terrorists intend to kill large numbers of Americans, disrupt the U.S. economy and infrastructure, and damage oil and gas infrastructure. According to the report, reasons for a terrorist attack on an LNG tanker or facility include the potential for high civilian casualties and substantial damage to the American economy. As LNG imports become a more important sector of the economy, the report posits, terrorist organizations will be more interested in attacking them.

---

[53] The Clarke Report focuses on the KeySpan LNG, L.P. application in Docket No. CP04-223-000 *et al.* and waterways within Rhode Island, but the Attorney General states that its findings relate equally to the Weaver's Cove proposal. The Clarke Report is available on the internet at ....

Docket No. CP04-36-000                                                      32

89.     The concerns expressed in Section 1 of the Clarke Report are not unique to LNG but could equally apply to many other liquid or gaseous fuels and chemicals. The Clarke Report does not identify specific evidence of LNG threats. Indeed the Department of Homeland Security document, *National Planning Scenarios*, referenced on page 26 of the report, presents a number of high-casualty scenarios for attacks on other industry sectors. Regardless of what terrorist intent can be deduced from news articles and publications, the Coast Guard security workshops referenced above considered a terrorist attack, and devised methods to protect the LNG vessel from credible scenarios. There also is no support in the Clarke Report for the conclusion that terrorist organizations will be more interested in attacking LNG terminals as LNG imports become a more important sector of the economy. In fact, additional terminals and LNG vessels would provide redundancy in case a ship or terminal were out of service and thereby lessen the potential economic impact.

90.     Section 2 of the Clarke Report examined seven attack scenarios on an LNG tanker in Narragansett Bay: aircraft, stand-off weapons, mortars, shaped charges, small boat, divers, and mines. The report found that an LNG vessel transiting the Narragansett Bay is susceptible to a number of potential terrorist threats, with the most probable/most effective to be a small boat attack, followed by a medium rocket and a small rocket. LNG cargo tank hole sizes for the most credible threats, stated the report, have a reasonably expected size of 5 square meters, but ranged from 2 to 12 square meters. The report also found that a pool fire is the most likely scenario to cause major deaths.

91.     The Coast Guard's security workshops identified above considered a similar range of credible attack scenarios, including the types of attacks in Section 2 of the Clarke Report. For each credible scenario, procedures were developed with port stakeholders and law enforcement officials to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities. The outcome of the workshops was the Vessel Transit Security Plan. Although the details of the plan are classified as Security Sensitive Information, the general measures were identified in the FEIS. The finding in the Clarke Report that the likely enhanced security measures would not significantly reduce the high risk of catastrophic damage was made without the benefit of the Coast Guard workshops that led to the Vessel Transit Security Plan.

92.     Section 3 of the Clarke Report on consequence management addresses potential injuries, fatalities, and damage to infrastructure that could result from an attack scenario. The Clarke Report states that it considered the flammable vapor and thermal radiation hazards created by an intentional breach of two cargo tanks each with a 5-meter diameter hole and a third tank breached by cascading damage, consistent with the vulnerabilities outlined in Section 2 of the report. However, a three tank breach as described in the preceding sentence is not consistent with the vulnerabilities outlined in Section 2 of the

Docket No. CP04-36-000                                                                    33

report. The credible threat scenarios identified there would likely result in a single cargo tank breach. Thus, the thermal hazard zones presented in Section 3 of the Clarke Report are overstated, reflecting the consequences of the 5 square meter, 3-tank breach from the Sandia Report.

93.    We believe that many of the attack scenarios presented in Section 2 of the report would likely yield damages on the low end of the scale, and even those judged most probable/most effective would have fewer consequences than projected in Section 3. In fact, the Sandia Report found that in most cases intentional breaching scenarios would not result in a hole of more than 5 to 7 square meters, which is a more appropriate range for calculating potential hazards from spills. Nevertheless, the Clarke Report leaves the misimpression that any successful attack will yield a worst case consequence scenario.

94.    The FEIS evaluated the 21-mile-long LNG vessel route to the Weaver's Cove facility for areas of development within the transient thermal hazard area for the nominal 5 to 7 square meter intentional breach scenarios. We believe these scenarios are more realistic than the worst case scenario examined in the Clarke Report; however, we do recognize that they represent a high consequence event for a successful worst case terrorist attack.

95.    In response to the DEIS, commentors expressed concern that local communities would have to bear a portion of the costs of ensuring the security of the LNG facility and the LNG vessel while in transit and while unloading at the dock. As a result of its recently completed security workshops, the Coast Guard has designed a robust security plan that requires significant Coast Guard, public, and private resources necessary to implement security measures. While the specific costs to the states and local communities have not been determined, Weaver's Cove has committed to providing funding for direct transit-related security costs.[54] In addition to these direct transit-related state and local security costs, there may be a need to fund additional capital costs associated with security and emergency response, such as equipment and personnel. Environmental Condition 42 requires that Weaver's Cove provide a comprehensive plan identifying the mechanisms for funding all project-specific security and emergency response/management costs that would be imposed on state agencies and local communities, including capital costs.

---

[54] As an indication of these costs, the proposed KeySpan LNG import terminal near Providence, Rhode Island estimated state and local security costs for its LNG deliveries at $40,000 to $50,000 per vessel port call.

Docket No. CP04-36-000

34

96.     To transit to the proposed LNG terminal site, LNG vessels would pass under or through four well-traveled bridges. A number of commentors expressed concern in response to the DEIS regarding the impact of potential of bridge closures -- the impact of traffic backups on local roads and highways, and the impact of bridge closures on the ability of emergency vehicle to access Fall River hospitals.[55] As part of the review of the LNG vessel transit through Narragansett Bay to the terminal on the Taunton River, the Coast Guard considered the closure of one or more of the bridges along the vessel route. While bridge closures are one of the many tools available to the Coast Guard, the security workshop participants have determined it is not necessary to close the bridges unless the threat condition or current intelligence raises a concern about security issues. To ensure emergency vehicle access across the Braga and Brightman Street Bridges to the Fall River hospitals, Environmental Condition 76 requires that at least one of these bridges remain open during the passage of LNG vessels through the federal navigation channel in the Taunton River.

97.     A number of organizations and individuals commented on the need to consider evacuation plans and warning systems. In a letter dated April 27, 2005, the Coalition for Responsible Siting of LNG Facilities (the Coalition) questioned whether Weaver's Cove can develop a viable emergency response plan for the project based on: (1) the number of people in close proximity to the proposed facility who could potentially be within the thermal radiation distances reported in the Sandia Report; (2) a National Fire Protection Association's study released in 2004, which indicated that most fire departments in Massachusetts do not have the training, personnel, or equipment to provide adequate emergency response services; and (3) the Coalition's belief that a plan comparable to the current Cove Point LNG Project emergency response plan cannot be developed for the Weaver's Cove LNG Project based on its discussions with emergency response personnel and review of the existing plan. The Coalition concludes that the Commission should require completion of the emergency response plan prior to permitting the facility, if the Commission believes a viable emergency response plan is possible for the project. By doing so, the Coalition indicates that local emergency and city officials could review and comment on the plan.

98.     While the preparation of emergency procedures typically occurs at the end of the LNG facility construction phase, the FEIS recognized that there remain a number of issues concerning the viability of emergency evacuation that have not yet been satisfactorily resolved. Therefore, Environmental Condition 34 requires Weaver's Cove

---

[55] After the FEIS was issued the Rhode Island Turnpike and Bridge Authority for the first time submitted comments expressing concern regarding the movement of LNG tankers under or near bridges under its jurisdiction. The issues it raises are addressed in the FEIS and in this order.

Docket No. CP04-36-000                                                                    35

to develop emergency evacuation routes for the areas along the route of the LNG vessel transit prior to construction. Emergency evacuation planning with local departments will identify evacuation routes based upon increasing severity of events, as well as the time required for evacuation.

99.    In addition, Environmental Condition 67 has been revised to require Weaver's Cove to develop an initial Emergency Response Plan (including evacuation) and coordinate procedures with local emergency planning groups, fire departments, state and local law enforcement prior to initial site preparation. Therefore, it is the responsibility of Weaver's Cove to develop emergency evacuation routes and the initial Emergency Response Plan in coordination with state and local officials to ensure that a viable plan is possible for the project. Weaver's Cove is required to file the evacuation routes and Emergency Response Plan for review and approval by the Director of OEP. These plans, similar to other mitigation plans, can be appropriately developed and implemented following the Commission's approval process, as long as there is a mechanism for review and approval by the Commission.

100.    The proposed import terminal location in Fall River makes use of a 73-acre industrially zoned property which is a contaminated site used historically as a petroleum products storage and distribution facility from the 1920s to the 1990s. The site is located on an existing federal navigation channel and turning basin and is within a designated port area for marine dependent industrial use under Massachusetts law. The FEIS examined alternative site locations and technologies for the project. No existing LNG facilities have the space to add the capacity proposed in this project. The FEIS did not identify any alternative location or technology that would be preferable to the proposed project. Alternatives were eliminated from consideration because they did not meet the purpose of the project, could not be developed in the time frame required by the applicant, involved greater environmental impacts, or the property was not available for development.

101.    One particular alternative the FEIS evaluated was siting the proposed LNG import terminal in offshore areas, which included an analysis of the preliminary plans to build LNG facilities offshore of Gloucester, Massachusetts by Neptune LNG, L.L.C. (a subsidiary of Tractabel LNG North America, L.L.C.), and Excelerate Energy, L.L.C. (Excelerate) for the Neptune LNG and Northeast Gateway Deepwater Port Projects, respectively. The FEIS found that if the Neptune LNG or the Northeast Gateway Projects were constructed, either project could potentially meet some of Weaver's Cove's objective of providing a new source of imported LNG in the New England market area; however, the reliability of the supply remains uncertain. To meet peak winter demand in New England, it is essential that an offshore system have the proven reliability to provide both the average baseload and maximum sendout during the most severe offshore weather.

Docket No. CP04-36-000    36

102.    The service reliability of this alternative is dependent on a limited supply of specially designed regasification ships because docking and cargo transfers cannot presently be performed by conventional LNG ships. The Neptune and Excelerate LNG Projects would each require three of the specialized regasification vessels to provide continuous baseload gas service. For this reason, the FEIS was unable to determine whether the Neptune LNG or Northeast Gateway Projects would be able to provide the service reliability of a traditional onshore LNG storage facility. Additionally, neither the Neptune LNG Project nor the Northeast Gateway Project could provide an additional source of LNG to meet the needs of existing peakshaving facilities for LNG truck service, which is currently critical in meeting peak winter demand in the New England region. Although the FEIS recognized the potential for offshore docking and LNG regasification ships to have a future role in the gas supply mix in New England as well as other areas, these facilities by themselves would not be a viable alternative that meets all of the objectives of the proposed Weaver's Cove LNG Project.

103.    On June 16, 2005, as part of its motion in support of the May 12, 2005 request for hearing by the City of Fall River and the Massachusetts Attorney General, the Massachusetts Energy Facilities Siting Board (Siting Board) filed comments on the alternatives analysis presented in the FEIS. Although the Siting Board concedes that the range of alternatives analyzed in the FEIS is reasonable, it contends that the FEIS does not systematically and comprehensively compare the advantages and disadvantages of proposed project with all the identified alternatives. The Siting Board states that the FEIS failed to evenly address the merits of all alternatives using a complete and common set of comparison criteria, adequately consider safety issues and community impacts in weighing comparison criteria, include gas supply cost and gas supply need as comparison criteria, reach conclusions as to whether the proposed project or an alternative is "preferable", and define how comparison criteria are to be weighed in drawing conclusions regarding alternatives.

104.    Under NEPA, the Commission's responsibility is to evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to that proposal. That does not require a detailed analysis of every alternative proposed. Once we have determined that a suggested alternative is not viable and have explained our reasoning for this determination, there is no reason to conduct further review of that suggested alternative.[56] In this proceeding, the baseline of the FEIS alternative analysis was the proposed action, and therefore all alternatives were compared to the proposed Weaver's Cove LNG terminal. In considering the range of alternatives that may offer environmental advantage over the proposed action, the FEIS considered criteria such as cost, safety, technical feasibility, community and other environmental impacts. In addition to evaluating whether an alternative was technically and economically feasible, reasonable, and practical, the evaluation criteria for selecting alternatives included

---

[56] East Tennessee Natural Gas Company, 101 FERC ¶ 61,188 at P 94 (2002).

Docket No. CP04-36-000                                                                 37

whether they meet the proposed project objectives. The FEIS analyzed alternatives to the point where it was clear that an alternative was not reasonable or would result in significantly greater environmental impacts that cannot be readily mitigated. Those alternatives that appeared to be the most reasonable with less than or similar levels of environmental impact were reviewed in the greatest detail.

105. We believe that the FEIS analysis of alternatives adequately weighs the safety and environmental impacts of both locating the proposed LNG terminal at alternative coastal locations and evaluating the existing or proposed natural gas facilities which could potentially meet the stated objectives of the proposed project. The assessment of site alternatives in the FEIS identified specific criteria and included a table comparing the relative merits of various sites in a systematic and comprehensive manner. The analysis of system alternatives in the FEIS considered specific criteria; however, the lack of information available regarding several of the planned natural gas facilities considered prevented a comparison at the same level of detail. The FEIS found no alternative that is clearly preferable to the proposed action and each alternative presents its own unique set of impacts. Further, the FEIS found that the proposed action can be constructed and operated in an environmentally acceptable manner.

106. In addition to the considerable public opposition to the project, most of the federal and state resource agencies with a permitting or advisory role in the project have significant concern about the project's dredging-related impacts on water quality and fisheries habitat in Narragansett Bay, Mt. Hope Bay, and the Taunton River. These agencies include NOAA Fisheries, EPA, COE, Massachusetts Office of Coastal Zone Management (OCZM), Massachusetts Department of Environmental Protection (DEP), Massachusetts Marine Division of Fisheries (DMF), Rhode Island Coastal Resources Management Council (CRMC), and the Rhode Island Department of Environmental Management.

107. To maintain safe access to the LNG terminal, Weaver's Cove proposes to permanently deepen the existing federal navigation channel and a portion of the east channel to 37 feet.[57] The horizontal limits of the dredging would be confined to the existing 400-foot-wide channel, and the existing turning basin would be permanently enlarged and deepened to 41 feet. The project would require the dredging of up to about 2.6 million cubic yards of sediment from the Taunton River and Mount Hope Bay to facilitate LNG ship transit. This dredging would disturb about 191 acres of the bed of the river and bay.

---

[57] The existing channel has a federally authorized depth of 35 feet mean lower low water (MLLW).

Docket No. CP04-36-000 38

108. While the FEIS includes a thorough review of Weaver's Cove's dredge modeling data, the resource agencies question the dredge modeling inputs used to assess the proposed dredging effects on aquatic resources and have suggested time of year restrictions more severe than the 228 day dredging window recommended in the FEIS (see Environmental Condition 21). Based on consultations with the federal and state resource agencies, the FEIS analyzed the impact of restricting dredging during times of the year when sensitive aquatic organisms (e.g., winter flounder, anadromous species) could be adversely affected, and it considered offshore disposal of dredged materials. Based on the new/existing Brightman Street Bridge construction delays,[58] the FEIS found that the time-of-year restriction to minimize impact on winter flounder (as required by Environmental Condition 21) would not impact the in-service date of the project or necessitate offshore disposal. It is possible that the time of year restrictions ultimately imposed by the agencies would limit Weaver's Cove's annual dredging to a 75-day period between November and January. The FEIS found that such restrictions could necessitate offshore disposal.

109. Additionally, the FEIS found that the offshore, open water disposal alternative would be environmentally acceptable if the COE and EPA determine that a significant volume of sediments are suitable for offshore, open water disposal.[59] However, the FEIS also determined that offshore disposal of suitable dredged material is not without impacts and is not clearly environmentally preferable to Weaver's Cove's proposed reuse of the dredged material as general site fill at the LNG terminal site. This conclusion assumes that Weaver's Cove is able to resolve the regulatory and legal disputes of its proposed sediment reuse plan at the LNG terminal site.

110. In addition to the resource agencies' concern associated with the proposed dredging, there are several other unresolved issues which are discussed in the FEIS which require resolution prior to any project construction. To date, the Massachusetts DEP has not made a final determination regarding whether: the proposed placement of the stabilized dredged sediment on the LNG terminal site complies with the anti-degradation provision of the Massachusetts Contingency Plan (MCP); the material could be placed on

---

[58] The Massachusetts Highway Department has verified that the new Brightman Street Bridge construction will delay Weaver's Cove's proposed schedule for the LNG terminal operations by at least 2 to 3 years until 2010.

[59] Weaver's Cove conducted Tier III testing of the sediments to determine their suitability for open water disposal. Weaver's Cove's analysis of these results indicates that most of the proposed dredged material would be suitable for open water disposal. However, the COE and EPA are currently reviewing the Tier III testing results and have not concurred with Weaver's Cove's determination regarding the suitability of the material for offshore disposal.

Docket No. CP04-36-000                                                              39

site without adversely affecting Shell's existing remediation activities; or that all the material constitutes a beneficial reuse and is necessary for site development under the MCP. A negative determination on any of these issues could prohibit or affect the proposed use of the site. Environmental Condition 18 requires that Weaver's Cove file documentation with the Commission prior to construction to verify that placement of the stabilized dredge material on the LNG terminal site is consistent with the MCP. If Weaver's Cove is unable to verify consistency of the proposed use of the sediment with the MCP, it must file a revised sediment placement plan that identifies alternative location(s) for use of the dredged sediments.

111.    There remains a legal question of whether or not Weaver's Cove can obtain control of the LNG terminal site due to both the ongoing remediation work at the site and the existing deed restrictions attached to the property. As explained above, and as set forth in Environmental Condition 77, Weaver's Cove will need to resolve this issue prior to construction of the LNG facility. Further, Weaver's Cove has not received to date concurrence from the OCZM or the CRMC regarding the project's consistency with the Massachusetts and Rhode Island Coastal Zone Management Plans. Environmental Conditions 23 and 24 require that Weaver's Cove file documentation of these concurrences prior to construction.

112.    We have reviewed the information and analysis contained in the FEIS regarding the potential environmental effect of the project. Based on our consideration of this information, we agree with the conclusions presented in the FEIS that, although the proposed LNG terminal would introduce a new risk to the public, the project would meet federal safety standards, could be operated safely, and would have limited adverse environmental impact. Further, we are ensuring the LNG facilities will be subject to Commission staff technical review and site inspections on at least an annual basis. The implementation of the Coast Guard's security plan that would control the LNG vessels operating through Narragansett Bay to and from the proposed terminal would further ensure the public's safety. These conclusions are based on the construction and operation of the project in accordance with Weaver's Cove's proposed mitigation and the environmental mitigation measures recommended the FEIS. Accordingly, we are including as Appendix B the environmental mitigation measures recommended in the FEIS as conditions to the authorization issued to Weaver's Cove in this order.

113.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions in this order. We encourage cooperation between Weaver's Cove, Mill River, and local authorities. However, this

Docket No. CP04-36-000                                                          40

does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[60]

114.    Weaver's Cove or Mill River, as pertinent, shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Weaver's Cove or Mill River. Weaver's Cove or Mill River shall file written confirmation of such notification with the Secretary of the Commission within 24 hours

115.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application and exhibits thereto, submitted in support of the authorization sought herein, and upon consideration of the record,

The Commission orders:

    (A)    In Docket No. CP04-36-000, Weaver's Cove is authorized under Section 3 of the Natural Gas Act to site, construct, and operate its proposed LNG terminal at Fall River, Massachusetts, as more fully described in this order and in the application.

    (B)    In Docket No. CP04-41-000, a certificate of public convenience and necessity is issued to Mill River under Section 7(c) of the Natural Gas Act authorizing it to construct and operate its proposed pipeline facilities, as more fully described in the order and in the application.

    (C)    In Docket No. CP04-42-000, a blanket transportation certificate is issued to Mill River under Subpart G of Part 284 of the Commission's regulations.

    (D)    In Docket No. CP04-43-000, a blanket construction certificate is issued to Mill River under Subpart F of Part 157 of the Commission's regulations.

    (E)    The authorizations in the above paragraphs are conditioned on Mill River's compliance with Part 154 and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations.

    (F)    In Docket No. CP04-41-000, Mill River shall adhere to the AFUDC requirements discussed in the body of this order.

---

[60] See, e.g., Schneidewind v. ANR pipeline Co., 485 U.S. 293; National Fuel Gas Supply v. Public Service Commission, 894 F.2d 571 (2nd Cir. 1990); Iroquois Gas Transmission System, L.P., et al., 52 FERC ¶ 61,091 and 59 FERC ¶ 61,094 (1992).

Docket No. CP04-36-000                                                    41

     (G)    Mill River's *pro forma* tariff is accepted, subject to Mill River's filing a narrative explaining how the tariff conforms to Order No. 637 and each NAESB standard, including a chart identifying each NAESB standard and definition and the location of the NAESB standards as incorporated verbatim or by reference in Mill River's tariff.

     (H)    Construction of the facilities authorized herein shall be completed within five years from the date of a final order in this proceeding in accordance with section 157.20(b) of the Commission's regulations.

     (I)    Mill River must execute a firm contract equal to the level of service and in accordance with the terms of service represented in its precedent agreement prior to commencement of construction.

     (J)    Within three years after its in-service date, as discussed herein, Mill River must make a filing to justify its existing rates or propose alternative rates.

     (K)    Weaver's Cove and Mill River shall comply with the environmental conditions contained in Appendix B to this order.

     (L) The requests for evidentiary hearing, for consolidation, for delay in processing the application, and for a supplemental draft environmental impact statement, are denied. The written materials jointly submitted as testimony in the requested hearing by the City of Fall River and the Attorney General of the Commonwealth of Massachusetts are rejected.

By the Commission. Commissioner Kelly dissenting with a separate statement attached.

( S E A L )

<div align="center">

Linda Mitry,
Deputy Secretary.

</div>

Docket No. CP04-36-000                                          42

## Appendix A – Intervenors

Algonquin Gas Transmission Company

Amerada Hess Corporation

BP Energy Company

Calpine Corporation

Cheniere LNG, Inc.

Conoco Phillips Company

Conservation Law Foundation

Distrigas of Massachusetts LLC

Duke Energy Trading and Marketing, L.L.C.

Ducharme, Frederick J. Jr.

ExxonMobil Gas & Power Marketing Company

FPL Group Resources, LLC

Freeport LNG Development, L.P.

Green Futures

KeySpan LNG, L.P.

The KeySpan Delivery Companies

Massachusetts, Attorney General of the Commonwealth of

Massachusetts Division of Energy Resources

Massachusetts Energy Facilities Siting Board

Merchants Mills Limited Partnership

Docket No. CP04-36-000                                                43

Miozza, Michael L.

National Grid USA

New England Gas Company

Project Technical Liaison Associates, Inc.

Rhode Island, Attorney General of the State of

Save the Bay, Narragansett Bay, Inc.

Sempra Energy LNG

Shell Oil Products US

Southern LNG Inc.

Statoil ASA and Statoil Natural Gas LLC

Thomas, Clement E.

Total Gas & Power North America, Inc.

Trunkline LNG Company, LLC

Docket No. CP04-36-000                                                                              44

## Appendix B

### Environmental Conditions for the Weaver's Cove/Mill River Project

As recommended in the EIS, this authorization includes the following condition(s):

1.    Weaver's Cove and Mill River[61] shall follow the construction procedures and mitigation measures described in its application, supplemental filings (including responses to staff data requests), and as identified in the environmental impact statement (EIS), unless modified by the Federal Energy Regulatory Commission's (FERC or Commission) Order. Weaver's Cove must:

   a.    request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b.    justify each modification relative to site-specific conditions;
   c.    explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d.    receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2.    For pipeline facilities, the Director of OEP has delegation authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project. This authority shall allow:

   a.    the modification of conditions of the Commission's Order; and
   b.    the design and implementation of any additional measures deemed necessary (including stop work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction and operation.

3.    For LNG facilities, the Director of OEP has delegated authority to take all steps necessary to ensure the protection of life, health, property, and the environment during construction and operation of the project. This authority shall include:

   a.    stop-work authority and authority to cease operation; and
   b.    the design and implementation of any additional measures deemed necessary to assure continued compliance with the intent of the conditions of this Order.

---

[61] Hereafter, Weaver's Cove is used in measures applicable to both Weaver's Cove and Mill River.

Docket No. CP04-36-000                                                          45

4.   **Prior to any construction**, Weaver's Cove shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs before becoming involved with construction and restoration activities.

5.   The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets, and shall include the staff's recommended facility locations. **As soon as they are available, and before the start of construction**, Weaver's Cove shall file with the Secretary revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by this Order. All requests for modifications of environmental conditions of this Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

6.   Weaver's Cove shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that will be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction** in or near that area.

This requirement does not apply to route variations recommended herein or minor field realignments per landowner needs and requirements that do not affect other landowners or sensitive environmental areas such as wetlands.
Examples of alterations requiring approval include all route realignments and facility location changes resulting from:
a.   implementation of cultural resources mitigation measures;
b.   implementation of endangered, threatened, or special concern species mitigation measures;
c.   recommendations by state regulatory authorities; and
d.   agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

7.   **At least 60 days before the start of construction,** Weaver's Cove shall file an initial Implementation Plan with the Secretary for the review and written approval by the Director of OEP describing how Weaver's Cove will implement the

Docket No. CP04-36-000                                                46

mitigation measures required by this Order. Weaver's Cove must file revisions to the plan as schedules change. The plan shall identify:

a.   how Weaver's Cove will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

b.   the number of EIs assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

c.   company personnel, including EIs and contractors, who will receive copies of the appropriate material;

d.   what training and instructions Weaver's Cove will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

e.   the company personnel (if known) and specific portion of Weaver's Cove's organization having responsibility for compliance;

f.   the procedures (including use of contract penalties) Weaver's Cove will follow if noncompliance occurs; and

g.   for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

   i.    the completion of all required surveys and reports;
   ii.   the mitigation training of onsite personnel;
   iii.  the start of construction; and
   iv.   the start and completion of restoration.

8.   Weaver's Cove shall develop and implement an environmental complaint resolution procedure. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way. **Prior to construction,** Weaver's Cove shall mail the complaint resolution procedures to each landowner whose property would be crossed by the project and to those landowners whose property is within ½ mile of the LNG terminal site.

a.   In its letter to affected landowners, Weaver's Cove shall:

   i.    provide a contact that the landowners shall call first with their concerns; the letter shall indicate how soon a landowner shall expect a response;

Docket No. CP04-36-000                                                                47

          ii.    instruct the landowners that, if they are not satisfied with the response, they shall call Weaver's Cove's hotline; the letter shall indicate how soon to expect a response; and

          iii.   instruct the landowner that, if they are still not satisfied with the response from Weaver's Cove, they shall contact the Commission's Enforcement Hotline at (888) 889-8030.

    b.    In addition, Weaver's Cove shall include in its weekly status report a copy of a table that contains the following information for each problem/concern:

          i.     the date of the call;

          ii.    the identification number from the certified alignment sheets of the affected property;

          iii.   the description of the problem/concern; and

          iv.   an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

9.     Weaver's Cove shall employ a team of EIs. The EIs shall be:

    a.    responsible for monitoring and ensuring compliance with all mitigation measures required by this Order and other grants, permits, certificates, or other authorizing documents;

    b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

    c.    empowered to order correction of acts that violate the environmental conditions of this Order, and any other authorizing document;

    d.    a full-time position, separate from all other activity inspectors;

    e.    responsible for documenting compliance with the environmental conditions of this Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

    f.    responsible for maintaining status reports.

10.   Weaver's Cove shall file updated status reports prepared by the EI with the Secretary on a weekly basis until all construction and restoration activities are complete. On request, these status reports shall also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    the current construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

    b.    a listing of all problems encountered and each instance of noncompliance observed by the environmental inspector(s) during the reporting period (both for the conditions imposed by the Commission and any

Docket No. CP04-36-000                                              48

               environmental conditions/permit requirements imposed by other federal, state, or local agencies);

   c.     corrective actions implemented in response to all instances of noncompliance, and their cost;

   d.     the effectiveness of all corrective actions implemented;

   e.     a description of any landowner/resident complaints which may relate to compliance with the requirements of this Order, and measures taken to satisfy their concerns; and

   f.     copies of any correspondence received by Weaver's Cove from other federal, state, or local permitting agencies concerning instances of noncompliance, and Weaver's Cove's response.

11.     Weaver's Cove must receive written authorization from the Director of OEP before commencing service of the project. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way is proceeding satisfactorily.

12.     **Within 30 days of placing the certificated facilities in service,** Weaver's Cove shall file an affirmative statement with the Secretary, certified by a senior company official:

   a.     that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

   b.     identifying which of the certificate conditions Weaver's Cove has complied with or will comply with. This statement shall also identify any areas along the right-of-way where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

13.     Weaver's Cove shall develop a site-specific plan for construction of the adopted River Street Variation that includes a description of any special construction techniques that would be used (e.g., stove-pipe or drag-section techniques) and other steps taken to minimize impacts on local residences and commercial facilities. This plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction**.

14.     Weaver's Cove shall prepare final engineering design plans ensuring the stability of all site grades and the waterfront walls and file these plans with the Secretary for review and approval by the Director of OEP **prior to construction**.

15.     Weaver's Cove shall prepare a plan for the discovery and management of contaminated soils and groundwater. This plan shall comply with applicable state and federal regulations and shall provide for management of contaminants at

Docket No. CP04-36-000                                                                                    49

known sites and include procedures for the identification and management of unknown contaminants in other locations. The plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction**.

16.   Weaver's Cove shall consult with the COE regarding the appropriate method(s) for dredging and managing the sediment from the immediate vicinity of turning basin core 10. Weaver's Cove shall file copies of all correspondence and any final plan for managing dredged sediment associated with core TB-10 with the Secretary for review and approval by the Director of OEP **prior to dredging**.

17.   Weaver's Cove shall provide all appropriate grading plans, cross section drawings, and risk assessments required to demonstrate the degree of isolation provided by the upland reuse of stabilized dredged materials. The required documentation shall be filed with the Secretary for review and approval by the Director of OEP **prior to construction**.

18.   Weaver's Cove shall file documentation with the Secretary **prior to construction** to verify that placement of the stabilized dredged material on the LNG terminal site is consistent with the Massachusetts Contingency Plan (MCP). If Weaver's Cove is unable to verify the consistency of the proposed use of the sediment with the MCP, it shall file a revised sediment placement plan that identifies alternative location(s) for use of the sediments. The alternative use plan, if necessary, shall be developed in consultation with the relevant agencies and include a detailed assessment of the environmental impacts associated with the alternative location(s) and demonstrate that the alternative location(s) are in compliance with applicable regulations. Weaver's Cove shall file the plan, if necessary, with the Secretary for review and approval by the Director of OEP **prior to construction**.

19.   Weaver's Cove shall consult with the COE and NOAA Fisheries regarding mitigation of wetlands as well as intertidal and subtidal habitats and shall file with the Secretary the results of these consultations and the COE-approved Wetland Mitigation Plan **prior to construction**.

20.   Weaver's Cove shall complete the coordination with applicable federal and state resource agencies regarding development and funding of mitigation measures to offset impacts on quahogs resulting from dredging of the turning basin and file the results of that coordination, including copies of agency approval, with Secretary **prior to dredging**.

21.   Weaver's Cove shall modify its proposed dredging program and pipeline construction plans within the Taunton River to prohibit any silt-disturbing construction activities during the winter flounder spawning period (January 15 through May 31). In addition, Weaver's Cove shall continue to consult with federal and state agencies and develop a mitigation plan to offset permanent loss

Docket No. CP04-36-000                                                         50

of winter flounder spawning and juvenile development habitat resulting from expansion of the turning basin. The revised dredging plan and the winter flounder habitat mitigation plan shall be filed with the Secretary **prior to dredging**.

22. Weaver's Cove shall coordinate with NOAA Fisheries to determine appropriate speed and seasonal restrictions, or other applicable measures, to avoid or minimize impacts on right whales. Results of the coordination, including a discussion of restrictions to be implemented, shall be filed with the Secretary, **prior to commencing operation of the LNG terminal**.

23. Weaver's Cove shall file with the Secretary **prior to construction** documentation of concurrence from the Office of Coastal Zone Management that the project is consistent with the Massachusetts Coastal Zone Management Program Plan.

24. Weaver's Cove shall file with the Secretary **prior to construction** documentation of concurrence from the Coastal Resources Management Council that the project is consistent with the Rhode Island Coastal Resources Management Program.

25. **Prior to construction**, Weaver's Cove shall file with the Secretary documentation of concurrence from the U.S. Department of the Interior that the project would not have a substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River (WSR) and that the project would be consistent with the Wild and Scenic River Act if the Taunton River were designated a Wild and Scenic River.

26. Weaver's Cove shall prepare a landscaping plan showing how the northern and southern parcels of the LNG terminal site would be restored and revegetated. The plan shall include the locations and descriptions of specific measures and plantings to screen views of the LNG facilities from nearby residences. The landscaping plan shall be filed with the Secretary for review and written approval by the Director of OEP **prior to construction**.

27. Weaver's Cove shall file with the Secretary for the review and written approval of the Director of OEP **prior to construction**, a visual screening plan developed in consultation with and approved by Somerset Power, L.L.C. that includes measures to replace screening vegetation removed from the temporary construction right-of-way between MPs 0.49 and 0.54 of the Western Pipeline route.

28. Weaver's Cove shall defer construction of the LNG terminal and Northern and Western Pipelines and associated aboveground facilities **until**:

    a.   Weaver's Cove provides the Massachusetts State Historic Preservation Office (SHPO) with the appropriate plans, drawings, and photographic simulations for the meter station and pipeyard in relation to the Winslow

Docket No. CP04-36-000                                                    51

            Burial Ground, and provides the SHPO's comments on this information;

b.    Weaver's Cove conducts the recommended site examination surveys at the CSX#1, CSX#2, ISP#1, ISP#2, and the Taunton River Marsh sites, and files with the Secretary the evaluation reports and the SHPO's comments on the reports;

c.    Weaver's Cove conducts additional site examination at the Barnaby Swamp 2 Site, and files with the Secretary the report and the SHPO's comments on the report;

d.    Weaver's Cove files with the Secretary an avoidance plan for the Slade Farmstead and Cemetery and the SHPO's comments on the plan;

e.    Weaver's Cove files with the Secretary and the SHPO any additional required survey and evaluation reports, and any required treatment or avoidance plans, and the SHPO's comments on all reports and plans; and

f.    The Director of OEP reviews and approves all cultural resources reports and plans, and notifies Weaver's Cove in writing that it may proceed with treatment measures or construction.

All material filed with the Secretary containing location, character, and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: "**CONTAINS PRIVILEGED INFORMATION - DO NOT RELEASE.**"

29.    Weaver's Cove shall use transportation grade (0.05 weight percent sulfur) or better diesel fuel in all construction equipment, including dredging equipment, for the proposed project and evaluate the feasibility of using catalysts and diesel particulate filters on this equipment and placing idling limits on the construction vehicles to further reduce particulate matter less than 10 microns in diameter, carbon monoxide, and volatile organic compound emissions.

30.    Weaver's Cove shall develop a nuisance odor complaint and abatement plan to investigate and address complaints related to odor emissions from the dewatered and stabilized dredged sediments. The plan shall include procedures for adjacent landowners to contact a Weaver's Cove representative regarding objectionable odors, a process for investigating and addressing the complaints, and a description of mitigative measures that would be implemented to abate the problem. The nuisance odor complaint and abatement plan shall be filed with the Secretary **prior to construction**. In addition, Weaver's Cove shall include any odor complaints in the weekly status reports filed with the FERC. The report shall include a discussion of how odor complaints were resolved.

31.    Weaver's Cove shall prepare a noise mitigation plan to ensure that the dredging, offloading, and stabilization operations do not contribute more than 55 decibels of the A-weighted scale (dBA) day-night sound level ($L_{dn}$) to the ambient noise level at any noise sensitive area (NSA). Weaver's Cove shall file the plan with the

Secretary for the review and written approval of the Director of OEP **prior to the initiation of any construction activities at the LNG terminal**.

32.     Weaver's Cove shall make all reasonable efforts to assure its predicted noise levels from the LNG terminal are not exceeded at the NSAs and file noise surveys showing this with the Secretary **no later than 60 days after placing the LNG terminal in service**. However, if the noise attributable to the operation of the LNG terminal exceeds 55 dBA $L_{dn}$ at an NSA or the noise increase exceeds 10 dBA sound level that is exceeded more than 90 percent of the time ($L_{90}$) at an NSA, Weaver's Cove shall file a report on what changes are needed and shall install additional noise controls to meet the level within 1 year of the in-service date. Weaver's Cove shall confirm compliance with these requirements by filing a second noise survey with the Secretary no later than 60 days after it installs the additional noise controls.

**The following measures apply to the LNG terminal design and construction details. Information pertaining to these specific recommendations 33 through 61, unless otherwise noted, shall be filed with the Secretary for review and approval by the Director of OEP either: prior to initial site preparation; prior to construction of final design; prior to commissioning; or prior to commencement of service. This information shall be submitted a minimum of 30 days before approval to proceed is required.**

33.     Weaver's Cove shall examine provisions to retain any vapor produced along the transfer line trenches and other areas serving to direct LNG spills to associated impoundments. Measures to be considered may include, but are not limited to: vapor fencing, intermediate sump locations, or trench surface area reduction. Weaver's Cove shall file final drawings, including cross sections, and specifications for these measures with the Secretary **prior to initial site preparation** for review and approval by the Director of OEP.

34.     Weaver's Cove shall develop emergency evacuation routes for the areas along the route of the LNG vessel transit in conjunction with the local emergency and town officials and file the routes with the Secretary for review and approval by the Director of OEP **prior to initial site preparation**.

35.     Weaver's Cove shall provide a technical review of its facility design that:

        a.      Identifies all combustion/ventilation air intake equipment and the distance(s) to any possible hydrocarbon release (LNG, flammable refrigerants, flammable liquids, and flammable gases).
        b.      Demonstrates that these areas would be adequately covered by hazard detection devices and indicate how these devices would isolate or shutdown any combustion equipment whose continued operation could add

Docket No. CP04-36-000                                                      53

to or sustain an emergency. Fired heaters shall be shut down in the event of an LNG spill, or presence of a flammable vapor cloud.
Weaver's Cove shall file this review **prior to initial site preparation**.

36.    **Prior to initial site preparation**, Weaver's Cove shall provide documentation, or a limited waiver from the Department of Transportation, on how the LNG tank would meet National Fire Protection Association (NFPA) 59A table 2-2.4.1, which requires the distance from the edge of the impoundment to the property line to be not less than 0.7 times the container diameter. The separation distance from the LNG tank impoundment wall to the property boundaries on the southwestern area of the site where the proposed plant property line abuts the shoreline of the Taunton River does not appear to meet the 0.7 criteria.

37.    **Prior to initial site preparation**, Weaver's Cove shall file a firewater system design that provides for fire water flow to be maintained for a minimum of two hours, in accordance with code requirements. The fire water tank shall be automatically filled from the city mains supply and the city mains pressure continuously monitored and alarmed at low pressure. As an alternative, river water may be evaluated for use in the firewater system.

38.    The portion of the planned retaining wall on the riverbank, which is opposite the tanks, shall be designed to ensure the stability of the LNG storage tank in a Safe Shutdown Earthquake (SSE) event. A slope stability analysis shall be conducted in order to ascertain the adequacy of the proposed retaining wall structures. The LNG tank shall be designed to withstand the SSE event as required by 49 CFR Part 193 and NFPA 59A (2001). All other structures shall be designed to withstand the effects of an Operating Basis Earthquake, as required by 49 CFR Part 193 and NFPA 59A (2001), and, further, the condition of these structures shall not adversely affect the stability and integrity of the tank in the SSE event. **Prior to initial site preparation**, Weaver's Cove shall file the results of the hydraulic test and stone column field test, and the final LNG storage tank design for seismic review and approval by the Director of OEP.

39.    Weaver's Cove shall revise the design of the impoundment sump to accommodate a design spill from the LNG storage tank in-tank pump discharge header with five pumps operating at maximum capacity. **At least 30 days prior to initial site preparation**, Weaver's Cove shall submit revised calculations showing the 1,600 $Btu/ft^2$-hr exclusion zone for the altered impoundment sump would meet the requirements of Title 49 CFR Part 193.

40.    Weaver's Cove shall provide evidence of its ability to exercise control over the activities that occur within the portions of the thermal exclusion zones that fall outside the site property line. Alternatively, Weaver's Cove may apply to the Department of Transportation for approval of a waiver, from its Title 49 CFR Part

Docket No. CP04-36-000                                                54

193 regulation, that specifies what alternative mitigation measures or plan Weaver's Cove may provide that would afford an equal or greater level of thermal radiation protection as the requirement for control over activities within the modeled exclusion zones. Weaver's Cove shall file this evidence or waiver **prior to initial site preparation**.

41. Weaver's Cove shall revise the design of the impoundment sump to accommodate a design spill from the LNG storage tank in-tank pump discharge header with five pumps operating at maximum capacity. **At least 30 days prior to initial site preparation**, Weaver's Cove shall submit revised calculations demonstrating that the flammable vapor dispersion exclusion zone for the altered impoundment sump would meet the requirements of Title 49 CFR Part 193.

42. Weaver's Cove shall provide a comprehensive plan identifying the mechanisms for funding all project-specific security/emergency management costs that would be imposed on state and local agencies. In addition to the funding of direct transit-related security/emergency management costs, this comprehensive plan shall include funding mechanisms for the capital costs associated with any necessary security/emergency management equipment and personnel base. This plan shall be filed with the Secretary **prior to initial site preparation** for review and approval by the Director of OEP.

43. The **final design** shall include a re-evaluation of the use of butterfly valves for high pressure isolation.

44. The **final design** of the hazard detection equipment shall include redundancy and fault detection and fault alarm monitoring in all potentially hazardous areas and enclosures.

45. The **final design** of the hazard detection equipment shall provide flammable gas and ultraviolet/infrared (UV/IR) hazard detectors with local instrument status indication as an additional safety feature.

46. The **final design** shall include a boil-off gas flow measurement system for the LNG storage tank.

47. The **final design** shall include a reliable measurement system to monitor deflections during the hydraulic test. At a minimum, this system shall include two slope indicator ducts which bisect the tank in mutually perpendicular directions, monitoring points at the terminals of these ducts, and other monitoring points along the perimeter of the concrete shell, so that sag, warping, tilt, and settlement can be monitored. Tolerances for sag, tilt, and shell warping shall meet or exceed the limits specified by the tank manufacturer.

Docket No. CP04-36-000                                          55

48.   The **final design** of the LNG tank carbon steel piping support plates and connections to piping supports shall provide adequate corrosion protection. Provisions for corrosion monitoring and maintenance of carbon steel attachments shall be included in the design and maintenance procedures.

49.   The **final design** of the LNG pumps shall include discharge flow measurement for minimum flow recycle control.

50.   The **final design** shall include provisions to ensure that hot glycol/water circulation is operable at all times when LNG is present in the LNG booster pump discharge piping or when the temperature in the LNG inlet channel to any vaporizer is below 0° Fahrenheit (F).

51.   The **final design** shall include detection instrumentation and shut down procedures for vaporizer tube leak, shell side overpressure, or bursting disc failure.

52.   The **final design** shall include temperature measurement of the vaporizer common discharge header which shall alarm the low temperature condition.

53.   The **final design** shall include provisions to recover boil-off gas, under all conditions, in the event that the send out vaporization system is not in operation.

54.   The **final design** shall include automatic isolation valves at the suction and discharge of screw compressors and reciprocating boil-off compressors.

55.   The **final design** shall ensure that air gaps are installed downstream of all seals or isolations installed at the interface between a flammable fluid system and an electrical conduit or wiring system. Each air gap shall vent to a safe location and be equipped with a leak detection device that: would continuously monitor for the presence of a flammable fluid; would alarm the hazardous condition; and would shutdown the appropriate systems.

56.   The **final design** of the relief vent stacks shall include Resistance Temperature Detectors capable of measuring low and high temperature.

57.   The **final design** shall ensure that dry nitrogen be supplied for purging cold systems.

58.   The **final design** shall include safeguards to protect above ground fire water piping, including post indicator valves, from inadvertent damage.

59.   The **final design** shall include a fire protection evaluation carried out in accordance with the requirements of NFPA 59A, chapter 9.1.2.

Docket No. CP04-36-000                                                      56

60.    The **final design** shall include procedures for offsite contractors' responsibilities, restrictions, limitations, and supervision of the contractors by Weaver's Cove staff.

61.    Security personnel requirements for prior to and during LNG vessel unloading shall be filed **prior to commissioning.**

62.    Operation and maintenance procedures and manuals, as well as emergency plans, emergency evacuation plan, and safety procedure manuals, shall be filed **prior to commissioning**.

63.    The contingency plan for failure of the outer LNG tank containment shall be filed **prior to commissioning**.

64.    Copies of the Coast Guard security plan, vessel operation plan, and emergency response plan shall be provided to the FERC staff **prior to commissioning**.

65.    Weaver's Cove shall coordinate with the Coast Guard to define the responsibilities of Weaver's Cove's security staff in supplementing other security personnel and in protecting the LNG ships and terminal **prior to commissioning**.

66.    A copy of the criteria for horizontal and rotational movement of the inner vessel for use during and after cool down shall be filed **prior to commissioning**.

67.    Weaver's Cove shall develop an initial Emergency Response Plan (including evacuation) and coordinate procedures with local emergency planning groups, fire departments, state and local law enforcement, and appropriate federal agencies. **This plan shall include at a minimum:**

   a.    designated contacts with state and local emergency response agencies;
   b.    scalable procedures for the prompt notification of appropriate local officials and emergency response agencies based on the level and severity of potential incidents;
   c.    procedures for notifying residents and recreational users within areas of potential hazard;
   d.    evacuation routes for residents along the route of the LNG vessel transit;
   e.    locations of permanent sirens and other warning devices; and
   f.    an "emergency coordinator" on each LNG vessel to activate sirens and other warning devices.

   The initial Emergency Response Plan shall be filed with the Secretary for review and approval by the Director of OEP **prior to initial site preparation**. Weaver's Cove shall notify FERC staff of all meetings in advance and shall report progress on its Emergency Response Plan at 6-month intervals starting at the

Docket No. CP04-36-000                                              57

commencement of construction.

68.    The FERC staff shall be notified of any proposed revisions to the security plan and
       physical security of the facility **prior to commencement of service**.

69.    Progress on the construction of the LNG terminal shall be reported in **monthly**
       reports filed with the Secretary. Details shall include a summary of activities,
       problems encountered and remedial actions taken. Problems of significant
       magnitude shall be reported to the FERC **within 24 hours**.

**The following measures apply throughout the operation life of the LNG facility.**

70.    The facility shall be subject to regular FERC staff technical reviews and site
       inspections on an **annual** basis, or more frequently as circumstances indicate.
       Prior to each FERC staff technical review and site inspection, Weaver's Cove
       shall respond to a specific data request including information relating to possible
       design and operating conditions that may have been imposed by other agencies or
       organizations. Weaver's Cove shall also provide up-to-date detailed piping and
       instrumentation diagrams reflecting facility modifications and provision of other
       pertinent information not included in the semi-annual reports described below,
       including facility events that have taken place since the previously submitted
       annual report.

71.    Weaver's Cove shall file **semi-annual** operational reports with the Secretary to
       identify changes in facility design and operating conditions, abnormal operating
       experiences, activities (including ship arrivals, quantity and composition of
       imported LNG, vaporization quantities, boil-off/flash gas, etc.), plant
       modifications including future plans and progress thereof. Abnormalities shall
       include, but not be limited to: unloading/shipping problems, potential hazardous
       conditions from offsite vessels, storage tank stratification or rollover, geysering,
       storage tank pressure excursions, cold spots on the storage tanks, storage tank
       vibrations and/or vibrations in associated cryogenic piping, storage tank
       settlement, significant equipment or instrumentation malfunctions or failures, non-
       scheduled maintenance or repair (and reasons therefore), relative movement of
       storage tank inner vessels, vapor or liquid releases, fires involving natural gas
       and/or from other sources, negative pressure (vacuum) within a storage tank and
       higher than predicted boil-off rates. Adverse weather conditions and the effect on
       the facility also shall be reported. Reports shall be submitted **within 45 days** after
       each period ending June 30 and December 31. In addition to the above items, a
       section entitled "Significant plant modifications proposed for the next 12 months
       (dates)" also shall be included in the semi-annual operational reports. Such
       information would provide the FERC staff with early notice of anticipated future
       construction/maintenance projects at the LNG facility.

Docket No. CP04-36-000                                                                    58

72.     In the event the temperature of any region of any secondary containment, including imbedded pipe supports, becomes less than the minimum specified operating temperature for the material, Weaver's Cove shall notify the Commission **within 24 hours** and shall specify the procedures for corrective action.

73.     Weaver's Cove shall make a foundation elevation survey of the LNG tank on an annual basis.

74.     Weaver's Cove shall report to FERC staff any significant non-scheduled events, including safety-related incidents (i.e., LNG or natural gas releases, fires, explosions, mechanical failures, unusual overpressurization, and major injuries) and security-related incidents (i.e., attempts to enter site, suspicious activities) **within 24 hours of the event.** In the event an abnormality is of significant magnitude to threaten public or employee safety, cause significant property damage, or interrupt service, notification shall be made immediately, without unduly interfering with any necessary or appropriate emergency repair, alarm, or other emergency procedure. This notification practice shall be incorporated into the LNG facility's emergency plan.    Examples of reportable LNG-related incidents include:

   a.     fire;
   b.     explosion;
   c.     estimated property damage of $50,000 or more;
   d.     death or personal injury necessitating in-patient hospitalization;
   e.     free flow of LNG for five minutes or more that results in pooling;
   f.     unintended movement or abnormal loading by environmental causes, such as an earthquake, landslide, or flood, that impairs the serviceability, structural integrity, or reliability of an LNG facility that contains, controls, or processes gas or LNG;
   g.     any crack or other material defect that impairs the structural integrity or reliability of an LNG facility that contains, controls, or processes gas or LNG;
   h.     any malfunction or operating error that causes the pressure of a pipeline or LNG facility that contains or processes gas or LNG to rise above its maximum allowable operating pressure (or working pressure for LNG facilities) plus the build-up allowed for operation of pressure limiting or control devices;
   i.     a leak in an LNG facility that contains or processes gas or LNG that constitutes an emergency;
   j.     inner tank leakage, ineffective insulation, or frost heave that impairs the structural integrity of an LNG storage tank;
   k.     any safety-related condition that could lead to an imminent hazard and

Docket No. CP04-36-000                                                              59

> cause (either directly or indirectly by remedial action of the operator), for purposes other than abandonment, a 20 percent reduction in operating pressure or shutdown of operation of a pipeline or an LNG facility that contains or processes gas or LNG;
>
> l.   safety-related incidents to LNG vessels occurring at or en route to and from the LNG facility; or
>
> m.   an event that is significant in the judgment of the operator and/or management even though it did not meet the above criteria or the guidelines set forth in an LNG facility's incident management plan.

In the event of an incident, the Director of OEP has delegated authority to take whatever steps are necessary to ensure operational reliability and to protect human life, health, property or the environment, including authority to direct the LNG facility to cease operations. Following the initial company notification, FERC staff would determine the need for a separate follow-up report or follow-up in the upcoming semi-annual operational report. All company follow-up reports shall include investigation results and recommendations to minimize a reoccurrence of the incident.

75.   Weaver's Cove shall **annually** review its waterway suitability assessment for the project; update the assessment to reflect changing conditions; provide the updated assessment to the cognizant Captain of the Port/Federal Maritime Security Coordinator for review and validation; and provide a copy to the FERC staff.

76.   Any security plans shall make allowance to have at least one of the Braga and Brightman Street bridges remain open during the passage of LNG vessels through the federal navigation channel in the Taunton River and consideration shall be given to scheduling bridge closures to avoid peak traffic periods.

77. Before commencement of any construction-related activities on the site formerly owned by Shell proposed for the LNG facilities approved here, Shell and Weaver's Cove must present appropriate evidence that they have reached agreement regarding deed restrictions with respect to future activities and use limitations on the site, or that a Massachusetts court of appropriate jurisdiction has resolved such deed restriction issues regarding Weaver's Cove's future use of the site.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Weaver's Cove Energy, LLC                    Docket No.   CP04-36-000

Mill River Pipeline, LLC                     Docket Nos.  CP04-41-000
                                                          CP04-42-000
                                                          CP04-43-000

(Issued July 15, 2004)

KELLY, Commissioner, *dissenting*:

This order authorizes Weaver's Cove Energy, L.L.C. to site, construct and
operate an LNG terminal in Fall River, Massachusetts, under section 3 of the
Natural Gas Act. The order finds that the proposed new LNG terminal will
promote the public interest by increasing the availability of new natural gas
supplies in the New England market. The order emphasizes that New England's
demand for natural gas is expected to grow and the region should have adequate
delivery infrastructure to meet winter cold peak demands only through 2010.[62]

I agree with the majority that New England needs more infrastructure for
greater gas supplies to meet projected demand after 2010. However, I do not
believe that the Weaver's Cove project is the way to meet this need. First, there
are numerous projects under construction, as well as additional proposed projects,
that can meet the region's growing demand for gas. Second, the safety,
environmental, and socioeconomic concerns related to the Weaver's Cove project
outweigh the benefit of the added natural gas to be supplied by it. Therefore, I
find it to be inconsistent with the public interest to authorize the siting,
construction and operation of this new LNG terminal in Fall River, Massachusetts.

**Alternatives Exist**

The proposed Weaver's Cove facilities include an LNG terminal and
storage facility, which would be able to provide LNG for delivery via truck to
peackshaving facilities in the region. Through pipe and truck, Weaver's Cove
would transport up to 800 MMcf per day of natural gas to the Northeast market,

---

[62] Order at P 6 *citing* The Power Planning Committee of the New England
Governors' Conference, Inc., *Meeting New England's Future Gas Demands:  Nine
Scenarios and Their Impacts*, March 1, 2005 (New England Governors'
Conference Report).

Docket No. CP04-36-000                                                    2

beginning in 2010.[63]  The FEIS concludes that no alternative projects would be
able to meet all of the objectives of the Weaver's Cove project, since such projects
would not be able to provide a new source of imported LNG for the New England
peakshaving market .[64]  However, I believe that there are numerous gas
infrastructure projects proposed to serve the New England region that present
reasonable alternatives to the Weaver's Cove facility.  These planned and
proposed projects would introduce new sources of natural gas into the New
England area by 2010.  As the New England Governors' Conference Report finds,
"to avoid leaving some customers without space heat in 2010 and after, additional
gas supply infrastructure (*either expanded pipeline capacity* or expanded LNG
storage capacity) or resources that reduce gas demand would have to have been
added to the system" (emphasis added).[65]

        There are two already-approved Eastern Canadian LNG terminals that are
currently under construction and are expected to start deliveries by 2008.  Irving
Oil Ltd.'s Canaport LNG Project in New Brunswick will be able to vaporize and
send out about 1.0 Bcf per day of natural gas.  Anadarko Petroleum Corporation's
Bear Head LNG facility in Nova Scotia will be able to vaporize and send out
about 750 MMcf per day of natural gas to the Maritimes & Northeast Pipeline
system.  Anadarko recently announced that it has signed agreements for nominated
capacity on a planned expansion of the Maritimes & Northeast Pipeline to
accommodate the initial Bear Head sendout capacity to markets in eastern Canada
and the Northeast.  In addition, Tennessee Gas Pipeline Company, another
pipeline that delivers gas into New England, has announced a non-binding open
season for its Atlantic Supply Expansion project, which is designed to respond to
the development of LNG terminals in eastern Canada and the Northeast.  This
project could bring an additional 250 MMcf per day into Tennessee Gas Pipeline's
system at its Dracut, Massachusetts interconnection with the joint facilities of
Maritimes & Northeast Pipeline and Portland Natural Gas Transmission System.

        There are other LNG import terminals being planned for the New England
region.  Neptune LNG and Excelerate Energy L.L.C. have independently proposed
to build LNG import facilities off the coast of Massachusetts that would provide a
new source of LNG into the New England market area.  Neptune LNG's facility
would have an average sendout capacity of 400 MMcf per day and a peak capacity
of 750 MMcf per day.[66]  Excelerate Energy L.L.C.'s Northeast Gateway Project

---

        [63] The new/existing Brightman Street construction will delay the proposed
schedule for the LNG terminal operations by at least two to three years until 2010.
*See* Order at P 108 & n. 58.

        [64] *See* pages 3-27-28.

        [65] New England Governors' Conference Report at page viii.

        [66] Neptune LNG filed a deepwater port application with the Coast Guard on

Docket No. CP04-36-000                                                                3

would have a baseload capacity of 400 MMcf per day and a peak capacity of 800 MMcf per day.[67] Algonquin Gas Transmission, LLC has filed an application with the Commission to construct and operate a 16-mile pipeline that will connect Algonquin's New England-area natural gas pipeline system to the proposed Northeast Gateway Project.

In addition to these LNG terminals with associated pipeline expansion, Tennessee Gas Pipeline Company has completed a binding open season for its proposed Northeast ConneXion-New England project. This project would provide an additional 136 MMcf per day of natural gas from Texas and Louisiana by increasing compression capacity at existing compressor stations in New York and Massachusetts.

### Significant Safety Issues Are Raised

In my view, this project raises significant, unresolved safety issues, especially in the event of an intentional breach of an LNG vessel as it passes by densely populated shoreline communities en route to the LNG import terminal in Fall River. The LNG vessels must pass under or through four well-traveled bridges and transit 21 nautical miles from the entrance of Narragansett Bay at Brenton Point through the Mount Hope Bay and up the Taunton River. As detailed below, the vessels will present a potential hazard to the people and buildings located along the passageway during the 4-hour transit to the terminal and the 10 to 12 hours while the vessels are docked and unloading cargo. Further, I believe that the lack of adequate emergency resources[68] and the need for evacuation within a short time interval, in the event of an LNG cargo release, present serious obstacles to creating a viable Emergency Response Plan and evacuation plan.

The inbound transit through the East Passage of Narragansett Bay would

---

February 15, 2005.

[67] Excelerate Energy, L.L.C. and Algonquin Gas Transmission, LLC filed environmental notification forms for the Northeast Gateway LNG Project and associated pipeline projects with the Secretary of the Massachusetts Executive Office of Environmental Affairs on March 15, 2005. Excelerate Energy, L.L.C. has commenced commercial operations of its Gulf Gateway Project in the Gulf of Mexico, which uses the same technology as the proposed Northeast Gateway Project.

[68] *See, e.g.,* June 9, 2005 comments from Fire Chief David L. Thiboutot, City of Fall River; Fire Chief Stephen Rivard, Town of Somerset; and Dr. Bruce S. Auerbach, the Vice President and Chief of Emergency and Ambulatory Services at Sturdy Memorial Hospital in Attleboro, Massachusetts.

Docket No. CP04-36-000                                                        4

pass by Newport, Middletown and Jamestown, Rhode Island. After turning at Sandy Point, the LNG vessels would pass by Bristol, Massachusetts, and in the vicinity of the Mount Hope Bridge. The LNG vessel would then travel within the 400-foot-wide channel through Mount Hope Bay and the Taunton River and would pass by Woodman Street and the south of Fall River, the State Pier near the center of Fall River, the Braga Bridge, and Somerset. The FEIS concludes that "[s]ome areas of development along the shoreline in the path of the LNG vessel transit in Rhode Island and Massachusetts could be within a potential transient hazard area, while parts of North Fall River would be exposed to a potential hazard while the LNG vessel is at the dock and unloading cargo."[69] I agree with this assessment, and it is a significant concern to me.

Specifically, the FEIS states that, assuming an LNG vessel transits the Taunton River at 3 knots while under tug assist, the adjacent communities located within a 4,340 to 4,810-foot distance to the 1,600 Btu/ft$^2$-hr thermal radiation level for a 2.5 and 3-meter diameter hole would be exposed to a potential transient hazard "for less than 30 minutes."[70] While transiting the East Passage to Sandy Point at 10 knots, the transient hazard to shoreside communities would be "less than 10 minutes."[71] A temporary hazard would also exist around the slip during part of the 10- to 12-hour period while the LNG vessel is at the dock and unloading cargo. For a spill in the vicinity of the dock, approximately 1,600 to 2,100 buildings, including single-family residences and multi-family units, would be within the temporary hazardous area.[72] Also located in this area are an elementary school, a rehabilitation and nursing center, a public housing project, an apartment building and a MassHighway facility.[73] I find the length of these exposures to the people along the transit route and the vicinity of the dock to be unacceptable.

The FEIS also evaluates the potential impact of an LNG spill on equipment and infrastructure. A thermal radiation level of 10,000 Btu/ft2-hr could potentially damage equipment and infrastructure. A fire associated with a potential spill in the vicinity of the Weaver's Cove's dock, resulting from a nominal cargo tank hole from an intentional event could expose the Somerset power plant, the proposed LNG storage tank, approximately one-half mile of Route 79 and one-half mile of proposed commuter rail to a thermal radiation level of 10,000 Btu/ft$^2$-hr for 10 to 15 minutes.[74]

---

[69] *See* page 4-279.

[70] *See id.*

[71] *See* page 4-280.

[72] *See id.*

[73] *See id.*

[74] *See id.*

Docket No. CP04-36-000                                                    5

For potential spills at the new Brightman Street Bridge and the Braga Bridge, the number of residences, buildings, schools and other facilities located within the 1,600 Btu/ft$^2$-hr transient hazard area would be approximately 1,600 to 2,300 and 1,200 to 1,600, respectively. At Fall River near Woodman Street, approximately 800 to 1,200 residences would be located in the transient hazard area. Approximately 100 to 300 residences and buildings would be located in the transient hazard area at the Mount Hope Bridge. The western-most portions of the U.S. Naval Station in Newport would also lie within a 1,600 Btu/hr-ft$^2$ transient hazard area. The transient hazard area from an LNG vessel spill in the main channel of the East Passage in the vicinity of Newport and Jamestown would not affect most shoreside areas. However, potential spill locations in deepwater areas outside the main channel and closer to shore were also evaluated. For a spill outside the normal route, an estimated 660 to 720 and 420 to 610 residences in Jamestown and Newport, respectively, would fall within these potential transient hazard areas.[75] Again, these threats present risks that should not be run, given that alternatives to the Weaver's Cove facility are available.

This order requires Weaver's Cove to develop emergency evacuation routes for the areas along the route of the LNG vessel transit prior to construction and to develop an initial Emergency Response Plan, including evacuation, prior to initial site preparation, in cooperation with local groups.[76] However, in light of the proposed transit of the LNG vessel past densely populated shoreline communities and well-traveled bridges, local officials' concerns about the lack of adequate emergency resources, and the need for evacuation within short time intervals in case of a release of LNG cargo, I believe that there are serious impediments to the development of a viable, effective Emergency Response Plan and evacuation plan in the area.

### Adverse Environmental Impacts Will Occur

This project would have significant adverse environmental impacts due to dredging and LNG ship ballasting. To allow LNG ships to transit, dock and turn in the Taunton River, the existing navigation channel and a portion of the east channel must be permanently deepened to a depth of 37 feet below Mean Lower Low Water (MLLW). In addition, horizontal dredging would take place within the existing 400-foot wide channel and the turning basin would need to be permanently enlarged and deepened to 41 feet MLLW. The project would require the dredging of up to 2.6 million cubic yards of sediment from the Mount Hope Bay and Taunton River and a turning basin to enable LNG ships to transit, dock

---

[75] See id.

[76] See Order at P 98-99.

Docket No. CP04-36-000                                                    6

and turn in the Taunton River.[77] The dredging would disturb about 191 acres of
river and bay bed.[78] At this time, it remains uncertain how Weaver's Cove will
dispose of the contaminated dredged sediment from the Taunton River and the
New Hope Bay.[79]

    The proposed project area serves as an important winter flounder spawning
and juvenile development habitat. The project would have adverse effects on this
species, including the temporary loss of 6.2 acres of winter flounder spawning
habitat and a permanent loss of 11 acres of winter flounder habitat due to the
deepening and widening of the turning basin. Further, there would be entrainment
or impingement of larvae and eggs during the operation of the LNG terminal when
ballast water would be withdrawn from the river by ships during offloading of
LNG. A total of 980 million gallons of water could be withdrawn each year from
the river for ship ballast, which would entrain and/or impinge larvae and eggs.
The cumulative impact of these losses, when combined with the numbers lost as
the result of power plant operations in the area, will further stress the fish
populations in Mount Hope Bay and Narragansett Bay.[80]

### Socioeconomic Impacts Will Affect the Communities

    This project will also cause socioeconomic impacts on the affected
communities. Weaver's Cove estimates the arrival and departure of 50 to 70 LNG
ships per year. Vehicle traffic delays resulting from the temporary closure of the
Brightman Street Bridge could span 16 minutes per transit. The temporary
closures of the Pell Bridge, Mount Hope Bridge, and Braga Bridge during the
LNG vessel transit would result in delays ranging from 6 to 8 minutes per transit.
The safety and security zone enforced around each LNG ship and around the ship
unloading facility while it is docked could result in recreational boating delays of
up to 60 minutes. For boaters near or upstream of the facility, there could be an
additional 60-minute delay while the LNG ship is berthed or turned. In addition,
recreational boaters could be prevented from boating or fishing in the vicinity of a
moored LNG ship for approximately 24 hours.

---

[77] *See* FEIS at page 3-70.

[78] *See* page 2-25.

[79] The Massachusetts Department of Environmental Protection is still
reviewing Weaver's Cove's proposal to dispose of the dredged sediment on the
project site. The U.S. Army Corps of Engineers and the U.S. Environmental
Protection Agency are still evaluating whether offshore disposal of some of the
dredged sediment is suitable.

[80] *See* page 4-304.

Docket No. CP04-36-000                                                                    7

**Conclusion**

In sum, the existence of reasonable alternatives for bringing much-needed natural gas supplies to New England, combined with safety concerns posed by the unique geography of the area and the close proximity of densely populated communities along the LNG vessel transit path and near the dock, the adverse impacts on the environment, and the socioeconomic impacts of this proposed LNG facility, lead me to conclude that the Weaver's Cove project is not consistent with the public interest under NGA section 3.  Therefore, I respectfully dissent from this order.

| | |
|---|---|
| | Suedeen G. Kelly |

# ATTACHMENT 3

114 FERC ¶ 61,058
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

| | |
|---|---|
| Weaver's Cove Energy, LLC | Docket Nos. CP04-36-001 |
| Mill River Pipeline, LLC | CP04-41-001 |
| | CP04-42-001 |
| | CP04-43-001 |

ORDER ON REHEARING

(Issued January 23, 2006)

1.    On July 15, 2005, the Commission issued an order authorizing Weaver's Cove Energy, LLC (Weaver's Cove) under section 3 of the Natural Gas Act (NGA) to site, construct and operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts.[1]  Weaver's Cove's authorization is subject to a number of environmental and other conditions.  The Commission also issued a certificate of public convenience and necessity to Mill River Pipeline, LLC (Mill River), an affiliate of Weaver's Cove, under section 7 of the NGA to construct and operate two short lateral pipelines to connect the LNG terminal to the interstate pipeline system of Algonquin Gas Transmission Company (Algonquin).

2.    Timely requests for rehearing and/or clarification of the July 15 Order were filed by Weaver's Cove; the City of Fall River, Massachusetts, jointly with the Attorney General of the Commonwealth of Massachusetts, the Attorney General of the State of Rhode Island, and the Massachusetts Energy Facilities Siting Board (jointly Fall River); the Conservation Law Foundation; Shell Oil Products US (Shell); KeySpan Delivery Companies (KeySpan); and Michael L. Miozza.

---

[1] 112 FERC ¶ 61,070 (2005) (July 15 Order).

Docket No. CP04-36-001, *et al.*                                                                    2

3.      On rehearing, Fall River asserts, *inter alia*, that the Commission should
deny the project based upon recent legislation that prohibits demolition of the old
Brightman Street Bridge over the Taunton River. Fall River and the Conservation
Law Foundation renew their arguments regarding safety and consideration of
alternatives to the Weaver's Cove project, and they question whether the project
would be consistent with the Wild and Scenic Rivers Act.

4.      Weaver's Cove and Shell raise questions regarding several conditions the
July 15 Order places on the Commission's approval of the project. Weaver's
Cove argues that the billing determinants the July 15 Order requires for Mill
River's rates based on theoretical capacity are too high. KeySpan, a shipper on the
Algonquin system, requests the Commission to clarify that the July 15 Order does
not address gas quality tariff issues relating to introduction of regasified LNG
from Mill River into Algonquin.

5.      For the reasons set forth below, we are granting Weaver's Cove's request
for rehearing of the rate issue and denying the other requests for rehearing.

## Background

6.      On July 11, 2003, the Commission, at Weaver's Cove's request, initiated
National Environmental Policy Act of 1969 (NEPA) review of this project under
the Commission's pre-filing procedures.[2]  The Commission issued a notice of
intent to prepare an environmental impact statement (EIS) for this project, inviting
comments on environmental aspects of the project from the public.[3]

---

[2] The purpose of the pre-filing process is to involve interested stakeholders
early in project planning and to identify and resolve issues before an application is
filed with the Commission. The NEPA pre-filing process does not necessarily
shorten the time period that is required for Commission staff to complete its
environmental analysis; rather, the pre-filing process allows the Commission to
process the application in less time after it is filed because the environmental
record is completed closer to the filing date.

[3] See Notice of Intent to Prepare an Environmental Impact Statement for
the Proposed Weaver's Cove LNG Project, Request for Comments on
Environment Issues, and Notice of Joint Public Scoping Meeting (NOI),
68 Fed.Reg. 42699 (July 18, 2003).

Docket No. CP04-36-001, *et al.*                                                3

7.      The July 11, 2003 notice explained that Commission staff had already met in Fall River on May 2, 2003, with representatives of Weaver's Cove and key federal and state agencies to discuss the project and the environmental review process. These agencies included the U.S. Army Corps. of Engineers (COE), the U.S. Coast Guard, the Massachusetts Department of Environmental Protection, the Massachusetts Energy Facilities Siting Board, the Massachusetts Executive Office of Environmental Affairs, the Rhode Island Coastal Resources Management Council, and the Rhode Island Department of Environmental Management. The notice invited other federal, state, and local agencies with jurisdiction or special expertise with respect to environmental issues to cooperate in preparing the Commission's environmental impact statement. The notice was also sent to all nearby landowners, elected officials, environmental and public interest groups, and local libraries and newspapers. All interested parties were invited to submit written comments and to attend a public scoping meeting conducted jointly by staff from this Commission and the Massachusetts Executive Office of Environmental Affairs on July 29, 2003.

8.      Approximately five months later, on December 19, 2003, Weaver's Cove filed an application proposing to construct an LNG terminal with a peak day sendout capacity of 800 MMcf a day on a site located on the Taunton River in the City of Fall River, Massachusetts. Notice of the proposal was issued on December 12, 2003, and published in the *Federal Register* on January 9, 2004.[4] The proposed facilities include a marine berth, an LNG storage tank, regasification facilities, and an LNG truck distribution facility. The proposed terminal will store LNG that it receives from ocean-going ships. LNG will be transferred into trucks for transportation to peak shaving storage facilities and industrial customers throughout New England, and vaporized (regasified) LNG will be delivered as pipeline quality natural gas into two pipeline laterals to be constructed by Mill River for transportation to separate interconnects with the Algonquin system for further transportation to customers.

9.      On July 30, 2004, 2004, the Commission issued a draft environmental impact statement (DEIS) addressing environmental and safety matters associated with the project and invited comments from the public. In accordance with Council on Environmental Quality (CEQ) regulations, we provided a 45-day

_____

[4] 69 Fed. Reg. 1580.

Docket No. CP04-36-001, *et al.*                                          4

comment period.[5]  In response to our invitation, the Commission received a large
number of comments from local, state and federal government agencies,
environmental groups, and individuals.  The Commission also conducted two
public comment meetings in the project area (one in Massachusetts and one in
Rhode Island) on September 8 and 9, 2004.

10.    On May 20, 2005, we issued a final environmental impact statement
(FEIS).  The FEIS addressed each comment on the DEIS.  In some cases, based on
the comments to the DEIS, we requested additional material from Weaver's Cove.
The new material was addressed in the FEIS, and where appropriate the FEIS
modified earlier recommendations for environmental conditions set forth in the
DEIS.  The FEIS also discusses a study of LNG safety issued after the DEIS by
the U.S. Department of Energy's Sandia National Laboratories, *Guidance on Risk
Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill
Over Water* (Sandia Report).  The FEIS also discusses comments from the United
States Coast Guard regarding ship transit and port security matters. [6]

11.    On July 15, 2005, the Commission found that the proposed new LNG
terminal will promote the public interest by increasing the availability of natural
gas supplies in the New England market, and that the Mill River laterals are
required by the public convenience and necessity to connect the proposed LNG
facilities to the interstate pipeline system.  Pursuant to the July 15 Order, before
construction may begin, Weaver's Cove must satisfy a number of environmental
and safety conditions, including:  the approval of emergency response and
evacuation plans; concurrence from the states of Massachusetts and Rhode Island
that the project is consistent with those states' coastal zone management programs;
appropriate state or federal approvals regarding water quality, air quality, and
dredging; and evidence that the proposed use of the terminal site is consistent with
applicable deed provisions and the Massachusetts Contingency Plan.

---

[5] In practice, however, the Commission continued to receive and consider
comments it received until it issued the final EIS in May 2005.

[6] During this period, the Coast Guard conducted a series of project-specific
security workshops with port stakeholders, and federal, state, and local agencies
identifying measures that would be necessary to manage risks associated with
LNG vessel traffic.

Docket No. CP04-36-001, *et al.*                                                5

**Procedural Matters**

    **Filings by Towns in Rhode Island**

12.    On September 26, 2005, the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island (the Towns) jointly filed a pleading styled an *amicus* brief to express their opposition to the July 15 Order's authorization of the Weaver's Cove LNG project. Each of the Towns is located along the water route for LNG tankers to and from Fall River. The Towns do not seek late intervention. The Towns state that they did not intervene in the proceeding because their positions were consistent with the opposition to the project advanced by the Governors and Attorneys General of Massachusetts and Rhode Island, and other elected officials. On October 14, 2005, the Town of Jamestown, Rhode Island submitted a similar filing. On October 31, 2005, Weaver's Cove replied to the Towns' pleadings, urging that the Commission reject them because they are untimely and improperly filed by non-parties to the proceeding.

    **Commission Response**

13.    The Towns acknowledge that they had ample notice of the Weaver's Cove project, but state that they chose not to participate in this proceeding and participate until now because their interests were being well represented by others. The Towns now disagree with the Commission's July 15 Order approving the Weaver's Cove project, and urge that the Commission reverse that approval. The time for filing comments has long passed. Moreover, these pleadings were submitted more than two months after the Commission's July 15 Order was issued. Under section 19(a) of the NGA and the Commission's Rules of Practice and Procedure, only parties to a proceeding may file requests for rehearing, and such requests must be filed within 30 days of the Commission's order.[7] Accepting the Towns' pleadings for consideration as *amicus* filings would allow the Towns to do indirectly what they cannot do directly in violation of our rules and the statute. Accordingly, the Towns' September 26, 2005 and October 14, 2005 filings will be rejected.[8]

---

[7] 15 U.S.C. § 717r and 18 C.F.R. § 385.713 (2005).

[8] On August 15, 2005, the Navy Undersea Warfare Center Division (Navy Center), located in Newport, Rhode Island, filed a motion for late intervention, to reopen the record, and to grant rehearing. On January 19, 2006, the Navy Center

                                           (continued...)

Docket No. CP04-36-001, *et al.*                                         6

## Comments Filed Prior to the July 15 Order

### Comments on the FEIS

14.     Several parties to the proceeding submitted comments on the FEIS issued May 20, 2005 too late for us to respond to them in the July 15 Order. Specifically, we received such comments from the U.S. Department of the Interior, Office of Environmental Policy and Compliance (DOI); the U.S. Environmental Protection Agency, Region 1 (EPA); the U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service (NOAA Fisheries); and the Massachusetts Executive Office of Environmental Affairs, Department of Environmental Protection (Mass DEP). The July 15 Order discusses many of the issues raised in these comments. We will address other issues raised in these comments in this order, as appropriate, either in this section of the order or as part of the discussion of rehearing issues raised by other parties.

### DOI

15.     DOI disagrees with the FEIS conclusion that the proposed project is compatible with potential Wild and Scenic River designation for the Taunton River, on which the LNG terminal would be located and under which the Mill River pipelines would run. DOI asserts that the FEIS does not adequately address protection of the outstanding fishery value of the Taunton River, and states that the failure to recommend dredging time-of-year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as wild and scenic. DOI believes that the proposed enlargement of the turning basin and development of the site would result in unavoidable adverse impacts, including damage to 11 acres of winter flounder habitat and 1.15 acres of saltmarsh and intertidal/subtidal habitat. DOI further indicates that development of the site appears to be inconsistent with the City of Fall River's goal of obtaining federal Wild and Scenic River designation.

16.     We found in the July 15 Order that the FEIS appropriately addressed fishery resource impacts, and we concluded that Weaver's Cove's proposed mitigation and our additional required mitigation will protect fishery resources within the Taunton River. Based on the FEIS analysis of Weaver's Cove's

---

filed a motion (dated January 13, 2006) withdrawing the August 15, 2005 motion. We grant the Navy Center's request to withdraw its pleading.

Docket No. CP04-36-001, *et al.*                                         7

dredging program, we found in the July 15 Order that additional dredging time-of-year restrictions to protect anadromous fish resources are not warranted.[9] It is important to recognize, however, that Weaver's Cove's dredging program falls under the jurisdiction of COE through its permitting process under section 404 of the Clean Water Act.[10] It is COE that will ultimately issue any dredging permits, and, as we noted in the July 15 Order, COE could impose additional time-of-year restrictions for anadromous fish resources should it find such measures warranted.[11] The July 15 Order also included several environmental mitigation measures that will reduce unavoidable impact on saltmarsh and intertidal/subtidal habitat (Condition 19) and winter flounder habitat losses (Condition 21).

17.    The site of the Weaver's Cove project is located within the area described by Massachusetts as the Fall River-Mount Hope Bay Designated Port Area for marine terminals.  Further, based on our review of the existing development plans for the City of Fall River as described in the FEIS (page 4-137), we concluded that the proposed project is not inconsistent with existing and planned uses of the site, including Fall River's Harbor and Downtown Economic Development Plan. Whether or not either the state's or Fall River's plans conflict with designation of this portion of the Taunton River as wild and scenic we cannot say; however, the LNG project is not inconsistent with Fall River's existing long range development programs.

### EPA, NOAA Fisheries, and Massachusetts DEP

18.    As in their prior comments to the DEIS, the primary concern of EPA, NOAA Fisheries, and the Massachusetts DEP with the project is the proposed dredging, which they believe will result in substantial and unacceptable impacts on water quality and fisheries habitat in Narragansett Bay, Mt. Hope Bay, and the Taunton River.  While these agencies generally support the dredge window

---

[9] *See* FEIS, section 4.6.2, *Aquatic Resources*, pages 4-97 – 4-107, and July 15 Order, P 108.

[10] COE must also issue related permits under section 10 of the River and Harbors Act of 1899 and section 103 of the Marine Protection, Research and Sanctuaries Act.

[11] On November 1, 2005, COE issued a public notice announcing public hearings on December 14 and 15, 2005 and inviting written comments by January 3, 2006.

Docket No. CP04-36-001, *et al.*                                          8

condition we included in the July 15 Order to protect winter flounder spawning, they aver that the FEIS underestimates the effects of dredging activities on fishery resources and habitats. As a result, these agencies assert that a more comprehensive restriction is warranted to fully protect the anadromous fish migration within the Taunton River and Mount Hope Bay, and they recommend additional protective measures, such as the use of environmental buckets and dredge sequencing. The EPA states that the only sure way to avoid an impact to inward and outward fish migration is to expand our recommended dredge restriction window in the FEIS.

19.     We continue to believe that the FEIS properly analyzed dredging related impacts and that the July 15 Order imposed appropriate conditions to protect fish resources and other potential aquatic impacts. As discussed above, however, Weaver's Cove must obtain the necessary dredging permits from COE, and COE can impose additional time-of-year restrictions for anadromous fish resources if COE finds that additional restrictions are needed.

20.     The Massachusetts DEP states that there are uncertainties regarding the management of dredge spoils (on-site or offshore), which would have major consequences on the project's impacts and scheduling. The Massachusetts DEP avers that additional dredge time-of-year restrictions that it believes will ultimately be required will have a significant impact on the project's construction schedule and may necessitate offshore disposal. As noted in the July 15 Order, the FEIS found that the offshore, open water disposal alternative would be environmentally acceptable if the COE and EPA determine that a significant volume of sediments are suitable for offshore, open water disposal. The FEIS also determined that offshore disposal of suitable dredged material is not without impacts and is not clearly environmentally preferable to Weaver's Cove's proposed reuse of the dredged material as general site fill at the LNG terminal site.

21.     In response to agency comments on the DEIS, Weaver's Cove Energy conducted a sediment analysis to evaluate the feasibility of disposing a portion of the dredged material at an offshore location. Although offshore disposal has not yet been proposed under its dredging plan before the Commission, Weaver's Cove initiated a Tier III analysis program in accordance with the COE- and EPA-approved protocols to determine the suitability of the materials for offshore disposal at the Rhode Island Sound Disposal Site (RISDS) formerly referred to as

Docket No. CP04-36-001, *et al.*                                              9

Site W or Site 69b and the Massachusetts Bay Disposal Site (MBDS).[12]  Weaver's
Cove filed the results of the Tier III testing with the EPA and COE on April 12,
2005.  The EPA and COE subsequently reviewed the test results and found that
the dredged materials would be suitable for offshore ocean disposal at the RISDS
and MBDS.

22.      In a letter to the Commission dated November 2, 2005, Weaver's Cove
stated that it is now in the process of pursuing the offshore ocean disposal
alternative for over 95 percent of the dredged material.  As noted above, we have
already analyzed, as part of our resource agency consultation, the offshore, open
water disposal alternative in the FEIS, the potential for additional dredging
restrictions, and regulatory issues associated with the proposed onshore disposal
(pages 3-69 through 3-82).  Offshore disposal was not previously considered a
viable alternative during preparation of the FEIS until the COE and the EPA
determined that the dredge sediments were in fact suitable for ocean disposal.  As
stated in the FEIS, additional environmental review and Commission approval will
be required if Weaver's Cove ultimately goes forward with any offshore disposal
proposal or changes its proposed LNG terminal site design (page 2-29).  We note,
however, that the offshore ocean disposal alternative would help facilitate
compliance with any further time-of-year restrictions imposed by the resource
agencies for the protection of anadromous fish migration.

23.      The existing plan still before the Commission for disposing of dredge
materials is for depositing them on the proposed LNG terminal site. The
Massachusetts DEP expresses concern with project impacts associated with the
quality and volume of dredge material proposed to be deposited on the project site.
The Massachusetts DEP asserts that Weaver's Cove has not demonstrated
reasonably necessary on-site reuse of the total volume of dredge spoils estimated
to be dredged.  The Massachusetts DEP further disagrees with a statement in the
FEIS that the dredge spoil processing and placement on the site as "fill material"
exempts the material from the regulatory definition of solid waste.  The
Massachusetts DEP argues that the Commission's approval of the project on the
basis that all the dredge spoil can be deposited on-site under the current proposal is
misplaced.

---

[12] Tier III testing involves the assessment of contaminants in the dredged
material on appropriately sensitive and benchmark organisms to determine if there
is the potential for an unacceptable toxicity or bioaccumulation impact at the
proposed site.

Docket No. CP04-36-001, *et al.*                                    10

24.    The July 15 Order addressed the Massachusetts DEP's concerns and notes that there are several unresolved issues that are addressed in the FEIS but require resolution prior to any project construction. The July 15 Order acknowledges that the Massachusetts DEP has not made a final determination regarding: whether the proposed placement of the stabilized dredged sediment on the LNG terminal site complies with the anti-degradation provision of the Massachusetts Contingency Plan (MCP); whether the material could be placed on site without adversely affecting Shell's existing remediation activities; or whether all the material constitutes a beneficial reuse and is necessary for site development under the MCP. The July 15 Order further acknowledged that a negative determination on any of these issues could prohibit or affect the proposed use of the site.

25.    Condition 18 of the July 15 Order requires Weaver's Cove to file documentation with the Commission prior to construction to verify that placement of the stabilized dredge material on the LNG terminal site is consistent with the MCP. If Weaver's Cove is unable to verify consistency of the proposed use of the sediment with the MCP, Condition 18 requires that Weaver's Cove file a revised sediment placement plan that identifies alternative location(s) for use of the dredged sediments. We find that the FEIS and the July 15 Order's Condition 18 adequately address the Massachusetts DEP's concerns. In addition, Weaver's Cove Energy's November 2, 2005 filing indicates that it is now pursuing the offshore disposal alternative, which will help avoid the Massachusetts DEP's concerns regarding the upland placement of stabilized dredge material on the LNG terminal site.

26.    EPA comments that the FEIS water usage estimate does not include cooling water used for the ship boilers that will power the propulsion systems of vessels moving through Narragansett Bay, Mount Hope Bay and the Taunton River. While EPA acknowledges that the projected level of entrainment may be small in comparison to the current levels in the project area, ships' cooling water usage would introduce a new source of entrainment that adds to the cumulative burden on the ecosystem.

27.    We note that this issue was not raised during the lengthy pre-filing process, at interagency meetings, public scoping meetings, nor in comments on the DEIS. Therefore, the issue was not addressed by staff in its environmental analysis. However, this issue is not the result of a new technological development, as steam powered LNG vessels, with their associated cooling water usage, have been visiting U.S. ports for more than 30 years. As noted throughout the FEIS, LNG vessel transits to the terminal site in Fall River will occur once per week and the unloading process at the site is anticipated to take about 24 hours. While the

Docket No. CP04-36-001, *et al.*                                                11

cooling water needed for the ship boilers was not specifically addressed in the FEIS, the limited LNG ship traffic at the site will not result in any appreciative impingement and entrainment impacts beyond what is described in the FEIS.

28.    EPA remains concerned that Mount Hope Bay and the Taunton River may be particularly vulnerable to invasive species due to the stressed nature of both ecosystems and the low numbers of many of the resident species. In response to the FEIS statement that the risk of invasive species will not be significantly increased because Fall River is an existing port, EPA avers that receiving ships from new ports of origin increases risk at an existing port, and it remains unclear whether Fall River currently receives vessels from the origination points of LNG that will be transported by tankers to Fall River. While we do not disagree that receiving ships from additional origination ports will increase to some extent the risk of introducing invasive species, we agree with the conclusion in the FEIS that any increased risk due to LNG vessel transit will be low because ballast water will not be discharged in Mount Hope Bay or the Taunton River.

29.    We do not agree with the EPA statement that the FEIS does not adequately address compensatory mitigation efforts regarding salt marsh and shellfish impacts. To ensure that these resources are adequately mitigated, the FEIS recommended, and Condition 19 in the July 15 Order requires, that Weaver's Cove consult with the COE and NOAA Fisheries to ensure that those resource agencies have an opportunity to address the adequacy of Weaver's Cove's wetland mitigation plan. In addition, Weaver's Cove has indicated in its November 2, 2005 letter noted above, that it intends to propose minor modifications to the LNG terminal site layout to further reduce impact on salt marsh areas, shellfish habitat, and a coastal dune site.

30.    The EPA remains concerned that project dredging and stormwater discharges from the construction site may not meet state water quality standards in Mount Hope Bay and the Taunton River, since those waterbodies are currently impaired. The EPA disagrees with the FEIS analysis of existing water quality conditions in the project area, and states its particular concern with elevated copper concentrations in the Taunton River. The EPA questions the FEIS' assertion that organisms have adapted to the degraded environment, and that sensitive marine organisms are already at risk of lethal and sublethal effects. The EPA further indicates that any National Pollutant Discharge Elimination System permit for dewatering discharges from onsite processing of the dredged material at the disposal site would need to contain limits which may significantly limit net increases in copper.

Docket No. CP04-36-001, *et al.*                                    12

31.    The FEIS analysis of the existing water quality conditions demonstrated
that the high levels were representative of background conditions and that
organisms have adapted to these levels.  As indicated in the FEIS, Weaver's Cove
must meet the states' water discharge requirements under section 402 of the Clean
Water Act and as specified in its forthcoming National Pollutant Discharge
Elimination System permit.  Weaver's Cove's analysis of the dredged sediments
has undergone extensive physical, chemical, and biological testing, and the
agencies, including EPA, have determined that the majority of the material is
acceptable for unrestricted ocean disposal. The sediment testing results further
supports our findings in the FEIS that toxicity levels should not cause undesirable
environmental effects on the existing water quality conditions in the project area.
For example, the Tier III chemical constituent concentration results demonstrate
that copper, zinc, and silver levels were below the EPA aquatic life guidelines in
both the elutriate results and background river water results.  Therefore, the Tier
III results further support the FEIS' conclusions that contaminants remain
absorbed to the sediments with little release to the water column and that the
proposed dredging program will not result in significant water quality impacts.

32.    EPA states that there is not enough information in the FEIS to support a
conclusion that aquatic resources will not be adversely affected by project
activities.  The FEIS addresses the cumulative impacts extensively[13] and
concludes that while construction and operation of the Weaver's Cove LNG
project could contribute cumulatively to impacts on aquatic resources and water
quality in the Taunton River, Mount Hope Bay, and Narragansett Bay, these
impacts would be relatively short term and/or minor in comparison to those from
other sources. The FEIS explained that implementation of Weaver's Cove's
proposed mitigation measures and the conditions adopted in the FEIS will reduce
impacts.  Further, as stated in the July 15 Order, we have determined, subject to
appropriate mitigation conditions set forth in Appendix B of the July 15 Order,
that the Weaver's Cove project should have limited environmental impact.

33.    Regarding the general air quality conformity discussion in the FEIS, EPA
states that, for a maximum of 70 ships per year, the facility's total potential to emit
nitrogen oxides ($NO_x$) is only a fraction of a ton below the limit that would require
a nonattainment New Source Review.  EPA therefore encourages Weaver's Cove
to work closely with the Massachusetts DEP to ensure the emission estimates are
accurate and practically enforceable.  Weaver's Cove has stated that a federally

---

[13] *See* FEIS, *Cumulative Impacts,* pages 4-297 – 4-305.

Docket No. CP04-36-001, *et al.*                                    13

enforceable permit condition will be included in the facility's air plan approval (air permit) to confirm that the combined emissions from the facility and the tankers, are less than 50 tons per year of $NO_x$ to prevent triggering the nonattainment New Source Review.

34.     The EPA also urges the implementation of additional pollution control measures on tugs, such as engine retrofitting and early engine re-manufacturing. As discussed in the FEIS (see page 4-218), the tugs would either be units currently on order for tug owners/operators or they would be ordered specifically for service at the LNG terminal.  For either scenario, the tugs will be subject to the International Maritime Marine Pollution (IM MARPOL) Annex VI regulation for $NO_x$ emissions and 40 CFR Part 94 of the EPA regulations for criteria pollutant emissions from marine engines.  Any servicing needed to maintain compliance with these regulations will be performed.

## Comments by Fall River Regarding DOT/FERC Correspondence

### Design spills

35.     On June 23, 2005, Fall River filed comments regarding an exchange of correspondence between FERC staff and the DOT's Office of Pipeline Safety staff (dated April 19 and May 6, respectively) that was placed in the docket on June 15, 2005 regarding the application of certain DOT regulations regarding the sizing of impoundment zones for LNG spills.  Fall River asserts that the correspondence reflects a significant misreading of the applicable DOT requirements and that the Commission staff has consistently erred in its interpretation and implementation of the regulations.  Fall River contends that the correspondence reflects staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments.  Fall River contends that the regulations do not dictate that the "design spill" be used for calculating either the thermal exclusion or flammable vapor exclusion zone.  Further, Fall River contends that only one paragraph of the four thermal radiation exclusion zones in the DOT regulations is based on the "design spill," while the other three refer to a fire over an impounding area containing a volume, V.

### Commission Response

36.     The correspondence reflected in the April 19, 2005 and May 6, 2005 letters concerns a single technical issue: the selection of the single accidental leakage source used to calculate spills from piping at LNG import terminals.  The letters are not related to any specific project, but rather the approach staff applies to each of the proposals currently before the Commission.  Although the correspondence

focuses on design spills for marine transfer lines, Fall River has misinterpreted this as staff's understanding that there is a single "design spill" that the regulations require to be used for sizing of impoundments. This assertion is wrong as shown in Table 4.12.4-1 of the FEIS which presents four design spills in addition to the impoundment for the LNG storage. Further, Table 4.12.4-2 presents four thermal exclusion zone distances; one for the "design spill" and three for the LNG storage tank impoundment, *i.e.*, a fire over an impounding area containing a volume, V.

### Spill duration

37.    Fall River contends that the suggestion in DOT's response that "...spill duration of 30 seconds or less from leaking flanges instead of guillotine breaks may be used for spill rate criteria..." has the air of rulemaking by letter. It also states that although FERC has the authority to select a duration shorter than 10 minutes, any such selection must be based on a specific evaluation of a facility.

### Commission Response

38.    DOT regulations provide that design spills be evaluated on the basis of flow from any single accidental leakage source for 10 minutes, or for a shorter duration based on demonstrable surveillance and shutdown provisions acceptable to the authority having jurisdiction. While the staff recognizes that the regulations provide a means to approve spills of a shorter duration, such as 30 seconds or less, all design spills evaluated by Commission staff on pages 4-245 and 4-246 of the FEIS are based on the 10-minute duration.

### Source of Possible Leak

39.    Fall River asserts that the assumption expressed in the correspondence by both FERC and DOT staff that the only possible accidental leak from a transfer operation would involve a flange or small diameter attachment, not a full pipe rupture, ignores history.

### Commission Response

40.    Rather than ignoring history, the operational experience of LNG facilities supports this selection of spill criteria in that full pipe ruptures have not occurred at LNG facilities. Nevertheless, the Commission requires that impoundment sizing be based on full-rupture volumes as an additional measure of conservatism, while recognizing that the design spill criteria is appropriate for the exclusion zones required by 49 CFR Part 193.

Docket No. CP04-36-001, *et al.*                                               15

## Calculation of flammable vapor exclusion zones

41.    Fall River contends that the Commission has consistently misapplied the DOT regulations by applying the DEGADIS (Dense Gas Dispersion) model (to calculate flammable vapor exclusion zones) only to the calculated overflow of unmixed LNG vapor from an impounding area, rather than to the full vapor volume, including entrained air. If the effect of the impounding area is considered, it says, the Commission must then use the FEM3A or some equivalent model.

## Commission Response

42.    First it is important to note that the input to DEGADIS is neither a volume of unmixed LNG vapor nor a full vapor volume including entrained air, but rather a *mass* of LNG vapor per unit time. Although 49 CFR Part 193 references the DEGADIS and FEM3A dispersion models, the mass source strength input for either model is not specified. As a result, the Commission uses commonly accepted methodology that can be applied within the limitations of the model, *i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. Second, we received similar comments on the DEIS concerning the mixing of air with LNG vapor in an impounding area and the use of FEM3A to account for these phenomenon. Based on the comments, the staff revised its calculations in the FEIS and addressed the specific issues in the document.[14]

## Brightman Street Bridge

43.    In their requests for rehearing Fall River and Mr. Miozza point out that that recently enacted federal law prohibits the use of federal funds for demolition of the existing Brightman Street Bridge across the Taunton River connecting Fall River with Somerset, Massachusetts. The law also appropriates funds for maintenance of the bridge for pedestrian and bicycle access and as an emergency service route.[15] Because the continued existence of the bridge will not permit operation of the LNG terminal, they assert, the Commission should dismiss the Weaver's Cove application as moot.

----

[14] See FEIS, section 4.12.4, Siting Requirements – Thermal and Dispersion Exclusion Zones, pages 4-250 – 4-251.

[15] See The Safe, Accountable, Flexible, Efficient Transportation Equity Act, Pub. L. No. 109-59 §§ 1702 and 1948 (2005).

Docket No. CP04-36-001, *et al.*                                    16

## Commission Response

44.    The site of the Weaver's Cove LNG terminal would be located on the
Taunton River above the existing nearly 100-year old Brightman Street Bridge.
The existing Brightman Street Bridge was, until passage of the legislation
described above, scheduled for demolition upon completion of a new Brightman
Street Bridge that would replace the old bridge.  The existing bridge has a
horizontal clearance of only 98 feet, which will not accommodate the 150-foot
wide LNG tankers Weaver's Cove plans to employ to transport LNG to the new
terminal.  Fall River is correct that if the existing Brightman Street Bridge is not
removed, as had been planned, the large LNG vessels described in the application
will not be able to access the proposed upstream LNG terminal.  The July 15
Order includes a condition requiring Weaver's Cove to review its waterway
suitability assessment on an annual basis in consultation with the Coast Guard.
This annual update to the Commission will need to address the continuing status
of the Brightman Street Bridge, and thus, the viability of the Weaver's Cove
project.  The July 15 Order, however, did not condition approval of the project on
removal of the bridge, and it would be premature at this time to find that the
project is moot.

## Requests for Rehearing and/or Clarification

### A.    Evidentiary Hearing

45.    Fall River contends that the procedures the Commission followed in
reaching its decision did not allow informed decision making.  Fall River argues
that the Commission should have conducted an oral evidentiary hearing to address
disputed material facts, that the Commission arbitrarily and without notice
established a cut-off date for submitting evidence, that it thus did not consider
sworn testimony that Fall River submitted to the Commission as an example of the
testimony it would offer at an oral evidentiary hearing, and that the Commission
improperly delegated to other agencies and to its own staff judgments that are the
Commission's alone to make.  Fall River also requests that we schedule its
rehearing request for oral argument.

46.    Fall River continues to assert that there are a number of material facts in
dispute that require cross examination in a trial-type, evidentiary hearing.  The
complexity of the issues, the importance of being able to evaluate the depth of
knowledge and the credibility of those offering conflicting viewpoints, asserts Fall
River, demand the fullest possible adjudicatory process.  The areas alleged to
require such oral testimony are the following:  the threat of terrorist attack; the
adequacy of the safety analysis and of safety standards; the feasibility of

Docket No. CP04-36-001, *et al.*                                                      17

evacuation and emergency response; the impacts on local planning, economic
well-being, and environmental justice; and environmental effects and the
consideration of alternatives. Fall River contends that the Commission has not
offered a reasoned explanation for its refusal to follow what Fall River claims has
been a longstanding practice of holding oral evidentiary hearings.

## Commission Response

47.    As we explained in the July 15 Order, trial-type evidentiary hearings are
required only where there are material issues of fact that cannot be resolved on the
basis of the written record. Where the Commission provides interested parties an
opportunity to participate through evidentiary submission in written form, it need
not provide an opportunity for cross-examination or examination under oath of
other parties who have made submissions.[16] Contrary to Fall River's assertion, the
Commission routinely decides complex and controversial cases on the basis of the
record in a paper hearing.[17]

48.    The July 15 Order at paragraph 25 demonstrates in detail that interested
parties had ample opportunity to present their views through the submission of
written comments. All areas identified by Fall River as demanding evidentiary
hearing were carefully discussed either in the FEIS or the July 15 Order, which
adopted the analysis and recommendations contained in the FEIS. The
Commission remains confident that we had ample information to make a reasoned
decision resolving all issues, and that cross examination of witnesses would not
have assisted our deliberations.

49.    Fall River claims that the Commission arbitrarily and without notice cut off
submissions by issuing the FEIS. Instead, as the facts demonstrate, the
Commission analyzed the comments in a deliberate and orderly manner as it
continued to consider all late-filed comments as long as physically possible until it
issued the FEIS. Although comments on the DEIS were due on September 24,
2004, we continued to accept and consider all materials submitted to the
Commission until we issued the FEIS in May 2005, nearly 8 months after the
comment due date. Where possible, we considered comments on the FEIS in the
July 15 Order. In this order we consider comments on the FEIS that we received

----

[16] See *Moreau v. FERC*, 982 F. 2d 556, 568 (D.C. Cir. 1993); *Cascade
Natural Gas Corp. v. FERC*, 955 F. 2d 1412, 1425 (10th Cir. 1992).

[17] See *Sound Energy Solutions*, 107 FERC ¶ 61,263 at P 78 (2004).

Docket No. CP04-36-001, *et al.*                                                          18

too late to include in the July 15 Order. We are also considering in this order, either as comments on the FEIS or as rehearing argument, material Fall River submitted on June 9, 2005, which Fall River identified at that time as sample evidentiary hearing testimony Fall River would introduce at a hearing.[18]

50.    We will likewise deny Fall River's request for oral argument of its rehearing request. As noted, Fall River has had ample opportunity to present its arguments through written submissions at public hearings. Fall River has not shown how oral argument would aid the Commission in its resolution of the issues. Based on the present record, we are able to address the issues raised from the information filed and disagree that an oral argument at this stage of the proceeding would shed light on these matters.

## B.    Alternatives

51.    Fall River and the Conservation Law Foundation argue that the Commission did not give proper consideration to alternatives to the Weaver's Cove project because it unreasonably narrowed the appropriate objectives of the project and thus eliminated from consideration projects that could help satisfy New England's acknowledged need for new gas supplies. Specifically, it states that the Commission focused overly on the delivery of LNG by truck to peakshaving facilities and did not give sufficient attention to other alternatives that would help satisfy the ability of the region to meet peak gas demands. Fall River avers that while careful consideration should be given to a project sponsor's stated objective for the project, it is the Commission's responsibility to define necessary characteristics of alternatives, and that it is not necessary that any one alternative satisfy all intended objectives, particularly where in combination with other options even the objectives specified by the project sponsor may be fulfilled. The Conservation Law Foundation states that the Commission must consider alternatives that even partially meet the proposal's goal.

52.    Truck delivery of LNG, Fall River states, is but one option. Fall River concedes that truck deliveries of LNG are an important component of reliable gas supply for New England, but it states that there is no suggestion that the need for truck deliveries is not currently being met or that the current supplier could not increase shipments. Expanded base load supplies and expanded pipeline capacity

---

[18] We previously rejected this material in the July 15 Order because it was submitted as sample testimony as part of a request for evidentiary hearing that we denied in the July 15 Order.

Docket No. CP04-36-001, *et al.*                                                    19

would clearly contribute to the ability to meet peak demand, asserts Fall River. Offshore projects proposed for New England and pipeline expansions from Canada would likewise contribute to meet this need without security and safety risks, it says. Fall River suggests also that the Commission should have looked at the capability of satellite facilities to liquefy natural gas off the pipeline system for storage, or the possibility that power plant use could not be moderated during peak demand periods through fuel switching.

53.    The Conservation Law Foundation asserts that the Commission should have conducted a "programmatic" environmental analysis to address the larger context for LNG terminal siting decisions in the region in order to develop a regional strategic plan assessing the need for and siting of LNG marine terminals in the New England region, the availability of alternatives to LNG deliveries by ship, and public safety and security concerns. This wider analysis is necessary, avers the Conservation Law Foundation, because the decision to license an individual facility is in essence a siting decision for the region that will likely foreclose other potentially less environmentally harmful options for meeting the region's natural gas needs.

54.    Fall River and the Conservation Law Foundation both contend that the alleged deficiencies in the Commission's alternatives analysis have led to a flawed NGA section 3 public interest determination. Fall River maintains that the only suggested benefit of truck deliveries is the introduction of a competitive supply, but that this economic benefit should have been compared with the potential risks and economic costs of the project to the public. Where there are risks to the public from a project, argues Fall River, it is incumbent upon the Commission, as part of its NGA section 3 analysis, to ascertain whether any alternative or combination of alternatives can satisfy the need at a lesser cost to the human and natural environment. Both Fall River and the Conservation Law Foundation allege that the Commission is deferring environmental evaluation to market forces. The Conservation Law Foundation asserts that the section 3 public interest analysis requires that the Commission address overall power supply needs in the New England region and alternative means for addressing those needs, including analyzing the effect of energy efficiency, which, it states, could dramatically reduce the demand for natural gas.

55.    Fall River also states that the Commission's analysis of alternatives is flawed because it lacked a consistent or systematic approach to analyzing different alternatives. While identifying a broad range of possible system alternatives, states Fall River, the FEIS did not evenly address the merits of all alternatives using a complete and common set of issues. Fall River argues that the FEIS

Docket No. CP04-36-001, *et al.*                                                      20

should have made issue by issue findings on the merits of the proposed project and alternatives to assess whether the advantages or disadvantages of the proposed project outweighed the advantages or disadvantages of the alternatives.

### Commission Response

56.     The FEIS set forth the criteria it employed for evaluating potentially reasonable and environmentally preferable alternatives to the project proposed by Weaver's Cove.  Those criteria were whether they:  were technically and economically feasible, reasonable, and practical; offer significant advantage over the proposed project; and meet project objectives.  The project objectives were identified as providing: (a) a new LNG import storage terminal as a new source of supply for natural gas for New England; (b) access to natural gas reserves from production areas throughout the world; the ability to deliver LNG by truck to LNG storage facilities throughout the region.[19]  The FEIS noted that not all conceivable alternatives are technically and economically feasible or practical, because, for example, they are unavailable and/or incapable of being implemented.  The FEIS explained that each alternative was considered to a point at which it was clear that the alternative was not reasonable or would result in significantly greater environmental impacts or could not be readily mitigated, and that those alternatives that appeared to be the most reasonable with less than or similar levels of environmental impact were reviewed in the greatest detail.[20]

57.     The FEIS evaluated a number of alternatives to the proposed project.[21] These alternatives included the no action or postponed action alternatives (including conservation and other sources of energy), system alternatives, alternative LNG sites, and LNG terminal layout alternatives.  The FEIS examined existing and proposed onshore LNG facilities, including the existing Distrigas LNG terminal in Everett, Massachusetts just outside Boston, the existing and proposed expansion facilities of KeySpan in Providence, Rhode Island, and possible new LNG import facilities in Maine.  The FEIS also evaluated the potential Neptune LNG and Northeast Gateway LNG facilities that would be located in the Atlantic Ocean off the coast of Massachusetts, and the Broadwater LNG project proposed for Long Island Sound between New York and

---

[19] FEIS, section 3.0, *Alternatives,* page 3-1.

[20] Id.

[21] FEIS, pages 3-1 – 3-50.

Docket No. CP04-36-001, *et al.*                                    21

Connecticut. The FEIS discussed the potential availability of additional supplies of natural gas from outside New England. Other potential locations for an LNG terminal to serve the New England market were also studied, including Boston Harbor, sites in Narragansett Bay, Rhode Island, and New London and New Haven, Connecticut.[22]

58.    Fall River and the Conservation Law Foundation contend that the Commission gave improper consideration to the role of LNG transportation by truck to peakshaving facilities in considering appropriate alternatives. We disagree. In identifying and defining a project's objective and goal for NEPA purposes, the Commission generally adopts the project sponsor's proposal in the NGA application that implicates the need to conduct the environmental review.[23] A federal appellate court explained that:

> The federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor of the siting and design of the project. In formulating the EIS requirement, the Congress did not expect agencies to determine for an applicant pipeline what the goals of its proposal should be.[24]

This general principle, however, is subject to the admonition that the goals of a project may not be so narrowly defined as to preclude consideration of what may actually be reasonable choices.[25] Thus, objectives must be reasonably identified and defined.

---

[22] The FEIS explained at page 3-28 that, based on a separate FERC study, it considered additional alternative LNG terminal sites only south of the Massachusetts/New Hampshire border out of concern that LNG facilities outside this area could not efficiently serve the New England market.

[23] *See Independence Pipeline Company*, 91 FERC ¶ 61,102, at 61,345 (2000).

[24] *City of Grapevine, Texas v. DOT,* 17 F3d. 1502, 1506 (D.C. Cir. 1993).

[25] *Simmons v. U.S. Army Corps. of Engineers*, 120 F.3d 664 (7th Cir. 1997); and Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. (1991).

Docket No. CP04-36-001, *et al.*                                        22

59.    In its broadest sense, the goal of the Weaver's Cove project is to provide an additional supply of natural gas to the New England region to help meet that area's increasing need for natural gas.  Both the FEIS and the July 15 Order explicitly recognize that there are other potential projects, such as offshore LNG facilities, onshore LNG terminals in Canada or Maine, and/or increased pipeline infrastructure to transport natural gas from more remote locations, that can play an important role in meeting this overall need.

60.    The FEIS and the July 15 Order explain, however, that New England relies heavily on the transportation of LNG by truck to above-ground peakshaving storage facilities located at nearly 50 sites across New England.  The FEIS explained that LNG storage is critical to meeting New England's winter peak needs for gas because there are no underground storage facilities in the area and the pipeline system is already operating at close to capacity.[26]  At the present time, these LNG storage facilities are served by truck shipments of LNG from a single source, the Distrigas LNG facility in Everett, Massachusetts.  The FEIS reports that in 2003 trucks from Distrigas provided approximately 14 Bcf of LNG to these facilities, which are relied upon to supply as much as 30 percent of the region's peak day needs.  The FEIS pointed out that the March 2005 Governor's Conference Report recognized the importance of stored natural gas by "allowing for an economic means to meet winter peak day requirements … [and] also contributes to the diversity of the regional gas portfolio and reduces our reliance on the availability and price-competitiveness of any individual supply source."[27]  The FEIS also referred to the Commission's December 2003 New England Gas Infrastructure Report that concluded that additional peakshaving LNG facilities would help to ensure more reliable service until additional pipeline capacity is constructed.  Based on this discussion, the FEIS concluded that truck service from the Weaver's Cove LNG terminal would provide a new source of supply to LNG storage facilities, which are critical to maintaining a reliable source of natural gas to the region during peak use periods and to maintaining price stability.

61.    Thus, the FEIS explained that LNG truck service is more than simply an option for meeting New England's gas needs.  It is, instead, a critical component in meeting those needs.  Thus, the ability to provide LNG service by truck from

---

[26] *See* FEIS, section 1.3, *Project Purpose and Need*, pages 1-5 – 1-9.

[27] The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts,* March 1, 2005.

the terminal facility is a legitimate and reasonable objective for this project. We conclude that it was reasonable to accord substantial weight to this goal of the project sponsors in considering the alternatives in the FEIS.

62.     The Conservation Law Foundation renews its earlier request for a programmatic environmental analysis addressing LNG siting and other energy issues on a region-wide basis. In rejecting this request, the July 15 Order explained that, as described above, the Commission studied a number of alternative methods for satisfying the objectives to be satisfied, but found none superior to the project before us in this proceeding. Contrary to the assertion of the Conservation Law Foundation, moreover, our approval of the Weaver's Cove project does not foreclose other energy options for the region. We explained that other potential energy projects we examined, both LNG and non-LNG, were not appropriate alternatives to the Weaver's Cove proposal. We also noted that some types of projects are not within this Commission's jurisdiction, such as the offshore LNG projects which are under the regulatory controls of the Coast Guard and the Department of Transportation.[28]

63.     A programmatic EIS, as the name implies, reflects the broad environmental consequences attendant upon a wide-ranging federal program.[29] Under CEQ regulations, a single EIS should be prepared if actions are "connected" to other actions, that is they closely enough related so they should be discussed together, if they are "cumulative," or if they are sufficiently "similar" to other reasonably foreseeable or proposed agency actions (such as by geography or timing) that a single EIS is the "best way" to assess the combined impacts.[30] The question of whether to prepare a programmatic EIS is initially that of the federal agency.[31] The D.C. Circuit has explained that in making this determination an agency should consider whether a programmatic EIS would contribute to the decisionmakers' basic planning of the overall program, and whether segmenting the overall

---

[28] Deepwater Port Act of 1974, as amended, 33 U.S.C. §§ 1501 et seq. (2003).

[29]*Foundation on Economic Trends v. Heckler*, 756 F.2d 143 (1985).

[30] 40 C.F.R. § 1508.25(a) (2006).

[31] *Kleppe v. Sierra Club,* 427 U.S. 390 (1976).

Docket No. CP04-36-001, *et al.*                                           24

program will unreasonably constrict the scope of the environmental consideration.[32]

64.     The application here is not part of a coordinated federal program that will involve multiple actions with similar or cumulative environmental consequences that should be discussed together. Instead, as we noted in the July 15 Order we have before us a discrete proposal for an energy project filed under a specific federal statute, the NGA. This project is likewise not connected, within the meaning of the CEQ regulations, to other projects that may or may not be developed, or that may or may not be under this Commission's jurisdiction, except in the sense that there are projects of various kinds being contemplated or proposed that would help meet New England's need for increased energy supplies. A programmatic EIS is neither required nor useful under the circumstances existing here.

65.     Fall River and the Conservation Law Foundation's claim that the Commission has deferred environmental concerns to market forces demonstrates a misreading of the July 15 Order and a misunderstanding of the nature of and the relationship between NGA section 3 and NEPA. Under section 3 of the NGA the Commission is charged with authorizing the siting, construction, and operation of LNG import facilities. Section 3 provides that the Commission shall approve such a project unless it finds that the proposal will "not be consistent with the public interest. The July 15 Order explained that it has been Commission policy generally to allow the market to decide which projects are best suited to meet the infrastructure needs of an area because that approach best serves the public interest and allows for the most efficient, cost effective, and timely development of energy infrastructure. The July 15 Order found specifically under section 3 that the LNG terminal proposed by Weaver's Cove would be in the public interest because it would enable the introduction of needed new gas supply into the New England region, because it would provide storage in an area where storage is critical for meeting peak day requirements, because the terminal will be located near major interstate pipeline facilities, and because the facility can facilitate LNG deliveries by motor carrier.

66.     As we explained in the recent *KeySpan* order, however, our most important duty in determining the public interest is ensuring that the project that is authorized is safe and secure.[33] We stated that we would not authorize an LNG

---

[32] *Heckler*, 756 F.2d at 159.

[33] *KeySpan LNG, L.P.*, 112 FERC ¶ 61,028 at P 56 (2005).

Docket No. CP04-36-001, *et al.*                                                              25

facility under section 3 if we continue to have questions about safety. *KeySpan* involved a proposal to construct a new LNG facility that would incorporate an existing LNG facility, the components of which did not meet the current federal safety standards required of all other new LNG import facilities in the United States. The Commission found that without meeting the Commission's full array of safety requirements the proposal would not be in the public interest and denied KeySpan's application. Here, in contrast, we have found that the Weaver's Cove proposal would meet all federal and state safety standards prior to construction and operation. In the July 15 Order we found that, if built according to Commission requirements, the terminal can be operated safely and that the Coast Guard security plan for LNG vessels will ensure the public's safety.

67.    We did not defer environmental matters to market forces under section 3 as Fall River and the Conservation Law Foundation contend. Rather, we evaluated them under NEPA. NEPA complements section 3 of the NGA, but it is not a part of section 3. NEPA is essentially procedural and it does not require the Commission to elevate environmental concerns over other appropriate considerations. [34] NEPA requires that the Commission consider and disclose all significant aspects of the environmental impact of a proposal.[35] The Commission must take a "hard look" at environmental consequences.[36] Although these procedures are almost certain to affect the agency's substantive decision, it is well-settled that NEPA itself does not mandate particular results.[37] As we explained in the July 15 Order, the Commission has conducted a comprehensive review of the project, and has imposed a number of conditions on our approval of the project under section 3 of the NGA that will appropriately mitigate any adverse effects from the project.

68.    In the July 15 Order at paragraphs 103-105 we addressed the assertion that the Commission's analysis of alternatives is deficient because it does not systematically compare all the advantages and disadvantages of the proposed project with all identified alternatives. We explained that NEPA requires us to

---

[34] *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227-28 (1980).

[35] *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 97-98 (1971);

[36] *Kleppe v. Sierra Club*, 427 U.S. 390, 409, n. 21 (1976).

[37] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Docket No. CP04-36-001, *et al.*                                                26

evaluate the environmental impacts from a proposal before the Commission, including reasonable alternatives to the proposal, but that NEPA does not require a detailed analysis of every alternative proposed. We explained that pursuant to NEPA requirements all alternatives were compared with the Weaver's Cove proposal, and that once we determined that a suggested alternative was not viable, did not meet project objectives, or would result in greater environmental impacts than the proposed action, we did not review an alternative further. As we noted in the July 15 Order, the FEIS identified specific criteria and included a table comparing the relative merits of various sites.[38] The FEIS properly concluded that no alternative was clearly preferable to the proposed action and that each alternative presented its own unique set of impacts.

### C.    Safety

### Breach of Containment

69.    Fall River contends that there have been in the past, and could be in the future, accidental breaches of LNG containment at both terminals and that even a low probability of an accident dictates rejection where the resulting consequences would be highly prejudicial. Fall River states further that there is no relationship between accident experience and the threat of a terrorist attack, so that the low number of past accidents should not be used to assess the possibility of a terrorist attack.

### Commission Response

70.    We affirm our conclusion in the July 15 Order that the risk to the public from accidental causes is negligible. Pages 4-274 and 4-275 of the FEIS identify the eight significant incidents involving LNG ships since the inception of LNG maritime transportation. None of these incidents resulted in rupture of a cargo tank or a breach of containment. The FEIS explained that the only loss of containment of an LNG storage tank occurred in 1944, and was attributed to the lack of an impoundment and improper steel alloys (page 4-230). Since then, with the development and use of superior tank materials for cryogenic service, there have been no breaches of containment. Nevertheless, even though unlikely, the potential for loss of storage tank containment is considered in the design requirements for impoundments and the exclusion zone requirements for LNG

---

[38] *See* FEIS, Table 3.2.4-1, page 3-29.

Docket No. CP04-36-001, *et al.*                                              27

storage tanks.[39]  The July 15 Order explained also that, based on the extensive
operational experience of LNG shipping, the structural design of an LNG vessel,
and the operational controls imposed by the Coast Guard and the local pilots, a
cargo containment failure and subsequent LNG spill from a vessel casualty –
collision, grounding, or allision – is highly unlikely.[40]

71.    Fall River's contention that "…it is in no way defensible to consider the
threat of a terrorist attack as having any relation to measures of accident
experience…" is not rooted in the FEIS, which states, as reaffirmed in the July 15
Order at paragraph 84, that historical experience with accidents provides little
guidance in estimating the probability of a terrorist attack.  The July 15 Order
explains, however, that the Coast Guard security workshops fully evaluated
scenarios involving possible terrorist attacks.

### Location of LNG Terminals and Use of Exclusion Zones

72.    Fall River restates its earlier arguments that the Pipeline Safety Act of 1979
directed DOT to consider the need to encourage siting of LNG terminals in remote
locations in adopting LNG terminal siting regulations.[41]  Once again, Fall River
contends that the DOT afforded little attention to this concern of Congress, and
instead adopted regulations that only require thermal radiation and flammable
vapor exclusion zones around such terminals.  Fall River argues that these zones
affect the design and size of LNG facilities, but not their location.  As neither
DOT nor the Commission has set minimum safety standards which would exclude
some locations as too dangerous, Fall River contends, the approval of the
Weaver's Cove project in an urban location violates the Pipeline Safety Act.  Fall
River also discounts the Commission's explanation that DOT did not adopt a
remote location requirement for LNG terminals because of the difficulty in
predicting whether a remote site would remain remote during the operating life of
the terminal.  The City of Fall River, it notes, has long been an urban area.

73.    Fall River contends that the Commission did not apply the same siting
criteria to the Weaver's Cove proposal that it applied in evaluating alternative

---

[39] See FEIS, Impoundment Systems and Design Spills, pages 4-245 -- 4-
251.

[40] *See* July 15 Order at P 83.

[41] *See* 49 U.S.C. § 60103 (2005).

Docket No. CP04-36-001, *et al.*                                        28

sites. Fall River alleges that the criteria the Commission applied in considering alternative sites are essentially the same as those described in the Pipeline Safety Act, *i.e.*, that they not be placed in close proximity to populations centers, and that they be placed where existing land use zoning, coastal zone management guidelines, or development plans are consistent with an LNG import terminal.

74.    Fall River contends that while lightly populated areas beyond an exclusion zone may require no special protections or consideration, heavily populated areas need far more protection because they are more likely targets of an intentional act, and they are far more difficult for authorities to evacuate.

75.    Fall River further contends that the thermal protection standards, which apply only to the terminal itself, should also apply to an LNG vessel in transit. There is a far greater probability of an accidental or intentional release relating to the vessel, it avers. If these thermal protection standards are necessary for the LNG terminals, no less is true for the LNG vessel in transit. Fall River refers to testimony from Dr. Jerry Havens alleging that the Commission's analysis of harm from a vessel incident is understated. Rather than allegedly focusing on a half-cargo tank loss of 3,000,000 gallons and an ensuing fire, Dr. Havens suggests that the Commission should have focused more on the loss and burning of an entire ship's cargo.

76.    Based on testimony from Dr. Havens, Fall River also contends that the thermal standards themselves are not adequate. It alleges that the use of a thermal radiation flux level of 5 kw/m$^2$ (1,600 Btu/ft$^2$-hr), the criterion defined in the DOT exclusion zone regulations, is too high to protect the public located outdoors and unprotected. The appropriate level should instead be 1.5 kw/m$^2$ (480 Btu/ft$^2$-hr), the level at which continuous exposure results in no thermal radiation damage. Fall River also refers to the standard of 450 Btu/ft$^2$-hr used by the U.S. Department of Housing and Urban Development (HUD) for unprotected facilities or areas of congregation; a level of 800 Btu/ft$^2$-hr recommended by the Society of Fire Protection Engineers as a public tolerance limit; and a 1.5 kw/m$^2$ specified in the European code for critical areas as support for a lower level of thermal radiation.

### Commission Response

77.    Fall River appears to recognize that Congress delegated the authority to DOT to adopt minimum safety standards for siting. DOT has adopted siting standards with which Fall River disagrees, and Fall River, as noted in the July 15 Order, has filed a petition with DOT requesting that it modify its regulations. That petition is still pending before DOT.

Docket No. CP04-36-001, *et al.* 29

78.    As we explained in the July 15 Order, rather than requiring remote locations for all LNG facilities, DOT adopted standards that it determined would better provide safe separation distances to protect the public in the vicinity of LNG facilities in the event of a spill. DOT's regulations establish thermal and flammable vapor dispersion exclusion zones, based on standards of the National Fire Protection Association, to protect persons and property from harm caused by heat radiation from fire and by dispersion and delayed ignition of gas vapor.[42]

79.    DOT's standards represent the minimum standards that must be observed in siting LNG terminal facilities. The Commission conducted an extensive independent evaluation of all safety issues relating to the Weaver's Cove project, and we adopted a number of requirements relating to construction, design, and operation of the terminal facilities. While the Commission may apply stricter siting standards than adopted by DOT, we found in the July 15 Order that application of DOT's standards was fully sufficient to protect the public. Fall River has presented nothing here that persuades us that this is not the case, and we continue to believe that the public will be well protected if the project is constructed and operated as required in the July 15 Order.

80.    We did not apply different locational criteria to the Fall River site and the alternative sites considered, as Fall River alleges. The FEIS used two sets of criteria for selecting and comparing sites as alternatives to the proposed site – required criteria, and favorable criteria. *Required* criteria included thermal exclusion/vapor dispersion exclusion zone values that are the same as for the proposed Fall River site. As a result of numerous comments during the pre-filing and scoping periods, issues were identified with the proposed site that could possibly be reduced or eliminated at a potential alternative site. As a result, *favorable* criteria were developed, including those identified by Fall River, to determine if an environmentally preferred alternative could be identified.

81.    The FEIS discusses thermal radiation and flammable vapor exclusion zones at pages 4-247 through 4-251 of the FEIS. The very nature of the zones is to ensure that a hazard does not exist outside the zones, regardless of the population density, whether it be light, moderate or heavy. The public outside the exclusion zones is thus protected from potential harm resulting from a release of LNG from the terminal. Nevertheless, it is not correct, as Fall River asserts, that FERC

---

[42] *See* July 15 order at P 38.

Docket No. CP04-36-001, *et al.*                                                  30

inappropriately relies on exclusion zones to determine the safety of a proposal. Exclusion zones represent only one of the ten safety categories evaluated in the FEIS.[43]

82.     The issue of applying exclusion zones to LNG vessel transit was addressed in the FEIS at page 4-280. As noted above, the Coast Guard is the agency responsible for vessel security, and the FEIS notes that Fall River had petitioned the Coast Guard to promulgate exclusion zone regulations for LNG vessel transits. However, the Coast Guard, in a letter dated December 27, 2005, informed Fall River that it would not be instituting the requested rulemaking proceeding, finding that a flexible approach assessing and managing specific risks is superior to the more rigid exclusion zone approach.

83.     Contrary to Dr. Haven's assertions, the Commission has not underestimated the possibilities of a large breach and resulting loss of LNG. The FEIS describes the hazards from four intentional breach scenarios from a 23,000 cubic meter spill (more than 6,000,000 gallons).[44] The FEIS also addresses the potential for multiple cargo tank failures and resulting hazards, including the analysis from the U.S. Department of Energy's December 2004 Sandia Report.[45]

84.     The issue of the use of the DOT-established 5 kw/m$^2$ (1,600 Btu/ft$^2$-hr) thermal radiation level was raised and addressed in the FEIS. The incident flux levels that are used to define thermal exclusion zones for onshore LNG facilities were developed by DOT through its rulemaking process and determined to be appropriate after evaluating comments on the levels of exposure. This process supports the incident flux levels for their intended purposes of determining onshore exclusion zones. Further, a 5 kw/m$^2$ thermal radiation level was also identified in the Sandia Report as a commonly used value for establishing fire protection distances for people.

---

[43] *See* FEIS, section 4.12, *Reliability and Safety*, pages 4-230 *et seq.*

[44] *See* FEIS, pages 4-277 – 4-279.

[45] U.S. Department of Energy's Sandia National Laboratories, Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water).

Docket No. CP04-36-001, *et al.*                                           31

## Vapor Dispersion

85.    Fall River contends that applying the DEGADIS model only to the
calculated overflow of the unmixed LNG vapor from an impounding area, rather
than the full vapor volume including entrained air, is not consistent with
experimental tests or with regulatory requirements.  It asserts that the Commission
continues to ignore that the vapor coming off an LNG impoundment would mix
with air within the impoundment and would not remain at 260 degrees below zero.
Further, it contends that if an applicant desires to take into account the effect an
impounding area may have on the calculation of flammable vapors, or to account
for the additional dilution caused by complex flow patterns induced by a tank or
dike structure, it must use FEM3A.  Fall River states that the DOT regulation is
clear that the only way to take into account the effect of the impounding area is to
use FEM3A or the equivalent.

## Commission Response

86.    The DOT regulations at 49 CFR 193.2059(a) state that flammable vapor-
gas dispersion distances *must* be determined using the DEGADIS model described
in the Gas Research Institute (GRI) report GRI-89/0242.  The regulations also
state that FEM3A, as described in GRI report GRI-96/0396.5, *may* be used as an
alternative method to account for additional cloud dilution caused by tank and dike
structures.  As stated in GRI report GRI-96/0396.5, the presence of impoundments
and plant structures has been shown to reduce the downwind dispersion of
flammable vapors.  Conversely, modeling which does not take into account the
flow-field obstacles presented by tank and dike structures would yield further
dispersion distances.  The dispersion modeling described in the Weaver's Cove
FEIS using DEGADIS provides a more conservative assessment of the downwind
dispersion than would a model which accounts for complex topography and flow-
field obstacles.

87.    Neither 49 CFR Part 193 nor NFPA 59A references a specific method for
the calculation of vapor production rates from an LNG spill into an impoundment.
The original 1980 version of 49 CFR 193.2059(d) specified the method for
determining vaporization rates for dispersion calculations.  This method was
derived by Arthur D. Little, Inc. and outlined in the report "Evaluation of LNG
Vapor Control Methods (October 1974)."  Subsequently, these equations were
developed by GRI into a computer program called SOURCE5.  Use of this
methodology to calculate the vapor source strength, coupled with DEGADIS to
compute dispersion distances, is the commonly-used and accepted approach by the
LNG industry, while FEM3A is not.  Commission staff evaluates each application
to ensure that the methodology can be applied within the limitations of the model,

Docket No. CP04-36-001, *et al.*                                              32

*i.e.*, vapor overflow occurs before the effects of warming and entrainment become significant. In performing vapor dispersion analysis, the duration of the LNG spill and the time until vapor overtops the impoundment should not be disproportionate. In the analysis presented in the FEIS, the vapor calculations for a design spill from the five in-tank pumps indicated that the vapor would overtop a deepened concrete sump within the 10-minute duration of the design spill.

## Threats related to possible terrorist attack

88.    Fall River contends that the record compels the conclusion that an LNG terminal and associated traffic in an urban environment offers precisely the target that terrorists prefer. For support, Fall River once again refers to the report prepared by Richard Clarke, *LNG Facilities in Urban Areas* (Clarke Report), as well as a statement from the NATO Committee on the Challenges of Modern Society to the effect that civilian military assets are considered to be attractive targets for terrorists, and that world trade may be disrupted by attacks directed against high-value vessels such as cruise ships, oil and LNG carriers, and nuclear waste ships. As the national dependence on imported LNG grows, avers Fall River, terrorists are likely to appreciate the consequences of a single successful strike that raises the possibility of a nationwide shutdown of LNG.

89.    Fall River contends that the Coast Guard workshops never achieved consensus with local safety officials. Referring to the July 2005 comments by Mr. Clarke, City of Fall River police chief John Souza, and Captain John Solomito of Somerset, Massachusetts, Fall River contends that the threat of terrorism is real and the best efforts of the Coast Guard cannot ensure success against such attacks.[46] Because of the characteristics of the shoreline, the large number of marinas and close proximity to several airfields, Clarke asserts that it would not be possible to provide for the secure transit of the LNG vessels. Chief Souza states that it would not be possible to prevent an attack simply through water-based surveillance and protection because of "pinch" points where the vessel transit is within 500 yards of shore and within the range of destructive armament. Land-based protection, Chief Souza asserts, is not feasible. Fall River claims that the Coast Guard's Vessel Transit Security Plan is flawed because it is based on the assumption that LNG vessel traffic *will occur*; not even considering *whether it should occur*.

---

[46] Chief Souza and Captain Solito participated in the Coast Guard workshops.

Docket No. CP04-36-001, *et al.*                                      33

90.    Fall River states that the July 15 Order incorrectly finds that the Weaver's Cove Vessel Transit Security Plan complies with NVIC 05-05[47] in all material respects. It states that a suitability evaluation in consultation with local officials has never been undertaken. Fall River states that in a similar situation the Coast Guard recommended application of NVIC 05-05 to the already approved Cameron LNG project.[48]

## Commission Response

91.    The July 15 Order discusses these issues and the Clarke Report in detail.[49] The Commission explained that the assertion that the facilities would be an especially attractive terrorist target is based on general information in the public domain that can apply equally well to many sectors of our society, rather than identifying specific evidence of threats on LNG facilities or vessels. Moreover, the Commission to date has authorized twelve terminals or expansions, and is currently evaluating an equal number of new applications. As more LNG import terminals are placed in service, the attractiveness of any particular target and the national impact of a single plant outage, whether caused by the forces of nature or malicious intent, will be further reduced.

92.    The Commission addressed the consequences of a terrorist attack in the FEIS (pages 4-276 through 4-280) based on the analyses in the Sandia Report (which is also referenced in the Clarke Report), and using its own independent calculations using the methodology set forth in ABSG Study.[50] Further, the FEIS evaluated potential consequences along the 21-mile-long LNG vessel transit through Narragansett Bay and the Taunton River, identifying areas of residential and commercial development within the transient thermal radiation hazard areas for several cargo tank breech scenarios.

---

[47] Navigation and Inspection Circular No. 05-05, Guidance on Assessing the Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic.

[48] Docket No. CP02-374-000, *et al.*

[49] *See* July 15 Order at P 84-94.

[50] ABSG Consultants, Consequence Assessment Methods for Incidents Involving Releases from Liquefied Natural Gas Carriers.

Docket No. CP04-36-001, *et al.*                                      34

93.      Under the Marine Transportation Security Act of 2002, the Coast Guard exercises responsibility for the security of LNG facilities and LNG vessels. Under that authority, the Coast Guard prepared a Vessel Transit Security Plan through a series of workshops throughout the winter of 2004 – 2005 with port stakeholders and federal, state and local law enforcement agencies. The workshops evaluated multiple scenarios, including scenarios identified by Chief Souza, and developed procedures which were incorporated into the Vessel Transit Security Plan. The close proximity to marinas and to airfields was recognized. As explained in the FEIS, the Coast Guard will make the final determination with respect to any additional resources and security measures required to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities to protect the LNG vessel and facility. The assertion in the Clarke Report, as restated in the rehearing request, that the Coast Guard cannot ensure success against terrorists was made without the benefit of the results of or reference to the Coast Guard security workshops.

94.      With respect to the suggestion that the Vessel Transit Security Plan was improperly based on the assumption that LNG vessel traffic *will occur* rather than *whether it should occur,* the Coast Guard in fact developed the plan, as the Commission evaluated issues associated with this project, in the conditional sense, *i.e.*, that impacts *would* only occur if the project is authorized by the Commission and subsequently constructed and operated in accordance with all conditions in the July 15 Order.

95.      As to compliance with the provisions of NVIC 05-05, the Coast Guard workshops identifying the security measures necessary to manage the risks associated with LNG vessel transits through Narragansett Bay and the Taunton River is the same process that was subsequently formalized in NVIC 05-05. The need for a waterway suitability assessment for this category of projects is determined by the Coast Guard on a case-by-case basis. In a July 27, 2005 letter to the City of Fall River, the Coast Guard stated that a waterways safety and security assessment – although not specifically titled WSA – for Weaver's Cove has already been completed and included in the FEIS. Approval of the Cameron project referred to by Fall River, on the other hand, did not include a vessel transit security review.

### Emergency Capabilities of local communities to handle the consequences of a spill

96.      Fall River asserts that local communities do not have evacuation and emergency response resources capable of dealing with an LNG spill, whether accidental or intentional. Fall River's Chief Souza states that approximately 9,000

residents live within a mile of the proposed LNG terminal site, with the closest residence only 1,200 feet away. Also in the area, he points out, is a high rise apartment occupied by elderly and disabled, business establishments. He states that the majority of the population has extremely limited escape routes, many of which are dead end side streets, or which head into the area of paramount danger. Another complexity to evacuation is the need to put on protective gear and evacuate the area in a very short time frame. Evacuation difficulties for shoreline areas along the 5-mile LNG vessel transit in Massachusetts could be even worse, it is suggested.

97.    Local fire chiefs Thiboutot of Fall River, and Rivard of Somerset, state that firefighters, even with protective clothing, would be unable to get close enough for effective fire extinguishing. Chief Thiboutot avers that evacuation efforts and emergency response needs would be in conflict, that necessary equipment and protective gear is not available, and that local medical facilities would be not be able to cope with the aftermath of an LNG emergency. Chief Rivard states that the only local hospital facilities for the Town of Somerset are located across the Taunton River in Fall River. He maintains that the need to close the Braga Bridge could extend the time to transport a person from Somerset to a hospital from 5 or 10 minutes to 30 minutes or more. Dr. Bruce Auerbach , an emergency service physician and member of the Bristol County homeland security task force, states that that the ability of local hospitals to address the consequences of an LNG fire are not adequate.

### Commission Response

98.    The Commission recognized the need for evacuation route planning in the July 15 Order. Condition 34 of the order requires Weaver's Cove to develop emergency evacuation routes in conjunction with local emergency and town officials for review and approval by the Director of OEP prior to initial site preparation. Condition 67 requires Weaver's Cove to develop an initial Emergency Response Plan, also for review and approval by the Director of OEP prior to initial site preparation. Condition 42 requires Weaver's Cove to provide a comprehensive plan identifying the mechanisms for funding all project-specific security/emergency management costs imposed on state and local agencies, for our review and approval prior to initial site preparation.

99.    The importance of emergency response planning was reinforced by section 311 of the Energy Policy Act of 2005, which requires that an LNG terminal operator develop an Emergency Response Plan in consultation with the Coast Guard and state and local agencies, and that the plan be approved by the Commission prior to any final approval to begin construction. Section 311 also

requires a cost-sharing plan describing any direct cost reimbursements that the applicant agrees to provide to any state and local agencies with the responsibility for security and safety at the LNG terminal and in proximity to vessels that serve the facility. Much of the speculation by Fall River about what cannot be done has been made without the benefit of a plan to evaluate. The July 15 Order requires Weaver's Cove to develop such a plan with input by state and local agencies. The issues raised by Fall River will need to be satisfactorily addressed in the Emergency Response Plan that is filed for our review and approval.

100.    The Commission received extensive comments on the DEIS on the effect of bridge closures on the travel of emergency and ambulances across the Taunton River, and the ability of local hospitals to handle large numbers of casualties from an LNG incident. We addressed the issue of bridge availability in the FEIS at page 4-183 and at page 4-271. Condition 76 of the July 15 Order requires that security plans make allowance for at least one bridge (either the Braga or the Brightman Street) to remain open during the passage of an LNG vessel. The issue of hospital resources was addressed in the FEIS at page 4-181. The Commission recognized that in the unlikely event of a high consequence LNG incident exceeding the capabilities of local hospitals other medical facilities throughout the region might need to be called on for assistance.

## Coast Guard Security Zone

101.    Fall River again raises the issue that the safety and security zone proposed for LNG vessels (2 miles ahead, 1 mile behind, and approximately 1,500 feet on either side of the vessel) does not comply with the Coast Guard regulation at 33 C.F.R. § 165.121, which requires a safety and security zone 2 miles ahead, 1 mile behind, and 1,000 yards (*i.e.*, 3,000 feet) on either side for high interest vessels, including LNG vessels in Narragansett Bay, the Providence River, and the Taunton River. Application of this 3,000-foot zone would place a significant number of homes and business within an area that is limited only to authorized persons, avers Fall River. Fall River contends that the FEIS mistakenly assumed that the zone would extend 1,500 feet from either side of the tanker, and suggests that the Commission "invited" the Coast Guard to relax the requirements in 33 C.F.R. § 165.121.

## Commission Response

102.    The FEIS addressed this issue in section 4.12.5, *Marine Safety,* at page 4-270, which was prepared with the cooperation and assistance of the Coast Guard Marine Safety Office Providence to reflect the results of the Coast Guard security workshops. At no time did Commission staff invite the Coast Guard to relax any

Docket No. CP04-36-001, *et al.*                                                                    37

requirements. The FEIS explains that the Coast Guard's Vessel Transit Security
Plan provides for a safety and security zone for LNG vessels, approximately 1,500
feet on either side of the LNG vessel, based on the Coast Guard's determination
that this zone would provide the desired level of security without creating
unnecessary restrictions.

103.    The Coast Guard has adopted a number of specific safety, security, and
regulated navigation areas in 33 C.F.R. Part 165 – *Regulated Navigation Areas
and Limited Access Areas.* The regulation at 33 C.F.R. § 165.121 describes a
generic-type safety and security zone for all ships of high interest vessels,
transiting Narragansett Bay, or the Providence and Taunton Rivers.[51] We expect
that in accordance with its usual practice, the Coast Guard will promulgate an
LNG-specific regulation for the traffic involved in the Weaver's Cove project.[52]

### D.    Compatibility of the Site With Local and Regional Development Plans

104.    Fall River asserts that the proposed project is inconsistent with the regional
and local development plans and is incompatible with the demographic
characteristics and natural physical aspects of the proposed site. Fall River
contends that the Commission did not consider the socio-economic impact of
placing an LNG terminal in the middle of Fall River's waterfront redevelopment
area or the impacts on recreational boating access resulting from LNG vessel
traffic associated with the project.

### Commission Response

105.    We disagree with Fall River. The FEIS describes at great length both the
current environment in the vicinity of the LNG terminal site (pages 4-140 – 4-148)
and the existing commercial/recreational vessel traffic in Narragansett Bay, Mount
Hope Bay, and the Taunton River (pages 4-168 –4-172). The FEIS further
acknowledges that an LNG terminal at the proposed site and the LNG vessel

---

[51] The regulation defines high interest vessels as including barges or ships
carrying LNG, LPG, chlorine, anhydrous ammonia, or any other cargo deemed to
be of high interest by the Captain of the Port, Providence. 33 C.F.R. § 165.121(b)
(2006).

[52] *See, e.g.,* 33 C.F.R. §§ 165.110 (Boston Harbor, Boston, Massachusetts),
and 165.502 (Cove Point, Chesapeake Bay, Maryland).

Docket No. CP04-36-001, *et al.*                                              38

transit traffic will not be without impacts. These impacts are described throughout the FEIS.

106.    The FEIS also includes an analysis of the existing local and regional plans for the City of Fall River (pages 4-133 – 4-140). The FEIS concluded that the proposed project is generally consistent with the historical uses, current zoning, and planned marine-industrial uses at the site. As described in the FEIS, the proposed terminal site would make use of an existing industrially zoned property that was previously used as a petroleum products facility. The proposed site for the terminal is located within the Fall River-Mount Hope Bay Designated Port Area, which is designated by the state for the purposes of promoting and protecting marine industrial activities and supporting uses. The LNG vessels would transit to the site along an existing federal navigational channel. In addition, the LNG terminal is immediately across the Taunton River from the Montaup Power Plant, which currently receives coal ship deliveries.

## E.    Deferring Issues to Other Agencies or to a Later Time

107.    Fall River contends that the Commission erred in finding that the project is in the public interest while important issues, such as development of security, evacuation, and emergency response plans, and responses to environmental issues (including the disposal of dredge material) remain unresolved. The Commission also erred, contends Fall River, in delegating the ultimate outcome of these matters either to other government agencies or Commission staff. As examples, Fall River argues that the Commission should have imposed more stringent safety standards than provided for in DOT regulations, and that it was improper for the Commission to defer issues relating to vessel transit to the Coast Guard. Fall River acknowledges that in a typical case it is not "unprecedented" to leave some matters for future determination and approval, but asserts that the importance of these issues is so central to this proceeding that they must be resolved before the Commission can find that the project is in the public interest. Fall River suggests that the Commission is in this proceeding permitting Weaver's Cove projected in-service date to drive the time available for the development of the necessary record, thereby making a "mockery" of informed decision-making.

### Commission Response

108.    We disagree that we acted prematurely in approving the Weaver's Cove project. As we have explained in other cases, the practical reality of large projects such as this is that they take considerable time and effort to develop. Perhaps more importantly, their development is subject to many significant variables whose outcomes cannot be predetermined. Accordingly, consistent with

Docket No. CP04-36-001, *et al.*                                                  39

longstanding practice, and as authorized by NGA section 7(e), the Commission typically issues certificates under its NGA jurisdiction subject to conditions that must be satisfied by an applicant or others before the grant of a certificate can be effectuated by constructing and operating the project.[53] As is the case in virtually every certificate issued by the Commission that authorizes construction of facilities, the approval in the July 15 Order is subject to Weaver's Cove's compliance with the environmental conditions set forth in the order. In this proceeding there are 77 such conditions.

109.   We have found that the Weaver's Cove project will be in the public interest and be environmentally acceptable only if Weaver's Cove complies with the conditions set forth in the July 15 Order. We have conditioned Weaver's Cove's authorization so that it cannot commence construction until the other agencies have completed their review of matters within their particular expertise and responsibility, thereby ensuring that the project will not proceed until there is satisfactory resolution of any remaining factors that could alter our finding that the project will not have significant environmental impacts. We have before us in this proceeding sufficient information regarding the proposed action to be able to fashion adequate mitigation measures to support a determination that the Weaver's Cove project will cause no significant environmental impacts upon compliance with those mitigation measures.

110.   This approach was approved in *City of Grapevine, Texas v. DOT*.[54] In that case, the Federal Aviation Administration (FAA) approved a proposed runway before completion of the review process required by the National Historic Preservation Act (NHPA). To ensure compliance with the NHPA, the FAA conditioned its approval of the runway upon completion of the NHPA review. The court rejected a challenge to the validity of this approach, concluding that, "because the FAA's approval of the West Runway was expressly conditioned upon completion of the Section 106 process, we find here no violation of the NHPA."[55]

---

[53] East Tennessee Natural Gas Company, 102 FERC ¶ 61,225 at P 23 (2003), aff'd sub nom. Na'l Comm. for the New River, Inc. v. FERC, 373 F.3d 1323 (D.C. Cir. 2004).

[54] 17 F.3d 1502 (D.C. Cir. 1994).

[55] *Id.* 1509.

Docket No. CP04-36-001, *et al.*                                              40

111.   Our approach here is also in accordance with the interagency agreement
between FERC, the Coast Guard, and the DOT to coordinate the review of safety
and security issues, including NEPA review.[56]  The agreement clarifies that the
Commission is responsible for authorizing the siting and construction of onshore
LNG facilities and conducting environmental, safety, and security reviews of LNG
plants and related pipeline facilities in its role as the lead agency responsible for
preparation of analysis and decisions required under NEPA for the authorization
of new facilities. The agreement explains that DOT regulations provide siting and
safety requirements, which the Commission, as lead agency in the NEPA review
process, ensures will be satisfied by any proposed project, and notes that the
Commission has the authority to impose more stringent safety requirements when
warranted by special circumstances. The Coast Guard, states the agreement,
exercises regulatory authority over LNG facilities that affect the safety and
security of port areas and navigable waterways.

112.   In this proceeding, we have ensured that all DOT siting and safety
regulations will apply. We have reviewed DOT's siting regulations, and for
reasons spelled out in the FEIS and in our July 15 Order, as further clarified in this
order, find its exclusion zone provisions sufficient to provide a high level of
protection to the public. We have, however, adopted a number of conditions
designed to improve the safety and reliability of the LNG terminal facility itself.
Moreover, we have not improperly delegated responsibilities to the Coast Guard.
We adopted several conditions ensuring the Coast Guard's adoption of security,
vessel operation, and emergency operation plans, and coordination of security
responsibilities relating to personnel and protecting the ships in the terminal area.
This Commission gives considerable deference to the Coast Guard in vessel
security matters because of its considerable expertise and given that the Coast
Guard has authority over navigation safety, vessel engineering and safety
standards, and all matters pertaining to the safety of facilities or equipment located
in or adjacent to navigable waters. The Weaver's Cove LNG terminal cannot be
placed in service without the approval and operational oversight of the Coast
Guard.

---

[56] Interagency Agreement Among the Federal Energy Regulatory
Commission, United States Coast Guard, and Research Programs Administration
for the Safety and Security Review of Waterfront Import/Export Liquefied Natural
Gas Facilities (Feb.11, 2004).

41

113.    We do not view this approach as an impermissible delegation of our responsibilities. In a recent proceeding we explained that, contrary to Fall River's assertion here, the Commission undertakes its own independent assessment of the other agencies' studies and results prior to accepting or rejecting their recommendations.[57] To the extent any of the pending consultations or studies in this case indicate a need for further review, or indicate a potential for significant adverse environmental impacts, the Director of the Commission's Office of Energy Projects (OEP) will not provide the necessary clearances for commencement of construction.

114.    Likewise, we have not improperly delegated authority to the Director of OEP to determine appropriate compliance with the conditions attached to our approval of the project. In accordance with our longstanding and usual practice in construction proceedings, the Commission has determined what conditions should apply for construction and operation of the proposed facilities, and have delegated authority in certain circumstances to determine whether those conditions have been met. The matters delegated to the Director of OEP are matters within the particular technical expertise of the Director and his staff. We have not, however, given the Director "unfettered discretion" over these matters, as Fall River asserts. Rather, determinations by the Director of OEP are subject themselves to a request for rehearing under the Commission's regulations.

115.    Also, a number of permits or approvals must be obtained from other government agencies before any approval for construction can be granted. For example, as conditioned in the July 15 Order, Weaver's Cove must obtain clean water and dredging permits from the state and COE, respectively.

## F.    Wild and Scenic Rivers Act

116.    Under the Wild and Scenic Rivers Act of 1968, as amended, [58] the Commission may not approve a project that would have an adverse effect on a river that is either formally designated as a wild and scenic river or has been

---

[57] *See, Cameron LNG, LLC,* 112 FERC ¶ 61,146 (2005), *citing, e.g., Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir. 1985), describing the Commission's obligation to take a hard look at the potential environment impacts of a proposed action, and to not axiomatically adopt other agencies' recommendations.

[58] 16 U.S.C. §§ 1278 *et seq.* (2005).

Docket No. CP04-36-001, *et al.*                                                          42

designated for such consideration by Congress. The "upper" Taunton River north
of Fall River has been designated a "study area" under section 5 of the act[59] by
Congress. Upon the request of municipalities located along the "lower" Taunton
River, the National Park Service expanded its study area to include that segment of
the Taunton River from Fall River (including The City of Fall River) to Mount
Hope Bay. If the Department of the Interior (National Park Service or DOI)
recommends the inclusion of the Taunton River in the Wild and Scenic River
program, Congress would then decide whether to approve some, all, or none of the
river as a component of the Wild and Scenic River system. DOI has stated that it
expected to complete its study and report to Congress some time in 2005.[60] Until
Congress acts on the forthcoming final report, however, the lower Taunton River
in the vicinity of the proposed project is not currently a Congressionally
authorized study river segment and is not under Interior's jurisdiction.

117.    The FEIS addressed the Wild and Scenic River Program and the impact of
the LNG terminal and the western lateral pipeline that would run beneath the
Taunton River, and concluded that construction and operation of the proposed
project would not have an adverse effect on the Taunton's River's potential
designation as a wild and scenic river.[61] Nevertheless, recognizing DOI's primary
role in this procedure, we conditioned construction of the Weaver's Cove project
(Condition 25) on Weaver's Cove's filing documentation that DOI concurs that
the project would not have a substantial adverse effect on the designation of the
Taunton River as a wild and scenic river and that the project would be consistent
with the Wild and Scenic Rivers Act.[62]

118.    Both Fall River and the Conservation Law Foundation contend that the
Commission did not go far enough. They point to the DOI's July 12 comments to

---

[59] 16 U.S.C. § 1276(a) (2005).

[60] Thus far, however, we have received no information that DOI has
completed its study.

[61] See FEIS, section 4.8.6.1, Designated Recreation and Public Interest
Areas, pages 4-166 – 4-168.

[62] The FEIS also noted that COE would provide the National Park Service
with a draft of its dredging permits, and that if the National Park Service objected
to the permits under the Wild and Scenic Rivers Act, the COE would not issue the
permits.

the FEIS pointing to concerns regarding the impact on fish resources (especially with respect to impact from dredging) and the impact on waterfront development. The Conservation Law Foundation states that, given DOI's concerns, the Commission's condition cannot be met, and the Commission cannot therefore approve the project. For its part, Fall River states that, while it might be possible to address concerns regarding the impact on fish resources through the adoption of expanded restrictions on dredging, there is no way to make the project compatible with Fall River's goals for its waterfront. Fall River also argues that, regardless of whether the river receives wild and scenic river designation, the Commission must independently assess preservation as part of its section 3 public interest analysis.

119.    Weaver's Cove requests that the Commission clarify that the DOI has no jurisdiction to review the Weaver's Cove project under the Wild and Scenic Rivers Act. Weaver's Cove asserts that DOI does not have direct jurisdiction to protect the "lower" Taunton River from potential impacts because that segment, unlike the "upper" Taunton River, has not been designated by Congress for study under the act. If a river or river segment has not been designated by Congress under section 5(a), states Weaver's Cove, it enjoys no special protection under the Wild and Scenic Rivers Act. Weaver's Cove also contends that DOI likewise holds no indirect authority to regulate the Weaver's Cove project in order to protect the "upper" Taunton River. While acknowledging that DOI may make a determination of adverse impact with respect to a water resource project or development sited above or below a Congressionally designated river if that project will have an impact on the scenic, recreational, or fish and wildlife values of the designated study river, it argues that the Weaver's Cove project is not a "water resources project" or a "development" within the meaning of the Wild and Scenic Rivers Act because its dredging activities will not affect the free-flow characteristics of the Taunton River. For these reasons, it contends that DOI has no jurisdiction to review the impact of Weaver's Cove's dredging activities, and it requests that the Commission delete Condition 25 from the July 15 Order.

### Commission Response

120.    Congress has entrusted DOI with implementation of matters related to the Wild and Scenic Rivers Act. We recognized this in the FEIS, and in the order we conditioned our approval upon a positive determination by DOI that the Weaver's Cove project will be consistent with the objectives of the act. The issues raised by Weaver's Cove relating to the types of activities covered by the Wild and Scenic Rivers Act are within the province of DOI to resolve. DOI has the jurisdiction and the expertise to address these matters. Weaver's Cove should pursue its

Docket No. CP04-36-001, *et al.*                                                    44

arguments with DOI, not this Commission. Accordingly, we will not remove
Condition 25 from our approval of this project.

121.   We disagree with Fall River and the Conservation Law Foundation,
however, that that there is no possibility that DOI will make a positive finding
regarding the impact of the Weaver's Cove project under the Wild and Scenic
Rivers program. The FEIS examined this aspect of the project and found that the
Weaver's Cove project should not adversely affect the free flow of the river, and
that the proposed LNG terminal would be consistent with the historical industrial
use of the site so that it would not impair the values of the river to any greater
extent than other facilities currently located along the lower Taunton River. We
remain hopeful that, in reaching its determination, DOI may well come to the
same conclusions, and that dredging and other remaining issues may be
successfully settled.

## G.    Rhode Island CZMA Concurrence

122.   Under section 307(c)(3)(A) of the Coastal Zone Management Act
(CZMA)[63] a federal agency cannot issue a license for a project affecting any land
or water use or natural resource of a state's coastal zone unless the state certifying
agency concurs with the applicant's certification of the project's consistency with
the state's federally approved coastal zone management program. Section 307
further provides that a state must either concur with or object within six months
"after receipt of its copy of the applicant's certification" or the state's concurrence
with the certification "shall be conclusively presumed." The CZMA
implementing regulations provide that the six-month review period does not begin
until the state has received "necessary data and information," including
information identified in the state's coastal zone management program.[64] If a state
notifies the applicant and this Commission within 30 days of receipt of the
application that the application is incomplete, the state may toll the six-month
decision period until the deficiencies are corrected.[65] What constitutes necessary
data and information is set forth in the implementing regulations,[66] and a request

---

[63] 16 U.S.C. § 1456(c)(3)(A) (2005).

[64] 15 C.F.R. § 930.60 (2005).

[65] *Id.*

[66] Id.

by a state for additional, as opposed to required, information, does not stop the six-month clock.[67] If the state objects to the applicant's proposal, the applicant may appeal to the Secretary of Commerce for an override of the state's objection.[68]

123.    Weaver's Cove requests that the Commission remove its condition that Weaver's Cove obtain consistency concurrence from the Rhode Island Coastal Resources Management Council (Rhode Island Council) under the CZMA (Condition 24) from the July 15 Order because the Rhode Island Council, it asserts, has failed to follow the deadlines established for review of Weaver's Cove's consistency with the Rhode Island coastal zone management plan. Weaver's Cove contends that concurrence is thus conclusively presumed as a matter of law.

124.    Weaver's Cove submitted an application with the Rhode Island Council for a federal consistency certification on July 19, 2004. According to a sworn affidavit submitted by the Rhode Island Council, Weaver's Cove was informed by telephone that the application lacked certain necessary data and information required by Rhode Island's coastal zone management plan, and that the state's review would not begin until all the necessary material was received by the state. Specifically, according to the affidavit, Weaver's Cove was told in the telephone conversation that the application did not include a viable disposal location for dredged materials, that the engineering plan submitted required a stamp from a Rhode Island certified professional engineer, and that Weaver's Cove must submit a water quality certificate from the Rhode Island Department of Environmental Management. Weaver's Cove states that in a letter dated August 2, 2004 it responded to the request for information regarding the disposal site, and stated that it would provide additional information and clarification found necessary by the Rhode Island Council. On August 12, Weaver's Cove resubmitted the engineering plan with a Rhode Island professional engineer's stamp. On August 26, 38 days after Weaver's Cove filed the original application, Rhode Island sent Weaver's Cove a letter stating that the application was incomplete because Weaver's Cove had not yet obtained a Clean Water Act quality certification.

---

[67] 15 C.F.R. § 930.60(b); and *Mountain Rhythm Resources v. FERC*, 302 F.3d 958 (9th Cir. 2002).

[68] CZMA matters are administered by NOAA, an agency of the Department of Commerce.

Docket No. CP04-36-001, *et al.*                                                46

125.    Weaver's Cove contends that the statutory six-month review period began on  July 19, 2004, when Weaver's Cove originally submitted the application. Weaver's Cove asserts that telephone notification that the application was incomplete did not toll the six-month review period because both the CZMA implementing regulations and the Rhode Island Council's own *Federal Consistency Manual* require that such notification be in writing.  Weaver's Cove asserts that the August 26 letter from the state to Weaver's Cove has no legal effect because it was sent beyond the required 30-day period (computed from July 19), and thus failed to toll the six-month review period.  Even if the August 26 letter is considered timely, the review period was not tolled, contends Weaver's Cove, because under the Rhode Island coastal zone management plan, an applicant for federal consistency review is not required to obtain a section 401 water quality permit for Rhode Island's review of the project, and thus that information is not necessary data and information that would render its application incomplete. Weaver's Cove avers that the statutory six months for CZMA review has long since elapsed.

126.    The Rhode Island Council disagrees that it has waived its right to assess the consistency of the Weaver's Cove project.[69]  It avers that it informed Weaver's Cove within the 30 days allowed by regulation that the application was deficient, and that it informed Weaver's Cove that the application was still incomplete after it resubmitted the application with the Rhode Island professional engineer's stamp. These notifications tolled the six-month determination period, contends Rhode Island.  The Rhode Island Council further states that Weaver's Cove has yet to submit the specified information necessary for evaluation of the project.  The Rhode Island Council states that it has complied with the CZMA notification requirements, and that it is Weaver's Cove that is either unwilling or unable to provide the necessary information for the Rhode Island Council to begin its review.  Moreover, avers the Rhode Island Council, it is the role of the Department of Commerce, not this Commission, to make determinations regarding application of CZMA requirements.

_____

[69] The Rhode Island Council is not a party to this proceeding.  Nevertheless, it submitted what it calls a "Memorandum of Law" opposing Weaver's Cove's contention regarding the Rhode Island Council's CZMA consistency determination approach.  Weaver's Cove filed a reply to the Rhode Island Council's pleading.  Although our rules of procedure do not provide for either submission, we will accept them so that we may have a full understanding of their positions.

Docket No. CP04-36-001, *et al.*                                                47

**Commission Response**

127.    The Commission's CZMA role is very limited.  The Commission's only
responsibility under the CZMA is to withhold construction authorization for a
project until the state finds that the project is consistent with the state's NOAA-
approved coastal zone management plan.  The Commission has found in other
proceedings that CZMA consistency can be presumed because the state has not
issued its consistency determination in a timely manner.  In those situations,
however, it was not disputed that the state did not meet the 30-day notification
requirement for informing the applicant that the application was missing
information, or that the state did not issue a consistency determination within six
months from submission of the application.[70]  Here, on the other hand, these
matters are intensely disputed.  Weaver's Cove argues that it did not receive
proper or timely notice from the Rhode Island Council regarding any perceived
deficiencies in its application, and that, in fact, some of the material the Rhode
Island Council did request is not required for CZMA consistency concurrence.
Rhode Island, for its part, contends that it has met all regulatory requirements and
deadlines.

128.    We cannot resolve on this record the complex issues raised by Weaver's
Cove and the Rhode Island Council with regard to whether consistency of the
Weaver's Cove project with Rhode Island's federally approved coastal zone
management program should be presumed as a matter of law.  To reach this
determination, Weaver's Cove asks this Commission to interpret and apply
regulations issued by the State of Rhode Island to find that information Rhode
Island has requested from Weaver's Cove is not required under its coastal zone
management program.  It also asks this Commission to interpret and apply
regulations issued by NOAA to determine that Rhode Island has not met the
statutory and regulatory deadlines addressed in those NOAA regulations.  This
Commission is not in a position to interpret regulations of other agencies or
otherwise to resolve the issues raised by the parties.  This issue is a matter for the
Rhode Island Council, the NOAA, and the Department of Commerce, not this
Commission.[71]

---

[70] See, e.g., Georgia Strait Crossing Pipeline, LP, 108 FERC ¶ 61,053
(2004); International Paper Company, 110 FERC ¶ 62,239 (2005).

[71] NOAA recently dismissed an appeal by Weaver's Cove that raised
similar arguments to those presented here.

Docket No. CP04-36-001, *et al.*                                           48

### H.    Deed Restrictions on the LNG Terminal Site

129.    As discussed in the July 15 Order, Shell and Weaver's Cove have different views on the interpretation of deed provisions regarding future activities on the site of the proposed terminal, and whether the deed permits the placing of dredged material on the site without the approval of Shell and its licensed site professional. Condition 77 in the July 15 Order requires that Shell and Weaver's Cove show that they have reached agreement with regard to deed restrictions relating to future activities and use limitations on the proposed terminal site, or that deed restriction issues regarding future use of the site have been resolved in court.

130.    Weavers' Cove contends that the Commission erred in imposing Condition 77 on its approval of the project by requiring Weaver's Cove to resolve what it calls a "contract dispute" with Shell before it begins any construction-related activities on the proposed LNG terminal site. Weaver's Cove asserts the dispute involves a private contractual arrangement between two private parties relating to interpretation of certain restrictive covenants in the deed conveying the site from Shell to its current owner, Jay Cashman, Inc. Weaver's Cove asserts that the Commission should remove Condition 77.

131.    Shell, on the other hand, maintains that Condition 77 does not go far enough, and it seeks clarification that the Commission did not intend to limit the scope of the issues that are governed by the deed, and that must be resolved by the parties. Shell states that many matters pertaining to the site are subject to the deed, and that other parties have rights and obligations under the deed.

### Commission Response

132.    The deed conveying the property for the proposed LNG terminal from Shell to Cashman created easements allowing Shell to perform remedial environmental activities required under the MCP, and established provisions restricting future use of the site and governing the rights of Shell, Cashman, and successors to Cashman's interests. The Commission recognized that it could not resolve deed issues regarding use of the site for Weaver's Cove's proposed activity and found that the parties should resolve the disagreement between them or pursue the matter in court. The Commission's Condition 77 in the July 15 order requires resolution of these matters prior to the commencement of any construction-related activities on the proposed site.

133.    What Weaver's Cove calls a contract dispute between two private parties outside the Commission's jurisdiction is in reality a threshold issue in this proceeding – whether Weaver's Cove may lawfully use the site for the purpose it

Docket No. CP04-36-001, *et al.*                                                          49

intends. Until that question is answered, all other issues in this proceeding are academic. The Commission cannot determine how this matter should be resolved, and it is not attempting to do so. Instead, Condition 77 merely reminds Weaver's Cove of its responsibility to obtain undisputed right under the deed to use the property for its proposed terminal, and assures that no property will be disturbed until Weaver's Cove demonstrates that right to the Commission. Shell's concern that our condition may too narrowly limit potential issues under the deed is unfounded. If the parties cannot agree, either party may bring its particular concerns to the attention of the court in any action brought. Condition 77 is sufficiently broad to accomplish this purpose and will remain unchanged. All provisions under the deed are subject to Massachusetts law.

## I.    Compliance with the Massachusetts Contingency Plan

134.    Condition 18 in the July 15 Order requires Weaver's Cove to file documentation prior to construction to verify that placement of stabilized dredged material on the proposed LNG terminal site is consistent with the MCP. [72]  Shell contends that the Commission should modify Condition 18 to clarify that the placement of dredged material on the proposed site in accordance with the MCP requirements is a continuing obligation subject to the jurisdiction of the Massachusetts DEP. Because Shell's remediation of the site is governed by the MCP, Condition 18 should also make clear, asserts Shell, that development of the site by Weaver's Cove must comply in all respects with the MCP.

### Commission Response

135.    We find that the requested modifications are not necessary. The purpose of Condition 18 is to assure the Commission, before it authorizes any construction activities to begin at the site, that the Massachusetts DEP has determined that placement of dredged material at the site complies with the MCP.[73]  The condition is not intended to describe Weaver's Cove's or Shell's responsibilities under the

---

[72] In the July 15 Order we explained that the MCP is a comprehensive regulatory program established to implement, as pertinent, remedial actions related to a release or the threat of a release of oil and/or hazardous material. The MCP complements the EPA's National Contingency Plan under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended.

[73] *See* July 15 Order at P 110.

Docket No. CP04-36-001, *et al.*                                           50

MCP, and it does not need to do so. Nevertheless, we note that the proposed site is a listed contaminated site under Massachusetts law being regulated under the MCP. Jurisdiction over the site and remediation actions on the site will continue with the Massachusetts DEP

## J.    Control of the "Wedge" Lot

136.    Weaver's Cove states that it has an option to purchase all the property within the exclusion zones provided for under DOT safety regulations[74] except for a 1.19-acre triangular shaped piece of property (referred to as the "wedge" lot) formed by its borders with the Taunton River, the proposed LNG facility, and a steep embankment to State Route 79. Weaver's Cove states that legal title to the wedge lot is unclear and may be difficult to establish. Because DOT siting regulations, however, require that the operator of an LNG facility legally control all activities within the exclusion zone,[75] Condition 40 of the July 15 Order requires Weaver's Cove to provide evidence of its ability to exercise legal control over activities on the wedge lot. Acknowledging Weaver's Cove's argument that it may have difficulty establishing title to the property, Condition 40 provides, alternatively, that Weaver's Cove would satisfy the exclusion zone control requirement by obtaining a waiver of this requirement from DOT that spells out alternative mitigation methods that would assure an equal or greater level of thermal protection within the exclusion zone.

137.    Weaver's Cove asserts that Condition 40 is unwarranted and that the Commission should remove the condition from its authorization of the project. Weaver's Cove argues that, while it may not be in technical compliance with this DOT exclusion zone provision because it does not hold legal title to the wedge lot, its proposal meets the intent of that requirement because it effectively can control public access to the wedge lot. The unique location of the wedge, it states, makes it unusable as there is no public access and no structures can be built on the property.

### Commission Response

138.    Weaver's Cove is requesting that this Commission waive a safety requirement duly adopted by another federal agency. Congress delegated the

---

[74] 49 C.F.R. § 193.2057(2005).

[75] 49 C.F.R. § 193.2007 (2005).

Docket No. CP04-36-001, *et al.*                                               51

responsibility for developing safety standards for the siting of LNG facilities to DOT. As discussed in the FEIS,[76] we agree that it is unlikely that prohibited activities can reasonably occur on the wedge lot; however, while this Commission may impose additional requirements more strict than those adopted by DOT if the circumstances warrant, we may not waive or apply requirements weaker than those found necessary by DOT to insure public safety. Accordingly, the July 15 Order properly requires Weaver's Cove to comply with the DOT site control requirement or obtain a waiver of that requirement from DOT. Condition 40 will remain.[77]

## K.    State and Local Permits

139.    The July 15 Order stated that any state or local permits issued with respect to the jurisdictional facilities authorized must be consistent with the conditions of the certificate. It explained that the Commission encourages cooperation between interstate pipelines and local authorities. However, the Commission pointed out that state and local agencies, through application of state or local laws, may not prohibit or unreasonably delay the construction or operation of facilities approved by the Commission.

140.    Fall River asserts that the Commission's statement regarding its preemption authority is overly broad. Fall River states that "to the extent that this language purports to assert sweeping and unbounded Commission jurisdiction over valid exercises of state or local authority to regulate environmental and land-use issues implicated by this project, it is legally untenable." Neither the Commission's enabling legislation nor the NGA, claims Fall River, gives the Commission jurisdiction over disputes arising from a state or local entity's exercise of its valid statutory or regulatory authority. Rather, such disputes must be resolved in accordance with standard procedures and remedies available under state law. Fall River states that approvals Weaver's Cove would need to obtain from state or local governments involve compliance with generally applicable state laws and regulations directed at the protection of the environment, natural resources, and the public health, safety, and welfare. They would not be laws or regulations

---

[76] See FEIS, section 4.12.4, Siting Requirements – Thermal and Dispersion Exclusion Zone, pages 4-248 – 4-249.

[77] The FEIS noted that Weaver's Cove requested waiver on September 20, 2004. That request is still pending.

Docket No. CP04-36-001, *et al.*                                                52

directed at natural gas companies or at the siting or operation of LNG terminals, it avers.

## Commission Response

141.   In *Schneidewind v. ANR Pipeline Co.* (*Schneidewind*), the Supreme Court held that because the Commission has exclusive jurisdiction over the rates and facilities of natural gas companies, a state agency may not regulate matters directly considered by the Commission pursuant to its authority under the NGA.[78] Subsequently, in *National Fuel Gas Supply Corporation v. Public Service Commission of the State of New York* (*National Fuel*),[79] the U.S. Court of Appeals for the Second Circuit specifically addressed the issue of a state's ability to impose additional requirements on a pipeline construction project authorized by the Commission.  The court held that a New York statute requiring an interstate pipeline to apply for and obtain a certificate of environmental compatibility from the New York PSC was preempted by the NGA on the grounds that either the NGA explicitly vested exclusive jurisdiction in the Commission to regulate interstate pipeline facilities or Congress had so occupied the field of regulation of interstate pipelines by enactment of the NGA that there was no room for the states to regulate.[80]  Accordingly, the court held that the pipeline did not have to comply with New York's regulatory scheme.

142.   With regard to a local authority's denial of a permit to a pipeline to conduct regulated activities within the town because the local agency thought another route was superior to the Commission-approved route, the Commission has explained that the NGA "preempts state and local law to the extent the enforcement of such

---

[78]485 U.S. 293 (1988).

[79]894 F.2d 571(2nd Cir. 1990).

[80]The court noted that Congress established the Commission as "a federal body that can make choices in the interests of energy consumers nationally," and reasoned that because the Commission "has authority to consider environmental issues, states may not engage in concurrent site-specific environmental review. Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate need, with the increased costs or lack of gas to be borne by utility consumers in other states." *National Fuel*, 894 F.2d at 579.

Docket No. CP04-36-001, *et al.*                                                    53

laws or regulations would conflict with the Commission's exercise of its jurisdiction under the federal statute."[81]   The Commission further explained:

> [a] state or local agency may challenge a Commission decision by filing a timely request for rehearing and appealing a Commission decision to the courts. A state or local agency may not use its regulatory power to challenge a decision by this Commission.[82]

In sum, as held by the court in *National Fuel*, the NGA preempts state and local agencies from regulating the construction and operation of interstate pipeline facilities.[83]

143.    Citing the Supreme Court's ruling in *Schneidewind*, the Commission for many years has included language in virtually every order in which a construction certificate is issued, including in the July 15 Order issued here at paragraph 113, explaining its policy requiring applicants to cooperate with state and local agencies, but noting that such agencies may not, through the application of state and local laws, . . . prohibit or unreasonably delay the construction of facilities approved by the Commission.

144.    That a state or local authority requires something more or different from the Commission, however, does not necessarily make it unreasonable for an applicant to comply with both the Commission's and another agency's requirements.  It is true that additional state and local procedures or requirements could impose more costs on an applicant or cause some delays in constructing a pipeline.  However, not all additional costs or delays are unreasonable in light of the Commission's goal to include state and local authorities to the extent possible in the planning and

---

[81]*Id.* at 61,360. *See also Maritimes & Northeast Pipeline, L.L.C.* (*Maritimes*),    81 FERC ¶ 61,166 at 61,728-31 (1997)

[82]*Id.*

[83]894 F.2d at 575-76 (setting forth circumstances under which the Supremacy Clause of the Constitution, Article VI, clause 2, provides for preemption of state and local law).

Docket No. CP04-36-001, *et al.*                                                      54

construction activities of pipeline applicants. A rule of reason must govern both the state's and local authorities' exercise of their power and an applicant's bona fide attempts to comply with state and local requirements.[84]

145.    If a conflict arises, however, between the requirements of a state or local agency and the Commission's certificate conditions, the principles of preemption will apply and the federal authorization will preempt the state or local requirements. The Commission cannot act as a referee, on an ongoing basis, between applicants and state and local authorities regarding each and every procedure or condition imposed by such agencies. In the event compliance with a state or local condition conflicts with a Commission certificate, parties may bring the matter before a federal court for resolution.[85]

### L.    Environmental Justice

146.    In its comments the EPA avers that the FEIS did not sufficiently assess the potential for disproportionate impacts from the project on low income or minority communities, and suggests that the Commission should conduct additional analysis. It states that it is particularly concerned with potential impacts to air quality during construction. In its rehearing request, Fall River also alleges that the Commission did not adequately assess environmental justice issues. We disagree. The FEIS fully and appropriately addresses the environmental justice implications pertinent to this project.

### Commission Response

147.    Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low Income Populations,* [86] requires that specified federal agencies shall make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human or environmental health effects of their programs, policies, and activities on minorities and low income populations. Executive Order 12898 applies to the agencies specified in section 1-102 of the order.[87] This Commission is not one of

---

[84] *Maritimes*, 81 FERC at 61,730-31.

[85]Id.

[86] 59 Fed. Reg. 7629 (Feb. 11, 1994).

[87] *See Millenium Pipeline Company, L.P.*, 97 FERC ¶ 61,292 (2001).

the specified agencies and the provisions of Executive Order 12898 are not binding on this Commission. Nonetheless, in accordance with our usual practice, as part of the FEIS, the Commission has examined the Weaver's Cove project to insure that it does not have disproportionately high and adverse human health or environmental effects on minority or low income communities.

148.    Based on available data from various government sources regarding income and ethnicity of the local communities, including environmental justice maps provided by the EPA, the FEIS identified potential environmental justice areas in the vicinity of the project. The FEIS then discussed a number of potential impacts that could affect these areas during construction and operation of the project. Specifically, the FEIS discussed possible visual impacts from the LNG terminal, impacts from vehicle traffic during construction and operation of the terminal, air quality and noise impacts from operation of the terminal, and potential impacts on public safety from possible incidents at the terminal and in the navigation channel. The FEIS concluded, however, that although some of the neighborhoods near the LNG terminal have lower than average income levels, the potential impacts would affect all the communities surrounding the terminal, and not have a disproportionate impact on environmental justice areas.[88]

149.    The FEIS did not specifically address the impact on air quality during construction of the project in its environmental justice analysis. Nevertheless, as the FEIS points out on page 4-195, the FEIS provides a more detailed analysis of air quality in section 4.11 of the FEIS. The FEIS explained that while construction of the LNG terminal and the pipelines would have some adverse impacts on air quality from fugitive dust emissions and from tailpipe emission from construction vehicles, these impacts would be temporary. Furthermore, the FEIS noted that the applicant will take a number of standard steps to minimize fugitive dust emissions, such as covering trucks and spraying water over exposed soils as necessary. The FEIS found that the temporary and intermittent nature of tailpipe emissions would be minimal, but nevertheless recommended a condition requiring the applicant to use high grade diesel fuel in all construction equipment and to evaluate the feasibility of using catalysts and filters on such equipment and placing idling limits on construction vehicles. The Commission adopted this recommendation as Condition 29 in the July 15 Order.

---

[88] *See* FEIS, section 4.9.7, *Environmental Justice*, at pages 4-192 – 4-197.

Docket No. CP04-36-001, *et al.*                                              56

## M.    Clarification of Certain Terms Used in Conditions

150.    Weaver's Cove requests the Commission to clarify the differences among
the phrases "prior to initial site preparation," "prior to construction," and "before
commencement of any construction-related activities," as used in the
environmental conditions to the July 15 Order. In particular, Weaver's Cove
requests clarification that activities that may be undertaken by the site's current
owner prior to Weaver's Cove's obtaining ownership, such as tank clearing, will
not be considered initial site preparation. Similarly, Weaver's Cove avers that
demolition of existing structures on the site, site clearing or minor site grading
activities associated with demolition should not be considered construction related,
if they were performed by the current site owner prior to Weaver's Cove's
acquiring the site.

### Commission Response

151.    The term "Before commencement of any construction-related activities…"
is used only in Condition 77, which requires appropriate evidence that issues
relating to deed restrictions on future activities on the site have been resolved.
The term "prior to initial site preparation" is only used in the conditions related to
the design and construction of facilities at the LNG terminal site, while "prior to
construction" is used for other resources. These terms have essentially the same
meaning and may be used interchangeably. With respect to demolishing existing
structures on the site, and clearing or grading activities associated with demolition,
the Commission has generally considered these activities to be initial site
preparation activities. These conditions apply to Weaver's Cove and Mill River
with respect to commencing site work on the LNG project involved in this
proceeding. Conversely, the conditions do not apply to the owner of the site,
which may perform any of these activities consistent with other applicable laws
and regulations.

## N.    Rate and Tariff Issues

### Gas Quality

152.    KeySpan requests that the Commission clarify, (1) that the July 15 Order
did not intend to make any finding regarding the impact that deliveries of
regasified LNG from the Weaver's Cove and Mill River facilities into the
Algonquin system may have on Algonquin's system or on Algonquin's customers,
and (2) that the Commission's approval of Mill River's *pro forma* tariff, including
its gas quality provisions, will not affect or influence the Commission's
consideration of future proposals to modify the quality provisions of Algonquin's

Docket No. CP04-36-001, *et al.*                                                    57

tariff. KeySpan argues that the Commission's Certificate Policy requires the
Commission to consider the impact of proposed new pipeline projects on other
affected pipelines and the captive customers they serve.[89] KeySpan argues that the
information supplied by Algonquin is insufficient to support a conclusion that
deliveries of regasified LNG from the Weaver's Cove facilities would not
adversely affect Algonquin and its captive customers. KeySpan is concerned that
the regasified LNG from the Weaver's Cove facility may not have the same
quality or interchangeability of current gas supplies on Algonquin's system and
will adversely affect KeySpan's delivery systems or the customers of those
systems. KeySpan seeks clarification that the Commission has not made findings
on these issues. In the event that the Commission does not grant the requested
clarification, then KeySpan requests rehearing of the July 15 Order.

## Commission Response

153.   The Commission addressed Mill River's *pro forma* tariff in the July 15
Order, and required Mill River to make several changes where the Commission
found them necessary to comply with Commission regulations. Mill River's *pro
forma* tariff, however, complies with current Commission regulations regarding
gas quality standards, which require that pipelines identify heat content and
measurement.[90]

154.   The issues raised here by KeySpan are beyond the scope of this proceeding.
The July 15 Order does make any findings relative to Algonquin's tariff, and it
does not address the circumstances under which gas could be introduced by Mill
River into the Algonquin system. Specifications relating to gas transported on
Algonquin's system are described in Algonquin's tariff. Our orders in this
proceeding have no effect on Algonquin's tariff. KeySpan is a shipper on
Algonquin's system, and it should pursue matters relating to the quality of the gas
transported on that system with Algonquin. The Commission recognizes that there
are serious industry concerns regarding the interchangeability of domestic natural

---

[89] *Citing Certification of New Interstate Natural Gas Pipeline Facilities*,
88 FERC ¶ 61,227 at 61,737 (1999), *order on clarification*, 90 FERC ¶ 61,128,
*order on clarification*, 92 FERC ¶ 61,094 (2000).

[90] 18 C.F.R. § 154.108(e) (2005).

Docket No. CP04-36-001, *et al.*                                                        58

gas and imported LNG and has been, along with the industry, exploring how these
concerns can best be resolved.[91]

## Billing Determinants

155.    Weaver's Cove asserts that the Commission erred in requiring Mill River to
base its rates upon theoretical pipeline capacity of 836,000 Dth per instead of its
firm contractual commitments of 400,000 Dth per day.  Weaver's Cove states that
the Algonquin system, the only pipeline system downstream of the laterals, can
physically receive only 400,000 Dth per day from the Mill River laterals on a firm
basis at the present time, and there is no possibility that Mill River will be able to
find subscribers for firm capacity anywhere near its theoretical 836,000 Dth per
day capacity, absent significant new construction by Algonquin.  Weaver's Cove
states that the two laterals are not over-sized; rather, Mill River proposed to
construct two separate laterals each with a design capacity of 400,000 Dth per day
for purposes of take-away flexibility.  It does not intend to sell firm capacity on
both laterals equal to the combined physical capacity of the two lines.  While the
proposed laterals could handle the larger capacity on peak demand days, peak use
would be temporary and uncertain, states Weaver's Cove.

156.    The Commission, avers Weaver's Cove, generally requires pipelines to use
their total physical capacity in determining their rates to guard against possible
cost over-recovery or the over-sizing of facilities, but has employed a more
flexible approach where, as here, that policy concern is not implicated.  The fact
that in the July 15 Order the Commission is requiring Mill River to submit a rate
filing after three years of actual operation to justify its recourse rates will serve as
an appropriate vehicle for the Commission to determine if there has been cost
over-recovery.  Weaver's Cove states that Mill River also agrees to credit any
additional revenues from interruptible service to firm shippers.  For these reasons,
Mill River requests that the Commission grant rehearing and permit it to design its
Rate Schedule FT reservation rate based on the actual firm capacity that it has
subscribed to its shipper, and that it be permitted to design its IT rates as a100
percent load factor derivative of such firm rate.

## Commission Response

157.    Upon further consideration, we agree with Weaver's Cove that the
circumstances of this case warrant a departure from the Commission's general

---

[91] See Docket No. PL04-3-000, Natural Gas Interchangeability

Docket No. CP04-36-001, *et al.*                                                    59

policy of requiring a pipeline to base its rates on actual capacity. Because there
are physical limitations to Mill River's transporting more than 400,000 Dth per
day for a sustained period, there is little likelihood of overrecovery of the
pipeline's costs. We are also persuaded that other protections against
overrecovery of costs are in place. Under the July 15 Order, Mill River must, after
three years of operation, submit either (a) a cost and revenue study justifying its
cost-based firm and interruptible recourse rates, or (b) an NGA section 4 filing to
propose alternative rates. Mill River has also stated it will credit any revenues
derived from interruptible service to firm shippers.[92] In view of these safeguards
against cost overrecovery, the Commission concludes that it is appropriate to grant
rehearing and permit Mill River to design its Rate Schedule FT reservation rate
based on the actual firm capacity that it has subscribed to its shipper, and is
permitted to design its IT rates as a100% load factor derivative of such firm rate.

## O.    Modification to Condition 11

158.    We have revised environmental Condition 11in Appendix B of the July 15
Order pertaining to the commencement of service of the project. Modifications to
the condition are necessary to clarify that in-service authorizations are required for
both the LNG terminal and the pipeline facilities. Condition 11 will now read:

> 11. Weaver's Cove must receive written authorization from the Director of
> OEP before commencing service *from the LNG terminal and other*
> *components of the project.* Such authorization will only be granted
> following a determination that *the facilities have been constructed in*
> *accordance with FERC approval and applicable standards, can be*
> *expected to operate safely as designed, and the* rehabilitation and

---

[92] At P 62 of the July 15 Order, we directed Mill River to allocate an
appropriate level of the estimated cost of service to interruptible services and
recalculate its rates, or alternatively, to provide a mechanism to credit 100 percent
of IT revenues to its firm and interruptible shippers. This direction was based in
part on the use of 836,000 Dth as billing determinants to derive Mill River's rates.
These 836,000 Dth included capacity that would be used for interruptible
transportation, so any IT revenues would correctly be credited to both firm and
interruptible shippers. Inasmuch as we are granting rehearing on the level of
billing determinants, the IT revenue crediting must also be reconsidered. The
level of 400,000 billing determinants includes only firm transportation. Since the
recourse rates are now derived based only on costs allocated to firm transportation,
any IT revenues should be credited only to firm shippers.

Docket No. CP04-36-001, *et al.*                                    60

restoration of the right-of-way and *other areas affected by the project are* proceeding satisfactorily. [Changes from July 15 Order are in italics.]

The Commission orders:

(A)    Except as described in the body of this order, the requests for rehearing are denied.

(B)    Fall River's request for oral argument of its rehearing request is denied.

(C)    The September 26, 2005 pleading filed by the City of Newport and the Towns of Bristol, Tiverton, Middletown, and Portsmouth, Rhode Island is rejected.

(D)    The October 14, 2005 pleading by the Town of Jamestown, Rhode Island is rejected.

By the Commission.  Commissioner Kelly dissenting with a
                              separate statement attached.

( S E A L )


                    Magalie R. Salas,
                    Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Weaver's Cove Energy, LLC                    Docket Nos. CP04-36-001

Mill River Pipeline, LLC                                 CP04-41-001
                                                         CP04-42-001
                                                         CP04-43-001

(Issued January 23, 2006)

KELLY, Commissioner, *dissenting*:

For the reasons detailed in my dissent from the July 15 Order,[93] I continue
to believe that, under the facts and circumstances of this case, it would not be in
the public interest to authorize the Weaver's Cove LNG facility under NGA
section 3. In my view, there are reasonable alternatives to this facility for meeting
New England's growing demand for natural gas. Given these alternatives, I think
that, on balance, the unresolved safety, environmental and socioeconomic
concerns raised by this project outweigh the benefit of the additional gas supply
that it would provide. In addition, I disagree with this order's failure to
substantively address the argument raised on rehearing that Rhode Island failed to
timely act on Weaver's Cove's Coastal Zone Management Act (CZMA)
certification application.

The Weaver's Cove facility would transport up to 800 MMcf per day of
natural gas to the Northeast market by 2010. As I have previously stated, I believe
that there are other natural gas infrastructure projects proposed to serve the New
England region that present reasonable alternatives to this facility. For example,
the Canaport LNG and Bear Head LNG import terminals in Canada are currently
under construction and are scheduled to be in service in 2008. The initial capacity
of the Canaport LNG facility is 1 Bcf per day. The designed throughput capacity
for Bear Head LNG is 1 Bcf per day. An additional storage tank could be added in
the future, increasing peak send-out capacity to as much as 1.5 Bcf per day. These
LNG import terminals would tie directly into the Maritimes & Northeast Pipeline,
which already serves New England. On September 15, 2005, Maritimes &
Northeast Pipeline submitted a pre-filing application with the Commission,
proposing to expand its existing pipeline system in order to transport a total
quantity of approximately 1.5 Bcf per day of gas from these two terminals. 1.5
Bcf per day of gas represents approximately 34 percent of New England's current

---

[93] 112 FERC ¶ 61,070 (2005).

Docket No. CP04-36-001, *et al.*                                                    2

normal peak day gas demand forecast.[94]  Commission staff is currently preparing an environmental impact statement regarding the proposed expansion.

In addition, proposals by Neptune LNG and Excelerate Energy LLC to build LNG import facilities off the coast of Massachusetts are continuing to move forward in the regulatory process.  The Neptune LNG facility would have an average sendout capacity of 400 MMcf per day and a peak capacity of 700 MMcf per day.  Excelerate Energy L.L.C.'s Northeast Gateway Project would have a baseload capacity of 400 MMcf per day and a peak capacity of 800 MMcf per day.

In light of the reasonable alternatives to the Weaver's Cove project, such as the ones described above, I think the benefit of additional gas supply that this facility would provide does not outweigh the unresolved safety, environmental and socioeconomic concerns that it raises.

Finally, I am troubled that the Commission declined to substantively address Weaver's Cove's argument on rehearing that we determine that Rhode Island failed to timely act within the statutory deadline on Weaver's Cove's CZMA certification application, and therefore "conclusively presume" Rhode Island's concurrence with the certification.  Rather than making a call either way, the Commission sidesteps the matter on the grounds that the issues raised are complex and "intensely disputed," and involve interpretation of regulations issued by the state of Rhode Island and the Department of Commerce.

CZMA section 307 provides that a state must either concur with or object within six months after it receives its copy of the applicant's CZMA certification, or the state's concurrence with the certification "shall be conclusively presumed."[95]  While Weaver's Cove and Rhode Island do indeed "intensely dispute" the facts, I believe that CZMA section 307 requires the Commission to sort through those facts, and make a call based on the record before it.  The Commission has made this type of determination several times before, and I see no reason not to do so in this order.

---

[94] This percentage is based on the total New England "normal" peak day demand forecast for 2006 of 4.4 Bcf per day.  *See* The Power Planning Committee of the New England Governors' Conference, Inc., *Meeting New England's Future Gas Demands: Nine Scenarios and Their Impacts*, March 1, 2005, pp. 20-21.

[95] 16 U.S.C. § 1456(c)(3)(A).

Docket No. CP04-36-001, *et al.*                                                        3

Accordingly, I respectfully dissent from this order.


_____

Suedeen G. Kelly

115 F.E.R.C. P61,058, *; 2006 FERC LEXIS 877, **

LEXSEE 115 FERC 61058

Weaver's Cove Energy, LLC, Mill River Pipeline, LLC

Docket Nos. CP04-36-002, CP04-41-002, CP04-42-002, CP04-43-002

FEDERAL ENERGY REGULATORY COMMISSION - COMMISSION

*115 F.E.R.C. P61,058; 2006 FERC LEXIS 877*

April 17, 2006

**ACTION:**
[**1] ORDER DENYING MOTIONS TO REOPEN RECORD IN PROCEEDING

**JUDGES:** Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly

**OPINION:**

[*61,179]
1. On July 15, 2005, the Commission issued an order (the July 15 Order) authorizing Weaver's Cove Energy, LLC (Weaver's Cove) under section 3 of the Natural Gas Act (NGA) to site, construct and operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts. n1 Subsequently, in an order issued January 23, 2006 (the January 23 Order), the Commission addressed requests for rehearing and/or clarification by: Weaver's Cove; the City of Fall River, Massachusetts, jointly with the Attorney General of the Commonwealth of Massachusetts, the Attorney General of the State of Rhode Island, and the Massachusetts Energy Facilities Siting Board (jointly Fall River); the Conservation Law Foundation; Shell Oil Products US (Shell); KeySpan Delivery Companies (KeySpan); and Michael L. Miozza. With one exception, not pertinent here, the Commission denied the requests for rehearing. n2 Fall River and Mr. Miozza have sought judicial review of our orders. n3

n1 *112 FERC P 61,070 (2005).*
[**2]

n2 *114 FERC P 61,058 (2006).*

n3 *See City of Fall River, Massachusetts v. FERC,* 1 st Cir. Nos. 06-1008.

2. Fall River, the Conservation Law Foundation, Mr. Miozza, and Save the Bay have filed motions to reopen the record in this proceeding. n4 Each party argues that the Commission should conduct additional analysis of the Weaver's Cove project in view of a recent filing by Weaver's Cove with the U.S. Coast Guard stating an intention to use different LNG vessels than it originally planned for LNG deliveries to the proposed Fall River LNG terminal. Fall River also requests that the Commission stay its orders in this proceeding until this further review is completed. Weaver's Cove filed replies to the motion by Save the Bay on March 3, 2006, and to the motions by Fall River and the Conservation Law Foundation on March 10, 2006. Fall River filed a response to the Weaver's Cove reply to its motion to reopen.

n4 The motions to reopen the record were filed by Save the Bay on February 16, 2006, Fall River on February 23, 2006, the Conservation Law Foundation on February 24, 2006, and Michael Miozza on March 1, 2006,

[**3]

3. For the reasons set forth below, we are denying the motions.

**Background**

4. The existing Brightman Street Bridge spans the Taunton River a short distance below the site of the proposed Weaver's Cove LNG terminal. Under longstanding plans, the existing bridge was to be torn down and replaced with a new Brightman Street Bridge approximately 1,100 feet upstream of the existing bridge. The existing bridge, with a 98-foot wide clearance, will not allow passage of the 150-foot wide LNG vessels originally contemplated by Weaver's Cove to transport LNG to the new terminal. The new bridge, which is under construction, will accommodate these vessels.

5. In the January 23 Order denying rehearing the Commission acknowledged that recent federal legislation prohibits demolition of the existing Brightman Street Bridge, n5 which provides inadequate clearance for the LNG vessels Weaver's Cove planned to use. The January 23 rehearing order, however, found that it would be premature to find that the project was moot.

> n5 *See The Safe, Accountable, Flexible, Efficient Transportation Equity Act,* Pub. L. No. 109-59 §§ 1702 and 1948 (2005).

[**4]

6. On February 2, 2006, Weaver's Cove informed the Coast Guard of a change in its proposed navigational operations. Instead of the LNG vessels described in its May 12, 2004 Letter of Intent to the Coast Guard, Weaver's Cove explained that it now plans to use smaller, specially designed LNG vessels that will fit through the 98-foot wide opening of the existing Brightman Street Bridge, thereby permitting access to the proposed terminal site. The vessels to be used would typically be 725 feet long and 82 feet wide. Because the smaller ships will have a smaller capacity, Weaver's Cove informed the Coast Guard, it anticipates making approximately 120 ship deliveries a year rather than the originally planned 50-70 deliveries.

**Requests to Reopen the Proceeding**

7. Fall River and the other moving parties argue that the planned use of the smaller LNG vessels by Weaver's Cove and the consequent larger number of vessel transits fundamentally alters the proposal approved by the Commission and requires that the Commission reopen the proceeding to conduct further environmental analysis and public interest review. This change, they contend, requires the Commission to consider [**5] several new issues: whether the smaller vessels can safely navigate the two Brightman Street bridges; whether these vessels are likely to be available in a timely manner; how the increased number of vessel transits would affect security plans; burdens on citizens who use the waterways, and on state and local officials; and the potential adverse impact on air quality.

8. Fall River also argues that real questions as to the viability of this proposal and its ability to satisfy public need for natural gas require that the Commission reexamine whether the benefits of the Weaver's Cove project would outweigh its disadvantages. The Conservation Law Foundation argues that the record should be reopened to consider that time of year dredging limitations recently recommended by the U.S. Department of the Interior and the new smaller ship plan will extend the project's in-service date beyond the start-up date for other projects the Commission rejected as alternatives for the Weaver's Cove project. The Conservation Law Foundation asserts that these factors essentially nullify what it calls the essence of the Commission's reasoning for approving the project - that Weaver's Cove is preferable [**6] [*61,180] to other alternatives because it promises the quickest and most reliable source of natural gas for New England.

9. In reply to the motions, Weaver's Cove avers that its proposed use of smaller LNG vessels does not change its project in any material respect and is not inconsistent with the Commission's determination that the project will promote the public interest by increasing the availability of natural gas supplies in the New England market. Weaver's Cove also states that the use of smaller ships will not increase the impact on the quality of the human environment or on safety or security considerations so that additional environmental review is required.

## Discussion

10. In determining whether there is good cause to reopen the record in a proceeding based on changes after the record is closed, the Commission considers whether or not the party requesting reopening has demonstrated the existence of extraordinary circumstances that outweigh the need for finality in the administrative process. To persuade the Commission to exercise its discretion to reopen the record, the requesting party must demonstrate a change in circumstances that is more than [**7] just material - the change must go to the very heart of the case. n6 We find that movants have not met that burden and will deny their requests to reopen.

>     n6 See *Georgia Strait Crossing Pipeline LP, 105 FERC P 61,190 (2003). See also, e.g., Cooley v. FERC, 843 F.2d 1464, 1473 (D.C. 1988)* (the Commission need only reopen the record where it clearly appears that the new evidence would compel a contrary result); *Reno Hilton Resorts v. NLRB, 196 F.3d 1275, 1285 n.10 (D.C. Cir. 1999).*

11. This Commission is responsible for authorizing the siting and construction of onshore LNG facilities under section 3 of the NGA. The U. S. Coast Guard exercises regulatory authority over LNG facilities that affect the safety and security of port areas and navigable waterways. The Coast Guard is responsible for matters relating to navigation safety, vessel engineering and safety standards, and all matters pertaining to the safety and security of facilities or equipment located [**8] in or adjacent to navigable waters.

12. Under a February 11, 2004 FERC/Coast Guard/U.S. Department of Transportation Interagency Agreement, n7 the Commission assumed responsibility to be the lead agency for the preparation of the analysis and decisions required under the National Environmental Policy Act of 1969 for the approval of new facilities. The scope of the review includes all aspects of the overall project including maritime safety and security operations that would normally be performed by the Coast Guard, not this Commission. With the assistance of the U.S. Department of Transportation, the Coast Guard, and other federal agencies, the Commission conducted substantial environmental and safety analysis described in the Commission's final environmental impact statement on the Weaver's Cove project.

>     n7 *Interagency Agreement Among the Federal Energy Regulatory Commission, United States Coast Guard, and Research Programs Administration for the Safety and Security Review of Waterfront Import/Export Liquefied Natural Gas Facilities* (Feb.11, 2004).

[**9]

13. In its July 15 Order approving the project, the Commission found that the proposed new LNG terminal will promote the public interest by increasing the availability of natural gas supplies in the New England market. n8 Pursuant to the July 15 Order, before construction may begin, Weaver's Cove must satisfy numerous environmental and safety conditions. These conditions include, for example, the approval of emergency response and evacuation plans; n9 concurrence from the states of Massachusetts and Rhode Island that the project is consistent with those states' coastal zone management programs; and conditions to ensure attainment of state or federal standards for, or to mitigate impacts on, water quality, air quality, dredging, and noise.

>     n8 Contrary to suggestions by movants, our orders in this proceeding did not find that the Weaver's Cove LNG terminal facilities would satisfy all New England's natural gas needs to the exclusion of a need for other supply sources. Rather, our July 15 Order found that the proposed Weaver's Cove terminal facilities will enable the introduction of new gas volumes from new sources of supply into the New England area where substantial market growth is expected. *See* July 15 Order, at P 51. Even should the volumes Weaver's Cove can deliver to customers fall short of its original estimate as a result of using smaller volume vessels for delivery to the terminal, the terminal would still provide a significant volume of natural gas to the New England market. As we also noted in the January 23 Order, the availability of natural gas from other projects can play an important role in meeting New England's overall need. *See* January 23 Order, at P 59.

[**10]

n9 *112 FERC P 61,070*, Appendix B.

14. Pursuant to Coast Guard regulations, an owner or operator that intends to construct an LNG facility must submit a Letter of Intent to the Coast Guard describing, as pertinent, the characteristics of the vessels intended to visit the facility and the frequency of the visits. n10 The applicant must notify the Coast Guard of any change in the information submitted. n11 The Coast Guard reviews the information provided by the applicant and makes a determination on the suitability of the waterway for LNG vessels. This determination is called a Letter of Recommendation. Factors considered by the Coast Guard under its regulations include, as pertinent: density and characteristics of marine traffic in the waterway; locks, bridges and other man-made obstructions in the waterway; and water depth and tides. n12 The applicant must also prepare a Water Suitability Assessment (WSA) for review and approval by the Coast Guard. The WSA identifies security threats and safety hazards to LNG marine transportation, and [*61,181] identifies appropriate risk [**11] management measures. Condition 75 in Appendix B to our July 15, 2005 Order requires Weaver's Cove to update its WSA for the project annually to reflect any changed conditions, and provide the updated assessment to the Coast Guard, which will review the updated assessment and report its conclusions to the Commission. The Coast Guard has not yet issued a Letter of Recommendation for the project, and no ship operations may take place until it does so.

n10 *33 C.F.R. § 127.007 (2005)*.

n11 *Id.*

n12 *33 C.F.R. § 127.009 (2005)*.

15. Weaver's Cove has informed the Coast Guard of the changes it is planning for its vessel operations. Pursuant to our July 15, 2005 Order, Weaver's Cove's first annual update of its WSA also must reflect these changes for the Coast Guard's review. The Coast Guard will evaluate this material and determine in accordance with its responsibilities whether the proposal to use smaller vessels with a larger number of deliveries [**12] meets its navigation and safety requirements. This is a matter for the Coast Guard, not this Commission. n13

n13 By letter dated March 13, 2006, to Weaver's Cove addressing its Letter of Intent describing its proposed operational changes, the Coast Guard informed Weaver's Cove that its smaller ship proposal presents a practical challenge with no margin for navigational error, and appears "unsuitable in its current state". The Coast Guard's March 13 letter further stated that a revised Water Suitability Assessment and environmental impact review may be required for issuance of a Letter of Recommendation.

16. Movants have not shown good cause for reopening the record in this proceeding for the purposes they set forth. Issues relating to the navigability and safety of LNG vessels on the Taunton River and other pertinent waterways are properly before the agency with appropriate jurisdiction to address them - the Coast Guard. No changes to our authorization or additional analysis are required with respect to [**13] the other matters raised by movants. As noted above, these matters remain subject to the conditions in our July 15 Order. The navigational changes Weaver's Cove has proposed to the Coast Guard do not affect these conditions or our approval of the project. We note, however, that if the Coast Guard's review of this matter results in changes to the project that require a change to our authorization, we would determine at that time what additional review we might be required to undertake in connection with such changes. We also note that we stand ready to offer the Coast Guard any assistance we can provide in connection with its consideration of this matter. Finally, because we are denying the motions to reopen the record, we likewise will deny Fall River's motion to stay the Commission's orders.

115 F.E.R.C. P61,058, *; 2006 FERC LEXIS 877, **

The Commission orders:

(A) The motions by Fall River, the Conservation Law Foundation, and Save the Bay to reopen the record in this proceeding are denied.

(B) The request by Fall River that the Commission stay its orders in this proceeding is denied.

By the Commission. Commissioner Kelly concurring with a separate statement attached.

**CONCURBY:**

KELLY

**CONCUR:**

KELLY, Commissioner, *concurring* [**14] :

[Issued April 17, 2006]

I agree that the issues raised in this proceeding should be addressed by the jurisdictional agency, the Coast Guard, particularly because the order is clear that, if the Coast Guard's review results in changes to the project that require a change to our authorization, then we will determine what, if any, additional Commission review is required.

However, for the reasons set forth in my dissents from the July 15, 2005 order n14, and the January 24, 2006 Order on Rehearing n15, I continue to believe that, under the facts and circumstances of this case, it would not be in the public interest to authorize the Weaver's Cove LNG facility under NGA section 3.

n14 *112 FERC P 61,070.*

n15 *114 FERC P 61,058.*

Suedeen G. Kelly

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Energy & Utilities LawAdministrative ProceedingsU.S. Federal Energy Regulatory CommissionGeneral OverviewEnergy & Utilities LawGas IndustryLiquefied Natural GasTransportation LawWater TransportationMaintenance & Safety

116 F.E.R.C. P61,041, *; 2006 FERC LEXIS 1662, **

LEXSEE 116 FERC 61041

Weaver's Cove Energy, LLC, Mill River Pipeline, LLC

Docket Nos. CP04-36-003, CP04-41-003, CP04-42-003, CP04-43-000

FEDERAL ENERGY REGULATORY COMMISSION - COMMISSION

*116 F.E.R.C. P61,041; 2006 FERC LEXIS 1662*

July 19, 2006

**ACTION:**
[**1]  ORDER DENYING REHEARING

**JUDGES:** Before Commissioners: Joseph T. Kelliher, Chairman; Nora Mead Brownell, and Suedeen G. Kelly

**OPINION:**
[*61,159]

1. On July 15, 2005, the Commission issued an order (the July 15 Order) authorizing Weaver's Cove Energy, LLC (Weaver's Cove) under section 3 of the Natural Gas Act (NGA) to site, construct and operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts. n1 In an order issued January 23, 2006 (the January 23 Order) n2 the Commission addressed requests for rehearing and/or clarification by: Weaver's Cove; the City of Fall River, Massachusetts, jointly with the Attorney General of the Commonwealth of Massachusetts, the Attorney General of the State of Rhode Island, and the Massachusetts Energy Facilities Siting Board (jointly Fall River); the Conservation Law Foundation; Shell Oil Products US (Shell); KeySpan Delivery Companies (KeySpan); and Michael L. Miozza. n3 The Commission denied motions by Fall River, the conservation Law Foundation, Mr. Miozza, and Save the Bay to reopen the record in this proceeding in an order issued April 17, 2006 (April 17 Order). n4

n1 *112 FERC P 61,070 (2005).*
[**2]

n2 *114 FERC P 61,058 (2006).*

n3 Fall River and Mr. Miozza have sought judicial review of our orders. *See City of Fall River, Massachusetts v. FERC*, 1 st Cir. No. 06-1203 *et al.*

n4 *115 FERC P 61,058 (2006).*

2. On May 1, May 4, and May 12, 2006, respectively, Fall River, Mr. Miozza, and the Conservation Law Foundation filed timely requests for rehearing of the Commission's April 17 denial of their requests to reopen the record. Fall River and the Conservation Law Foundation contend that the Commission erred in not conducting supplemental environmental review under the National Environmental Policy Act of 1969 (NEPA) and in not reassessing the proposed project under NGA section 3. For the reasons set forth below, we are denying the rehearing requests.

**Background**

3. As described in detail in the April 17 Order, the grounds for the motions to reopen this proceeding primarily arose from a February 2006 proposal by Weaver's Cove to the U.S. Coast Guard to employ smaller LNG vessels than origi-

nally planned for making deliveries [**3] to the proposed LNG terminal in the City of Fall River. The smaller vessels, Weaver's Cove related to the Coast Guard, were necessary to enable passage of the vessels through the existing Brightman Street Bridge located a short distance downstream of the terminal site. Fall River and the Conservation Law Foundation contended that the proposal to the Coast Guard fundamentally altered the overall project proposal approved by the Commission and required the Commission to reopen the proceeding to conduct further NEPA environmental analysis and further NGA section 3 public interest review.

4. The Commission rejected this argument, explaining that the particular issues involving vessel navigation through the Brightman Street Bridge and other pertinent waterways were properly before the Coast Guard, and required no further analysis by the Commission at this time.

**The Rehearing Requests**

**The Smaller Ship Proposal to the Coast Guard**

5. On rehearing, Fall River and the Conservation Law Foundation renew their earlier NEPA and section 3 arguments. They assert that the proposal to use smaller ships is essentially a new project that has not been the subject of [**4] NEPA analysis or public interest review. The Commission, they contend, cannot shift its permitting responsibilities to the Coast Guard even though that agency has primary responsibility for navigational safety. Fall River maintains that the costs and benefits from the assertedly new proposal are markedly different from those already addressed by the Commission and require a fresh hard look. [*61,160]

**Commission Response**

6. In this proceeding, the Commission under NGA section 3 has approved a specific project proposed by Weaver's Cove for an LNG terminal and related facilities in Fall River. In cooperation with other state and federal government agencies, the Commission, as the lead agency, conducted environmental review pursuant to NEPA, prepared an environmental impact statement, and concluded that the project, as proposed, would be environmentally acceptable, if constructed and operated in accordance with mitigation provisions attached as conditions of the Commission's authorization. This review included analysis of issues relating to the safety and security of LNG vessels traveling to Fall River through waterways under the Coast Guard's jurisdiction and supervision. [**5] The Commission also found that the proposed project would be in the public interest because it would increase the availability of natural gas supplies in New England.

7. At issue here is whether there is now a new or materially altered proposal before the Commission that calls into question the premises upon which our approval was based so that additional analysis and review by the Commission are required. Contrary to assertions by Fall River and the Conservation Law Foundation, however, there is no new or significantly changed project before the Commission for it to assess either under NEPA or under section 3 of the NGA. Weaver's Cove has proposed to the Coast Guard a change in its method of navigating the waterways by which vessels will deliver the LNG to the approved terminal in Fall River. As we stated in the April 17 Order, because the Coast Guard is the government agency with the appropriate jurisdiction to review navigational issues, the Coast Guard, not the Commission, is the appropriate agency to review this matter.

8. Fall River and the Conservation Law Foundation nonetheless suggest that the Commission has improperly abdicated its responsibilities to the Coast [**6] Guard by not ordering additional review. This is simply not the case. Our April 17 Order specifically stated that should the Coast Guard's review ultimately result in changes to the proposal approved by the Commission we would at that time assess what additional review by the Commission would be appropriate. To clarify that statement so that there will be no misunderstanding our intent, should the Coast Guard approve a navigation plan different from the navigation plan considered by the Commission when we approved the Weaver's Cove project, we will examine that navigation plan and determine whether further Commission action is necessary and/or what that action should be.

9. No LNG vessels may transit the waterways leading to Fall River without Coast Guard approval. The Coast Guard has not yet approved any plan for such transit. Unless or until the Coast Guard approves a plan for such transit that differs from the proposal approved by the Commission, there is no reason for the Commission to conduct additional review. To do so would serve no purpose, as the Coast Guard could approve the original plan, the smaller ship proposal now before

116 F.E.R.C. P61,041, *; 2006 FERC LEXIS 1662, **

the Coast Guard, some other plan that would [**7] satisfy Coast Guard responsibilities, or possibly no plan at all. As reflected in our April 17 Order, the Commission stands ready to assist the Coast Guard in this process.

**Dredging and Alternatives**

10. The Conservation Law Foundation also renews earlier arguments that the Commission should have reopened the record to admit new evidence that so-called "binding" time-of-year dredging limitations by the U.S. Department of Interior (DOI) will allegedly result in significant delays in completion of the project beyond the 2010 target date. The Conservation Law Foundation argues that alternatives previously considered and rejected by the Commission should be reassessed because they may now represent opportunities for service to begin earlier than the Weaver's Cove project, and thus be preferable to the Weaver's Cove project.

**Commission Response**

11. The Conservation Law Foundation appears to believe that the 2010 target date for the commencement of service at the proposed facilities is crucial to the Commission's authorization of the project. This is not so. The New England Governors' Conference projected that the New England region would have adequate gas [**8] infrastructure for its winter peak-day demands until 2010, but that to continue to meet its increasing needs after that time would require substantial demand reduction or infrastructure development. n5 We approved this infrastructure project as a means for introducing substantial new gas volumes to this growing market. Projects of this nature require substantial lead time for construction and securing additional permits and approvals. We cannot predict with certainty how long the process will actually take from Commission approval to commencement of operations; however, we remain confident that the Weaver's Cove project will contribute significantly to addressing New England's infrastructure requirements.

> n5 July 15 Order, at P 6.

12. As to the Conservation Law Foundation's argument that DOI will impose dredging restrictions that will delay the project, we note that in the July 15, 2005 and January 23 Orders we specifically recognized that the U.S. Army Corps of Engineers (COE) is the agency responsible [**9] for issuing dredging permits and can impose additional time-of-year restrictions beyond those recommended in [*61,161] the FEIS. n6 We also implicitly recognized that these restrictions could lengthen the construction process and extend the in-service date for the project. As the Commission was aware of this possibility at the time we approved the project, this does not affect our decision.

> n6 We note that COE, not DOI, is the agency with responsibility for dredging permits. DOI's so-called "binding" restrictions are instead recommendations submitted to COE in its comments to COE as part of that agency's permitting process.

13. The Conservation Law Foundation's assertion that other projects could be operational prior to the Weaver's Cove project likewise does not affect our authorization of that project. In the January 23 Order we explained that there are other potential projects, such as offshore LNG facilities, onshore LNG terminals in Canada or Maine, and/or increased pipeline infrastructure to [**10] transport natural gas from remote locations, that along with the Weaver's Cove project can play an important role in meeting New England's natural gas needs. n7 However, we found that these projects could not serve as alternatives to the exclusion of the Weaver's Cove project for various reasons, chief among them that they could not provide needed gas storage or LNG truck deliveries to peak shaving storage facilities and industrial customers located throughout New England. Even if it were true that these other projects could begin operations prior to Weaver's Cove, n8 they would still not be able to satisfy the objectives of the Weaver's Cove project. n9

> n7 See January 23 Order, at P 59 et seq.

n8 This is by no means as certain as the Conservation Law Foundation apparently believes, however, as none of these "alternative" projects has received any necessary government approval. The status of these potential projects is unchanged since Commission approval of the Weaver's Cove project.

n9 We also explained in the April 17 Order that even should the volumes Weaver's Cove can deliver to customers fall short of its original estimate as a result of using smaller volume vessels for delivery to the terminal, the terminal facilities would still provide a significant volume of natural gas to the New England market. Thus, we continue to believe that the Weaver's Cove project will be in the public interest, so long as it is constructed and operated in accordance with the conditions set forth in our July 15 Order.

[**11]

The Commission orders:

The requests by Fall River, the Conservation Law Foundation, and Mr. Miozza for rehearing of the April 17, 2006 Order in this proceeding are denied.

By the Commission. Commissioner Kelly concurring with a separate statement attached.

**CONCURBY:**

KELLY

**CONCUR:**

KELLY, Commissioner, *concurring*:

[Issued July 19, 2006]

I agree that it is appropriate to deny rehearing of our April 17, 2006 order in this proceeding. However, for the reasons set forth in my dissents from the July 15, 2005 order n10, and the January 24, 2006 Order on Rehearing n11, I continue to believe that, under the facts and circumstances of this case, it would not be in the public interest to authorize the Weaver's Cove LNG facility under NGA section 3.

n10 *112 FERC P 61,070.*

n11 *114 FERC P 61,058.*

Suedeen G. Kelly

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Energy & Utilities LawAdministrative ProceedingsU.S. Federal Energy Regulatory CommissionGeneral OverviewEnergy & Utilities LawGas IndustryLiquefied Natural GasTransportation LawWater TransportationMaintenance & Safety

# ATTACHMENT 4



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
New England Field Office
70 Commercial Street, Suite 300
Concord, New Hampshire 03301-5087

REF:  Public Notice NAE-2004-2355                    February 7, 2006

Ms. Christine Godfrey, Chief
Regulatory Division
U. S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742-2751

Dear Ms. Godfrey:

We have reviewed the Public Notice on the liquefied natural gas (LNG) import terminal and natural gas pipeline facilities in Bristol County, Massachusetts proposed by Weaver's Cove Energy. These are the comments of the Department of the Interior. The following comments are provided in accordance with the Fish and Wildlife Coordination Act (948 stat. 401, as amended; 16 U.S.C. 661 et seq.) and the Wild and Scenic Rivers Act (16 U.S.C. 1271-1287, as amended).

The proposal is for the development of a LNG terminal on the site of a former Shell Oil Facility along the Taunton River in Fall River, Massachusetts. Site development will include over one acre of permanent wetland and waterway fill. Moreover, the dredging of 2.6 million cubic yards of material from the navigation channel and turning basin will have significant impacts to fishery and shellfishery resources.

We previously addressed our concerns for anadromous fish, and the Wild and Scenic Rivers issue, in our letter of September 22, 2004 to the Corps of Engineers, and the Department's July 5, 2005 comment letter to FERC.

Protection of Fishery Resources

As we have stated previously, the Taunton River provides important habitat for anadromous fish, including the blueback herring, alewife, American shad and rainbow smelt. These species use all or some of the Taunton River for passage, spawning, nursery and foraging. To protect these resources, we have previously recommended time-of-year restrictions for both upstream and downstream migrations. Subsequent to our recommendations, the applicant has decided to use ocean disposal of dredge material and to institute time-of-year restrictions for the spring

upstream migrations. However, the applicant has refused to incorporate restrictions to protect downstream migrations.

We recommend a time-of-year restriction of March 1 – July 31 for the protection of the incoming anadromous fish migration. To adequately protect the downstream migration, we continue to recommend a time-of-year restriction of July 1 through October 31. If this is unacceptable, we recommend that no dredging take place upstream of the I-195 bridge from July 1 to October 31.

Taunton Wild and Scenic River Study

Public Law 106-318, the Taunton River Study Act of 2000, authorized a study of the Upper Taunton River from its headwaters at the confluence of the Town and Matfield Rivers to its confluence with the Forge River in Raynham.

Interim Protections of Study Rivers

Resource values contributing to the potential designation of such congressionally-authorized study segments are afforded statutory protection under the Wild and Scenic Rivers Act.

The pertinent language from Section 7(b) of the Wild and Scenic Rivers Act is:

"…and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval…"

(and)

"Nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area…"

Protection of the Wild and Scenic River Values of the Taunton River

The significance of the anadromous fish resources of the Taunton River is well documented, and is one of the values for which the upper Taunton River would be designated by Congress as a component of the National Wild and Scenic Rivers System. The statutorily required resource protections of the Wild and Scenic Study legislation, as cited above, therefore apply to the protection of anadromous fish resources. In order to comply with the required protection standard, no diminishment of this resource value may be allowed. It is the Department's determination that the time-of-year restrictions stipulated in this letter will ensure that this standard is met.

Considerations Related to the Lower Taunton River

In September, 2002, responding to petitions from the five lower Taunton River communities from Taunton to Fall River, U.S. Representatives Barney Frank, James McGovern and Stephen Lynch formally requested that the study area be extended to include all of the Taunton River to its confluence with Mt. Hope Bay. In the spring of 2003, the National Park Service agreed to expand the study area as requested. The expanded area is not subject to the statutory protection of the study legislation.

Current Status of Wild and Scenic River Study

Between November 2004 and July 2005, all ten communities abutting the mainstem of the Taunton River voted through Town Meeting or City Council (Cities of Fall River and Taunton) to endorse the Taunton River Stewardship Plan and to seek federal Wild and Scenic River designation. Such community votes are the final step required by the National Park Service's Study process. Since that time, the Commonwealth of Massachusetts, through a letter from the Secretary of the Executive Office of Environmental Affairs, has written to express support for Wild and Scenic River designation of the entire Taunton River, as have many non-governmental and citizen groups. Legislation has also been filed in both the U.S. House of Representatives and the U.S. Senate to designate the entire mainstem of the Taunton River. A Draft Report to Congress is under preparation that will document study findings and the expressed public support for designation.

Lower Taunton Site Impacts

Consistent with the Department's July 5, 2005 comment letter to FERC on the Final EIS for this project, we continue to believe that there are likely to be unavoidable site impacts associated with this project that render its construction and operation incompatible with Wild and Scenic River designation of the lower-most portion of the mainstem of the Taunton River (below Steep Brook in north Fall River). While this incompatibility is not subject to the same statutory protection requirement afforded the Upper Taunton Study area, there has been a substantial demonstration of the public interest in seeing the entire mainstem protected as a National Wild and Scenic River. This demonstration has been noted elsewhere in this letter. The Department believes that this expression of public interest needs to be fully considered by the Corps of Engineers in its own weighing of the public interest.

- 4 -

Conclusion

As currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River. Without time-of-year restrictions for both upstream and downstream migrations, we continue to recommend that this application be denied. If you have any questions please call me at 603-223-2541, or Jamie Fosburgh, of the National Park Service, at 617-223-5191.

Sincerely yours,

William J. Neidermyer
Assistant Supervisor, Federal Activities
New England Field Office

# ATTACHMENT 5

JAN 2 3 2007



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

Mr. Bruce Kiely
Baker Botts L.L.P.
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

**Re: Weaver's Cove Energy, LLC Proposed Balanced Dredging Mitigation Plan**

Dear Mr. Kiely:

Thank you for your letter requesting that we provide concurrence with specific aspects of the October 25, 2006 "Proposed Balanced Dredging Mitigation Plan" developed by Weavers Cove, and suggesting a meeting on the subject. I have had extensive discussions with the Northeast Regional Office and I am responding with our perspective on the most appropriate way to move forward.

Weavers Cove, in letters dated January 20, 2006, and June 21, 2006, presented NOAA with a consensus mitigation plan and a proposed balanced dredging mitigation plan. In a letter dated February 24, 2006, I requested that Weavers Cove coordinate the discussion of outstanding issues through the Corps of Engineers Interagency Process. We have reviewed your proposal internally and with the other federal resource agencies. The outstanding issues revolve around the recommendations to provide safe passage for anadromous fish species in the Taunton River during dredging operations, and a mitigation plan that compensates for unavoidable temporary and permanent impacts. In this regard, we believe we have a solution that the resource agencies may support to resolve the issues associated with the time-of-year restriction with additional modifications to your proposal. We are continuing discussions with the other federal resources agencies regarding the proposed mitigation of winter flounder habitat impacts. At this point in time, I believe it may be best to have an open discussion under the purview of the New England District of the Corps of Engineers (NEDCE) so we can bring these and any other issues to a decision point. It is my understanding that the NEDCE recently requested that an interagency meeting occur in order to discuss the outstanding issues relative to the proposed project. I encourage you to follow up with the Corps to move this project forward.

Consistent with the federal interagency review process, we encourage further coordination between representatives of Weaver's Cove coordinated and convened by the Corps of Engineers. We look forward to meeting with you as part of the interagency review process to resolve these outstanding issues.

Sincerely,



William T. Hogarth, Ph.D.

THE ASSISTANT ADMINISTRATOR
FOR FISHERIES


Printed on Recycled Paper



Lou Chiarella
<Lou.Chiarella@noaa.
gov>

02/13/2007 07:19 AM

To: "Lento, Theodore M NAE"
    <Theodore.M.Lento@nae02.usace.army.mil>
cc: Vernon_Lang@fws.gov, jamie_fosburgh@nps.gov,
    bob_mcintosh@nps.gov, jim_tilmant@nps.gov, ben_letcher@usgs.gov,
    Michael_Thabault@fws.gov, Michael_Bartlett@fws.gov,
Subject: Re: Update on meeting with WCE to discuss mitigation
    (UNCLASSIFIED)

Ted,
Attached is a summary of time-of-year restrictions that we discussed with USFWS and MDMF in
November.
Lou

Lento, Theodore M NAE wrote:

```
Classification:  UNCLASSIFIED
Caveats: NONE

Hi, Lou...

I have checked with WCE staff and they were able to attend
all proposed
meeting days, however based on the responses received so
far, there is a
schedule conflict with the agencies. I will check again with
WCE for possible
days in mid to end of March and get back to you and others
on the email list.

In addition, it would be useful for all the agencies to have
an
understanding, prior to the meeting, of the solution NOAA
mentions in the
attached letter that may resolve some of the concerns on
this project.  Can
NOAA send an email with more information on this proposal?

Ted


-----Original Message-----
From: Lou Chiarella [mailto:Lou.Chiarella@noaa.gov]
Sent: Thursday, February 08, 2007 7:16 AM
To: Lento, Theodore M NAE
Cc: Vernon Lang@fws.gov; jamie fosburgh@nps.gov;
bob mcintosh@nps.gov;
jim tilmant@nps.gov; ben letcher@usgs.gov;
Michael Thabault@fws.gov;
Michael Bartlett@fws.gov; Peter.Colosi@noaa.gov;
colarusso.phil@epamail.epa.gov; vincent.malkoski@state.ma.us
;
```

Weavers Cove LNG TOYs-LAC.doc    Lou.Chiarella.vcf

Weavers Cove LNG

February 13, 2007

Seasonal Dredging Restrictions as suggested by NMFS – For Discussion Only

1. Winter Flounder:  No dredging between January 15 – May 31 – Entire project

2. Anadromous Fish:
     Upstream:     No dredging March 15 – June 15 – Entire project
                     No dredging June 16 – July 31 – Upstream of the C-17 buoy (line between C-17 buoy and City Pier)

     Downstream: Upstream of C-17 buoy – August 1 – October 31 – dredging along the east or west side turning basin only, regardless of material type. Limit to 1 dredge in this location during this time period regardless of material type

River Reach Perspective:
2 Reaches: Upstream of C-17 Buoy and Downstream of C-17 Buoy

Downstream of C-17 Buoy:  No dredging January 15 – June 15

Upstream of C17 Buoy:      No dredging January 15 – July 31; limited dredging August 1 – October 31

Mitigation for Winter Flounder Habitat

In-Lieu fee of $500,000 is not appropriate.  1 – amount not sufficient to cover cost of 11 acre mitigation, 2- Projects need to be implemented regardless of cost.

Types of mitigation to consider – Alterations to existing hard shorelines to create natural shorelines which include additional inter and subtidal areas; Wetland enhancement/restoration in low quality wetlands which include creation of additional subtidal habitat, tidal creeks; Eel grass restoration in Bay – may be limited due to water quality

# ATTACHMENT 6



"Lento, Theodore M
NAE"
<Theodore.M.Lento@n
ae02.usace.army.mil>

03/06/2007 03:14 PM

To: "Lento, Theodore M NAE"
    <Theodore.M.Lento@nae02.usace.army.mil>,
    <Vernon_Lang@fws.gov>, <jamie_fosburgh@nps.gov>,
cc: "Almeida, John P NAE" <John.P.Almeida@nae02.usace.army.mil>,
    "Mike Howard" <mhoward@Epsilonassociates.com>
Subject: CANCELLATION of Meeting on WCE project to discuss mitigation and
    time of year requirements on dredging (UNCLASSIFIED)

```
Classification:   UNCLASSIFIED
Caveats: NONE


Thank you for taking the time to arrange your schedules to attend the March
19th meeting on the Weavers Cove Energy project, however WCE staff requested
today that the meeting be cancelled.  There are currently no plans to
reschedule this meeting, but there will be an opportunity to review the final
mitigation plans for the project when they are completed.
Classification:   UNCLASSIFIED
Caveats: NONE
```

# ATTACHMENT 7

**U.S. Department of**
**Homeland Security**
**United States**
**Coast Guard**



Commanding Officer
U.S. Coast Guard
Sector Southeastern New England

1 Little Harbor Road
Woods Hole, MA  02543
Phone: 508-457-3219
Fax: 508-457-3236-
Email: Edward.G.LeBlanc@uscg.mil

16000
May 9, 2007

Mr. Gordon Shearer
Chief Executive Officer
Weaver's Cove Energy, LLC
One New Street
Fall River, MA  02720

Dear Mr. Shearer

I reviewed the information Weaver's Cove submitted regarding its smaller liquefied natural gas (LNG) tanker proposal, including the original Letter of Intent (LOI) of May 12, 2004; the Federal Energy Regulatory Commission's (FERC) Final Environmental Impact Statement of May 2005; FERC's approval order of July 15, 2005; the Weaver's Cove amended LOI of February 2, 2006; its Environmental Assessment of the Use of Smaller Ships of November 2006, its Waterway Suitability Assessment of November 22, 2006; and its Additional Smaller LNG Ship Design, Navigational and Operational Data report of February 21, 2007.  Enclosure (1) is a review of the material submitted, specifically, the smaller tanker proposal.

Among other issues described in enclosure (1), the doubling of tanker transits and the slower movement of tankers through the waterway segment between Borden Flats and the proposed Weaver's Cove facility presents navigation safety and security challenges and environmental impacts beyond those addressed in the original LOI.  Accordingly, before a Letter of Recommendation (LOR) can be issued, the Coast Guard will conduct supplemental reviews, including an environmental review, and afford an opportunity for public comment.  Additionally, given the need for a full understanding of security resource and coordination impacts, I will require workshop discussions with state and local law enforcement and public safety officials to ensure the risks, impacts, resource demands, capabilities, and coordination requirements are well understood and quantified.

In my March 13, 2006, letter to Weaver's Cove, I summarized that the transit through the new and old Brightman Street Bridges was 'an extraordinary navigational maneuver' that left 'no margin for error'.  The recent submission of vessel transit modeling does not include either Marine Safety International's or the individual marine pilot's conclusion that smaller LNG tankers can be safely navigated through this waterway on a consistent, repeatable basis.

16000
May 9, 2007

Based upon my review, it appears that the waterway may not be suitable for the type and frequency of LNG marine traffic contained in your smaller tanker proposal. This review is a preliminary assessment and does not constitute final agency action since analysis required by the National Environmental Policy Act (NEPA) has not been completed. The final determination of suitability will be provided in my Letter of Recommendation. Should Weaver's Cove desire to move forward in the Letter of Recommendation process, please advise this office in writing with your specific intentions.

Sincerely,

ROY A. NASH
Captain, U.S. Coast Guard
Captain of the Port
Southeastern New England

Enclosure:  (1) Executive Summary

Copy:  Commander, First Coast Guard District (d, dp, dl)
          Commander, Atlantic Area (Am)
          Commandant (CG-3PSO)
          Federal Energy Regulatory Commission
          Mass and RI Congressional delegations
          Mayor, City of Fall River
          Applicable state and local agencies

2

## EXECUTIVE SUMMARY

Weaver's Cove LLC proposes to import Liquefied Natural Gas (LNG) via tanker to its proposed waterfront facility in Fall River, MA. Per 33 CFR 127, applicable to Waterfront Facilities Handling Liquefied Natural Gas and Liquefied Hazardous Gas, special precautions are required in connection with transport of this commodity through the navigable waterways of the U.S.

In its initial Letter of Intent (LOI) dated May 12, 2004, Weaver's Cove proposed employing tankers typically 975' long by 145' beam by 37.5' draft. These tankers would make about 60 deliveries each year. (This is commonly referred to as the "larger tanker" proposal.) On August 10, 2005, President Bush signed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. 109-59. Section 1948 of the Act stated that "no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge…" The practical effect of the Act is that the old Brightman Street Bridge will essentially remain in place. Subsequent to the Act, Weaver's Cove submitted an amended LOI on February 2, 2006, proposing to use smaller tankers of approximately 725' long by 82' beam by 36' draft. These tankers would make about 120 to 130 deliveries each year. (Commonly referred to as the "smaller tanker" proposal.) A submission addressing navigability of small tankers using modeling was submitted on February, 21, 2007, suggesting a range of tanker design dimensions that would include vessels up to 750' long by 85' beam by 37.5' draft.

In short, of the entire proposed transit route, the area of highest apparent potential consequence in the case of accident or incident—the Fall River/Somerset metropolitan area—is also the area of highest risk to navigation safety, and presents a unique challenge to water-borne security. The sum of measures, mitigations and precautions described in the Weaver's Cove proposal do not appear to sufficiently reduce the risks to a point where the waterway could be declared suitable for the proposed cargo transit. Listed below are key factors affecting the suitability of the waterway:

- Proximity of the waterway to population concentrations.
- Proximity of the Brightman Street Bridges to each other.
- Dimensions and condition of the old Brightman Street Bridge.
- Channel offset between bridges.
- Severe turn required beneath and just north of the Braga Bridge
- Close proximity of the channel to Fall River piers, infrastructure (e.g., I-195/Braga Bridge) and USS MASSACHUSETTS museum complex.
- Prolonged, frequent exposure of the Fall River metropolitan region to safety and security risks during the transits.
- Expected delays to marine and vehicular traffic associated with frequent LNG tankers navigating through or under five bridge crossings.
- Conditions favorable to inbound and outbound transits are severely limited by vessel draft, tidal state, wind, visibility, and infrastructure.

After considering the totality of proposed LNG marine traffic through this waterway, and acknowledging the substantial safety features and navigation capability of the proposed tankers, pilots, and accompanying tugs, the waterway continues to present a substantial challenge to the safe navigation of hazardous cargo, and the concerns I expressed in my letter to Weaver's Cove of March 13, 2006, remain.

The aggregate of navigation safety factors--daylight, infrastructure, vessel dimensions, controlling depth, weather, visibility, tidal conditions, bridge operations, and human factors—which must be aligned to provide a safe transit through the waterway, particularly that portion of the waterway from Borden Flats, under the Braga Bridge, and through the old and new Brightman Street Bridges, are not measurably improved in submissions since the Weaver's Cove submittal of February 2, 2006. Safety margins are not quantified in the Weaver's Cove proposal in addressing the navigation safety risks presented through this complex waterway, for the proposed vessel transits.

Consequently, to ensure the Coast Guard has a comprehensive understanding of safety, security and environmental impacts of the proposed marine transport of LNG into Fall River via smaller tankers with more frequent deliveries, workshop discussions with state and local law enforcement and public safety officials, a supplemental review, and an opportunity for public comment are necessary.

A. **DEFINITIONS:**

1. **Bare Steerageway:** The minimum speed at which a ship's rudder remains effective in influencing the movement of the vessel; generally between two and three knots per hour of speed.

2. **Coast Guard**: Coast Guard Captain of the Port, Southeastern New England, unless otherwise noted.

3. **Controlling Depth**: As defined by the National Ocean and Atmospheric Administration (NOAA), the least depth in the navigable parts of a waterway, governing the maximum draft of vessels that can enter.

4. **LNG Tanker, or LNG Vessel, or Tanker**: The Coast Guard assumed the following LNG tanker dimensions for this analysis:

   (a.)    Length:  750.0 feet
   (b.)    Beam:     85.0 feet
   (c.)    Draft:    37.5 feet

5. **Letter of Intent (LOI)**: Letter submitted by Weaver's Cove to the Coast Guard on May 12, 2004.

6. **Mean Lower Low Water (MLLW)**: The average of the lower low water height of each tidal day, as measured over a 19-year period. MLLW is the reference point from which water depths are determined and plotted by NOAA on navigation charts.

7. **$m^3$:** Cubic meters, or meters cubed.

8. **PAWSA**: Ports And Waterways Safety Assessment, the two-day navigation safety risk assessment conducted September 7 and 8, 2004.

9. **Revised LOI**: Letter of Intent submitted by Weaver's Cove to the Coast Guard on February 2, 2006.

10. **Safety and Security Zone**: As described in the FEIS, a moving zone patrolled and enforced by Coast Guard and other law enforcement resources, extending 4000 yards ahead, 2000 yards astern, and approximately 500 yards on each side of an LNG tanker during any transit in the waterway between the entrance to Narragansett Bay and Fall River. Safety and security zones are controlled-access areas per 33 CFR 165.20 and 33 CFR 165.30, respectively.

11. **Sandia Report**: The report published by Sandia National Laboratory, U.S. Department of Energy, in December 2004 and entitled "Guidance on Risk Analysis and Safety Implications of a Large Liquefied Natural Gas (LNG) Spill Over Water."

12. **Ship Design Report**: The ship design information provided to the Coast Guard by Weaver's Cove Energy, LLC, via its transmittal letter of February 21, 2007.

13. **Waterway**:

    (a.)    On NOAA chart 13221, that body of water within 500 yards on either side of an approximately 25.4 nautical mile track-line extending from the center of the Pilot Boarding Area on the "Inbound" portion of the Separation Zone (just east of the "NB" buoy at the entrance to Narragansett Bay) and proceeding in a generally northeasterly direction to the charted navigation channel and through the East Passage of Narragansett Bay, east of Gould Island and east of Prudence Island to a point adjacent to Sandy Point; then easterly towards the Mount Hope Bridge and through Mount Hope Bay to the Taunton River; then up the Taunton River to the proposed Weaver's Cove facility in Fall River, Massachusetts.

    (b.)    For the purposes of this report, the waterway has been segmented into three geographically distinct areas:

        (1.)    **Segment One**: From the Narragansett Bay entrance buoy ("NB") north through the East Passage of Narragansett Bay and under the Newport/Pell Bridge to a point adjacent to Sandy Point, Prudence Island. This segment of the waterway is approximately 12.5 nautical miles long.

        (2.)    **Segment Two**: From Sandy Point, Prudence Island, northeasterly under the Mount Hope Bridge and through Mount Hope Bay to the area known at Borden Flats where the federal channel in Mount Hope Bay intersects with the private channel leading to the Brayton Point power plant. This segment of the waterway is approximately 9.6 nautical miles long, the federal channel in Mount Hope Bay is 400' wide, and dredging is assumed down to -37 feet at Mean Lower Low Water (MLLW).

        (3.)    **Segment Three**: From Borden Flats northeasterly into the Taunton River, under the Braga Bridge, through the old and new Brightman Street bridges, to the proposed Weaver's Cove facility on the east bank of the Taunton River in Fall River, Massachusetts. This segment of the waterway is approximately 3.3 nautical miles long, 400' wide, and dredging is assumed down to -37' at Mean Lower Low Water (MLLW).

14. **Weaver's Cove**: Depending upon the context in which it is used, may mean either the geographic site where the proposed LNG terminal is to be built, or the corporation proposing the facility, Weaver's Cove Energy, LLC.

B. **ASSUMPTIONS:** In conducting this analysis, the Coast Guard derived these assumptions to "bound" the issue and guide us in our evaluation:

1. **Aids to Navigation:** It is assumed that the aids to navigation improvements proposed by Weaver's Cove (such as additional buoys, and additional NOAA PORTS (Physical Oceanographic Real Time System) capability) would be installed and operating prior to any tanker transits.

2. **Channel:** It is assumed that the channels in Narragansett Bay, Mount Hope Bay, and the Taunton River will remain in their current configurations, with the exception of depth. The controlling depth of the channels is assumed to be post-dredged depths as indicated in the Weaver's Cove proposal, i.e., -37 feet MLLW (Mean Lower Low Water).

3. **Dredging:** It is assumed that all dredging as proposed is approved and completed, i.e., the Federal Channel dredged to a controlling depth of -37 feet MLLW, and the turning basin to -41 feet MLLW.

4. **New Brightman Street Bridge:** It is assumed that construction of the new Brightman Street Bridge will be completed as designed (with a 200' opening) and permitted under Coast Guard Bridge Permit 8-97-1, as amended.

5. **Old Brightman St. Bridge:** Per Section 1948 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) signed into Federal law on August 10, 2005, "no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge..." Consequently, it is assumed that the Old Brightman Street Bridge will remain in place, in its current configuration (98' opening, on the west side of the navigation channel), but will not be utilized by routine vehicular traffic, as that traffic will be re-routed to the new Brightman Street bridge once construction is complete and the new bridge opened.

   Note: In response to complaints received from two entities regarding the old Brightman Street Bridge, the First Coast Guard District, Boston, Massachusetts, is conducting an investigation in accordance with 33 CFR 116 to determine if the bridge constitutes an unreasonable obstruction to navigation. That investigation does not fall under the purview of the Captain of the Port, and was not considered as part of this analysis.

6. **Range of tide:** Per the National Oceanic and Atmospheric Administration (NOAA), the range of tide between Mean High Water and Mean Low Water at Fall River, Massachusetts, is 4.36 feet, but can vary from as much as 5.41 feet mean spring range of tide to as little as 2.35 feet mean tide level. Range of tide may expand or restrict the available opportunity for sufficient under keel clearance on any given day for an LNG tanker transit.

7. **Scope of Coast Guard Review/Analysis**:

   a. Weaver's Cove has essentially asked the Coast Guard to review its proposal under two scenarios:

Table 1 – Vessel Dimensions and Frequency of Shipments

| Proposed LNG vessels: | Length (ft) | Beam (ft) | Draft (ft) | Volume (m3) | Frequency of Shipments (annual) |
|---|---|---|---|---|---|
| Original LOI: (Letter of May 12, 2004) | 950 | 145 | 37.5 | 145,000[1] | 60 port visits (120 transits of the waterway) |
| Amended LOI: (February 2, 2006), as modified by the Ship Design Report (February 21, 2007) and Environmental Assessment of the Use of Small Ships of November 2006 | 750[2] | 85[2] | 37.5[2] | 55,000 | 120-130 port visits (240 – 260 transits of the waterway) |

[1] The Ship Design Report uses the figure of 155,000m$^3$ of cargo carrying capacity vice the earlier figure of 145,000 m$^3$ for the larger tankers. The increase in cargo carrying capacity is attributed to refinements in cargo containment design coupled with the reduced space occupied by a newer, smaller, propulsion system and smaller fuel tanks.

[2] Weavers Cove has proposed a "range of ship sizes" up to and including the dimensions listed here.

   b. Although Weaver's Cove has asked that the suitability of the waterway be evaluated for both the smaller and larger tanker proposals, it is impractical and inappropriate at this time to devote the resources necessary to evaluate a proposal that assumes the old Brightman Street Bridge will be removed or otherwise altered to accommodate larger tankers, as there is no indication that the status quo will change. Consequently, this evaluation is limited only to the proposal for smaller tankers at the higher number of port visits.

8. **Security**: It was assumed that waterside and shoreside security will be provided for both the inbound and outbound transits, and the pierside offload, per the Vessel Transit Security Plans included as appendices G and H, respectively, to the Waterways Suitability Assessment submitted by Weaver's Cove on November 22, 2006.

9. **Scheduling**:

   a. For the proposed tankers having dimensions up to 750' long x 85' beam x 37.5' draft, the following are some factors that impact the scheduling of a hazardous cargo tanker transit in this waterway:

      (1.) Available daylight (no nighttime transits allowed through the old Brightman Street Bridge).
      (2.) Visibility (no transits in less than two miles visibility along the 25.4 nautical mile transit route).
      (3.) Winds (no transit through the old Brightman Street Bridge when winds exceed 15 knots on the beam).
      (4.) Tides (outbound transit of the old Brightman Street Bridge on a flood tide only).
      (5.) Tidal lift (transits through dredged channel in Mount Hope Bay and the Taunton River on a high tide only) to provide sufficient underkeel clearance (10% of tanker draft).
      (6.) Bridge maintenance periods (the old Brightman Street Bridge has been closed for at least one 14-day period for each of the last several years).
      (7.) Per FERC's approval order Environmental Condition #76, "consideration shall be given to scheduling bridge closures to avoid peak traffic periods."
      (8.) Availability of Federal, state, and local waterside and shoreside security forces.
      (9.) Availability of pilots and tugs.

10. **Transits:** For the purposes of discussing navigation within the waterway, and unless otherwise specified, vessel transits are described in terms of inbound transits, daylight only. (Although future nighttime transits are proposed by Weaver's Cove, the Coast Guard has proposed regulations that would limit all commercial vessel transits through the old Brightman St. Bridge to daylight only due to the complexity of the waterway at the two Brightman Street bridges. This is the current marine practice, being followed voluntarily, by the commercial vessel industry. See the Coast Guard Notice of Proposed Rulemaking, "Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence River and Taunton River", Federal Register, Vol. 71, No. 101, May 25, 2006.) Simultaneous transits of LNG tankers (one outbound, one inbound within Narragansett Bay or Mount Hope Bay at the same time) was not proposed or considered.

11. **Underkeel Clearance:** For planning purposes it is assumed that water depth equal to at least 10% of the tanker's draft would be required under the tanker's keel as it transits the waterway. Per the proposed regulations referenced in sub-paragraph 10 above, the Coast Guard is considering maximum draft measures for Narragansett Bay and Mount Hope Bay.

C. **NAVIGTION SAFETY AND SECURITY:**

1. **Segment One:  Transit from the sea buoy through the Narragansett Bay East Passage to Sandy Point (12.5 nautical miles):**

    a.  The waterway of the lower East Passage between Newport and Jamestown is narrow and congested, and is an area of high consequence should an accident or incident occur with other large vessels or infrastructure.  The safety mitigations proposed by Weaver's Cove, many of which are identical to measures currently practiced for transits of Liquefied Petroleum Gas (LPG) to Providence, could adequately address the navigation safety risks, pending further environmental impact analysis commensurate with the proposed smaller tanker and number of transits.

    b.  Assessment of security mitigations for this waterway segment pends further analysis to address the more frequent transit of small LNG tankers, particularly during the summer and fall seasons.

2. **Segment Two:  Transit from Sandy Point through Mount Hope Bay to Borden Flats and the entrance to the Taunton River (9.6 nautical miles):**

    a.  This segment includes areas of noteworthy infrastructure, including the Mount Hope Bridge and Roger Williams University, and the 400'-wide federal channel in Mount Hope Bay.  An accident or incident resulting in a tanker grounding would effectively close Fall River and the Brayton Point and Somerset power plants to commercial marine traffic.  However, the safety mitigations proposed by Weaver's Cove, excepting the proposed draft of the LNG tanker (see assumptions), could adequately address the navigation safety risks associated with transiting this portion of the waterway, pending further environmental impact analysis commensurate with the proposed smaller tanker and number of transits.

    b.  Assessment of security mitigations for transit through this waterway segment pends further analysis of impacts that may result from doubling the number of transits, per the small LNG tanker proposal.

3. **Segment Three:  Transit from Borden Flats to the Weaver's Cove site, Fall River, Massachusetts (3.27 nautical miles):**

    a.  This segment can be characterized as narrow, winding, and in close proximity to significant populations and infrastructure.  The close proximity to populations include both Fall River and Somerset, Massachusetts; the infrastructure includes a 400 foot wide Federal Channel (dredged to -37 feet) which serves the Brayton Point Power Plant, and Somerset (formerly Montaup) Power Plant opposite the Weaver's Cove site, and passes under the fixed (I-195) Braga Bridge, and through two bascule (Brightman Street) bridges along this waterway segment.

b.  The September 2004 Ports And Waterways Safety Assessment (PAWSA) identified the Taunton River in the Fall River metropolitan region (to include Somerset) as an area of "very high absolute risk" in terms of consequences from a hazardous materials release. Consensus could not be reached when participants were asked if current and/or future mitigations could balance that risk. It is important to note that the 2004 PAWSA assumed:

(1)  The old Brightman Street Bridge would be removed before LNG tanker transits would take place; and
(2)  LNG tanker deliveries to Fall River would be about one per week.

Those assumptions are no longer accurate or conservative, and the presence of an additional bridge, and more frequent proposed deliveries, elevates the risk of an accident with infrastructure.

c.  As a tanker approaches the Braga Bridge from the south, it must turn sharply to port while passing under the bridge, in close proximity to piers and the USS MASSACHUSETTS. Conversely, when approaching the Braga Bridge from the north, a tanker must head directly towards the USS MASSACHUSETTS and the adjacent commercial piers, and then turn sharply to starboard to pass parallel to the USS MASSACHUSETTS and underneath the Braga Bridge. There is minimal room for tugs and escort vessels to react to a loss of power or steering error under the Braga Bridge.

d.  On the approach to the old and new Brightman Street Bridges, a new situation is presented, including adjacent, nearly parallel bascule bridges 1100 feet apart, with openings that are navigationally off-set approximately one ship's width along the revised channel. This configuration results in a compound navigational challenge when considering the proposed tanker's length, breadth, and draft dimensions, the number of assist tugs, and the coordination of security forces. Maneuvering safely and repeatedly through and between both bridges needs to be virtually certain for the proposed frequent hazardous cargo vessel transits. The proximity and arrangement of the old and new Brightman Street Bridges to each other presents a high risk of a vessel striking either or both bridges. Specifically, not only is the old 98-foot wide bridge narrow relative to the 85-foot wide tankers proposed, but a transiting vessel must stop forward momentum to avoid striking the new bridge in a very short distance. Once stopped, the vessel must be moved sideways approximately one hundred feet with tugs and/or bow and stern thrusters, to become aligned in the channel for passage through the opening of the new bridge. Once aligned with the new bridge opening, the vessel must regain steerageway and transit through, and proceed approximately 0.7 miles to the Weaver's Cove berth. A safe transit through these two off-set bridges requires numerous mechanical and behavioral factors to succeed (not fail). Repeatable safe transits are dependent upon the highest probabilities of success for each of the component risk factors. The navigational maneuver that must be successfully executed in each transit to avoid an adverse striking of either bridge is considered very complex. The following risk factors, at a minimum, are deemed relevant to a safe transit:

(1)   Probability of no helmsman error resulting in a bridge allision.
(2)   Probability of no engine order telegraph operator error resulting in a bridge allision.
(3)   Probability of no conning error by pilot(s)/master resulting in a bridge allision.
(4)   Probability of no human error by ship's bow and/or stern thrusters' operator.
(5)   Probability of no human error by any of three tug operators that adversely affect control of the tanker.
(6)   Probability of no mechanical error in any of the three tugs adversely affecting control of the tanker while transiting a bridge.
(7)   Probability of no coordination error between pilots when two pilots are in the wheelhouse, adversely affecting safety during bridge transits.
(8)   Probability of no ship steering failure resulting in bridge allision.
(9)   Probability of no loss of ship's main propulsion resulting in a bridge allision.
(10)  Probability of accurate vessel draft and under-keel clearance calculation for transit without grounding in the dredged channel.
(11)  Probability of clear channel without obstructions.
(12)  Probability that favorable wind predictions are accurate and conservative for safe bridge transit, such that gusts do not set the ship onto a bridge while transiting.
(13)  Probability of no mechanical failure of bridge opening systems on the old bridge.
(14)  Probability of no mechanical failure of bridge opening systems on the new bridge.
(15)  Probability of no electrical failure to bridge operating system (old bridge).
(16)  Probability of no electrical failure to bridge operating system (new bridge).
(17)  Probability of no bridge operator error in opening the bridge fully (old bridge).

e.   While the ability of an LNG tanker to withstand the impact of alliding with the fendering system (or indeed, with either Brightman Street Bridge) without suffering major damage is not in doubt, an LNG tanker could damage the fendering system and/or either Brightman Street Bridge to the extent that the bridge and/or the waterway may be closed to all traffic for a prolonged period of time. In such a case, whether the LNG tanker is damaged or not, the navigational effort to maneuver the tanker (presumably stern first) out of the Taunton River and Mount Hope Bay, to Narragansett Bay, would be extraordinary. Note that there is no practical turnaround option available in the 400' wide federal channel north of the Mount Hope Bridge for ships of this length, except in the turning basin adjacent to the Somerset (formerly Montaup) Power Plant facility, opposite the Weaver's Cove site. Such a maneuver, even in a safely aborted bridge transit, may cause inordinate delays to vessel and vehicular traffic, and may cause an arduous, indeterminable burden on security resources enforcing a security zone.

f.   In its smaller tanker proposal, Weaver's Cove indicated that it would like to use vessel drafts up to the depth of water after dredging (37 feet), or even the draft specified in its larger tanker proposal (37.5 feet), with a goal of optimizing the cargo

carriage capacity as the ship design is further refined. Weaver's Cove also indicates a design draft of 34 feet and a scantling draft of 36 feet for modeling, and suggests that changes in these drafts do not significantly affect modeling outcomes. The Coast Guard fully expects that the depth of water under the keel of a ship in a dredged channel, particularly in a relatively narrow river, will in fact make a difference in ship-handling, and margins of safety. A suggestion that the difference in vessel drafts between 34 feet and 37.5 feet in a 37 foot deep channel is insignificant was not supported.

g.  From approximately one mile south of the Braga Bridge, and continuously to the vicinity of the proposed Weaver's Cove site, the federal navigation channel lies in close proximity to downtown Fall River, and within 500- to 1,000-meters from this channel lie population density areas of 1,000 persons per square mile to over 9,000 persons per square mile, as documented in Figure 3-8 of the Weaver's Cove Waterway Suitability Assessment of November 22, 2006. The slow transit speed over an extensive stretch of waterfront, coupled with the close proximity to the shore line through this populated waterway segment creates a security challenge for Coast Guard and other waterborne assets. Similarly, the need for substantial shore-side patrols to protect the proposed frequently transiting vessels from relatively close shore-side buildings, warehouses, vessels and bridge exposures needs further assessment by supporting agencies to adequately address the small tanker/more frequent delivery proposal.

h.  While approaching and proceeding through the Brightman Street bridges, the tanker would proceed at bare steerageway with assistance from one-to-three tugs, and would at one or more points be completely stopped between the bridges while it moves transversely to align itself with the next bridge opening. This procedure might be described as a "locking through" of the vessel between the old and new bridges, and where towing and security forces need to be most effective to mitigate limited maneuverability of the vessel. This 'locking through' would occur up to 260 times per year under this small tanker proposal, and occurs in the waterway segment having the greatest population concentration along the 25.4 nautical mile inland route, and in the vicinity of significant infrastructure.

i.  The Vessel Transit Security Plan, Upper Bay (Appendix G to the Waterways Suitability Assessment of November 22, 2006) does not specifically quantify and account for the additional waterside and shoreside resources that will be required to secure the old Brightman Street Bridge.

j.  At Battleship Cove, the USS MASSACHUSETTS museum ship hosts approximately 90,000 visitors annually, including approximately 24,000 students and scouts who sleep aboard the vessel for various functions throughout the year. This vessel is approximately 95 feet outside of the channel. A recommendation or determination on the disposition of visitors to Battleship Cove while an LNG tanker passes is not included in the proposal.

k.    Except to say that the tanker may remain at the pier, the proposal does not adequately describe the contingency plans and impacts of maintaining adequate government water-borne security should an LNG vessel remain indefinitely at the Weaver's Cove facility due to a breakdown of the vessel, damage to the bascules of either Brightman Street bridge, or unfavorable tide and weather parameters.

l.    Assessment of security forces and mitigations for secure transit through this waterway segment pend further identification and analysis of impacts resulting from doubling the number of vessel transits in the small LNG tanker proposal to 130 ship arrivals, and 260 transits per year. This would include assessment of security agreements, capabilities, training, and capacities of state and local authorities, noting the near proximity of the transit route to populations, buildings, and infrastructure on the Fall River and Somerset waterfronts.

## 4.  Security burden:

a.    The security burden of boarding vessels offshore and escorting them through near-shore waters and 25.4 miles of inland waters may involve four hours or more from the time when the vessel begins its transit from the off-shore boarding location. Once moored, security presence continues for the expected 24-hour off-loading period. Upon completion, the escort flotilla would begin a moving security zone for the outbound voyage, another four hours or so. Outbound transits depend on conditions being favorable for transit.

b.    The limitations of daylight, favorable wind conditions, visibility, tidal lift, avoidance of commuter hour traffic, and external demands on security resources present challenges for scheduling and coordinating security resources. The inability to control several environmental factors appears to preclude accurate forecasting and projecting of a relatively well-defined schedule, with adequate contingencies to mitigate the uncertainty of demands on security resources.

D. **ENVIRONMENTAL IMPACT:**

1. **Transit from the sea buoy through the Narragansett Bay East Passage to Sandy Point and to Borden Flats and the entrance to the Taunton River:** The environmental impact of the revised proposal using smaller tankers at more frequent delivery intervals cannot be adequately assessed within the current Environmental Impact Statement (EIS) published by FERC. Consequently, the Coast Guard will require further environmental review, including assessment of impacts to vehicular traffic over the Newport and Mount Hope bridges.

2. **Transit from Borden Flats to the Weaver's Cove site, Fall River, Massachusetts:** The environmental impact of the revised proposal using smaller tankers at more frequent delivery intervals cannot be adequately assessed within the current Environmental Impact Statement (EIS) published by FERC. Consequently, the Coast Guard will require further environmental review, including assessment of impacts to vehicular traffic over the Braga Bridge. Additionally, the following items surrounding the old Brightman Street Bridge are readily apparent and are of special concern in terms of environmental (socio-economic) impacts.

   a.  Increased openings of the Old Brightman Street Bridge: Currently, the old Brightman Street Bridge opens approximately 900 times per year to allow commercial and recreational traffic to pass. At 130 additional LNG deliveries per years, that would equate to about 520 additional openings of the old Brightman Street bridge, computed as follows:

   There would be at least four openings per delivery of product by an LNG vessel.

   (1)  For an inbound transit, the old Brightman Street Bridge would open to permit passage of the LNG vessel, tugs, and security escort vessels, and then close.
   (2)  After the LNG vessel is safely moored at the Weaver's Cove facility, the bridge would again open to permit passage of tugs that had been tending to the LNG vessel.
   (3)  For outbound transits, the bridge would open to allow tugs passage north toward the Weaver's Cove facility and then close.
   (4)  The bridge would reopen when the outbound LNG vessels with tugs required passage.

   Note:  This does not account for any bridge openings that may be required to permit passage of security or logistics vessels while the LNG vessels is pierside and off-loading product at the Weaver's Cove facility.

   b.  The expected additional 520 (plus) bridge openings of the old Brightman Street Bridge annually over the current average of 900 openings, represents an increase of at least 58%. Given the age and condition of that bridge, particularly the bascule mechanisms, and considering the current maintenance required of the Massachusetts Highway Department to keep the bridge operating to meet its current demand, the

impact on the reliability of the bascule's opening mechanism may need to be addressed.

c.  The safety and security zone encompassing the tanker would effectively stop recreational traffic in the Taunton River for its transit through the old and new Brightman Street bridges, a period of time that needs to be re-assessed in light of the retention of the old Brightman Street Bridge and smaller tanker proposal.

d.  A comprehensive assessment of access to a proper and safe area of refuge in the case of a fire emergency has not been provided. The turning basin off of the Weaver's Cove facility appears to be the primary proposed location to move a vessel in an emergency. In the case of a fire involving an LNG vessel's cargo, the turning basin location may place vessels moored at the Somerset (formerly Montaup) power plant, the power plant itself, and coal stored at the power plant at risk. The identification of the turning basin between Weaver's Cove and the Somerset power plant as the refuge for an LNG ship fire emergency would need to be supported with regard to the expected radiant heat flux emanating from an LNG tanker fire.

e.  The waterway and economic impact of the smaller tanker proposal on the sailing, yacht-racing, recreational boating and cruise ship activities prevalent in the Newport/lower Narragansett Bay area, with 130 arrivals (and 260 transits), is not adequately accounted for in the information submitted by Weaver's Cove. Consequently, the Coast Guard will require further review of these impacts.

# ATTACHMENT 8

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commanding Officer
U.S. Coast Guard
Sector Southeastern New England

1 Little Harbor Road
Woods Hole, MA  02543
Phone: 508-457-3219
Fax: 508-457-3236-
Email: Edward.G.LeBlanc@uscg.mil

16000
October 24, 2007

BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Gordon Shearer
Chief Executive Officer
Weaver's Cove Energy, LLC
One New Street
Fall River, MA  02720

Dear Mr. Shearer

This is my Letter of Recommendation issued pursuant to 33 C.F.R. § 127.009. It is issued in response to your Letter of Intent of May 12, 2004 proposing to transport Liquefied Natural Gas (LNG) by ship to your terminal in Fall River, Massachusetts using large tankers, as amended by your change of information letter dated February 2, 2006 proposing smaller LNG tankers. In making this recommendation, I have compiled and considered a comprehensive administrative record. A complete listing of the documents I considered in making my recommendation is contained in enclosure (1) of this letter, and those documents are incorporated by reference herein. This record includes the additional documentation submitted by you and your counsel in response to my May 9, 2007 letter. I also considered information obtained during my observation of a simulated transit on May 24, 2007, and my own observations of the waterway while onboard deep-draft vessels transiting through Mount Hope Bay and the Taunton River. Enclosure (2) contains my factual determinations, analysis, and detailed recommendations in arriving at an ultimate recommendation.

This Letter of Recommendation is based upon my review of the aforementioned record, and my observations and knowledge of current commercial vessel traffic using the transit route along which you propose. My ultimate recommendation is that the waterway from near Sandy Point, Prudence Island, Rhode Island at approximate position 41° 36' 21"N, 071° 18' 13"W to the proposed facility in Fall River, Massachusetts, is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG marine traffic associated with your proposal.

As I have determined that the above described segment of the proposed transit route is unsuitable from a navigation safety perspective, an exhaustive analysis of the other segments of the intended transit route described in my letter of May 9, 2007 and other factors relevant to waterway suitability for LNG traffic, such as maritime security, were not further analyzed in detail. Therefore, no additional public meetings and workshops with state and local officials, to further address security risks, resource demands, capabilities and coordination requirements, will be held. Moreover, as I view the safety of navigation as paramount, my recommendation that the waterway is unsuitable generated no additional environmental documentation requirements.

16000
October 24, 2007

The environmental impact of my sole alternative holding that the waterway is unsuitable due to navigation safety determinations is discussed in the May 20, 2005 FERC final environmental impact statement, incorporated by reference herein. I therefore adopt that document.

The determinations, analysis, and ultimate recommendation as to the suitability of this waterway for LNG transits between Sandy Point and Weaver's Cove, as contained in this letter and its enclosures, would be referenced in concert with a Captain of the Port Order, should an LNG transit be attempted along this waterway segment. Such an order would be issued pursuant to my authority under the Ports and Waterways Safety Act of 1972, as amended by the Port and Tanker Safety Act of 1978, 33 U.S.C. §1223, et seq, among other authorities.

Should there be significant changes to the characteristics of the waterway prior to the expiration of FERC's approval order in July 2010, Weaver's Cove may submit a new Letter of Intent in accordance with 33 CFR §127.007.

If you feel aggrieved by this action, you may request reconsideration by me pursuant to 33 C.F.R. §127.015(a). Your request for reconsideration must be submitted to me, in writing, within 30 days of receipt of this letter. If the delay in presenting a written request for reconsideration would have an adverse impact on your operations, you may request to make an oral presentation, but your written request must be submitted within five days of your oral presentation.

If you have questions, my point of contact is Mr. Ed LeBlanc of the Sector Southeastern New England Waterways Management Branch. He may be reached at the address, phone number, and e-mail address listed above.

Sincerely,


ROY A. NASH
Captain, U.S. Coast Guard
Captain of the Port
Southeastern New England


Enclosure: (1) Administrative Record
(2) Determination of Unsuitability

Copy: Commander, First Coast Guard District (d, dp, dl)
Commander, Atlantic Area (Am)
Commandant (CG-3PSO)
Federal Energy Regulatory Commission
Mass and RI Congressional delegations
Mayor, City of Fall River
Applicable state and local agencies

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| | Date Signed / Published | Document Originator | Document Title or Subject |
|---|---|---|---|
| 1. | March 13, 2000 | Dr. A.M. Rothblum, Coast Guard Research & Development Center | "Human Error and Marine Safety." Presented at the Maritime Human Factors Conference 2000, Linthicum, MD, March 13-14, 2000. |
| 2. | January, 2004 | NOAA | Chart 13226, Mount Hope Bay |
| 3. | May 12, 2004 | Weaver's Cove LLC | Letter of Intent |
| 4. | September 1, 2004 | Coast Guard Marine Safety Office Providence | Docket CGD01-04-093, Notice, Request for Comments; Letter of Recommendation, LNG Facility Weaver's Cove, Fall River, MA |
| 5. | September 7, 2004 | Coast Guard Marine Safety Office Providence | Ports and Waterways Safety Assessment (PAWSA) Workshop Report, Narragansett Bay |
| 6. | May 20, 2005 | FERC | FERC Final Environmental Impact Statement (FEIS) |
| 7. | June 14, 2005 | Commandant (G-MSO-2), U.S. Coast Guard | Guidance on Assessing the Suitability of a Waterway for Liquefied Natural Gas (LNG) Marine Traffic, Navigation and Vessel Inspection Circular (NVIC) No. 05-05 |
| 8. | June 27, 2005 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 9. | July 7, 2005 (date received) | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 10. | July 27, 2005 | Captain of the Port, Southeastern New England | Response to Fall River letter of June 27, 2005 |
| 11. | August 10, 2005 | Mitt Romney, Governor of Massachusetts | Weaver's Cove Energy, LLC Docket #CP04-36-00 |
| 12. | August 30, 2005 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 13. | October 26, 2005 | Marine Safety International | Brightman Street Bridge Simulation Report |
| 14. | December 27, 2005 | Commandant (G-MSO-2), U.S. Coast Guard | Petition for rulemaking regarding thermal and vapor dispersion zones |

Page 1 of 4

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| | | | |
|---|---|---|---|
| 15. | January 6, 2006 | Captain of the Port, Southeastern New England | Operations in the Vicinity of the Naval Undersea Warfare Center, Newport, RI |
| 16. | February 2, 2006 | Weaver's Cove LLC | Amended Letter of Intent |
| 17. | February 7, 2006 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, Docket #CGD01-04-093 |
| 18. | February 17, 2006 | Senator Edward M. Kennedy, et al | Letter to FERC re: Weaver's Cove Energy |
| 19. | February 24, 2006 | City of Fall River, Massachusetts | Weaver's Cove Energy, LLC, U.S. Coast Guard Docket #CGD01-04-093, FERC Docket #CP04-36 |
| 20. | February 24, 2006 | Senator Lincoln Chaffee | Letter to Captain Mary E. Landry re: Weaver's Cove Energy Change of Information Letter |
| 21. | March, 2006 | NOAA | Chart 13227, Fall River Harbor |
| 22. | March 4, 2006 | Commander (dpb), First Coast Guard District | Memo regarding Brightman Street Bridge |
| 23. | March 7, 2006 | New England District, Corps of Engineers | Weaver's Cove Energy (WCE) proposed dredging of the Taunton River |
| 24. | March 8, 2006 | Senator Edward M. Kennedy, et al | Letter to Coast Guard Commandant re: Weaver's Cove Energy |
| 25. | March 13, 2006 | Captain of the Port, Southeastern New England | Letter to Weaver's Cove Energy re: Navigation Safety |
| 26. | March 13, 2006 | Senator Jack Reed, et al | Letter to Captain Roy A. Nash re: Weaver's Cove Energy |
| 27. | March 17, 2006 | New England District, Corps of Engineers | Docket number CP04-36-000 concerning Weaver's Cove Energy (WCE) proposed dredging of the Taunton River in conjunction with the construction of a Liquefied Natural Gas (LNG) Terminal in Fall River, Massachusetts |
| 28. | March 27, 2006 | Weaver's Cove LLC | Response to Captain of the Port, Southeastern New England, letter of March 13, 2006 |
| 29. | April 3, 2006 | KeySpan LNG | Weaver's Cove March 27, 2006 Letter |
| 30. | April 6, 2006 | Commandant (G-PWB), U.S. Coast Guard | Preliminary Investigation of the Brightman Street Bridge Across the Taunton River, Mile 2.1, Between Somerset and Fall River, Masssachusetts |

Page 2 of 4

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| 31. | May 5, 2006 | Representative David B. Sullivan | Weaver's Cove Energy |
|---|---|---|---|
| 32. | May 25, 2006 | Commander, First Coast Guard District | Notice of Proposed Rulemaking "Regulated Navigation Area: Narragansett Bay, RI and Mount Hope Bay, MA, Including the Providence and Taunton River". |
| 33. | June, 2006 | NOAA | Chart 13221, Narragansett Bay |
| 34. | June 28, 2006 | Captain of the Port, Southeastern New England | Status of Coast Guard review of Weaver's Cove proposal |
| 35. | August 21, 2006 | Weaver's Cove LLC | Weaver's Cove comments on Notice of Proposed Rulemaking |
| 36. | November 2006 | Weaver's Cove LLC | Environmental Assessment of the Use of Smaller Ships |
| 37. | November 22, 2006 | Weaver's Cove LLC | Waterway Suitability Assessment |
| 38. | February 21, 2007 | Weaver's Cove LLC | Additional Smaller LNG Ship Design, Navigational, and Operational Data |
| 39. | March 20, 2007 | Weaver's Cove LLC | Sandia Zones |
| 40. | April 3, 2007 | Captain of the Port, Southeastern New England | Response to Weaver's Cove regarding navigation issues |
| 41. | May 2007 | Northeast Marine Pilots | "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River" |
| 42. | May 8, 2007 | Eighth Coast Guard District Bridge Branch | Navigation Review, Brightman Street Bridge Across the Taunton River, Mile 1.8, Between Fall River and Somerset, Massachusetts |
| 43. | May 9, 2007 | Weaver's Cove LLC LLC | Initial reply to Coast Guard letter of May 9, 2007 |

Page 3 of 4

U.S. Coast Guard Sector Southeastern New England
Letter of Recommendation, Weaver's Cove LLC
Enclosure (1), Administrative Record

| 44. | May 9, 2007 | Captain of the Port, Southeastern New England | Preliminary Assessment of Suitability |
|---|---|---|---|
| 45. | May 25, 2007 | Baker Botts LLP | Transmittal of "Feasibility Report" from Northeast Marine Pilots |
| 46. | June 6, 2007 | Baker Botts LLP | Letter of Recommendation process |
| 47. | June 8, 2007 | Baker Botts LLP | Maritime Security |
| 48. | June 12, 2007 | Baker Botts LLP | Transmittal of Brightman Street Bridge Simulation Report from Marine Safety International |
| 49. | June 20, 2007 | City of Fall River | Weaver's Cove Energy LLC |
| 50. | July 18, 2007 | Weaver's Cove LLC | Detailed rebuttal to Coast Guard letter of May 9, 2007 |
| 51. | July 27, 2007 | Baker Botts LLP | Letter of Recommendation process |
| 52. | August 9, 2007 | Captain of the Port, Southeastern New England | Consolidated response to eight letters from Weaver's Cove and Baker Botts LLP. |
| 53. | August 9, 2007 | Weaver's Cove LLC | Weaver's Cove comments on the city of Fall River's letter to the Coast Guard of June 20, 2007 |
| 54. | October, 2007 | National Oceanic and Atmospheric Administration (NOAA) | Coast Pilot 2, 36th Edition, Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ, 2007 |
| 55. | October 2, 2007 | Captain of the Port, Southeastern New England | Waterways Analysis and Management System (WAMS) Review, Narragansett Bay, Rhode Island and Mount Hope Bay, Rhode Island and Massachusetts |
| 56. | October 16, 2007 | Coast Guard Marine Information for Safety and Law Enforcement (MISLE) database | Vessel Critical Profile, M/V WINTERSET |
| 57. | October 16, 2007 | Coast Guard Marine Information for Safety and Law Enforcement (MISLE) database | Vessel Critical Profile, M/V CLIPPER RANGER (renamed to M/V ANDERMATT) |

Page 4 of 4

## A. PROCEDURAL BACKGROUND

1. On December 19, 2003, Weaver's Cove, LLC submitted an application to the Federal Energy Regulatory Commission (FERC) to operate a liquefied natural gas (LNG) terminal in Fall River, Massachusetts. On May 20, 2005 FERC issued its final environmental impact statement for the proposal and on July 15, 2005 FERC authorized Weaver's Cove, in its Order CP-04-0036-000, to site, construct and operate an LNG terminal. On April 17, 2006 FERC denied numerous requests to reconsider their decision and reopen the proceedings.

2. One of the conditions precedent to operation was the completion of a Coast Guard Letter of Recommendation finding the waterway suitable for the transit of LNG tankers. The complete FERC docket can be found at http://www.ferc.gov/industries/lng/indus-act/terminals/exist-prop-lng.asp.

3. On May 12, 2004, Weaver's Cove submitted a letter of intent (LOI) pursuant to 33 CFR §127.007 to transport LNG by ship to its proposed terminal in Fall River, Massachusetts by way of Narragansett Bay and Mount Hope Bay, portions of which lie in Rhode Island. The original letter of intent proposed 50-60 transits per year to the Weaver's Cove terminal, using tanker ships 975' long by 145' beam, with a 37.5' draft.

4. On August 10, 2005, the President signed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub.L. 109-59. Section 1948 of that Act states that "no Federal funds shall be obligated or expended for the demolition of the existing Brightman Street Bridge…" That bridge, which crosses the transit route proposed by Weaver's Cove in its Letter of Intent, allows only vessels that may safely pass through the 98-foot wide horizontal opening to transit. Subsequent to the Act, Weaver's Cove submitted an amended LOI on February 2, 2006, proposing to use smaller tankers of approximately 725' long by 82' wide by 36' draft. These tankers would make about 120 to 130 deliveries each year. On February 21, 2007, Weaver's Cove provided information on modeling and simulations for its revised proposal. On May 9th, 2007, the Coast Guard Captain of the Port provided Weaver's Cove with the results of his preliminary analysis of the revised LOI, navigation simulations, and modeling information. Weaver's Cove continued to submit information, though not requested, and eight additional submissions between May 9th and August 8th, 2007 were received. In addition, representatives for Weaver's Cove met with the Captain of the Port on May 24th, 2007, and September 4th, 2007, to present a simulated transit, and to discuss the Letter of Recommendation process, respectively.

## B. FACTUAL DETERMINATIONS

1. <u>General Description of Waterway</u>: As described in the FEIS and the Letter of Intent as amended LNG tankers would transit the waterway to the Weaver's Cove waterfront LNG facility "via the East Passage of Narragansett Bay and the federal navigation channel in Mount Hope Bay and the Taunton River." For the purposes of this Letter of Recommendation, the waterway described in the FEIS was further segmented to facilitate a navigation safety analysis.

2. <u>Waterway Segments</u>:

   a. **Segment One**: This segment of the waterway is approximately 12.5 nautical miles long, extending from the Narragansett Bay entrance buoy ("NB") north through the East Passage of Narragansett Bay and under the Newport/Pell Bridge to a point adjacent to Sandy Point, Prudence Island, Rhode Island. The U.S. Coast Pilot 2 (Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as the "East Passage" as:

      > "East Passage, the principal passage in Narragansett Bay, extends between Rhode Island on the East and Conanicut and Prudence Islands on the west. It is the most direct route to...Mount Hope Bay, and Taunton River.
      >
      > The Newport Bridge, a fixed highway suspension bridge, crosses East Passage about 3.6 miles above the entrance, between Jamestown and Newport...A privately maintained fog signal is sounded at the Bridge.
      >
      > The mean range of tide is 3.5 feet...In the entrance (to the East Passage) the flood current is often irregular. There may be a long period of slack water preceding the flood, or there may be a double flood. The flood reaches a strength of about 1.2 knots; the ebb is regular and averages 1.5 knots at strength."

      As described in FERC's FEIS (enclosure (1), document 6) "this segment is relatively wide (0.25 to 0.75 mile) and deep (60 to 120 feet)." The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway. Appendix A is a chartlet of Segment One, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 3, 6, 33, and 54, among others.

   b. **Segment Two**: This segment of the waterway is approximately 9.6 nautical miles long and extends from the East Passage at Sandy Point, Prudence Island,

northeasterly under the Mount Hope Bridge and through Mount Hope Bay to the area known at Borden Flats where the federal channel in Mount Hope Bay intersects with the private channel leading to the Brayton Point power plant. This segment includes areas of noteworthy infrastructure, including the Mount Hope Bridge and Roger Williams University, and the 400-foot wide federal channel in Mount Hope Bay. The controlling depth for this segment of the waterway is 35 feet MLLW. Weaver's Cove has proposed to dredge the Federal channel to a depth of 37 feet MLLW. The U.S. Coast Pilot 2 (Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as "Mount Hope Bay" as:

> "Mount Hope Bay, in the northeastern part of Narragansett Bay, is the approach to the city of Fall River and Taunton River. There are two approaches to the bay. The approach from the Sakonnet River...is little used. The approach from East Passage is well marked, and with care 34 feet can be carried in the channel into the bay.
>
> Mount Hope Bridge crosses the entrance to Mount Hope Bay between Bristol Point and Rhode Island. The bridge has two lighted towers which are visible for many miles in clear weather and a racon. It is a high-level suspension highway bridge with a clearance of 135 feet.
>
> Borden Flats, the shoal area northward of the channel in Fall River Harbor, is marked by a light equipped with a fog signal.
>
> A Federal project provides for a channel 35 feet deep through Mount Hope Bay to about 0.9 miles above the Bright Street Bridge across the Taunton River at Fall River."

The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway. Appendix B is a chartlet of Segment Two, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 2, 3, 6, and 54, among others.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 1A, Waterway Segment Two, Mount Hope
Bay:



c. **Segment Three:** This segment of the waterway is approximately 3.3 nautical miles long, and extends from Borden Flats northeasterly into the Taunton River, under the Braga Bridge, through the old and new Brightman Street bridges, to the proposed Weaver's Cove facility on the east bank of the Taunton River in Fall River, Massachusetts. This segment can be characterized as narrow, winding, and in close proximity to significant populations and infrastructure. Densely populated areas in close proximity to this segment include both Fall River and Somerset, Massachusetts; infrastructure includes three bridges and a 400 foot wide Federal Channel which serves the Dominion power plant at Brayton Point, and the NRG power plant opposite the Weaver's Cove site. The controlling depth for this segment of the waterway is 35 feet MLLW. Weaver's Cove has proposed to dredge the Federal channel in this area to a depth of 37 feet MLLW, and dredge the turning basin north of the Brightman Street bridge to a depth of 41 feet MLLW. The U.S. Coast Pilot 2 (Atlantic Coast: Cape Cod, MA to Sandy Hook, NJ), published by the National Oceanic and Atmospheric Administration (NOAA) (see enclosure (1), document 54) describes this segment, commonly referred to as the "Taunton River":

> At Fall River, two highway bridges cross Taunton River. The first, a fixed bridge at State Pier, has a (vertical) clearance of 135 feet; a privately maintained fog signal is sounded from the bridge. The second, Brightman Street Bridge, about 1.1 miles above the fixed bridge at State Pier, has a bascule span with a (vertical) clearance of 27 feet….In October 2000, a replacement bascule bridge was under construction about 0.2 miles above the

existing Brightman Street Bridge with a design clearance of 60 feet.

The mean range of tide is 4.4 feet at Fall River and 2.8 feet at Taunton.

In Taunton River the currents generally follow the direction of the channel and, except at bridges, do not hinder navigation. The ebb is usually stronger than the flood.

The Coast Guard periodically conducts a Waterways Analysis and Management System (WAMS) review of the aids to navigation system in this segment, the most recent completed in October, 2007, which found the aids-to-navigation system to be adequate for current users of the waterway. Appendix C is a chartlet of Segment Three, and more detailed narrative descriptions of this segment can be found in enclosure (1), documents 3, 6, 21, and 54, among others.



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 1B, Waterway Segment Three, Borden Flats and Taunton River:



(1) From approximately one mile south of the Braga Bridge, and continuously to the vicinity of the proposed Weaver's Cove site, the federal navigation channel lies in close proximity to downtown Fall River, and within 500- to 1,000-meters from this channel lie population density areas of 1,000 persons per square mile to over 9,000 persons per square mile. See in Figure 3-8 of the Weaver's Cove Waterway Suitability Assessment of November 22, 2006 (enclosure (1), document 37).

(2) At Battleship Cove, the USS MASSACHUSETTS museum ship hosts approximately 90,000 visitors annually, including approximately 24,000 students and scouts who sleep aboard the vessel for various functions throughout the year. This vessel is approximately 95 feet outside of the channel.

(3) As a tanker approaches the Braga Bridge from the south, it must turn approximately 55 degrees to port while passing under the bridge, in close proximity to piers and the USS MASSACHUSETTS. Conversely, when approaching the Braga Bridge from the north, a tanker must head directly towards the USS MASSACHUSETTS and the adjacent commercial piers, and then turn approximately 55 degrees to starboard to pass parallel to the USS MASSACHUSETTS and underneath the Braga Bridge.

Page 6 of 30

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 2A, Passing USS Massachusetts Museum*



*The USS Massachusetts is 681 feet long and lies approximately 95 feet outside of the
navigation channel.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 2B, Passing USS Massachusetts Museum



(4) The September 2004 Ports and Waterways Safety Assessment (PAWSA) identified the Taunton River in the Fall River metropolitan region (to include Somerset) as an area of "very high absolute risk" in terms of consequences from a hazardous materials release. (See enclosure (1), document 5.) Weaver's Cove was a participant in this Assessment. Consensus could not be reached when participants were asked if current and/or future mitigations could balance that risk. It is important to note that the 2004 PAWSA assumed:

    1. The old Brightman Street Bridge would be removed before LNG tanker transits would take place; and

    2. LNG tanker deliveries to Fall River would be about one per week.

(5) A notable feature of this segment is the proximity of the old and new Brightman Street bridges to each other, the difference in their horizontal opening clearances (98 feet and 200 feet, respectively), and the alignment of their openings with respect to each other, and to the Federal channel. These bridges and their impact

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

on the waterway are more fully discussed below.  See Figures 3A and 3B below for aerial views the Brightman Street bridges.

Figure 3A, Aerial View of Brightman Street Bridges from the southwest:




Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 3B, Aerial View of Brightman Street Bridges from the east:



(6) As illustrated in figure 3B, the separation between the nearly parallel old and new Brightman Street bridges is approximately 1100 feet (See enclosure (1), documents 13 and 16. With the respect to the navigation channel, the bridge openings of the old and new bridges are navigationally off-set, requiring a transiting vessel to stop (or be stopped by tugs) between the bridges, be moved laterally approximately 100 feet, and then proceed forward through the next bridge opening. The opening of the old Brightman Street bridge (southernmost of the two) is 98 feet wide and is located adjacent to the western edge of the navigation channel. The opening of the new Brightman Street bridge is 200 feet wide and is located in the center of the navigation channel. When passing through the old Brightman Street Bridge on an inbound transit, the new Brightman Street Bridge is directly ahead. See Figures 4A and 4B. Conversely, when passing through the new Brightman Street Bridge on an outbound transit, the old Brightman Street Bridge is directly ahead. See Figures 5A and 5B.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 4A, Inbound through the Old Brightman Street Bridge



Figure 4B, Inbound through the Old Brightman Street Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 5A, Outbound through the New Brightman Street Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 5B, Outbound through the New Brightman Street Bridge



(7) In its May 2007 feasibility report (enclosure (1), document 41), the Northeast Marine Pilots indicated concern about the adequacy of the bridge fendering system, particularly the fendering system of the old Brightman Street bridge. The Pilots suggest that the fendering in the old bridge "must be returned to the original design and status so that vessels can make contact with the fendering so that there is no damage to the bridge or the vessel." The report indicates that the fendering system has not been maintained properly over the last 25 years. Although an impact assessment of the fendering system of the new Brightman Street bridge was included with the original Weaver's Cove Letter of Intent, no similar impact assessment for the fendering system of the old Brightman Street bridge was submitted. (See enclosure (1), documents 3 and 16.)

(8) Current commercial traffic through the Brightman Street bridges consists primarily of coal carrying ships, tug/barge combinations, and occasionally heavy fuel barges to the NRG power plant. In nearly every instance tugs are required to safely complete navigation through the two Brightman Street bridges for any commercial vessel. Typical transits of commercial coal ships include, among other tugs, a tug tethered to the stern of the ship to serve as an additional brake and stopping mechanism to a ship's engines turning propellers in the astern direction. See Figure 6. A tethered tug

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

astern, while absolutely necessary to ensure a commercial vessel transiting through
one Brightman Street bridge does not impact the other bridge, nonetheless essentially
adds to the length of any tug/ship combination, further reducing available room for
maneuvering between the two bridges

Figure 6, Tug Astern of coal ship, passing through old Brightman Street Bridge



(9) Other vessels:  There are other vessels that routinely berth adjacent to the channel,
particularly in the vicinity of the Braga Bridge.  There, the channel passes within
approximately 120 feet of the State Pier, which houses a container facility and
shipping terminal.  Fishing and commercial container vessels routinely berth between
the west end of the State Pier and the east edge of the shipping channel.  The USS
MASSACHUSETTS museum is berthed to an appendage on the north side of the
State Pier, and its stern is within approximately 95 feet of the channel.  See figures
7A and 7B.



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 7A, approaching State Pier & USS Massachusetts museum, & under the Braga
Bridge



Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Figure 7B, passing State Pier, & under the Braga Bridge



(10)  With respect to navigating through the two Brightman Street Bridges, following
are some factors that currently impact most commercial traffic using this waterway
segment, and would likewise impact LNG traffic.

(a)  Daylight.  There are currently no nighttime transits by commercial shipping
traffic through the two Brightman Street bridges, and pilots will not make a night
time transit with the current configuration of the waterway.  Daytime-only
transits have been proposed as a Federal regulation.  See the notice of proposed
rulemaking "Regulated Navigation Area: Narragansett Bay, RI and Mount Hope
Bay, MA, Including the Providence River and Taunton River", Coast Guard
docket CGD01-06-052, published in the Federal Register on May 25, 2006, Vol.
71, No. 101, pages 30108-30112. (See enclosure (1), document 32.)

(b)  Visibility.  Current practice by marine pilots calls for no transits in less than
one mile visibility.

(c)  Winds:  Current practice by marine pilots calls for no transit through the old
Brightman Street Bridge when winds exceed 12 knots sustained, 15 knot gusts,
on the beam.  Excessive wind on the beam decreases control and

maneuverability of the ship in close quarters situations, and could lead to allisions, collisions or groundings.

    (d)  Tides: Outbound transits of the old Brightman Street Bridge are conducted on a flood tide only to ensure sufficient water flow over a vessel's rudder as it proceeds at very slow speed through the opening of the bridge. Water flow over the rudder provides a vessel with some level of control over its own movement through the 98-foot wide bridge opening, where tugs are of limited effectiveness while the vessel is actually within the bridge opening.

    (e)  Inbound transits of a laden LNG tanker through the dredged channel in Mount Hope Bay and the Taunton River are possible only with sufficient tidal lift. A delay in the transit while the tanker is in one of these channels could result in the vessel losing its tidal lift and could cause temporary grounding.

    (f)  Air Draft: In the waterway from Sandy Point to the Weaver's Cove facility, the proposed LNG tankers would have to safely pass beneath the Mount Hope Bridge, the Braga Bridge, and overhead power cables in Fall River. While Weaver's Cove provided no specifics as to the height of its proposed LNG tankers, it did state that the tankers would be designed to safely pass beneath the Mount Hope and Braga Bridges, each of which have a minimum clearance of 135 feet at Mean High Water. The overhead power cables in Fall River have a minimum clearance of 150 feet at Mean High Water, so vessels designed to pass safely beneath the Mount Hope and Braga Bridges would also pass safely beneath the overhead power cables.

d.  The Coast Guard Captain of the Port Southeastern New England, has personally transited Segment Three of the waterway on several occasions on commercial cargo and Coast Guard vessels to observe and gauge the factors affecting navigation safety.

e.  The following additional factual information is provided in accordance with 33 CFR §127.009(d) regarding the waterway directly adjacent to the proposed facility:

    (1).  **Depths of the water**: Proposed to be dredged to a depth of 41 feet MLLW alongside.

    (2).  **Tidal Range**: Per the National Oceanic and Atmospheric Administration (NOAA), the tidal range between Mean High Water and Mean Low Water at Fall River, Massachusetts, is 4.36 feet, but can vary from as much as 5.41 feet mean spring range of tide to as little as 2.35 feet mean tide level.

    (3).  **Protection from the high seas**: The site of the proposed Weaver's Cove facility in Fall River, Massachusetts, is approximately 25.4 miles inland from the entrance to Narragansett Bay.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

(4). **Natural hazards, including reefs, rocks, and sandbars**: Other than insufficient depth of water outside of the 400 federal channel, and outside of the turning basin proposed to be deepened as proposed by Weaver's Cove, the natural hazards, reefs, rocks, and sandbars are as depicted on the NOAA charts 13221, 13226, and 13227.

(5) **Underwater pipelines and cables**: As depicted on NOAA charts 13221, 13226, and 13227.

(6) **Distance of berthed vessel from the channel, and the width of the channel**.

(a.) **Proposed LNG vessel**: As proposed, an LNG vessel berthed at the Weaver's Cove facility would be adjacent to, but not in, the Federal channel and would in fact be adjacent to a turning basin that Weaver's Cove proposes to widen to accommodate LNG vessels.

3. WEAVER'S COVE PROPOSAL

a. On May 12th, 2004, Weaver's Cove LLC submitted a Letter of Intent with respect its proposal to construct and operate a new waterfront facility handling LNG in Fall River, Massachusetts. (This is referred to as the "larger tanker proposal".) The dimensions of LNG tankers, and frequency of tanker portcalls, proposed by Weaver's Cove are contained in Table 1 below.

b. On February 2nd, 2006, Weaver's Cove LLC submitted a "Change of Information Letter of Intent to Operate a Newly Constructed Waterfront Facility Handling LNG." The letter stated that, due to the retention of the existing Brightman Street bridge (a consequence of the SAFETEA-LU Act cited above), utilization of smaller size LNG vessels, with more frequent deliveries, was required. (This is referred to as the "smaller tanker proposal"). The dimensions of LNG tankers, and frequency of tanker portcalls, proposed by Weaver's Cove in this letter are contained in Table 1 below.

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

Table 1 – Vessel Dimensions and Frequency of Shipments

| Proposed LNG vessels: | Length (ft) | Beam (ft) | Draft (ft) | Volume (m3) | Frequency of Shipments (annual) |
|---|---|---|---|---|---|
| Original LOI: (Letter of May 12, 2004) | 950 | 145 | 37.5 | 145,000[1] | 60 port visits (120 transits of the waterway) |
| Amended LOI: (February 2, 2006) | 725 | 82 | 36 | 55,000 | 120-130 port visits (240 – 260 transits of the waterway) |
| Amended LOI: (February 2, 2006), as modified by the Ship Design Report (February 21, 2007) and Environmental Assessment of the Use of Small Ships of November 2006 | 750[2] | 85[2] | 37.5[2] | 55,000 | 120-130 port visits (240 – 260 transits of the waterway) |

   c.  Modeling:  Weaver's Cove submitted a letter with navigation modeling information to
       the Coast Guard on February 21, 2007.  The navigation modeling involved a ship of
       dimensions 732.2 feet long, by 78.8 feet wide, by 33.8 feet draft, and was conducted by
       Marine Safety International (MSI), on behalf of Weaver's Cove LLC.  The reports
       submitted for this modeling effort are contained in enclosure (1), document 38.  The
       Weaver's Cove transmittal letter with this modeling submission stated that the final
       design of the proposed smaller LNG tanker could not be determined, but suggested that
       the dimensions of the smaller tanker may extend to 750 feet long, by 85 feet wide, by
       37.5 feet draft.  Additionally, in May 2007 a report was submitted by the Northeast
       Marine Pilots to Weaver's Cove regarding their assessment in participating in the
       modeling work at MSI.

   (1) Some relevant comments from the report include:

       (a) The Northeast Marine Pilots cautioned that the simulator had "inherent
           limitations" and that the tanker hull design had "not been proven."

_____

[1] The Ship Design Report uses the figure of 155,000m$^3$ of cargo carrying capacity
vice the earlier figure of 145,000 m$^3$ for the larger tankers.  The increase in cargo
carrying capacity is attributed to refinements in cargo containment design coupled
with the reduced space occupied by a newer, smaller, propulsion system and
smaller fuel tanks.

[2] Weavers Cove has proposed a "range of ship sizes" up to and including the
dimensions listed here.

(b) The vessel modeled was not of the dimensions as that of the largest 'small tanker' now proposed, as noted in Table 2 below:

Table 2 – Vessel Dimensions

| | Length (feet) [3] | Beam (feet) | Loaded Draft (feet) |
|---|---|---|---|
| Vessel Modeled[4] | 732.2 | 78.8 | 33.8 |
| Vessel Proposed[5] | 750 | 85 | 37.5 |

(c) The simulation modeling used "one tug on the stern acting as a brake" which is necessitated by the presence of the Brightman Street bridges in close proximity and nearly parallel to each other. While the size of the simulator tug is not specified, Weaver's Cove indicates that the typical length of actual tugs it would employ are from 92 to 95 feet. The length of the towline or distance between the simulated tanker and tug is not specified.

(d) In its simulation report, the Northeast Marine Pilots stated that it had historically piloted vessels up to 90' wide through the old Brightman Street bridge, but has reduced that to 80' in large part because "the new bridge has been built in the center of the federal channel, while the old bridge is on the western limit of the federal channel. Therefore the two bridges do not line up and are in significantly close proximity to each other."

d. Weaver's Cove has proposed various measures to mitigate risks to navigation safety, including dredging the 35-foot deep Federal channel to 37 feet at MLLW, enlarging and dredging to 41-feet deep the turning basin that currently exists adjacent to the facility site, making aids-to-navigation improvements including additional buoys and enhancements to the NOAA PORTS Physical Oceanographic Real Time System, adding improved tanker organic maneuvering capabilities (e.g., bow and stern thrusters) and improved external capabilities such as the use of three tractor tugs and two pilots when maneuvering through the Brightman Street bridges.

---

[3] There is some ambiguity regarding the exact dimensions of the proposed LNG tanker. In its letter of February 2, 2006 (the "smaller tanker" proposal), Weaver's Cove indicates that the size of the proposed LNG tankers would be 725 feet long by 82 feet wide by 36 feet deep. In a subsequent letter dated February 21, 2007 ("Weaver's Cove Energy, LLC, Amended Letter of Intent, Additional Smaller LNG Ship Design, Navigational and Operational Data"), Weaver's Cove proposed a "range of ship sizes" up to and including the dimensions noted here. Consequently, the Coast Guard used the latest information provided by Weaver's Cove, which was for larger "small tankers".

[4] Per the May 2007 report of Northeast Marine Pilots "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River"

[5] Per Weaver's Cove letter of February 21, 2007

    e.  The waterway through which LNG tankers are proposed to transit is described in section 4.12.5 of the FERC FEIS (enclosure (1), document 6), with one major exception. Per Table 4.12.5-1 of that document, LNG tankers would be required to transit under or through the four bridges listed. But, the FERC FEIS assumed that the old Brightman Street Bridge would be "replaced with a bascule type bridge that is to be completed in 2010." (See page 4-260). Per the SAFETEA-LU Act cited above, there are currently no plans to demolish the old Brightman Street Bridge, so that a fifth bridge, in addition to the four listed in Table 4.12.5-1, must be navigated by LNG tankers.

    f.  In its letter of July 18, 2007, Weaver's Cove notes that coal ships are permitted to transit through the two Brightman Street bridges. Weaver's Cove states the "dimensions of the small LNG ships contemplated in (our) revised LOI are comparable to those of the coal ships" and argues that, when compared to coal vessels "comparably sized LNG vessels should be acceptable provided the handling characteristics of the smaller LNG ships are equal to or better than those of the coal ships."

C.  ANALYSIS:

    1.  <u>Waterway.</u>

        a.  **Segment One (entrance of Narragansett Bay to Sandy Point)**. The safety mitigations proposed by Weaver's Cove could potentially address the navigation safety risks associated with transiting this segment of the waterway, pending further maritime security and environmental impact analysis commensurate with the proposed smaller tankers and increased number of transits.

        b.  **Segment Two (Sandy Point to Borden Flats)**. The safety mitigations proposed by Weaver's Cove, excepting that portion of the channel north of Mount Hope Point, could potentially address the navigation safety risks associated with transiting this segment of the waterway, pending further maritime security and environmental impact analysis commensurate with the proposed smaller tankers and increased number of transits. However, once a LNG tanker enters the 400-foot wide Federal channel at a point adjacent to Mount Hope Point, there are very limited options in terms of responding to a disabling incident or accident. In short, once a northbound LNG tanker enters the Federal channel in this segment, they are committed to completing the entire transit – there is no feasible alternative. As such, the navigation safety issues identified for Segment Three are inextricably linked to Segment Two north of the Federal Channel entrance. In the event of a disabling casualty in the Federal Channel in Segment Two for a vessel of the proposed length and draft there appear to be two options: either tow the tanker backwards out of the channel, or tow it through the channel all the way to the Weaver's Cove facility, both subject to sufficient under-keel clearance provided by a favorable tidal lift, among other constraints. Given the situation of the two Brightman Street bridges described

elsewhere in this Letter, the latter option is not feasible. The former option to be towed backwards down the channel would require extraordinary navigational maneuvers and present additional risks. Both options would require additional time, and would preclude use of the channel by other commercial traffic and most recreational traffic during the evolution.

c. **Segment Three (Borden Flats to the Weaver's Cove facility).**

    (1) Listed below are key factors affecting the suitability of this segment of the waterway with respect to navigation safety. The issue of the Brightman Street bridges is discussed in greater detail in below.

        (a) Proximity of the waterway to population concentrations
        (b) Proximity of the Brightman Street Bridges to each other.
        (c) Dimensions and condition of the old Brightman Street Bridge.
        (d) Channel offset between bridges.
        (e) 55-degree turn required beneath and just north of the Braga Bridge.
        (f) Close proximity of the channel to Fall River piers, vessels moored thereto, infrastructure (e.g., I-195/Braga Bridge) and USS MASSACHUSETTS museum complex.
        (g) Conditions favorable to inbound and outbound transits are severely limited by proposed vessel's length, breadth, and draft, available daylight hours, tidal state, wind, minimum two-mile visibility, and infrastructure.

    (2) The PAWSA assumptions that (1) the old Brightman Street bridge would be removed, and (2) transits would be about 50-60 each year are no longer accurate. The presence of an additional (retained) bridge, and the more frequently proposed deliveries (doubled), elevates the risk of an accident or incident and were not considered by the PAWSA.

    (3) The configuration of the two Brightman Street bridges, as they relate to each other and the navigation channel, results in a compound navigational challenge when considering the proposed tanker's length, breadth, and draft dimensions, the number of assist tugs, and the application and coordination of security forces. The proximity and arrangement of the old and new Brightman Street Bridges to each other presents an elevated risk of the proposed vessel striking either or both bridges. The current navigational challenges have been recognized by both marine pilots and the Coast Guard, which has prompted a Federal rulemaking to impose vessel transit conditions and restrictions as described above.

    (4) While approaching and proceeding through the Brightman Street bridges, the tanker would proceed with assistance from one to three tugs, and would at one or more points be completely stopped between the bridges while it moves transversely to align itself with the next bridge opening. This maneuver might be described as a "locking through" of the vessel between the old and new bridges, where towing vessels need to be most effective to mitigate limited

maneuverability of the vessel, compounded by the very limited maneuvering room for multiple vessels associated with the LNG tanker bridge transit in the area. This 'locking through' would occur up to 260 times per year under this small tanker proposal in a waterway segment having significant infrastructure and the greatest population concentration along the 25.4 nautical mile inland route. Maneuvering safely and repeatedly through and between both bridges needs to be virtually certain for the proposed frequent LNG vessel transits. The proximity and arrangement of the old and new Brightman Street Bridges to each other makes safe navigation highly challenging for the proposed vessels. Specifically, not only is the old 98-foot wide bridge narrow relative to the 85-foot wide tankers proposed, but a transiting vessel through the first bascule opening must stop forward momentum to avoid striking the second bridge in a very short distance (less that ¼ ship length). Once stopped, the vessel must be moved sideways approximately one hundred feet with tugs and/or bow and stern thrusters, to become aligned in the channel for passage through the opening of the new bridge. Once aligned with the new bridge opening, the vessel must transit through, and proceed approximately 0.7 miles to the Weaver's Cove berth. The reverse must occur on an outbound transit.

(5) A Coast Guard study has found that "about 75-96% of marine casualties are caused, at least in part, by some form of human error." Other studies have shown that human error has contributed to 84-88% of tanker accidents, and 75% of allisions. (Enclosure (1), document 1.) In addition to the narrow high tide transit window that would provide sufficient underkeel clearance, the close proximity of the Brightman Street bridges to each other, the narrow horizontal opening of the old bridge, and the channel off-set between the two bridges provide very little tolerance for human error while simultaneously introducing numerous risk factors. These risk factors are further compounded by wind, current, and the presence of security boats, among other things. A safe transit through these two bridges requires numerous mechanical and behavioral factors to succeed (not fail). Repeatable safe transits are dependent upon the highest probabilities of success for each of the component risk factors. The navigational maneuver that must be successfully executed in each transit to avoid an adverse striking of either bridge is considered very complex. The following risk factors, at a minimum, are deemed relevant to a safe transit:

(a) Risk/probability of helmsman error, resulting in a bridge allision.
(b) Risk/probability of engine order telegraph operator error, resulting in a bridge allision.
(c) Risk/probability of conning error by pilot(s)/master, resulting in a bridge allision.
(d) Risk/probability of human error by ship's bow and/or stern thruster operator, resulting in a bridge allision.
(e) Risk/probability of human error by any of three tug operators that adversely affects control of the tanker, resulting in a bridge allision.
(f) Risk/probability of mechanical failure in any of the three tugs adversely affecting control of the tanker while transiting a bridge, resulting in a bridge allision.
(g) Risk/probability of coordination error between pilots when two pilots are in the wheelhouse, or between pilot and the master, adversely affecting navigation safety during bridge transits, resulting in a bridge allision.
(h) Risk/probability of ship steering failure resulting in a bridge allision
(i) Risk/probability of loss of ship's main propulsion resulting in a bridge allision
(j) Probability of accurate vessel draft calculation, under-keel clearance, and transit time from sea to allow for bridge transit without grounding in the dredged channel.
(k) Probability of a clear channel without obstructions.
(l) Probability that favorable wind predictions are accurate and conservative for safe bridge transit, such that wind gusts do not set the ship onto a bridge while transiting.
(m) Risk of mechanical failure of bridge opening systems on the old bridge (assuming the bridge is normally in the down position).
(n) Risk of mechanical failure of bridge opening systems on the new bridge.
(o) Risk of electrical failure to bridge operating system (old bridge) (assuming the bridge is normally in the down position).
(p) Risk of electrical failure to bridge operating system (new bridge).
(q) Probability of bridge operator error in opening the old Brightman Street bridge to a full vertical position (assuming the bridge in normally in the down position).

Multiplying the probability of all of these risk factors, considered together for each transit of the bridges, while also considering the difficulty of the maneuver, leads only to a conclusion that the waterway is not suitable for marine traffic of the dimensions, type, and frequency proposed by Weaver's Cove.

d. The current practice by marine pilots is to restrict transits through the two Brightman Street bridges to daylight hours. A fundamental requirement for these transits is to have the very best visibility to judge the current, the wind, and to otherwise see all aspects of a vessel's movement through the narrow bridge opening; this is paramount. The current practice is a clear indication by vessel operators, marine pilots, and the Coast Guard that

night transits through the two Brightman Street bridges would elevate the risk, and consequently the waterway in the vicinity of the Brightman Street bridges is not suitable for night transits.

e.  As proposed by Weaver's Cove, the smaller tankers would be 725 to 750 feet in length. When transiting through the Brightman Street bridges, each tanker would be accompanied by a tug astern of approximately 100 feet in length, which would be "made up" to the tanker's transom by a towline extending approximately 50 or more feet. This tanker/tug combination would essentially act as a single vessel approximately 900 feet in length, attempting to execute precise maneuvers in the waterway segment between the Brightman Street bridges that is only about 1100 feet wide. This maneuvering would be attempted 240 to 260 times annually, and the tanker/tug combination would be accompanied by at least two additional tugs and a security flotilla, further complicating navigation safety. Maneuvering an LNG tanker with an 82- or 85-foot beam through a 98-foot opening, and preventing that same vessel combination of approximately 900 feet in overall length (tanker plus tug astern) from colliding with a bridge only about 1100 feet beyond the first bridge requires extraordinary precision and should only be attempted—if ever—in the most ideal of conditions, not 240 to 260 times per year in a variety of environmental conditions. Should any vessel(s)—not only LNG tankers, but even vessels carrying non-hazardous cargoes—of similar dimensions attempt such maneuvers I would have similar reservations in terms of navigation safety, particularly at such frequency.

f.  Given that the pilots, on their own volition and presumably in the interest of navigation safety, have reduced the maximum beam allowance for vessels currently transiting the Brightman Street bridges (none of which carry flammable cargo as defined by Federal regulation) to 80 feet (see enclosure (1), document 41), the Coast Guard can find no rationale to support a finding that the waterway is suitable for vessels with a beam of over 80 feet carrying 55,000 cubic meters of LNG, even after considering the enhanced maneuvering capability proposed for the smaller LNG tankers. Even with an 80-foot beam, the Coast Guard would not be likely to consider this segment of the waterway as suitable for the smaller LNG ships, for the reasons addressed elsewhere in this Letter.

g.  An accident while maneuvering an LNG tanker in the vicinity of the Brightman Street bridges could damage the fendering system and/or either bridge to the extent that the bridge(s) and the waterway may be closed to marine traffic for a prolonged period of time. In such a case, whether the LNG tanker is functionally damaged or not, the navigational effort to maneuver the tanker (presumably stern first) out of the Taunton River and Mount Hope Bay, to Narragansett Bay, would be extraordinary. Note that there is no practical turnaround option available in the 400' wide federal channel north of the Mount Hope Bridge for ships of the proposed length and draft, except in the turning basin adjacent to the NRG power plant facility, opposite the Weaver's Cove site. Although other vessels that currently transit this waterway (such as coal ships) could conceivably cause similar damage to either Brightman Street bridge, with similar adverse impacts, the dimensions and frequency of these vessel transits are far less than that proposed by Weaver's Cove. Additionally, coal vessels are not required to have a safety

and security zone enforced around them, and are not subject to a higher standard of care as prescribed for LNG tankers in Federal regulation.

h.  Simulation Modeling:

(1) Although not required, the May 2007 report of the Northeast Marine Pilots entitled "Report on the Feasibility study of the Proposed Weaver Cove LNG Ship to transit from Sea to the proposed LNG terminal in Fall River" (enclosure (1), document 41) was helpful. Much weight has been assigned by Weaver's Cove to the simulation modeling conducted by the Northeast Marine Pilots at the Marine Safety International facility in Middletown, RI. Simulation modeling is a valuable tool to test concepts and provide risk-free training in certain applications, but it is just that—simulation—and subject to limitations, such as those noted in the Pilots' report. The Captain of the Port personally observed simulated transits of an LNG ship at Marine Safety International on May 24, 2007, and appreciates that both Northeast Marine Pilots and Marine Safety International submitted feasibility evaluations. Simulated environmental conditions for modeling transit on May 24, 2007 were "ideal," and an experienced Northeast Marine Pilot was controlling the vessel, yet it appeared to me that the stern tug came unacceptably close to the fender of the new Brightman Street Bridge (an exact determination could not be made due to the inherent limitations of the simulator). As discussed above (and as confirmed in the simulator), a tethered stern tug is essential to effectively controlling an LNG tanker transiting through the Brightman Street bridges, but it also serves to effectively add to the overall length of the tanker itself, extending the effective length of the proposed tanker to nearly 900 feet, which allows only the narrowest of margins when there is 1100 feet spacing between the two bridges. The Captain of the Port also observed this maneuver several times during actual transits of the bridges on coal ships destined to or from the NRG power plan in Somerset.

(2) Importantly, the feasibility evaluation of the Northeast Marine Pilots contains a number of caveats and qualifiers that lends only nominal weight to their conclusion that the simulation project "suggests" that tanker transits would be safe. Both the Captain of the Port's personal observations of the simulations and a close examination of the feasibility evaluations, and substantial personal observations of actual ship transits through this segment of the waterway with pilots and vessel masters, affirm the Coast Guard's determination that the waterway surrounding the Brightman Street bridges is not suitable for routine transits of LNG marine traffic.

(3) Whether assuming the larger 'small tanker' dimension (750' x 85' x 37.5') or the original small tanker dimensions (725' x 82' x 36'), the Coast Guard's navigation safety analysis is similar and leads to the same understanding of the proposal in terms suitability of the waterway for marine traffic of the type and frequency proposed by Weaver's Cove.

(4) The items above are mentioned not to discount the value of simulation modeling, but to highlight that the risk-free value of simulation must be appropriately weighed, and

Enclosure (2)
Factual Determinations, Analysis, and Detailed Recommendations

is only one of many components considered in evaluating the suitability of the waterway for LNG marine traffic. The probabilities associated with human factors, mechanical factors, and environmental factors which must be precisely aligned for a safe transit through the Taunton River are critically important, but not addressed in the scope of the submitted analysis. While the simulations may suggest that safe transits are feasible, they offer no substantive analysis that such transits can be routinely performed safely, do not account for historical accidents, do not account for relevant human error and mechanical failure probabilities, and certainly do not demonstrate that the waterway itself is suitable for such transits.

i. Coal Ships: The LNG vessels proposed by Weaver's Cove are not comparably sized with coal ships currently transiting the waterway, nor would the proposed LNG vessels carry cargo of comparable risk. Table 3 below provides a comparison between currently transiting coal ships and the proposed LNG tankers.

Table 3 – Comparison of Coal Ships to Proposed LNG Tankers

| Largest vessel transiting Brightman St. bridges: | Coal vessel | Proposed LNG vessel | Difference (absolute) | Difference (percent) |
|---|---|---|---|---|
| Length | 539.14 feet (M/V Winterset) | 750 feet | 210.86 feet | 39.11 |
| Beam | 77.76 feet (M/V Clipper Ranger) | 85 feet | 7.24 feet | 9.3 |
| Draft | 28.5 feet (M/V Winterset, & M/V Clipper Ranger) | 37.5 feet | 9 | 31.6 |
| Approximate displacement (metric tons) | 28,000 (M/V Winterset) | 43,000 (modeled vessel, which is smaller than the proposed vessel) | 15,000 | 53.6 |
| Number of total annual deliveries | 25 | 120-130 | 95-105 | 380-420 |
| Flammable cargo as defined in 33 CFR §154? | No | Yes | N/A | N/A |

j. Given the characteristics of the waterways, particularly its narrowness, off-set channel, and close proximity of bridges to each other, any safety and security zone encompassing a tanker would effectively stop all marine traffic in the Taunton River during the vessel's transit through the old and new Brightman Street bridges. The period of marine traffic stoppage was not evaluated for the condition of two Brightman Street bridges (with offset openings) in place, and for 260 bridge transits. Stoppage of vessel traffic to permit frequent transits of LNG tankers could adversely impact navigation safety, particularly for vessels subject to transit restrictions through the old Brightman Street Bridge (wind,

flood current, sufficient tide, daylight, etc.), and for vessels that would have to exit the relative safety of the navigation channel and await the LNG tanker's passage in less-safe waters outside the channel.

k.  There is very minimal room for tugs and escort vessels to react to a loss of power or steering error under the Braga Bridge or through the Brightman Street bridges.

l.  In conducting this analysis due consideration was given to the various measures proposed by Weaver's Cove to mitigate risk to navigation safety.

m.  In conclusion, of the entire proposed transit route, the area of highest apparent potential consequence in the case of accident or incident—the Fall River/Somerset metropolitan area of the Taunton River—is also the area of highest navigational safety risk. The sum of measures, mitigations and precautions described in the Weaver's Cove proposal are not sufficient to reduce the risks to a point where the waterway can be declared suitable for the proposed cargo transits.

D.  RECOMMENDATIONS:

1.  Recommendation as to suitability:  Transit Route Segment One:  Although the navigational safety aspects of LNG tanker transits on this segment of the route are not addressed in detail in this letter, vessels of similar dimensions as those proposed by Weaver's Cove, and carrying hazardous cargoes, currently transit along this segment enroute the Port of Providence, RI.  The impacts of frequently arriving and departing 'small LNG tankers', as proposed, has not been addressed specifically.  Because of the issues with waterway Segments Two and Three described throughout this document, and below, further analysis of the navigational safety aspects of Segment One is not pursued. Therefore, I offer no recommendation as to the suitability of this segment.

2.  Recommendation as to suitability:  Transit Route Segment Two:  It is possible that LNG transits could be safely conducted from Sandy Point northeasterly to the line approximately between Mount Hope Point and Common Fence Point.  Northeast of that line, however, the channel becomes restricted, particularly by width and depth.  As the channel is only 400 feet wide from the above described line for about 4 ¼ miles until north of the Braga Bridge in Segment Three, and then 600 feet wide north of the Braga Bridge but narrowing to 98 feet at the old Brightman Street bridge, any northbound LNG tanker of the size proposed by Weaver's Cove cannot be turned around until the ship reaches the turning basin adjacent to its destination.  Thus, any casualty disabling an LNG tanker occurring in the northeast portion of Segment Two would present two unattractive options:  either back the ship out, into Segment One, which would require a rather extraordinary navigational maneuver or second, tow the ship under the Braga Bridge and through the Brightman Street bridges, to be turned around in the vicinity of Weavers Cove.  Given my recommendations regarding Segment Three, described below, any casualty requiring a dead-ship towing evolution into Segment Three may present an unacceptable risk of another, more significant casualty.  Therefore, my recommendation is that Segment Two is UNSUITABLE for the transit of LNG tankers as proposed.

3. <u>Recommendation as to suitability: Transit Route Segment Three</u>: Segment Three presents numerous navigational safety challenges, as described in this analysis, including, but not limited to: the transit in the vicinity of the Braga Bridge, USS MASSACHUSETTS and Battleship Cove, and the transit between the two Brightman Street Bridges. After carefully reviewing the record, reviewing the provided simulation and modeling data, conducting analysis of navigation safety parameters, and considering my personal observations of vessels being navigated through this waterway segment, it is my conclusion that transits of LNG vessels of the dimensions proposed, at the frequency proposed, cannot be safely conducted on a routine, repeatable basis, and that the risk of a casualty is unacceptably high. Therefore, my recommendation is that waterway Segment Three is UNSUITABLE for the transit of LNG tankers as proposed.

4. <u>Overall recommendation as to suitability</u>. Given that I recommend that segments 2 and 3 of the proposed route are unsuitable for the transit of the proposed LNG tankers, my overall recommendation is that the waterway northeast of the line between Mt. Hope Point and Common Fence Point is UNSUITABLE for the transit of the proposed LNG tankers. In making this ultimate recommendation, I have considered the factors listed in 33 CFR §127.009, as described throughout this document.

5. <u>Recommendation as to action in the event of LNG transits</u>. In addition to analyzing the specific requirements set forth in 33 CFR §127.009, I have taken into account my overarching responsibilities as Captain of the Port, Federal Maritime Security Coordinator, and Federal On-Scene Coordinator. See, e.g., 33 C.F.R. §§ 3.01-1 (d)(1), 3.05-20, Executive Order 10173, 33 U.S.C. § 634, 33 U.S.C. § 1221, et seq. (the Ports and Waterways Safety Act of 1972, as amended); 50 U.S.C. § 191 (the Magnuson Act), 46 U.S.C § 70101, et seq. (the Maritime Transportation Security Act of 2002, as amended) and 40 C.F.R. Part 300 (the National Response Plan). Based on my thorough review of the facts before me, even without the Letter or Recommendation process of Part 127, to fulfill my responsibilities to ensure the safety of the waterway, I would feel compelled to use my discretionary authorities to control vessel movements to prohibit the recurrent transit of LNG tankers from northeast of the line between Mt. Hope Point and Common Fence Point, under the Braga Bridge and through the Brightman Street Bridges and to the north of those bridges in the Taunton River.

Appendices:
A: Chartlet of Waterway Segment One
B   Chartlet of Waterway Segment Two
C   Chartlet of Waterway Segment Three



Sandy Point

Newport/Pell Bridge

East Passage

Waterway Segment One, from "NB" entrance buoy to Sandy Point, approximately 12.5 nautical miles long

"NB" Entrance Buoy

Chart Name:    NARRAGANSETT BAY  RI-MA
Chart ID:      13221_1

APPENDIX A: CHARTLET, WATERWAY SEGMENT ONE

© MAPTECH, INC.



Borden Flats

Brayton Point Channel

Mount Hope Bridge

Waterway Segment Two, from Sandy Point to Borden Flats, approximately 9.6 nautical miles long

Sandy Point

| Chart Name | NARRAGANSETT BAY  RI-MA |
| Chart ID | 13221_1 |
| Top Left | 41° 43' 32" N  71° 22' 39" W |
| Bottom Right | 41° 36' 8" N  71° 7' 58" W |

© MAPTECH, INC

APPENDIX B:  CHARTLET, WATERWAY SEGMENT TWO



APPENDIX C: CHARTLET, WATERWAY SEGMENT THREE

# ATTACHMENT 9



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENERGY & ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

DEVAL L. PATRICK
Governor

TIMOTHY P. MURRAY
Lieutenant Governor

IAN A. BOWLES
Secretary

ARLEEN O'DONNELL
Commissioner

June 4, 2007

Ted Gehrig
President and Chief Operating Officer
Weaver's Cove Energy, LLC
One New Street
Fall River, MA 02720

Dear Mr. Gehrig:

The Department of Environmental Protection ("MassDEP") has reviewed the May 9, 2007 letter and related Executive Summary from the United States Coast Guard to Weaver's Cove Energy, LLC ("Weaver's Cove") in which the Coast Guard preliminarily determined that the waterway may not be suitable for the type and frequency of LNG marine traffic contained in the Weaver's Cove smaller tanker proposal. The Coast Guard's determination was based on a review that included the original Letter of Intent ("LOI") filed by Weaver's Cove on May 12, 2004; the FERC Order dated July 15, 2005; the Weaver's Cove amended LOI describing its smaller ships proposal dated February 2, 2006; the Weaver's Cove Environmental Assessment of the Use of Smaller Ships dated November, 2006; the Weaver's Cove Waterway Suitability Assessment dated November 22, 2006, and the Weaver's Cove Additional Smaller LNG Ship Design, Navigational and Operational Data report dated February 21, 2007.

The Coast Guard's May 9, 2007 assessment identified multiple navigation safety, security and environmental problems associated with the Weaver's Cove proposal. More specifically, the Coast Guard found that "the doubling of tanker transits and the slower movement of tankers through the waterway segment between Borden Flats and the proposed Weaver's Cove facility presents navigation safety and security challenges and environmental impacts beyond those addressed in the original LOI" and that "the aggregate of navigation safety factors…are not measurably improved in submissions since the Weaver's Cove [amended LOI] submittal of February 2, 2006." See page 1 of the Coast Guard letter and page 2 of the Executive Summary. The Coast Guard's findings also encompass areas that are directly relevant to MassDEP's permitting of the project such as the Coast Guard's conclusion that "the safety and security zone encompassing the tanker would effectively stop recreational traffic in the Taunton River for its transit through the old and new Brightman Street bridges." See page 14 of the Executive Summary.

This information is available in alternate format. Call Donald M. Gomes, ADA Coordinator at 617-556-1057. TDD Service - 1-800-298-2207.

MassDEP on the World Wide Web. http://www.mass.gov/dep
♻ Printed on Recycled Paper

2

While preliminary in nature, the substance and outcome of the Coast Guard's May 9, 2007 determination represents a significant change in the overall status of the Weaver's Cove project and casts serious doubt as to the feasibility of the project. Moreover, the Coast Guard's assessment of the navigational, security, and environmental impacts associated with the Weaver's Cove proposal also has a bearing on MassDEP's own review of the key pending permit applications. An additional, critical consideration is that the Coast Guard has informed MassDEP that it expects to make a final assessment of whether the waterway is suitable for the Weaver's Cove smaller ship proposal this summer. If the Coast Guard reaffirms its May 9, 2007 preliminary assessment, Weaver's Cove will not be allowed to transport LNG by ship as proposed.

In any event, the Coast Guard's final assessment will include a definitive evaluation of navigational issues such as the dimensions of the smaller ships and the impact of the doubling of the transits on other water dependent users. For example, the Coast Guard disagreed with Weaver's Cove suggestion that changes in the vessel drafts used for the purposes of modeling (a 34' design draft and a 36' scantling draft) do not significantly affect modeling outcomes. Instead, the Coast Guard stated that it "fully expects that the depth of water under the keel of a ship in a dredged channel, particularly in a relatively narrow river, will in fact make a difference." See page 11 of the Executive Summary. The Coast Guard's final assessment of the draft of the small ships in determining feasibility from a navigation safety standpoint is relevant to MassDEP's independent determination of the scope of dredging to be allowed under Chapter 91. See, 310 CMR 9.40(3)(a) ("The extent of dredging shall not exceed that reasonably necessary to accommodate the navigational requirements of the project.")

The Coast Guard also highlighted its concern about Weaver's Cove need to employ what the Coast Guard described as a "locking through" procedure for small ships proceeding at bare steerageway between the old and new Brightman Street bridges for up to 260 times per year. See page 11 of the Executive Summary. The Coast Guard's final assessment will inform MassDEP's own evaluation of the resulting impacts to other water dependent users and the public's right to navigation for the purpose of determining Weaver's Cove compliance with the Chapter 91 performance standards.

In short, the Coast Guard expects to make its final assessment of the Weaver's Cove small ships proposal in the near future - this summer - and the outcome of that critical decision will likely affect both the feasibility of the project and the substance of MassDEP's permit reviews. This situation warrants MassDEP's reassessment of its expenditure of limited permitting resources on the pending permit applications.

For the above reasons, it is reasonable and appropriate for MassDEP to await the Coast Guard's final assessment before resuming its technical reviews of the pending permit applications and Requests for Superseding Orders of Conditions for the dredging activity and for the LNG terminal (the latter includes an assessment of the Chapter 91 impacts of the ship traffic resulting from the operation of the terminal). Accordingly, MassDEP is staying its technical reviews of the above permits until the Coast Guard has made its final Letter of Recommendation determination. If the Coast Guard determines that the waterway is suitable for the Weaver's

3

Cove smaller ships proposal, MassDEP will resume its technical review of these pending permit applications.

Sincerely,

Arleen O'Donnell
Acting Commissioner

cc:    Barry Fogel, Esquire
       Captain Roy A. Nash, United States Coast Guard
       Edward G. LeBlanc, United States Coast Guard
       Richard Lehan, MassDEP
       Phillip Weinberg, MassDEP
       Lealdon Langley, MassDEP

# ATTACHMENT 10



COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF ENERGY & ENVIRONMENTAL AFFAIRS
DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108 617-292-5500

DEVAL L. PATRICK
Governor

TIMOTHY P. MURRAY
Lieutenant Governor

IAN A. BOWLES
Secretary

LAURIE BURT
Commissioner

December 14, 2007

Mr. Ted Gehrig
Weaver's Cove Energy LLC
One New Street
Fall River, MA
02720

Re:    LNG Terminal Dredging Application
       Application for BRP W 050971
       Major Dredging Project-Filed April 2004, Amended November 2006

Dear Mr. Gehrig:

Weaver's Cove Energy, LLC ("WCE") filed the above referenced application for a C. 91 dredge permit with the Department of Environmental Protection ("MassDEP") for dredging activities to accommodate the transit of liquefied natural gas ("LNG") tankers through Mount Hope Bay and up the Taunton River to serve a proposed LNG terminal located in Fall River, Massachusetts. One component of the application proposed dredging the Federal Navigational Channel ("Channel") and the Turning Basin ("Basin") to allow for the passage of the LNG tankers. A second component of the application proposed dredging a trench up river from the Channel and Basin to lay a natural gas pipeline across the River to interconnect to pipelines located in Fall River and Somerset, Massachusetts ("Western Lateral Crossing" or "WLC"). When Weaver's Cove filed its application in April 2004, the entire project was undergoing review under the Massachusetts Environmental Policy Act ("MEPA") (EOEA # 13061). On July 28, 2006, the Secretary of the Executive Office of Environmental Affairs (EOEA) issued a Certificate on the Supplemental Final Environmental Report.

MassDEP has conducted a technical review of this application and is hereby notifying the applicant Weavers Cove Energy, LLC of the deficiencies in the application that derive from the determination in the United State Coast Guard's Letter of Recommendation (October 24, 2007) that the affected waterway is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG marine traffic associated with your proposal.

This information is available in alternate formats. Call Donald M. Gomes, ADA Coordinator at 617-556-1057, TDD Service - 1-800-298-2207.

MassDEP on the World Wide Web: http://www.mass.gov/dep
Printed on Recycled Paper

The regulations governing the review of a dredge permit application provide, in part, that the extent of permitted dredging shall not exceed the navigational requirements of the project. 310 CMR 9.40 (3)(a). The initial description of the navigational requirements of the project proposed dredging the Channel and the Basin to accommodate an LNG tanker with a proposed length of 950' a beam of 145'and a draft of 37.5' that would make approximately 60 deliveries (120 transits) annually to the terminal. The 48 acres of the Channel located in Massachusetts and a small portion of the East Channel was to be dredged to a depth of 37', and 54 acres of the Basin were to be dredged to a depth of 41' and widened to a width of 550'to 1400'. The estimated dredge sediment to be generated by this component of the project's activities in Massachusetts was approximately 2.4 million cubic yards.

In 2006, in response to the navigational obstacles created by the retention of the existing Brightman Bridge, WCE proposed to rely on smaller tankers, including a reduction in the dimension of the ships' length to 725', beam to 82' and draft to 36', which was later amended in a February 2007 submission to the USCG to ships with dimensions of 750'x 85'x 37.5' respectively. [1]  To make up for the reduced carrying capacity of the smaller ships, WCE also proposed to double or more the number of annual deliveries from 60 to between 120-130 (up to 260 transits). WCE also proposed to retain the option to revert to the use of larger tankers if the existing Brightman Bridge was eventually removed.

The United States Coast Guard (USCG) is responsible for the safety and security of navigable waterways in regard to the transit of LNG tankers pursuant to 33 C.F.R. § 127.009. WCE filed a Letter of Intent with the USCG on May 12, 2004 requesting approval of its LNG tanker transit proposal and subsequently amended it through a change of information letter dated February 2, 2006 proposing the smaller LNG tankers discussed above. On October 24, 2007, the USCG issued its Letter of Recommendation (LOR) in which it concluded that "transits of LNG vessels of the dimension proposed, at the frequency proposed, cannot be safely conducted" on the Taunton River and downstream portions Massachusetts waters, and those segment of the waterway were "unsuitable" for the use proposed[2].

The rejection by the USCG of both the dimension and frequency of WCE's initial and revised tanker proposals invalidates fundamental factual assertions in the dredge permit application. The proposed dredge depth and footprint for the Channel and Basin are directly related to the ship's dimensions in order to meet navigationally required clearances between the ships and the river bottom. The USCG's unconditional rejection of the proposed tanker dimensions renders it arbitrary or speculative to determine the navigational requirements of the project, and as a result the extent of dredging necessary to accommodate the project as required pursuant to 310 CMR 9.40 (3)(a). The USCG's rejection of the proposed frequency of the transits also invalidates WCE's contention that the extent of dredging proposed in the application is necessary to accommodate the increased frequency of deliveries associated with the small ship proposal.

---

[1] WCE also commissioned a naval architect to design a ship with even smaller dimensions that was the basis for the computer simulations WCE submitted as part of its LOI submissions.
[2] The LOR was affirmed by the USCG's letter of December 7, 2007 in response to WCE's request for reconsideration.

In addition, the provisions of 310 CMR 9.40(2)(a) and (b) prescribe that the design and timing of dredging shall avoid interference with anadromous fish runs and minimize impacts on shellfish beds, fishery resource areas and submerged aquatic vegetation. The Taunton River is spawning habitat for several species of anadromous fish. The proposed dredging footprint will also permanently eliminate 11 acres of winter flounder spawning habitat and result in a one-time loss of 84 acres of northern quahog habitat[3].

The USCG's LOR determination that the dimensions and frequency of transit of the tankers proposed in the application are unsuitable for the waterway has resulted in a critical information gap regarding the navigational requirements of the project. As a consequence, the necessary volume, footprint and timing of the proposed dredging activity cannot be reasonably assessed making it infeasible to apply the performance standards of 310 CMR 9.40(2)(a) (b) and 3(a). WCE's proposal to mitigate the adverse resource impacts caused under its current application does not address the regulations' requirement to avoid interference and minimize impacts.

Under these circumstances set forth above, determining the applicant's compliance with the regulations based on the factual assumptions in the current application would require MassDEP to accept as true factual assumptions that have been explicitly rejected by the governing regulatory agency. MassDEP will not act on the application on that basis, and the applicant cannot demonstrate its compliance with regulatory performance standards and/or necessary mitigation measures based on the actual impacts of its project. MassDEP finds the application's proposal to dredge the Channel and the Basin to be deficient. Given the relationship between the conclusions in the LOR and compliance with the performance standards of the regulations, the deficiency may only be addressed by a decision of the USCG that approves the type, size and frequency of vessels that WCE proposes to transit waters of the Commonwealth in areas that it represents are necessary to dredge to meet the approved navigational requirements of the project.

In accordance with 310 CMR 4.00, you have 180 days from the date of this letter to submit the deficient information, subject to your right to request an extension. If you fail to submit the required material within the applicable date, your application will be deemed withdrawn and you must reapply if you still wish to seek the permit. You will not receive a refund as a result of this action. You also have the option to withdraw your application at this time.

Should WCE decide to submit a revised Letter of Intent to the USCG in response to the LOR, or a revised proposal in response to this notice, both the dimensions of the tanker and/or the frequency of the transits may be need to be significantly revised potentially affecting the volume, footprint and duration of dredging. The Secretary's Certificate on the Supplemental Final Environmental Impact Report (July 28, 2006) prescribed that if there was any material change to the project resulting from the USCG's review that is subject to MEPA jurisdiction a Notice of Project Change (NPC) would be required to be submitted. Therefore, in the event that in response to this notice or the LOR, the applicant proposes a material change to the navigational

---

[3] Furthermore, on August 10, 2007, the Rhode Island Department of Environmental Management denied WCE's application for dredging Mount Hope Bay finding, in part, that dredging in the Massachusetts portion of the Bay "will contribute to the cumulative adverse impacts on important fisheries in Rhode Island waters".

requirements of the project that would affect the current application, a NPC would need to be submitted and acted upon prior to a MassDEP decision on the revised application.

The component of the application proposing the dredging of a trench for installation of the WLC is not affected by potential changes to the dimensions or transit frequency of the LNG tankers. While there is at present no approved means to deliver the LNG to the approved terminal for processing and transmission through the WLC, obtaining such approval is not a pre-condition for the issuance of a conditional dredge permit for the pipeline. However, the terms and conditions of dredge permit would require the applicant to obtain all the approvals necessary to provide natural gas to the WLC prior to commencing construction of the trench.

Sincerely,

Lealdon Langley, Director
Wetlands and Waterways Program

4

Ccs:

Karen Adams, Regulatory/Enforcement Division, U.S. Army Corps of Engineers, 696
Virginia Rd, Concord, MA 01742-2751
Robert Boeri , CZM, 251 Causeway Street, Suite 900, Boston, MA 02114
Frank Germano, DMF, 838 South Rodney French Blvd., New Bedford, MA 02744
Fall River Conservation Commission, 1 Government Center, 3rd Floor, Fall River, MA 02722
Somerset Conservation Commission, 140 Wood Street, Somerset, MA 02726
Michael Howard, Epsilon Associates, Inc., 3 Clock Tower Place, Suite 250, Maynard, MA 01754
Theodore Barton, Epsilon Associates, Inc., 3 Clock Tower Place, Suite 250, Maynard, MA 01754
Mayor Edward Lambert, City of Fall River, 1 Government Center, Fall River, MA 02722
Joseph Bolton, Acting Town Administrator, 140 Wood St., Somerset, MA 02726

# ATTACHMENT 11

Sharon Kliwinski      To: Bob McIntosh/Boston/NPS@NPS
06/27/2007 12:35 PM      cc: Jamie Fosburgh/Boston/NPS@NPS
EDT      Subject: taunton river briefing

June 2007

# Taunton Wild and Scenic River Study/Weaver's Cove LNG Proposal

## Study Background

In 2000, the National Park Service (NPS) initiated a legislatively authorized Wild and Scenic River Study of the upper Taunton River in southeastern Massachusetts for potential addition to the National Wild and Scenic Rivers System. The study was administratively extended to the entire Taunton River in 2002 based on letters from Representatives Frank, McGovern and Lynch and support letters from all affected communities. As of July 11, 2005, all ten communities abutting the 40-mile mainstem Taunton have voted (Town Meeting/City Council) to support the Taunton River Stewardship Plan and federal designation as a Wild and Scenic River. In the fall of 2005, the Taunton River Stewardship Plan was published to guide local, state and federal efforts to protect and enhance the natural, cultural and recreational values of the Taunton River, and to serve as the basis of management and administration in the event of national Wild and Scenic River designation.

## Status of Draft Study and Summary of Findings

The NPS Taunton River Wild and Scenic River Study Draft Report has been approved for public release, and is due back from the General Printing Office on or before July 20, at which point it will go out for public/agency comment.

The draft report finds that the entire mainstem of the Taunton River meets the requirements of the Wild and Scenic Rivers Act for designation, based on free-flowing character, the presence of one or more "outstandingly remarkable" resource value, and overwhelming local, state, and non-governmental organization participation and support.
- the Taunton is the longest free-flowing main stem river in Massachusetts
- the Taunton supports the State's largest and most diverse diadromous fish populations
- the Taunton offers outstanding semi-wilderness paddling
- the Taunton has been found to be one of the most biologically/ecologically diverse river systems in the         Atlantic Coast Ecoregion
- the Taunton has rich historical and archaeological resources/significance.

## Designation Alternatives

The Draft Report includes an Environmental Assessment, and considers two Wild and Scenic River designation alternatives: 1) designation of the entire 40-mile mainstem; and, 2) designation of approximately 36 miles of the mainstem from the headwaters to Steep Brook in North Fall River. Designation of the entire mainstem is identified as the Environmentally Preferred Alternative.

**Weaver's Cove Proposed Liquid Natural Gas (LNG) Facility**

The Federal Energy Regulatory Commission (FERC) has given preliminary approval through a Final Environmental Impact Statement (FEIS) to the Weaver's Cove LNG facility planned for Fall River, MA on the lower Taunton River. However, the FEIS (May 2005) correctly cites that final FERC approval necessary for the project cannot be issued without concurrence from the Department of the Interior that the project will not adversely affect potential designation of the Taunton as a Wild and Scenic River, as required by Section 7 of the Wild and Scenic Rivers Act. The Department's authority in this regard was appealed by Weaver's Cove Energy (WCE), but was sustained by FERC (FERC Order on Rehearing, January 23, 2006).

Similarly, the U.S. Army Corps of Engineers' permitting of the project (2.5 million cubic yards of dredge, 11 acres of permanent intertidal/subtidal habitat loss) requires an NPS finding that the project will not adversely affect the values for which the Taunton River may be designated a Wild and Scenic River. At issue is the impact of the project upon diadromous fish runs in the Taunton River – considered to be the most important in the Commonwealth of Massachusetts (species diversity and abundance).

**Current Status**

On May 9, 2007, the U.S. Coast Guard issued a preliminary finding that: 1) navigational issues for LNG ships entering Taunton River are unsafe; 2) FERC EIS is deficient in analyzing safety and environmental issues; 3) a supplemental EIS or separate NEPA review (EA or EIS) will be needed, complete with new opportunity for public comment.

On June 4th, the Massachusetts Department of Environmental Protection (MA DEP) issued a letter to WCE advising that MA DEP has stopped processing the required 401 Water Quality Certificate for the proposed LNG development, stating that they will resume only if/when the Coast Guard issues have been dealt with.

The U.S. Army Corps of Engineers has confirmed to NPS that they will not proceed with processing of its permit for the LNG facility until both the Coast Guard and state 401 issues have been settled. The additional public and agency comment period envisioned based on the Coast Guard ruling will provide DOI/NPS additional opportunities to raise pertinent issues of scientific relevance to the protection of the Taunton's diadromous fish stocks.

DOI has been coordinating the development and review of potential permit conditions based on scientific review at the regional level of the NPS and US Fish and Wildlife Service, with additional support from the NPS' Water Resources Division, and the U.S. Geological Survey's Conte Anadromous Fish Laboratory, and in close coordination with other state and federal agencies, including the National Marine Fisheries Service and Massachusetts Division of Marine Fisheries.

This process has been inactive since late in 2006, but the NPS has signaled to both WCE and the Army Corps a willingness to continue this process whenever the parties are ready.

**Congressional Legislation**

Congressional legislation to designate the entire 40 miles of the Taunton River as a component of the National Wild and Scenic Rivers System has been filed in both the House (HR3321) and Senate (S2033).

**Point of Contact**

Bob McIntosh, Associate Regional Director, Planning, Construction & Facility Management, North East Region, National Park Service, (617) 223-5122

Sharon Kliwinski
Water Resources Division
Washington Liaison
202-513-7181

# ATTACHMENT 12



**U.S. Department of**
**Homeland Security**

**United States**
**Coast Guard**

Commanding Officer
U.S. Coast Guard
Sector Southeastern New England

1 Little Harbor Road
Woods Hole, MA 02543
Phone: 508-457-3219
Fax: 508-457-3236
Email: Edward.G.LeBlanc@uscg.mil

16000
December 7, 2007

BY CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Mr. Bruce F. Kiely
Baker Botts L.L.P.
1299 Pennsylvania Ave., NW
Washington, D.C. 20004-2400

Mr. Gordon Shearer
President and Chief Executive Officer
Weaver's Cove Energy, LLC
1185 Avenue of the Americas
New York, NY 10036

Dear Mr. Kiely and Mr. Shearer:

I have reviewed your letter of November 20, 2007, requesting reconsideration of my Letter of
Recommendation (LOR) of October 24, 2007. As requested, I reconsidered my determinations,
analysis, and ultimate recommendation that the waterway from near Sandy Point, Prudence
Island, Rhode Island to the proposed facility in Fall River, Massachusetts, is unsuitable from a
navigation safety perspective for the type, size, and frequency of LNG marine traffic associated
with your proposal of May 12, 2004, as amended by your change of information letter dated
February 2, 2006. After a thorough review of your request, including its exhibits and other
documents referenced therein, I find no substantive issue, nor new information, that would
suggest my recommendation of unsuitability was incorrect or made without due consideration of
the record. Consequently, I stand by my October 24, 2007 recommendation.

Several recurring themes and inaccurate factual assertions raised in your request for
reconsideration merit specific response:

1.  **The LOR Process**: Your letter suggests that Weaver's Cove has not been afforded due
    process, and specifically that I "in spirit and substance...did not adhere to the process set
    forth in NVIC 05-05."[1] As a preliminary matter, I note that the *guidance* provided by NVIC
    05-05, by its own language, was not applicable to your application to the extent that NVIC
    05-05 was published on June 14, 2005, more than a year *after* Weaver's Cove submitted its
    original Letter of Intent, and more than a month after FERC issued its Final Environmental
    Impact Statement (FEIS). FERC's approval order was issued just one month later. In any
    event, I have reviewed the steps that I and my predecessors undertook in gathering and

---

[1] Weaver's Cove Request for Reconsideration ("Reconsideration Request") dated November 20, 2007, page 10

16000
December 7, 2007

analyzing the information I am required to assess in making my waterway suitability recommendation under 33 CFR § 127.009, and I am convinced that the process used to evaluate the information in the record and arrive at a decision was full, fair, transparent and in accordance with law, regulation, and policy.

2. **The Administrative Record**:

    a. Your request for reconsideration contends that I "ignored or missed four (4) key evidentiary documents before [me] at the time of decision..."[2] I will address each assertion in order.

        i. The October 9, 2007, letter from Weaver's Cove to the COTP regarding issues raised at a meeting of September 4, 2007. Admittedly, this letter is not listed as part of the Administrative Record in Enclosure (1) to my Letter of Recommendation. This submission was received just as my analysis was finalized. I have, however, since reviewed the letter, along with the accompanying documentation, in its entirety. I find nothing therein that prompts me to alter my ultimate recommendation of unsuitability.

        ii. The COTP letter of May 23, 2007. As I was the author of this letter, I implicitly considered its contents in developing my Letter of Recommendation. As the letter itself does not contain any substantive matter on which my Letter of Recommendation was based, it was not specifically listed in Enclosure (1) to the LOR. My letter (of May 23, 2007) speaks to, among other things, a NEPA review. The Record of Decision, issued concurrently with my Letter of Recommendation on October 24, 2007 (available on FERC's public docket), states:

        As I view the safety of navigation as paramount, my recommendation that the waterway is unsuitable generated no additional environmental documentation requirements. I, therefore, (pursuant to 40 CFR § 1506.3) adopt those portions of the FERC EIS that address the environmental impacts associated with the proposed use of the waterway and those portions addressing any environmental impacts of the no action alternative. This letter represents the Coast Guard's record of decision on the adopted portions of the FERC EIS.

        Accordingly, the record indicates I considered and addressed the procedural substance of my May 23, 2007 letter.

_____

[2] Reconsideration Request at 7.

16000
December 7, 2007

    iii.    The third and fourth sets of documents your letter suggests were not considered by me are the "input, letter, or other submission" provided by the Coast Guard to FERC preceding issuance of FERC's DEIS and FEIS, respectively. Unlike in other post-NVIC 05-05 FERC-led LNG terminal siting projects mentioned in your letter, the Coast Guard neither produced nor submitted a waterway suitability report, as such, to FERC. The Coast Guard did, however, provide the functional equivalent through the course of the Port and Waterways Safety Assessment (PAWSA) workshop, held on September 7 and 8, 2004; and through several other workshops focused exclusively on maritime security. The results of these workshops were communicated to FERC during the course of the Coast Guard's dialogue with that agency during its environmental review process.[3] This input was adopted by FERC and is reflected in DEIS and FEIS documents themselves.

          As my Letter of Recommendation indicated, because my ultimate recommendation was based on my analysis of *navigation safety* issues, other relevant factors, such as maritime security, were not further analyzed. With respect to the PAWSA workshop, its results were indeed considered by me.[4] Reliance on its findings, however, was tempered by, among other things, the fact that the 2004 PAWSA assumed (1) that the old Brightman Street Bridge would be removed before LNG tanker transits would take place, and (2) that LNG tanker deliveries to Fall River would occur at a rate of about one per week.

  b.    Your request for reconsideration also contends that I "relied on at least seven (7) documents of which [I] had not provided Weaver's Cove prior notice of [my] intent to rely on them and the opportunity to rebut or refute."[5] Again, I will address each assertion in order.

---

[3] With respect to these documents, you claim that Coast Guard has "refused" to respond to requests under the Freedom of Information Act (FOIA) for their production. In fact, the Coast Guard has not refused to provide documents. Rather, we are working diligently to respond to the FOIA requests submitted on behalf of Weavers Cove. As the FOIA requests at issue are very broad in nature, however, it is taking considerable resources to locate, examine, and copy the material that is responsive to your request. We will continue to process your requests in accordance with applicable law and procedures.

[4] In a related argument, your reconsideration request claims that "the previous COTP" made findings favorable to Weaver's Cove that have now been arbitrarily overturned. This misrepresents the record. The previous COTP neither made findings, nor issued a Letter of Recommendation. At the time – a time before federal law effectively barred removal of the old Brightman Street Bridge – the previous COTP cooperated with FERC in developing a DEIS and FEIS, under the hypothesis of what could be possible if it were (later) determined (through the LOR process) that the waterway was suitable for LNG transits, which is one of about 75 conditions attached to FERC's approval.

[5] Reconsideration Request at 5.

16000
December 7, 2007

   i. The Rothblum paper, "Human Error and Marine Safety," a product of the Coast Guard Research and Development Center, was relied on for the general proposition that human error can contribute to marine accidents. Weaver's Cove does not dispute that proposition. [6]

   ii. The First District memo regarding the old Brightman Street Bridge, listed in Enclosure (1) to my Letter of Recommendation, was incorrectly transcribed from "4/3/06" as March 4, 2006. It should read "April 3, 2006." [7] This April 3, 2006, memo was provided to you via a previous FOIA request.

   iii. The Corps of Engineers correspondence you reference (including both the dredging information and Docket CP04-46) is included in FERC's docket for the Weaver's Cove proposal. Thus, Weaver's Cove has had ample opportunity to review and comment on its contents.

   iv. The recently completed Coast Guard Waterways Analysis and Management System (WAMS) review was relied on primarily for the proposition that the aids-to-navigation system in the waterway at issue is adequate for current users. Nowhere has Weaver's Cove refuted that assertion. Moreover, the general public, including Weaver's Cove in particular, was invited to provide input during the WAMS review. No input was received from Weaver's Cove.

   v. The vessel critical profiles for vessels delivering coal to NRG power were obtained from a Coast Guard database (Marine Information for Safety and Law Enforcement, or MISLE) to assess Weaver's Cove's claim, in its letter of July 18, 2007, that its proposed LNG vessels were essentially similar to coal ships already transiting the area. Should Weaver's Cove wish to refute the accuracy of the vessel characteristic information maintained by the Coast Guard, it is free to do so.

  c. Additionally, your request for reconsideration suggests that various politicians made "numerous undocumented assertions and held several undisclosed meetings" with me and members of my staff, and that I did not give Weaver's Cove "notice of those comments or meetings," or "afford Weaver's Cove an opportunity to rebut comments

---

[6] Your request for reconsideration asserts that in the absence of information on LNG tanker accident statistics, "any statements about human error have no relevance or validity in [my] analysis." I disagree. Your letter misconstrues, and misrepresents, my intent in mentioning the myriad places where any human error could affect the safe navigation of a tanker and tug combination undertaking the unique evolution that would be required to negotiate the old and new Brightman Street bridges. I did not intend to employ a quantitative, statistical risk analysis of this evolution. Again, as you concede, it is undisputable that human error can contribute to marine accidents. The point is that the navigation evolution you propose leaves little to no room for such error – something the simulation modeling data and reports affirmed. Thus, I highlighted a number of places where that error could manifest to help illustrate why, in my professional opinion, navigating the proposed transit route with the type, size, and frequency of ships you propose cannot be done safely on a *repeatable* basis.

[7] In reviewing Enclosure (1) to the LOR, an additional typographical error was found. In item #40 (Response to Weaver's Cove regarding navigation issues), the date should read "April 3, 2006" vice "April 3, 2007."

16000
December 7, 2007

made in those meetings."[8]  The Coast Guard routinely provides informational briefings to federal, state, and local officials on various Coast Guard operations and responsibilities.

I personally provided three briefings on the Weaver's Cove proposal to various elected officials, at their specific request.  Importantly, in all such instances, I limited my interaction to providing factual background and details from the public record, information regarding my duties and responsibilities with respect to assessing the suitability of the waterway for LNG marine traffic, and updates on the procedural posture and anticipated timeline for issuing my Letter of Recommendation.  Those officials wishing to comment on the project were asked to do so in writing to ensure that all comments could be reflected in the public docket.  If any elected official provided me with unsolicited opinions outside the docket or public meeting process, I did not consider those comments in arriving at my ultimate recommendation, I only considered those written comments contained in the record, including notes from public meetings where verbal comments were received.

3.  **Professional Judgment**:  In your request for reconsideration, you indicated surprise that I "chose to override the recommendation of the marine pilots" and claim you are "unaware of anywhere else in the LNG industry where a COTP has substituted his judgment for the judgment of professional pilots"[9].  The judgment of marine pilots is indeed valued and was carefully considered in my analysis.  Of course, marine pilots are but one of several groups of professional mariners the Coast Guard works with.  Ultimately, I am the only financially disinterested party with the statutory authority and responsibility in the LOR process for ensuring the safety of the federal waterway.  Weaver's Cove suggestions notwithstanding, I will not abdicate that responsibility to marine pilots, to Weaver's Cove, or any other person or entity—that duty is mine alone.  I carefully considered the entire record before exercising my professional judgment and discretion to arrive at my ultimate recommendation.

For the reasons cited above, I affirm my determinations, analysis, and ultimate recommendation that the waterway from near Sandy Point, Prudence Island, Rhode Island to the proposed facility in Fall River, Massachusetts, is unsuitable from a navigation safety perspective for the type, size, and frequency of LNG marine traffic associated with your proposal.

If you feel aggrieved by this action, you may appeal to the Commander, First Coast Guard District, pursuant to 33 C.F.R. §127.015(a).  Your appeal must be submitted, in writing, to the Commander, First Coast Guard District, within 30 days of receipt of this letter.  Your appeal should be addressed to:

> Commander (dp)
> First Coast Guard District
> 408 Atlantic Ave
> Boston, MA 02110-3350

---

[8] Reconsideration Request at 3.

[9] Reconsideration Request at 45.

16000
December 7, 2007

If the delay in presenting a written appeal would have an adverse impact on your operations, you may request to make an oral presentation, but your written request must be submitted within five days of your oral presentation.

If you have questions, my point of contact remains Mr. Ed LeBlanc of the Sector Southeastern New England Waterways Management Branch. He may be reached at the address, phone number, and e-mail address listed above.

Sincerely,

ROY A. NASH
Captain, U.S. Coast Guard
Captain of the Port
Southeastern New England

Copy: Commander, First Coast Guard District (d, dp, dl)
       Commander, Atlantic Area (Am)
       Commandant (CG-3PSO)
       Federal Energy Regulatory Commission
       U.S. Army Corps of Engineers, New England District
       Mass and RI Congressional delegations
       Mayor, City of Fall River
       Applicable state and local agencies

# ATTACHMENT 13

# United States Court of Appeals
## For the First Circuit

———————————————

Nos. 06-1203 and 06-2146

CITY OF FALL RIVER, MASSACHUSETTS;
THE ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS;
THE ATTORNEY GENERAL FOR THE STATE OF RHODE ISLAND; and
MASSACHUSETTS ENERGY FACILITIES SITING BOARD,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

———————————————

Nos. 06-1204 and 06-2147

CONSERVATION LAW FOUNDATION,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

———————————————

No. 06-1220

MICHAEL L. MIOZZA,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

ON PETITIONS FOR REVIEW OF AN ORDER OF THE
FEDERAL ENERGY REGULATORY COMMISSION

Before

Torruella and Lipez, <u>Circuit Judges</u>,
and Fusté,<sup>*</sup> <u>District Judge</u>.

<u>Robert S. Taylor</u>, with whom <u>Edward Berlin</u>, <u>Lester S. Hyman</u>, <u>B,
H&T Associates</u>, <u>Thomas F. McGuire, Jr.</u>, Corporation Counsel, <u>Thomas
F. Reilly</u>, Massachusetts Attorney General, Chief, <u>Carol Iancu</u>,
Assistant Attorney General, were on brief, for the City of Fall
River, the Attorney General of the Commonwealth of Massachusetts,
and Massachusetts Energy Facilities Siting Board.
      <u>Paul Roberti</u>, Assistant Attorney General, Chief, Regulatory
Unit, with whom <u>Patrick C. Lynch</u>, Attorney General of the State of
Rhode Island, and <u>Terence Tierney</u>, Special Assistant Attorney
General, were on brief, for the Attorney General for the State of
Rhode Island.
      <u>Susan M. Reid</u>, with whom <u>Jerry Elmer</u> were on brief, for
Conservation Law Foundation.
      <u>Beth G. Pacella</u>, Senior Attorney, with whom <u>John S. Moot</u>,
General Counsel, and <u>Robert H. Solomon</u>, Solicitor, were on brief,
for Federal Energy Regulatory Commission.
      <u>Bruce F. Kiely</u>, with whom <u>G. Mark Cook</u>, <u>Adam J. White</u>, <u>Jessica
A. Fore</u>, <u>Emil J. Barth</u>, and <u>Baker Botts L.L.P.</u> were on brief, for
intervenors Weaver's Cove Energy, LLC and Mill River Pipeline, LLC.
      <u>Michael L. Miozza</u>, on brief, pro se.

October 26, 2007

---

<sup>*</sup>  Of the District of Puerto Rico, sitting by designation.

**TORRUELLA**, **Circuit Judge**.   The City of Fall River, Massachusetts, the Attorneys General of the States of Massachusetts and Rhode Island, the Conservation Law Foundation ("CLF"), and Michael Miozza (together, "Appellants") seek reversal of the July 2005 Order of the Federal Energy Regulatory Commission ("FERC") granting conditional approval to Weaver's Cove Energy ("WCE") to site, construct, and operate a proposed liquified natural gas ("LNG") terminal and associated pipeline in Fall River, Massachusetts, as well as the reversal of subsequent orders denying the reopening of the record and rehearing.  The facility, which would include a marine berth (requiring dredging of the harbor and waterways, including the Taunton River), an LNG storage tank, regasification facilities, and an LNG truck distribution facility, would receive LNG from ocean-going ships for off-load to trucks or for regasification and delivery by pipeline to New England's network of natural gas pipelines.

The conditional permit is subject to a number of stipulations, including approval of the vessel transportation plan by the United States Coast Guard ("USCG") and consistency with the Wild and Scenic Rivers Act, as determined by the Department of the Interior ("DOI").  Because the USCG and the DOI have not completed their respective evaluations of these aspects of the project, we find that it would be premature to address the merits of the appeal.  Appellants maintain the right to petition FERC, and

subsequently seek appeal to this Court, if and when these and other relevant agencies have made their final recommendations.

## I. **Background**

In 2004, FERC, USCG, and the United States Department of Transportation ("DOT") entered into an Interagency Agreement to coordinate review of proposed LNG facilities. Under the agreement, FERC is the lead agency in authorizing LNG facilities and in preparing a proposed facility's Environmental Impact Statement ("EIS"),[1] which is required by the National Environment Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq. Generally, authorization is granted (as it was in this case) on the condition that certain stipulations, environmental and otherwise, are met.

Here, the development of the EIS began on May 2, 2003, with a preliminary meeting between WCE, FERC staff, and key federal and state officials to discuss WCE's proposal and the accompanying environmental review process. At that time, FERC invited all federal, state, or local agencies with jurisdiction or special expertise to cooperate in preparing the EIS, and also invited all interested parties to submit written comments and to attend a public scoping meeting to be conducted jointly by FERC and Massachusetts state officials on July 29, 2003. On December 19, 2003, WCE formally applied to FERC under the Natural Gas Act of

---

[1] An EIS addresses not only environmental issues, but also safety, security and design issues, as well as maritime safety and security operations.

-4-

1938 ("NGA"), 15 U.S.C. §§ 717 <u>et seq.</u>, requesting authority to site, construct, and operate the proposed LNG facility.

During the review process, FERC received voluminous comments from the public, as well as objections from government agencies.    As part of this process, FERC's Commissioner and Chairman also hosted a meeting in January 2005, at which Fall River's Mayor, Senators Edward Kennedy and John Kerry, Congressman James McGovern, Massachusetts Representative David Sullivan, and then-Governor Mitt Romney's representative presented their views on the proposal.

Based on those comments and the research conducted during the review process, FERC prepared and issued a Final EIS on May 20, 2005, and conditionally authorized the project on July 11, 2005.[2] The conditional authorization was based on an analysis of the need

---

[2]    Shortly after conditional approval, on January 23, 2006, FERC denied a petition by CLF to rehear the case.

for the project,[3] project alternatives,[4] and safety and security
considerations.[5]

The conditions imposed on the project's authorization
include two significant hurdles: (1) approval of WCE's
transportation plan by the USCG,[6] and (2) the DOI's finding that
the project is consistent with the Wild and Scenic Rivers Act.[7]

---

[3] LNG facilities have existed in New England for over thirty
years. The demand for the project is fueled by New England's
increasing consumption of natural gas. When consumption peaks in
the winter months, daily demand can exceed supply by over 1 billion
cubic feet of gas. Weaver's Cove Energy, LLC, 112 F.E.R.C. 61,070,
61,528 (2005).

[4] The alternatives considered included: no action or postponed
action; onshore or offshore system and terminal site alternatives;
terminal layout alternatives; and dredge disposal alternatives.
The alternatives each failed for at least one of the following
reasons: it did not meet the purpose of the proposed project; it
could not be developed by 2010, when the project was expected to be
operational; it involved greater environmental impacts; or the
property was not available for development. Weaver's Cove, 112
F.E.R.C. at 61,544.

[5] This includes federal and state safety standards, including the
USCG's security plans for LNG vessels. Weaver's Cove, 112 F.E.R.C.
at 61,540.

[6] "Pursuant to [USCG] regulations, an owner or operator that
intends to construct an LNG facility must submit a Letter of Intent
to the Coast Guard describing . . . the vessels . . . and the
frequency of the visits." Weaver's Cove Energy, LLC, 115 F.E.R.C.
61,058, 61,179 (2006) (citing 33 C.F.R. § 127.007 (2005)). The
USCG makes a determination on the suitability of the waterway for
LNG vessels in a Letter of Recommendation. Id. "Factors
considered by the [USCG] . . . include, as pertinent: density and
characteristics of marine traffic in the waterway; locks, bridges
and other man-made obstructions in the waterway; and water depth
and tides." Id. (citing 33 C.F.R. § 127.009 (2005)).

[7] According to FERC's conditional permit, approval was granted
conditional to the DOI's evaluation that "the project would not

-6-

Neither the USCG nor the DOI have completed their respective final evaluations.

Since the conditional approval, there have also been two changes in project conditions that could very well affect WCE's final project approval. First, at the time of conditional approval, the Brightman Street Bridge, which crosses the river leading from the ocean to the planned LNG facility site, was scheduled for demolition. However, in late 2005, Congress passed legislation forbidding the demolition of the bridge, frustrating WCE's original plan to use 150-foot wide vessels to bring LNG to the facility. A new, larger Brightman Street Bridge is still scheduled to be built next to the old protected bridge. In an amended proposal, WCE informed the USCG that it would use smaller ships that could pass through the ninety-eight foot wide opening of the Bridge, thereby increasing the frequency of shipments from the planned fifty to seventy deliveries up to 120 deliveries per year. Even with the smaller ships, however, transit through the new and old Brightman Street Bridges would be "an extraordinary navigational maneuver" leaving "no margin for error," according to the Coast Guard's preliminary findings.

_____

have a substantial adverse effect on the Taunton River's potential designation as a Wild and Scenic River ("WSR") and that the project would be consistent with the Wild and Scenic River Act if the Taunton River were designated a WSR." Weaver's Cove, 112 F.E.R.C. at 61,550.

-7-

Second, seven months after FERC approval, DOI announced new restrictions that would limit the dredging of the necessary waterways to a few months of the year, likely delaying the completion of the project from 2010 to 2015.

On April 17, 2006, CLF petitioned FERC to reopen the record to consider the impact of those two developments on the project. FERC denied the motion, finding that there had not been a change in circumstances on which its conditional approval was based, and therefore review was not warranted. FERC explained that it is the USCG's duty to review the changed shipment plan in its yet-to-be-released Letter of Recommendation, and that there is no change relative to FERC's conditional approval unless the USCG's review of this matter results in changes to the project that require a change to the plan authorized by FERC.[8]  FERC did not address the potential impact of the changes in dredging regulations on the project's start date.

Following FERC's order denying the motion to reopen the record, CLF requested a rehearing based on the changes to WCE's navigation plan and potential delays caused by the new dredging

_____

[8]    Although the USCG has not provided FERC with a Letter of Recommendation regarding the transit of the LNG vessels, the USCG's preliminary letter stated, as previously noted, that the maneuvers required to get through the Brightman Street Bridges were extremely difficult and that the waterway configuration "appears unsuitable" for WCE's vessel transit proposal. It also noted that the "entire proposed transit route . . . represents a unique challenge to water-borne security."

-8-

constraints.  FERC denied CLF's subsequent rehearing request on July 19, 2006.  The explanation accompanying the denial of rehearing was largely the same as the denial to the motion to reopen.  FERC added that, in regard to the dredging regulations, there was "no new or significantly changed project" warranting a rehearing and that the 2010 target date for the commencement of service was not a prerequisite for FERC's authorization to the project.

The Appellants now seek review of (1) the merits of FERC's conditional project approval and (2) FERC's denial of Appellant's motion to reopen the record.

## II. Discussion

### A. FERC's Conditional Approval

At this time, we decline to review the merits of FERC's conditional project approval because it is not yet ripe for review. "Ripeness is a justiciability doctrine" that is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."   Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807-08 (2003) (quoting Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)). Even in cases "raising only prudential concerns, the question of ripeness may be considered on a court's own motion." Id. at 808.  We now consider the question.

-9-

The ripeness doctrine is designed to prevent courts from "entangling themselves in abstract disagreements over administrative policies" and from improperly interfering in the administrative decision-making process. Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). In determining whether a case is ripe for review, we must examine "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149.

Under the first prong of this ripeness inquiry, fitness for judicial review, we consider "whether the matter involves uncertain events which may not happen at all, and whether the issues involved are based on legal questions or factual ones." Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1237 (10th Cir. 2004); see also McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 70 (1st Cir. 2003) ("In the fitness inquiry, . . . prudential concerns focus[] on the policy of judicial restraint from unnecessary decisions."). "If the court's interest tends toward postponement, we must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted." Midwestern Gas Transmission Co. v. Fed. Energy Reg. Comm'n, 589 F.2d 603, 618 (D.C. Cir. 1978).

In making the fitness determination, the prospect of entangling ourselves in a challenge to a decision whose effects may never be "felt in a concrete way by the challenging parties," Abbott Labs., 387 U.S. at 148-49, is an especially troublesome one. We have explained that "premature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." W.R. Grace & Co. v. EPA, 959 F.2d 360, 366 (1st Cir. 1992) (internal quotation marks and citation omitted). As such, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81 (1985)).

A pragmatic view of the facts in this case reveals that it is not ripe for review. Plainly stated, WCE's proposed LNG project may well never go forward because FERC's approval of the project is expressly conditioned on approval by the USCG and the DOI. Neither agency has yet given its final recommendation, and each has expressed serious reservations about the project. The USCG has remarked that "it appears that the waterway may not be suitable for the type and frequency of LNG marine traffic contained in [the WCE] smaller tanker proposal," and that "the entire

-11-

proposed transit route . . . presents a unique challenge to water-borne security."    Likewise, the DOI has warned that if Taunton River is designated as a National Wild and Scenic River (a designation that has strong local support), it is unlikely that "[the DOI] will . . . be able to provide the statutorily required affirmative statement of no adverse impact," due to the "unavoidable adverse site impacts."    Because "[c]ourts have no business adjudicating the legality of non-events," Nat'l Wildlife Fed'n v. Goldschmidt, 677 F.2d 259, 263 (2d Cir. 1982), we decline to decide whether FERC's actions thus far were proper.

The balance of hardship to the parties in this case does not persuade us otherwise.    Appellants retain every opportunity to challenge FERC's decision in the event the USCG and DOI approve the project.    Such a challenge would not be barred by the statute of limitations.    "A time limitation on petitions for review . . . can run only against challenges ripe for review."    Baltimore Gas & Elec. Co. v. Interstate Commerce Comm'n, 672 F.2d 146, 149 (D.C. Cir. 1982); see also Whittle v. Local 641, Int'l Bhd. of Teamsters, 56 F.3d 487, 489 (3d Cir. 1995) (holding that a cause of action accrues "when it is sufficiently ripe that one can maintain suit on it").    While the statute of limitations may pose a bar to claimants who delay filing their complaints based "on their own assessment of when an issue is ripe for review," see, e.g., Eagle-Pitcher Indus. Inc. v. EPA, 759 F.2d 905 (D.C. Cir. 1985) (articulating the

-12-

limited "circumstances under which the court will engage in 'retrospective ripeness analysis' after the statutory review period has expired"), the appellants here will not suffer that consequence. Because we hold that Appellants' challenge to FERC's approval of the WCE project will not be ripe for review until the USCG and the DOI have given their respective approvals for the project, the statute of limitations period will not begin to run against Appellants until WCE obtains those approvals. Cf. Baltimore Gas & Elec. Co. v. Interstate Commerce Comm'n, 672 F.2d at 149-50 (dismissing the petition on ripeness grounds, but reassuring the petitioner that the statute of limitations would not begin to run until its claims ripened).

Concerns about hardship to the parties are further lessened by the fact that FERC's decision will have no immediate impact on Appellants. Because WCE may not proceed with the NLG project until it obtains approval from the USCG and the DOI, no one will experience the effects of FERC's decision unless and until the agencies authorize the project. See New Hanover Twp. v. United States Army Corps of Eng'rs, 992 F.2d 470, 473 (3d Cir. 1993) (concluding that the challenge to defendant's issuance of a general permit to landfill corporation was not ripe for review because corporation needed further approval from state agency before proceeding with landfill project).

-13-

Given that decisive questions remain open, we think it wiser to allow the agencies to continue their decision-making process at least until final authorization is granted by all three agencies. See Midwestern Gas Transmission Co., 589 F.2d at 620 ("Exhaustion of this administrative process will refine and focus the factual basis upon which both the public interest determination and the overall authorization rest, and will avoid a multiplicity of suits challenging conditional, tentative [agency] decisions."). Until then, our review would be advisory, and likely irrelevant to the ultimate approvability of the project. See Nat'l Wildlife Fed'n, 677 F.2d at 263 (declining to review adequacy of Final EISs prepared for proposed highway sections that might never be built, noting that "[r]eview now might well adjudicate matters which are ultimately immaterial and would by no means put the matter to rest, since actions brought after a decision to build [the highway] has been made can challenge the present [Final EISs] as obsolete."); see also Environmental Defense Fund, Inc. v. Johnson, 629 F.2d 239, 241 (2d Cir. 1980) (holding that adjudication of the legality of an agency's recommendation would be premature where project undergoing further study could ultimately be abandoned or substantially altered).

## B. **FERC's Denial of Appellant's Motion to Reopen the Record**

When FERC denies a petition to reopen a case record, we review its decision for abuse of discretion. E. Carolinas Broad.

-14-

Co. v. FCC, 762 F.2d 95, 103 (D.C. Cir. 1985) ("[We] normally reverse an agency's decision not to reopen the record only for abuse of discretion."). We generally uphold a federal agency's decision not to reopen a record or hearing based on changed circumstances or newly available information unless it "clearly appear[s] that the new evidence would compel or persuade . . . a contrary result." Id. (quoting Friends of the River v. FERC, 720 F.2d 95, 98 n.6 (D.C. Cir. 1983)).

We find that FERC did not abuse its discretion in denying to reopen the record due to the changes in the applicable dredging regulations and the status of the old Brightman Street Bridge. While the changes in dredging regulations are likely to delay project completion, FERC has denied that the anticipated project completion date of 2010 was a controlling factor in its conditional project approval. Thus, it is not clear that the change in the dredging regulations would compel FERC to adopt a "contrary result." Id. Likewise, we cannot conclude that the change in the status of the old Brightman Street Bridge would necessarily compel FERC to revoke the conditional project approval. Congress's prohibition of the demolition of the bridge will surely impact WCE's transit plan, but until the USCG determines the acceptable contours of that plan, FERC is not in a position to make an informed evaluation.

-15-

## III. **Conclusion**

In sum, we will not review the merits of FERC's conditional project approval because we find it is not ripe for review at this time. We also find no abuse of discretion in FERC's decision to deny a reopening of the record. However, our decision does not preclude Appellants from again petitioning FERC to reopen the record -- or subsequently seeking redress with this Court -- when the future of WCE's proposed LNG project is more certain.

**Affirmed**.

# ATTACHMENT 14

II

110TH CONGRESS
1ST SESSION

# S. 868

To amend the Wild and Scenic Rivers Act to designate segments of the Taunton River in the Commonwealth of Massachusetts as a component of the National Wild and Scenic Rivers System.

---

## IN THE SENATE OF THE UNITED STATES

MARCH 13, 2007

Mr. KENNEDY (for himself and Mr. KERRY) introduced the following bill; which was read twice and referred to the Committee on Energy and Natural Resources

---

# A BILL

To amend the Wild and Scenic Rivers Act to designate segments of the Taunton River in the Commonwealth of Massachusetts as a component of the National Wild and Scenic Rivers System.

1   *Be it enacted by the Senate and House of Representa-*
2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. TAUNTON RIVER, MASSACHUSETTS.**

4       Section 3(a) of the Wild and Scenic Rivers Act (16
5   U.S.C. 1274(a)) is amended—

6           (1) by redesignating paragraph (167) (relating
7       to the Musconetcong River, New Jersey) as para-
8       graph (169);

2

1       (2) by designating the undesignated paragraph

2    relating to the White Salmon River, Washington, as

3    paragraph (167);

4       (3) by designating the undesignated paragraph

5    relating to the Black Butte River, California, as

6    paragraph (168); and

7       (4) by adding at the end the following:

8       "(170) TAUNTON RIVER, MASSACHUSETTS.—

9    The segment downstream from the headwaters, from

10   the confluence of the Town River and the Matfield

11   River in Bridgewater to the Mount Hope Bay in the

12   city of Fall River, Massachusetts.".

○

I

110TH CONGRESS
1ST SESSION
# H. R. 415

To amend the Wild and Scenic Rivers Act to designate segments of the
Taunton River in the Commonwealth of Massachusetts as a component
of the National Wild and Scenic Rivers System.

---

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 11, 2007

Mr. FRANK of Massachusetts (for himself and Mr. MCGOVERN) introduced the
following bill; which was referred to the Committee on Natural Resources

---

# A BILL

To amend the Wild and Scenic Rivers Act to designate
segments of the Taunton River in the Commonwealth
of Massachusetts as a component of the National Wild
and Scenic Rivers System.

1    *Be it enacted by the Senate and House of Representa-*
2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. TAUNTON RIVER, MASSACHUSETTS.**

4    Section 3(a) of the Wild and Scenic Rivers Act (16

5  U.S.C. 1274(a)) is amended by adding at the end the fol-

6  lowing new paragraph:

7    "(_____).  TAUNTON   RIVER,   MASSACHU-

8  SETTS.—The segment downstream from the head-

2

1    waters, from the confluence of the Town River and

2    the Matfield River in Bridgewater to the Mount

3    Hope Bay in the city of Fall River, Massachusetts.".

○