# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEAVERS COVE ENERGY, LLC ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 07-cv-1525(RBW) |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPT. OF INTERIOR, ) | |
| *et al.,* ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Bruce F. Kiely (Bar No. 223024)
Adam White (Bar No. 502007)
Jeffrey M. Bauer (Bar No. 494284)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7721
Fax: (202) 585-4076

*Attorneys for Plaintiff Weaver's Cove Energy, LLC*

Dated: February 22, 2008

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION ......................................................................................................1

FACTS .......................................................................................................................5

    A.   FERC's Approval of Weaver's Cove's Project ...........................................6

    B.   Weaver's Cove's Application to the Army Corps for Permission to Dredge ................8

    C.   The WSRA, and Defendants' Actions in this Case ....................................9

        1.   WSRA Background ........................................................................9

        2.   The Taunton River's Status Under the WSRA ..........................10

        3.   Defendants' Actions Claiming Authority Under the WSRA To Bar Weaver's Cove's Dredging ...........................12

        4.   Aftermath of Defendants' Actions ...........................................13

    D.   Other Regulatory Approvals in Process ..................................................14

SUMMARY OF ARGUMENT .................................................................................16

ARGUMENT ..........................................................................................................17

  I.   WEAVER'S COVE HAS STANDING TO RAISE ITS CLAIMS ..................17

    A.   Weaver's Cove Has Standing Because DOI's Determinations Purport To — and in Fact Have — Blocked Weaver's Cove from Receiving Permission to Dredge ...........17

    B.   There Is No Merit to Defendants' Zone of Interests Argument ....................................23

  II.   COUNTS I AND II — IN WHICH WEAVER'S COVE CHALLENGES DEFENDANTS' ASSERTION OF AUTHORITY AS *ULTRA VIRES* — ARE SUPPORTED BY A PROPER CAUSE OF ACTION AND ARE RIPE FOR DECISION ...........................................................................................................26

    A.   Weaver's Cove Has a Cause of Action To Enforce the WSRA's Statutory Limits on Defendants' Jurisdiction ..................................27

    B.   The Claims in Counts I and II Are Ripe for Decision ...............................29

1.    The Issues Are Fit for Judicial Review ...................................................29

2.    Weaver's Cove Will Continue To Suffer Hardship if Review Is Delayed..............30

3.    There Is No Merit to Defendants' Argument that Review of the Denial of this
      Permit Should Wait Until All Other Permits Are Obtained .....................................32

C.   DOI's Other Jurisdictional Challenges to Counts I and II Are Without Merit..............34

III.  WEAVER'S COVE'S APA CLAIMS ARE FINAL UNDER THE APA AND RIPE
      FOR DECISION ..........................................................................................35

A.   Defendants' 2005 and 2006 Letters Are Final ...........................................................36

1.    The Letters Represent the Agency's Conclusive Determination — There Is No
      Indication of Agency Intent To Reconsider Unless Weaver's Cove Changes its
      Proposal ....................................................................................................37

2.    The Letters Determine Rights and Obligations, Giving Rise to Legal
      Consequences.........................................................................................39

B.   The APA Claims Are Ripe for Decision ...................................................................41

CONCLUSION .........................................................................................................42

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ............................................................................. 27, 30

*Aid Ass'n for Lutherans v. USPS,*
    321 F.3d 1166 (D.C. Cir. 2003) ............................................................. 27, 28

*Am. Bird Conservancy v. FCC,*
    --- F.3d ---, 2008 WL 425529, at *2 n.1 (D.C. Cir. Feb. 19, 2008) ............ 30, 38

*Amgen, Inc. v. Smith,*
    357 F.3d 103 (D.C. Cir. 2004) ..................................................................... 23

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) .................................................................... 40

*Athlone Indus., Inc. v. CPSC,*
    707 F.2d 1485 (D.C. Cir. 1983) .................................................................... 30

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................... *passim*

*Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
    452 F.3d 798 (D.C. Cir. 2006) ..................................................................... 41

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986) ............................................................... 30, 41

*City of Fall River v. FERC,*
    507 F.3d 1 (1st Cir. 2007) ........................................................................ 7, 34

*Clark v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) .................................................................................... 23

*Continental Air Lines, Inc. v. Civil Aeronautics Bd.,*
    522 F.2d 107 (D.C. Cir. 1975) ..................................................................... 32

*County of San Miguel v. MacDonald,*
    244 F.R.D. 36 (D.D.C. 2007) ....................................................................... 24

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ............................................................... 27, 28

*FTC v. Standard Oil of Calif.*,
    449 U.S. 232 (1980) ........................................................................ 36

*Forest Guardians v. United States Forest Serv.*,
    370 F. Supp. 2d 978 (D. Ariz. 2004) ............................................. 9, 10

*Fund for Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003) ......................................................... 18

*Int'l Union, United Automobile, Aerospace & Agric. Implement Workers v. Brock*,
    783 F.2d 237 (D.C. Cir. 1986) ......................................................... 36

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Airport Noise, Inc.*,
    501 U.S. 252 (1991) ........................................... 18, 20, 23, 33, 34

*National Parks Conservation Ass'n v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005) ................................................. 20, 21, 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*,
    461 U.S. 190 (1983) ...........................................................29, 30, 31, 32

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*,
    489 F. Supp 699 (E.D. Cal. 1980) ................................................... 31

*Seminole Nation v. Norton*,
    223 F. Supp. 2d 122 (D.D.C. 2002) ................................................. 38

*Sierra Club N. Star Chapter v. Pena*,
    1 F. Supp. 2d 971 (D. Minn. 1998) ................................................. 22

*Sokol v. Kennedy*,
    210 F.3d 876 (8th Cir. 2000) .......................................................... 25

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................ 18

*Swanson Mining Corp. v. FERC*,
    790 F.2d 96 (D.C. Cir. 1986) ....................................................... 9, 22

*Swinomish Tribal Cmty. v. FERC*,
    627 F.2d 499 (D.C. Cir. 1980) ......................................................... 22

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ................................................................. 29, 30

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................. 34, 35, 36

*Venetian Casino Resort, L.L.C. v. EEOC*,
   409 F.3d 359 (D.C. Cir. 2005) ............................................................. 29

*Weaver's Cove v. MassDEP*,
   No. 07-1238 (D.C. Cir.) ....................................................................... 15

*Weaver's Cove v. RIDEM*,
   No. 07-1235 (D.C. Cir.) ....................................................................... 15

*Wilderness Soc'y v. Tyrrel*,
   918 F.2d 813 (9th Cir. 1990) ................................................................. 9

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ................................................................ 29

## STATUTES

5 U.S.C. § 702 ........................................................................................... 18, 34

15 U.S.C. § 717 ............................................................................................. 1

15 U.S.C. § 717b(d) ...................................................................................... 6

15 U.S.C. § 717b(e)(1) .................................................................................. 6

15 U.S.C. § 717r(d)(2) ................................................................................ 15

Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1271 *et seq* ................ 2

   16 U.S.C. § 1273(a) .................................................................................. 9

   16 U.S.C. § 1274 ................................................................................. 9, 10

   16 U.S.C. § 1274(b) ................................................................................ 24

   16 U.S.C. § 1276(a)(137) ........................................................................ 11

   16 U.S.C. § 1278 ................................................................................ 3, 24

   16 U.S.C. § 1278(a) ............................................................................. 9, 24

   16 U.S.C. § 1278(b) ................................................................ 10, 12, 24, 28

16 U.S.C. § 1536(a)(2) ..................................................................................... 19

28 U.S.C. § 1331 ........................................................................................... 35

33 U.S.C. § 403 ("Section 10") ...................................................................... 8

33 U.S.C. §§ 1221 *et seq* ................................................................................ 14

33 U.S.C. § 1341 ............................................................................................. 15

33 U.S.C. § 1344 ............................................................................................. 8

33 U.S.C. § 1413 ............................................................................................. 8

Energy Policy Act of 2005, Pub. L. No. 109-58 § 311, 119 Stat. 594, 686 ................................. 32

Taunton River Wild and Scenic River Study Act of 2000, Pub. L. No. 106-318 § 3, 114
      Stat. 1278 (Oct. 19, 2000) ...................................................................... 10, 11

## MISCELLANEOUS

151 Cong. Rec. H6962 (July 28, 2005) ........................................................ 32

ISO New England, *New England Electricity Analysis,* at 51 (Aug. 2, 2007) ....................... 31, 32

North American Reliability Council, *Long-Term Reliability Assessment, 2007-2016*, at
      148 (Oct. 2007) ..................................................................................... 31, 32

Smith, *More Households Falling Behind in Heating Bills*, Wall St. J., Feb. 14, 2008, at
      D1 ............................................................................................................ 31, 32

*Weaver's Cove Energy, LLC,*
      112 FERC ¶ 61,070 (2005) ................................................................. 6, 7, 14, 15

*Weaver's Cove Energy, LLC,*
      115 FERC ¶ 61,058 (2006) ........................................................................... 6

## INTRODUCTION

Plaintiff Weaver's Cove Energy LLC ("Weaver's Cove") brought this suit to redress a concrete and immediate injury caused by the U.S. Department of the Interior ("DOI") acting through its agencies the National Park Service ("NPS") and the Fish and Wildlife Service ("FWS") (collectively, the "Defendants"). Weaver's Cove has invested over $40 million dollars engineering, planning construction of, and seeking regulatory approval for a marine terminal to be situated on the bank of the lower Taunton River in Fall River, Massachusetts, and for related pipelines. Weaver's Cove's project would receive Liquefied Natural Gas ("LNG") shipped by boat from gas-exporting nations, and would process that gas and distribute it throughout the northeastern United States through interstate gas pipeline networks.[1]

Under Section 3 of the Natural Gas Act, 15 U.S.C. Section 717 *et seq.*, Weaver's Cove is obligated to obtain a public interest determination from the Federal Energy Regulatory Commission ("FERC"). In conjunction with that determination, Weaver's Cove is required to obtain an array of other federal and state permits for the siting, construction, and operation of its LNG terminal. Defendants' actions have served to block two permits necessary for the dredging portion of Weaver's Cove's project. In order to use the proposed terminal, Weaver's Cove must dredge portions of the existing federal navigational channel in the lower Taunton River so that ships carrying the LNG could travel from the Atlantic Ocean to the terminal site. Defendants have blocked FERC from granting Weaver's Cove permission to begin dredging. Defendants

---

[1] LNG is natural gas that has been chilled to -260° F to form a liquid that has one six-hundredth the volume of natural gas in its gaseous state. Converting natural gas to liquid facilitates the efficient transportation of gas from distant gas producing areas to consumers in the United States, via oceangoing tankers. When LNG is returned to its gaseous state through a warming process known as "vaporization," it is essentially indistinguishable from natural gas currently used to heat homes and generate electricity in this country.

have also blocked the U.S. Army Corps of Engineers (the "Corps" or "Army Corps") from issuing Weaver's Cove a permit to dredge.[2]

Defendants have blocked the dredging permissions by issuing two determinations barring the proposed dredging pursuant to a claim of authority under Section 7 of the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1271 *et seq.* Those determinations are attached as Exhibits A and B to the Declaration of George F. "Ted" Gehrig accompanying this memorandum (the "Gehrig Decl."). The first determination, dated July 5, 2005, informed the FERC that Defendants' affirmative signoff on the dredging plan would be "statutorily required" in order for FERC to permit dredging, and that Defendants were not able to sign-off on the dredging plan as proposed. *See* 7/5/2005 Ltr at 3, Ex. A to Gehrig Decl. The second determination, dated February 7, 2006 and addressed to the Corps, notified the Corps of Defendants' purportedly binding determination that the WSRA required the Army Corps to deny Weaver's Cove's application to dredge. *See* 2/7/2006 Ltr, Ex. B to Gehrig Decl. In each determination, Defendants notified the recipient agency that the WSRA prohibited the dredging plan Weaver's Cove had submitted, and that dredging could be allowed only if Weaver's Cove changed the plan by, for instance, restricting dredging to designated times of the year. Because Defendants' actions, on their face, purport to bar Weaver's Cove from receiving the dredging permissions on the applications Weaver's Cove submitted (and because Defendants' additional conditions might make the dredging impossible to complete in a timely manner), Weaver's Cove brought this suit. The suit challenges Defendants' actions in two ways.

---

[2] The dredging permit (which governs the *removal* of sediment from the river bottom) is different from permits for sediment management or disposal, which govern the disposition of the sediment afterwards and are not at issue in this lawsuit.

*First*, in Counts I and II, Weaver's Cove raises a purely legal challenge to Defendants' assertion of jurisdiction over the project at issue. Defendants have based their asserted jurisdiction on Section 7 of the WSRA, 16 U.S.C. § 1278. But that statute does not give Defendants *carte blanche* authority to regulate *every* project that affects *any* river in the United States. Rather, the statute gives Defendants authority only over (i) "water resource projects" on rivers specifically designated by Congress; or (ii) project works in "study areas" — specific regions protected *for a limited time* while Defendants study the possibility of adding them to the designated river list. No part of the Taunton River has *ever* been designated as a wild and scenic river under the WSRA. Count I requests a declaration that Defendants' actions are *ultra vires* and in excess of jurisdiction because Weaver's Cove's proposed dredging project is neither a "water resource project" on a specifically designated river, nor a project work in a Congressionally designated study area. *See* Complaint ("Compl.") ¶¶ 67-76. Count II requests a declaration that Defendants' actions are outside the agency's jurisdiction because the project's only possible connection to the WSRA — that it is 16 miles downstream from an area of the *upper* Taunton River that was *once* designated as a study area — also fails to confer authority on the Defendants. Although the 2000 designation of the Upper Taunton River as a *study area* did confer limited statutory protections, the study area protections expired in 2003. Defendants have therefore blocked Weaver's Cove's project well beyond the expiration date of any conceivable congressional authority. *See* Compl. ¶¶ 77-88. These challenges are purely legal, and can be decided purely by reference to statutory text, without resort to the agency's record.

*Second, and in the alternative*, Weaver's Cove brings APA challenges in Counts III and IV, alleging that even in the unlikely event that the WSRA applied, Defendants' fact-finding and reasoning regarding the dredging proposals' permissibility would be void because they are

arbitrary and capricious and unsupported by substantial evidence in the record. These latter counts would require examination of the agency record, but need only be reached if the Court determines that Counts I and II do not already dispose of the case.

Defendants have not even tried to justify their assertion of authority outside the statute's geographic- and time-limits. Instead, Defendants seek to evade review by raising a hodge-podge of meritless procedural arguments. Defendants argue that Weaver's Cove is without standing because, as a profit-seeking enterprise it is outside the zone of interests of the WSRA, or because the dredging permits blocked by Defendants are only some of the numerous regulatory approvals that Weaver's Cove must obtain to bring its overall project to fruition. Contrary to Defendants' argument, however, Supreme Court and D.C. Circuit precedent have made perfectly clear that when Congress passes environmental statutes, it intends developers to be able to sue to block overenforcement. And Defendants' theory that a plaintiff who requires multiple permits or approvals may not sue over the denial of any until all other permits and approvals are in hand is obviously nonsensical: Such a theory would put developers on an endless merry-go-round in which they might never be able to get review of *any* wrongfully withheld permit or approval, so long as more than one agency was withholding permits or approvals in violation of the law.

Defendants also attack the availability of declaratory relief against *ultra vires* agency action — an argument that requires ignoring clear D.C. Circuit precedent *favoring* such review. And Defendants attack the lawsuit as unripe (and the Defendants' Letters as nonfinal), based largely on their purported willingness to reconsider them if Weaver's Cove capitulates to their position and submits a *different* application, and on Defendants' unfounded and factually false assertions that Weaver's Cove has changed its dredging plans. Contrary to Defendants' implications, this is something that Weaver's Cove has not done: While Weaver's Cove has

submitted alternative plans for various aspects of its LNG vessel transits, it has never submitted a new dredging plan. In any case, the purely legal questions in Counts I and II, involving the agency's statutory jurisdiction under the acts of Congress, are presumed fully ripe and ready for review regardless of Counts III and IV.

The Court should not be deceived. Defendants' objections are but a transparent attempt to distract the court from the real issue in this case: Whether Defendants may block the Weaver's Cove project despite a lack of statutory authority to do so. Defendants' motion to dismiss should be denied, and this case should proceed to summary judgment.

## FACTS

Because Defendants' memorandum shows considerable confusion about the status of Weaver's Cove's dredging proposal, and the relationship between that proposal and various other permitting requirements, Weaver's Cove offers this statement of facts to set the record straight.[3]

Weaver's Cove proposes to construct and operate an LNG marine, import, storage, and vaporization terminal facility at Fall River, Massachusetts, on the lower Taunton River. *See* Compl. ¶¶ 30-35. To allow LNG tankers to access the facility, Weaver's Cove proposes to dredge approximately two miles of the existing federal navigational channel in the Lower Taunton river to allow LNG tankers to transit to and from the terminal site. Compl. ¶ 35. This case arises because Defendants have issued two determinations asserting statutory authority under the WSRA to block the Army Corps from issuing dredging permits unless Weaver's Cove first satisfies Defendants' demands. *See* 7/5/2005 Ltr., Ex. A to Gehrig Decl.; 2/7/06 Ltr., Ex. B to Gehrig Decl. (collectively, the "Letters"). As a result of Defendants' actions, regulatory

---

[3] The facts discussed herein are based on the Complaint and on a declaration by George F. "Ted" Gehrig attached to the memorandum ("Gehrig Decl.") and attachments to that declaration.

consideration of permits necessary for the dredging component of the project to continue has halted.

One fact must be stressed at the outset: Despite Defendants' contrary (and unsupported) assertion, Weaver's Cove has never submitted a changed or altered dredging plan to the Army Corps. The only dredging plan or application submitted by Weaver's Cove is the one that Defendants' Letters have now blocked. *See* Gehrig Decl. ¶ 35. Although Defendants baldly assert that other plans have been submitted, they never cite to such submissions. Instead, Defendants list only potential changes to the ships that would transport the LNG — an issue that does not affect the dredging. Defendants should either state specifically what they contend amounts to the submission of a changed dredging plan, or should retract that falsehood. *See generally* p. 8 & nn.7-8, *infra*.

### A.    FERC's Approval of Weaver's Cove's Project

Federal law makes FERC the primary regulatory authority overseeing the Weaver's Cove project. FERC has "exclusive authority" under the Natural Gas Act to approve the siting, operation, construction, or expansion of the LNG terminal. 15 U.S.C. § 717b(e)(1). Other agencies, however, maintain control over specific aspects of the LNG terminal's construction and operations, *see id.*, and the states of Massachusetts and Rhode Island have certain powers under the Clean Water Act, Clean Air Act, and Coastal Zone Management Act, *id.* § 717b(d).

FERC has approved Weaver's Cove's proposed LNG terminal and related pipelines and has authorized the terminal's construction and operation. Compl. ¶¶ 37-38; *Weaver's Cove Energy, LLC*, 112 FERC ¶ 61,070 (2005) ("*FERC Initial Order*"), *order on reh'g*, 114 FERC ¶ 61,058 (2006) ("*FERC Order on Reh'g*"). After that initial decision, FERC denied various objectors' petitions to reopen the record. *See Weaver's Cove Energy, LLC*, 115 FERC ¶ 61,058 (2006), *order on reh'g*, 116 FERC ¶ 61,041 (2006). The First Circuit, in turn, has also rejected

attempts by Massachusetts, Rhode Island, and other parties to force FERC to reopen the record, and has held that it will postpone deciding objectors' challenges to FERC's conditional approval until Weaver's Cove satisfies certain of the order's initial conditions.   *City of Fall River v. FERC*, 507 F.3d 1 (1st Cir. 2007).[4]

FERC's approval states a variety of conditions which Weaver's Cove must satisfy prior to execution of specific phases or aspects of the project.   *See FERC Initial Order* at App. B.   By the terms of the approval, just three conditions must be satisfied before Weaver's Cove can begin dredging:   The Army Corps must approve both the dredging and the sediment management plan; various federal and state agencies must approve certain dredging mitigation measures; and Weaver's Cove must limit its dredging to certain times of the year so as to minimize environmental impacts**.**   *See FERC Initial Order* at App. B, Conditions 16, 20, 21.   Defendants' contention that other conditions in the Initial Order must be satisfied prior to dredging is refuted by the text of the order itself.[5]

---

[4] The McIntosh Declaration attached to Defendants' Memorandum incorrectly states that in *City of Fall River* the First Circuit dismissed the entire suit on ripeness grounds.   McIntosh Decl. ¶ 19.   In fact, only *some* of the petitions in *Fall River* were dismissed on ripeness grounds.   *See* 507 F.3d at 6-8.   The First Circuit considered other petitions on the merits, and ruled in FERC's favor, affirming the agency's decision not to reopen the record.   *Id.* at 8.

[5] Defendants erroneously assert that the proposed dredging "cannot begin until plaintiff both receives and complies with the conditions of a FERC certificate governing this project's location, construction, and operation."   Def.'s Mem. at 12-13.   Indeed, Defendants charge that the certificate requires Weaver's Cover "to meet *77 conditions* before commencing its LNG dredging project."   (Def.'s Mem. 13 (citing Att. 2 to Def.'s Mem.) (emphasis added)).   But the document Defendants cite plainly lists only *some* of those 77 as requirements "prior to dredging."   Some requirements do not even come into play until *after* the certificated facilities are placed "in service."   *See* Att. 2 to Def.'s Mem., FERC Initial Order App. B (Conditions 12, 22).   And many of the "77 conditions" Defendants cite are not requirements for dredging approval, but rather design requirements for the terminal or pipeline.   *See, e.g., id.* (Conditions 43-60). Even some of the conditions referencing the WSRA do not apply to dredging as such.   Condition 25, for example, which requires Weaver's Cove to document that the project would have no "substantial adverse affect on the Taunton River's potential designation as a Wild and Scenic River . . . and that the project would be consistent with the [WSRA] if the Taunton River were designated a Wild and Scenic River," must be satisfied prior to *construction* of the LNG terminal.   *Id.*   Defendants' statement about 77 conditions is baseless hyperbole.

## B.    Weaver's Cove's Application to the Army Corps for Permission to Dredge

The Army Corps has regulatory authority over Weaver's Cove's dredging plans under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403 ("Section 10").  On March 18, 2004, Weaver's Cove applied to the Army Corps for permission to dredge.  Compl. ¶ 39.[6]

In that application, Weaver's Cove proposed to dredge approximately 2.5 million cubic yards of sediment from the existing federal navigational channel in Massachusetts and Rhode Island waters.  Weaver's Cove's dredging proposal is the same today as it was at the time of its original application.  Without identifying any specific new submission, Defendants repeatedly imply that Weaver's Cove has since changed its dredging proposal.[7]  Such a statement is categorically false:  *Weaver's Cove has never changed its proposal to dredge the Taunton River and other pertinent waterways*.  There is only one dredging proposal: the one that Weaver's Cove proposed to the Army Corps on March 18, 2004, and that the Defendants' actions now block.  *See* Gehrig Decl. ¶ 35.[8]

---

[6] The Corps also has authority over Weaver's Cove's plans for disposing of dredged materials offshore under Section 103 of the Marine Protection, Research and Sanctuaries Act, 33 U.S.C. § 1413.  Those plans for *disposing* of the dredged material are not connected to the WSRA determinations at issue in this lawsuit.  In addition, Weaver's Cove has applied to the Corps for permission to fill the space above a proposed pipeline in Massachusetts under Section 404 of the Clean Water Act, 33 U.S.C. § 1344.  That last application likewise does not relate to dredging and is not at issue in this lawsuit.

[7] *See, e.g., Def.'s Mem.* 9 ("Plaintiff's Initial And Existing LNG Dredging Projects"); *id.* at 10 ("plaintiff changed its LNG dredging proposal"); *id.* at 19 ("plaintiff materially changed the LNG dredging project"); *see also* McIntosh Decl. ¶ 11 ("Interior's analysis of the Taunton River dredging project was based on the project description proposed at the time.")

[8] Defendants' confusion on the subject appears to be rooted in Weaver's Cove's revision of its tanker transit proposals to the Coast Guard or perhaps due to changes in the selection of preferred disposal location for the dredged sediment  It is true that Weaver's Cove has now proposed using smaller tanker ships than before and it is true that Weaver's Cove initially proposed to place sediment upland as a preferred sediment management plan but is now recommending offshore disposal under Section 103 as the preferred sediment management plan.  But this modification have in no way changed its dredging proposal: the original dredging plan (which would have accommodated longer ships with a slightly larger draft) obviously is perfectly capable of accommodating the smaller ships in Weaver's Cove's current tanker transit plans.  *See* Gehrig Decl. ¶ 35.  And changes in sediment disposal *after* dredging has nothing to do with the WSRA and has never been noted as a WSRA issue by Defendants.

### C.    The WSRA, and Defendants' Actions in this Case

As discussed above, FERC has exclusive jurisdiction for the siting, construction, and operation of LNG terminals, and the Corps has statutory authority over dredging.  DOI blocked both FERC and the Corp from approving Weaver's Cove's dredging, under a claim of authority under the WSRA.  That claim of authority is without statutory basis.

### 1.  *WSRA Background*

The WSRA applies only to two categories of rivers:  specifically designated rivers (or river segments), and rivers (or segments) that Congress has chosen to study for potential future designation.  River segments that fall into neither category are not subject to the WSRA at all.  *See Forest Guardians v. United States Forest Serv.*, 370 F. Supp. 2d 978, 987 (D. Ariz. 2004) (holding that Section 7 of WSRA did not apply to water that was neither a Designated River nor a Study River).

*Designated Rivers.*  The WSRA limits development along rivers and river segments that have been specifically designated for inclusion in the National Wild and Scenic River ("NWSR") System ("Designated Rivers").  A river or river segment becomes a Designated River either when *Congress* specifically designates it as such, or when the Secretary of the Interior designates it pursuant to precise statutory procedures after official application by State Governors.  *See* 16 U.S.C. § 1273(a); *see also Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 815 (9th Cir. 1990) (describing designation process).  The WSRA prohibits FERC from licensing certain types of projects "on or directly affecting" Designated Rivers, and prohibits federal agencies from licensing or assisting "water resource project[s]" that would have a "direct and adverse effect" on the purposes for which the river was designated.  *Id.* § 1278(a); *see Swanson Mining Corp. v. FERC*, 790 F.2d 96, 102 (D.C. Cir. 1986).  The list of congressionally designated rivers appears at 16 U.S.C. § 1274, and does not include the Taunton River.

*Study Rivers.*  The WSRA also contains precise, time-limited protections for rivers and river segments that Congress has chosen to study for possible *future* inclusion in the NWSR System ("Study Rivers").  *See* 16 U.S.C. § 1278(b).  For such Study Rivers or study river segments, Section 7 of the WSRA precludes federal agencies from assisting — by license, loan, or otherwise — the development or construction of any "water resources project" that has been found to have a "direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval."  16 U.S.C. § 1278(b).  But the protection is strictly time limited:  It applies (i) for the three fiscal years following designation of the river for study, followed by (ii) the period between the date on which the President's final report on the river is due to Congress and the date on which Congress receives the report, and (iii) the period during which Congress considers the President's report.  *Id.*; *see* Compl. ¶¶ 78-84; *Forest Guardians*, 370 F. Supp. 2d at 982 (describing WSRA "protection for study river[s]" as "short-term").

### 2.  The Taunton River's Status Under the WSRA

No part of the Taunton River is now or ever has been a Designated River under the WSRA.  *See* 16 U.S.C. § 1274.  In 2000, Congress designated an upstream portion of the Taunton River (hereinafter, the "Upper Taunton") for study for possible inclusion as a Designated River in the NWSR System.  Compl. ¶¶ 23-24.  *See* Taunton River Wild and Scenic River Study Act of 2000, Pub. L. No. 106-318 § 3, 114 Stat. 1278 (Oct. 19, 2000).  That study portion, however, was far upstream from the Weaver's Cove site, and the Study River period and related protections in any case expired well before the Defendants' actions in this case.  As the Complaint makes clear (and Defendants have not denied), the statutory period of protection for the Upper Taunton study area expired on September 30, 2004.  Compl. ¶ 80.  As a result, the Upper Taunton's current status under the statute is the same as if it had never been designated for

study, and Defendants' no longer have any jurisdiction under the WSRA as to any aspect of the Taunton River, let alone Weaver's Cove's proposed dredging.

Moreover, in listing the Upper Taunton river for study, Congress did not include the downstream portion of the Taunton River ("Lower Taunton"), on which the Weaver' Cove LNG terminal would be located and through which the LNG tanker ships would transit. *Id.* ¶ 24.  In fact, the lowest boundary of the study area designated by Congress is a full sixteen miles upstream from the Weaver's Cove site. *See* Taunton River Wild and Scenic River Study Act of 2000, Pub. L. No. 106-318 § 3, 114 Stat. 1278 (Oct. 19, 2000).[9]

As the Defendants' Memorandum notes, NPS has chosen, for its own purposes, to "*administratively* extend[] the study area to include the entire river." Def.'s Mem. at 6 (emphasis added).[10]  But such an "administrative extension" does nothing to expand DOI's powers under the statute.  Rather, DOI has explicitly stated to the Army Corps that the "administrative[] exten[sion]" of the study to include the Lower Taunton did *not* affect the WSRA's application to the Lower Taunton:  "The expanded area is not subject to the statutory protection of the study

---

[9] The McIntosh Declaration therefore errs in stating that "[t]he Taunton River has been designated a potential addition to the [NWSR] System . . . pursuant to 16 U.S.C. s 1276(a)(137)." McIntosh Decl. ¶ 2. In fact, that statute clearly states that only the *Upper* Taunton was designated for study. *See* 16 U.S.C. § 1276(a)(137) ("The segment downstream from the headwaters, from the confluence of the Town River and the Matfield River in Bridgewater *to the confluence with the Forge River in Raynham, Massachusetts*." (emphasis added)).  The Court may take judicial notice of the indisputable fact that Fall River, the site of Weaver's Cove's proposed project, lies well outside of this zone.  The site of the proposed Weaver's Cove LNG terminal and LNG tanker transit route therefore are not on the river segment designated for study by Congress.

[10] In June 2007, several years after the Upper Taunton was designated for study (and well after DOI's expected 2005 study-completion date, the DOI issued a "Draft Report and Environmental Assessment," proposing that the entire river be designated for inclusion in the NWSR System.  Weaver's Cove filed comments on September 17, 2007.  DOI has not issued a "Final Report," nor has it publicly responded to Weaver's Cove's comments.  The President has not sent a report to Congress proposing that any segment of the Taunton River be designated for inclusion in the NWSR System.  As a result, the DOI's draft assessment is without effect under the WSRA.

11

legislation." 2/7/2006 Ltr. at 3, Ex. B to Gehrig Decl.[11]  Nor could administrative extension affect the duration of *Congress's* limited time protections for Study Rivers in the WSRA.

### 3. *Defendants' Actions Claiming Authority Under the WSRA To Bar Weaver's Cove's Dredging*

Defendants NPS and FWS, two agencies within Defendant DOI, issued the two determinations at issue in this suit.

*First,* on July 15, 2005, Defendants informed FERC of their conclusion that *Defendants* had ultimate jurisdiction over FERC's ability to authorize Weaver's Cove's terminal, and that Defendants were withholding approval.  The letter asserted that, under the WSRA it was "*statutorily required*" that Defendants make an "affirmative statement of no adverse impact to the values for which the Taunton River may be included in the [NWSR] System" before FERC could conclusively authorize terminal operations.  *See* 7/5/2005 Ltr. at 3, Ex. A to Gehrig Decl. (emphasis added).  Defendants also opined that the Weaver's Cove dredging could *not* be permitted consistent with the WSRA:  "[W]e do not feel that the proposed development can be made compatible with Wild and Scenic River designation of the lower Taunton River in the vicinity of the project area." *Id.*  In short, the letter constituted Defendants' determination (i) that FERC was without power to allow Weaver's Cove to begin dredging unless Defendants made a "no adverse effect" finding; and (ii) that Defendants had decided against such a finding.

*Second*, on February 7, 2006, Defendants notified the Army Corps of their position that the proposed dredging "will have significant impacts to fishery and shellfishery resources," and that the proposed dredging activities are subject to the "statutorily required resource protections

---

[11] In an October 3, 2003 letter to the U.S. Army Corps of Engineers, DOI's Jamie Fossburgh incorrectly stated that the *entire* Taunton River was "under congressionally-authorized study for possible inclusion in the [NSWR] System." 10/3/03 Ltr., Ex. C to Gehrig Decl.  The DOI subsequently contradicted this statement, explaining to the U.S. Army Corps of Engineers that only the Upper Taunton was the subject of the congressionally-authorized study, and only the Upper Taunton received the study-river protections set forth at 16 U.S.C. § 1278(b). *See* 2/7/06 Ltr. at 3, Ex. B to Gehrig Decl.

of the Wild and Scenic Study legislation." 2/7/06 Ltr. at 1-2, Ex. B to Gehrig Decl. Defendants stated their "determination" that the Corps should insist on certain additional dredging restrictions to "ensure that this standard is met." *Id.* at 2. Defendants additionally stated that "there are likely to be unavoidable site impacts associated with this project that render its construction and operation incompatible with Wild and Scenic River designation of the lower-most portion of the mainstem [*sic*] of the Taunton River." *Id.* at 3.

### 4. *Aftermath of Defendants' Actions*

After Defendants' issued their Letters, Weaver's Cove was informed by FERC, via Condition 25 in its Approval Order, and by Army Corps officials, that the Army Corps could not process Weaver's Cove's dredging approval requests in light of Defendants' adverse determination. Compl. ¶¶ 6, 65.

Without conceding Defendants' statutory authority, Weaver's Cove nevertheless worked with DOI in order to secure a finding that neither the LNG terminal nor the proposed dredging activities would have adverse effects on the Taunton River or otherwise violate the WSRA. Compl. ¶¶ 41-62. Seeking an amicable and environmentally friendly solution, Weaver's Cove met repeatedly with DOI and NPS officials and proposed a variety of mitigation measures to safeguard fish and wildlife whether or not the DOI had any actual authority. Those negotiations were ultimately unsuccessful.[12] As a result, after many months of negotiations, Defendants have refused to rescind the letters they issued to FERC and the Army Corps. Those letters continue to

---

[12] Gehrig Decl. ¶¶ 7-30. As of the final meeting on the subject, held on May 3, 2007, the only outstanding issue between Weaver's Cove and the DOI was the manner by which the effect of the dredging on fish migration would be monitored. *See id.* ¶¶ 24-30. Nevertheless, the parties reached impasse and Weaver's Cove filed the present suit. Defendants make an unjustified assertion that Weaver's Cove unilaterally broke off negotiations. That course of negotiation, of course, is wholly collateral to the question of whether Defendants have any authority under the statute. In any event, the evidence demonstrates that Weaver's Cove negotiated in good faith with Defendants, and that the negotiations failed because Defendants refused to consider a reasonable alternative method of monitoring. *See id.*

reflect Defendants' last and final determination that FERC and the Corps cannot permit dredging because Defendants have found the project not to be in compliance with the WSRA.

### D.    Other Regulatory Approvals in Process

Weaver's Cove also has underway regulatory approval processes for other aspects of the project. Because Defendants' Memorandum lists some of these regulatory processes as a reason to deny review, Weaver's Cove briefly summarizes them below.

***Coast Guard Review of Tanker Transit Routes.*** In 2004, Weaver's Cove filed a "Letter of Information" ("LOI") application requesting Coast Guard approval of the LNG vessel transits to and from the proposed terminal under the Ports and Waterways Safety Act, 33 U.S.C. §§ 1221 *et seq.* The 2004 LOI application was subsequently followed by a February 2, 2006, Revised LOI, which also requested the Coast Guard to approve the use of smaller ships. The Coast Guard's Captain of the Port rejected Weaver's Cove's Revised LOI, in late 2007, and on January 8, 2008, Weaver's Cove administratively appealed that determination within the Coast Guard. *See* McIntosh Decl., Att. 8. That appeal is currently pending, and Weaver's Cove also has a right to file an alternate letter of intent to the Coast Guard to address their stated concerns or to propose a different plan.

In any event, the Coast Guard's decision on that application has nothing to do with dredging. FERC's order approving the LNG project had required as a condition of its approval that Weaver's Cove "shall *annually* review its waterway suitability assessment for the project; update the assessment to reflect changing conditions; provide the updated assessment to the cognizant Captain of the Port/Federal Maritime Security Coordinator for review and validation; and provide a copy to the FERC staff." *FERC Initial Order* at App. B, Condition 75 (emphasis added). Contrary to Defendants' assertion (Defs. Mem. 13) this FERC condition was *not* a

prerequisite to commencement of dredging activities. Rather, that condition applies to the "operation" of the LNG facility. *FERC Initial Order* at 61,554.

**Massachusetts and Rhode Island Clean Water Act (CWA) Review.** In 2004, Weaver's Cove requested certifications from Massachusetts and Rhode Island regulatory authorities pursuant to Section 401 of the Clean Water Act ("CWA"), 33 U.S.C. § 1341. Under the CWA, state agencies have one year to act on a "Water Quality Certification" application; where a state fails to conclusively allow or deny the certification within that time period, it forfeits any right to object to the project under Section 401. *Id.*

Here, neither state agency acted within the one year period, and the requirements of Section 401 are waived. Weaver's Cove has therefore petitioned the U.S. Court of Appeals for the D.C. Circuit for declaratory and injunctive relief pursuant to 15 U.S.C. § 717r(d)(2) to make clear that the States' inaction has forfeited their ability to object under Section 401. *See Weaver's Cove v. RIDEM*, No. 07-1235 (D.C. Cir.); *Weaver's Cove v. MassDEP*, No. 07-1238 (D.C. Cir.). The cases are currently pending in the Court of Appeals, with oral argument scheduled for April 7, 2008. Contrary to Defendants' suggestions (Def.'s Mem. 12; McIntosh Decl. ¶ 15), Weaver's Cove's petitions in those cases do *not* challenge *decisions* by MassDEP and RIDEM to deny Weaver's Cove its certifications. Rather, they argue that because the agencies violated the CWA's one-year deadline, they lost any ability to object to the dredging plans under the CWA.[13]

---

[13] Considerably after Weavers' Cove's filing of its D.C. Circuit petitions complaining of the state agencies' inaction, Rhode Island and Massachusetts each issued a variety of determinations. The Massachusetts Department of Environmental Protection has issued approvals under section 401. Rhode Island denied Weaver's Cove's application by deeming the application deficient — even though Rhode Island had previously declared the application complete. Massachusetts granted the application in part and determined to take no action on the other part. Although Weaver's Cove's D.C. Circuit petition against the States maintains that the States were without jurisdiction in the matter because of their failure

## SUMMARY OF ARGUMENT

Defendants virtually ignore the main issue in this case: whether their actions under the WSRA exceeded the authority granted by Congress. As Counts I and II allege (and as Defendants have not seriously attempted to rebut), Defendants lack authority to take *any* action with respect to the Weaver's Cove project because the project is not a "water resource project" on a Designated River or Study River, and because any WSRA protections for *any* part of the Taunton River lapsed years ago. Defendants' actions were therefore *ultra vires*, and should be declared as such by this Court.

Defendants cannot rely on procedural niceties to evade this Court's power over their *ultra vires* actions. Weaver's Cove has standing to bring the claims, the claims are properly pled, and they are ripe for review. Weaver's Cove has suffered an injury-in-fact because Defendants' Letters, by their own terms, bar Weaver's Cove from receiving approval to dredge — a necessary prerequisite to complete a project on which Weaver's Cove has invested over $40 million dollars. Gehrig Decl. ¶ 36. While Defendants appear to claim that the injury is ultimately traceable to the Corps or FERC rather than Defendants, Defendants themselves have lost multiple cases where the Supreme Court or D.C. Circuit held that DOI and its agencies *can* be sued where their determinations change the legal landscape in which *other* agencies determine environmental questions. Courts have also repeatedly rejected Defendants' claims that environmental statutes permit only those pressing for more enforcement to sue, rather than those (like Weaver's Cove) complaining of agency *over*enforcement. Moreover, Weaver's Cove has stated a valid cause of action for declaratory relief to declare illegal *ultra vires* agency action.

---

to act earlier, Weaver's Cove has filed protective administrative and judicial appeals of the Rhode Island determinations to preserve its rights.

The statutory construction issues in Counts I and II are the sort of purely legal questions that the D.C. Circuit finds presumptively ripe for decision.  And — while Defendants' actions are final, as discussed below — finality is not even a requirement where parties raise nonstatutory challenges to *ultra vires* action as Weaver's Cove does here.

The APA claims in Counts III and IV likewise are properly before the Court.  The determinations set forth in the Defendants' Letters are "final agency action," stating Defendants' definitive views on Weaver's Cove's actual dredging proposal, and leaving no possibility for reconsideration unless Weaver's Cove *changed* its proposal.  Although the APA claims (in contrast to the declaratory claims) are not *purely* legal, the issues are ripe for review, and delay would result in extreme hardship.  In any case, even if the APA counts were dismissed on finality or ripeness grounds, the declaratory claims in Counts I and II should nonetheless proceed to judgment independently.

## ARGUMENT

## I.   WEAVER'S COVE HAS STANDING TO RAISE ITS CLAIMS

Weaver's Cove has invested millions of dollars in planning its LNG terminal.  Gehrig Decl. ¶ 36.  One necessary step for Weaver's Cove to achieve a return on that investment is to dredge the existing federal navigational channel to permit LNG tankers to reach the terminal.  Defendants' actions directly prevent Weaver's Cove from obtaining permission to dredge unless Weaver's Cove acquiesces to Defendants' position taken under the auspices of the WSRA.  That is sufficient injury and causation to provide standing for all of Weaver's Cove's claims.

### A.   Weaver's Cove Has Standing Because DOI's Determinations Purport To — and in Fact Have — Blocked Weaver's Cove from Receiving Permission To Dredge

"To establish standing, [plaintiffs] 'must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Airport Noise, Inc.*, 501 U.S. 252, 264 (1991). "'For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint.'" *Id.* Further, the court "must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

Under D.C. Circuit precedent, Weaver's Cove's standing is virtually self-evident, because Weaver's Cove and its LNG project are the object of the administrative actions under review. "In many if not most cases the petitioner's standing to seek review of administrative action is self-evident." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003). "In particular, if the complainant is 'an object of the action (or forgone action) at issue'" there should be "'little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" *Id.* at 733-34. That reasoning should apply here.

Defendants do not appear to take serious issue with Weaver's Cove's ability to meet the injury-in-fact prong.[14]    Instead, Defendants aim their primary barbs at causation and redressibility. According to Defendants, Weaver's Cove "has failed to identify a provision of the WSRA or any other law that requires the federal agencies with primary regulatory" authority to

---

[14] Defendants cite part of the APA, 5 U.S.C. § 702, to assert that Weaver's Cove has failed to "establish a 'legal wrong.'" (Def.'s Mem. 22). Defendants' citation of Section 702 is evidently an attempt to raise issues of sovereign immunity or cause-of-action — not standing. In any case, Section 702 is discussed at p. 34, *infra*. Defendants also argue that Weaver's Cove fails to show violation of "an interest protected by an applicable requirement of the WSRA." (Def.'s Mem. 22). But that, of course, goes to the question of whether Defendants have or have not violated the law — not standing. In any case, Defendants never even attempt to rebut Weaver's Cove's argument that Defendants have in fact committed a "legal wrong" by violating WSRA. Defendants certainly do not point to any statutory provision giving them authority to block Weaver's Cove's dredging, given that the study period for the Upper Taunton has lapsed and that the study region never included the Lower Taunton to begin with.

follow the conclusions of the DOI letters.  Def.'s Mem. 22.  By this, Defendants appear to argue either that it is not, in fact, the positions taken in Defendants' Letters that are preventing Weaver's Cove from receiving its permits or approvals; or that an order against Defendants would not redress Weaver's Cove's injuries, because the other agencies would remain free to withhold dredging permits on the same or other grounds.

A virtually identical argument, however, was rejected by the Supreme Court when the same Defendants presented it in *Bennett v. Spear*, 520 U.S. 154 (1997).  *Bennett* involved a challenge to a biological opinion letter issued by DOI's Fish and Wildlife Service ("FWS") under the Endangered Species Act ("ESA").  *Bennett*, 520 U.S. at 157.  The ESA requires federal agencies to ensure that federally licensed or funded activities not jeopardize endangered species. *Id.* at 157-58; 16 U.S.C. § 1536(a)(2).  The ESA and related regulations required agencies whose activities or licensees might adversely affect such species to engage in formal consultation with the FWS.  *Bennett,* 520 U.S. at 158.  The FWS, in turn, would respond with a Biological Opinion, giving FWS's judgment as to the threat the project posed to protected species, and listing "reasonable and prudent measures" the other federal agency should insist on to minimize the impact.  *Id.*  In *Bennett*, ranchers and an irrigation district sued FWS and DOI challenging an FWS biological opinion that advised the Bureau of Reclamation to revise its policies for the Klamath Project dams in Oregon and northern California.  *Id.* at 158-59.  The FWS advocated for dismissal, arguing that plaintiffs were without standing because it was not the FWS *per se* that had altered policies on the dams; rather, the FWS advice simply made it more likely that the Bureau would eventually do so.  *Id.* at 168.

The Supreme Court rejected the argument.  Like Defendants' argument here, FWS's and DOI's argument in *Bennett* "wrongly equate[d] injury 'fairly traceable' to the defendant with

injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168-69. Although "it does not suffice if the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court,'" that rule "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169. Nor is there a requirement that the sued defendant's decision *absolutely* or *conclusively* determine the other agency's decision. In *Bennett*, the recipient agency was "technically free to disregard the [FWS's] Opinion and proceed with its proposed actions." *Id.* at 170. Nevertheless, the plaintiffs had standing to sue the FWS because the FWS's determination had "alter[ed] the legal regime to which the [other] agency is subject." *Id.* at 169. *Bennett* is directly controlling of this case, as it rejected the same arguments, made by the same Defendants, under a closely analogous conservation statute.

Standing is further confirmed by another Supreme Court decision. In *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991), the Supreme Court found standing where a statute purported to give an allegedly unconstitutional review board power to veto a lower board's decision. Although the review board had not *exercised* that power, the injury asserted by plaintiffs was "'fairly traceable' to the Board of Review's veto power because knowledge that the master plan was subject to the veto power undoubtedly influenced" the other agency. *Id.* at 264. In other words, plaintiffs had standing to sue the board that was without authority, because that board was by its very *existence* altering the decisions of the agency that had issued the decision actually harming the plaintiffs.

Finally, Weaver's Cove's standing is confirmed by a recent D.C. Circuit case, *National Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005). *National Parks Conservation* involved a statutory scheme whereby the same Defendants Weaver's Cove now sues would

assist state governments in the state governments' determination of whether a proposed project would adversely affect air quality in national parks and national wilderness areas. *Id.* at 3. The federal statutory scheme instructed DOI, NPS, and FWS to "transmit[] to the *state* authority their findings regarding the potential air-quality ramifications of the proposed project." *Id.* (emphasis added). The state government would then make its *own* decision on whether to allow the project. *Id.* In *National Parks Conservation*, DOI, reviewing a proposed power plant, first notified the state of Montana that the plant would cause air quality deterioration, but then withdrew that report. *Id.* at 3-4. Environmental groups sued, claiming that DOI's withdrawal of the report was illegal, and had injured the plaintiffs by causing Montana to grant a permit for the plant under Montana's discretionary authority. *Id.* at 4. The Court of Appeals rejected the DOI agencies' argument that the plaintiffs were without standing. Even if Montana *had* "discretionary authority to conduct an independent evaluation" under the statute, "in this case it did not do so." *Id.* at 6. "[I]n determining whether to release an adverse impact report, [DOI] expects and intends its decision to influence the permitting [state] authority." *Id.* Just as in *Bennett*, the DOI determination "'alter[ed] the legal regime to which the [other] agency is subject'" — a fact sufficient to create standing. *Id.* Notwithstanding the fact that Montana had arguable room to act in contradiction to the federal defendants' determination, the Court of Appeals held that the plaintiffs had standing to sue the federal defendants because of the effect their determination could have had on the State.

Those cases compel a finding that Weaver's Cove has standing here. Up until this lawsuit, Defendants have never seen fit to advise FERC, the Army Corps, or Weaver's Cove that the determinations set forth in Defendants' Letters were without legal effect. To the contrary, the 2005 letter to FERC states that DOI's "affirmative statement of no adverse impact" would be

"*statutorily required*" for Weaver's Cove and the recipient agencies to proceed. 7/5/2005 Ltr. at 3, Ex. A to Gehrig Decl. (emphasis added). Just as they were in *Bennett*, Defendants here are, "to put it mildly, keenly aware of the virtually determinative effect of" the opinions they have issued in this case. *Bennett*, 520 U.S. at 170. Indeed, over the years, Defendants have repeatedly maintained that their WSRA determinations *do* bind other agencies. Defendants have insisted on their "right to impose conditions" under the WSRA that bind FERC. *See Swinomish Tribal Cmty. v. FERC*, 627 F.2d 499, 508-09 (D.C. Cir. 1980) (noting that Departments of Interior and Agriculture "insist[ed] on their right to impose conditions"); *cf. Swanson Mining Corp. v. FERC*, 790 F.2d 96, 104 (D.C. Cir. 1986) (FERC's statement that it "lacks 'jurisdiction' to issue a license if the Secretary of the Interior . . . determines that the [WSRA] precludes" it). Defendants have insisted that their WSRA determinations bind the Department of Transportation and Federal Highway Administration. *See, e.g., Sierra Club N. Star Chapter v. Pena*, 1 F. Supp. 2d 971, 975 (D. Minn. 1998) (noting that DOI "directed [other] Federal agencies not to issue permits, approvals, or authorizations" for a bridge that DOI determined would violate WSRA). Defendants' attempt to hint that they *might* entertain another position *now*, for purposes of getting out of this lawsuit, cannot be taken at face value, in light of their previous positions and in light of their own comments in the Letters at issue.

If Defendants wish to enter into a stipulation that the opinions in the Letters should be of no effect in the other agencies' proceedings and that they have no jurisdiction under the WSRA as to the activities in the Lower Taunton River, then Weaver's Cove might have reason to stop prosecuting this lawsuit. Until that happens, however, Defendants' Letters on their face bar FERC from permitting Weaver's Cove to dredge, and have utterly stopped proceedings at the Army Corps. *See* pp. 37-38, *infra*; Compl. ¶¶ 6, 65. As a result, Weaver's Cove has no choice

but to attack the problem at its source in this lawsuit. Under *Bennett*, under *Metropolitan Washington Airports,* and under *National Parks Conservation,* Weaver's Cove has standing to do so.

### B.    There Is No Merit to Defendants' Zone of Interests Argument

Defendants also claim that because the WSRA is a conservation statute, only parties seeking to force *expansion* of environmental protections have standing to sue — not those (such as Weaver's Cove) claiming that the agency has impermissibly exceeded its statutory authority. *See* Def.'s Mem. 23. Although Defendants do not denominate it as such, their citation of cases such as *Clark v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987), suggests that their theory is based on the so-called zone-of-interests test.

But the zone-of-interest test does not apply at all here. As *Clarke* makes clear, the test applies only where the plaintiff "is not *itself* the subject of the contested regulatory action." *Clarke,* 479 U.S. at 399 (emphasis added); *see id.* ("In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."). Here, Weaver's Cove *is* the directly regulated party — Defendants are blocking Weaver's Cove from dredging unless it does what Defendants demand. As a result, the zone-of-interest test does not apply.

Even if the test *did* apply, it would be satisfied. The zone of interest test "is not meant to be especially demanding." *Clarke*, 479 U.S. at 399. And satisfying the test does not require any "indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399-400. Contrary to Defendants' assertion, the fact that Weaver's Cove is motivated by commercial interests does not remove its standing to sue: "Parties motivated by purely commercial interests routinely satisfy the zone of interests test . . . ." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004).

And most importantly, as the Supreme Court has held in addressing another conservation statute, when Congress gives an agency power to regulate *under certain circumstances* for conservation purposes, two kinds of plaintiffs are within the act's zone of interests: conservationists trying to prevent *underenforcement*, and economic actors trying to prevent *overenforcement*.

Once again, *Bennett v. Spear* controls. There, the Supreme Court held that ranchers and other plaintiffs had standing to challenge a determination by the FWS under the Endangered Species Act ("ESA"), notwithstanding that "the interests [the plaintiffs] seek to vindicate are economic rather than environmental." *Bennett*, 520 U.S. at 161, 162-66. The Court discerned in the Endangered Species Act *two* objectives. One was "to advance the ESA's overall goal of species preservation." *Id.* at 176. But the other goal was at least as important: "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 176-77. As a result, the Court held that ranchers challenging a conservation directive as overbroad and not scientifically justified were indeed within the zone of interests for challenging agency action under the statute. *Id.*; *see also County of San Miguel v. MacDonald*, 244 F.R.D. 36, 44 (D.D.C. 2007) (holding that landowners and commercial users had standing to intervene in case concerning ESA designation that could limit their land use and reduce their businesses' profitability).

The reasoning in *Bennett* directly applies here. In passing the WSRA, Congress listed specific conditions in which DOI and other agencies could take specific regulatory actions. Congress restricted the WSRA to specific Designated Rivers, 16 U.S.C. § 1278(a), and further restricted protections around any Designated River to a limited boundary, *id.* § 1274(b). As for Study Rivers, Congress reserved for itself the power to name Study River segments, and Congress imposed strict cut-off dates for each Study River's protections. *Id.* § 1278(b). Those

restrictions reveal that, as in *Bennett*, Congress's goal was twofold: to advance the statute's conservation purposes; and "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett,* 520 U.S. at 176-77.  In seeking to hold Defendants to the limits Congress established, Weaver's Cove is eminently within the WSRA's zone of interest.

Weaver's Cove's ability to judicially challenge Defendants' overenforcement of the WSRA is further confirmed by the Eighth Circuit's decision in *Sokol v. Kennedy*, 210 F.3d 876 (8th Cir. 2000).  In that case (unlike here), the river in question had actually been designated by Congress for WSRA protection.  *Id.* at 877.  A landowner sued, however, complaining that the NPS and DOI had included too much *adjacent* land in the boundaries of the river's protected zone.  *Id.* at 877-78.  The Eighth Circuit rejected the NPS and DOI boundary determination, because the Defendants had not fulfilled the Congressional command to tie the boundaries of the protected area to the precise terms of the standard specified by Congress.  For a Designated River, "[t]he Act allows the administering agency discretion to decide which boundaries [of adjacent land] would best protect and enhance the outstanding remarkable values in the river area, *but it must identify and seek to protect those values, and not some broader category*."  *Id.* at 879 (emphasis added).  As a result, the Court of Appeals "h[e]ld that the Park Service's boundary selection violated its statutory duty under the Act."  *Id.* at 881.  If it is proper for a private party to sue Defendants for exerting jurisdiction over too much land adjacent to an *actual* Designated River, then *a fortiori* Weaver's Cove may sue to prevent Defendants from exerting jurisdiction over a river that has *never* been designated to begin with.  Weaver's Cove is well

within the zone of interests to enforce Congressional goals, and its suit must be allowed to go forward.[15]

## II.    COUNTS I AND II — IN WHICH WEAVER'S COVE CHALLENGES DEFENDANTS' ASSERTION OF AUTHORITY AS *ULTRA VIRES* — ARE SUPPORTED BY A PROPER CAUSE OF ACTION AND ARE RIPE FOR DECISION

In Counts I and II of the Complaint, Weaver's Cove asserts that Defendants' blocking of Weavers' Cove's dredging applications is *ultra vires* because the Weaver's Cove project is not a "water resource project" in a protected area, and because the Taunton River is categorically outside Defendants' Study River jurisdiction both geographically and under the time limits established by statute. Compl. ¶¶ 67-88. Notably, Defendants have nowhere explained how they have any authority, under Section 7 of the WSRA, over a project that does not fall within the definition of a "water resource project." Nor do Defendants explain how an act of Congress gives them authority to do *anything* with respect to the Taunton River now that the study period with respect to the Upper Taunton River has lapsed. Rather, in attempting to block this Court's review, Defendants resort to a grab-bag of purported procedural and jurisdictional complaints.[16]

Each is utterly without merit. Weaver's Cove has a valid cause of action for declaratory relief under the longstanding and well-established principle that parties may sue to enjoin or declare illegal *ultra vires* action unless Congress has indicated the opposite in *exceedingly* clear terms. Moreover, the issues presented are ripe for decision: Counts I and II present purely legal questions of statutory interpretation, which further administrative action would not elucidate at

---

[15] The contrary view would immunize overenforcement of the WSRA no matter how grossly contrary to law. Since Congress passed a carefully delimited statute rather than simply writing Defendants a blank check, such a preposterous result cannot be presumed to have been Congress' intent. Nor would such a result square with D.C. Circuit precedents establishing a high presumption that where Congress specifies limits to agency jurisdiction, it intends those limits to be judicially enforceable via declaratory and injunctive relief. *See* pp. 27-28, *infra*.

[16] Defendants' objections to Weaver's Cove's standing is dealt with above, at pp. 17-26, *supra*.

all. At bottom, this case can be decided simply by determining whether Congress meant what it said when it time-limited the WSRA provisions applicable to study rivers, and limited the Act's protections as a whole to the two categories of rivers specified in the statute. Delay would serve no purpose at all, except to prolong Defendants' illegal activities.

### A.  Weaver's Cove Has a Cause of Action To Enforce the WSRA's Statutory Limits on Defendants' Jurisdiction

Non-statutory review of an agency's *ultra vires* action is a time-honored mechanism that exists in addition to APA review: Even before enactment of the APA it was recognized that "'[t]here is always an appropriate remedy in equity in cases where an administrative officer has exceeded his authority and there is no adequate remedy at law.'" *Abbott Labs. v. Gardner,* 387 U.S. 136, 142 (1967) (quoting Congressional report on APA). The APA did not restrict or cut back that authority to sue over *ultra vires* action. To the contrary, the APA preserved such "non-statutory," pre-APA causes of action.

The D.C. Circuit has stated the principal unequivocally: Whether or not a plaintiff has recourse to review under the APA, "'[j]udicial review is favored where an agency is charged with acting beyond its authority.'" *Aid Ass'n for Lutherans v. USPS,* 321 F.3d 1166, 1172 (D.C. Cir. 2003). "[T]he case law in this circuit is clear that judicial review is available when an agency acts *ultra vires.*" *Id.* at 1173. That is precisely the *gravamen* of Weaver's Cove's claims in Counts I and II. Congress did not write Defendants a blank check to obstruct licenses and economic development for whatever projects, on whatever rivers, and during whatever time periods Defendants choose. Rather, Congress gave Defendants precise limitations on their ability to exercise power under the WSRA, and Defendants clearly have violated those limitations. That makes Weaver's Cove's cause of action proper. "When Congress limits its delegation of power [to an agency], courts infer (unless the statute clearly directs otherwise) that

Congress expects this limitation to be judicially enforced." *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988).[17]   What Weaver's Cove seeks in this case — judicial enforcement of Congress' decision to "limit [the] delegation of power" to Defendants — is therefore entirely proper.

In arguing the contrary, Defendants apparently confuse the availability of declaratory and injunctive relief against *ultra vires* action with the more restrictive requirements applicable to APA relief.   *See* Def.'s Mem. 14-15 (repeatedly citing APA in discussing whether Weaver's Cove has a cause of action to enforce limits under the WSRA).   But *Aid Association* and *Dart* foreclose such an argument.   Weaver's Cove's cause of action for Counts I and II is proper.

Defendants also present a highly confusing argument that Weaver's Cove cannot prevent Defendants from exceeding their WSRA jurisdiction precisely *because* Weaver's Cove claims that its project is not covered by the WSRA.   *See* Def.'s Mem. 15-16.   Defendants first quote statutory language making clear Congress's intent to limit WSRA applicability to "water resources project[s] that would have a direct and adverse effect on" rivers designated under the Act.   Def.'s Mem. 15 (quoting 16 U.S.C. § 1278(a).   Defendants then conclude that Weaver's Cove cannot enforce these limits precisely because Weaver's Cove alleges that Defendants have violated them (Def.'s Mem. 16).   The argument is not only circular, but conclusively wrong. *Every time* a plaintiff sues to prevent *ultra vires* action, its argument is that the agency is seeking

---

[17] Indeed, the principle requiring court review of *ultra vires* actions is so strong that the D.C. Circuit generally infers Congressional intent to preserve such review even where Congress has *explicitly* barred review in general.   *See Aid Ass'n for Lutherans*, 321 F.3d at 1173 ("'Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction.'"); *Dart*, 848 F.2d at 221-23 (even where Congress has expressly precluded review of actions within an agency's authority, D.C. Circuit presumes that review is available for actions that on their face go beyond the agency's authority).   Since no express intent to preclude review of *anything* is discernable in the WSRA, that makes this an *a fortiori* case.

to apply the law in a circumstance where the law by its own terms does *not* apply. As explained above, the D.C. Circuit finds such lawsuits absolutely proper. *See* pp. 27-28 & n.17, *supra*.

**B.    The Claims in Counts I and II Are Ripe for Decision**

In determining ripeness, the Court must "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 364 (D.C. Cir. 2005). Ripeness is decided claim-by-claim; if some claims are ripe and the others not, only the unripe claims should be dismissed. *See, e.g., Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) (deciding ripe portion of complaint on the merits, but not deciding unripe portion). As Defendants note, ripeness is traditionally decided with reference to two factors: the fitness of the issues for judicial review; and the hardship the plaintiffs would suffer from delaying review. *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 200 (1983). Here, both factors identify the claims in Counts I and II as ripe.

**1.    *The Issues Are Fit for Judicial Review***

The issues in Counts I and II are fit for review because they "'raise purely legal questions,'" making them "'presumptively suitable for judicial review.'" *Venetian Casino*, 409 F.3d at 364. Count II presents the purely legal question of whether Defendants can continue to exercise WSRA authority over any part of the Taunton River years after the statutory protections for the study river portion have lapsed. Count I asks a further purely legal question: whether, even disregarding the expiration of the study period protection, the designation of the Upper Taunton as a study region conferred any regulatory authority on DOI over the part of the river sixteen miles downstream, where the dredging would occur. As case after case recognizes, "purely legal" questions involving the construction of an Act of Congress are generally considered fit for review. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581

29

(1985) (finding case ripe where issue presented "is purely legal, and will not be clarified by further factual development"; *Abbott*, 387 U.S. at 149 (finding case ripe, in part because "the issue tendered is a purely legal one" involving "whether the statute was properly construed"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (case ripe where claim was an issue "purely of congressional intent").[18]   Just this month, the D.C. Circuit reiterated that "'purely legal' issues are generally fit for review." *Am. Bird Conservancy v. FCC*, --- F.3d ---, 2008 WL 425529, at *2 n.1 (D.C. Cir. Feb. 19, 2008).   As these cases make clear, there is a *strong* presumption that purely legal questions are fit for immediate review.   Here, that presumption not only applies, but also is unrebutted.   There is no sense in which further agency action will change the Court's determination as to whether Defendants may evade statutory limits on their jurisdiction.   Nor would further administrative proceedings shed light on the subject.   "'Where the only . . . dispute relates to the meaning of the statutory term . . . [the controversy] presents issues on which courts, and not [administrators] are relatively more expert.'"   *Athlone Indus., Inc. v. CPSC*, 707 F.2d 1485, 1489 (D.C. Cir. 1983) (alterations in original).   The claims in Counts I and II are eminently fit for review, and delay would serve no purpose.

### 2.   *Weaver's Cove Will Continue To Suffer Hardship if Review Is Delayed*

The case is also ripe under the hardship prong.   Weaver's Cove is engaged in a multifaceted, time-consuming, and expensive regulatory approval process to obtain all necessary licenses to allow a multimillion dollar energy project to proceed.   By claiming first that the project is covered by the WSRA, and then that the project would not comply with WSRA requirements, Defendants have blocked Weaver's Cove from obtaining a permit for an activity

---

[18] Indeed, the Supreme Court has found cases ripe even where the issue was only "*predominantly* legal." *Pac. Gas*, 461 U.S. at 201 (emphasis added).   Since the issues in Counts I and II are *purely* legal, the case for ripeness is that much stronger.

integral to the project's functioning. Delaying review would serve no purpose for the agency, which has already staked out its position. *See generally* pp. 36-41 (discussing finality of DOI action). But delay would gravely burden Weaver's Cove by imposing additional delay, cost, and uncertainty. Gehrig Decl. ¶¶ 1, 36.

In *Pacific Gas & Electric Co. v. State Energy Resource Conservation & Development Comm'n*, 461 U.S. 190 (1983), the State of California had passed a law baring construction of nuclear plants until the State determined that the nation had adequate technology for long-term nuclear waste disposal. *Id.* at 198. Two utilities sued, claiming that the state law was preempted by federal law. As the district court opinion made clear, the plaintiffs had not even begun the federal approval process before bringing suit — rather, they alleged that they *planned* to seek federal approval for nuclear plants in the future if a court would first declare the state laws preempted.[19] Nevertheless, the Supreme Court held that the plaintiffs' challenge to California's moratorium was ripe for immediate review. *Pac. Gas*, 461 U.S. at 201-02. The Court noted that "construction of new nuclear facilities requires considerable advance planning." *Id.* at 201. As a result, the hardship prong for ripeness was demonstrably met: "[F]or the utilities to proceed in hopes that, when the time for certification came, either the required findings would be made or the law would be struck down [would] require[] the expenditures of millions of dollars over a number of years, without any certainty of recovery if certification were denied." *Id.* In short, "'[t]o require the industry to proceed without knowing whether the [State government's] moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California." *Id.* at 201-02.[20]

---

[19] *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 489 F. Supp 699, 701 (E.D. Cal. 1980).

[20] The Court's concern for the "citizens of California" who would be served by a nuclear plant shows that this Court should also consider the hardship that delay causes American consumers who would be served

The same is true here. Builders' ability to proceed in the face of regulatory uncertainty has its limits. Planning and building an LNG facility is like assembling a complex puzzle composed of interlocking and interdependent regulatory, engineering, and financing pieces. If courts postpone review where agencies wrongly withhold particular regulatory pieces, then the puzzle will never be built.[21] "However much the courts might prefer to resolve a particular question at another time and place, they should have a very good reason for indulging that preference if in doing so they are refusing a petitioner's request to be relieved of an onerous legal uncertainty." *Continental Air Lines, Inc. v. Civil Aeronautics Bd.*, 522 F.2d 107, 128 (D.C. Cir. 1975) (en banc portion of opinion). Defendants' made-up assertions about revised dredging proposals — and their misrepresentations about which of FERC's conditions apply to dredging — do not even come close to meeting that standard.[22]

---

by the imported LNG once the project is completed. As has been commonly noted, high heating costs, which exact a severe toll on consumers, could be greatly ameliorated by an increase in LNG supply and a corresponding decrease in natural gas prices. *See generally* Smith, *More Households Falling Behind in Heating Bills*, Wall St. J., Feb. 14, 2008, at D1; ISO New England, *New England Electricity Analysis,* at 51 (Aug. 2, 2007), *available at* http://www.iso-ne.com/committees/comm_wkgrps/othr/sas/mtrls /elec_report/scenario_analysis_final.pdf; North American Reliability Council, *Long-Term Reliability Assessment, 2007-2016,* at 148 (Oct. 2007), *available at* ftp://www.nerc.com/pub/sys/all_updl/ docs/pubs/LTRA2007.pdf.

[21] Although *Pacific Gas* did find another portion of the utilities' challenge unripe, that aspect of the case does not apply here. *Pacific Gas* determined not to decide the utilities' challenge to a California statute requiring the State's case-by-case approval of the adequacy of interim waste-storage plans for contemplated nuclear facilities. *Pacific Gas*, 461 U.S. at 197-98, 203. The Court denied review because it was not clear that the State would ever find a plant's interim storage plans to be inadequate. *Id.* at 203. Here, by contrast, Defendants *have* blocked a concrete plan proposed by Weaver's Cove.

[22] In addition, *Pacific Gas* found relevant that Congressional legislation showed an intent to remove hindrances to the commercial development of atomic energy. *Pac. Gas*, 461 U.S. at 202. Here, an analogous factor favors immediate review of Defendants' attempt to obstruct Weaver's Cove's LNG terminal. Congressional determination to remove improper roadblocks to LNG terminal approval is evident, for instance, in the Energy Policy Act of 2005, Pub. L. No. 109-58 § 311, 119 Stat. 594, 686, which was intended to "break[] the bureaucratic logjam that ha[d] stymied work on approximately 40 liquefied natural gas facilities nationwide." 151 Cong. Rec. H6962 (July 28, 2005) (statement of Rep. Murphy).

### 3.    There Is No Merit to Defendants' Argument that Review of the Denial of this Permit Should Wait Until All Other Permits Are Obtained

Defendants at times suggest that consideration of this case should be delayed until Weaver's Cove successfully obtains *all* the other permits that would be necessary for all phases of the project to go forward.  The argument both rests on an illogical premise, and reveals a profound insensitivity to the hardship that such a rule would cause those in Weaver's Cove's position.  The logical fallacy in Defendants' position is easy to spot:  For any project involving *multiple* permits, there is a substantial chance that more than one such permit will be wrongfully withheld.  Defendants' rule would thus result in a scenario in which *no* permit denial could be challenged, because any challenge to one permit would be delayed on grounds of the other missing permits — a problem compounded by the fact that (as here) various regulatory statutes direct different district or circuit courts as the appropriate venue for challenging particular regulatory denials.

A policy of waiting for all permitting processes to conclude before judicial review of wrongful denials would also impose tremendous hardship on applicants such as Weaver's Cove.  Moving projects forward amidst complex regulatory schemes requires proceeding on several fronts at once.  To require conclusion of one process before even beginning judicial review of another would expand the timeline for such projects exponentially.  When a court does find agency action unlawful, the most common result is to vacate and remand for the agency to try again — which on Defendants' view, would mandate yet further delays in judicial review for all the other permits.  Imposing such a procedural requirement would incentivize agency delay, because a hostile agency would know that by delaying its own procedures, it could stop further action on judicial review not just of its own actions but of other agencies' as well.  In *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*,

501 U.S. 252 (1991), where plaintiffs challenged a review board's authority to veto another agency's decisions, the Supreme Court found the challenge ripe even though the veto power had not yet been exercised. "The threat of the veto hangs over the [other agency] like the sword over Damocles, creating a 'here-and-now subservience' . . . ." *Id.* at 265 n.13. The same is true here. The suit is ripe.[23]

### C.    DOI's Other Jurisdictional Challenges to Counts I and II Are Without Merit

Defendants also allude to a variety of other potential objections to Weaver's Cove's suit. To the extent Defendants imply (Def.'s Mem. 14-15) that the claims in Counts I and II are precluded by sovereign immunity because non-APA suits are outside of the immunity waiver in 5 U.S.C. § 702, the argument borders on the frivolous. In *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006), the D.C. Circuit expressly reaffirmed a plethora of cases "holding that the 'APA's waiver of sovereign immunity [under 5 U.S.C. § 702] applies *to any suit* whether under the APA or not.'" *Id.* at 186 (emphasis added).

*Trudeau* also makes clear that Defendants' arguments on finality (refuted at pp. 36-41, *infra*, with respect to the APA claims) have no bearing at all on Weaver's Cove's non-APA claims in Counts I and II. *Trudeau* directly holds that "'judicial review is available when an

---

[23] The First Circuit's decision in *City of Fall River v. FERC*, 507 F.3d 1 (1st Cir. 2007), is not to the contrary. There, the First Circuit held that petitions by parties *objecting* to FERC's conditional approval and seeking to block the project *outright* were not ripe. On the balance of hardships prong, the Court found it significant that petitioners objecting to the project would not "experience the effects of FERC's decision" until all other regulatory approvals were in — because without those approvals, Weaver's Cove would not proceed to build the project. *Id.* at 7. Objectors could very well achieve their goal — blocking the project — without the First Circuit deciding the case, because overturning the FERC certificate would have been a sufficient, but not necessary, step towards that goal. Weaver's Cove, however, is in the opposite position. It cannot achieve *its* goal — building and putting the project into operation — unless all required permits *are* obtained. Therefore, in every case where an agency blocks a permit, judicial review of that permit is a *necessary* step for Weaver's Cove to achieve the complete relief to which it is entitled. (This distinction is illustrated by the fact that the First Circuit *did* decide other petitions in that case – namely, challenges to FERC's refusal to reopen the record. *Id.* at 8.)

agency acts *ultra vires*' even if a statutory cause of action is lacking" for reasons such as lack of finality under the APA. *Id.* at 190.[24]

Also meritless is Defendants' suggestion that this case should be dismissed for lack of a specific jurisdictional statute covering suits to enforce WSRA limitations. Def.'s Mem. 14. Jurisdiction over Counts I and II — which ask whether a federal agency is exceeding the authority delegated by an Act of Congress — is conferred by the general federal question statute, 28 U.S.C. § 1331. *See* Compl. ¶ 13. As shown above, *see* pp. 27-28 & n.17, the D.C. Circuit has specifically held that declaratory or injunctive relief is proper for such questions.

For the reasons stated above, Weaver's Cove's request for declaratory relief in Counts I and II are properly before the court; they are ripe; and Weaver's Cove has standing to bring them. Thus, regardless of the Court's disposition of Counts III and IV, Counts I and II should proceed to summary judgment.

## III.    WEAVER'S COVE'S APA CLAIMS ARE FINAL UNDER THE APA AND RIPE FOR DECISION

In Counts III and IV, Weaver's Cove challenges Defendants' Letters under the APA, contending that the Letters were arbitrary and capricious and not supported by substantial evidence. *See* Compl. ¶¶ 89-94 (Count III); *id.* ¶¶ 95-99 (Count IV). Those counts charge that the agency — which cited no record in support of the Letters' conclusions — acted arbitrarily and capriciously and without substantial evidence in concluding that the Weaver's Cove dredging would negatively affect values protected under the WSRA.

Once again, Defendants seek to evade review on the merits by raising a variety of non-merits-based requests for dismissal. But Defendants' efforts to paint its 2005 and 2006 letters

---

[24] *Trudeau* also explains that nonstatutory review is, in some ways "a more difficult course" than APA review. 456 F.3d at 347. But that at most means that the plaintiff must establish a clear violation of law by the defendant agency.

fail because of the Letters' own text. The letters evince no intent on Defendants' part to reconsider their conclusions unless *Weaver's Cove* first capitulates to Defendants' WSRA-based positions — something that Weaver's Cove has not done. Likewise, Defendants' ripeness arguments are without merit.[25]

### A.    Defendants' 2005 and 2006 Letters Are Final

Although Defendants assert that finality is an issue of jurisdiction and justiciability, the D.C. Circuit has held that "the APA's final agency action requirement is not jurisdictional." *Trudeau*, 456 F.3d at 184. At most, then, it is a question relating to Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim, and it is subject to all the ordinary requirements of that rule, including those precluding Defendants from basing their argument on matters outside the Complaint. That in itself precludes Defendants from relying on their assertions that Weaver's Cove, or Defendants themselves, have taken actions subsequent to the letters rendering Defendants' actions nonfinal.

The finality inquiry "is a 'flexible' one which necessarily takes account of 'pragmatic considerations.'" *Int'l Union, United Automobile, Aerospace & Agric. Implement Workers v. Brock*, 783 F.2d 237, 248 (D.C. Cir. 1986) (quoting *FTC v. Standard Oil of Calif.*, 449 U.S. 232 (1980)). There are two aspects to finality. First, a final decision is one that is not "merely tentative or interlocutory." *Bennett*, 520 U.S. at 178. Second, "the action must be one by which 'rights and obligations have been determined' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178. Defendants' determinations in the Letters at issue here meet both requirements.

---

[25] Defendants' standing argument with respect to all counts in the Complaint has been previously discussed at pp. 17-26, *supra*.

### 1. The Letters Represent the Agency's Conclusive Determination — There Is No Indication of Agency Intent To Reconsider Unless Weaver's Cove Changes its Proposal

The 2005 and 2006 letters, on their face, do not purport to be tentative or interlocutory, but rather set forth the Agency's definitive view on the dredging application. The letters evince the agency's intent to revisit the question *only if Weaver's Cove changed its application by proposing additional restrictions satisfactory to Defendants.*

The 2005 Letter to FERC makes clear Defendants' conclusion that the conditions proposed in Weaver's Cove's application do not "adequately address protection of the fishery resource." 7/5/2005 Ltr at 3, Ex. A to Gehrig Decl. The letter did state a willingness to coordinate further reviews to consider future proposals that might include *additional* conditions to safeguard fishery resources, such as "time of year restrictions" on dredging. *Id.*[26] But the Letter was clear: "In the absence" of such additional conditions, "we will not be able to provide the statutorily required affirmative statement of no adverse impact." *Id.* The Letter's concluding statements are even more emphatic. Defendants stated that "[w]e do not feel that the proposed development can be made compatible with [WSRA] designation of the lower Taunton River"; and that "the NPS would not be able to find . . . compatibility" for "the project as currently proposed." *Id.* at 4.

The 2006 Letter, likewise determines that "[a]s currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River." 2/7/2005 Ltr., at 4, Ex. B to Gehrig Decl. Once again, there is no indication that the agency would reconsider its conclusions about the project "as currently proposed." The letters point to no procedure by which Weaver's Cove could request further consideration of the

---

[26] Although FERC had already adopted time-of-year restrictions, Defendants have sought to impose more onerous restrictions.

extant proposal. At most, the letter leaves open a possibility for reconsideration if Weaver's Cove *changed* its proposal to meet DOI's WSRA-based demands.

When the Letters are considered not just individually, but as part of Defendants' overall sequence of communications in this case, and their litigating positions in other cases, *see* pp. 21-22, *supra*, it becomes even clearer that Defendants have reached a final and conclusive determination that *they* have the final say over Weaver's Cove's WSRA compliance, and that they will *not* approve the dredging project. As a result, the decisions are final. "[T]he defendants' steadfast position . . . has been sufficiently reiterated so as to constitute the agency's final position on the matter." *Seminole Nation v. Norton*, 223 F. Supp. 2d 122, 143 (D.D.C. 2002).

Defendants' contrary argument is based largely on the supposition that Defendants' position on Weaver's Cove's dredging "could change if either FERC or plaintiff adopted 'satisfactory fishery resource protection,'" or if the Army Corps or Weaver's Cove "adopted [Defendants' WSRA-based] 'time-of-year restrictions for both upstream and downstream migrations.'" Def.'s Mem. 18. But Defendants' willingness to consider a *different* proposal *if* one is submitted has no bearing on the finality of their conclusion on *this* proposal, which actually *was* submitted. Otherwise, agencies could delay judicial review indefinitely, denying a party's *current* request for a license, but leaving open the possibility of considering a *modified* request. The APA does not permit such game-playing as a way to evade review. *Cf. Am. Bird Conserv., Inc. v. FCC*, --- F.3d ---, 2008 WL 425529, at *2 n.1 ("[A]gencies cannot avoid judicial review of their final actions merely because they have opened another docket that may address some related matters."). Certainly, the letters themselves indicate no process by which

Weaver's Cove could appeal the determinations therein by administrative processes within Defendants' agencies.

Defendants also premise much of their argument on their allegation that Weaver's Cove *has* changed its dredging proposal. *See* p. 8 & nn.7-8, *supra*. But that allegation is categorically false. Defendants cite no submission by Weaver's Cove that would constitute such a changed proposal. Weaver's Cove states definitively that is has *not* made such a submission. *See id.*; *see also* Gehrig Decl. ¶ 35.[27] The only action Defendants point to is a proposal to use smaller ships — not a change in the dredging plan. Defendants' allegations on this point are, moreover, foreclosed because they rely on extra-record evidence, whereas finality is a non-jurisdictional issue. *See* p. 36, *supra*. Finally, even if Weaver's Cove *had* made such an alternative dredging proposal in response to Defendants' actions, that would not destroy Weaver's Cove's right to judicial review of Defendants' erroneous WSRA-based decision on its *initial* submission. In short, there is no doubt that the Letters represent Defendants' final decisions on the matter. Defendants' contrary arguments are unsupported and legally irrelevant.

### 2. The Letters Determine Rights and Obligations, Giving Rise to Legal Consequences

The Letters likewise satisfy the second prong of the finality inquiry — they determine rights and obligations and give rise to legal consequences. The 2005 Letter to FERC states that a DOI "statement of no adverse impact" is "statutorily required" for the project to proceed — and that DOI can provide no such statement. 7/5/2005 Ltr. at 3, Ex. A to Gehrig Decl. As a result, that Letter, on its own terms, prohibits FERC from issuing an unconditional approval and prohibits Weaver's Cove from proceeding to dredge. It matters not that DOI's determination

---

[27] Weaver's Cove, in an effort to arrive at a workable resolution of the WSRA issues, proposed to add additional mitigation measures to further minimize any potential impact of dredging. But those attempts at settlement — which were unsuccessful — did not result in changes to the dredging proposal that Weaver's Cove actually submitted.

ultimately affects Weaver's Cove through its application by another agency.  In *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), the D.C. Circuit held that an EPA Guidance document telling state agencies how *they* should regulate power companies was indeed final for purposes of the power companies' challenge.  The D.C. Circuit had no trouble concluding that such a document created "obligations on the part of the State regulators *and those they regulate*." *Id.* at 1023 (emphasis added).  The same is true here.  Defendants' actions effectively foreclose Weaver's Cove from proceeding to dredge, because Defendants have announced that it would be illegal both for Weaver's Cove to dredge and for the other agencies to permit such dredging, absent Defendants' consent under the WSRA.

*Bennett v. Spear* establishes the finality of the actions under challenge here.  Just as in *Bennett*, DOI has issued a determination that "alter[s] the legal regime to which the [other] agency is subject," thereby affecting not just the other agency's freedom, but also the regulated party's freedom.  *Bennett,* 520 U.S. at 178.  *Bennett* found that fact sufficient to establish not just standing, *see* pp. 19-20, *supra*, but also finality.  *See Bennett,* 520 U.S. at 178.  Indeed, *Bennett* explicitly distinguished the sort of DOI action at issue there (and here) from other cases where agency action was found non-final because it was a true recommendation that the recipient had "absolute discretion to accept or reject."  *Id.* (discussing *Dalton v. Specter*, 511 U.S. 462 (1994)).  Here, contrary to Defendants' arguments in its Motion, and as the 2005 Letter to FERC makes clear, Defendants' position is that the recipient agencies in *this* case do *not* have discretion to reject DOI's determinations.  Rather, Defendants' Letter stated that a DOI statement of no adverse impact would be "statutorily required" before FERC could issue a permit.  7/5/2005 Ltr at 3, Ex. A to Gehrig Decl.  That is also the position Defendants have taken in other cases.  *See* p.

22, *supra*.[28] Defendants' carefully hedged pretense that their decision *might* have other effect in this case is but a convenient and late-adopted litigating position that cannot immunize their decisions from review.

### B.    The APA Claims Are Ripe for Decision

Unlike the non-statutory claims in Counts I and II, Weaver's Cove's APA claims in Counts III and IV cannot be considered purely legal. Nevertheless, they are ripe for decision now. The ripeness doctrine is not simply a way for agencies to delay paying the piper. Rather, it is a doctrine designed to ensure that judicial review is limited to actual controversies, that are concrete enough to allow appropriate review. Those conditions are satisfied here. Defendants have not identified any additional administrative action *they* are taking with respect to Weaver's Cove's *actual* application that would further develop the case for judicial review. Defendants' main argument for why the issue is unfit for review — that Weaver's Cove has submitted an alternative dredging plan — is simply without basis in fact. *See* p. 8 & nn. 7-8, *supra*. As a result, there is no sense in which further delay would make the issues more fit for review. In addition, Defendants' improper obstruction of the dredging imposes substantial hardship on Weaver's Cove. *See* pp. 30-34, *supra*. Thus, although ripeness of the APA claims is considered

---

[28] There is no doubt that letters announcing an agency's position may qualify as final. In *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), for instance, the D.C. Circuit found a series of EPA letters announcing the agency's position on a pesticide subject to immediate review, notwithstanding the fact that the agency had neither incorporated the letters' positions into regulations nor begun enforcement proceedings. In arguing against finality, Defendants primarily cite to cases that find a lack of finality in documents that merely announce an abstract policy without applying it to particular cases. In *Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006), for instance, the issue was the finality of agency letters discussing "'policy guidelines' for 'regional recalls'." *Id.* at 800. Here, by contrast, the letters at issue are not generalized policy guidelines. They are specific *determinations about a specific project*, specifically informing the recipient agencies that licensing cannot be approved for *that* project as currently proposed. That makes this case far closer to *Ciba-Geigy* than to *Center for Auto Safety*. In addition, *Center for Auto Safety* found it critical that the letters at issue there had been issued by a person with no authority to bind either the recipients or the agency. *Id.* at 810. Here, by contrast, the letter to FERC itself *states* that the recipient agency is bound. Defendants have not asserted that the Letters challenged in this lawsuit were sent by a rogue employee without authority to state the agencies' positions.

separately from that of the Declaratory Judgment claims, the APA claims are sufficiently ripe for immediate review.

## CONCLUSION

While Defendants expend great energy and resources inventing reasons why this case should not be heard, they never even *attempt* to justify how the Weaver's Cove project qualifies as a "water resource project." Nor do they justify how Congress' now *expired* designation of the *Upper* Taunton River as a study area justifies Defendants' blocking of Weaver's Cove's attempt to dredge the *Lower* Taunton. This is no accident: Defendants do not attempt any such justification because none is possible. There is no statute making the Lower Taunton a Designated River or study area, and no statute extending the Upper Taunton study period beyond 2003. Nor is there any statute or principle of law conferring on these agencies the power to unilaterally disregard the geographical- and time-limits Congress placed on their powers under the WSRA. Weaver's Cove therefore has access to this Court under the time-honored method of seeking declaratory relief to prevent an agency's *ultra vires* actions. In addition, Weaver's Cove rightfully challenges the substance of Defendants' determinations under the APA.

For the reasons given above, the Court should deny Defendant's Motion to Dismiss, and should set a schedule for summary judgment briefing so that the case can be decided on the merits.

Respectfully submitted,

<u>/s/ Bruce F. Kiely</u>
Bruce F. Kiely (Bar No. 223024)
Adam White (Bar No. 502007)
Jeffrey M. Bauer (Bar No. 494284)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
Tel: (202) 639-7721
Fax: (202) 585-4076

Attorneys for Plaintiff Weaver's Cove Energy, LLC

February 22, 2008

**CERTIFICATE OF SERVICE**

I, Jeffrey M. Bauer, certify that a true and correct copy of the foregoing Memorandum In Opposition To Defendants' Motion To Dismiss was served today on the following by the Court's ECF System:

Gregory D. Page
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20004-0663


/s/ Jeffrey M. Bauer
Jeffrey M. Bauer

February 22, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WEAVERS COVE ENERGY, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 07-cv-1525(RBW) |
| | ) |
| UNITED STATES DEPT. OF THE | ) |
| INTERIOR, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF GEORGE F. "TED" GEHRIG

George F. "Ted" Gehrig, President of Weaver's Cove LNG, LLC ("Weaver's Cove"),

hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.  In my capacity as President of Weaver's Cove, I have been involved in the filing of applications for dredging and supporting documentation before the U.S. Army Corps of Engineers ("USACE"), and the addressing of the stated concerns of the U.S. Department of the Interior ("DOI") (including the Fish and Wildlife Service ("FWS") and the National Park Service ("NPS")) about such dredging in proceedings pertaining to the dispute giving rise to this lawsuit.

2.  I attach hereto a copy of a letter from the DOI's William R. Taylor to the Federal Energy Regulatory Commission ("FERC"), dated July 5, 2005, setting forth the DOI's position as to the status of the Taunton River and the proposed Weaver's Cove LNG terminal project, sent for the purposes of FERC's review of the environmental effects of the project. (Exh. A) ("July 5 Letter").

3.  I attach hereto a copy of a letter from the DOI's William J. Neidermyer to the USACE's Christine Godfrey, dated February 7, 2006, setting forth the DOI's position as to the status of the Taunton River and the proposed dredging to be undertaken in furtherance of the operation of the proposed Weaver's Cove LNG terminal, sent for the purposes of the USACE's review of the dredging permit application filed by Weaver's Cove. (Exh. B) ("February 7 Letter").

4.  I attach hereto a copy of a letter from the DOI's Jamie Fosburgh to Epsilon Associates' Katherine Lesser (a consultant employed by Weaver's Cove), dated

October 3, 2003, requesting that the DOI "be kept apprised of the project's status . . . ." (Exh. C.)

5. I have reviewed two documents filed in the captioned case: Defendant's Motion to Dismiss and the Declaration of Robert McIntosh ("McIntosh Declaration") and the documents Defendants submitted in support thereof.

6. As discussed in greater detail below, the McIntosh Declaration includes factual statements that do not fully depict the nature and course of the extended discussions between Weaver's Cove, the DOI, and the USACE.

7. Paragraph 13 of the McIntosh Declaration states that, "[i]n February 2007, the [USACE] attempted to convene a meeting among state and federal fisheries agencies to review a revised set of time of year restrictions for the Taunton River dredging project, and other proposals to mitigate the impacts to anadromous fish species in the Taunton River." According to Attachment 6 of the McIntosh Declaration, the meeting would have been held on March 19, 2007.

8. Paragraph 13 further states that the National Marine Fisheries Service ("NMFS") "sent to the [USACE] a revised proposal, which was based on a consensus developed by Interior, NMFS, and the Massachusetts Division of Marine Fisheries . . . ."

9. Paragraph 13 concludes by stating that, "[a]t the request of Weaver's Cove, however, the meeting was cancelled and has not been rescheduled."

10. To the extent that the McIntosh Declaration (¶ 13) attempts to suggest that Weaver's Cove was not an active, cooperating participant over the long course of negotiations between the parties, it is inaccurate and mischaracterizes the relations between the parties.

11. With respect to the cancelled March 19, 2007 meeting: Contrary to the McIntosh Declaration's Paragraph 13, the Attachment 5 cited therein nowhere states that the proposal contained therein was the product of agency "consensus," nor was that characterization of the proposal elsewhere communicated to me or Weaver's Cove's representatives by Mr. McIntosh or by any other representative of Defendants.

12. Instead, Attachment 5 of the McIntosh Affidavit (a January 23, 2007 letter from the National Oceanic and Atmospheric Administration ("NOAA")) merely states that "we *believe* we have a solution that the resource agencies *may* support to resolve the issues associated with the time-of-year restriction with additional modifications to your proposal." McIntosh Decl., Attach. 5, at 1 (emphasis added). That letter continues by noting that "[w]e are continuing discussions with other federal resources agencies regarding the proposed mitigation of winter flounder habitat impacts. At this point in time, I believe it may be best to have an open discussion . . . so we can bring these and any other issues to a decision point." *Id.*

13.   Weaver's Cove was interested in attending the March 19 meeting to discuss a proposal from NOAA. In a February 7, 2007 email from Mike Howard of Epsilon Associates, on behalf of Weaver's Cove, Howard stated that "we would very much appreciate the [USACE] scheduling a meeting with the resource agencies to discuss the items outlined in the NOAA letter dated January 23, 2007." *See* Exh. D (E-mail, Feb. 7, 2007). On February 13, 2007, Weaver's Cove emailed its list of expected attendees for the March 19 meeting. *See* Exh. E (E-mail, Feb. 13, 2007).

14.   At the time of that invitation from NOAA, Weaver's Cove was interested in bringing those negotiations to a successful resolution, but the statement in the NOAA letter that there was no actual proposal endorsed by the agencies was disappointing, as it indicated that there was no actual consensus proposal to be discussed.

15.   To the best of my knowledge and recollection, neither Defendants, nor NOAA, nor the USACE, nor any other agency sent me any such "consensus" proposal in response to our request.

16.   In light of the federal agencies' inability or reluctance to provide an actual "consensus" proposal to be specifically discussed at the proposed meeting, and the inclusion of participants whose jurisdictions were far attenuated from the subject matter of the DOI's review, Weaver's Cove concluded that such a meeting would be inefficacious. After almost one year of substantive and focused discussions with the DOI to try to reach a consensus as to dredge mitigation issues specifically related to the WSRA, reverting to a potentially unmanageable discussion with multiple representatives with remarkably different regulatory responsibilities from at least six different state and federal agencies, without even a document or agenda on which to focus, would have been less fruitful than direct meetings between Weaver's Cove and the NPS to discuss specific proposals related to NPS's stated WSRA concerns. We did not think that inviting other parties not responsible for determining WSRA issues would be a productive means by which to resolve the WSRA issue.

17.   Contrary to the characterization of the process in the McIntosh Declaration, Weaver's Cove's decision to advise that it would not attend the March 19, 2007 meeting was neither the beginning nor the end of discussions between the parties. Such discussions commenced nearly one year earlier, and continued further into 2007.

18.   On April 18, 2006, Weaver's Cove met with representatives of the DOI (including the FWS and the NPS), the USACE, and NOAA to discuss the substance of the DOI's February 7 Letter. At that meeting, Weaver's Cove challenged the substance of the February 7 Letter, but offered a compromise proposal with respect to dredging time-of-year restrictions. The DOI, FWS, and NPS asked for time to assess the proposal and Weaver's Cove's other arguments. *See* Exh. F at 1 (Memorandum, June 8, 2006).

19.    By email dated May 10, 2006 ("May 10 E-mail"), FWS, apparently on behalf of NPS, advised Weaver's Cove that it had reviewed Weaver's Cove's "Dredging Program Report" and materials submitted in support thereof, as well as other then-unidentified "background information." FWS criticized the materials filed by Weaver's Cove. But FWS did not address or discuss Weaver's Cove's April 18, 2006 compromise proposal. *See generally* Exh. G (containing May 10 E-mail).

20.    On June 8, 2006, Weaver's Cove sent to FWS's Michael Thabault, the designated lead negotiator for Defendants, a memorandum specifically challenging the May 10 E-mail's factual analysis and asking for FWS guidance on the subject. Weaver's Cove's memorandum noted that "[a]pparently it is the position of the DOI contingent that dredging of the lower Taunton is governed by the [Wild and Scenic Rivers Act] study of the upper Taunton authorized by Congress and that the term 'no adverse effect' in the context of the Weaver's Cove project effectively means 'no effect.'" *See* Exh. F at 2.

21.    In its June 8, 2006 memorandum, Weaver's Cove informed FWS that if FWS's legal positions remained unchanged, then "any further meetings or exchange of information would then appear futile." But Weaver's Cove left the door open to further meetings, stating that "Weaver's Cove remains willing, as it has been from the inception of this project, to work with the DOI contingent to arrive at reasonable, science-based [time-of-year] restrictions." In an effort to continue the discussion, Weaver's Cove enclosed with that memorandum "a comprehensive proposal on fish protection issues, including proposed mitigation measures." *Id.*

22.    Weaver's Cove and the Defendants and other agencies subsequently met in Boston on December 13, 2006, to further discuss dredging mitigation plans, pursuant to a proposal sent by Weaver's Cove to the DOI on December 6, 2006. *See* Exh. H at 1 (E-Mail, Dec. 15, 2006).

23.    The parties convened a follow-up conference call on December 14, 2006. *See* Exh. I (E-Mail, Dec. 26, 2006)..

24.    On December 15, 2006, Weaver's Cove sent to FWS's Michael Thabault an email revising its December 6 proposal along the lines discussed at the December 13 meeting; at that time, it was Weaver's Cove's understanding that it had satisfied every NPS demand other than its demand to include a hydro-acoustic monitoring requirement. Weaver's Cove noted (as it had done previously) that one proposed system of scientific monitoring — specifically, "hydro acoustic based bio-monitoring" — would be unacceptable to Weaver's Cove, on the grounds that such monitoring programs had not been shown to be sufficiently scientifically rigorous or accurate to be used for anything other than research purposes. *See* Exh. H at 1.

25.    The DOI's response to Weaver's Cove's December 15, 2006 proposal was an e-mail dated December 26, 2006, from NPS's Bob McIntosh (*i.e.*, the author of

Defendants' Declaration), that the Defendants would continue to insist upon the use of hydro acoustic based bio-monitoring as part of a compromise proposal on dredging. *See* Exh. I at 1.

26.    Furthermore, the December 26, 2006 e-mail informed Weaver's Cove that FWS's Michael Thabault would no longer be the lead official for purposes of DOI review; instead, "the NPS will take the lead on this matter from this point forward." Mr. McIntosh instructed us that, "[a]s such, please consider me as your primary contact person." *Id.*

27.    Weaver's Cove responded to the December 26 e-mail on January 8, 2007. Weaver's Cove stressed that "[w]e are surprised and somewhat dismayed to learn that, after Marvin Moriarty's letter of several months ago designating Mike Thabault as the lead for addressing the Wild and Scenic River Act ('WSRA') legal position set forth in the FWS February 7, 2006 letter, we are now being instructed to deal exclusively with a new and different lead negotiator and a different agency, NPS. This late change . . . is also rather odd as we have been dealing with Mike Thabault for several months now, [and] the issues have been distilled down to a few . . . ." *See* Exh. J (Letter, Jan. 8, 2007).

28.    Weaver's Cove's January 8, 2007 letter assured McIntosh that Weaver's Cove would continue to review the content of the December 26 email and respond accordingly. *Id.*

29.    On February 21, 2007, Weaver's Cove sent a letter to NPS Director Mary Bomar (with a copy sent to McIntosh), requesting a meeting "between the company, senior NPS policy personnel and anyone else from NPS . . . . The goal would be to see if the parties could take a step back from the months of discussions and the politically charged emotions in New England and try to establish if there is common ground on which a balanced resolution of the remaining issues could be reached." *See* Exh. K at 2 (Letter, Feb. 21, 2007). To the best of my knowledge and recollection, Director Bomar did not respond.

30.    Weaver's Cove eventually secured a meeting with NPS's Deputy Director Dan Wenk on May 3, 2007. At that meeting, Weaver's Cove conveyed that, notwithstanding the fact that NPS had no authority under the WSRA to block the dredging proposal, Weaver's Cove had a good-faith desire to reach a compromise with the NPS and DOI despite the NPS's positions set forth in the July 5 Letter, in the February 7 Letter, and in the course of meetings described above. No agreement on the compromise was reached at that meeting, and Weaver's Cove received no response or further communication from the DOI or NPS with respect to dredging mitigation measures to resolve the issues regarding the July 5 Letter and the February 7 Letter.

31.    Although he does not note it in his Declaration, Mr. McIntosh attended the May 3, 2007 meeting, months after the date of the cancelled March 2007 meeting.

32.   The McIntosh Declaration (¶ 12) states that the DOI's analysis of Weaver's Cove's dredging proposal was affected by Weaver's Cove's proposal to the U.S. Coast Guard ("USCG") to use smaller LNG tanker ships than it originally proposed to the USCG: "Interior needed to evaluate what impacts, if any, the use of smaller ships making more frequent trips, would have on fisheries resources in the project area."

33.   To the best of my knowledge and recollection, through all the written communications and meetings with Defendants in 2006, Defendants never communicated to me (as in ¶ 12) that its review was contingent on the tanker transit issues. Indeed, such a position was not referenced in the July 5 Letter or the February 7 Letter; neither of those letters indicated that tanker transits were relevant to the fish-related issues raised by the DOI with respect to the proposed dredging activities.

34.   With respect to the McIntosh Declaration's Paragraph 12, as to alleged changes in dredge proposals, Weaver's Cove's proposal to the USCG for approval to use smaller ships did not affect Weaver's Cove's dredging proposal to the USACE (dated March 18, 2004), because that dredging proposal was *perfectly compatible* with both the original ships and the smaller ships transit proposals.

35.   Weaver's Cove's dredging proposal, submitted to the USACE on March 18, 2004, remains unchanged. Weaver's Cove never has cited the proposed use of small ships and constituting cause for changing the proposed quantity or location of dredging to be undertaken to support the operation of its LNG terminal. It is true that Weaver's Cove now proposes to use smaller tanker ships than were proposed before, and it is true that Weaver's Cove initially proposed to place sediment upland as a preferred sediment management plan, but is now recommending offshore disposal — under Section 103 of the Marine Protection Research and Sanctuaries Act of 1972 — as the preferred sediment management plan. But neither of those modifications have in any way changed Weaver's Cove's *dredging* proposal: the original dredging plan (which would have accommodated longer ships with a slightly larger draft) is perfectly capable of accommodating the smaller ships in Weaver's Cove's current tanker transit plans.

36.   In the effort to secure the requisite approvals from FERC, the USACE, the DOI, and other regulatory bodies, Weaver's Cove has acquired the land on which the terminal would be sited; it has employed vessel and transit experts, LNG facility construction and design experts, pipeline design engineers, environmental consultants, lawyers, and other staff and consultants. Taken together, Weaver's Cove has incurred costs in excess of $40 million.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 22, 2008.

George F. "Ted" Gehrig

# EXHIBIT

# A



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240



JUL 0 5 2005

ER 04/0571

Honorable Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**RE: COMMENTS ON THE FINAL ENVIRONMENTAL IMPACT STATEMENT FOR THE DRAFT CONFORMITY DETERMINATION FOR THE PROPOSED WEAVER'S COVE LNG PROJECT, BRISTOL COUNTY, MASSACHUSETTS, (Docket Nos. CP04-36-000, and CP04-41-000)**

Dear Ms. Salas:

The U.S. Department of the Interior (DOI) has reviewed the subject final environmental impact statement (FEIS) for the development of a liquefied natural gas (LNG) terminal and natural gas pipeline facilities proposed by Weaver's Cove Energy.

DOI previously submitted comments provided by our U.S. Fish and Wildlife Service (FWS), and our National Park Service (NPS). Our comments on the FEIS are as follows:

<u>General Comments</u>

DOI's comments on the Weaver's Cove draft environmental impact statement (DEIS) dated September 17, 2004, included reference to the statutory protections afforded to rivers under the congressionally authorized study for potential designation as components of the National Wild and Scenic Rivers System, (Wild and Scenic Rivers Act, Section 7(b)):

> "....and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval."

This statutory provision applies during the period of the study and up to three years following submittal of a final report to Congress.

The Federal Energy Regulatory Commission's (FERC) FEIS concludes its treatment of the Wild and Scenic River issue (page 4-168) as follows:

1

Honorable Magalie R. Salas

"For reasons stated above, we do not believe that construction or operation of the
proposed project would have a substantial adverse effect on the Taunton River's potential
designation as a Wild and Scenic River. However, final determination on whether the
Weaver's Cove LNG Project would have a substantial adverse affect on the Taunton
River's potential designation as a Wild and Scenic River would be made by the U.S.
Department of the Interior. In addition, the COE would provide a draft of its permits
pursuant to Section 10 of the Rivers and Harbors Act and Section 404 of the CWA to the
NPS for review. If the NPS objects to the permit under the provision of the WSR Act,
the COE would not issue the permits. Therefore we recommend that:

- Prior to construction, Weaver's Cove Energy must file with the Secretary,
  documentation of concurrence from the U.S. Department of the Interior that the
  project would not have a substantial adverse affect on the Taunton River's
  potential designation as a Wild and Scenic River; and that the project would be
  consistent with the WSR Act if the Taunton River were designated a Wild and
  Scenic River."

## Current Status of Wild and Scenic River Consideration

In the nine months since FERC issued the DEIS for comment, the Wild and Scenic River Study
of the Taunton River has progressed, and is now in the final stage.

As of June 6, 2005, the legislative bodies of nine out of 10 communities abutting the main-stem
of the Taunton River voted to endorse the Taunton River Stewardship Plan and seek Federal
designation as a Wild and Scenic River.   The City of Fall River has specifically requested that
the designation extend all the way to Mt. Hope Bay at the 195 Bridge (Braga Bridge). This
showing of strong local support is the final step required to judge suitability for Federal
designation.

The Taunton Wild and Scenic River Study Advisory Committee (representing local, State, and
non-governmental river stakeholders) recommended Congressional designation of the entire
main stem of the Taunton River from the confluence of the Town and Matfield Rivers to Mt.
Hope Bay as a National Wild and Scenic River. The NPS's draft report will be issued later this
summer.

## Protection of Outstanding Fishery Values

As a part of DOI's comments on the DEIS dated September 17, 2004, the protection of the
outstanding fishery value of the Taunton River was highlighted as a critical issue related to the
potential Wild and Scenic River designation. The importance of these resource values has been
expanded upon by State and Federal agencies, including National Marine Fisheries Service and
Massachusetts Division of Marine Fisheries.

Honorable Magalie R. Salas

It does not appear that the conditions proposed as a part of the FEIS adequately address protection of the fishery resource. Of particular concern to the NPS, the failure to require recommended dredging time of year restrictions to protect anadromous fish resources could result in a direct and adverse impact to the values for which any portion of the Taunton River would be designated as Wild and Scenic. The National Marine Fisheries Service (NOAA Fisheries) specifically commented in this regard:

> "In order to take a risk averse approach for the conservation of anadromous fishery resources within the Taunton River, NOAA Fisheries recommends that no work should be conducted between March 1-July 31 of any year to avoid adverse impacts on upstream spawning migrations of Alewife, Blueback Herring, Rainbow Smelt, and American Shad. Downstream migrations of anadromous fishery resources in the Taunton River generally occur and need protection between June 15 and October 31 of any year. Alternatives should be developed and analyzed that avoid adverse impacts on downstream migrations of these aquatic resources of national importance."

Our NPS will continue to consult and coordinate with the appropriate fishery resource experts and permitting agencies on the conditions that would be necessary to safeguard the outstanding fishery resource of the Taunton River, including its anadromous fish stocks.

In the absence of satisfactory fishery resource protection, we will not be able to provide the statutorily required affirmative statement of no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System.

Site Impacts to the Lower Taunton River

All of the communities abutting the lower Taunton River have voted to endorse the Taunton River Stewardship Plan and seek federal legislation to designate the Taunton River to Mt. Hope Bay as a component of the Wild and Scenic Rivers System.

The relevant State and Federal fishery agencies, in their comments on the DEIS, have indicated that there may be unavoidable adverse site impacts related particularly to the enlargement of the turning basin and development of the Weaver's Cove site. These include the permanent loss of 11 acres of winter flounder habitat and 1.15 acres saltmarsh and intertidal/subtidal habitat. The FEIS appears to agree that these impacts to this portion of the Lower Taunton River are unavoidable.

In addition, the proposed development of the Weavers Cove site for LNG purposes appears to be contrary to the goals and intentions of the City of Fall River as it relates to the desire to seek Federal Wild and Scenic River designation and endorse the Taunton River Stewardship Plan. Development of this site would foreclose opportunities for the City to connect a significant portion of their waterfront to the Taunton River through redevelopment, emphasizing public access and recreation as an important aspect of economic revitalization and quality of life improvement.

3

Honorable Magalie R. Salas

For these reasons, we do not feel that the proposed development can be made compatible with Wild and Scenic River designation of the lower Taunton River in vicinity of the project area.

We must therefore disagree with FERC's tentative conclusion that the proposed project is compatible with the Taunton River's potential designation as a Wild and Scenic River. Based upon our understanding of the project as currently proposed in the FEIS, the NPS would not be able to find such compatibility.

Until Congress has made a final determination on whether to designate some, all, or none of the Taunton River as a component of the National Wild and Scenic River System, we may not be able to render a finding of no adverse impact related to the potential Wild and Scenic River designation.

If FERC or Weaver's Cove have any questions or you need further assistance or information please contact Mr. Jamie Fosburgh, NPS, Program Manager, 617-223-5191.

The Department of the Interior appreciates the opportunity to review and provide comments on the final EIS for the Weaver's Cove LNG Project.

Sincerely,

Willie R. Taylor, Director
Office of Environmental Policy
and Compliance

cc: Service List

Honorable Magalie R. Salas

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding (Docket Nos. CP04-36-000, CP04-41-000).

Vijai N. Rai, Team Leader
Office of Environmental Policy and Compliance
202-208-6661

JUL _ 5 2005
Dated

# Exhibit

# B

FEB-07-2006 TUE 01:40 PM U.S.Fish & Wildlife        FAX NO. 6032230104        P. 01



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
New England Field Office
70 Commercial Street, Suite 300
Concord, New Hampshire 03301-5087



REF:  Public Notice NAE-2004-2355                              February 7, 2006

Ms. Christine Godfrey, Chief
Regulatory Division
U. S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742-2751

Dear Ms. Godfrey:

We have reviewed the Public Notice on the liquefied natural gas (LNG) import terminal and natural gas pipeline facilities in Bristol County, Massachusetts proposed by Weaver's Cove Energy. These are the comments of the Department of the Interior. The following comments are provided in accordance with the Fish and Wildlife Coordination Act (948 stat. 401, as amended; 16 U.S.C. 661 et seq.) and the Wild and Scenic Rivers Act (16 U.S.C. 1271-1287, as amended).

The proposal is for the development of a LNG terminal on the site of a former Shell Oil Facility along the Taunton River in Fall River, Massachusetts. Site development will include over one acre of permanent wetland and waterway fill. Moreover, the dredging of 2.6 million cubic yards of material from the navigation channel and turning basin will have significant impacts to fishery and shellfishery resources.

We previously addressed our concerns for anadromous fish, and the Wild and Scenic Rivers issue, in our letter of September 22, 2004 to the Corps of Engineers, and the Department's July 5, 2005 comment letter to FERC.

Protection of Fishery Resources

As we have stated previously, the Taunton River provides important habitat for anadromous fish, including the blueback herring, alewife, American shad and rainbow smelt. These species use all or some of the Taunton River for passage, spawning, nursery and foraging. To protect these resources, we have previously recommended time-of-year restrictions for both upstream and downstream migrations. Subsequent to our recommendations, the applicant has decided to use ocean disposal of dredge material and to institute time-of-year restrictions for the spring

- 2 -

upstream migrations. However, the applicant has refused to incorporate restrictions to protect downstream migrations.

We recommend a time-of-year restriction of March 1 – July 31 for the protection of the incoming anadromous fish migration. To adequately protect the downstream migration, we continue to recommend a time-of-year restriction of July 1 through October 31. If this is unacceptable, we recommend that no dredging take place upstream of the I-195 bridge from July 1 to October 31.

Taunton Wild and Scenic River Study

Public Law 106-318, the Taunton River Study Act of 2000, authorized a study of the Upper Taunton River from its headwaters at the confluence of the Town and Matfield Rivers to its confluence with the Forge River in Raynham.

Interim Protections of Study Rivers

Resource values contributing to the potential designation of such congressionally-authorized study segments are afforded statutory protection under the Wild and Scenic Rivers Act.

The pertinent language from Section 7(b) of the Wild and Scenic Rivers Act is:

"...and, no department or agency of the United States shall assist by loan, grant license or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval..."

(and)

"Nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or diminish the scenic, recreational, and fish and wildlife values present in the potential wild, scenic or recreational river area..."

Protection of the Wild and Scenic River Values of the Taunton River

The significance of the anadromous fish resources of the Taunton River is well documented, and is one of the values for which the upper Taunton River would be designated by Congress as a component of the National Wild and Scenic Rivers System. The statutorily required resource protections of the Wild and Scenic Study legislation, as cited above, therefore apply to the protection of anadromous fish resources. In order to comply with the required protection standard, no diminishment of this resource value may be allowed. It is the Department's determination that the time-of-year restrictions stipulated in this letter will ensure that this standard is met.

- 3 -

### Considerations Related to the Lower Taunton River

In September, 2002, responding to petitions from the five lower Taunton River communities from Taunton to Fall River, U.S. Representatives Barney Frank, James McGovern and Stephen Lynch formally requested that the study area be extended to include all of the Taunton River to its confluence with Mt. Hope Bay. In the spring of 2003, the National Park Service agreed to expand the study area as requested. The expanded area is not subject to the statutory protection of the study legislation.

### Current Status of Wild and Scenic River Study

Between November 2004 and July 2005, all ten communities abutting the mainstem of the Taunton River voted through Town Meeting or City Council (Cities of Fall River and Taunton) to endorse the Taunton River Stewardship Plan and to seek federal Wild and Scenic River designation. Such community votes are the final step required by the National Park Service's Study process. Since that time, the Commonwealth of Massachusetts, through a letter from the Secretary of the Executive Office of Environmental Affairs, has written to express support for Wild and Scenic River designation of the entire Taunton River, as have many non-governmental and citizen groups. Legislation has also been filed in both the U.S. House of Representatives and the U.S. Senate to designate the entire mainstem of the Taunton River. A Draft Report to Congress is under preparation that will document study findings and the expressed public support for designation.

### Lower Taunton Site Impacts

Consistent with the Department's July 5, 2005 comment letter to FERC on the Final EIS for this project, we continue to believe that there are likely to be unavoidable site impacts associated with this project that render its construction and operation incompatible with Wild and Scenic River designation of the lower-most portion of the mainstem of the Taunton River (below Steep Brook in north Fall River). While this incompatibility is not subject to the same statutory protection requirement afforded the Upper Taunton Study area, there has been a substantial demonstration of the public interest in seeing the entire mainstem protected as a National Wild and Scenic River. This demonstration has been noted elsewhere in this letter. The Department believes that this expression of public interest needs to be fully considered by the Corps of Engineers in its own weighing of the public interest.

FEB-07-2006 TUE 01:41 PM U.S.Fish & Wildlife          FAX NO. 8032230104          P. 04

-4-

Conclusion

As currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River. Without time-of-year restrictions for both upstream and downstream migrations, we continue to recommend that this application be denied. If you have any questions please call me at 603-223-2541, or Jamie Fosburgh, of the National Park Service, at 617-223-5191.

Sincerely yours,

William J. Neidermyer
Assistant Supervisor, Federal Activities
New England Field Office

- 5 -

cc:    Reading File
       NMFS
       EPA
       MA Marine Fisheries
       J. Fosburgh, NPS
ES:    WNeidermyer:2-7-06:603-223-2541

# EXHIBIT

# C



**United States Department of the Interior**

NATIONAL PARK SERVICE
NORTHEAST REGION
15 State Street
Boston, Massachusetts 02109-3572

IN REPLY REFER TO:

October 3, 2003

Ms. Katherine Lesser
Epsilon Associates, Inc
150 Main Street
P.O.Box 700
Maynard, MA 01754-0700

Dear Ms. Lesser:

This letter is in response to a September 9 letter from Epsilon Associates addressed to Marie Rust, Regional Director of the National Park Service, requesting identification of NPS interests in the vicinity of the proposed Weaver Cove LNG facility in Fall River and its associated pipeline alternatives.

As you know from previous telephone conversations with Jamie Fosburgh and with Bill Napolitano of the Southeast Regional Planning and Economic Development District (SRPEDD), the Taunton River from its headwaters to Mt. Hope Bay is under congressionally-authorized study for potential inclusion in the National Wild and Scenic Rivers System. During the study period (and for up to three years afterward) the protections of the Wild and Scenic Rivers Act (Section 7) are in effect on an interim basis. Of particular note to the Weaver's Cove project, these W&SR protections are codified in US Army Corps of Engineers' regulations that require NPS consultation and sign-off before a Corps permit can be issued on a designated or study river.

Both the proposed LNG plant itself and its associated pipelines (particularly West and North Alternatives) appear to present potential impacts to the Taunton River. We therefore request that we be kept apprised of the project's status so that we may ensure the protection of important river values.

We further encourage proactive coordination in this regard prior to Epsilon's filing of formal permit documents, so that both potential resource impacts and permitting delays can be avoided.

Sincerely,

Jamie Fosburgh, Manager
National Rivers North
(617) 223-5191
Jamie_fosburgh@nps.gov

Cc:  Bill Napolitano, SRPEDD
     Jim Ross, Chair W&SR Study Committee
     Dave Clark, NPS
     Ted Lento, Corps of Engineers

# EXHIBIT

# D

**Howard, Mike**

| | |
|---|---|
| **From:** | Howard, Mike |
| **Sent:** | Wednesday, February 07, 2007 9:06 AM |
| **To:** | 'Lento, Theodore M NAE' |
| **Subject:** | RE: NOAA NMFS Correspondence (UNCLASSIFIED) |

Ted,

Per our discussion this morning, we would very much appreciate the Corps scheduling a meeting with the resource agencies to discuss the items outlined in the NOAA letter dated January 23, 2007. We are pretty flexible with the dates and times and we would respectfully request that you schedule the meeting as soon as possible. Dates that do not work for the Weaver's Cove team are as follows:  2/23, 2/28, and 3/5 through 3/9.

Thanks in advance,

Mike

Michael Howard, Manager - Ecological Sciences Epsilon Associates, Inc.
3 Clock Tower Place, Suite 250
Maynard, MA 01754
978.461.6247
(f) 978.897.0099
www.epsilonassociates.com


-----Original Message-----
From: Lento, Theodore M NAE [mailto:Theodore.M.Lento@nae02.usace.army.mil]
Sent: Tuesday, January 30, 2007 7:52 AM
To: Howard, Mike
Subject: RE: NOAA NMFS Correspondence (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE


Mike, thanks for sending the NOAA letter. We can gather the crowd and setup the meeting as soon as WCE is ready. The NOAA letter has set the agenda, which includes discussion of the dredging plan, time of year requirements, and mitigation plans. If the final mitigation package is ready, it might be a good idea to distribute the plan a few days ahead of the meeting so everyone comes to the meeting prepared. I will also suggest to the agencies that they share their solutions mentioned in the letter in advance of the meeting.

The conference room seats about 24 people max at the table, if there are more then 24 attending, there will be extra chairs along the wall. Let me know how many folks would be attending from WCE and I'll also get a head count from the agencies.

So, when you are ready, send me a few possible days and times and I will make the arrangements by email. Given the number of people attending, the longer the lead time the easier it will be to fit this into everyone's schedules.
Also, I'll try to set up a backup date in case of a snow day and it is difficult to travel.

Ted
Classification:  UNCLASSIFIED
Caveats: NONE

# Exhibit

# E

**Howard, Mike**

| | |
|---|---|
| **From:** | Howard, Mike |
| **Sent:** | Tuesday, February 13, 2007 3:48 PM |
| **To:** | 'Lento, Theodore M NAE' |
| **Subject:** | RE: WCE meeting on time of year requirements and mitigation (UNCLASSIFIED) |

Ted,

That will work just fine. Here is the attendance list for Weaver's Cove:

Ted Barten, Epsilon
Mike Howard, Epsilon
Ted Gehrig, Weaver's Cove
Deb French McKay, ASA
Craig Swanson, ASA
Jill Rowe, ASA
Bruce Kiely, Baker Botts

Thanks again. We will see you on the 19th at 10:30 a.m.

Mike

-----Original Message-----
From: Lento, Theodore M NAE [mailto:Theodore.M.Lento@nae02.usace.army.mil]
Sent: Tuesday, February 13, 2007 2:50 PM
To: Howard, Mike
Subject: WCE meeting on time of year requirements and mitigation (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Mike, I have received responses from NMFS, EPA, DMF and NPS and they can attend on March 19th.

Is 10:30 ok for a start time?

Also, when you have time, please email a list of folks attending from WCE
that I can leave with the security guards...   thanks
Classification: UNCLASSIFIED
Caveats: NONE

# EXHIBIT

# F

**BAKER BOTTS** LLP

AUSTIN
DALLAS
DUBAI
HONG KONG
HOUSTON
MOSCOW
NEW YORK
RIYADH
**WASHINGTON**

# M E M O R A N D U M

June 8, 2006

TO:         Michael Thabault

FROM:     Bruce Kiely

RE:         E-mail Dated May 11, 2006

On April 18, 2006, Weaver's Cove Energy, LLC ("Weavers Cove") met with representatives of the Department of the Interior, U.S. Fish and Wildlife Service, National Park Service ("DOI contingent"), USACE, and NOAA to discuss the February 7, 2006, letter from FWS to USACE ("February 7 Letter"). Distilled to its essence, that letter stated that unless additional time-of-year ("TOY") dredging restrictions extending to October 31 were imposed on proposed dredging in the lower Taunton River, the USACE should deny Weaver's Cove's dredging permit application. In the February 7 Letter, FWS/NPS concludes:

> We recommend a time-of-year restriction of March 1 – July 31 for the protection of the incoming anadromous fish migration. To adequately protect the downstream migration, we continue to recommend a time-of-year restriction of July 1 through October 31. If this is unacceptable, we recommend that no dredging take place upstream of the I-195 bridge from July 1 to October 31 . . . As currently proposed, the dredging for this project would have unacceptable adverse impacts to the anadromous fishery resources in the Taunton River. Without time-of-year restrictions for both upstream and downstream migrations, we continue to recommend that this application be denied.

At the April 18 meeting, Weaver's Cove challenged the findings and conclusions of FWS in the February 7 Letter because, among other things, (1) they are not supported by any scientific evidence in the record as of the date of that letter, (2) the location of the proposed dredging is not within a Wild and Scenic River Act ("WSRA") study area giving FWS/NPS no legal authority under the WSRA to dictate TOY restrictions on dredging, and (3) the proposed dredging is not a "water resource project" and thus is not covered by the WSRA. Weaver's Cove offered a balanced proposal as to the TOY restrictions which provided, to the benefit of FWS/NPS, far more restrictions than the scientific evidence in the record at the time of the February 7 Letter would support and, for the benefit of Weaver's Cove, fewer restrictions than the February 7 Letter would require.

The DOI contingent at the April 18 meeting asked for time to assess the situation, to assess the facts in the record, and to address the Weaver's Cove compromise proposal.

By e-mail dated May 10, 2006, but received on May 11, 2006 ("May 10 e-mail"), FWS advised Weaver's Cove that the Weaver's Cove "Dredging Program Report," ASA Modeling Report and some unidentified background information had been reviewed and provided what were called "comments." We later received the documents on which the e-mail relied and then received on May 25, 2006 the page references on which the e-mail was based.

Weaver's Cove has reviewed the e-mail and has several observations:

1.    Since the May 10 e-mail contained no references to the February 7 Letter and since that e-mail provided no information from the record as it existed on February 7, 2006, Weaver's Cove is left to assume that the DOI contingent was not able to find any evidence in the record as of February 7 to support the conclusions in that letter.

2.    Your May 10 e-mail contains no discussion of Weaver's Cove's proposed compromise as to the TOY restriction on dredging.

Weaver's Cove is left to conclude that the response of the DOI contingent to Weaver's Cove's proposal as to TOY restrictions is done of rejection without discussion. Apparently it is the position of the DOI contingent that dredging the lower Taunton is governed by the WSRA study of the upper Taunton authorized by Congress and that the term "no adverse effect" in the context of the Weaver's Cove project effectively means "no effect." We do not believe those positions will survive judicial scrutiny.

If that is the conclusion the DOI contingent intends to convey, please advise us, as any further meetings or exchange of information would then appear futile.

Notwithstanding its position that the extensive TOY restrictions sought by the DOI contingent are without scientific basis, Weaver's Cove remains willing, as it has been from the inception of this project, to work with the DOI contingent to arrive at reasonable, science-based TOY restrictions. We therefore provide as Attachment 1 our analysis of and response to the assertions made in the e-mail. For ease of reading, the e-mail wording is shown in regular type and Weaver's Cove's responses are in bold. In addition, in the hope of bringing this debate on TOY restrictions to a close, we provide as Attachment 2 a comprehensive proposal on fish protection issues, including proposed mitigation measures.

After you have had a chance to review this e-mail, please call so we can determine whether a further meeting is in order.

Attachments

cc:    Marvin Moriarty
       Ted Barten
       Deborah French-McCay
       Ted Gehrig

*WEAVER'S COVE RESPONSE TO*
*10 MAY 2006 AND 25 MAY 2006 DOI E-MAILS FROM VERN LANG*

*(For ease of reading, the e-mail text is in regular print and the Weaver's Cove response is in bold print)*

June 8, 2006

10 May 2006 email:
As follow-up to our April 18, 2006 meeting regarding the Weaver's Cove Energy Project, we have reviewed the Dredging Program Report, ASA Modeling Report and background information and offer the following comments.

"As you know, the effects threshold under the Wild and Scenic Rivers Act (WSRA) is clear, i.e., there shall be no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System. ... For purposes of the Weaver's Cove Project review, effects thresholds that cause a behavioral response to suspended sediment such as avoidance are included in the category of adverse effects."

*Weaver's Cove's Response:*
**As a threshold matter, Weaver's Cove does not agree that the assertion above reflects the law nor does it even reflect the DOI/FWS/NPS position articulated in the February 7 Letter from the FWS to USACE. According to that letter, Section 7(b) of the WSRA states "... no department or agency of the United States shall assist by loan, grant, license or otherwise the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated ... nothing in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a potential wild, scenic or recreational river area ... which will not invade the area or diminish the scenic, recreational and fish and wildlife values present in the potential wild, scenic or recreational river area." As this quoted statutory language makes clear, the reference in the May 10 e-mail to an "effects threshold" of "no adverse impacts" confuses the standard applicable to a study river versus a development below or above a study river.**

**We also note that the February 7 Letter only talks about the significance of anadromous fish resources. It does not address estuarine fish as incorrectly asserted in the May 10, 2006 e-mail.**

**Further, in the May 10 e-mail, DOI/FWS/NPS appears to be creating its own, more exacting standard for Weaver's Cove. The notion of an environmental impact review standard of "effects thresholds that cause a behavioral response" simply does not square with the statutory standard of "direct and adverse effects".**

**Furthermore, the Taunton River Stewardship Plan (July 2005 draft), Fisheries section, states that the value of the upper Taunton is based primarily on the nature of the habitat (repeated references to the undammed river runs with good fishing habitat), not the specific number of fish observed passing through the river over a period of several years. Specifically, the Stewardship Plan states: (1) "The Taunton River is the longest undammed coastal river in New England".... (2) "Currently dams limit or eliminate access to spawning habitats on some tributaries, but there is huge potential for the restoration of species such**

as herring, shad and rainbow smelt through selective dam removal".... (3) "The quantity of freshwater habitat and absence of deadly hydroelectric dams from the entire watershed make the Taunton River critical habitat for these threatened migratory fish".... (4) "The Taunton River is extremely important in providing foraging, nursery and migratory habitat for many species of fish" (pages 36-38). Nothing in the May 10 e-mail or the prior comment letters of DOI/FWS/NPS in the permitting record demonstrates that the proposed dredging work will have any effect whatsoever on any of these listed habitat values in the upper Taunton, the only section of the river formally authorized for study by Congress. The lower Taunton, the segment of the river adjacent to the terminal, has not been authorized by Congress for study.

This response does not address the other threshold issue, namely does DOI/FWS/NPS have any authority under the WSRA to issue any binding recommendations as to time-of-year restrictions for the Weaver's Cove Project. Weaver's Cove has addressed this issue fully in the permitting record.

Effects Thresholds

<u>10 May 2006 e-mail</u>:
Weaver's Cove Energy has utilized an effects threshold of 600 mg/l suspended sediment for adult and juvenile fish, 200 mg/l for larvae, and 100 mg/l for fish eggs (70 mg/l for w. flounder) (Table 5.6 in the ASA Modeling Report 02-200). Our analysis indicates that these values are 1-2 orders of magnitude under protective for the Taunton River situation. As you know, the effects threshold under the Wild and Scenic Rivers Act (WSRA) is clear, i.e., there shall be no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System. Diadromous and estuarine fish, including winter flounder, white perch, rainbow smelt, alewife, blue back herring, American eel, American shad, coastal brook trout, and other species of aquatic life comprise the aquatic life values of the Taunton River.

<u>**Weaver's Cove's Response:**</u>
**The issue is the potential for impact to migratory (diadromous) species, which both use the upper Taunton River in the area being studied for Wild and Scenic River status (which is freshwater) and the Weaver's Cove dredging area (which is estuarine), during the general period of downstream migration between August 1 to October 31. No other species of aquatic life occurs in both areas.**

**Most of the species cited by DOI are not included in the list of those that migrate down the Taunton River between June and the end of November. Of these species, the only ones that are included in the list, as provided by Massachusetts Division of Marine Fisheries (MDMF) in their 9 December 2005 memo to MEPA Secretary Stephen Pritchard, are alewife (mid-June through November) and blue back herring (September through early November).**

**Coastal brook trout would not be found in areas as far downstream as the proposed dredging, and so could not be impacted. They have never been impinged on the Taunton River intake screens at Brayton Point Station or the intake screens at Somerset Station (Mike Scherer, Marine Research Inc., personal comm. May 2006). They were also not reported in Taunton River fisheries studies completed upstream by Bridges (1955), Curley et al. (1974), Madore (1976), Hurley (1990), MRI (1992), and Buerkett and Kynard (1993).**

Winter flounder and other estuarine-marine species of aquatic life do not occur in the area of the Taunton River being studied for Wild and Scenic River status, and similarly could not be impacted. Accordingly, most of this long list of fish are not relevant to the TOY restriction from July 31 to October 31. Finally, we note again that the formal position of DOI/FWS/NPS in the February 7 Letter was limited to anadromous fish.

10 May 2006 e-mail:

For purposes of the Weaver's Cove Project review, effects thresholds that cause a behavioral response to suspended sediment such as avoidance are included in the category of adverse effects. These effects thresholds correspond to severity of ill effect levels (SEV) 1-3 or higher based on Newcombe and Jensen (1996). Avoidance of the suspended sediment plume could delay or abort migratory movements, increase the channeling of fish into zones where they would be subject to increased predation, cause fish to attempt to move around the edge of the plume closer to the shoreline and enter intake/discharge zones, or cause other adverse effects depending on the species/life stage involved.

*Weaver's Cove's Response:*

For perspective, Weaver's Cove would invite DOI/FWS/NPS to review the scale of severity (SEV) of ill effects associated with excess suspended sediment.

Scale of the severity (SEV) of ill effects associated with excess suspended sediment (Table 1 [page 694] in Newcombe and Jensen [1996])

| SEV | Description of Effect |
|-----|----------------------|
| | **Nil Effect** |
| 0 | No behavioral effects |
| | **Behavioral effects** |
| 1 | Alarm reaction |
| 2 | Abandonment of cover |
| 3 | Avoidance response |
| | **Sublethal effects** |
| 4 | Short-term reduction in feeding rates; short-term reduction in feeding success |
| 5 | Minor physiological stress; increase in rate of coughing; increased respiration rate |
| 6 | Moderate physiological stress |
| 7 | Moderate habitat degradation, impaired homing |
| 8 | Indications of major physiological stress; long-term reduction in feeding rate; long-term reduction in feeding success; poor condition |
| | **Lethal and paralethal effects** |
| 9 | Reduced growth rate; delayed hatching; reduced fish density |
| 10 | 0-20% mortality; increased predation, moderate to severe habitat degradation |
| 11 | >20-40% mortality |
| 12 | >40-60% mortality |
| 13 | >60-80% mortality |
| 14 | >80-100% mortality |

In the ASA modeling report and below you will find support for Weaver's Cove's assertion that the effects thresholds used in the modeling are conservatively low and appropriate for the limited extent and short duration of exposure to suspended sediments that would occur

during dredging (dredging is not a point source discharge that is in one location for decades).

The reference in your May 10 e-mail to and your reliance on Dr. Charles Newcombe are helpful. Dr. Charles Newcombe has read the ASA Weaver's Cove report, and has stated, in a 2 February 2004 e-mail communication with Chris Powell (Rhode Island Division of Fish and Wildlife), that it is "well thought out and well written" and that "in all respects it is exemplary." Dr. Newcombe did not express any reservations or concerns about the effects thresholds that we used in our modeling.

10 May 2006 e-mail:
Smelt and brook trout are among the most sensitive group of fishes to suspended sediment (Newcombe and Jensen 1996; Wilber and Clarke 2001). Newcombe and Jensen give brook trout an SEV rating of 3 (avoidance response) for a 4.5 mg/l exposure duration of 168 hours to suspended sediment based on a study by Gradall and Swenson (1982). Newcombe and Jensen give rainbow smelt an SEV score of 7 (impaired homing) for a 3.5 mg/l exposure duration of 168 hours based on a study by Swenson (1978). Newcombe and Jensen give trout (species not listed) an SEV rating of 4 (short-term reduction in feeding rate) for a 16.5 mg/l exposure duration for 24 hours based on information by Townsend (1983) and Ott (1984). Brown trout and rainbow trout, close relatives to brook trout, are given an SEV rating of 10 (0-20% mortality) for an 18 mg/l exposure duration of 720 hours (30d), based on a study by Peters (1967), as cited in Newcombe and Jensen (1996).

***Weaver's Cove's Response:***
While two isolated brown trout have been collected in the saline waters at the Brayton Point intake screens (one in 1976 and another in 1998) and brown trout were listed as being collected in the Taunton River in the 1970's (Madore, 1976), the chance of a trout being near the proposed dredging is extremely low (Mike Scherer, Marine Research Inc., personal comm. May 2006). Thus, laboratory data using trout, which are generally found in clear freshwater streams and rivers, (not estuaries like the lower Taunton River) cannot credibly be deemed relevant to the impact evaluation of the proposed Weaver's Cove dredging. In addition, the brook trout citation given in the May 10 e-mail here is for a study on red clay turbidity in freshwater, which is not relevant to exposures (to silt, sand and small percentages of clay) in the estuarine study area of concern.

With respect to rainbow smelt, there is no indication that they migrate down the Taunton River during the period of concern (August 1 to October 31). Smelt have been collected on the intake screens at Brayton Point every year between December and April, and most have been collected in March (Mike Scherer, Marine Research Inc., personal comm. May 2006).

Based on research done north of Cape Cod, smelt eggs appear the first week of March and spawning ends by early May (Mike Scherer, Marine Research Inc., personal. comm. May 2006). Smelt eggs typically hatch in 10-21 days, and upon hatching larvae are immediately transported downstream into the tidal zone to begin feeding on zooplankton (Chase and Childs, 2001). Therefore, there is no evidence that smelt would be expected to be in the area of the Weaver's Cove dredging during the period at issue, July 31 to October 31.

In addition to the established fact that brook trout would not be present at all and rainbow smelt would not be migrating down or in the Taunton River project area between the end of July and the end of October, it should be noted that the duration of exposure is critical in determining the level of effect on any species (Wilber and Clarke, 2001). For instance, concentration alone correlated poorly with responses of salmonid fish to suspended sediments, whereas dosage (measured as mg h $L^{-1}$) was more strongly associated with fish responses (Newcombe and MacDonald, 1991 as cited in Wilber and Clarke, 2001). Dosage is a function of both concentration and duration of exposure. In general, the longer the duration and greater the exposure, the more severe the effects (Berry et al., 2003). As stated by Berry et al. (2003), it is expected that as the duration of exposure and intensity of exposure increase, sub lethal effects are manifested, and lethal effects would begin to be expressed at more intense exposures of longer duration.

While the exposure durations for the species listed above are on the order of 168-720 hours (7 to 30 days), this would not be the case in the proposed dredging plan where the dredge is moving over time and the area potentially affected changes with each tide. The peak excess concentrations of suspended sediment from dredging at maximum sediment removal rates are predicted to (1) be very low, (2) occur temporarily (only for 1 hour during times of slack tide when the sediment load affects the same portion of water and the concentration builds); (3) occur over a limited area, and (4) occur only just above the bottom sediments (observations of dredging operations have shown the highest concentrations at or near the bottom due to the impact of the dredge bucket). In addition, the dredge will not operate at maximum sediment removal rates throughout the dredging program, as the dredge cannot dredge while it is being repositioned nor while full scows are being moved out and empty scows are being moved into position near the dredge. Thus, the data cited in the May 10 e-mail are simply not relevant to the analysis of the potential impacts of the proposed dredging.

10 May 2006 e-mail:
Chiasson (1993) reports that smelt showed an alarm response (increased swimming behavior) at suspended sediment concentrations of 10 mg/l and above. The alarm response has an SEV score of 1. Wildish and Power (1985) identified a threshold effect for smelt (avoidance response) at a suspended sediment concentration between 18.8 and 21.8 mg/l. This response has an SEV score of 3.

*Weaver's Cove's Response:*
There are several reasons why the results suggested in the assertion above do not indicate that rainbow smelt or any other anadromous species would be negatively affected by suspended sediments in this range. First, the most compelling reason why suspended sediments of 10-40 mg/L should not cause sub lethal effects on migrating anadromous fish is that the background concentrations in the Taunton River, as in typical northeast estuaries, average between 8 and 11 mg/L and concentrations during storms typically are in the range of 10-40 mg/L. (Boucher, 1991; Stella Tamul, MA DEP, Division of Watershed Management, personal comm., February 2006). The maximum concentrations observed during any storm period in any study was 84 mg/L, with a rapid return (12-18 hours) to pre-storm conditions (Turner et al., 1990).

Thus, all the anadromous species using the Taunton River are routinely exposed to suspended sediment concentrations in the range of 10-40 mg/L and substantially higher

during rain events. TSS is not particularly high or variable because the river watershed has relatively little readily reodable material left from the scouring effects of the extensive glaciation of the region (Postma, 1980). There is no reason to believe that the temporary localized plumes from dredging in this same concentration range and over the same time scale of hours (and far more localized in the case of the dredging) would have any different effect on anadromous species than do storm-induced plumes. It is possible that anadromous species behavior is affected by storm-induced plumes, but the species have evolved to successfully migrate up and down the Taunton River with these conditions present, just as they have done in many other rivers.

Second, as noted by Wildish and Power (1985), there may be bias in their laboratory results such that they cannot be applied to the field. The observations were simply that in the laboratory apparatus the fish swam faster in the water containing more suspended sediment than was where the water contained lower concentrations of sediment. Wildish and Power suggest the need for field studies where other behaviors, such as migration and escape movements, could be evaluated to determine if these behavior might "override the avoidance movements" observed in their laboratory tests and laboratory equipment. Similarly, Chiasson (1993) states that because of the nature of the experimental conditions used in the study, extrapolating these results to the field is questionable.

Lastly, this same reaction of increased swimming speed is common when the fish are feeding or prey are present in the water (Durbin et al., 1981; Macy et al., 1999; Andrew et al., 2002; Marchard et al., 2002). Satiation and current velocity can also play a part in fish swimming behavior (Asaeda et al, 2001; Hinch and Rand 2000; McFarland and Levin 2002). Therefore, the causes and implications of changes in swimming behavior are complex and observed bursts of swimming activity are a normal behavior fish undergo naturally. Thus, the assumption based on laboratory experiments that either observed increases in swimming speeds and/or preference for lower turbidity indicates an adverse effect in the field is unfounded.

10 May 2006 e-mail:
Johnston and Wildish (1981) found that Atlantic herring, a clupeoid fish related to the alosids, showed a reduced feeding rate at a suspended sediment concentration of 20 mg/l exposure duration of three hours. In a 1982 study, these authors found that juvenile Atlantic herring exhibited an avoidance response to a 9-12 mg/l exposure duration of three hours. These responses have SEV scores of 4 and 3, respectively.

*Weaver's Cove's Response:*
The statement as to Atlantic Herring is not relevant here. Atlantic herring is not among the species that migrates between the area where dredging is proposed and the upper Taunton River area being investigated for Wild and Scenic River status. In fact, Atlantic herring are "sea herring", as opposed to "river herring" such as alewife and blueback herring. Atlantic herring spend their lives in coastal marine areas and never migrate to freshwater (John Torgan, Save the Bay, http://narragansettbaykeeper.blogspot.com/2006 _02_01_narragansettbaykeeper_archive.html, May 2006). Adult Atlantic herring make extensive seasonal migrations between summer spawning grounds on Georges Bank and in the Gulf of Maine and over wintering areas in southern New England and the Mid-Atlantic region ocean waters (Stevenson and Scott, 2005).

We also note that the citations for the two Johnston and Wildish papers are reversed. The Johnston and Wildish (1981) paper is actually the Johnston and Wildish (1982) paper, and vice versa. Johnston and Wildish (1982) is a study on larval herring, not juvenile herring as stated in the May 10 e-mail. Since Atlantic Herring are not in the area and do not migrate through the area, larval and juvenile Atlantic Herring are also not found in the area.

10 May 2006 e-mail:
Berry et al. (2003) report that adult hard clams (*Mercenaria mercenaria*) showed a reduced growth response to a suspended sediment concentration of 27 mg/l exposure duration of 14 days based on a study by Murphy (1985). Berry et al. (2003) report that juvenile hard clams show a reduced growth response to a 44 mg/l exposure duration of 21 days based on a study by Bricelj et al. (1984). Both of these responses have an SEV score of 9 (reduced growth rate).

**Weaver's Cove's Response:**
**These statements above are not relevant to the issue of whether dredging during the period July 31 to November 30 could impact migratory fish.**

**Hard clams only exist in saltwater estuarine areas; they are not found in the freshwater environment of the upper Taunton.**

**Further, the data reflected in the May 10 e-mail relate to long durations of exposure, which are 14 days and 21 days, respectively, for adult and juvenile hard clams in the studies described above. In sharp contrast, the dredging would produce localized concentrations of this order for only about an hour, and not for days. Wilber and Clarke (2001) showed that aquatic biota can tolerate relatively high suspended sediment concentrations when exposure duration is brief.**

10 May 2006 e-mail:
General Response to DOI's assertion that dredging should not occur during the migratory fish down-stream migration period.

**Weaver's Cove's Response:**
**The DOI reviewed the DEIS for the Providence River dredging project and the record does not indicate that DOI made any comments that the downstream migrations of the same diadromous species would be impacted by dredging. Thus, it is inconsistent (and there is no evidence to support) DOI/FWS/NPS's change in their opinion from one of no comment to one where potential impacts from dredging become the rationale for severe dredge restrictions to protect downstream fish migrations. In all five segments of the Providence Project, dredging was allowed to occur from August 1 to January 31 with no mention of potential impacts on downstream migrating diadromous fish (USACE, 2001).**

**For the Providence Project, dredging restrictions were limited to winter flounder (February – April) in two of five project segments and a short shellfish spawning restriction in one segment.**

*Noise threshold*

<u>10 May 2006 e-mail:</u>
Fish, particularly the clupeoid fishes (e.g., alewife, herring, American shad, white perch) are known to respond to the sounds made by boats, dredges, and other man-made facilities (Wilson and Dill 2002). The effects of the construction and operational noises from this project on acoustically-sensitive fish species have neither been discussed nor evaluated. To our knowledge, Weaver's Cove Energy has not identified which species of fish besides the clupeoids identified here, or other aquatic life are acoustically sensitive to the range of sounds that would be emitted from the Project. Nor have they identified the range and characteristics of the sounds that would be produced. Connor et al. (2005) state that short duration, low frequency sounds tend to produce startle responses in Pacific and Atlantic herring, while longer duration, high frequency sounds produce avoidance responses such as compacting the school, sinking in the water, or leaving the area.

**<u>Weaver's Cove's Response:</u>**
**Again, the issue with respect to the DOI/FWS/NPS suggested ban on dredging through October 31 reflected in the February 7 Letter to USACE is the potential for impact to migratory (diadromous) species, which both use the upper Taunton River in the area being studied for Wild and Scenic River status (which is freshwater) and the area where dredging would occur for the Weaver's Cove Project (which is estuarine), during the general period of downstream migration between August 1 to October 31.**

**Various species of anadromous fish show avoidance responses when subjected to high-frequency sounds (~100-180 kHz). There have been a number of studies investigating this response in relation to mechanisms to deter anadromous fish from entering hydroelectric turbines (Dunning, et al., 1992; Gibson and Myers, 2002; Nestler, et al., 1992). However, low frequency sound (<1000 Hz), possibly mimicking "sounds of predation", can also elicit strong avoidance responses in prey fish such as alewife. The number of alewife entering an experimental structure was reduced by 71% - 99% when low frequency sound-emitting poppers were operating (Haymes and Patrick, 1986). There is evidence that sound pressure levels (intensity), rather than frequency, are important in creating response. Avoidance has only been noted when sound intensity exceeds the hearing threshold of the fish at a given frequency by more than 30 dB (Mitson, 1995). Mann et al. (1998) found the hearing threshold of American shad to be 100 dB[1] within the frequency range of 200-800 Hz, 159 dB within the frequency range of 3.2-12.5 kHz, and 147 dB within the frequency range of 12.5-25 kHz. The hearing threshold for herring, for sounds between 20Hz and 1.2 Hz, was found to be at 75 dB (Mitson, 1995). Mitson (1995) also reported that for vessel noise, the distance where fish react was found to vary between 100 and 200 m for normal vessel noise (~125 to 150 dB between 1 to 1000 Hz), and up to 400 m for "noisy" vessels (up to 185 dB).**

**From the available literature, the noise levels produced by dredges (in particular clamshell bucket types) fall well short of the high frequency range (usually range between 20 - 300 Hz, although frequencies can be as high as 1 kHz depending on sediment type; Dickerson et**

---

[1] The scale used to measure noise levels in air is different than the scale used to measure noise levels in water. All citations to dB above are in water and are in reference to 1 μPa at 1m from the sound source. To put water-based sound levels into perspective, subtract approximately 63 dB to get an equivalent air noise level.

al., 2001). According to the Dickerson et al. (2001) study, the most intense sounds produced during a dredging operation occur when the bucket strikes the sediment surface. Peak sound pressure levels were measured at 124 dB at a frequency of 163 Hz. Sounds ranged from 20 - 1000 Hz with maximum intensities near the source (within ~100m) around 110 dB. Additionally, the strength of sounds produced by dredging operations vary greatly depending on the sediment type. Soft sediments, such as those found in Mt. Hope Bay and the Taunton River, produce much "quieter" sounds that do not travel as far. Additionally, Wilson and Dill (2002) state that Atlantic and Pacific herring and other clupeoids, "respond to the sounds made by boats, tackle, sonar equipment, and most recently, acoustic deterrent devices for marine mammals" (citing Mohr 1971; Misund, et al., 1996; Kraus, et al., 1997). None of these articles mention the impact from dredges. Hence their relevance here is doubtful.

The dredge noises are at or just above hearing thresholds of anadromous fish, similar to normal vessel noise. Thus, the distance where fish would react would be within about 100 m of the dredge and any associated support vessels. Such a modest distance would not cause fish diversions to place them close to coast line hazards.

*Dredging and Suspended Sediment*

10 May 2006 e-mail:
After reanalyzing the Weaver's Cove Dredging Program Report and the Suspended Sediment Modeling Report, we contacted you for additional information on the physical aspects of the dredge material, e.g., grain size analysis and references related to suspended sediment impacts. You responded to these requests via phone, overnight mail, and email.

As described in Section 3.4 of the Modeling Report, the hydrodynamic model (WQMAP) was calibrated with field data collected from the Taunton River. The suspended sediment model (SSFATE) described in Chapter 4, however, was not calibrated with field data from that proposed activity.

**Weaver's Cove's Response:**
SSFATE estimates suspended sediment concentrations (TSS) generated from dredging activities based on bucket type, amount of scow overflow, the physical characteristics of the sediment being dredged (primarily grain size), and a number of other parameters. The SSFATE model was co-developed by ASA and USACE Vicksburg for the express purpose of providing an objective estimate of suspended sediment concentration levels for use in the evaluation of environmental windows (Johnson et al., 2000; Swanson et al., 2000). This model computes and reports sediment loadings above background levels and has been validated (Swanson et al., 2004) using monitoring data from actual dredging projects. It has been applied and tested for other projects as well, most recently in Oakland Harbor (San Francisco Bay) by USACE and ASA.

DOI/FWS/NPS apparently have doubts about the model because water column suspended sediment concentrations and resulting deposition thicknesses surrounding the dredge and predicted by the model have not been measured directly in the Taunton River and Mount Hope Bay with a direct comparison of site specific field results with model predictions. In short, they apparently conclude that the model results may not be accurate because no

dredging has actually been executed in the river and hence no site *specific* direct measurements are immediately available for the Taunton River and Mount Hope Bay.

In any event, the assertion in the May 10 e-mail is not correct. Site specific field data were collected to increase the accuracy of the SSFATE model prediction. In particular, site specific sediment grain size data were collected at discrete points within those areas of the Taunton River and Mount Hope Bay where dredging is proposed. SSFATE predicts the rate at which particles drop out of the water column based on the size and concentration of the sediment particles introduced into the water column as a result of dredging operations. The rate at which particles settle through water determines the suspended sediment in the water column and the thickness of any dredge induced depositional layer created by the dredging operation. As part of the Tier II and Tier III evaluations, the grain sizes of the specific sediments in the Taunton River were sampled, evaluated, and tested.

The science of settling rates associated with a set of particles falling through a column of water is reasonably well understood, documented, and can be predicted accurately with the proven models that are built into the SSFATE program. Particles of a given size and concentration falling through the waters of the Taunton River and Mount Hope Bay will settle at the same rate as particles in any other body of water. Thus the model has indeed been calibrated using site *specific* data – it simply has not been calibrated with a direct measure of sedimentation rate. The fact that the calibration technique does not use a direct measure taken in the Taunton River provides no logical basis for a conclusion that the model has not been calibrated and that the results are therefore suspect or in any way questionable.

In cases where the dredging has not yet taken place, as is the case here, a two-step analytical approach is typically used in this type of modeling studies when actual measurements of sediment loading rates (the rate at which sediment is introduced into the water column by dredging operations), and sediment settling rates (the rate at which the particles fall out of the water) are not available. First a literature survey of loss estimates (how much sediment is introduced into the river by the dredging operation) from measurements associated with other comparable dredging projects is performed. That was done and a case was made for the selection of an appropriate sediment loading rate. The second step is to perform a sensitivity analysis on the loss rate to show how the model results change as loss rate changes.

In the case of the Weaver's Cove dredging project, a comprehensive sensitivity analysis was performed using a range of loss rates (and other *model* parameters). A representative loss rate, based on site specific sediment characteristics, was chosen and then additional higher loss rates were used to check model performance. In fact, loss rates used in this study are six times higher than the representative measured rates. This analysis indicated that the model performs with a generally linear response: doubling the loss rate tends to double the sediment concentration and deposition.

In conclusion, the model results are based on site specific grain size data, well known and predictable settling rates of particles through water, and estimated sediment loading rates based on field measurements from other dredging projects. Sensitivity studies were then executed on the model to document the full range of potential impacts from dredging operations.

<u>10 May 2006 e-mail:</u>
The SSFATE model was used to simulate suspended sediment plumes based on various inputs to the model and predetermined subprograms in SSFATE. We agree with the statement in § 4.1.2 on page 54 of the Modeling Report that "One of the major factors that controls TSS concentration is how fast the sediment settles out from the water column." Figure 4.2 on page 55 shows the grain size distribution over the dredge reaches used in the ASA modeling report. However, when Figure 4.2 is compared to the grain size distribution for the individual sediment cores (in this discussion, cores include the 55 samples identified on page 18 of the Dredging Program Report), a number of discrepancies become apparent. For instance, the bar graphs of sediment grain size for each of the cores in Appendix D of the Dredging Program Report and the proprietary numerical grain size data provided in your April 27, 2006 email are represented in a different format and scale than the format and scale used in Table 4.3 of the ASA report. Just how these data are transformed into sediment class sizes using the grain size data in Appendix D is not explained, except for silt, which is arbitrarily split 50-50 between fine and coarse size classes.

Note: based on the discussion on page 54, it appears that ASA did not have the numerical grain size distribution data when formatting SSFATE input data. Figure 4.2 on page 55 shows the percent of coarse sand (actually fine sand >.130 mm in diameter) and fine sand (.075 - .130 mm) in the turning basin parent material to be 40 and 45% of the total, respectively. In fact, only 11 of the 27 cores for the turning basin have greater than 50% sand (retained on a 200 sieve), and meet the coarse sediment designation used in Appendix D, and only four of these have greater than 85% sand. The remaining 16 cores are predominately silts and clays. Accordingly, the average of these solid fractions in the turning basin as discussed on page 54 and represented in Figure 4.2 is open to question. This becomes an issue in the model results. For example, on page 59, Figure 4.5, the plume for native material is described as "a relatively small elongated area centered at the site because most of the material is coarse grain and quickly falls out of the water column." The data, except for the four cores mentioned above, do not support this assertion.

<u>*Weaver's Cove's Response:*</u>
**First, ASA did have the full grain size distribution data set for use in formulating the SSFATE model runs.**

**Secondly, two separate modeling analyses were performed for the Turning Basin. One looked at the maintenance materials (softer, generally finer sediments). The other turning Basin analysis looked at the deeper native materials (more residual, somewhat coarse materials). In performing the analysis of Turning Basin native materials, core segments having higher fractions of coarse material were purposely selected such that the worst case sediment deposition rates could be studied (critical to the winter flounder egg deposition concern).**

**This analysis did indeed yield high deposition rates (in comparison to other cases). However, as shown on Figure 1, the area of dredge-related elevated suspended sediment levels (10 mg/l or higher) is very small in comparison to the analysis of the finer maintenance materials (Figure 2).**

11



Figure 1.  Scenario : Turning Basin – surface sediments, mean tidal stage with mean river flow, 1.32% loss rate.



Figure 2.  Scenario:  Turning Basin – native sediments, mean tidal stage with mean river flow, 1.32% loss rate.

A more detailed discussion of the SSFATE modeling work follows.

The May 10 e-mail reflects an assumption that the grain size of the sediment has been mischaracterized somehow and this "error" has skewed the model results in a way that tends to make the model under-predict adverse impacts from dredging operations.

The important point to remember is that with regards to suspended sediment concentrations, an issue for migrating fish, dredging coarse grained sediments in the turning basin and dredging fine grained sediments in the turning basin have both been modeled. The results demonstrate that suspended sediment loadings fall well below effects thresholds for migrating fish in both cases. Hence the point raised in the May 10 e-mail with regards to sediment grain size simply cannot be an issue of concern with regards to outgoing fish migrations. The TSS levels associated with fine grained sediments are the controlling factor – and the models have shown these levels to be low and acceptable. When dredging coarse grained materials the TSS levels drop rapidly because the coarse grained material drops out relatively quickly.

The concern with coarse grained materials alluded to in the May 10 e-mail had very little to do with TSS levels and everything to do with the smothering of benthic organisms in the area surrounding the dredge. Since deposition rates associated with the Project are low, the only benthic organisms that are remotely a concern with regards to smothering are winter flounder eggs which are roughly 1 mm in diameter and rest on the bottom. Originally the "pass" criteria set by the resource agencies were 1.0 mm of cover in 21 days in waters less than 6 meters deep – and the ASA modeling showed no impact for either coarse or fine grained sediments at maximum dredge production. The resource agencies requested further analysis using 0.5 mm of cover in 40 days in waters less than 8 meters deep. There is no scientific support for the 4-day duration or 8-meter depth; however, this was modeled as an overly conservative scenario. With these criteria, the model showed several acres of potentially impacted areas in the area immediately surrounding the turning basin – but only when native (coarse grained) sediments are dredged.

Weaver's Cove believes that the grain size estimates and classifications were properly completed by the Project consultants. An important point made in the ASA Report that was overlooked in the May 10 e-mail is that the sediment size classes used in SSFATE model "...differ from other physical descriptions and classification methods used in other portions of the dredging and disposal effort but are required for this modeling effort" (ASA Report, section 4.1.2, pg 54).

ASA did in fact have an earlier spreadsheet with the identical grain size data supplied by others on the Project team responsible for overseeing the sediment analyses and development of the dredging program.

For the turning basin native material (the native material is the deeper material that has not been influenced by industrial activities), five cores listed in the proprietary grain size spreadsheet attached to the email of 27 April 2006 were used by ASA: TB-4 (6-10), TB-6 (13-15), TB-11 (8-17), TB-15 (5-11) and MA-19 (4-13). These cores were selected by the team from the 11 "coarse"-designated cores for the following reasons:

13

1) There is not necessarily a direct correlation between coarse grained cores and native sediment. In particular, some coarse sediments could still be considered as depositional based on the characteristics of the river/bay where the sediment was collected. In particular, coarser sediments tend to preferentially deposit in center channel area where water flow rates tend to be highest while finer grained sediments tend to settle out in areas where water currents are lower. In actuality, the coarse designation was used in other reviews of the dredging operation by Project team members to help identify which samples would be least likely to have any potential pollution. For example, coarse grained sediments tend to be "cleaner" because the chemical constituents do not readily absorb onto sands – and sands tend to be the bulk of the coarse grained material.

2) In determining the physical location of the cores relative to the historical dredging that has been completed over the past 80 years within the turning basin, the location of the turning basin expansion, and proposed ship maneuvering areas were used to estimate which sediments were native (not previously anthropogenically altered) and non-native (deposited in the post industrial era).

If one splits the "silt fraction" reported in the proprietary spreadsheet for the five selected cores evenly between SSFATE fine and coarse silt and then adds together the fractions reported as passing through a #60, #40 and #10 sieve and then averages these cores together, the results are as presented in Figure 4.2 of the ASA Report . These results are 4.8 % clay, 3.9% fine silt, 3.9% coarse silt, 45.0% fine sand and 42.5% coarse sand. If one averages the 11 "coarse" cores as the May 10 e-mail suggests, the results are largely unchanged with a high sand content of 77% (7.1% clay, 8.0% fine silt, 8.0% coarse silt, 43.7% fine sand and 33.2% coarse sand). Thus, the original conclusion that the SSFATE modeling results show that the plume for native material is "a relatively small elongated area centered at the site because most of the material is coarse grain and quickly falls out of the water column." stands. See Figure 1.

While there will be slight variations in sediment characteristics (including grain size) across the river and bay as the dredge moves from one area to the next, the potential impacts of these small variations in grain size on ASA's predictions of TSS levels and depositional thickness are relatively minor when one considers the fact that the model has been repeated with sediment loading rate particularly a full range from 0.22% to 1.32% loading rates (see a discussion of this topic below). Basically, the model has been run with all the estimated grain size fractions increased by a factor of six. While there may be some disagreement as to the exact split of grain sizes used in the model, the impact of these shifts has been fully covered by running the model with up to six times the predicted sediment loading rate.

<u>10 May 2006 e-mail:</u>
The loss rates of sediment during the dredging operation are discussed in § 4.1.1 Estimation of Source Strength and rely to a great extent on estimated sediment losses from a Boston Harbor study. Of particular concern is the assumption on page 52 that Boston Harbor sediments would be similar to Taunton River and Mt. Hope Bay sediments. Boston Harbor sediments contain a cohesive blue clay that forms clumps. These clays frequently exceed 40-50% of the maintenance sediment in the main ship channel (USACE 2003). The 55 Taunton River sediment cores generally contain only 10-15% clay. There is no evidence presented in the Dredging Program Report that these Taunton River materials are cohesive, that they form clumps, or that they are

14

resistant to erosion during dredging. Accordingly, we think it is reasonable to conclude that the loss rates and suspended sediment plumes may be underestimated in the Modeling Report. Connor et al. (2005), citing Van Ooestrum and Vroege (1994), state that 0-5% of the dredge material is resuspended during the dredging process. The Modeling Report, however, only used loss values at the low end of the scale-0.22 and 1.32%, respectively, for open and closed buckets-and did not model loss values at the upper end of the scale.

### *Weaver's Cove's Response:*

**The SSFATE model has been run at six times the field verified 0.22% loss rate measured for the Boston Harbor Dredging effort. The May 10 e-mail did not provide any evidence (nor did the February 7 Letter) to establish the apparent premise that the Taunton River sediment is so different from the Boston Harbor maintenance dredge sediment such that comparisons to the Boston Harbor study results are invalid (particularly when the Taunton River is modeled at a loss rate six times greater than the loss rate actually measured in Boston Harbor).**

**The SSFATE modeling for the Weaver's Cove Project was based on the relevant loss rate information that was published by Hayes and Wu in 2001 (pages 7 and 8) which ranged from 0.28 to 0.88% for open buckets and 0.10 to 0.22% for closed buckets. ASA chose values for analysis of 0.22 % for closed buckets and 0.66% for open buckets based on data from Boston Harbor for dredging of primarily maintenance material. Scow overflow rate was assumed to be equal to bucket loss rate (Hayes and Wu, 2001 page 8). It is important to note that the suspended sediment modeling results developed by ASA and presented to the agencies for over a year are based on a deliberately conservative 1.32 % (6 times the Boston value for closed bucket, no scow overflow). By focusing only on the Dec 2003 Modeling report and nothing else that has subsequently been submitted into the record, the 10 May 2006 e-mail simply ignores this key point.**

**Subsequent to ASA's completion of the SSFATE analysis for Weaver's Cove, a paper was presented at the 2004 Western Dredging Association (WEDA) conference in Orlando that described SSFATE model and data comparisons for two dredging operations, one in upper Chesapeake Bay, Maryland and the other in Panama City, Florida (Swanson, et al., 2004). An extensive field program was conducted at each site to track the strength and extent of the plumes generated by dredging activity. The SSFATE model was successfully calibrated to the observations using loss rates of 0.5% and settling rates higher than typically used based on particle diameter alone. This indicated that using higher loss rates (i.e. 2%) will result in much higher concentrations in the water column than were observed if one did not concurrently increase settling rates. The attached paper (Attachment A) summarizes these studies. It subsequently has been submitted for publication in the WEDA Journal in response to a request by one of its editors.**

**Most recently, Douglas Clarke of the ERDC USACE compared the SSFATE model to his plume mapping experiments conducted during the Providence River dredging. He presented his findings at a recent meeting (25 April 2005) to review research results conducted during the dredging operations. He found that the SSFATE model was consistently conservative. His other conclusions indicated that a higher loss rate can be used, but must be balanced by significantly higher settling coefficients to account for suspected flocculation processes that remove the sediment from the water column quickly.**

Alternatively, lower loss and settling rates can be used to achieve the same result that matches the data.

The Weaver's Cove analysis used lower rates for both loss and settling to correspond to the data taken in Boston. The use of a 2% loss rate is not an appropriate value to be used in the assessment of actual dredging operations unless a higher settling rate is also used to account for flocculation.

The van Oostrum and Vroege (1994) paper referenced in the May 10 e-mail was reviewed and found to summarize a series of 22 monitoring "campaigns" conducted in the Netherlands for a variety of dredging types. Their notation of grab dredger is equivalent to the bucket dredging technology proposed for this project. They report on 7 grab dredger monitoring studies with estimated loss rates from 0.4 to 5.1% with a mean of 2.0% and a standard deviation of 1.6%. Six of the 7 studies estimated rates less than 2.5% with one at 5.1%. Their summary section (page 219) starts with the following:

> Based on field measurements it is concluded that the resuspension of sediments (sand/silt mixtures), depending on the characteristics of the dredging project, fall within the 0 – 5% range of the quantity of dredged sediments. Within this range the way dredging is carried out (yes / no overflow, careful excavation versus production dredging) strongly influences the quantity of sediments resuspended.

Unfortunately no information was provided in the paper on the type of bucket (open or closed) used nor whether there was scow overflow which makes any meaningful extrapolation to this project impossible. In marked contrast, the Hayes and Wu (2001) data used by ASA includes relevant information on specific dredging locations, bucket type (open, closed) and scow overflow. More detailed plume tracking data was presented by Reine, et al. 2003, as referenced by Swanson, et al. 2004, and was used in SSFATE model validation studies. A copy of the Swanson, et al. 2004 study is provided as Attachment A.

In addition, it is interesting to note that van Oostrum and Vroege (1994) (page 213) made the following observation on the resettling of the resuspended sediments:

> The results of the turbidity campaigns show that the vast majority of the sediments (sand/silt) resettled within one hour after dredging. Only a very small fraction (the very fines) took longer to resettle.

10 May 2006 e-mail:
The suspended sediment modeling on pages 57-63 shows suspended sediment plumes with a maximum concentration of 40 mg/l. These results are noteworthy when compared to the measured results from other mechanical dredging projects. Wilber and Clark (2001) cite a study (LaSalle 1990) of a clamshell dredge where the maximum sediment plume concentration of 1,100 mg/l extends as far as 1,000 m along the bottom. Suspended sediment concentration from an open bucket dredge in Black Rock Harbor was reported to be 1,100 mg/l by McLellan et al. (1989) as cited in Connor et al. (2005).

*Weaver's Cove Response:*
Table 2 (page 7) in LaSalle (1990) presents bottom concentrations from bucket dredging to be LESS THAN or equal to 1100 mg/L and plume lengths to be LESS THAN or equal to

16

1000 m. Nowhere in the paper is there any discussion that a maximum sediment plume concentration of 1100 mg/L extends as far as 1000 m. In fact, the section on bucket dredges (page 4) states:

> ...a typical bucket dredge operation can be described a producing a downstream plume which extends up to 300 m at the surface and 500 m near the bottom. Maximum suspended sediment concentrations in the surface plume are generally less than 500 mg/L in the immediate vicinity (100 m) of the operation, decreasingly rapidly with distance due to settling and dilution.

LaSalle (1990) refer to McLellan et al. (1989) as one of the sources for Table 2 consistent with the reference by Connor et al., (2005). In fact McLellan (1989) indicate (page 60) the sediment was "sandy organic clay with greater than 90% fines. The liquid limit was 170, plastic limit was 65, and the wet weight was 72 lb/cu ft with 25-percent solids content." One of the authors of that report (Hayes, personal communication) relates that the sediment was "as resuspendable as any dredged sediment I have seen". A 10 cu yd open bucket was used (unpaginated Table 14). The report indicates a maximum contoured concentration level of 1100 mg/L (page 63 and Tables 12, 14 and 15) but the data presentation in Appendix B indicates a maximum concentration of 1400 mg/L at the bottom (page B4). This measurement was taken at a distance downstream of the dredge of approximately 60 m (*not* 1000 m) (page B4). In fact, the report notes that the peak measurements did not occur at the dredge but some distance downstream (page 64) due to the tidal currents. Under similar conditions SSFATE also shows the maximum concentration occurring some distance away from the dredge due to the advection of the peak concentration that was generated during slack water, away from the dredge location.

In summary, the statement of a suspended sediment concentration of 1100 mg/L as far as 1000 m from the source is not in the original report and appears to based on a misreading of the actual measurements reported. Weaver's Cove does not believe it is either appropriate to rely on such inexact data reported in LaSalle nor is it the best evidence available, particularly when there is available actual monitoring data from projects in Narragansett Bay and elsewhere. It should be also noted that the maximum dredge plume TSS concentration reported from the Providence River and Harbor dredging project compliance monitoring was 78 mg/L (from monitoring reports downloaded from RIDEM website).

10 May 2006 e-mail:
The duration of these plumes is dependent on many factors. One factor mentioned on page 57 of the Modeling Report and also by Wilber and Clarke (2001) is "fluffing effects", in which settling of particles is inhibited as concentrations of suspended sediments in the water column increase. Fluff zones can persist for days or weeks. The ASA modeling report did not include fluff effects because the "water content is unknown" (page 57).

*Weaver's Cove's Response*:
We were unable to locate the Wakeman, et al., (1975) report referenced in the May 10 e-mail. That report actually is referenced by Wilber and Clarke (2001), so Weaver's Cove contacted Don Hayes, Professor at the University of Utah, expert in the dredge material field about this issue. His observations follow:

This seems like a clear case of confusion to me. Increasing TSS concentrations increases settling rates until such a high concentration that inhibited (zone) settling occurs. Depending upon the sediment and environment, that would normally occur at levels of at least 100,000 mg/L [10% solids], i.e. it doesn't happen in the water column. At lower concentrations, increased TSS increases flocculation and settling. Actually, turbulence helps cause particle contact and increases flocculation as well. It is important to remember that non-native sediments being dredged are there because they had a tendency to settle in that environment once; they will have a propensity to do so again. As for the "fluff layer", that is organic matter that separates from the suspension because these particles have a very, very low settling velocity. They will stay in the nepheloid suspension [the particle rich layer that may exist just above the bottom] at a near equilibrium condition for days, more so in freshwater conditions (Lake Okeechobee is an example) than estuaries. If this layer exists, it certainly can move about with even minor currents. But, the mass of solids in this layer is generally low (typically 20-30 mg/L), and it hangs right near the bottom, somewhat as an extension of the bed sediments. (E-mail from D. Hayes to C. Swanson, 30 May 2006)

10 May 2006 email:
In view of the above, we believe the model simulations of the suspended sediment plumes should be regarded as "draft", in need of considerable ground truthing (calibration) using field data collected from the Taunton River/Mt. Hope Bay environs. In addition to suspended sediment plumes from dredging, the suspended sediment plumes from ship traffic to and from the terminal need to be measured and simulated over a range of conditions so that a more realistic assessment of near- and far-term impacts associated with the construction and operation of the Project can be considered. The spatial, temporal, and other characteristics of the various stratification phenomena that occur in the Taunton River/Mt. Hope Bay system relating to dissolved oxygen, temperature, salinity, or other factors need to be identified and delineated. The extent to which these factors affect suspended sediment distribution from dredging and/or ship traffic needs to be identified and factored into the various physical and biological analyses. Due in large measure to these factors, we did not spend time reviewing the SSDOSE model results since it is dependent on SSFATE results.

*Weaver's Cove's Response:*
At this late stage of the permitting process, and after the plain declaration of position in the February 7 Letter, the fact that the only support for the DOI position is the assertion above as to "concerns" is remarkable. "Concerns" are not evidence in support of the February 7 Letter. Concerns are at best unformulated, unsupported opinions. Even more troublesome is that in the May 10 e-mail there is the statement that the agency has concerns with the SSDOSE model but is not willing to highlight those concerns. Such a position or non-position does not move the scientific debate forward in an organized or meaningful fashion. To vaguely refer to various phenomenon and "other factors" and then not articulate clearly why they are a concern reveals that this is an unsupportable position.

Measurements of characteristics indicating stratification, such as dissolved oxygen, temperature, and salinity, are not among the data inputs to the modeling. The field program conducted for the Project showed that any temperature or salinity stratification that did occur at the terminal site was found to break down during the biweekly spring

18

tides (ASA Report, pg 11). This breakdown of stratification is seen in other areas in the greater Narragansett Bay system.

The measurements of dissolved oxygen at the terminal site indicated that during the period DO averaged 10.7 mg/L at the surface and 11.7 mg/L at the bottom, relatively high values. The surface and bottom waters mix during spring tides (ASA Report, pg 15).

As to LNG ship traffic, there will be no LNG ship transits to the terminal during the period of dredging. Thus, the perceived concerns regarding suspended sediment plumes from ship traffic to and from the terminal are not relevant to the setting of time-of-year windows for the dredging.

Alternative Dredging Plans

10 May 2006 e-mail:
During our April 18, 2006 meeting, we discussed various dredging scenarios that would enable Weaver's Cove Energy to accomplish the dredging program within a three-year construction time frame and within the 2½-month dredging window provided by the January 15-October 31 time-of-year restriction to protect fish stocks. While this dredging window creates constraints, no one from Weaver's Cove Energy indicated that the Project would become impracticable if additional dredging equipment were used.

*Weaver's Cove's Response:*
DOI/FWS/NPS representatives asked a number of "what if" questions at the April 18 meeting. Could Weaver's Cove use more dredges?  Could Weaver's Cove use bigger dredges?  Could Weaver's Cove use a large fleet of barges and tugs to "work around" the bad weather conditions experienced in November, December and January, etc. all aimed at cramming the dredge program into three 2 ½ month seasons.  Weaver's Cove representatives explained that the Project wanted to have a workable and realistic dredge schedule, a schedule which reflected the real world constraints of weather, equipment availability, operating logistics, staffing and the possibility of equipment breakdowns. Weaver's Cove representatives supported these points with a number of facts:  (1) the planned 26 CY dredge is the largest currently available, and the Project hopes to secure one, possibly two from the very limited fleet in the US (five total); (2) if operating in a very compressed season, we cannot assume that all planned dredges will be on site and ready to begin on December 1 (three years in a row); (3) weather downtime in December/January could approach 50% of the available time, and Weaver's Cove will not press the contractor to operate in unsafe conditions in order to make an unrealistic schedule; (4) there are limits on the rate at which material can be discharged at RISDS (~6 loads per day); and (5) the compressed dredge season includes several holidays, etc.

Such a compressed program would add greatly to the cost of an already expensive undertaking and would add major schedule risks to the Project.  Finally, it should not be forgotten that the dredging was being undertaken entirely at the Project's expense; a large part of the program is maintenance dredging that would normally be undertaken by the USACE at taxpayer expense.

<u>10 May 2006 e-mail</u>:

Weaver's Cove Energy's October 15, 2004 response to FERC also discusses some of the constraints and clearly states on page 7 that "Each of the three dredging window scenarios can be managed to meet the overall Project schedule consistent with the design proposed in Weaver's Cove application if 100% offshore disposal proves feasible." We understand that about 97% of the material has been approved for open water disposal and assume that the remaining 3% can be accommodated on site.

*<b>Weaver's Cove's Response:</b>*

**The single sentence that is quoted is excerpted and taken out of context from an 8-page discussion that Weaver's Cove provided to the FERC Staff on November 4, 2004. In that response, Weaver's Cove addressed in detail a data request dated October 15, 2004 that requested Weaver's Cove, among other things, to "assess the effect on the proposed project design, schedule, and costs if dredging is not allowed or is severely restricted during" certain identified restriction periods. As can be seen from a reading of the entire Weaver's Cove response, a copy of which is attached as Attachment B, the single sentence that is quoted has been taken out of context.**

**Weaver's Cove never suggested that offshore disposal was a panacea for any time-of-year dredging restrictions, whether reasonable or severe. As Weaver's Cove explained, while dredging windows could be "managed" in the event that offshore disposal is used, this does not mean that dredging restrictions are therefore without environmental or cost consequences. Indeed, as Weaver's Cove stated in the very next sentence immediately following the sentence that is quoted, with limited dredging windows available "the potential environmental impacts will involve trade-offs between production rates and suspension of sediments in the water column". Weaver's Cove also made clear its position that "[u]sing sound scientific principles and analysis, Weaver's Cove believes that its numerous studies have demonstrated dredging windows and time of year restrictions that force shutdown of the dredge fleet *do not provide additional protection for the environment* above that in the filed program." (emphasis added) Thus, any implication in the e-mail that offshore disposal provides some independent basis or justification for the imposition of dredging restrictions through the end of October is both misleading and incorrect.**

<u>10 May 2006 e-mail</u>:

We assume also that Weaver's Cove Energy has gained some increased flexibility now that two disposal sites are available for 97% of the material.

*<b>Weaver's Cove's Response:</b>*

**The second disposal site is the Massachusetts Bay Disposal Site ("MBDS"). Its use was contemplated in the Tier III sampling as a fallback to RISDS. Weaver's Cove's clearly stated intention is to use RISDS; this newly designated site is intended to serve dredging projects in Rhode Island and southeastern Massachusetts. RISDS is located in Federal waters off the mouth of Narragansett Bay, approximately 37 nautical miles from the turning basin. The site has more than sufficient capacity to accept the full dredge volume being contemplated.**

**As discussed in the FEIS and in submittals that Weaver's Cove has made to the FERC, the USACE and other agencies, MBDS is located off Boston Harbor and is nearly 140 nautical miles from the Turning Basin via Buzzards Bay and the Cape Cod Canal. It is nearly 340**

**nautical miles distant via the primary shipping lanes to the south and east of Cape Cod. Assuming that dredging was to be limited to November, December and the first half of January, as recommended in the February 7 Letter, winter storms would reduce the number of work days and would certainly complicate and increase the risks of using MBDS.**

<u>10 May 2006 email:</u>
If you have any questions regarding the above, feel free to give me a call at (603) 223-2541.


Vern

21

DOI References

Berry, W., N. Rubinstein, B. Melzian and B. Hill. 2003. The biological effects of suspended and bedded sediment (SABS) in aquatic systems: A Review. Internal Report, USEPA, Narragansett Laboratory, Narragansett, RI.

Chiasson, A.G. 1993. The effects of suspended sediment on rainbow smelt ( Osmerus mordax): a laboratory investigation. Can. J. Zool. 71: 2419-2424.

Connor, M., J. Hunt and C. Werme. 2005. White Paper: Potential impacts of dredging on Pacific herring in San Francisco Bay. Prepared for USACE, South Pacific Division.

Gradall, K.S. and W.A. Swenson. 1982. Responses of brook trout and creek chubs to turbidity. Transactions of the American Fisheries Society. 111: 392-395.

Johnston, D.D. and D.J. Wildish. 1981. Avoidance of dredge spoil by herring (Clupea harengus). Bull. Environm. Contam. Toxicol. 26: 307-314.

Johnston, D.D. and D.J. Wildish. 1982. Effect of suspended sediment on feeding by larval herring (Clupea harengus harengus L.). Bull. Environm. Contam. Toxicol. 29: 261-267.

Newcombe, C.P. and J.O.T. Jensen. 1996. Channel suspended sediment and fisheries: A synthesis for quantitative assessment of risk and impact. North American Journal of Fisheries Management. 16: 693-727.

U.S. Army Corps of Engineers. 2003. Final environmental assessment: Maintenance dredging of Boston Harbor, Massachusetts. New England District, Concord, MA.

Weaver's Cove Energy. 2004. Response by Ted Gehrig, President and Chief Operating Officer, to the Federal Energy Regulatory Commission staff's October 15, 2004 environmental data request, 8 pp.

Wilber, D.H. and D.G. Clarke. 2001. Biological Effects of Suspended Sediments: A Review of Suspended Sediment Impacts on Fish and Shellfish with Relation to Dredging Activities in Estuaries. North American Journal of Fisheries Management. 21: 855-875.

Wildish, D.J. and J. Power. 1985. Avoidance of suspended sediments by smelt as determined by a new "single fish" behavioral bioassay. Bull. Environm. Contam. Toxicol. 34: 770-774.

Wilson, B. and L.M. Dill. 2002. Pacific herring respond to simulated odontocete echolocation sounds. Can. J. Aquat. Sci. 59: 542-553.

**Weaver's Cove References**

Andrew, J.E., C. Noble, S. Kadri, H. Jewell, and F.A. Huntingford. 2002. The effect of demand feeding on swimming speed and feeding responses in Atlantic salmon *Salmo salar* L., gilthead sea bream *Sparus aurata* L. and European sea bass *Dicentrarchus labrax* L. in sea cages. *Aquaculture Research* 33(7):501.

Asaeda,T., T. Priyadarshana, and J. Manatunge. 2001. Effects of satiation on feeding and swimming behavior of planktivores. *Hydrobiologia* 443:147-157.

Bridges, C. 1955. A fisheries investigation of the Taunton River and North River drainages. Project Completion Report F-1-R-4. Massachusetts Division of Fisheries and Game, Westborough. 264p + 24p.

Boucher, J.M., 1991. Nutrient and phosphorous geochemistry in the Taunton River Estuary, Massachusetts, Ph.D. Thesis, University of Rhode Island, Kingston, RI, 316 pp.

Buerkett, C. and B. Kynard. 1993. Sturgeons of the Taunton River and Mount Hope Bay: Distribution, habitats, and movements. Final Report for Project AFC-24-1. To Massachusetts Division of Marine Fisheries. 13p (unpublished).

Chase, B.C., and A.R. Childs. 2001. Rainbow Smelt (*Osmerus mordax*) Spawning Habitat in the Weymouth-Fore River. Massachusetts Division of Marine Fisheries Technical Report TR-5. 29p.

Curley, J.R., R.P. Lawton, D.L. Chadwick, K. Reback, and J.M. Hickey. 1974. A study of the marine resources of the Taunton River and Mount Hope Bay. Monograph Series 15. Massachusetts Division of Marine Fisheries, Boston. 37p.

Dickerson, C., K.J. Reine and D.G. Clarke (2001). Characterization of Underwater Sounds Produced by Bucket Dredging Operations, *DOER Technical Notes Collection* (ERDC TN-DOER-E14), U.S. Army Engineer Research and Development Center, Vicksburg, MS. www.wes.army.mil/el/dots/doer.

Dunning, D.J., Q.E. Ross, P. Geoghegan, J.J. Reichle, J.K. Menezes and J.K. Watson. (1992). Aelwives Avoid High-Frequency Sound. *North American Journal of Fisheries Management* 12:407-416.

Durbin, A.G., E.G. Durbin, P.G. Verity, and T.J. Smayda. 1981. Voluntary swimming speeds and respiration rates of filter-feeding planktivore, the Atlantic menhaden, *Brevoortia tyrannus* (Pisces: Clupeidae). *Fishery Bulletin* 78(4):877-886.

ENSR International. 2002. Boston Harbor Navigation Improvement Project - Phase 2 Summary Report. Contract DACW33-96-D-004, Document No. 9000-278-000. <http://www.nae.usace.army.mil/projects/ma/BHNIP/cover.pdf>.

Gibson, A.J.F. and R.A. Myers. (2002). Effectiveness of a High-Frequency-Sound Fish Diversion System at the Annapolis Tidal Hydroelectric Generating Station, Nova Scotia. *North American Journal of Fisheries Management* 22:770-784.

Hayes, D. and P.-Y. Wu. 2001. Simple approach to TSS source strength estimates. Proceedings of the Western Dredging Association Twenty-first Technical Conference and Thirty-third Annual Texas A and M Dredging Seminar Special PIANC Session / Texas A and M University, Center for Dredging Studies, pg-303, June, 2001.

Haymes, G.T. and P.H. Patrick. (1986). Exclusion of Adult Alewife, *Alosa pseudoharengus*, Using Low-frequency Sound for Application at Water Intakes. *Can. J. Fish. Aquat. Sci.* 43:855-862

Hinch, S.G., and P.S. Rand. 2000. Optimal swimming speeds and forward-assisted propulsion: energy-conserving behaviors of upriver-migrating adult salmon. *Can. J. Fish. Aquat. Sci.* 57(12):2470-2478.

Hurley, S.T. 1990. Fisheries sampling report, Taunton River, Taunton-Raynham, Massachusetts Division of Fisheries and Wildlife, Buzzards Bay. 2p (unpublished).

Johnson, B.H., E. Anderson, T. Isaji, and D.G. Clarke. 2000. Description of the SSFATE numerical modeling system. DOER Technical Notes Collection (TN DOER-E10). U.S. Army Engineer Research and Development Center, Vicksburg, MS. http://www.wes.army.mil/el/dots/doer/pdf/doere10.pdf.

Kraus, S.D., A.J. Read, A. Solow, K. Baldwin, T. Spradlin, E. Anderson, and J. Williamson. 1997. Acoustic alarms reduce porpoise mortality. Nature (London), 388:525.

Macy, W.K., A.G. Durbin, and E.G. Dubin. 1999. Metabolic rate in relation to temperature and swimming speed, and the cost of filter feeding in Atlantic menhaden, *Brevoortia tyrannus*. *Fishery Bulletin* 97(2):282-293.

Madore, R.P. 1976. Survey and inventory of ponds and streams, stream survey (Taunton River Drainage). Job performance report. F-36-R-8. Massachusetts Division of Fisheries and Wildlife, Westborough. 8p.

Mann, D.A., Z. Lu, M.C. Hastings, and A.N. Popper. 1998. Detection of ultrasonic tones and simulated dolphin echolocation clicks by teleost fish, the American shad (*Alosa sapidissima*). *J. Acoust. Soc. Am.* 104:562-568.

Marchard, F., P. Magnan, and D. Boisclair. 2002. Water temperature, light intensity and zooplankton density and the feeding activity of juvenile brook charr (*Salvelinus fontinalis*). *Freshwater Biology* 47(11):2153.

McFarland, W., and S.A. Levin. 2002. Modeling the effects of current on prey acquisition in planktivorous fishes. *Marine and Freshwater Behavioral and Physiology* 35:69-85.

McLellan, T. N., Havis, R.N., Hayes, D.F., and G.L. Raymond. 1989. Field studies of sediment resuspension characteristics of selected dredges. Technical Report HL-89-9, USACE, Vicksburg, MS

Misund, O.A., J.T. Ovredal, and M.T. Hafsteinsson. 1996. Reactions of herring schools to the sound field of a survey vessel. Aquat. Living Resour. 9: 5-11.

Mitson, R.B. (1995). Underwater Noise of Research Vessels, *Underwater Noise of Research Vessels* International Council for the Exploration of the Sea, Copenhagen, Denmark.

Mohr, H. 1971. Behaviour patterns of different herring stocks in relation to ship and midwater trawl. *In* Modern Fishing Gear of the World. Vol. 3. Edited by H. Kristjonsson. Fishing News (Books) Ltd., London. Pp. 368-371.

MRI (Marine Research, Inc.). 1992. Taunton Energy Center Aquatic Ecology Studies July 1990-December 1991. Submitted to HMM Associates, Inc., Concord, MA, February 6, 1992. 59p + appendices.

Nestler, J.M., G.R. Ploskey, J. Pickens, J. Menezes and C. Schilt. (1992). Responses of Blueback Herring to High-Frequency Sound and Implications for Reducing Entrainment at Hydropower Dams. *North American Journal of Fisheries Management* 12:667-683.

Newcombe, C.P., and D.D. MacDonald. 1991. Effects of suspended sediments on aquatic ecosystems. *North American Journal of Fisheries Management* 11:72-82.

Postma, H., 1980. *Sediment Transport and Sedimentation, in Chemistry and Biogeochemistry of Estuaries*, edited by E. Olausson and I. Cato, John Wiley & Sons, Chichester, UK, pp. 153-186.

Reine, K. J., Clarke, D. G., and Dickerson, C. 2003a. "Suspended sediment plumes resulting from bucket dredging operations in Brewerton Channel and Baltimore Inner Harbor, Chesapeake Bay, Virginia," U.S. Army Engineer Research and Development Center, Vicksburg, MS. Final report to the U.S. Army Engineer District, Baltimore, MD.

Scherer, M.D. 2006 Personal Communication., Marine Research Inc./Normandeau Associates, Falmouth, MA. 02540-3595

Stevenson, D.K., and M.L. Scott. 2005. Atlantic Herring, *Clupea harengus*, life history and habitat characteristics. NOAA Technical Memorandum NMFS-NE-192. <http://www.nefsc.noaa.gov/nefsc/publications/tm/tm192/tm192.pdf>.

Swanson, J.C., T. Isaji, M. Ward, B.H. Johnson, A. Teeter, and D.G. Clarke. 2000. Demonstration of the SSFATE numerical modeling system. DOER Technical Notes Collection (TN DOER-E12). U.S. Army Engineer Research and Development Center, Vicksburg, MS. http://www.wes.army.mil/el/dots/doer/pdf/doere12.pdf.

Swanson, J.C, T. Isaji, D. Clarke, and C. Dickerson, 2004. Simulations of Dredging and Dredged Material Disposal Operations in Chesapeake Bay, Maryland and Saint Andrew Bay, Florida. Presented at WEDA XXIV / 36th TAMU Dredging Seminar, July 7-9,2004, Orlando, Florida

Turner, C., S. Asselin and S. Feng, 1990. City of Fall River Combined Sewer Outflow Facilities Plan: Receiving Water Impacts Field Measurement Program, ASA Report 90-020.

US Army Corps of Engineers (USACE). 2001. Providence River and Harbor Maintenance Dredging Project. Final Environmental Impact Statement. Appendix L : Windows/Sequencing Discussions. 78 pp. plus appendices.

van Oostrum, R. W., and I.P. Vroege. 1994. Turbidity and contaminant release during dredging of contaminated sediment. In Proceedings of the Second International Conference on Dredging and Dredged Material Placement (Dredging '94), Lake Buena Vista, FL, pgs 210-219.

Wakeman, T., R. Peddicord and J. Sustar, 1975. Effects of suspended solids associated with dredging operations on estuarine organisms. In D.M. Bolle, editor. Proceedings of Ocean 75. San Diego, CA, pgs 431-436.

**ATTACHMENTS:**

A.    Swanson, et al., 2004 "Simulations of Dredging and Dredged Material Disposal Operations in Chesapeake Bay, Maryland and Saint Andrew Bay, Florida"

B.    Weaver's Cove Energy, LLC Responses to the Federal Regulatory Commission Staff's October 15, 2004 Environmental Data Requests

Weaver's Cove Energy, LLC
LNG Import Terminal and Connecting Pipelines
Fall River, Massachusetts

**PROPOSED BALANCED DREDGING MITIGATION PLAN**

June 8, 2006

Weaver's Cove Energy, LLC ("Weaver's Cove") received approval from the Federal Energy Regulatory Commission ("FERC") in July of 2005 to construct and operate a proposed new LNG receiving terminal on the Taunton River in Fall River, Massachusetts. To facilitate the transit of LNG ships to the Terminal, Weaver's Cove proposes, at its expense, to perform certain maintenance and improvement dredging operations in the existing Mount Hope Bay/Taunton River Federal navigational channel and existing Federal Turning Basin. The Weaver's Cove dredging proposal also includes a small extension of the existing Turning Basin and an open cut pipeline crossing immediately upstream of the Turning Basin. FERC conditioned its July 2005 approval upon Weaver's Cove's receipt of a dredging permit from the U.S. Army Corps of Engineers ("USACE").

On March 18, 2004, Weaver's Cove filed its Section 10/Section 404 Individual Permit application with the USACE. The application was subsequently amended to include Section 103 approval for ocean disposal of suitable sediments. During the course of the USACE review process, two public notices were issued and four separate public hearings were held. Certain participating Federal agencies have filed comment letters[1] requesting a variety of time-of-year ("TOY") restrictions on dredging. On May 17, 2006 Weaver's Cove filed a comprehensive response to these comments in a document entitled "Responses to Comments, Review of Public Interest Factors and Compliance with Section 404(b)(1) Guidelines."

In order to bridge the differences as to TOY restrictions between Weaver's Cove and the various agencies, Weaver's Cove offers this Proposed Balanced Dredging Mitigation Plan. This Proposal is based on the science in the record and addresses agencies' concerns by providing reasonable and effective protections to identified marine species in the dredging area, while providing Weaver's Cove with a workable set of measures.

I.    **SUMMARY OF PROPOSAL**

Weaver's Cove is prepared to adopt a comprehensive, balanced solution that protects the marine environment, is fully consistent with recent practice adopted in other major dredging projects in New England, and which will allow dredging to proceed within a workable and achievable schedule. The Proposal includes many of the major

---

[1] September 17, 2004 - U.S. Department of the Interior ("DOI") to FERC; September 22, 2004 – U.S. Fish and Wildlife Service ("FWS") to USACE; July 5, 2005- DOI to FERC; December 27, 2005 – National Marine Fisheries Service of the National Oceanic & Atmospheric Administration ("NOAA Fisheries") to USACE; February 7, 2006 – FWS to USACE.

elements that NOAA Fisheries, FWS, and other agencies have requested. These elements include:

**A.** **Seasonal Dredging Restrictions**: Dredging operations would not be allowed for significant portions of the year due to specific biological activities that occur during those seasons. Where appropriate, somewhat less severe restrictions are proposed for the open waters of Mount Hope Bay.

**B.** **Dredge Equipment Restrictions and Equipment Operating Techniques**: These measures are aimed at minimizing the amount of sediment released into the water column during dredging operations and minimizing the extent of the river cross section affected by dredge-induced elevated suspended sediment levels.

**C.** **Mitigation Measures**: These are proposed to avoid project impacts on certain species (for example, shellfish), or to appropriately mitigate certain unavoidable project impacts (for example, potential loss of winter flounder spawning habitat).

This Balanced Dredging Mitigation Plan assumes that offshore ocean disposal is utilized by the Project for all suitable materials. Earlier Project plans had been based on upland placement of stabilized dredged material.

## II. DETAILS OF WEAVER'S COVE PROPOSED BALANCED DREDGING MITIGATION PLAN

**A.** **Seasonal Dredging Restrictions**[2]

1. **Extended Winter Flounder Restriction**: A complete and extended 4 ½ month ban on dredging running between January 15 and May 31 of each year, in order to protect both winter flounder spawning (eggs and larvae).

2. **Anadromous Fish Restriction**: A complete ban on dredging in Massachusetts waters running between March 15 and June 15 of each year in order to protect the upstream migration of anadromous fish species. This restriction is in accordance with Massachusetts Wetlands Protection Act ("WPA") regulations.

3. **Extended Anadromous Fish Restriction**: An extension of the restriction for the upstream migration of anadromous fish through to July 31 in Massachusetts waters located upstream of the Braga Bridge (Interstate 195). This six-week extension of the Massachusetts WPA restriction will further protect anadromous fish species in the narrower confines of the Taunton River.

---

[2] With respect to dredging restrictions, the Weaver's Cove Proposal goes far beyond restrictions required for the recently completed 6,000,000 cubic yard Providence River and Harbor dredging project and the Boston Harbor dredging project.

Weaver's Cove, in consultation with NOAA Fisheries, may elect to conduct fish counts or other sampling to assess the dates(s) at which the upstream anadromous fish migration is substantially concluded. Should such data indicate that the July 31 restriction is unnecessarily restrictive, NOAA Fisheries will work constructively with Weaver's Cove to develop an alternative restriction.

4. **Pipeline Crossing Restriction**: Since dredging for the pipeline crossing will, of necessity, involve moving the dredge across the flow of the river, dredging/backfilling for the Taunton River pipeline crossing will only be conducted between November 1 and January 14. Biological activity is at a low ebb during this early winter period.

5. **Downstream Anadromous Fish Migrations**: At all other times (August 1 through January 14 in the Taunton River, June 16 through January 14 in Mount Hope Bay, below the Braga Bridge)[3], dredging will be conducted in accordance with the equipment and operating measures described in Section B (below). Because of the balance afforded by the foregoing, it is agreed that there will be no further restrictions, sequencing requirements or other limits including any such measures as previously recommended by several agencies with respect to the downstream anadromous fish migration. Following the precedent established of the nearby Providence River and Harbor Project, and as recommended by FERC in the Weaver's Cove FEIS, it will be recognized that the measures described in Section B are adequate for the protection of the downstream migration of anadromous fish.

B. **Dredge Equipment Restrictions and Equipment Operating Techniques**

1. **Bucket Size**: Buckets appropriate for the depth of dredge cut in a given area shall be used; buckets up to 26 CY may be used in the Turning Basin and the "S-Bend"

2. **Environmental Buckets**: Closed or "environmental" buckets shall be used in all depositional or maintenance sediments. Conventional open buckets may be used in the more resistant native sediments. A conventional open bucket may also be used in areas where excessive debris limits the effectiveness of environmental buckets.

3. **No Scow Overflow**: There shall be no deliberate scow overflow at any time.

---

[3] Excepting the pipeline crossing, as noted in paragraph II.A.4, above.

3

4. **Production Dredge Spacing**: During periods where multiple production dredges are being deployed, a minimum upstream/downstream spacing of 1,500 feet between dredges will be maintained.

5. **Number of Dredges**: Typically, only one dredge in each of the three major reaches (the Turning Basin, the S-Bend, and the Federal Channel south of the Braga Bridge) will be operated.

6. **Dredge Movements**: In addition, dredge equipment movements will be maintained, to the extent practicable, in a direction generally parallel to the river/tidal flow (north/south) as opposed to back and forth (east/west) across the river. By working parallel to the direction of the current and tidal flows, the cross sectional area of the dredge-induced sediment "plume" will be minimized, thereby maximizing the unaffected river cross section available to anadromous fish to swim around the "plume."[4]

C. **Mitigation Measures**

1. **Salt Marsh Avoidance**: Weaver's Cove will revise the shoreline profile of the site and plant layout so as to completely avoid impacts to the 0.04 acres of salt marsh on the south end of the project site.

2. **Salt Marsh Restoration Plan**: Even though impacts to that salt marsh have been avoided, Weaver's Cove will continue to implement the previously proposed on-site salt marsh mitigation measures. These measures comprise restoration of a 0.7 acre salt marsh area currently degraded by fill material and common reed.

3. **Shellfish Mitigation Plan**: While shellfish (primarily northern quahog) are reported to be relatively abundant in portions of the dredge area, commercial harvesting is not allowed in the Taunton River and Mount Hope Bay. The shellfish in this area are biologically contaminated and unsafe for human consumption, as a result of elevated fecal coliform levels.

Approximately 84 acres of the approximately 160-acre dredge footprint in Massachusetts has been mapped by the Massachusetts Division of Marine Fisheries ("MADMF") as potential habitat for northern quahog. An additional 11.5 acres of potential northern quahog habitat may exist in the approximately 33-acre dredging footprint located in Rhode Island waters (this area is also closed to shellfishing).

---

[4] This will not be possible during dredging of the pipeline crossing (estimated volume of 33,000 cubic yards out of a total project planning volume of 2,600,000 cubic yards, hence the pipeline dredging will be conducted in the November 1 – January 14 period.

4

Although the shellfish within the dredge footprint are not available for commercial harvest or human consumption, Weaver's Cove has developed a plan to mitigate the one time loss or relocation of shellfish stocks which would result from the dredging work. The performance based plan includes the following elements:

- Pre-Harvest Survey – a pre-harvest survey will be conducted for the mapped MADMF areas within the dredging footprint. The survey will establish relative abundance and location of quahogs so that it can be determined if a potentially commercially-harvestable quantity exists. The results of the pre-harvest survey will define the locations from which pre-dredge harvesting will occur.

- Harvest and Relay – The purpose of the shellfish harvest and relay phase is to remove and transfer potentially commercially-harvestable quahogs that may be directly impacted by the dredging project. By removing the quahogs and relaying them to suitable off-site locations, impacts to the existing (and currently restricted) resource will be minimized. As a result, those shellfish resources can continue to grow, depurated if moved to less contaminated areas, and then harvested for human consumption.

- Seeding – Following the dredging work, shellfish seeding will be conducted. The shellfish seeding is expected to boost natural regeneration and shellfish propagation in suitable habitats.

- Post-Seed Monitoring and Compliance with Success Criteria – During the pre-harvest survey, prior to the start of dredging in each dredging element, shellfish sampling will be performed to determine the numbers and weight of quahogs per unit area, as well as the sediment grain size distribution. As the quahogs are harvested for relay, the numbers and weight of clams in defined areas will be recorded. Growth data (shell length versus age) available from University of Rhode Island researchers (Rice et al., 1989) will be used to determine the median age of quahogs present. Following the dredging work, seeding will be performed. Subsequently, the areas will be re-surveyed to determine the biomass present. Statistical analyses will be used to determine if the biomass present in the number of years after seeding is equivalent to (i.e., not significantly different from) the pre-dredging condition. If the biomass is significantly lower, an analysis will be made of the habitat characteristics (grain size and physical-chemical) of the seeded areas to determine if they are suitable for quahogs. If those areas are deemed suitable, additional seeding will be performed. If an area is deemed not suitable, other mitigation

5

sites will be used (e.g., areas where harvesting such as the ongoing relays has occurred). Weaver's Cove will consult with MADMF on these evaluations. Once the biomass has reached the pre-dredging level, the area will be considered restored.

Weaver's Cove maintains that the proposed shellfish mitigation plan will adequately compensate for any Project-related impacts to quahog habitat.

4.    **Mitigation for Winter Flounder Spawning Habitat in the Turning Basin Expansion Area**

Weaver's Cove will finalize, in good faith consultation with NOAA Fisheries, FWS, the National Park Service ("NPS"), the U.S. Environmental Protection Agency ("EPA") and USACE, via the USACE permitting process, the winter flounder habitat mitigation plan. Recognizing that in-kind replacement of 11 acres of winter flounder habitat is not practicable, the agencies will work constructively with Weaver's Cove to finalize an alternative mitigation option(s).

NOAA Fisheries has estimated that approximately 11 acres of the river bottom that will be dredged to a depth of 41 ft (~12.5 meters) MLLW will no longer be suitable for winter flounder spawning. This analysis is based strictly on water depth, without consideration of bottom conditions and suitability of existing exposed sediment type for winter flounder spawning.

On May 20, 2005, Weaver's Cove submitted for agency review, a proposed mitigation plan for these impacts. Because there are no meaningful opportunities for on-site, in-kind mitigation of impacts to aquatic winter flounder habitats, Weaver's Cove proposed that an "in-lieu" fee of $500,000 be established in a trust account administered by a state or Federal resource agency, or paid directly to a private natural resource management entity, for the purpose of providing compensatory mitigation for approximately 12 acres of aquatic resource impacts (including previously proposed subtidal fill).[5]

The amount of financial assistance proposed by Weaver's Cove in the May 20th mitigation plan was determined through the evaluation of three general mitigation scenarios commensurate with dredging related impacts. During 2005, two mitigation proposals were made by Weaver's Cove, the second of which was based on a concept suggested by a Federal agency. Neither of

---

[5] The use of in-lieu fees for the purpose of providing compensation for adverse impacts to aquatic resources is consistent with other USACE Individual Permits (see Special Condition #16 in the USACE permit for the Hubline project) and USACE regulatory guidance letters.

these plans were accepted by the agencies, thus Weaver's Cove has proceeded to develop a third and hopefully final, plan.

It is understood that the USACE will schedule further coordination meetings with the resource agencies to advance this mitigation plan to the same level of detail as described in the shellfish mitigation plan described above.

The current winter flounder habitat mitigation program includes three elements, all of which will mitigate the potential loss of spawning habitat by strengthening the winter flounder stocks in Narragansett Bay. The plan includes 1) planting or re-establishing several acres of eel grass beds in Narragansett Bay, 2) direct restocking of winter flounder, and 3) expansion of the salt marsh/inter-tidal habitat restoration program at the southern end of the Project site. Items 1 and 2 would be funded by the previously proposed $500,000 account. Item 3 would be accomplished by Weaver's Cove as an incremental addition to the program.

5.    **Long Term Mitigation to Improve and Expand Anadromous Fish Spawning Habitat**

As part of this Balanced Dredging Mitigation Program, Weaver's Cove is introducing a new element to the overall mitigation package. In lieu of severe or extensive restrictions to eliminate any possibility of short term impacts to passing anadromous fish, which restrictions are of uncertain value to the resource, the Project is proposing to fund measures that would clearly benefit the Taunton River anadromous fishery resources for the long term. More specifically, MDMF has identified a series of possible fish ladder improvements, fish ladder construction, removal of dam remnants, and removal of small dams and other obstructions (see Technical Report TR-15). According to MDMF, such measures would reopen significant spawning areas in the upstream tributaries of the Taunton River, spawning areas which are very important to the long term strength of the Taunton River anadromous fishery.

As part of this balanced dredging mitigation plan, Weavers Cove is willing to fund such measures in the amount of $750,000. It is expected that funding would be made available to state agencies, advocacy groups and /or local government bodies; these agencies or entities would be tasked to and would be responsible for implementing the measures.

7

### III.   CONDITIONS OF PROPOSAL

This Proposed Balanced Dredging Mitigation Plan reflects a balance of science issues, costs and timing, and has been developed based on, and is contingent on, a number of assumptions. Of course, should any of those assumptions be altered, this Proposal may need to be reviewed and/or modified.

A.   First, this Proposal is based on the key assumption that all suitable dredged material will be disposed of offshore. While two dredge disposal alternatives remain under consideration by Weaver's Cove, the Project's strongly preferred alternative is to dispose of all suitable dredged material offshore in Federal waters at the Rhode Island Sound Disposal Site ("RISDS") and/or the Massachusetts Bay Disposal Site ("MBDS"). The EPA and the USACE have determined that all of the tested material meets the criteria for acceptability for ocean disposal as described in Sections 227.6 and 227.27 of the Ocean Dumping Regulations, and is suitable for unrestricted ocean disposal at either location under EPA Region 1/ USACE-NAE (2004) guidance. More than 2,500,000 cy of the 2,600,000 cy planning volume was covered by this determination. In a subsequent comment letter to the USACE, EPA has indicated that ocean disposal of dredged material versus upland disposal is environmentally preferable in this instance, because it will reduce the duration of the dredging as compared to the original proposal.

An additional Sampling and Analysis Plan ("SAP") for sediments located in the vicinity of the existing wooden pier (approximately 3% of the total sediments to be dredged) was submitted to the USACE on April 24, 2006 and remains under review. Depending on the results of the SAP, this material will either be disposed of offshore with the other material, or disposed of at an appropriate upland site (other than the LNG terminal site).

This plan would need to be modified if the Project's secondary disposal alternative proposal of using stabilized dredged material as engineered fill to develop the LNG terminal site in Fall River were to once again become the primary alternative. This alternative has been the subject of significant criticism by the Massachusetts Department of Environmental Protection, as well as by other commentors.

B.   Second, this Balanced Dredging Mitigation Plan Proposal necessarily is based upon the key assumption of agency concurrence with the plan, including concurrence with the issuance of necessary permits that reflect this plan. In other words, it is understood that Weaver's Cove, NOAA Fisheries, FWS, NPS, EPA and USACE would no longer advance any positions, whether new or previously taken in written comments, to the extent that such positions are inconsistent with the resolutions reflected in this Proposal. For example, as part of this Proposal, NOAA Fisheries, FWS, NPS, EPA and USACE will not object to Weaver's Cove's ongoing efforts to secure approval for the ocean disposal of dredged material at

8

designated sites in federal waters (RISDS and/or MBDS), consistent with the suitability determination by the USACE and the EPA that the material is deemed suitable for ocean disposal. In that regard, it is further understood that NOAA Fisheries, FWS, and NPS will accept the EPA-prepared October, 2004, RISDS FEIS as full and complete documentation of the potential environmental effects of offshore disposal at the RISDS of all sediments found to be suitable by the USACE and the EPA.

C.  Neither NOAA Fisheries, FWS, nor NPS will oppose the issuance of a USACE dredging permit to Weaver's Cove by the USACE that incorporates such approval of offshore disposal.

For its part, Weaver's Cove commits that it will finalize, in good faith consultation with NOAA Fisheries, FWS and NPS, via the USACE permitting process, the mitigation plans discussed in Section II above.

Weaver's Cove looks forward to meeting with the relevant agencies and working toward a comprehensive plan along the lines set forth above.

# EXHIBIT

# G

**Percival, Linda**

| | |
|---|---|
| **From:** | Kiely, Bruce |
| **Sent:** | Friday, September 08, 2006 12:22 PM |
| **To:** | Percival, Linda |
| **Subject:** | FW: Weaver's Cove Dredging Program |

```
-----Original Message-----
From: Vernon_Lang@fws.gov [mailto:Vernon_Lang@fws.gov]
Sent: Thursday, May 11, 2006 4:14 PM
To: tbarton@epsilonassociates.com
Cc: Kiely, Bruce; dfrench@appsci.com
Subject: Fw: Weaver's Cove Dredging Program


Ted: Lets try this again, Vern.
----- Forwarded by Vernon Lang/R5/FWS/DOI on 05/11/2006 03:57 PM -----

          Vernon
          Lang/R5/FWS/DOI
                                                              To
          05/10/2006 10:16        Ted Barton
          AM                                                  cc
                                  bruce.kiely@bakerbotts.com,
                                  dfrench@appsci.com
                                                         Subject
                                  Weaver's Cove Dredging Program
```

As follow-up to our April 18, 2006 meeting regarding the Weaver's Cove Energy Project, we have reviewed the Dredging Program Report, ASA Modeling Report and background information and offer the following comments.

Effects Thresholds

Weaver's Cove Energy has utilized an effects threshold of 600 mg/l suspended sediment for adult and juvenile fish, 200 mg/l for larvae, and 100 mg/l for fish eggs (70 mg/l for w. flounder) (Table 5.6 in the ASA Modeling Report 02-200). Our analysis indicates that these values are 1-2 orders of magnitude underprotective for the Taunton River situation. As you know, the effects threshold under the Wild and Scenic Rivers Act (WSRA) is clear, i.e., there shall be no adverse impact to the values for which the Taunton River may be included in the National Wild and Scenic River System. Diadromous and estuarine fish, including winter flounder, white perch, rainbow smelt, alewife, blueback herring, American eel, American shad, coastal brook trout, and other species of aquatic life comprise the aquatic life values of the Taunton River. For purposes of the Weaver's Cove project review, effects thresholds that cause a behavioral response to suspended sediment such as avoidance are included in the category of adverse effects. These effects thresholds correspond to severity of ill effect levels (SEV) 1-3 or higher based on Newcombe and Jensen (1996). Avoidance of the suspended sediment plume could delay or abort migratory movements, increase the channeling of fish into zones where they would be subject to increased predation, cause fish to attempt to move around the edge of the plume closer to the shoreline and enter intake/discharge zones, or cause other adverse effects depending on the species/life stage involved. Smelt and brook trout are among the most sensitive

1

group of fishes to suspended sediment (Newcombe and Jensen 1996; Wilber and Clarke 2001). Newcombe and Jensen give brook trout an SEV rating of 3 (avoidance response) for a 4.5 mg/l exposure duration of 168 hours to suspended sediment based on a study by Gradall and Swenson (1982). Newcombe and Jensen give rainbow smelt an SEV score of 7 (impaired homing) for a 3.5 mg/l exposure duration of 168 hours based on a study by Swenson (1978). Newcombe and Jensen give trout (species not listed) an SEV rating of 4 (short-term reduction in feeding
rate) for a 16.5 mg/l exposure duration for 24 hours based on information by Townsend (1983) and Ott (1984). Brown trout and rainbow trout, close relatives to brook trout, are given an SEV rating of 10 (0-20% mortality) for an 18 mg/l exposure duration of 720 hours (30d), based on a study by Peters (1967), as cited in Newcombe and Jensen (1996). Chiasson (1993) reports that smelt showed an alarm response (increased swimming behavior) at suspended sediment concentrations of 10 mg/l and above. The alarm response has an SEV score of 1. Wildish and Power (1985) identified a threshold effect for smelt (avoidance response) at a suspended sediment concentration between 18.8 and 21.8 mg/l. This response has an SEV score of 3. Johnston and Wildish (1981) found that Atlantic herring, a clupeoid fish related to the alosids, showed a reduced feeding rate at a suspended sediment concentration of 20 mg/l exposure duration of three hours. In a 1982 study, these authors found that juvenile Atlantic herring exhibited an avoidance response to a 9-12 mg/l exposure duration of three hours. These responses have SEV scores of 4 and 3, respectively. Berry et al. (2003) report that adult hard clams (Mercenaria mercenaria) showed a reduced growth response to a suspended sediment concentration of 27 mg/l exposure duration of 14 days based on a study by Murphy (1985). Berry et al. (2003) report that juvenile hard clams show a reduced growth response to a 44 mg/l exposure duration of 21 days based on a study by Bricelj et al. (1984). Both of these responses have an SEV score of 9 (reduced growth rate).

Fish, particularly the clupeoid fishes (e.g., alewife, herring, American shad, white perch) are known to respond to the sounds made by boats, dredges, and other man-made facilities (Wilson and Dill 2002). The effects of the construction and operational noises from this project on acoustically-sensitive fish species have neither been discussed nor evaluated. To our knowledge, Weaver's Cove Energy has not identified which species of fish besides the clupeoids identified here, or other aquatic life are acoustically sensitive to the range of sounds that would be emitted from the project. Nor have they identified the range and characteristics of the sounds that would be produced. Connor et al. (2005) state that short duration, low frequency sounds tend to produce startle responses in Pacific and Atlantic herring, while longer duration, high frequency sounds produce avoidance responses such as compacting the school, sinking in the water, or leaving the area.

Dredging and Suspended Sediment

After reanalyzing the Weaver's Cove Dredging Program Report and the Suspended Sediment Modeling Report, we contacted you for additional information on the physical aspects of the dredge material, e.g., grain size analysis and references related to suspended sediment impacts. You responded to these requests via phone, overnight mail, and email. As described in Section 3.4 of the Modeling Report, the hydrodynamic model (WQMAP) was calibrated with field data collected from the Taunton River. The suspended sediment model (SSFATE) described in Chapter 4, however, was not calibrated with field data. The SSFATE model was used to simulate suspended sediment plumes based on various inputs to the model and predetermined subprograms in SSFATE. We agree with the statement in § 4.1.2 on page 54 of the Modeling Report that "One of the major factors that controls TSS concentration is how fast the sediment settles out from the water column." Figure 4.2 on page 55 shows the grain size distribution over the dredge reaches used in the ASA modeling report. However, when Figure 4.2 is compared to the grain size distribution for the individual sediment cores (in this discussion, cores include the 55 samples identified on page 18 of the Dredging Program Report), a number of discrepancies become apparent. For instance, the bar graphs of sediment grain size for each of the cores in Appendix D of the Dredging Program Report and the proprietary numerical grain size data provided in your April 27, 2006 email are represented in a different format and scale than the format and scale used in Table 4.3 of the ASA report. Just how these data are transformed into sediment class sizes using the grain size data in Appendix D is not explained, except for silt, which is arbitrarily split 50-50 between fine and coarse size classes. Note: based on the discussion on page 54, it appears that ASA did not have the numerical grain size distribution data when formatting SSFATE input data. Figure 4.2 on page 55 shows the percent of coarse sand (actually fine sand >.130 mm in diameter) and fine sand (.075 - .130 mm) in the turning basin parent material to be 40 and 45% of the total, respectively. In fact, only 11 of the 27 cores for the turning basin have greater than 50% sand

2

(retained on a 200 sieve), and meet the coarse sediment designation used in Appendix D, and only four of these have greater than 85% sand. The remaining 16 cores are predominately silts and clays. Accordingly, the average of these solid fractions in the turning basin as discussed on page 54 and represented in Figure 4.2 is open to question. This becomes an issue in the model results. For example, on page 59, Figure 4.5, the plume for native material is described as "a relatively small elongated area centered at the site because most of the material is coarse grain and quickly falls out of the water column." The data, except for the four cores mentioned above, do not support this assertion.

The loss rates of sediment during the dredging operation are discussed in § 4.1.1 Estimation of Source Strength and rely to a great extent on estimated sediment losses from a Boston Harbor study. Of particular concern is the assumption on page 52 that Boston Harbor sediments would be similar to Taunton River and Mt. Hope Bay sediments. Boston Harbor sediments contain a cohesive blue clay that forms clumps. These clays frequently exceed 40-50% of the maintenance sediment in the main ship channel (USACE 2003). The 55 Taunton River sediment cores generally contain only 10-15% clay. There is no evidence presented in the Dredging Program Report that these Taunton River materials are cohesive, that they form clumps, or that they are resistant to erosion during dredging. Accordingly, we think it is reasonable to conclude that the loss rates and suspended sediment plumes may be underestimated in the Modeling Report. Connor et al. (2005), citing Van Ooestrum and Vroege (1994), state that 0-5% of the dredge material is resuspended during the dredging process. The Modeling Report, however, only used loss values at the low end of the scale—0.22 and 1.32%, respectively, for open and closed buckets—and did not model loss values at the upper end of the scale.

The suspended sediment modeling on pages 57-63 shows suspended sediment plumes with a maximum concentration of 40 mg/l. These results are noteworthy when compared to the measured results from other mechanical dredging projects. Wilber and Clark (2001) cite a study (LaSalle 1990) of a clamshell dredge where the maximum sediment plume concentration of 1,100 mg/l extends as far as 1,000 m along the bottom. Suspended sediment concentration from an open bucket dredge in Black Rock Harbor was reported to be 1,100 mg/l by McLellan et al. (1989) as cited in Connor et al. (2005).

The duration of these plumes is dependent on many factors. One factor mentioned on page 57 of the Modeling Report and also by Wilber and Clarke (2001) is "fluffing effects", in which settling of particles is inhibited as concentrations of suspended sediments in the water column increase. Fluff zones can persist for days or weeks. The ASA modeling report did not include fluff effects because the "water content is unknown" (page 57).

In view of the above, we believe the model simulations of the suspended sediment plumes should be regarded as "draft", in need of considerable ground truthing (calibration) using field data collected from the Taunton River/Mt. Hope Bay environs. In addition to suspended sediment plumes from dredging, the suspended sediment plumes from ship traffic to and from the terminal need to be measured and simulated over a range of conditions so that a more realistic assessment of near- and far-term impacts associated with the construction and operation of the project can be considered. The spatial, temporal, and other characteristics of the various stratification phenomena that occur in the Taunton River/Mt. Hope Bay system relating to dissolved oxygen, temperature, salinity, or other factors need to be identified and delineated. The extent to which these factors affect suspended sediment distribution from dredging and/or ship traffic needs to be identified and factored into the various physical and biological analyses. Due in large measure to these factors,  we did not spend time reviewing the SSDOSE model results since it is dependent on SSFATE results.

Alternative Dredging Plans

During our April 18, 2006 meeting, we discussed various dredging scenarios that would enable Weaver's Cove Energy to accomplish the dredging program within a three-year construction time frame and within the 2½-month dredging window provided by the January 15-October 31 time-of-year restriction to protect fish stocks. While this dredging window creates constraints, no one from Weaver's Cove Energy indicated that the project would become impracticable if additional dredging equipment were used. Weaver's Cove Energy's October 15, 2004 response to FERC also discusses some of the constraints and clearly states on page 7 that "Each of the three dredging window scenarios can be managed to meet the overall project schedule consistent with the design proposed in Weaver's Cove

application if 100% offshore disposal proves feasible." We understand that about 97% of the material has been approved for open water disposal and assume that the remaining 3% can be accommodated on site. We assume also that Weaver's Cove Energy has gained some increased flexibility now that two disposal sites are available for 97% of the material.

If you have any questions regarding the above, feel free to give me a call at (603) 223-2541.


Vern


References

Berry, W., N. Rubinstein, B. Melzian and B. Hill. 2003. The biological effects of suspended and bedded sediment (SABS) in aquatic systems: A Review. Internal Report, USEPA, Narragansett Laboratory, Narragansett, RI.

Chiasson, A.G. 1993. The effects of suspended sediment on rainbow smelt ( Osmerus mordax): a laboratory investigation. Can. J. Zool. 71: 2419-2424.

Connor, M., J. Hunt and C. Werme. 2005. White Paper: Potential impacts of dredging on Pacific herring in San Francisco Bay. Prepared for USACE, South Pacific Division.

Gradall, K.S. and W.A. Swenson. 1982. Responses of brook trout and creek chubs to turbidity. Transactions of the American Fisheries Society. 111: 392-395.

Johnston, D.D. and D.J. Wildish. 1981. Avoidance of dredge spoil by herring (Clupea harengus harengus). Bull. Environm. Contam. Toxicol. 26: 307-314.

Johnston, D.D. and D.J. Wildish. 1982. Effect of suspended sediment on feeding by larval herring (Clupea harengus harengus L.). Bull. Environm. Contam. Toxicol. 29: 261-267.

Newcombe, C.P. and J.O.T. Jensen. 1996. Channel suspended sediment and fisheries: A synthesis for quantitative assessment of risk and impact. North American Journal of Fisheries Management. 16: 693-727.

U.S. Army Corps of Engineers. 2003. Final environmental assessment: Maintenance dredging of Boston Harbor, Massachusetts. New England District, Concord, MA.

Weaver's Cove Energy. 2004. Response by Ted Gehrig, President and Chief Operating Officer, to the Federal Energy Regulatory Commission staff's October 15, 2004 environmental data request, 8 pp.

Wilber, D.H. and D.G. Clarke. 2001. Biological Effects of Suspended Sediments: A Review of Suspended Sediment Impacts on Fish and Shellfish with Relation to Dredging Activities in Estuaries. North American Journal of Fisheries Management. 21: 855-875.

Wildish, D.J. and J. Power. 1985. Avoidance of suspended sediments by smelt as determined by a new "single fish" behavioral bioassay. Bull. Environm. Contam. Toxicol. 34: 770-774.

Wilson, B. and L.M. Dill. 2002. Pacific herring respond to simulated odontocete echolocation sounds. Can. J. Aquat. Sci. 59: 542-553.

# EXHIBIT

# H

**Kiely, Bruce**

| | |
|---|---|
| **From:** | Kiely, Bruce |
| **Sent:** | Friday, December 15, 2006 5:23 PM |
| **To:** | 'Michael_Thabault@fws.gov' |
| **Cc:** | 'Gehrig, Ted'; 'Barten, Ted' |
| **Subject:** | Weaver's Cove Energy Proposed Dredging Mitigation Plan |

Mike,

As agreed at the meeting in Boston on December 13, Weaver's Cove is providing revisions to the December 6 draft "Proposed Dredging Mitigation Plan" along the lines discussed. Items of note are:

1.    In Section 1, we deleted certain definitions.

2.    In Section 2, we made it subject to the validation of the Physical Monitoring results.

3.    In Section 2, we limited the number of dredges while dredging native sediments in the Turning Basin to two.

4.    In Section 3.2, we deleted "New Brightman Street Bridge" in two places and replaced it with "C17 Buoy - City Pier Line".

5.    In Section 3.3, we deleted the text of Section 3 but intentionally left it blank to minimize the number of changes that would come through in a compare-write. We created a new bullet in Section 3.2 comprised of the last sentence of old Section 3.3.

6.    In Section 3.6, we added a turbidity curtain during the removal of existing piles.

7.    In Section 4, we added a new bullet comprised of the last sentence of the first paragraph.

8.    In Section 5, we deleted most of the text which was duplicative of the text of the Plan itself. In this way, there should be no confusion.

9.    As to Section 6, for the reasons I related to you on the telephone today, the concept of some form of a hydro acoustic based bio-monitoring plan is not one that we see is workable in the context of this project. As we see it, the hydro acoustic method is not one that has yet to be fully developed for use for the purposes for which certain people seemed to want it imposed here. Instead, the approach appears to be more like a data collection technique for research purposes rather than a time and event tested methodology with known and measurable criteria by which data is analyzed and conclusions drawn. Among other things, it is hard to fathom how all the external variables that can effect the river in addition to dredging can properly be segregated for testing and data analysis.

In sum, Weaver's Cove believes that the Proposed Dredging Mitigation Plan we attach, particularly when assessed in light of existing science, has provisions in it to minimize any actual impacts to fish from dredging. And, when coupled with the proposed mitigation measures and provisions for funding additional mitigation measures or fish enhancement activities, the Plan as a whole protects the downstream migration of anadromous fish during dredging in the months of August through October.

Bruce



Redline of 1215
WCE Mitigation...

Bruce F. Kiely
Baker Botts L.L.P.
1299 Pennsylvania Ave., NW
Washington, DC  20004-2400
(202) 639-7711
(202) 585-1035 - Fax
bruce.kiely@bakerbotts.com

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/0615/06*

*Red-Lined Version of 12/15/06 to 12/06/06 Version*

---

# PROPOSED DREDGING MITIGATION PLAN

---

# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| 1.0 | DEFINITION OF TERMS | | 1 |
| 2.0 | MEASURES TO MINIMIZE LOSS OF SEDIMENT INTO THE WATER COLUMN | | 2 |
| 3.0 | SEASONAL DREDGING RESTRICTIONS | | ~~3~~4 |
| | 3.1 | Winter Flounder Restriction | ~~3~~4 |
| | 3.2 | Incoming Anadromous Fish Restrictions | ~~3~~4 |
| | 3.3 | Downstream Anadromous Fish Migration Restrictions and Sequencing | ~~3~~4 |
| | 3.4 | Winter Period Restrictions (November 1 through January 15) | ~~3~~4 |
| | 3.5 | Pipeline Dredging Restriction | ~~3~~4 |
| | 3.6 | Ancillary waterfront construction activities | ~~4~~5 |
| 4.0 | ADDITIONAL DREDGING RESTRICTIONS NORTH OF THE CITY PIER – C17 BUOY – CITY PIER LINE, AUGUST, SEPTEMBER, OCTOBER | | ~~4~~5 |
| 5.0 | PHYSICAL MONITORING TO VERIFY SSFATE MODELING RESULTS | | ~~4~~5 |
| 6.0 | BIOLOGICAL MONITORING, TURNING BASIN, MAINTENANCE SEDIMENT DREDGING, AUG 1 – OCTOBER 31 | | ~~5~~6 |
| 7.0 | MITIGATION PROGRAMS | | ~~5~~7 |
| | 7.1 | Salt Marsh Avoidance | ~~5~~7 |
| | 7.2 | Salt Marsh Restoration Plan | ~~6~~7 |
| | 7.3 | Shellfish Mitigation Plan | ~~6~~7 |
| | 7.4 | Winter Flounder Spawning Habitat Mitigation | ~~7~~8 |
| | 7.5 | Long Term Mitigation To Improve And Expand Anadromous Fish Spawning Habitat | ~~8~~9 |

## Attachments

Attachment 1  Physical Monitoring Program

Attachment 2  Biological Monitoring Plan

# List Figures

Figure A    Turning Basin, East/Center/West Delineation

Figure B    S-Bend East/Center/West Delineation

Figure C    S Bend in the vicinity of the existing Brightman Street Bridge East/Center/West Delineation

Figure D    SSFATE modeling, cross sectional areas

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/06~~15~~/06*

# PROPOSED DREDGING MITIGATION PLAN for

# WEAVER'S COVER ENERGY, LLC, MILL RIVER ~~POWER~~PIPELINE, LLC

## (IN A FORM SUITABLE FOR INCLUSION IN THE U.S. ARMY CORPS OF ENGINEERS

### SECTION 10/404/103 INDIVIDUAL PERMIT)

**1.0      DEFINITION OF TERMS**

~~**Project area**:  the approximately 200 acre dredging footprint as proposed by Weaver's Cove Energy, LLC and Mill River Pipeline, LLC in its U.S. Army Corps of Engineers Section 10/Section 404/Section 103 Individual Permit application;~~

~~**Production dredge**:  a dredge and support vessels deployed for the purpose of removing sizeable volumes of maintenance and/or native sediments on a continuous or nearly continuous basis.  Barge or vessel mounted equipment deployed for the purpose of removing existing timber piers/pilings, installing new pier/mooring structures or placing sheet pile are not considered to be production dredges;~~

**Turning Basin**:  the project area between the new Brightman Street Bridge and proposed northern limit of the expansion of the existing Federal channel turning basin;

**S-Bend**:  the project area between the Braga Bridge (I-195) and the New Brightman Street Bridge;

**Southern Channel**:  the project area extending from the Braga Bridge south to the start of the existing Fall River Federal navigation channel;

**C17 Buoy – City Pier line**:  a line established on the NOAA navigation chart, approximately 2,000 ft north of the Braga Bridge.  This line bisects the S-Bend area and is shown on Figure B (attached);

~~**NRG Somerset Power Station**:  a coal/oil fired power station located on the west bank of the Taunton River, just north of the Federal navigation channel turning basin.  Also know as the Montaup power plant;~~

~~**Somerset Power Station Intake**:  a conventional shoreline intake structure for the once through cooling water system serving Somerset Unit 6 (112 MW).  The intake structure is located at the north end of the power block, approximately 500 feet northwest of the nearest corner of the existing turning basin;~~

**Pipeline Dredging**:  dredging associated with the placement of the gas pipeline across the Taunton River.  This crossing is located approximately 600 feet north (upstream) of the expanded Turning Basin.

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/06~~15~~/06*

Eastern, Center and Western Portions of the Turning Basin: as delineated by Figure A, attached;

Eastern, Center and Western Portions of the S-Bend, north of the C17 Buoy – City Pier Line: as delineated by Figure B and C, attached.

~~**Physical Monitoring Plan**: A procedure designed to measure the cross-sectional extent of the sediment plume (10 mg/l TSS above background or greater).~~

~~**Biological Monitoring Plan**: A monitoring plan designed to measure/assess the behavior of young-of-year anadromous fish during their outgoing migrations to the sea, with a particular focus on possible impingement on the Somerset intake screens.~~

**2.0    MEASURES TO MINIMIZE LOSS OF SEDIMENT INTO THE WATER COLUMN**

~~These~~**Subject to the requirements of Section 5 of this document, Physical Monitoring, these** measures apply to the entire project, all reaches, all time periods and are designed to minimize the amount of sediment introduced into the water column by the dredging operations.  **Additional dredging restrictions during the months of August, September, and October are addressed in Section 4.**

**Bucket Size**: Buckets appropriate for the depth of dredge cut in a given area shall be used; buckets up to 26 CY may be used in the Turning Basin and the "S-Bend".

**Environmental Buckets**: Closed or "environmental" buckets shall be used in all depositional or maintenance sediments. Conventional open buckets may be used in the more resistant native sediments. A conventional open bucket may also be used in areas where excessive debris limits the effectiveness of environmental buckets.

**No Scow Overflow**: There shall be no deliberate scow overflow at any time.

**Production Dredge Spacing – Depositional Sediments**: With **the exception of work during November, December and the first half of January,** a minimum upstream/downstream spacing of 1,500 feet between dredges will be maintained when dredging depositional sediments in the Turning Basin, the S Bend and the Southern Channel.

**Production Dredge Spacing – Native Sediments**: With **the exception of work during November, December and the first half of January,** a minimum separation of 750 feet between dredges will be observed when dredging native sediments In the Turning Basin and the S-Bend.  **Notwithstanding the foregoing, there will be a maximum of two production dredges in the Turning Basin.**

**Dredge Movements**: In addition, dredge equipment movements will be maintained, to the extent practicable, in a direction generally parallel to the river/tidal flow (north/south) as opposed to back and forth (east/west) across the river. By working parallel to the direction of the current and tidal flows, the cross sectional area of the dredge-induced

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/06̶15/06*

sediment "plume" will be minimized, thereby maximizing the unaffected river cross section available to anadromous fish to swim around the "plume."[1]

## 3.0    SEASONAL DREDGING RESTRICTIONS

These restrictions reflect the results of an extended and comprehensive environmental review process.   The restrictions are intended to provide certainty of protection for important species in the Taunton River and Mount Hope Bay.

### 3.1    Winter Flounder Restriction

A complete 4½ month ban on dredging between January 15 and May 31 of each year, will be observed in order to protect winter flounder spawning (eggs and larvae).

### 3.2    ~~Incoming~~ Anadromous Fish Restrictions

♦   A complete ban on dredging between March 1 and July 31 of each year for the project area north of the ~~New Brightman Street Bridge~~**C17 Buoy – City Pier Line**;

♦   A complete ban on dredging between March 1 and June 15 of each year for the project area south of the ~~New Brightman Street Bridge~~**C17 Buoy – City Pier Line**, in Massachusetts waters;

♦   A complete ban on dredging between March 1 and May 31 of each year for the project area south of the Massachusetts/Rhode Island border;

### ~~3.3    Downstream Anadromous Fish Migration Restrictions and Sequencing~~

♦   ~~A complete ban on dredging in the S-Bend north of the C17 Buoy – City Pier Line and in the Turning Basin between June 15 and July 31 of any year.~~   During the months of August, September and October, the additional restrictions listed in **Section 4** shall apply.

### **3.3**    

**This subsection is intentionally left blank.**

### 3.4    Winter Period Restrictions (November 1 through January 15)

Dredging operations undertaken in the Turning Basin, S-Bend, or Southern Channel during the period between November 1 and January 14 shall be subject to the dredge restrictions listed in **Section 2 only**.  Recognizing that biological activity is at a low ebb during this period, no further restrictions shall apply.

---

[1]   This will not be possible during dredging of the pipeline crossing (estimated volume of 33,000 cubic yards out of a total project planning volume of 2,600,000 cubic yards, hence the pipeline dredging will be conducted in the November 1 – January 14 period.

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/0615/06*

### 3.5 Pipeline Dredging Restriction

A complete ban on Pipeline Dredging will be in effect from January 15 through October 31. Since Pipeline Dredging will, of necessity, involve moving the dredge across the flow of the river, dredging/backfilling for the Taunton River pipeline crossing will only be conducted between November 1 and January 14. Biological activity is at a low ebb during this early winter period. Pipeline Dredging may proceed in parallel with one or more production dredges operating in the Turning Basin during the period from November 1 to January 14 of any year. There will be no deliberate scow overflow during the pipeline dredging/backfilling; no other restrictions will apply to this activity.

### 3.6 Ancillary waterfront construction activities

Subject to a U.S. Army Corps of Engineers approved sediment monitoring and/or a containment plan as necessary, simultaneous waterfront construction work such as the removal of the existing timber pile pier, the placement of piles for the new pier/mooring structures, or the installation of sheet pile below the mean high water line may be conducted at any time during any year. Such non-dredging work is not subject to the separation requirements or other supplement restrictions applicable to production dredges. **A turbidity curtain will be used during removal of the existing piles.**

## 4.0 ADDITIONAL DREDGING RESTRICTIONS NORTH OF THE CITY PIER – C17 BUOY – CITY PIER LINE, AUGUST, SEPTEMBER, OCTOBER

The following dredging restrictions will be applied between August 1 and October 31 when dredging depositional (maintenance) sediments in the areas north of the C17 Buoy –City Pier Line. These additional measures are designed to afford a further degree of protection for the outgoing anadromous fish migration. ~~These additional measures do not apply to the dredging of coarser native sediments.~~

- ♦ When dredging depositional (maintenance) sediments in the Turning Basin only a single production dredge will be used. This single production dredge will operate along either the eastern or western portion of the Turning Basin during this time period. There will be no dredging of depositional (maintenance) sediments in the center portion of the Turning Basin as shown on Figure A.

- ♦ When dredging depositional (maintenance) sediments in the subsection of the S-Bend located north of the C17 Buoy – City Pier line, only a single production dredge will be used. This single production dredge will operate along either the eastern or western portion of the northern portion of the S-Bend during this time frame. There will be no dredging of depositional (maintenance) sediments in the center portion of the northern section of the S-Bend as shown on Figures B and C.

- ♦ **Subject to model verification as stipulated in Section 5, these additional measures do not apply to the dredging of native sediments.**

## 5.0 PHYSICAL MONITORING TO VERIFY SSFATE MODELING RESULTS

Weaver's Cove will initiate a field measurement program in the Turning Basin, for the purpose of verifying that the actual in-river areas of dredge-induced elevated suspended

sediment (10 mg/l TSS or more above background) comport with the SSFATE modeling results which have been provided to the agencies during the course of the NEPA and MEPA reviews.

More specifically, the extent of the river cross section in the Turning Basin affected by dredge-induced elevated suspended sediment levels will be compared to the applicable cross section in Figure D. For purposes of this measurement program, a margin of +/-25% is acceptable.

The Physical Monitoring Program is set forth in Attachment 1.

~~If the compiled monitoring results for the initial monitoring effort confirms that the measured cross section is in accordance with the modeled cross section (+/- 25%), the monitoring report will be submitted to the U.S. Army Corps of Engineers. No further physical monitoring of any aspect of the dredge program would be required.~~

~~If the measured cross sectional area exceeds the modeled area by more than 25%, Weaver's Cove will take corrective actions as described in the Physical Monitoring Plan, within 48 hours of the availability of the compiled monitoring results. Within 72 hours of implementation of corrective action, the physical monitoring program will be repeated and the results complied and provided to the U.S. Army Corps of Engineers (and copied to DOI/NPS/USFWS). If the corrective action does not demonstrate that the cross sectional area is in accordance with the modeled cross section (+/- 25%), dredging of maintenance sediments in the Turning Basin operation will be modified a second time and the measurement procedures will be repeated. If this test does not conform to the modeling results, the dredging operation will be halted for 2 days in order to allow the U.S. Army Corps of Engineers, DOI and Weaver's Cove to confer on appropriate next steps.~~
~~Further, if the Turning Basin Physical Monitoring Program does not demonstrate that the measured cross section of dredge-induced elevated suspended sediment levels is in accordance with the modeled cross section (+/- 25%), the Physical Monitoring Program will also be carried out for the dredging of maintenance sediments in the S-Bend, north of the C17 Buoy City Pier line.~~

~~Lastly, if the Turning Basin Physical Monitoring Program does not demonstrate that the measured cross section of dredge-induced elevated levels is in accordance with the modeled cross section (+/- 25%), the Physical Monitoring Program will also be carried out for the dredging of native sediment in the Turning Basin.~~

The Physical Monitoring Program will be funded and conducted by Weaver's Cove.

6.0    **BIOLOGICAL MONITORING, TURNING BASIN, MAINTENANCE SEDIMENT DREDGING, ~~AUG~~AUGUST 1 – OCTOBER 31**

Weaver's Cove will conduct a Biological Monitoring Program designed to assess the effects, or lack thereof, from dredging of maintenance sediments on fish behavior in the vicinity of the Somerset cooling water intake. The biological monitoring will be carried out during the period of August 2 through October 31, to the extent that maintenance sediments are being dredged in the Turning Basin.

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/0615/06*

The plan is set forth in Attachment 2.

**The Biological and Monitoring Program will be funded and conducted by Weaver's Cove.**
Regulatory agency personnel will be welcome to observe the field work, subject to reasonable advance notice and available space in the vessel being used by monitoring personnel.

## 7.0    MITIGATION PROGRAMS

### 7.1    *Salt Marsh Avoidance*

Weaver's Cove has revised the shoreline profile of the site and plant layout so as to completely avoid the previously identified impacts to the 0.04 acres of salt marsh on the south end of the project site.

### 7.2    *Salt Marsh Restoration Plan*

Even though impacts to the 0.04 acres of salt marsh have been avoided, Weaver's Cove will continue to implement the previously proposed on-site salt marsh mitigation measures. These measures comprise restoration of a 0.7 acre salt marsh area currently degraded by fill material and common reed. Also, see Section 7.4. below, regarding Mitigation for Winter Flounder Spawning Habitat in the Turning Basin.

### 7.3    *Shellfish Mitigation Plan*

Background:

While shellfish (primarily northern quahog) are reported to be relatively abundant in portions of the dredge area, per Massachusetts Division of Marine Fisheries (MADMF), commercial harvesting is not allowed in the Taunton River and the Massachusetts portion of Mount Hope Bay. For many years, the shellfish in this area have been determined to be biologically contaminated and unsafe for human consumption, as a result of elevated fecal coliform levels.

Approximately 84 acres of the approximately 160-acre dredge footprint in Massachusetts has been mapped by MADMF as potential habitat for northern quahog. An additional 11.5 acres of potential northern quahog habitat may exist in the approximately 33-acre dredging footprint located in Rhode Island waters (this area also has also been closed to shellfishing for many years).

Although the shellfish within the dredge footprint have been and remain unavailable for commercial harvest or human consumption, Weaver's Cove has developed a plan to mitigate the one time loss or relocation of shellfish stocks which would result from the dredging work. Weaver's Cove maintains that the proposed Shellfish Mitigation Plan will adequately compensate for any Project-related impacts to quahog habitat.

Shellfish Mitigation Plan:

The performance based shellfish mitigation plan includes the following elements:

♦ Pre-Harvest Survey – a pre-harvest survey will be conducted for the mapped MADMF areas within the dredging footprint. The survey will establish relative abundance and location of quahogs so that it can be determined if a potentially commercially-harvestable quantity exists. The results of the pre-harvest survey will define the locations from which pre-dredge harvesting will occur.

♦ Harvest and Relay – The purpose of the shellfish harvest and relay phase is to remove and transfer potentially commercially-harvestable quahogs that may be directly impacted by the dredging project. By removing the quahogs and relaying them to suitable off-site locations, impacts to the existing (and currently restricted) resource will be minimized. As a result, those shellfish resources can continue to grow, depurate if moved to less contaminated areas, and then be harvested for human consumption.

♦ Seeding – Following the dredging work, shellfish seeding will be conducted. The shellfish seeding is expected to boost natural regeneration and shellfish propagation in suitable habitats.

♦ Post-Seed Monitoring and Compliance with Success Criteria – During the pre-harvest survey, prior to the start of dredging in each dredging element, shellfish sampling will be performed to determine the numbers and weight of quahogs per unit area, as well as the sediment grain size distribution. As the quahogs are harvested for relay, the numbers and weight of clams in defined areas will be recorded. Growth data (shell length versus age) available from University of Rhode Island researchers (Rice et al., 1989) will be used to determine the median age of quahogs present. Following the dredging work, seeding will be performed. Subsequently, the areas will be re-surveyed to determine the biomass present. Statistical analyses will be used to determine if the biomass present in the number of years after seeding is equivalent to (*i.e.*, not significantly different from) the pre-dredging condition. If the biomass is significantly lower, an analysis will be made of the habitat characteristics (grain size and physical-chemical) of the seeded areas to determine if they are suitable for quahogs. If those areas are deemed suitable, additional seeding will be performed. If an area is deemed not suitable, other mitigation sites will be used (*e.g.*, areas where harvesting for the ongoing relays has occurred). Weaver's Cove will consult with MADMF on these evaluations. Once the biomass has reached the pre-dredging level, the area will be considered restored.

The shellfish mitigation program will be funded and conducted by Weaver's Cove.

### 7.4    *Winter Flounder Spawning Habitat Mitigation*

Background:

NOAA Fisheries has estimated that the approximately 11 acres of the river bottom that will be dredged to a depth of 41 ft (~12.5 meters) MLLW will no longer be suitable for winter flounder spawning. This analysis is based strictly on water depth, without consideration of bottom conditions and suitability of existing exposed sediment type for winter flounder spawning.

On May 20, 2005, Weaver's Cove submitted for agency review, a proposed mitigation plan for these potential impacts. Because there are no meaningful opportunities for on-

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/0615/06*

site, in-kind mitigation of impacts to aquatic winter flounder habitats, Weaver's Cove proposed that an "in-lieu" fee[2] of $500,000 be established in a trust account administered by a state or Federal resource agency, or paid directly to a private natural resource management entity, for the purpose of providing compensatory mitigation for the loss of approximately 11 acres of potential winter flounder habitat.[3]

The Winter Flounder Habitat Mitigation Program:

This program includes three elements, each of which will mitigate the potential loss of spawning habitat by strengthening the winter flounder stocks in Narragansett Bay. The plan includes:

1)    planting or re-establishing several acres of eel grass beds in Narragansett Bay,

2)    direct restocking of winter flounder, and

3)    expansion of the salt marsh/inter-tidal habitat restoration program at the southern end of the Project site to incorporate an additional approximately 0.25 acres of new open shallow sub-tidal habitat. Under this scenario, channels could be opened to create more open-water shallow sub-tidal habitat with comparable substrate type, grain size distribution, and benthic flora and fauna preferred by winter flounder for spawning.

Items (1) and (2) would be funded by Weaver's Cove's commitment to establish a $500,000 account. This funding would be made available within 90 days of the receipt of the first commercial cargo at the Weaver's Cove Terminal. Item (3) would be accomplished by Weaver's Cove as part of the Terminal construction program (i.e., over and above the $500,000 fund).

Next Steps:

Weaver's Cove will submit a more detailed Winter Flounder Habitat Mitigation Plan to the U.S. Army Corps of Engineers within one month of the agreement by DOI to a Dredging Mitigation Plan. The more detailed plan will be comparable to the level of detail of the current shellfish mitigation plan. It is expected that the U.S. Army Corps of Engineers will distribute the more detailed plan for review by Federal and state resource agencies. It also is anticipated that the U.S. Army Corps of Engineers will convene an Interagency working group meeting(s) for purposes of finalizing this plan. It is expected that Weaver's Cove would be invited to participate in this meeting(s). It is agreed that this process would be completed as part of the U.S. Army Corps of Engineers action on the Weaver's Cove permit.

---

[2]    The use of in-lieu fees for the purpose of providing compensation to offset possible adverse impacts to aquatic resources is consistent with other U.S. Army Corps of Engineers Individual Permits (see Special Condition No. 16 in the U.S. Army Corps of Engineers permit for the Hubline project), and U.S. Army Corps of Engineers regulatory guidance letters.

[3]    Weaver's Cove has collected additional topographic data along the shoreline that has resulted in a refined and more accurate delineation of the mean low water line and related sub-tidal habitat areas. This more accurate survey has confirmed that no sub-tidal habitat will be filled. Earlier filings had indicated that a small area of sib-tidal habitat would be filled.

_CONFIDENTIAL_
*For Settlement Discussion Purposes Only*
*12/0615/06*

**7.5    Long Term Mitigation To Improve And Expand Anadromous Fish Spawning Habitat**

Background:

In lieu of severe or extensive restrictions aimed at eliminating any unforeseen impacts associated with the project, Weaver's Cove will fund measures that would clearly and substantially benefit the Taunton River anadromous fishery resources for the long term. More specifically, MADMF has identified a series of possible fish ladder improvements, fish ladder construction, removal of dam remnants, and removal of small dams and other obstructions (see Technical Report TR-15). According to MADMF, such measures would reopen significant spawning areas in the upstream tributaries of the Taunton River, spawning areas which are very important to the long term strength of the Taunton River anadromous fishery.

Mitigation Plan Funding Commitment:

1. As part of this Mitigation Plan, Weaver's Cove would fund such measures by two mechanisms. The intent of this two part funding arrangement is to provide early funding for use as "seed money" to help NPS and USFWS identify, develop, engineer and obtain permits for initial improvements. The annual payments would then provide the appropriate resource agencies or other qualified entities with additional development funds and funding (complete or matching as appropriate) for execution of an ongoing series of projects.

   ♦ The first payment would be in the amount of $500,000. This sum would be made in three equal annual installments, with the first payment being made upon the commencement of dredging work, the second at the beginning of the second dredging season, and the third at the beginning of the third dredging season.

   ♦ The second payment element would be on an annual basis once the terminal has been placed in service and begins to receive commercial deliveries of LNG. The payments would be based on the annual volume of LNG received by the terminal and would continue for a period of 25 years. At an annual LNG volume equivalent to 146,000,000 MMBtu (the Project's base load throughput of 400,000 MMBtu per day, 365 days per year) an annual payment of $100,000 would be made. The amount of this payment would be adjusted up or down based on the actual volume of LNG received at the LNG Terminal in a given year. As a condition of its FERC authorization, Weaver's Cove is required to provide semi-annual reports of the quantity of imported LNG. These FERC reports will be used as the basis for calculating the annual payment. Allowing for a partial first year, these payments will be made on a calendar year basis. The annual payment would be made on or before March 15 of the subsequent year. Assuming that the facility operates at its base load throughput on an annual basis, the sum of these annual payments to this mitigation program would be expected to be $2,500,000 over a twenty-five year period.

2. Funding under this Section 7.5.1 would be made available to a program office designated by the U.S. Army Corps of Engineers in consultation with DOI and created for the purpose of administering this effort, and/or to state agencies,

*CONFIDENTIAL*
*For Settlement Discussion Purposes Only*
*12/06̲1̲5̲/06*

advocacy groups and/or local government bodies. The designated agencies or entities would be responsible for implementing the measures consistent with the intent of this Section 7.5.

3. To the extent that any of the funding under this Section 7.5 is to be used for research activities, it is agreed that the purpose of the research would be to further the understanding of anadromous fish in the upper reaches of the Taunton River, specifically the portion of the Taunton River (and associated tributaries) previously designated by Congress for study under the Wild and Scenic River Act.

Document comparison done by DeltaView on Friday, December 15, 2006 4:12:56 PM

| Input: | |
|---|---|
| Document 1 | PowerDocs://DC01/460835/1 |
| Document 2 | PowerDocs://DC01/461704/2 |
| Rendering set | 1-Bold Double Underline-Strikethrough |

| Legend |
|---|
| **Insertion** |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Redline Summary: | | |
|---|---|---|
| No. | Change | Text |
| 1 | Insertion | CONFIDENTIAL |
| 2-3 | Change | "12/06/06" changed to "12/15/06" |
| 4-5 | Change | "DC01:460835.1" changed to "DC01:461704.2" |
| 6-8 | Change | "DC01:460835.179001/dredging mitigation plan.doc" changed to "DC01:461704.2i" |
| 9-10 | Deletion | i        Epsilon Associates.com |
| 11-12 | Change | "RESTRICTIONS    3" changed to "RESTRICTIONS    4" |
| 13-14 | Change | "Restriction    3" changed to "Restriction  4" |
| 15-16 | Change | "Restrictions 3" changed to "Restrictions4" |
| 17-18 | Change | "Sequencing 3" changed to "Sequencing 4" |
| 19-20 | Change | "January 15) 3" changed to "January 15) 4" |
| 21-22 | Change | "Restriction    3" changed to "Restriction  4" |
| 23-24 | Change | "activities     4" changed to "activities     5" |

| 25-26 | Change | "SEPTEMBER, OCTOBER    4" changed to "SEPTEMBER, OCTOBER    5" |
| 27-28 | Change | "MODELING RESULTS    4" changed to "MODELING RESULTS    5" |
| 29-30 | Change | "OCTOBER 31    5" changed to "OCTOBER 31    6" |
| 31-32 | Change | "7.0    MITIGATION PROGRAMS5" changed to "7.0 MITIGATION PROGRAMS7" |
| 33-34 | Change | "Marsh Avoidance    5" changed to "Marsh Avoidance    7" |
| 35-36 | Change | "Restoration Plan    6" changed to "Restoration Plan    7" |
| 37-38 | Change | "Mitigation Plan    6" changed to "Mitigation Plan    7" |
| 39-40 | Change | "Mitigation    7" changed to "Mitigation    8" |
| 41-42 | Change | "Spawning Habitat    8" changed to "Spawning Habitat    9" |
| 43-44 | Change | "DC01:460835.179001/dredging mitigation plan.doc" changed to "DC01:461704.2" |
| 45 | Deletion | 8    Epsilon Associates.com |
| 46-47 | Change | "MILL RIVER POWER LLC" changed to "MILL RIVER PIPELINE, LLC" |
| 48 | Deletion | LLC |
| 49 | Deletion | Project area:  the...Permit application; |
| 50 | Deletion | Production dredge:  a...be production dredges; |
| 51 | Deletion | NRG Somerset Power...the Montaup power plant; |
| 52 | Deletion | Somerset Power Station...existing turning basin; |
| 53 | Deletion | Physical Monitoring Plan:...background or greater). |
| 54 | Deletion | Biological Monitoring...Somerset intake screens. |
| 55-56 | Change | "These measures apply" changed to "Subject to the...these measures apply" |
| 57 | Insertion | operations.  Additional...addressed in Section 4. |

| 58 | Insertion | the S-Bend. ...in the Turning Basin. |
|----|-----------|---------------------------------------|
| 59 | Change | "3.0    SEASONAL" changed to "3.0    SEASONAL" |
| 60 | Change | "3.2    Incoming Anadromous Fish" changed to "3.2 Anadromous Fish" |
| 61-62 | Change | "north of the New Brightman Street Bridge;" changed to "north of the C17 Buoy – City Pier Line;" |
| 63-64 | Change | "south of the New...Bridge, in Massachusetts" changed to "south of the C17 Buoy –...Line, in Massachusetts" |
| 65 | Change | "3.3    Downstream Anadromous...and Sequencing" changed to "" |
| 66 | Change | "♦    A complete ban on...year.  During the months" changed to "♦    During the months" |
| 67 | Change | "" changed to "3.3" |
| 68 | Insertion | This subsection is intentionally left blank. |
| 69 | Change | "3.6    Ancillary" changed to "3.6  Ancillary" |
| 70 | Insertion | production dredges.  A...of the existing piles. |
| 71 | Deletion | migration.  These...native sediments. |
| 72-73 | Insertion | ♦    Subject to model...of native sediments. |
| 74 | Deletion | If the compiled...would be required. |
| 75 | Deletion | If the measured cross...appropriate next steps. |
| 76 | Deletion | Further, if the Turning...C17 Buoy-City Pier Line. |
| 77 | Deletion | Lastly, if the Turning...in the Turning Basin. |
| 78-79 | Change | "SEDIMENT DREDGING, AUG 1 – OCTOBER" changed to "SEDIMENT DREDGING, AUGUST 1 – OCTOBER" |
| 80 | Insertion | The Biological and...by Weaver's Cove. |
| 81 | Change | "7.2    Salt Marsh" changed to "7.2        Salt Marsh" |
| 82 | Change | "1)    planting or" changed to "planting or" |
| 83 | Change | "2)    direct restocking" changed to "direct restocking" |
| 84 | Change | "3)    expansion of" changed to "expansion of" |

**Statistics:**

|  | Count |
|---|---|
| Insertions | 35 |
| Deletions | 49 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 84 |

# EXHIBIT

# I

**Kiely, Bruce**

| | |
|---|---|
| **From:** | Bob_McIntosh@nps.gov |
| **Sent:** | Tuesday, December 26, 2006 3:59 PM |
| **To:** | Kiely, Bruce |
| **Cc:** | michael_thabault@fws.gov |
| **Subject:** | Weaver's Cove Discussion Follow-Up |



wce9points122606.
doc (35 KB)

Dear Mr. Kiely:

This email responds to your email of 12/15/2006 to Mike Thabault, in
which you transmitted Weaver's Cove Energy's ("WCE") response to
discussions held on 12/13 in Boston and 12/14 by conference call. Since
the National Park Service (NPS) has primary responsibility for Wild and
Scenic River issues within the Department of the Interior, the NPS will
take the lead on this matter from this point forward. As such, please
consider me as your primary contact person.

Let me start out by noting that all reports I have heard from the 12/13
meeting and 12/14 biological monitoring conference call have been
positive on our end. Therefore, I was very surprised by the content of
WCE's response and the position expressed by your 12/15/2006 email –
particularly regarding the biological monitoring component. As you know,
the ability to monitor actual fish passage through the project area has
been a central tenet of our willingness to entertain the operational
dredging flexibility sought by WCE during the downstream migration
period. We continue to believe that a successful biological monitoring
program is critical to providing adequate protection to the resource and
the flexibility sought by WCE. Therefore, we ask WCE to reconsider the
scope of the biological monitoring component within the mitigation plan
for this project. WCE's current proposal to monitor in front of the
Somerset plant intake is too narrow in scope to demonstrate successful
fish passage through the project area during the downstream migration
period.

Because there is a lack of scientific information regarding behavioral
responses of migrating river herring and shad to anticipated dredging
impacts, including sediment and noise, a biological monitoring program
must be in place to document successful fish passage if WCE dredges the
Taunton River during the downstream migration period. We are confident,
however, that the hydro-acoustic based monitoring discussed on the 12/14
conference call, which seemed to be acceptable to your consulting
biologist at the time, can provide the information necessary to document
and assure successful passage. We acknowledge the extent to which WCE
has been willing to adopt measures to mitigate project impacts and
applaud these efforts. The hydro-acoustic based biological monitoring
will document the effectiveness of these measures and ensure that the
project impacts are acceptable.

The attached word document contains additional comments in response to
the nine points contained in your 12/15 email. The importance of the
biological monitoring component within the overall context of the
mitigation plan is discussed further in response to point #9. We
continue to await the revised biological monitoring scope/proposal you
indicated would be forthcoming based on our 12/13 and 12/14 discussions.

(See attached file: wce9points122606.doc)

Sincerely,

1

Bob McIntosh
Associate Regional Director,
Planning, Construction & Facility Management
Northeast Region
National Park Service
15 State Street
Boston, MA 02109
ph: 617.223.5122, fax: 617.223.5172

1

Attachment to 12/26/06 email to B. Kiely from B. McIntosh

1.    In Section 1, the deletion of certain definitions was agreed upon.

2. & 3.    In Section 2, you made the dredging restrictions subject to the validation of the Physical Monitoring results and limited the number of dredges, while dredging native sediments in the Turning Basin to two.

The operational flexibility sought by WCE for dredging of native sediments must be linked to the results of physical and biological monitoring in year one for dredging of "depositional" sediments showing that migrating herring or shad are not adversely affected.  If dredge spacing is reduced from 1,500 feet to 750 feet, or if an additional dredge is brought into the turning basin or s-bend when dredging native sediments, biological monitoring would need to be continued until it is documented that river herring and shad are able to move past the dredge operation successfully.

Adding a second dredge into the turning basin during the November – January15 period is encouraged based on the flexibility provided by allowing dredging to start after June 15 in the "s bend" below the C17/City Pier Buoy line, per WCE's October 25, 2006 mitigation proposal.

4.    In Section 3.2, replacing "C17 Buoy - City Pier Line" for "New Brightman Street Bridge" in two places was agreed upon.

5.    In Section 3.3, the deletion of the text of Section 3.3, but intentionally left blank to minimize the number of changes and the creation of new bullet in Section 3.2 comprised of the last sentence of old Section 3.3 is acceptable.

6.    In Section 3.6, the addition of a turbidity curtain during the removal of existing piles was agreed upon.

7.    In Section 4, you added a new bullet comprised of the last sentence of the first paragraph.

Applying the east, west and center dredging protocols to depositional sediments only has not yet been agreed to.  The dredging restrictions in Section 4 ensure that at least two-thirds of the river width will be open to fish movement and free of dredge and barge

operations.  If WCE wishes to create an exception to this limitation for native sediment dredging, it will need to be tied to observed fish response to sediment and other operational impacts such as noise through the hydro-acoustic based biological monitoring.

2

8.    In Section 5, the deletion of most of the text, which was duplicative of the text of the Plan, is acceptable.

9.    As to Section 6, your email states that the concept of some form of a hydro-acoustic based bio-monitoring plan is not one that is workable in the context of this project because the hydro acoustic method is not fully developed for use for the purposes needed. According to your email, you believe the approach appears to be more like a data

collection technique for research purposes rather than a time and event tested methodology with known and measurable criteria by which data is analyzed and conclusions drawn.

Hydro-acoustic detection and monitoring of fish presence and movement is a well-established technology that is used widely in fisheries management today.  The development of narrow beam echo sounder transducers by Biosonics, Inc. and others has allowed scientists to accurately count juvenile down-stream migrating fish under numerous circumstances since the technology was first employed in 1978. The technology is used extensively to document fish as they pass through turbine intakes at hydroelectric facilities and is also used extensively in open river systems to document and estimate relative abundance of migrating fish at locations throughout the world.  The use of hydro-acoustics for assessment of fish size, distribution, and abundance has been an accepted science for decades. Proven methodologies have been developed to give reliable and defendable information about fish and plankton schools and total biomass of species of virtually every size. Fish migration assessment in rivers was one of the applications that helped launch Biosonics Inc. in 1978.

Some example applications similar to how this technology could be used in the Taunton River project include active tracking for assessing fish behavior at the Dalles dam on the Columbia river; annual monitoring of salmon migration at Wells dam on Columbia River since 1981; estimating sockeye salmon smolt flux and abundance in British Columbia; fish behavior near hydroelectric dams including the Ice Harbor Dam on the Snake River, Dalles Dam on the Columbia River and John Day Dam on the Columbia River; detection of migrating salmon in rivers (using split-beam technology) in numerous locations as reviewed by Ransom, et al.; to evaluate fish passage at a prototype surface bypass and collector at lower granite dam on the Snake River; hydro-acoustic analysis of fish populations in Copco and Iron Gate Reservoirs, California; fish behavior determination in response to strobe light deterrents at Grand Coulee Dam; surveys to locate eulachon aggregations in the Lower Fraser River, British Columbia; and stock assessment of salmon returning to Salmon Bay, and Luck Lakes, Prince of Wales Island. Reports detailing these applications can be made available if necessary,

The NPS has suggested coupling fixed station split-beam hydro-acoustic assessments with a newer (but proven) technology involving a mobile acoustic camera (the **d**ual frequency **id**entification **son**ar (**DIDSON**) camera developed by Sound Metrics Corporation) that provides higher individual fish resolution and would allow tracking individual schools of fish to determine and document their reaction when encountering the dredge operation area.  When combined with an array of fixed station split-beam

3

hydro-acoustic sensors, we feel that the fate of herring, shad, and most other species moving through the project area can be well documented.

The DIDSON camera was originally developed for the U.S. military by the University of Washington's applied physics lab for diver detection and underwater mine identification, but for nearly ten years, has been adapted to fishery and aquatic resource use. For the last two years, the Alaska Department of Fish and Game (ADFG) has been testing the

DIDSON sonar system to help them count salmon returning to Alaska's rivers. Because many of the rivers and streams in Alaska are glacially occluded or highly silt-laden, the DIDSON has proven to be a useful tool for observing and counting fish in these turbid conditions. Results from experiments in 2002 and 2003 show that the DIDSON provided significant improvements in their ability to detect and track fish, and determine the direction of travel of migrating fish over the more conventional split- and single-beam sonar systems currently used at many sites. This system has also been successfully used in a number of tests and applications including for sturgeon on the Columbia River; observing salmon behavior in the Ballard Locks in Seattle, Washington; identifying and counting salmon and steelhead on the Methow River, Washington; counting salmon on the Kenai River in Alaska; and is currently being used in conjunction with Biosonics split-beam hydroacoustics to evaluate herring response to a test hydro generation unit in the east river near New York City.

Given the extensive previous and ongoing use of the suggested methods to monitor and determine the fate of herring attempting to migrate through the project area, we do not feel that the suggested methods are "experimental" or "research" in nature. A review of past and ongoing use of this hydro-acoustic equipment indicates that this technology, if appropriately applied on WCE's proposed project, will provide the information necessary to validate adequate protection of migrating fish. However, we are open to considering alternative suggestions for monitoring herring/shad response to WCE's proposed dredging if WCE can provide suitable documentation that such methods are likely to be successful in providing the documentation needed.

We believe that we are close to reaching a workable solution that provides flexibility for WCE to accomplish necessary project dredging within the stated three year timeframe, while assuring necessary resource protection objectives are met. However, biological monitoring of herring and shad response to the operational procedures must be a part of the mitigation plan.

# EXHIBIT

# J

# BAKER BOTTS LLP

THE WARNER
1299 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20004-2400

TEL  +1 202.639.7700
FAX  +1 202.639.7890
www.bakerbotts.com

AUSTIN
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
**WASHINGTON**

January 8, 2007

Mr. Bob McIntosh
Associate Regional Director,
Planning, Construction & Facility Management
Northeast Region
National Park Service
15 State Street
Boston, MA  02109

Bruce F. Kiely
TEL  +1 (202) 639-7711
FAX  +1 (202) 585-1035
bruce.kiely@bakerbotts.com

Re:    Weaver's Cove Energy, LLC

Dear Mr. McIntosh:

Weaver's Cove Energy LLC ("Weaver's Cove") is in the process of reviewing and assessing your e-mail of December 26, 2006. We are surprised and somewhat dismayed to learn that, after Marvin Moriarty's letter of several months ago designating Mike Thabault as the lead for addressing the Wild and Scenic River Act ("WSRA") legal position set forth in the FWS February 7, 2006 letter, we are now being instructed to deal exclusively with a new and different lead negotiator and a different agency, NPS. This late change in both agency and contact person is also rather odd as we have been dealing with Mike Thabault for several months and now, as it appears that the issues have been distilled down to a few, we are told that we have to shift gears in order to deal with a new agency and with a new person as the lead. Finally, this change away from the FWS leadership is confusing as the assertion of WSRA legal positions designed to block the project set forth in the February 7 letter is one taken by a FWS employee and is on FWS letterhead, not an NPS employee and not on NPS letterhead.

That said, Weaver's Cove is reviewing the contents of your e-mail and the arguments you set forth in defense of the use of a hydro acoustic monitoring method and the examples of those methods used elsewhere for other purposes. Finally, in light of (1) the scientific evidence as to impacts on outward migrating fish from dredging, (2) the package of operational measures and the extensive mitigation measures Weaver's Cove has proposed that are designed to more than offset any possible effects of dredging on fish, we are assessing the appropriateness, workability and substantive value of any hydro acoustic monitoring method in the context of the short-term, temporal nature of this particular dredging even.

Once Weaver's Cove has finished this review and assessment and has formulated its response, I will contact you.

Sincerely,

*BF/KS*

Bruce F. Kiely
Attorney for Weaver's Cove Energy, LLC

cc:    Mike Thabault
Ted Gehrig
Ted Barten

# EXHIBIT

# K

# BAKER BOTTS LLP

THE WARNER
1299 PENNSYLVANIA AVE., NW
WASHINGTON, D.C.
20004-2400

TEL +1 202.639.7700
FAX +1 202.639.7890
www.bakerbotts.com

AUSTIN
DALLAS
DUBAI
HONG KONG
HOUSTON
LONDON
MOSCOW
NEW YORK
RIYADH
**WASHINGTON**

February 21, 2007

Bruce F. Kiely
TEL +1 (202) 639-7711
FAX +1 (202) 585-1035
bruce.kiely@bakerbotts.com

Mary A. Bomar
Director
National Park Service
1849 C Street, NW
Washington, DC 20240

Re:    Request for Meeting

Dear Ms. Bomar:

This letter is sent on behalf of Weaver's Cove Energy, LLC ("Weaver's Cove") and relates to positions taken at varying times by the National Park Service ("NPS")"and the Fish and Wildlife Service ("FWS") under the Wild and Scenic Rivers Act ("WSRA") in proceedings before the Federal Energy Regulatory Commission ("FERC") and the United States Army Corps of Engineers ("USACE"). Weaver's Cove is developing an LNG import terminal on the lower Taunton River, in the city of Fall River, Massachusetts, and has received FERC authorization for the project subject to certain conditions.

In particular, NPS/FWS have asserted authority under the provisions of the WSRA related to rivers designated for study. Based on this assertion of authority, NPS/FWS have told FERC on the one hand via a July 5, 2005, letter, and USACE, on the other hand, via a February 7, 2006, letter, that they will not issue a determination of "no adverse effect" unless very restrictive, and from Weaver's Cove's perspective, unworkable, Time of Year ("TOY") restrictions are imposed on the proposed dredging of the existing federal channel. These assertions are frustrating Weaver's Cove's ability to satisfy a condition of FERC's approval of its project and the finding the project is in the public interest. USACE has advised Weaver's Cove that because the assertions made by NPS were made under the WSRA, it has no choice but to impose the aggressive TOY restrictions.

FERC found Weaver's Cove's LNG terminal to be in the public interest as it would provide much needed natural gas supplies to New England to help meet the demand for gas of residential customers and electric power plants. Weaver's Cove has presented numerous scientific studies demonstrating no significant impact and also proposals in an attempt to work with FWS and NPS regional personnel in order to reach an agreement on mitigation measures to address concerns as to potential impacts on fish, but has not been able to get the parties to come to closure or to state exactly what either agency would accept by way of final mitigation. Initially the FWS took the lead in all discussions. On December 26, 2006, Bob McIntosh of the NPS directed that we were to deal only with the NPS.

**BAKER BOTTS** LLP

Mary A. Bomar                                  - 2 -                          February 21, 2007

      At this juncture, and in light of this recent directive, Weaver's Cove believes that a meeting between the company, senior NPS policy personnel and anyone else from NPS you desire would be beneficial. The goal would be to see if the parties could take a step back from the months of discussions and the politically charged emotions in New England and try to establish if there is common ground on which a balanced resolution of the remaining issues could be reached. Otherwise, since the last-stated NPS position is effectively blocking Weaver's Cove's ability to finalize its approvals and permits, the company's only recourse would be to seek judicial resolution of whether NPS has any authority under the WSRA in this case and whether its position as to TOY restrictions on dredging is supported by substantial evidence in the record.

      I will call you in a few days to see if we can schedule a meeting.

      Sincerely,

      Bruce F. Kiely
      Attorney for
      Weaver's Cove Energy, LLC

cc:    Bob McIntosh
      Marvin Moriarty, FWS
      Mike Thabault, FWS
      Ted Gehrig, Weaver's Cove Energy, LLC